IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

```
                                 *
United States of America         *
                                 *  No. 2018 CR-24
            vs.                  *
                                 *  Suppression Hearing
John T. Terry,                   *
            Defendant            *
                                 *
```

(TRANSCRIPT)

Pages 1 through 158                319 Washington Street
                                   Courtroom A
                                   Penn Traffic Building
                                   Johnstown, Pennsylvania

                                   Monday, February 25, 2019


BEFORE:        Kim R. Gibson, Presiding Judge

APPEARANCES:

               ARNOLD BERNARD, JR., Esquire
               Special Assistant United States Attorney
               319 Washington Street
               Room 224, Penn Traffic Building
               Johnstown, Pennsylvania, 15901
                   (For the United States)

               STEPHANIE L. HAINES, Esquire
               Assistant United States Attorney
               319 Washington Street
               Room 224, Penn Traffic Building
               Johnstown, Pennsylvania, 15901
                   (For the United States)

               SANDRA THOMPSON, Esquire
               Law Office of Sandra Thompson, LLC
               351 E. Princess Street
               York, Pennsylvania, 17403
                   (For the Defendant)

I N D E X

|  | Page |
|---|---|
| DISCUSSION AMONG PARTIES | 3 - 4 |
| WITNESS:  Ryan Marmol | |
| DIRECT EXAMINATION | |
| By Attorney Bernard | 4 - 70 |
| CROSS EXAMINATION | |
| By Attorney Thompson | 71 - 152 |
| DISCUSSION AMONG PARTIES | 152 - 157 |
| CERTIFICATE | 158 |

E X H I B I T S

| NUMBER | DESCRIPTION | PAGE IDENTIFIED | PAGE RECEIVED |
|---|---|---|---|
| Gov. 1 | (DVD) | 19 | 21 |
| Gov. 2 | (Miranda Card | 49 | 64 |
| Gov. 3 | (Complaint) | 57 | 64 |
| Gov. 4 | (Incident Report) | 68 | 70 |
| Def. 1 | (Transcript) | 148 | 152 |
| Def. 2 | (Property Record) | 144 | 152 |

P R O C E E D I N G S

------------------------------------------------------------

JUDGE GIBSON: Good morning. Please, be seated. This is the time and place set for the suppression hearing in the United States v. John T. Terry, 18 Criminal 24. And would Counsel enter their appearance, please?

ATTORNEY BERNARD: Your Honor, on behalf of the Government, Arnold Bernard. Here with me at counsel table is Assistant United States Attorney Stephanie Haines.

ATTORNEY THOMPSON: Your Honor, on behalf of Defendant, John Terry, Sandra Thompson.

JUDGE GIBSON: Welcome to all of you and to the others present this morning. I understand we're going to be watching --- I'll turn the lights off so we can see the video. This is what I have scheduled today, and I don't know how long it will take, but the only other thing I have scheduled is at one o'clock. I have a status conference in a case, which should take less than 15 minutes. So if we go into the afternoon, I don't know if we will or not, but if we do we have set aside the time. I read both parties' briefs. They were both well done. They set things out very understandably and very thoroughly, and I am looking

forward to today's proceeding. When suppression hearings are well-briefed, I find them very interesting and I look forward to them. So feel free to take the time you need today. Attorney Bernard, since the Government has the burden of proof today, you may proceed.

ATTORNEY BERNARD: Thank you, Your Honor. At this time, the Government calls Pennsylvania State Police Trooper Ryan Marmol.

JUDGE GIBSON: If you'd come forward to be sworn.

Whereupon,

RYAN MARMOL,

having been first duly sworn, testified as follows:

JUDGE GIBSON: Please, have a seat.

DIRECT EXAMINATION

BY ATTORNEY BERNARD:

Q.    Good morning, Trooper Marmol. Would you please tell the Court by whom you are employed?

A.    The Pennsylvania State Police.

Q.    And for how long have you worked for the Pennsylvania State Police?

A.    A little over six years.

Q.    Now, prior to becoming a state police trooper, were you required to graduate from the Pennsylvania

State Police Academy?

A.    Yes.

Q.    What year did you graduate from the State Police Academy?

A.    2013.

Q.    And while you were at the academy, did you receive any training regarding sections of Title 75 of the Pennsylvania Statutes, which is commonly referred to as the Motor Vehicle Code?

A.    Yes.

Q.    And specifically, are you familiar with the section titled roadways laned for traffic; that would be § 3309?

A.    Yes.

Q.    And are you familiar with § 3310, which is entitled following too closely?

A.    Yes.

Q.    Are you familiar with the section entitled general lighting requirements?

A.    I'm familiar, yes.

Q.    Now, over the course of the six-plus year career that you've had, have you conducted traffic stops based on these sections of the Motor Vehicle Code?

A.    Yes.

Q.    Specifically following too closely?

A.    I have conducted traffic stops for that, yes.

Q.    Unsafe lane change?

A.    Yes.

Q.    And general lighting requirements?

A.    Yes.

Q.    Now, once you graduated the academy, were you assigned to any particular unit?

A.    I was assigned to a patrol unit in Erie.

Q.    And how long did you serve as a patrol officer?

A.    Approximately, two-and-a-half years, three years.

Q.    Following your time as a patrol officer, were you then transferred to a different unit?

A.    I was.

Q.    What unit is that?

A.    The SHIELD unit.

Q.    Is that the unit you currently work for?

A.    Correct.

Q.    Can you tell the Court what the SHIELD unit is exactly?

A.    Yes, the SHIELD unit stands for Safe Highway Initiative through Effective Law Enforcement Detection.

Q.    Now, to become a member of that particular unit, did you have to undergo any type of specialized training?

A.    Yes.

Q.    Approximately, when did you undergo that training?

A.    I believe it was in 2014.

Q.    Do you recall the length of that training you received?

A.    It was approximately 40 hours.

Q.    Did that include training on conducting traffic stops?

A.    It included training on conducting traffic stops, correct, and deceptive behavior, hidden compartments, commercial motor vehicles, things of that nature.

Q.    So with respect to deceptive behavior training, approximately how much training have you received in that particular skill set?

A.    I would say approximately 50 hours.

Q.    What about identifying hidden compartments in vehicles; how much training have you had in that?

A.    I can't give an approximate number at this time, but I have had some training in regards to that and also personal experience with the seizures of my own and in addition to other officers that I have assisted in locating hidden compartments.

Q.    So over the course of your career, have you come

across vehicles that contain hidden compartments?

A.    Yes.

Q.    Approximately, how many?

A.    Personally that I have come across that were my traffic stops, approximately 13.

Q.    And you specified that were your traffic stops. Have you found hidden compartments when you're backing up other officers at other times?

A.    I have, yes.

Q.    Now, aside from the training that you received, do you participate as an instructor or teach any trainings to other officers?

A.    Yes.

Q.    And what trainings do you instruct?

A.    It's at our SHIELD training for the department. We put the course on two times a year for --- the troopers are afforded the opportunity to come to this training, and also sometimes we have local or municipal officers that attend.

Q.    And are those trainings, are you instructing them in those areas that we just discussed with respect to traffic stops, hidden compartments, deceptive behaviors; are those topics covered in the trainings that you're teaching?

A.    I don't teach those topics specifically, but

those topics are covered, yes.

Q.    What's your particular topic that you teach?

A.    Networking and furthering investigations.

Q.    What do you mean by that?

A.    Essentially networking with other officers and other states and in furthering investigations. In my particular field if, for say for an example, if we have a traffic stop and there is a large sum of narcotics that are seized, attempt to get the occupants of the vehicle or occupant to cooperate and to potentially conduct a controlled delivery.

Q.    So that would be expanding the operation beyond the traffic stop and the arrest there on the highway; is that correct?

A.    I'm sorry, could you repeat that?

Q.    Sure. So what you mean is you would teach skills involved in expanding an operation beyond the arrest that occurs on a highway?

A.    Just kind of how to navigate the furthering of the investigation.

Q.    Now, over the course of your six-year career, have you conducted many traffic stops?

A.    Yes.

Q.    Can you put a number on it at all?

A.    I can give an approximate, and again, this is an

approximation, but thousands of traffic stops.

Q.     Do you know about how many you may have conducted in the last year alone?

A.     Again, it's an approximate but I would say approximately 500.

Q.     And of those 500, have any of them led to a search of a vehicle?

A.     Yes.

Q.     Do you have any idea how many vehicle searches you might've conducted over the last year?

A.     Again, this is an approximation, but I would say 30 to 40 vehicles that I had searched.

Q.     Having searched 30 or 40 over the past year, can you estimate how many vehicles you may have searched over the course of your six-year career?

A.     Hundreds of vehicles.  And again, that's an approximation, but I searched hundreds of vehicles.

Q.     Would that include vehicles that were your stops specifically as well as others where you arrived on scene as backup?

A.     That's correct.

Q.     Now, is there a method to the way in which you're trained to search a vehicle?

A.     Yes.  We train and we try to do systematic searches.  When I say that, we start and finish in a

certain area. That way we don't potentially miss something, but that can, you know, differ with the incident.

Q. So generally, what are the areas of the vehicle that you're going to look at if you're conducting a vehicle search?

A. Going to conduct as thorough of a search as I can starting with the --- depending on what side of the vehicle I search on, whether it be on the passenger side or the driver's side, I am looking at the dash area, the exhaust tunnel underneath the center console, the void that's right where --- excuse me, the radio and all like the toggles are for the air conditioning and so forth. The seats, we're checking underneath the rear of the backseat, the trunk, the headliner, the rear deck, which is where the third brake light typically is for vehicles, the doors, engine compartment. We're conducting very thorough searches.

Q. Are these searches conducted only visually meaning only using your eyesight or are there other senses that you're using when you're conducting these searches?

A. Using our --- we're conducting a hand search and sometimes I have an upholstery tool that I use. And basically what, you know, that tool is to pop certain

panels off of the vehicle. And we do this because the last thing we want to do is damage a vehicle and so we're trying to do a thorough search but at the same time we're not trying to, you know, harm anything in the vehicle.

Q.    Is there anything that you're looking for in particular when you're conducting a vehicle search?

A.    Yes, we're looking for any sort of contraband. We're looking for any tooling on certain panels, screws that have been tooled with. We're looking for air fresheners that are what we believe to be methodically placed. We're looking for glued carpet, indications of aftermarket hidden compartments, Bondo, black-over spray that is used to camouflage compartments sometimes. Those are some of the things that we're looking for.

Q.    Based on your training and experience when you encounter what you believe to be an aftermarket hidden compartment, what conclusion are you led to reach based on finding the compartment itself?

A.    I'm sorry, could you rephrase that?

Q.    Sure. If you're searching a motor vehicle and you encounter what you believe to be a hidden compartment, what do you suspect is going on?

A.    I would suspect that there's trafficking, drug

trafficking going on because those compartments in my experience are used for one purpose and one purpose only, and that purpose is to conceal contraband whether that be guns, money, drugs, and things of that nature. In my experience, that's what it's used for.

Q. I think you mentioned you had found approximately 13 compartments in vehicles?

A. That's correct.

Q. Of those 13, do you have any idea, if you know, how many of those contained an item of contraband, whether that's drugs or guns?

A. It's an approximation, but I would say that 10 of those compartments, 9 or 10 of those compartments contained contraband.

Q. So let's talk about this case in particular. Were you working in your capacity as a SHIELD officer on April 4th, 2018 at approximately 2:30 in the afternoon?

A. Yes.

Q. Were you working on patrol at that time?

A. Yes.

Q. Where approximately were you patrolling; what area?

A. The Pennsylvania Turnpike, specifically the Somerset County. That day I had started my SHIELD

duties in New Stanton, Pennsylvania, which is approximately mile marker 75, and then I worked my way up to the Allegheny Tunnels.

Q. So that would be approximately how far in miles away?

A. Fifty (50) miles approximately.

Q. What time did you start that day?

A. Roughly 0800 hours.

Q. And what time were you scheduled to finish your shift?

A. That day it was 1600 hours, which is 4:00.

Q. So at approximately 2:30 you're in the Somerset area?

A. Correct.

Q. Earlier in that day, had you conducted any traffic stops on any vehicles?

A. I did.

Q. Did you conduct any vehicle searches?

A. I can't remember.

Q. What kind of vehicle were you traveling in?

A. I was driving a Ford Explorer, which is a marked Pennsylvania State Police Patrol Unit.

Q. Did it have lights and sirens?

A. Correct.

Q. It had the Pennsylvania State Police insignia on

it somewhere?

A.    It did.

Q.    All right.  Did you have a partner in the car with you, or were you by yourself?

A.    No, I was by myself.

Q.    And are you a K-9 officer; do you have a dog with you while you're patrolling?

A.    No.

Q.    Now, the vehicle that you're driving in, generally is there any type of recording equipment inside that vehicle?

A.    Yes.  It's equipped with a dash camera and a microphone, audio microphone.

Q.    There's a microphone in the car?

A.    It's a lapel microphone, correct.

Q.    Okay.  So you're wearing it on your person?

A.    Yes.

Q.    Okay.  And do you wear a body camera?

A.    No.

Q.    Is there a camera in the car somewhere?

A.    Yes.

Q.    Where is that camera located?

A.    It's attached to the windshield of the vehicle, so it is facing out towards the front of my vehicle.

Q.    Are there any cameras that would capture the

inside of your vehicle?

A.    There is one.  It's in the --- well, now I have turned it so it covers the front passenger seat, but I believe at that time it was facing the rear second row seating area of my vehicle.

Q.    And I think you mentioned before but just to clarify, there was no other person inside the vehicle with you on that day?

A.    Correct.

Q.    Can you describe the stretch of highway that you were patrolling there near the Somerset exit?

A.    Yes, it's the Pennsylvania Turnpike.  It's a four-lane highway, two lanes traveling eastbound and two lanes traveling westbound.

Q.    What's the highway number?

A.    Interstate 76.

Q.    And do you know generally across the state how far that particular road stretches?  Maybe not necessarily in miles but in terms of geographic locations.

A.    It stretches --- it travels from east to west, and it's more than 300 miles long; I know that.

Q.    Do you know what county you would've been in when you were patrolling at that time?

A.    Somerset County.

Q.    Do you know what the speed limit is on that stretch of highway in that area?

A.    Seventy (70) miles per hour.

Q.    Now, we're talking about April 4th at 2:30 in the afternoon.  Can you describe what the weather conditions were like that day?

A.    It was cold, windy.  There was some snow flurries, I believe.

Q.    And around that time in the afternoon, did you happen to conduct a traffic stop on any vehicles?

A.    Yes.

Q.    What make and model of the vehicle did you conduct a traffic stop?

A.    It was a Ford Taurus.

Q.    What color was it?

A.    Red.

Q.    And at the time that you conducted that traffic stop, were you stationary, or were you traveling on the turnpike?

A.    I was traveling.

Q.    And which lane were you in?

A.    I was in the left lane.

Q.    And what direction were you headed?

A.    West.

Q.    Where were you headed to at that point?

A.    I was actually headed home.

Q.    So at that point, you conducted a traffic stop on a Ford Taurus.  Did you notice anything about the Ford Taurus itself that you believe constituted a violation of the Motor Vehicle Code?

A.    The tinted taillight covers.

Q.    So as you're traveling westbound in the left lane, are there any cars between you and this Ford Taurus that you see?

A.    No.

Q.    And while you're behind that Ford Taurus is your camera inside your vehicle recording?

A.    Yes.

Q.    Was your microphone turned on at that point?

A.    No.

Q.    When does your microphone become activated if you're conducting a traffic stop?

A.    As soon as I activate the emergency lights and also it's a manual microphone so I can turn it on and off.  Sometimes the microphone is off and before I exit the vehicle I ensure that the microphone is on.

Q.    Now, you mentioned the video camera was working. Do you know whether or not that camera captured that traffic stop and any interaction you may have had with the occupants of the vehicle on that date?

A.    It captured the traffic stop, the majority of my encounter with Gerald Terry and John Terry.

Q.    Would that encounter have been captured on your body microphone at that time as well?

A.    A majority of it.

Q.    And do you know following that traffic stop whether that video and that audio was transferred to a DVD?

A.    It was.

Q.    I'm going to show you on the screen I'm going to direct your attention there.  Let me show you this. I'm going to show you what I've previously marked as Government's Exhibit 1.

                    *   *   *

    (Whereupon, the item was marked as Government's Exhibit No. 1 for purposes of identification.)

                    *   *   *

BY ATTORNEY BERNARD:

Q.    I'm going to ask you to take a look at that for me, sir, and if you can describe what it is that I placed in front of you?

A.    It's a Maxell DVD-R disk.  It has the incident number PA18-358259 on the disk.  It's written in black marker, and then the name John Terry is written on it as well.

Q.    Do you know whether that incident number would correspond with the incident number of the traffic stop you conducted that day?

A.    Can I refer to my report to ---?

Q.    Yes.  I can show you your report.  Would that refresh your recollection as to whether that matches?

A.    Yes, I'm not quite sure.  I don't remember the incident number off the top of my head.

Q.    Sure.  Take a look at that and let me know if that refreshes your recollection?

A.    Yes, that is the incident number respective to this incident.

Q.    Thank you.  So now I'm going to direct your attention to the screen that you have next to you there.  Turning to that screen, do you see an image appearing there?

A.    Yes.

Q.    Can you describe what you see there?

A.    Yes, I am at this point stopped because the video is stopped, but I am traveling westbound on the Pennsylvania Turnpike.

Q.    So does this appear to be a copy of that video that would've been recorded on April 4th?

A.    Yes.

Q.    All right.  I'm going to just jump ahead here

real quick to the end.  Do you know approximately how long that video would've been?

A.    According to the video, it's approximately 1:31:00.

Q.    And does that comport with your recollection of the duration of the traffic stop and the encounter that you had with the Terrys on that date?

A.    Yes.

Q.    And so does that video that you see before you is that a fair and accurate depiction of the video that was taken from the dashboard camera on April 4th, 2018?

A.    Yes, with limitations.  I say limitations because it doesn't capture things that are on, you know, the sides of the vehicle, but it's fairly accurate, yes.

ATTORNEY BERNARD:  Your Honor, at this point, I'd move for the admission of Government's Exhibit 1 being the disk of the traffic stop.

ATTORNEY THOMPSON:  No objection.

JUDGE GIBSON:  The exhibit is admitted without objection.

                          *    *    *

     (Whereupon, the item marked as Government's Exhibit No. 1 was received in evidence.)

                          *    *    *

JUDGE GIBSON: Are you now going to play the entire exhibit?

ATTORNEY BERNARD: Judge, yes. I'm going to sort of skip to certain parts that I have marked in my notes here as the video is an hour-and-a-half long. Not all of it from my perspective is of evidentiary value. Of course, Attorney Thompson may wish to show other portions of it and the video is admitted in its entirety for the Court's consideration.

JUDGE GIBSON: So this 1:31:00 is that the length of the encounter that day?

ATTORNEY BERNARD: Yes. Yes, that's from what you'll see the traffic stop initiate until the time when there's a discovery of some items inside the vehicle and it concludes after that.

ATTORNEY THOMPSON: If I may, just one caveat, Your Honor, not of the day in its entirety but just on the road. It's the showing of what was happening on the road.

ATTORNEY BERNARD: Correct.

ATTORNEY THOMPSON: And not the rest of the day.

ATTORNEY BERNARD: Right, just from the time that Trooper Marmol pulls the vehicle over until the time he finds certain items within the vehicle.

JUDGE GIBSON: Okay. So the encounter that continued thereafter, we have no video of that?

ATTORNEY BERNARD: That's correct. And as soon as the actors leave the scene of the traffic stop, there is no further video.

JUDGE GIBSON: All right. And how do you propose to do this; are you just going to play it through?

ATTORNEY BERNARD: I have certain times marked in my notes that I believe are pertinent to the Court's consideration of the issues. I'll sort of play it, stop it, ask a few questions, and then move to the next portion.

JUDGE GIBSON: That was my inquiry whether you were going to play it and then ask questions and then continue again.

ATTORNEY BERNARD: Yes, I think it's best to sort of break it up because that would be a lot of video followed by a lot of questions without something to tether them to.

JUDGE GIBSON: All right. Then you may proceed.

ATTORNEY BERNARD: Thank you, Your Honor.

(VIDEO PLAYED)

BY ATTORNEY BERNARD:

Q.    So Trooper Marmol, as I play this video, can you describe here what we're seeing transpire?

A.    Yes, I'm traveling westbound in the left-hand lane, and I'm not sure of my exact speed at this time. But I'm approaching a red Ford Taurus.  At this point, you know --- I'm not sure exactly at what point I could see the tinted taillights, but I could see the tinted taillights.  And then just here in a few short seconds, there's an abrupt lane change and now the vehicle, the red Ford Taurus is following another sedan too close at which at that point I deemed was an unsafe lane change.

Q.    Okay.  For purposes of the record, and I'm doing this through Windows Media Player which shows the time of the video down at the bottom, I've stopped the video at 47 seconds into the video.  So I have a few questions for you based on what we just saw there. Approximately, how far in terms of distance would you estimate you followed that Ford Taurus before you observed that lane change?

A.    Approximately, four-tenths of a mile.

Q.    And upon witnessing that lane change, what did you do at that point?

A.    A few seconds after that, I maneuvered my patrol vehicle into the right-hand lane directly behind the

red Ford Taurus and activated my lights and sirens --- or activated my lights.  I'm not sure if it was sirens.

Q.    So what was your basis for activating your lights and sirens at that point and conducting a traffic stop?

A.    For the tinted taillights, the unsafe lane change, following too closely.

Q.    With respect to following too closely, is there a particular standard that governs how far one vehicle should follow another?

A.    Yes, according to the Pennsylvania Driver's Manual from what I understand is a four-second following distance.

Q.    And again, the speed limit on this particular stretch of highway is what?

A.    Seventy (70) miles per hour.

Q.    All right.

A.    And the easiest way for the four-second following distance to kind of give the Court a visual on a four-second following distance, the easiest way to do that is to pick a fixed point.  So the easiest way to do it is if the silver vehicle that's in front of the red vehicle once it passes a fixed point you would count four seconds.  And in this case, you can see that --- you can kind of estimate where the silver vehicle

is in relation to there's a white post on the side of the roadway and once you play the video you'll see how quickly the red vehicle passes that white post.

Q.    And based on your training and experience, would the gap between those vehicles have been less than the four seconds as recommended by the Pennsylvania Driver's Manual?

A.    I would estimate it to be, yeah.

Q.    All right.  So I'm going to play the video a little bit further here, and then I'll ask you some questions.

(VIDEO PLAYED)

BY ATTORNEY BERNARD:

Q.    So I paused the video again at 1:25 in.  Prior to that, Trooper Marmol, we could hear on the audio some rustling, perhaps some striking of keys.  Can you describe to us what you did upon first pulling over that Ford Taurus?

A.    Yes, I entered the traffic stop into our computer-automated dispatch system.

Q.    So what does that mean when you enter it into the computer-automated dispatch system?

A.    So whenever you enter a traffic stop into our computer-automated dispatch system, you put in the plate, the registration plate numbers, letters and so

forth, the corresponding state, and then you submit that. And it ultimately, you know, conducts a --- it automatically conducts a registration query.

Q. And does that return information to you that you possess prior to exiting the vehicle?

A. Yeah. Yes, depending on if you look at it or not.

Q. In this particular case, did you look at that registration information before you left your car?

A. I believe I did.

Q. Okay. I'm going to continue to play the video here, and then we'll have some more questions.

(VIDEO PLAYED)

THE WITNESS: So at this point right here, I asked for the driver's license of --- requested a driver's license from the operator at which time, you know, he was --- I can't remember exactly what he was doing, but he's searching for his driver's license.

BY ATTORNEY BERNARD:

Q. Okay. I saw on the video that you approached, and for record purposes this is at 1:38 into the video that we've stopped it now. You approached on the passenger side as opposed to the driver's side of the vehicle; is there a reason for that?

A. Yes, it's just a --- it's a safer approach for

everybody involved essentially. I can keep my eye on the occupants of the vehicle, but also I can watch traffic that's coming in behind us. So in an instance where somebody is driving unsafely, I can at least give the occupants of the vehicle a heads up, or you know, if I have enough time maybe perhaps extract them from the vehicle. But that's why I conduct the passenger-side approach.

Q. Okay. I'm going to continue the video here for about a minute-and-a-half, and then I'll pause it and ask you some more questions; all right?

A. Okay.

(VIDEO PLAYED)

BY ATTORNEY BERNARD:

Q. Okay. I paused the video at 3:03 in. Now, it's kind of difficult to hear the transaction that occurred or the interaction that occurred. Can you describe the conversation that you had with the occupants of that vehicle?

A. Yes. So basically I requested the driver's license from the operator at which point he provided me his driver's license. And when he provided me his driver's license, I didn't immediately retrieve it. And at this time, I observed his hand to be visibly shaking, which I noted to be nervous behavior. From

that point, I asked if the vehicle was his and he related that it was his friends. And then I asked if it was a girl or something like that, and he said that it was his friend's wife. Now, in my training and experience, it was my understanding that it was a third-party vehicle. And I know that third-party vehicles are utilized to smuggle narcotics. And the reason third-party vehicles are used is because the occupants of the vehicle can distance themselves from the contraband that's located within. And that in and of itself is an innocent factor. But when you take the totality of the circumstances combined, that raises my suspicion.

Q. Okay. Before we get into some of the other observations that you made, who was the driver of the vehicle as identified by the information they provided?

A. The driver of the vehicle was Gerald Terry, who was identified via a Pennsylvania driver's license.

Q. And who was the passenger of the vehicle?

A. The passenger was John Terry, and he was eventually identified via a Pennsylvania identification card.

Q. Is Mr. Terry, John Terry, in the courtroom here today?

A. Yes.

Q.    And can you identify him for the record?

A.    Yes, he's sitting right next to Defense Counsel.

Q.    And that would be John Terry?

A.    John Terry, correct.

Q.    So you described Gerald Terry's demeanor during that interaction.  How would you describe John Terry's demeanor?

A.    John was just looking straight ahead.  I noticed that he didn't have his shoes or his socks, I can't remember which one, but I made note of it in the video, and it just struck me as odd but ---.

Q.    But was it anything that would lead you to suspect criminal activity based on the fact that he didn't have shoes on?

A.    His --- whenever --- during my interaction with him, I noted that his carotid artery was pulsating, which again, I noted to be nervous behavior but in and of itself is innocent but in the totality of the circumstances it raises my suspicion.

Q.    I believe we heard on the video you asked where they were headed; is that right?

A.    Yes.

Q.    Did they give you a response as to where they were going and the purpose of their travel?

A.    Yes, they were traveling to Pittsburgh,

Pennsylvania. And Gerald indicated that he was speaking at an NA meeting in Pittsburgh, and that they would be there for a short amount of time, a few hours, and then travel back to Philadelphia, Pennsylvania.

Q. So is there anything in particular with regards to where they're coming from and the destination they were going to that led you to believe that criminal activity may be occurring?

A. Yes. In my training and experience, Philadelphia, Pennsylvania is a known source area for the distribution of narcotics. It, again, in and of itself is innocent but in the totality of the circumstances, you know, it raises my suspicion. And in Pittsburgh, Pennsylvania it notably is a consumption area but also a local distribution area for the distribution of narcotics. And in my experience, what I have learned is that Philadelphia actually supplies Pittsburgh with narcotics.

Q. So given the stated itinerary as far as where they're coming from, where they're going to, did you find anything suspect about the purpose of their travel?

A. When I took all of my observations and all my observations and my interactions with the occupants of the vehicle, I believed that there was criminal

activity afoot.

Q. What did you make of this idea that they were headed from Philadelphia to Pittsburgh and then immediately turning around and going back to Philadelphia?

A. Well, I felt it --- I felt it was a very quick trip, which in my experience the quick trips are made to evade law enforcement, and so they can get from point A to point B and back to point A as quickly as possible to evade law enforcement. And also, the trip seemed implausible to me. The trip seemed implausible to me because they were traveling --- yeah, they were traveling to Pittsburgh, Pennsylvania four-and-a-half hours away to conduct an NA meeting or speak at an NA meeting for that matter and then they were turning around and traveling directly back. And I felt that, you know, in the Philadelphia area as in Pittsburgh I'm sure, I don't know for sure, but that there would be a lot of NA meetings in those areas.

Q. So we paused the video here at the point when you just returned to your vehicle. Once you got back to your car, do you recall what you did at that point in time?

A. Yes, I conducted a criminal history check utilizing Gerald Terry's information and immediately a

return came, which indicated that he has been arrested before.

Q.    At that point in time, did you have any information about the identity of the vehicle's registered owner?

A.    It was available.

Q.    So did you have an opportunity to see that at that point?

A.    I can't recall if I did or not.

Q.    At some point, did you review that information?

A.    Yes.

Q.    And did it comport with the explanation as to who the vehicle belonged to that was provided to you by Gerald Terry?

A.    Well, he said that it was his friend's wife's car, but the car was registered to a male --- or a female, excuse me.  Hold on, I'm sorry.  The vehicle was registered to a male, but Gerald Terry said that the vehicle was registered to his friend's wife. Excuse me, I apologize for that.

Q.    So based on all of these findings that heightened your suspicion at this point, once you got back in the car and received that criminal records return, what did you do at that point?

A.    I immediately contacted Troop T Highspire

dispatch and requested an additional unit for a vehicle search.

Q. I'm now going to let the video play for about three minutes here, and then we'll follow up with some questions at that point.

(VIDEO PLAYED)

ATTORNEY BERNARD: Judge, I'm pausing it here for a second because I think we're missing some audio.

(VIDEO PLAYED)

BY ATTORNEY BERNARD:

Q. So what we heard there, and I paused the video at 4:12, I believe you requested a backup for a vehicle search?

A. Yes.

Q. At that point in time, did you know for a fact you were going to search that vehicle?

A. I didn't. I knew I wanted to search the vehicle. I believe that there was criminal activity afoot, and I wanted to search the vehicle.

Q. I'm going to jump ahead here to 5:40 --- well, 5:32. 4:42.

(VIDEO PLAYED)

BY ATTORNEY BERNARD:

Q. I'm going to pause the video here at 6:20. We

heard you a few seconds ago on the video talking. Are you relaying the information to anyone in particular at that point?

A. No, I was just talking to myself, just talking into the microphone.

Q. Is there a reason why you do that?

A. Just to kind of help paint a picture I guess you can say just to try to help myself, you know.

Q. So that's a way of documenting what you had just seen?

A. Some of the things I had seen, yeah.

Q. Now, we heard some I think sort of clicking sounds and some beeping. Were you conducting any other type of record searches at that point?

A. Yes, there was some things. I was conducting queries, some criminal history queries, driver's license queries, registration queries, just the business of the traffic stop.

Q. I'm going to jump ahead here to approximately 14 minutes into the video and play it, and then follow up with some questions.

(VIDEO PLAYED)

BY ATTORNEY BERNARD:

Q. I paused the video at 14:50. We heard you reading I think some information of an individual. Do

you know whose information that was that you were reciting?

A.    Yes, if I remember correctly, I believe it was the information for the registered owner, Kelly Royster.

Q.    And how were you able to access that information?

A.    By running a criminal history query utilizing name and date of birth.

Q.    And that was based off of information that you had received from the driver of the vehicle?

A.    Yes, if I remember correctly --- wait, excuse me, scratch that.  Can you rephrase your question?

Q.    Sure.  Was the name and date of birth associated with Kelly Royster provided to you by the driver, or how did you get that?

A.    No, it was attached to the registration query. So whenever a registration query returns, sometimes it just --- I've seen it go both ways, but sometimes the driver's license number is attached in a hyperlink. Sometimes it just comes back completely because there's no other people with the same names or anything like that.  And then sometimes it doesn't come back.  And in this case, it did come back.

Q.    And what type of offenses did that show you?

A.    Can you clarify?

Q.    Sure.  The criminal history that you ran for the registered owner, what type of offenses were associated with that individual?

A.    Drug offenses and firearm violations.  That's all I can remember.

Q.    Did that in any way heighten or lessen your suspicion of the occupants of the vehicle?

A.    It bolstered my reasonable suspicion.

Q.    I'm going to jump ahead here to 18:30 into the video.  I actually started at 18:16.

(VIDEO PLAYED)

BY ATTORNEY BERNARD:

Q.    I'm pausing it at 19:36.  Just one quick question.  We heard you engage in a dialogue with someone.  Can you identify who that was that you were speaking to?

A.    Yes, that was Trooper Nicholas Petrosky.  At that time, he was assigned to Troop T Somerset Barracks.

Q.    Was that the backup officer that we heard you request earlier?

A.    That's correct.

Q.    Did you know him prior to this encounter?

A.    I knew of him.  I think he may have assisted

with one of our stops before, but that's about it, the extent of it.

Q. And do you know whether he had a canine in his vehicle?

A. He did not.

Q. I'm going to continue playing the video here from 19:36 on.

(VIDEO PLAYED)

BY ATTORNEY BERNARD:

Q. I'm pausing the video at 21:40 in. Trooper Marmol, I believe that during the course of that interaction there, it was kind of difficult to hear, did you ask Gerald Terry whether or not you could search the vehicle?

A. I asked can I search the vehicle.

Q. And what response were you given?

A. Yeah, yeah.

Q. Prior to that, did you ask if there was anything in the vehicle that you should be aware of?

A. I asked if there was anything illegal in the vehicle, yes.

Q. And what response was given to you?

A. If I remember correctly, no.

Q. Now, during that interaction John Terry was approximately how far away from where you were speaking

with Gerald?

A. Several feet.

Q. Would he have been able to hear what you were saying from that distance?

ATTORNEY THOMPSON: Objection, speculation.

JUDGE GIBSON: Sustained.

THE WITNESS: I'm not sure ---.

JUDGE GIBSON: Trooper, I sustained the objection, so you don't need to answer that question.

THE WITNESS: Sorry, my apologies.

JUDGE GIBSON: You can rephrase if you wish to.

ATTORNEY BERNARD: Okay. That's all right.

BY ATTORNEY BERNARD:

Q. Do you ask then --- well, we heard you ask then whether you were permitted to pat down Gerald Terry; is that right?

A. Yes.

Q. Okay. Would you have patted him down regardless of whether or not he would've consented to that?

A. I can't answer that. That's why I ask if I can pat somebody down. If I would've felt that, you know, I saw a bulge or they were taking some aggressive

action, then yes, but that's why I always ask.

Q.     Is there a reason why you asked Gerald Terry for consent to search the vehicle as opposed to John Terry?

A.     Because he was operating the vehicle and in care, custody, and control of the vehicle.

Q.     At any point during your interaction with John and Gerald on the roadside, did John Terry give any indication that he was, in fact, the privilege holder capable of consenting or denying a search?

A.     Not that I remember.

Q.     At any point, did he interject in your conversations with Gerald Terry to make that known to you that he may have been responsible for the vehicle?

A.     Not at that time.

Q.     Did Gerald Terry limit the scope of the search of the vehicle in any way?

A.     No.

Q.     What would you have done if at that point Gerald Terry had denied consent to search the vehicle?

A.     Well, I believe it would've been my obligation to attempt to contact a K-9.  If a K-9 wasn't available and able to respond in a timely and reasonable manner, then I would've terminated the traffic stop and released Gerald and John Terry from the traffic stop.

Q.     Now, when you're given consent to search a

vehicle, what do you understand the area of that vehicle that the person is consenting search to?

A.    Unless there's limitations on, that the occupants of the vehicle put limitations on the scope of the search, then we search the vehicle in its entirety, you know, whether that be pulling certain panels off or what, but we search the vehicle in its entirety.

Q.    Now, at this point in time during this interaction with Gerald Terry, are he and John under arrest at that point?

A.    They are not under arrest.

Q.    Was your traffic enforcement action completed?

A.    No, because I had issued Gerald Terry a verbal warning.  However, I did not return his documents, so my answer to that question would be no.

Q.    Now, when you're searching a vehicle, do you always begin searching the same area every time?

A.    It's difficult to say.  I try to do a systematic search.  I always try to start and finish --- I always try to finish on the same side that I started.  That way I do a full and complete thorough search.  So I have a thought I guess that I completed a thorough search and didn't forget anything.

Q.    In this particular case after you're given

consent to search, do you recall the order of the areas of the car that you searched?

A.    If I remember correctly, I started on the passenger side of the vehicle and then went over to the driver's side.  And then I worked counterclockwise from the driver's side to the passenger side of the vehicle.

Q.    So during the course of the search --- well, let me ask you this question.

Would your search be captured on the dash cam video?

A.    Yes.

Q.    And that would show what areas of the car you're accessing and at different points?

A.    The camera would show the general areas that I'm in, not specifically what I'm checking, but the general area.

Q.    During the course of your search of this vehicle, does Gerald Terry at any point interrupt and tell you that you no longer have consent?

A.    No.

Q.    At any point, did John Terry tell you that he was actually the consent authority holder and that you no longer had consent?

A.    No.  To my recollection, nobody said anything.

Q.    So they never made any contact with you form the

time you began that search?

A.    I don't believe so.

Q.    Now, did you eventually find something as a result of your search that piqued your interest?

A.    Yes, I believe that I had located an aftermarket hidden compartment in the passenger-side dash area.

Q.    Okay.  I'm going to fast-forward the video and play it from 32:40 on for a few minutes.

(VIDEO PLAYED)

BY ATTORNEY BERNARD:

Q.    I paused the video at 35:30.  Trooper Marmol, can you describe what you saw in the passenger glove compartment area of the vehicle?

A.    Yes.  So when you open the glove compartment, on the side typically there's two like kind of plug-looking mechanisms, and they keep the glove box from dropping all the way down.  So in able to drop the glove box down to do a good inspection of the dash, I dropped down the glove compartment the full way down so it was swinging like a pendulum.  From that point, I looked up into the dash and I could see a box that was --- there was like some welds, I believe.  And that was suspicious to me, and you know, I believed that to be an aftermarket hidden compartment.

Q.    What would typically be located in that area of

a vehicle?

A.    I believe the airbag, I believe.

Q.    And this box that you saw in that area, would that be consistent with the airbag mechanisms that you've seen in vehicles in the past?

A.    No.

Q.    Now, after you discovered that hidden compartment, did you consider the further search to be an extension of the consent search at that point?

A.    Once I found the compartment, I believed that my consent search ripened into a probable cause search at that time.

Q.    So after having found that hidden compartment, what would you have done if Gerald Terry had then revoked the consent that he had previously given?

A.    I would've continued with my search because I believed at that point my search had ripened into a probable cause search, because again, as I described before the --- I may have explained this before; I'm not sure.  But those compartments are used for one purpose and one purpose only in my training, knowledge, and experience.  And what that is is to conceal contraband because quite frankly if you're not trained in locating hidden compartments, they can be difficult to find.  And that's why those compartments are

outfitted in these vehicles is so that they can --- organizations can evade the detection of the --- or the finding of the narcotics.

Q. Is there some sort of way that the hidden compartment in this case could be opened or accessed?

A. Yes, I believe I never was able to access the compartment actually in the manner that it's supposed to be operated in. But I believe that this compartment was opened via some sort of cable, and then the cable extended, and then whenever --- to open it, the cable would extend and the access door would come out. And then to close it, the cable would retract.

Q. Okay. Is that consistent with the way you've seen other hidden compartments open and close?

A. I had seen them open like that before, but they also are opened there's manual compartments and there's also compartments that are operated off of pistons or linear actuators.

Q. So in this particular case, what type of compartment would you describe this as?

A. The compartments just depend on the size and then the location. The location, I guess, kind of dictates where or how the compartment is going to open. So it could be a trunk latch or it could be a piston or it could be a cable; it just all depends.

Q.   So were you ultimately able to get that compartment opened in this car?

A.   Yes.

Q.   And how were you able to do so?

A.   I pried it open enough to create some like slack for lack of a better word to open the access door.

Q.   And what did you find inside that compartment?

A.   Inside of the compartment was approximately three kilograms of an unknown-type substance at that time.  There was a firearm Smith & Wesson pistol. There was a vial that contained an unknown-liquid-type substance.  And then there was some circular pills that were found.

Q.   Would you have documented the items that were found in that on any sort of evidence inventory form?

A.   I should have.  I haven't looked at the property inventory, but I should have.

Q.   Okay.  I'm going to jump ahead here to 1:29:55 in the video.

(VIDEO PLAYED)

BY ATTORNEY BERNARD:

Q.   Okay.  Now, what we saw in that video you placed three rectangular objects on the dashboard --- or excuse me, on the hood of your vehicle.  Were those three items located within that hidden compartment?

A.  Yes.

Q.  We also noticed you placed a firearm there at that point as well; was that located in the hidden compartment?

A.  Yes.

Q.  And you sort of disassembled the firearm at that point.  What was the purpose of that?

A.  I was just clearing the firearm, just rendering it safe.

Q.  But all of the components of that firearm, would those have been taken and preserved for evidence collection?

A.  Yes.

Q.  During the course of the vehicle search, you can see at different times, and I may not have played any during the course of our conversation here, but I believe you can see you on your cell phone?

A.  Yes.

Q.  Who are you contacting, and what's the purpose of those calls?

A.  My supervisor.  Actually, if I remember correctly, my supervisor was at a narcotics meeting, and I have to contact my supervisor as soon as practical after I locate contraband that meets the thresholds within our department.

Q.     And during that last video clip, we saw what appeared to be a tow truck arrive on scene.  What was the purpose of that?

A.     To tow the vehicle back to PSP Somerset County barracks.

Q.     Was that prior to your discovery of the contents of the hidden compartment?  Was the tow truck called there prior to you finding the items in the ---?

A.     I'm not sure at what point it was contacted.

Q.     Was there a point at which you were able to see inside the compartment without having access to the contents?

A.     Yes, at one point I was able to pry it open.  I didn't want to completely break the compartment open. I was actually trying to locate the wires to --- so I could jump the supply power to the --- the power to the compartment so I could open it, but I was able to pry the door open, and I was able to see what I believed at that time to be kilogram packages.

Q.     So from the point when you discovered this compartment in the vehicle, how long did it take you to ultimately be able to access it?

A.     It took some time because I wanted to be as gentle for lack of a better word.  I wanted to, again, try to open it without having to pry it open but

essentially that's what I had to resort to.

Q. Now, following the discovery of those three rectangular items that at that time were an unknown substance to you, did you place the Terrys under arrest?

A. Yes, from the best of my recollection at some point after, I can't even remember exactly what point after I had located the contraband, but I went to the vehicle where Gerald Terry and John were positioned and from the best of my recollection I read a Miranda card that I carry with me to the both of them.

Q. Did you advise them that they were under arrest at that point in time?

A. To the best of my recollection I believe I did. As a general practice, I do.

\* \* \*

(Whereupon, the document was marked as Government's Exhibit No. 2 for purposes of identification.)

\* \* \*

BY ATTORNEY BERNARD:

Q. I'm going to show you what's been previously marked as Government's Exhibit 2. Do you recognize that document?

A. Yes.

Q.    Can you tell the Court what that is?

A.    It's a card that displays Miranda warnings that is provided by the Pennsylvania State Police.

Q.    Well, it's not a card itself though; right?

A.    It's an exhibit, yes.

Q.    It's a paper copy, photocopy?

A.    Correct.

Q.    And does that photocopy appear to be a fair and accurate depiction of the Miranda card that you carry with you?

A.    Yes.

Q.    And is that a fair and accurate depiction of the Miranda card that you read from on the date that you arrested John and Gerald Terry?

A.    Yes.

            ATTORNEY BERNARD:  Your Honor, at this point, I move for the admission of Government's Exhibit 2 into evidence.

            ATTORNEY THOMPSON:  Your Honor, I would object to Government's Exhibit 2.  The officer actually testified he did not recall if he read it to them, the card to them.  He just said what he generally does as his practice, but he didn't specifically recall if he read the card to these gentlemen.

            JUDGE GIBSON:  Counsel?

ATTORNEY BERNARD: Maybe I'm misremembering the testimony. I believe he did, but I can ask the question if he did that.

JUDGE GIBSON: Well, before you do that, let me ask the court reporter can you go back to the section where he responded to that question?

* * *

(COURT REPORTER READS BACK RECORD AS REQUESTED)

* * *

JUDGE GIBSON: We'll go back on the record. You heard the question and your response during the time we were off the record. The court reporter read that. Did you hear that?

THE WITNESS: Yes.

JUDGE GIBSON: It appears that you did state that you believed that you did meaning read them the Miranda warnings.

THE WITNESS: Yes, to the best of my recollection, sir.

JUDGE GIBSON: Okay. That would seem to be something that you would recall either having done or not having done.

THE WITNESS: Yes, I documented in my report, sir. Again, it's a general practice.

JUDGE GIBSON: When you say documented

it in your report, what does that mean?

THE WITNESS: I documented in my report that I advised the occupants that they were under arrest and that I advised them --- subsequently advised them of their Miranda warnings.

JUDGE GIBSON: So at the time this occurred, when you put that into a report how soon after this search did you do that?

THE WITNESS: Well, I'm not exactly sure when I started the report.

JUDGE GIBSON: Well, approximately.

THE WITNESS: I submitted the report a month later.

JUDGE GIBSON: Why was it a month later before you formalized this into a report?

THE WITNESS: I'm not sure, sir. We're a unit that our offices are --- my office is 40 minutes from my house, and we work on the highway. And quite frankly, I want to be on the highway as much as possible. I guess that's why it was submitted a month later.

JUDGE GIBSON: So do I understand then that when you did this a month later you weren't certain whether you had done this or not; you were just saying this is what I usually do. The way you

responded to the question, that's what it sounded like.

THE WITNESS: Well, sir, I started the report. I write ---.

JUDGE GIBSON: The question is when you did the report, when you put it to paper about a month later, the way you responded to the question today it sounds as if when you did that report you were just basically saying this is what I usually do; you had no specific recollection at that point in time as to whether you did or did not read the Miranda Warnings to Mr. Terry?

THE WITNESS: Sir, it was to the best of my recollection. I mean it's obviously been a year since then, but ---.

JUDGE GIBSON: I'm talking about at the time you wrote your report.

THE WITNESS: I understand what you're saying, sir.

JUDGE GIBSON: That wasn't a year. That was 30 days later approximately. At that point in time, it sounds as if you were not certain whether or not you did that. You just said this is what I usually do.

ATTORNEY BERNARD: Judge, to be fair, the report doesn't use that conditional language.

JUDGE GIBSON: What does it say? Have the Trooper look at it and tell me what it says?

ATTORNEY BERNARD: Sure.

THE WITNESS: Would you like me to read it out loud?

JUDGE GIBSON: Yes, go ahead.

THE WITNESS: While in Trooper Petrosky's car, G. Terry and J. Terry were advised that they were under arrest. I advised both of their Miranda Warnings at the same time.

JUDGE GIBSON: So at the time you prepared the report it sounds as if you did recall doing it; is that correct?

THE WITNESS: Yes.

JUDGE GIBSON: So when you answered today to the best of your recollection you believe you did it that's based on your recollection today?

THE WITNESS: Yes, sir.

JUDGE GIBSON: All right. Did you review that report before coming into court?

THE WITNESS: I did.

JUDGE GIBSON: And having read that in your report, you still don't have any specific recall of doing it?

THE WITNESS: After reading my report,

it refreshes my memory, but I don't --- as I stand here today, you know, I believe I documented in my report because at the time I wrote the report that was my recollection. Like I said before, it's been some time since that incident, so ---.

JUDGE GIBSON: I understand. I'll permit you to ask some additional questions, Attorney Bernard, and then I'll rule on the objection.

ATTORNEY BERNARD: Thank you, Judge.

BY ATTORNEY BERNARD:

Q. So Trooper Marmol, you said the date of the report was May 4th; is that right, or approximately a month later, which would be May 4th?

A. Can I refer to my report?

Q. Absolutely. I'm showing you again a copy of your report. If you can tell me if that refreshes your recollection as to when that report was dated?

A. Yes, date of report 5/4 of '18.

Q. Does that mean that was the date on which you wrote the report?

A. It's the date the report was completed.

Q. So had you began the report prior to May 4th?

A. I probably started it before then, yes. There are certain things that have to happen to get my video from the traffic stop once it's downloaded from the

database and things of that nature.

ATTORNEY BERNARD: Just a moment, please, Judge.

BY ATTORNEY BERNARD:

Q. Now, is it fair to say that at the time you wrote your report your recollection of the events that unfolded on April 4th would've been fresher in your mind than they are here today?

A. Yes.

Q. Did this case begin in federal court?

A. It did not.

Q. Were charges filed elsewhere prior to the indictment that was issued here in federal court?

A. Yes, there were state charges filed.

Q. And as a result of that in order to file state charges, are you required to author a criminal complaint?

A. Yes, a criminal complaint in conjunction with a probable cause affidavit.

Q. So in that probable cause affidavit, what are you setting forth generally?

A. Setting forth a prima facie case, some facts of the case.

Q. And did you do that in the case against John Terry?

A.    Yes.

Q.    Do you recall when you would have completed that criminal complaint?

A.    It was the evening of the arrest.

Q.    And what's done with that criminal complaint once it's completed?

A.    It is either faxed over to the magistrate's office where they process the paperwork and there's a subsequent arraignment to that, or depending on the situation and the time oftentimes --- it kind of varies by county because I know in Westmoreland County that if it's after a certain time then charges are completed. The defendant is processed and then subsequently dropped off at the jail, and then they're arraigned the following morning.

Q.    So if you completed the criminal complaint on the date of the incident, is it fair to say that your recollection at that time would've been fresher than what it was even at the time you authored your Pennsylvania State Police report?

A.    Yes, it was immediately --- it was the same day as the traffic stop.

                    *   *   *

        (Whereupon, the document was marked as Government's Exhibit No. 3 for purposes of

identification.)

                                \*   \*   \*

BY ATTORNEY BERNARD:

Q.     Trooper Marmol, I'm showing you what's been marked for identification purposes as Government's Exhibit 3; do you recognize that document?

A.     Yes.

Q.     And can you explain what that document is?

A.     Yes, it's an Affidavit of Probable Cause, and there is a synopsis of the incident listed.

Q.     Does that pertain to this incident involving John Terry?

A.     It does.

Q.     Would that have been the case that was filed in Somerset County Court?

A.     Yes.

Q.     And who authored that Affidavit?

A.     I did.

Q.     And does that appear to be a true and correct copy of the Affidavit of Probable Cause that was attached to the criminal complaint you filed in Somerset County against John Terry?

A.     Yes.

                ATTORNEY BERNARD:  Your Honor, at this point in time, I'd move for the admission of

Government's Exhibit 3.

ATTORNEY THOMPSON: Your Honor, I would maintain the same objection. These exhibits as from the officer's testimony is not really refreshing his recollection to support his testimony. And even from May 4th to today to even potentially April 4th, it seems as though when the officer is writing these reports he's going by his general behavior, which is potentially why he doesn't have a specific memory of actually reading Miranda Rights to the Terrys.

ATTORNEY BERNARD: Judge, the Affidavit of Probable Cause was authored the day of the incident, that very evening. Trooper Marmol's memory would've been freshest at that point in time. If he included in that Affidavit, which he's obligated to tell the truth in by penalty of law, then there is a certain degree of credibility that can be afforded to the recollection as it's recorded in that document that's relevant to the Court's consideration here today.

JUDGE GIBSON: Well, are you using this document to refresh his recollection?

ATTORNEY BERNARD: I was going to offer it ---.

JUDGE GIBSON: I don't think you've asked that question yet.

ATTORNEY BERNARD: I have not. I was going to both use it for that purpose as well as to admit as to the content of it.

JUDGE GIBSON: Well, I'll defer ruling on this also until the witness responds or answers the question as to whether or not this has refreshed his recollection today?

BY ATTORNEY BERNARD:

Q. So Trooper Marmol, having looked over --- or take some time and read through that Affidavit; would you please?

A. (WITNESS PERUSES DOCUMENT).

Q. Having reviewed that Affidavit of Probable Cause, does that refresh your recollection as to whether or not you provided the Terrys with their Miranda Warnings at the time of their arrest?

A. Yes, I mean I read both of them their Miranda Warnings at the same time.

Q. Okay. So that does refresh your recollection?

A. Yes.

Q. So did you, in fact, read the Terrys, Gerald and John Terry, their Miranda Warnings at the time of their arrest?

A. Yes.

Q. And is there a way that you would've done that;

do you have them memorized?

A.    No, I read them verbatim from the card that I have that lists the Miranda Warnings on them.

Q.    And is that something you do in every case where you complete an arrest?

A.    Yes.

Q.    And in every case, do you use that card to provide the Miranda Warnings to the suspects?

A.    I can only think of one case where I did not and there was a reason for that because there was ---.

ATTORNEY THOMPSON:  Your Honor, I'm just going to object to the relevance.  I think only what was done in this case is relevant.

JUDGE GIBSON:  I'll sustain the objection.  I think you've covered that issue, and I don't need to hear him telling me about another case where he did not do it.  Counsel for Defendant can certainly follow that up if they wish to.  Have you completed your questioning regarding the refreshing recollection?

ATTORNEY BERNARD:  Yes, Your Honor.  At this point, we move for the admission of Government Exhibits 2 and 3.

JUDGE GIBSON:  I'll hear from Counsel.

ATTORNEY THOMPSON:  Your Honor, I do

maintain the same objections.  All do respect to the Trooper, when he was presented with the first proposed Exhibit 2 and basically said some of the same language and was written on May 4th it still did not refresh his recollection.  It was not until after a few minutes of our discussion and argument in front of the Trooper and presentation of Government Exhibit 3 that as I would say to the Court that the Trooper reluctantly said yes biting his lip as I observed him to say yes, sort of coached on what is the right answer.  I think that his first answer was his truthful and honest answer.  Even after looking at Exhibit 2, which says the same thing as proposed Exhibit 3 that he really did not have his memory refreshed.

ATTORNEY BERNARD:  Judge, I think there was testimony first from the Trooper that indeed reviewing the document did refresh his recollection and I think his demeanor before the Court, number one, demonstrates his desire to be wholly truthful and wholly accurate in this issue as well as the other issues.  And we saw that through the question that was posed to him to which his response was I believe so to the best of my recollection.  Then followed up by presenting him with his state police report, which was authored a month after the incident in which it notes

that he did provide Miranda Warnings and advised that that did refresh his recollection further. And you could see him begin to better recall that. And then again through Government's Exhibit No. 3, which is a copy of his Affidavit of Probable Cause in support of the state charges, which was authored and filed the same day of the incident, upon reading that he indicated it did refresh his recollection. And although he was to a certain degree it took a little while to get there, I think that's a testament to the display of honesty that he's trying to portray before the Court.

So I think the Government has utilized these exhibits, number one, as a way to refresh his recollection. And number two, can be offered as an example of his regularly --- or excuse me, the Affidavit at least is a report that he is required to author in which he's required to be truthful, and it was authored closest in time to the events that occurred. So I would submit independently of the Trooper's recollection that criminal complaint can be before the Court for its consideration of that particular question as to whether or not the Miranda Warnings were given.

JUDGE GIBSON: I'll admit Exhibits 2

and 3.  Counsel for Defendant can certainly cross-examine on those same issues.

*  *  *

(Whereupon, the documents marked as Government's Exhibit Nos. 2 and 3 for identification were received in evidence.)

*  *  *

JUDGE GIBSON:  Go ahead, Mr. Bernard.

ATTORNEY BERNARD:  Thank you, Your Honor.

JUDGE GIBSON:  Just one moment.  Go ahead, Counsel.  I was considering taking a recess at this point.

ATTORNEY THOMPSON:  The only thing I wanted to do is correct a statement for the record.  I had referred to Government Exhibit 2, and I think everyone may have known I was actually referring to the complaint that was shown to him, but it wasn't really marked.  So I just wanted to make sure that is clear for the record of what I was actually referring to comparing the complaint with Government Exhibit 3, that was marked, the Affidavit of Probable Cause and the complaint.

JUDGE GIBSON:  Two was the copy of the card.

ATTORNEY THOMPSON:  Right.

JUDGE GIBSON:  And Three was the complaint.  And if in any way the record was not clear on that as to what you were referring to, it was clear to me that you were referring to the complaint.

ATTORNEY THOMPSON:  Thank you, Your Honor.

JUDGE GIBSON:  We're going to take a recess at this point.  Everyone can use the restroom and get up and walk around a bit.  We will come back into court I have 11:05, start at 11:20.

(BRIEF RECESS)

JUDGE GIBSON:  You may continue with your Direct Examination.

ATTORNEY BERNARD:  Thank you, Your Honor.

BY ATTORNEY BERNARD:

Q.    Trooper Marmol, after your interaction with the Terrys at the roadside, where did you proceed next?

A.    We transported Gerald Terry and John Terry back to PSP Somerset, the county barracks.  The vehicle was also towed back to that location.

Q.    Were they placed in any sort of cells at that point in time?

A.    No cells.  There are prisoner benches that are

in the patrol room, and it's the Somerset County Barracks.

Q. Can you describe what you're doing in there after you arrived there with the two Terrys?

A. Yeah, basically just getting everything set up and organized to be processed to get the evidence ready, figuring out who the shift supervisor is, and processing the evidence.

Q. When you say processing the evidence, what do you mean by that?

A. Just getting things ready to be packaged up. A NIK test was completed, which indicated a positive presumptive test for cocaine, things of that nature.

Q. Where was that activity taking place in relation to the Terrys?

A. It was in close proximity. To where the bench is and where the computers are, I'd say 15 feet, maybe 15 to 20 feet.

Q. So it's in the same room as they were located?

A. Yes.

Q. At any point in time, did you conduct an interview with either Gerald or John Terry?

A. With John Terry, I did. It was just John and I in the interview room. There was nothing of substance at that time that stemmed from the interview.

Q.     Did he indicate that he wished to have an attorney present?

A.     Not that I recall.

Q.     Did he indicate that he did not wish to continue the interview?

A.     Not that I remember.

Q.     At some point, did John Terry make any statement to you at the barracks?

A.     Yes.  When we were at the barracks, he claimed responsibility for the vehicle, the red Ford Taurus.

Q.     Can you explain the circumstances around when that statement was made?

A.     Yes.  Basically, we were in the patrol room and it was he and his brother, Gerald, that was sitting across from him.  And he claimed responsibility for the vehicle, the red Ford Taurus.  And at that point, I took that statement to believe that he was responsible for the vehicle and its contents.  He also --- that's all I can think of right now.

Q.     Did he make any sort of --- did he condition that statement at all or in any way in terms of I'm responsible for the vehicle?

A.     That's all that I remember is that he was responsible for the vehicle.

Q.     Was that in response to any sort of questioning

on your part?

A.    I can't remember.

Q.    Was there a dialogue between yourself and John at that point?

A.    I can't remember.

Q.    And sort of for purposes of clarifying the record, we referred to this before, but I'm going to show you what I'm marking as Government's Exhibit 4.

                         *   *   *

      (Whereupon, the document was marked as Government's Exhibit No. 4 for purposes of identification.)

                         *   *   *

BY ATTORNEY BERNARD:

Q.    I'm showing you what's been marked for identification purposes as Government's Exhibit 4; do you recognize that document?

A.    Yes.

Q.    Can you tell the Court what that document is?

A.    It's a Pennsylvania State Police incident report for this incident.

Q.    Who authored that report?

A.    I did.

Q.    And does that appear to be a fair and accurate copy of the report that you authored in this incident?

A.    Yes.

ATTORNEY BERNARD:  Your Honor, at this point, I move for the admission of Government's Exhibit 4 into evidence.

ATTORNEY THOMPSON:  Your Honor, with the same objections that I had previously made, Government Exhibit 4 is actually the report that I had referred to previously where the officer had reviewed I believe it's page 6 about the Miranda Warnings where he could still not have his recollection refreshed at the time he reviewed this report.  I would also object to any other hearsay statements that may be within that are not admissions.

ATTORNEY BERNARD:  Judge, I think we've heard testimony from this report over the course of this hearing and in addition to that it's already been admitted as an exhibit attached to the Defendant's suppression motion in this case.  I believe it's Document 26 that's been filed here of record.  So insofar as it's already previously been admitted, it's been referred to thoroughly throughout the course of the testimony here today, it's been read from verbatim at certain points, I'd ask that it be admitted at this time.

JUDGE GIBSON:  I'll admit Government

Exhibit 4 with the understanding that the objection topics can be Cross Examination areas.

* * *

(Whereupon, the document marked as Government's Exhibit No. 4 for identification was received in evidence.)

* * *

JUDGE GIBSON: Go ahead.

ATTORNEY BERNARD: That's all the questions I have for Trooper Marmol, Your Honor.

JUDGE GIBSON: Cross-examine, Counsel.

ATTORNEY THOMPSON: Thank you, Your Honor. If you'll allow me a minute to get set up.

JUDGE GIBSON: Yes, go ahead.

ATTORNEY THOMPSON: Thank you, Your Honor. Just to begin to give some preliminary explanation, I think Attorney Bernard and myself we looked at this video in two different programs. So the program that I had did not have the specific timeframes. So I'm still going to try to use Attorney Bernard's computer that's set up and try as best I can to find the same timeframe on it. So that may cause a little bit of a delay going through.

JUDGE GIBSON: I'm sure we can work around that. Go ahead.

CROSS EXAMINATION

BY ATTORNEY THOMPSON:

Q.    Good afternoon, Trooper.

A.    Good afternoon, ma'am.

Q.    As you may know, I'm Sandra Thompson representing John Terry.  I want to sort of go back toward the beginning.  Now, on April 4th, 2018 when you first observed the red Ford Taurus; right?  It was a Ford Taurus?

A.    It was a Ford Taurus, correct.

Q.    When you first observed the red Ford Taurus, weren't you stationary by the tunnel?

A.    I was.

Q.    So then you see the Ford Taurus pass you with two black males in it; is that right?

A.    That's correct, ma'am.

Q.    And then you start following the Ford Taurus?

A.    Not --- no, not at that time.  Not as they passed, I did not.

Q.    How much time elapsed between the time you see the Ford Taurus with two black males and then you leave your stationary position?

A.    I'm not sure on the time, but it was sometime after that vehicle had passed my location.

Q.    Say just a couple minutes?

A.    I would say, again, a short time after.  I'm not sure how many minutes.

Q.    And as a part of SHIELD, your duties include drug investigations on the highway?

A.    That is a portion of it, correct.

Q.    And so you're seeking out vehicles you deem suspicious?

A.    We are a unit that's --- we take an all crimes approach.  We are kind of --- we are taught for some vehicles to look for suspicious vehicles that are --- that are compartment cars, vehicles that are outfitted with compartment cars, tractor-trailers and so forth and so on.  But to answer your question, yeah, we are trained to look for cars like that, yes.

Q.    And again, for you to determine suspicious vehicles for you to activate movement from a stationary position; is that right?  That's what would cause you to act if you see ---?

A.    Sometimes.

Q.    And on April 4th, 2018 when you saw the red Ford Taurus pass you with two black males, you said some time after you began to activate and you followed behind?

A.    I pulled into the travel lanes, correct, and began --- I was actually traveling --- I was going

home. I had no intention on stopping that car.

Q. Well, you were actually traveling at a high rate of speed; wouldn't you say?

A. I'm not sure how fast I was going but ---.

Q. You did say that that road was 70 miles per hour; right?

A. Correct.

Q. I'm going to try to start the video.

(VIDEO PLAYED)

BY ATTORNEY THOMPSON:

Q. So you see, Trooper, that from your position you're starting to pass all these cars once you start to move, you're passing all the cars on the left-hand side where you are you're passing the cars on the right-hand side; is that right?

A. That's correct, ma'am.

Q. And your speed is fast enough to pass all those cars until you finally come up --- I'm pausing it right now. You finally come up to catch up with the red Ford Taurus; is that right?

A. That's correct.

Q. And so you would have to say that for you to pass all those vehicles you would have to be exceeding the speed of all those vehicles; is that right?

A. I'd say that's an accurate statement, yeah.

Q.    Okay.  So then as far as the rules of the road for Pennsylvania, if you're in the fast lane, which is the left lane, and you have another car fast approaching you then you're supposed to move over to the right lane; is that right?

A.    That's right, but I think that you have to do so with safety.

Q.    I understand that.  And then you were in a marked police vehicle; is that correct?

A.    That's correct.

Q.    So then a person --- you would agree that if a person is in the left lane and sees a car quickly approaching them, even if it wasn't a police vehicle, then they would move out of the way of that car; would you agree that would be reasonable?

A.    Well, I would think that you would pass the vehicle.  Rather than making an abrupt lane change, you would pass the vehicle.

Q.    I understand, Trooper.  What I'm saying is isn't it reasonable when you see a car quickly approaching you from behind that you would move out of that lane?

A.    I think you would move out of that lane but you have to do so --- it's your responsibility as a driver to make a safe lane change.

Q.    I understand that.  And then when a police

officer in a marked vehicle is quickly approaching you, then you would agree that a reasonable person would get out of that lane promptly without a police officer to go about their business?

A.    I would not agree, because it doesn't happen like that all the time, and I ---.

Q.    And I understand it doesn't happen all the time, but what I'm asking you, Trooper Marmol, is whether or not it's reasonable for a person to see a marked police vehicle quickly approaching them to activate their lights and promptly get out of the lane of travel of the marked police vehicle?

A.    Well, I'm not going to agree with you because I think that you have to, again, keep safety in mind and you would pass that vehicle and then make a lane change.

Q.    And I understand that.  That's a different step. I'm just asking you would you agree that it's reasonable that a person would get out of the way of the police?

A.    Yeah, sure.

Q.    Thank you.  So shown in this is correct that this is sort of the front of your vehicle; is that right?

A.    Where ---.

Q.    Right here, right where the light is.

A.    Where you see the push bar, that would be the front of my vehicle, correct.

Q.    Okay.  And then you're approaching, I guess, what would --- how would you refer to these dividers?

A.    Just a dotted centerline.

Q.    So you're coming within about two to three of those dotted centerlines of the red Ford Taurus; is that right?

A.    It looks like three centerlines I would say if I had to estimate.

Q.    And in your estimation, what's that distance?

A.    I'm not sure.

Q.    Okay.  So that was stopped for the record at 39 seconds.  So I'm proceeding.  So I'm going to try to go back a little bit.  I'm going back to 27 and then start from 27.

(VIDEO PLAYED)

BY ATTORNEY THOMPSON:

Q.    So again, you're quickly approaching the red Ford Taurus; right?  Is that right?

A.    I would say that, yeah, I'm closing in.  I'm closing the distance I would say, yes.

Q.    And then the red Ford Taurus activated its lights and got into the right lane.  It activated its

turn signal and got into the right lane; is that right?

A. That's correct.

Q. I'm going to have to rewind again. And that right there is stopped at 50 seconds. And at that point, at 50 seconds, you have activated your lights and pulled the vehicle over; is that right?

A. I think you'd have to back it up some time before is when I activated my lights.

Q. Okay. So I'm going to back it up to another question. Back it up to 39 seconds --- sorry, I'll start back at 11 seconds and take it from there.

(VIDEO PLAYED)

BY ATTORNEY THOMPSON:

Q. So again, you're back to passing the vehicles; is that right? That's to your right?

A. I'm passing in the fast lane on the left-hand side.

Q. So at this point, the vehicle was first parallel and activated --- the red Ford Taurus was first parallel to the vehicle to its right; is that right?

A. Could you back it up if you don't mind?

Q. Sure.

A. Thank you. I'm sorry, I wasn't paying attention to that.

Q. I'm back to starting at 11 seconds.

(VIDEO PLAYED)

Q.    So as you're quickly approaching the red Ford Taurus, the vehicle is parallel to a vehicle on the right; is that correct?

A.    Yes, it looks like --- it appears that it's decelerating right now.  It was slightly in front of --- I guess it's fair to say it was parallel, but I mean there was some acceleration/deceleration that appears in that picture.

Q.    Right.  When you say there was some deceleration, which vehicle?  The red Ford Taurus did?

A.    That's what it appears in this video, yes.

Q.    So as you're quickly approaching, the red Ford Taurus is parallel with the vehicle to his right; is that right?

A.    Yes.

Q.    Then the red Ford Taurus as you again are approaching it starts to decelerate; is that right?

A.    That's correct.  That's what it appears in the video.

Q.    And then as it starts to decelerate then it also --- the red Ford Taurus activates its right turn signal; is that right?

A.    I don't know if the vehicle applies its brakes

before and then activates or just activates and gets over. I'd have to see the video. I don't recall.

Q. First before I start the video, do you recall that the red Ford Taurus activated its right turn signal?

A. Yes, it did.

Q. And that was to indicate that it was going to get into the right lane?

A. That's correct.

Q. And as the red Ford Taurus decelerates then the --- what color is that?

A. It looks like aluminum or silver to me, but I could be wrong.

Q. So whatever the vehicle is to the right of the red Ford Taurus continues its journey down the road; is that right?

A. I'm sorry?

Q. So I'm starting it again at 36 seconds.

(VIDEO PLAYED)

BY ATTORNEY THOMPSON:

Q. So the red Ford Taurus decelerated so that the vehicle to its right could get in front of it; is that right?

A. I don't know what their intention was.

Q. Well, they were parallel. They decelerated, and

they put on their right turn signal. That was so they could get into the right lane; isn't that right?

A. The intention is to get into the right lane I'm assuming.

Q. And they did not accelerate to try to get in front of the vehicle to the right; is that right?

A. That's correct.

Q. So again, at this point when it's moving to the right lane, this is still the front of your vehicle that's marked at about 40 seconds? That's still the front of your vehicle; is that right?

A. Where the push bar is, that would be the front of the vehicle.

Q. Are you talking about that right there (indicating)?

A. Yes.

Q. Okay. And now, you're about two of those dotted centerlines away from the red Ford Taurus; is that right?

A. That's what it appears, ma'am.

Q. Okay. And then at this 40-second mark, the vehicle that was to the right of the red Ford Taurus is now in the front of the red Ford Taurus; is that right?

A. Correct.

Q. I'm starting at 40 seconds.

(VIDEO PLAYED)

BY ATTORNEY THOMPSON:

Q.   And so now at 42 seconds, you see the red Ford Taurus and the vehicle in front of the red Ford Taurus separating distance; isn't that right?

A.   I mean I'd have to see the video here.  They may start creating separation there, but at the same time still following too closely, I believe.

Q.   Well, it had just actually changed lanes; right?

A.   Yeah.

Q.   From 40 to 42 seconds it had changed lanes; is that right?  And it being the red Ford Taurus?

A.   I'm sorry, can you ---?

Q.   Yes.  We showed at 40 seconds that the red Ford Taurus had changed into the right lane, and it was closely behind the other vehicle; is that right?

A.   That's correct.

Q.   And at 42 seconds, the red Ford Taurus and the other vehicle that was parallel to it are now a greater distance away; isn't that right?

A.   It still doesn't justify the fact that ---.

Q.   I'm sorry, Trooper Marmol, I'm not asking you whether it justifies.  I'm just asking you is that a correct fact?

A.   That's a correct fact, but I feel that it needs

elaboration.

Q.    Thank you, Trooper Marmol.  One minute, please. I want to start it again at 42.

A.    Okay.

(VIDEO PLAYED)

BY ATTORNEY THOMPSON:

Q.    And so around about 47 you start to get, where it's stopped currently, you then start to get behind the red Ford Taurus in the right lane.  You changed lanes; is that right?

A.    Yes, I believe at that time I activated my lights.

Q.    And that's at 47 seconds.  And then the red Ford Taurus activates his brake lights; is that right?

A.    That's what it appears.

Q.    That's what you see in the video?

A.    Yes, I do.

Q.    Now, when the red Ford Taurus activated its turn signal and as well as currently you can see the color red; is that correct?

A.    I can see the color red, ma'am.

Q.    And that's for the turn signal as well as the brake lights you can see the lights' color of red?

A.    Yes.

Q.    Now, is it correct that you state that you had

--- the time that you activated your lights to pull over the red Ford Taurus it was following behind the vehicle that was once parallel to it one car length away?

A. That's what I estimated, yes.

Q. And you did not activate your lights to stop the red Ford Taurus until it had changed lanes; is that right?

A. That's correct.

Q. I'm going to start the video at 47 seconds.

(VIDEO PLAYED)

BY ATTORNEY THOMPSON:

Q. So I might have to correct myself, but when I started from 47 seconds and I just stopped it at 51 seconds, did you see the right turn signal activated by the red Ford Taurus?

A. I wasn't even paying attention to the turn signal to be honest with you.

Q. All right. So I'm just going to ask you, Trooper, if you could please pay attention to the video. I'll try to back it up a little bit. It looks like we're starting at 39 seconds.

A. That's at 1:39.

Q. I'm sorry. So the video went back to 29 seconds to start, so we'll see that part again.

(VIDEO PLAYED)

Q.    So did you see the color of the right turn signal?

A.    Yes, it appeared to be like a bright color.

Q.    Do you see the right turn signal now?

A.    Yes, ma'am.

Q.    What color is it?

A.    Yellow.

Q.    So the right turn signal is actually yellow.  I think I misspoke earlier; right, the right turn signal is yellow?

A.    The right turn signal is yellow, right.

Q.    And then the brake lights were red?

A.    The brake lights are red, correct.

Q.    And you were able to determine those colors?

A.    I could determine those colors from the video, yes.

Q.    And the video is a true and accurate depiction of what you would've seen as well traveling in your vehicle; is that right?

A.    Yes, I would say with limitations though.  I mean as far as like distance it's not a direct depiction of what I'm seeing as far as like a bird's eye view, the difference between a bird's eye view and

my perspective, but it's still capturing everything accurately I would say, yes.

Q. Now, your video, and it was already explained on Direct, but with this being audio and video-recorded, and that's from your microphone on your person; is that right?

A. Correct.

Q. And the video is from the vehicle camera; is that right?

A. That's correct, yes.

Q. So at times throughout this about 1:31:00 video, which I believe was Government Exhibit 1, the sound is not activated; is that right?

A. Yes, there's portions of it that it's not activated.

Q. So is it correct that you would've cut off the sound at points of time?

A. Yes.

Q. So the times where we're watching a video and we cannot hear a sound, that's when you cut off your microphone?

A. Yes.

Q. Also, the video is created by a WatchGuard program; is that right?

A. Yes.

Q.   And then it has a WGV player?

A.   I'm not sure of that, but I know WatchGuard is --- we have WatchGuard dash cam cameras, and I believe that is the system.

Q.   So do you have knowledge of whether or not when you watch the video in the WGV player if you see the actual times that we're referring to through the Windows Media Player?

A.   Yes, the times that I went off with my report was from Windows Media Player, but I don't think that I watched the video via the WatchGuard application.

Q.   I'm going to start it where it looks like it's 59 seconds.

(VIDEO PLAYED)

BY ATTORNEY THOMPSON:

Q.   You can still see the yellow of the right turn signal; is that right?

A.   I can still see the yellow of the turn signal.

Q.   So about 1:57 is when you begin to tell the occupants of the red Ford Taurus your probable cause for stopping; is that right?

A.   That's correct.

Q.   So I'm going to continue it at 1:58.

A.   One of the reasons why.

Q.   Well, my question though, Trooper Marmol, is

this the time where you tell the occupants the reasons why you stopped them?

A.    A reason for the traffic stop, yes.

(VIDEO PLAYED)

BY ATTORNEY THOMPSON:

Q.    So I'm going to stop it at 2:06.  So the reason that you gave to the occupants of why you stopped the red Ford Taurus is just that it was switching lanes, how they switched lanes that was close to the car in front of them; isn't that right?

A.    Correct, but can I elaborate?

Q.    Well, not unless it's responsive to my question. That what you told the occupants at that period of time was just that it was the way they changed lanes; they were too close to the vehicle in front of them?

A.    Yes, but I need to elaborate, ma'am, to ---.

Q.    You may be able to do that with the Government Counsel.  Now, I'm going to start it again at 2:06.

(VIDEO PLAYED)

BY ATTORNEY THOMPSON:

Q.    I'm going to stop it at 2:31, but I'm going to back it up that on your initial approach after you're telling them that they were stopped because of the lane change and being too close to the vehicle in front of them you asked for the toll ticket; is that correct?

A.    That's correct, ma'am.

Q.    And having the toll ticket is not something that you need to investigate or write a citation for the traffic violations that were mentioned; is that right?

A.    It's something that I always ask for when I make traffic stops, ma'am.

Q.    But my question, Trooper Marmol, is taking their toll ticket is not something that you need for the traffic citations; isn't that right?

A.    I don't need it to complete a warning or a traffic citation.

Q.    And taking the ID of the passenger, John Terry, is also something that you do not need to investigate or to complete a traffic citation; is that right?

A.    I need to elaborate on that, if I can.

Q.    I just would like you to be responsive to my question.

A.    I understand, ma'am, but I need to elaborate. But if you could ask that question again?

Q.    Yes.  My question, Trooper Marmol, is whether or no taking possession of the identification for John Terry, who was the passenger, was necessary for your investigation for the reasons that you stopped the vehicle being a traffic citation?

A.    No, but it's necessary for the investigation.

Q.   And when you say it's necessary for the investigation, that's because you were doing a criminal investigation?

A.   Well, at that time, ma'am, you know, I was already starting to see indicators of criminal activity.

Q.   I'm going to try to back the video up.  I'm starting this about 1:28.

(VIDEO PLAYED)

BY ATTORNEY THOMPSON:

Q.   So first is stopped now at 1:35.  You are as you previously testified approaching the passenger side of the red Ford Taurus; is that right?

A.   That's correct.

Q.   And it is correct that the window is rolled down to accommodate you?

A.   I believe it was, yes.

Q.   Because you're kind of leaning into the vehicle?

A.   Leaning into the vehicle.

Q.   Is that right?

A.   Yes.

Q.   And you did state that this was a cold and snowy, like snow flurry day; is that right?

A.   It was.

Q.   And also through on your Direct testimony we

heard a lot of wind through your microphone; is that right?

A. Yes.

Q. So is it correct that it was also strong winds that day?

A. There was some winds, some strong gusts, yes.

Q. And you asked the driver, when you approached, you asked the driver for his license and car registration; is that right?

A. I can't remember if I asked for a registration or not, but I know I asked for his driver's license.

Q. But he did give you the registration as well?

A. He provided me the registration.

Q. And you said that at least in your report you intentionally did not take the items as the driver was reaching over to hand them to you for a matter of minutes; is that right?

A. It wasn't a matter of minutes, no. It was actually a brief period of time.

Q. So your purpose of not --- so just to visualize, the driver is reaching over the passenger to you on the passenger side holding out his hand holding items in his hand; is that right?

A. That's correct.

Q. And that's his right hand; is that right?

A.    That would be his right hand.

Q.    And you intentionally did not immediately take them; is that right?

A.    Correct.

Q.    And then you start to see his hand shake?

A.    Yes.

Q.    And his hand starts to shake because he's holding it out to you; is that right?

A.    That's correct.

Q.    And it's cold?

A.    It's cold, but they are inside the vehicle.

Q.    But the window is down?

A.    The window is down, correct.

Q.    Did you ask the driver about his health?

A.    I did not.

Q.    And you also did not ask the driver if he was cold?

A.    I did not.

Q.    I'm going to start it again at 1:35.

(VIDEO PLAYED)

BY ATTORNEY THOMPSON:

Q.    So about 1:46 and you began to question the occupants about whose vehicle it is?

A.    Yes.

Q.    And this is actually before you even tell them

why you stopped them?

A.    Yes.

Q.    I'm going to start it again at 1:46.

(VIDEO PLAYED)

BY ATTORNEY THOMPSON:

Q.    And then at 1:50 you're asking again for the owner's name?

A.    Yes.

Q.    And the owner's name is not necessary for you to write a traffic citation for the reasons that you gave as probable cause for the stop; is that right?

A.    Can I elaborate?

Q.    Well, first if you can answer my question, be responsive to my question.

A.    Well, ma'am, I believe that --- to answer the question appropriately, I think it needs elaboration.

Q.    So Trooper Marmol, for the citations of changing lanes and following too closely, do you need the vehicle owner's name to write up those citations or to give a warning?

A.    Yes.

Q.    And why is that?

A.    Because it goes on the warning.  It's documented on the warning.

Q.    So you document on the warning who the owner of

the vehicle is?

A.    Yes.

Q.    Starting at 1:51.

(VIDEO PLAYED)

BY ATTORNEY THOMPSON:

Q.    So going from 1:51, I just stopped it at 1:57, did you need to know the owner was a girl or not?

A.    I was just trying to clarify who the registered owner was.

Q.    But it was not necessary for your investigation to write out a citation for changing lanes or following too closely?

A.    Again, ma'am, it needs elaboration, my answer would.

Q.    You don't need to know the gender of the person; isn't that correct, of the owner?

A.    Well, ma'am, at that point in time, you know, whenever I ask the operator who the vehicle is registered to he indicated that it was his friend's. And then so I asked --- I needed to clarify that because how am I supposed to know as a law enforcement officer that the vehicle is not stolen?

Q.    Well, you didn't ask them those type of questions.  You asked about the gender; is that right?

A.    I did ask about the gender, yes.

Q. And actually, the person that was speaking at this period of time was Gerald Terry, the driver; is that right?

A. I believe so, yeah.

Q. I'm going to try to back up a little bit. Hopefully, I went to 1:50.

(VIDEO PLAYED)

BY ATTORNEY THOMPSON:

Q. So actually he said it was his friend's wife?

A. Friend's wife.

Q. Right. And that was around about 1:57. Now, you made a determination that it was suspicious activity for them to have a borrowed car; is that correct?

A. Not --- having a borrowed car innocent of itself is not suspicious. However, when you place it in the totality of the circumstances, it raises my suspicion.

Q. Well, this was around about I think we established before when you took their toll ticket about two minutes after the stop; is that right?

A. I'm not sure what the time stamp was, but it was a short time after.

Q. And for a married couple, a vehicle could be registered in the name of one of the people but the other person is the actual driver of that car on a

routine basis; isn't that right?

A. It could happen that way.

Q. So that's really reasonable; isn't that right?

A. That's reasonable.

Q. And isn't it also reasonable that people borrow cars for non-criminal activity every day; isn't that right?

A. That answer needs elaboration I believe, ma'am, I'm sorry.

Q. Well, in your training and experience and just personal knowledge, it's reasonable for people to borrow cars for their family or friends?

A. Again, yes, it is. And innocent of itself, that --- or that by itself is innocent. However, in the grand scheme of things, the totality of the circumstances it raises my suspicion.

Q. And it is correct that you actually began questioning the driver immediately about items that were not necessary for the prosecution or the preparation of the traffic citation?

A. Ma'am, the questions that I was asking I didn't believe were unreasonable. They're the questions that I ask on every traffic stop essentially.

Q. So I'm not asking about every traffic stop. I'm asking about this particular traffic stop that you

agree that you began asking questions of the driver that was not necessary to you preparing the traffic citation?

A.    No, but it's conversation that we're having to.

Q.    They're having the conversation with you because there is a police officer asking them questions; right?

A.    Correct, yeah.

Q.    And from the time that you approached their vehicle, they at no time were free to leave?

A.    They were not free to leave.

Q.    And then from the time that you especially took their driver's license and IDs, they could not leave; is that right?

A.    That's correct.

Q.    And the time that you took their toll ticket they could not leave; is that correct?

A.    That's correct.

Q.    And it is correct that from the time of around about two minutes after the stop until the end of an 1:31:00 you never returned their ID or their toll ticket?

A.    No.

Q.    And the reason why you took the toll ticket is because you wanted to investigate their origination point; isn't that right?

A.    Yes.

Q.    Now, when you asked where they were coming from, they said Philadelphia?

A.    That's correct.

Q.    And where at they were going to they said Pittsburgh?

A.    That's correct.

Q.    And the driver, Mr. Gerald Terry, answered that he was going to speak at a Narcotics Anonymous meeting; is that right?

A.    Yes.

Q.    And he also indicated to you that he had a book bag of materials from Narcotics Anonymous; is that right?

A.    I remember that he indicated that he had something in --- that he pointed to something in the backseat, but I can't remember directly what he said that was.

Q.    Do you remember that he pointed at the same time he said he was speaking at an event that was a Narcotics Anonymous event?

A.    I remember him pointing towards the backseat.

Q.    So I'm going to start the video around about 1:57.

(VIDEO PLAYED)

BY ATTORNEY THOMPSON:

Q.    Now, when you asked where are you off to, the driver, Gerald Terry, begins to speak; is that right?

A.    Yeah.

Q.    And then you can see where I stopped at 2:26 because of the driver, Mr. Gerald Terry, speaking you then look from the front as you were speaking to them to the rear of the vehicle; isn't that right?

A.    Yes.

Q.    So that's where he had indicated to you; isn't that right?

A.    It appears that way, yes.

Q.    So when you were searching the vehicle, did you see the backpack with the Narcotics Anonymous books and pamphlets?

A.    I believe I saw a backpack, but I didn't see inside of it at that time.

Q.    So you didn't search inside of it?

A.    At this time specifically?

Q.    During the one hour and 31 minutes, did you search inside of the backpack?

A.    Yes, I did.

Q.    So did you see the Narcotics Anonymous books and pamphlets?

A.    I don't remember.

Q.    You did not make any note in your report as to what was inside the backpack?

A.    I did not.

Q.    Do you think that the reason why you did not make note of what was inside of the backpack is because it did corroborate what Gerald Terry had said to you that he had Narcotics Anonymous books and pamphlets in it?

A.    No, I don't remember what was in there.  I couldn't tell you the first thing that was in there.

Q.    And then when you asked how long the gentlemen were staying in Pittsburgh they told you basically it was just a day trip, they were going to the meeting, and coming back?

A.    Yes, ma'am.

Q.    And you determined that you felt that was too suspicious for a person to travel from Philadelphia to Pittsburgh to attend a meeting and then return the same day?

A.    The trip in and of itself is not suspicious. However, in the totality of the circumstances combined with the other indicators, yes, it is.

Q.    Well, when you say you typed your report on May 4th, 2018, which was about a month after the stop --- well, first of all, let me rephrase that.

You did say you typed your report, submitted your report on May 4th, 2018, about a month after the stop; is that right?

A.    It was submitted a month after the stop, correct.

Q.    And in that report, actually you state that you then investigate on May 4th, 2018 you start to investigate Narcotics Anonymous locations within 50 miles of Philadelphia; is that right?

A.    That's correct.

Q.    And then you use that to bolster your conclusion that it wasn't reasonable for a person to travel from Philadelphia to Pittsburgh when there are hundreds of Narcotics Anonymous locations around Philadelphia; right?

A.    That's correct.

Q.    Would you agree that if a person is a speaker at an event that they may travel across the state to act in that capacity?

A.    I'm not sure.  I can't speak to that.

Q.    Do you through your training and experience, even personal knowledge, know that people take day trips even to New York for the day for shows or shopping?

A.    I'm sure that it happens.  And again, innocent

of itself and by itself, it's not suspicious. However, when you take the totality of the circumstances and all the indicators combined it becomes a suspicious activity in my training and experience.

Q. So also while you are interacting with --- when you first approach primarily with the driver, Gerald Terry, John Terry is sitting in the passenger seat; right?

A. Yes.

Q. And then you note that he's basically facing ahead; right?

A. Correct.

Q. And you also note he has his shoes off and is in no socks; right?

A. Yes, ma'am.

Q. And you also indicate that as being suspicious activity?

A. It was strange, but as John said he was just trying to be comfortable for the ride, I believe.

Q. Right. But that was also one of your indicators of suspicious activity; right?

A. No, I just noted it in my report.

Q. But in your report you said it was suspicious that John Terry was looking straight ahead?

A. I just --- can I read my report?

Q.    Sure.

JUDGE GIBSON:  Do you have the report there?

THE WITNESS:  Yes.  Can I use this one, Your Honor.

ATTORNEY THOMPSON:  It's Government's Exhibit 4?

THE WITNESS:  Exhibit 4.

JUDGE GIBSON:  As long as it's your report, you can look at it.

BY ATTORNEY THOMPSON:

Q.    See if it refreshes your recollection, and it may be page 4 of it.

A.    Yes.  Yes, as I thought, I basically just indicated that during the majority of the contact with the occupants of the vehicle I noted that the passenger was looking straight ahead.  And then that's when I eventually looked down at the passenger's feet and saw his shoes were off and he wasn't wearing any socks.

Q.    And then you started engaging Mr. Terry as the passenger and that's when you asked for his identification?

A.    That's correct.

Q.    And so then he had to then turn to his right and engage you; is that correct?

A.    I'm not sure how his posture was at that specific time, but we engaged in conversation.

Q.    Right.  So first you note that he was looking straight ahead, so then you start engaging him, asking for his ID, but you're saying you did not note if he turned toward you then?

A.    I didn't note which way he turned.

Q.    But you did note you said that his carotid artery flared or something?

A.    Pulsated physically.

Q.    Pulsated, okay.  So when you made that notation, did you note any health conditions for John Terry?

A.    No, I didn't ask or clarify.

Q.    Did you note that he has a large tumor on his back by his neck?

A.    No, I didn't.  I don't recall what side that was on, and again, he had a sweatshirt on.  I don't think I knew until after the fact that there was a condition.

Q.    And when you say you noted after the fact, was that when you were processing him?

A.    I'm not sure at what time.  I know I noticed it, but I'm not sure exactly at what point during my encounter with John that I noticed that.

Q.    And just to clarify for the record, the it is the large tumor on his back right by his neck?

A.   Noticed the tumor --- yes, I did.

Q.   I'm going to start the video at 2:26.

(VIDEO PLAYED)

BY ATTORNEY THOMPSON:

Q.   So then you leave the Ford Taurus and you approach your vehicle, return back to your vehicle, around about three minutes after the stop; is that right?

A.   Yes, it looks like.

Q.   I'm starting again at 3:06.

(VIDEO PLAYED)

BY ATTORNEY THOMPSON:

Q.   Around about --- this is stopped at 3:55. Around about 3:54 you start to hear your voice, and is that when you called for backup for a search?

A.   Yes.

Q.   Okay.  And how much time does it take for a criminal history check?

A.   Oh, I don't know, ma'am.  Sometimes it can be fast.  Sometimes, you know, it takes --- there's some delay.

Q.   And do you know how much time it took for you to perform a criminal history check in this case?

A.   Well, I can tell you it was very quick because of the sound that I could hear with this specific

query, and so as soon as it returned that's when I started to turn up the volume on the radio so that I could hear the radio and contact Troop T Highspire dispatch.

Q.    Had you started contacting them before it came back, the criminal history came back?

A.    I'm sorry, can you ---?

Q.    Isn't it correct that you started contacting the dispatch, reaching out to dispatch, before the criminal history came back?

A.    As soon as the --- the response that returned was a response that provides me information to get the criminal history.  So as soon as I saw the initial response, I knew that there was an arrest record available, and then I subsequently contacted Troop T Highspire dispatch.

Q.    So then the first thing you did when you returned to the vehicle was not to check the registration, the vehicle registration records, but it was to perform a criminal history search?

A.    Yes, ma'am.

Q.    And isn't it correct that you made this decision that you were going to search the vehicle prior to returning to your vehicle?

A.    I made the decision once the criminal history

response, the initial response returned, that's when I believe I made the decision that I wanted to search the vehicle because of all the indicators that I observed upon my initial approach coupled with the initial criminal history return.

Q.    I'm going to ask you to refer to Government Exhibit 4, page 5, the first paragraph.

ATTORNEY THOMPSON:  Your Honor, since I guess it's admitted, I can try to see if I can operate this.

BY ATTORNEY THOMPSON:

Q.    So I'm referring you to, again, page 5 of Government Exhibit 4, and around about toward the end of that paragraph where it begins to the right of the word prior.

A.    Yes.

Q.    So does that refresh your recollection?

A.    Refresh my recollection to what?

Q.    Of the circumstances before I ask the next question of what was going on?

A.    I'm sorry, I'm confused right now.

Q.    Okay.  Let me ask this question.  Didn't you make a decision that you were going to search the vehicle from the time you encountered the red Ford Taurus before you returned to your vehicle?

A.    I wanted to search the car because of the indicators that I, you know, had mentioned.  I wanted to search the car.  I ran the criminal history once I got back to the car.

Q.    Well, in your report and this is why I asked does it refresh your recollection, in your report where it begins with prior to this which says that's prior to the reports that you ran in your vehicle; isn't that right?  That's what prior to this means?

A.    I'm sorry, can you repeat that?

Q.    Yes.  Where you reference in your report prior to this point, you mean prior to these reports coming back to you, you had already known or you knew you wanted to search the car because of the previously-mentioned indicators that you had observed during your initial approach; isn't that right?

A.    Yes.

Q.    Right.  So again, it was already a goal to search the vehicle prior to your returning to your police vehicle to do the other search?

A.    It was not my goal, ma'am.  It was I was just doing my job.

Q.    But you had already made a decision before you returned to your vehicle; is that right?

A.    That was the thought, yes.

Q.    So I think we established about 3:55 by then you had called for backup because you wanted to follow through on your thought to search the red Taurus; is that right?

A.    Wanted to follow through on my thought and suspicion, yes.

Q.    And so then about 18 minutes or so past 5:00 because you're waiting on the backup?

A.    Yes, ma'am.

Q.    And then you don't approach the vehicle again until the backup arrives?

A.    Yes, I --- yes.

Q.    I'll try to skip to that.

A.    Okay.

                ATTORNEY THOMPSON:  It's fine with me. It's up to Your Honor.  I can keep trying to work on the projector.  Are you fine with me at the monitor or should I get it to the projector, the video?

                JUDGE GIBSON:  I'm not sure what the question is.

                ATTORNEY THOMPSON:  I'm sorry.  We're trying to get the projector to reactivate.  We weren't sure if it's still showing up on the monitor that you may have before you.

                JUDGE GIBSON:  No, I've been watching

the screen actually.

ATTORNEY THOMPSON: All right. I don't know why it's not coming back on. Your Honor, is that something you can see? The quality looks different.

JUDGE GIBSON: The quality of the video looks different. I can see it. It's getting clearer as we speak.

BY ATTORNEY THOMPSON:

Q. I'm going to take the video to around about 18 minutes. So the video is starting at 17:59.

(VIDEO PLAYED)

BY ATTORNEY THOMPSON:

Q. And so when the second trooper asks you did they know what's going on, you said, no, we'll see. And is that because you had intended to search and they did not know about it?

A. Yes, I intended to search, and I'm assuming I extended the traffic stop so I'm assuming that, you know, their suspicions were piquing. But I can't speak to that.

(VIDEO PLAYED)

BY ATTORNEY THOMPSON:

Q. So I started the video at about 19:27. So as we see, I stopped the video at 20:18. This is your second time approaching the red Ford Taurus and its occupants;

is that right?

A.    Yes, this is my second approach.

Q.    Now, on this approach, you approach on the driver's side and you ask the driver to exit; is that right?

A.    Yes.

Q.    I'm going to start the video at 20:18.

(VIDEO PLAYED)

BY ATTORNEY THOMPSON:

Q.    So it was around about 20 minutes, maybe about 40-or-so seconds you tell Gerald Terry that he's going to get a warning for the violation; is that right?

A.    Yes, ma'am.

Q.    And that violation was the lane change and the following too close; is that right?

A.    Yes, and then eventually I addressed the tinted taillights.

Q.    So I'm going to start again at 20:47.

(VIDEO PLAYED)

BY ATTORNEY THOMPSON:

Q.    So around about 20:49 is the first time you mentioned the tinted taillights; is that right?

A.    That's correct.

Q.    And from the time you first left the vehicle, the red Ford Taurus, which was about three minutes

after the stop and you sat in your vehicle for roughly about 15, 17 minutes, then you were able to observe the rear vehicle more extensively; is that right?

A.    I observed it extensively, yes.

Q.    And it was that time that you actually noticed the taillights; is that right?

A.    No.

Q.    I'm going to start the video at 20:53.

(VIDEO PLAYED)

BY ATTORNEY THOMPSON:

Q.    So as you began to talk to Gerald Terry and now you are suspecting criminal activity; is that right?

A.    No, I suspected it before.

Q.    But as you're speaking to him and asking him questions, you're suspecting criminal activity?

A.    It's already been suspected, yes.

Q.    And you indicate around about 21:05 that you're going to turn over the license registration and the ID of the passenger as well as their toll ticket to a second trooper that was standing nearby?

A.    That's correct.

Q.    You were not returning it to Gerald Terry?

A.    That's correct.

Q.    And you were not returning it to John Terry?

A.    That's correct.

Q.   And during this period of time where you had already suspected criminal activity and were continuing to hold onto their documents, you did not read them their Miranda Rights?

A.   That's correct.

Q.   So I'm going to start it again at 21:06 seconds.

(VIDEO PLAYED)

BY ATTORNEY THOMPSON:

Q.   I stopped it at 21:24.  I want to try to back it up to the question about the search.  So I backed it up to 20 minutes.

(VIDEO PLAYED)

BY ATTORNEY THOMPSON:

Q.   First, I tried to stop it at 20:55 where we could observe John Terry, the passenger, he was getting out of the vehicle and then he was approaching the right side, which is the passenger side of your patrol car; is that right?

A.   Yes, they were approaching the right front quarter panel area.

Q.   And the second trooper who had arrived, Petrosky; is that his name, Petrosky?

A.   Yes, Nick Petrosky.

Q.   The second trooper, Petrosky, who had arrived, he's standing in that same area but out of the camera;

is that right?

A.    Yes.

Q.    And both of you had your weapons; is that right?

A.    Yes.

Q.    And both of you are trained to have your hand in or around your weapons?

A.    I don't know how to speak to that.  I know everybody is different.  I know perhaps, you know, we're trained in an interview stance, but I think as time progresses in your career that you may break from that, be more relaxed.

Q.    And just to go back, you gave a verbal warning but you never gave any type of paper warning to any of the occupants, the driver or the passenger?

A.    I never issued any sort of paper.

Q.    So I'm going to actually back up a little bit to 20:45 and start it from here.

(VIDEO PLAYED)

BY ATTORNEY THOMPSON:

Q.    So by 21:13 you had already asked about the search; is that right?

A.    I had asked for consent to search the vehicle, yes.

Q.    So even on the video, it's difficult --- well, first of all, the microphone was right on your person;

right?  It was on your body?

A.    Yes, it was on my body.

Q.    And so you were standing within about six inches to a foot away from Mr. Gerald Terry?

A.    I was standing in close proximity to Mr. Terry.

Q.    And then that microphone wasn't picking up very clearly his part of the conversation; is that right?

A.    Yeah, it's tough to hear.

Q.    So it was tough to hear.  Was he speaking lowly?

A.    I don't remember.  When I asked for consent, he said, yeah, yeah.

Q.    And I'm not sure why this is --- I'm going to try it at 20:23.

(VIDEO PLAYED)

BY ATTORNEY THOMPSON:

Q.    So around about 21 minutes, you tell Mr. Terry about how extensive his criminal history record is; right?

A.    That's correct.

Q.    Right.  And then you began to ask questions if there was anything in the car?

A.    Yes.

Q.    And then you asked can you search the car?

A.    Yes.

Q.    And Mr. Terry's basically just nodding his head;

isn't that right?

A. I would have to watch the video again. I wasn't really paying attention to him nodding. I was just --- whenever asked for consent, that's what I was ---.

Q. And also, when you're speaking to Mr. Terry about his criminal history and then you go into consent, isn't your voice lowered some than what it was?

A. I don't know. I can't speak to that.

Q. I'm starting at 20:45 to see if you can hear it again.

(VIDEO PLAYED)

BY ATTORNEY THOMPSON:

Q. So at this time that you are having this conversation around about 21 minutes, John Terry is again standing a couple of feet away from your conversation with Gerald Terry; is that right?

A. That's correct.

Q. And John Terry again is I guess his back is to the front of the vehicle so his front would've been toward where the second trooper, Petrosky, was; is that right?

A. It's depicted on the camera, yeah.

Q. Okay. And do you recall if Trooper Petrosky was actually engaging John Terry in conversation at that

time?

A.    He might've been, but I'm not sure.

Q.    So then if Trooper Petrosky is engaging John Terry then John Terry doesn't know what your conversation is with Gerald Terry; is that right?

A.    I'd say that is accurate, yeah.

Q.    I'm starting at 20:56 to look again at Gerald Terry's response.

(VIDEO PLAYED)

BY ATTORNEY THOMPSON:

Q.    So again, do you see Gerald Terry basically nodding?

A.    I believe when I asked him if there was anything illegal in the car he shook his head no and if I'm watching the video correctly when I asked him for consent and he says, yeah, yeah, it appears that he nods his head, yes, the way it appears to me.

Q.    I'm going to start the video again at 21:03.

(VIDEO PLAYED)

BY ATTORNEY THOMPSON:

Q.    So you begin your search about 21:40; is that right?  You approach the vehicle and open the door?

A.    Yes, approximately.

Q.    Okay.  I'm going to start again 21:41.

(VIDEO PLAYED)

BY ATTORNEY THOMPSON:

Q.    Okay.  So around about 22 minutes --- I stopped it at 22:26, but around about a second before or so you can start to see Trooper Petrosky in the camera to the right in front of Gerald and John Terry; is that right?

A.    Yes, that's what it appears.

Q.    And then you can begin to see that Trooper Petrosky has his hand on his weapon; can you see that?

A.    I don't know if he has his hand on his weapon or not.

Q.    Let me continue from 22:26.

(VIDEO PLAYED)

BY ATTORNEY THOMPSON:

Q.    So can you now see at 22:28 I stopped it again, can you now see Trooper Petrosky better that he has his hand on his weapon?

A.    That's what it looks like, yes.

Q.    Okay.  So isn't it correct that as you were searching, Trooper Petrosky was standing around Gerald and John Terry with his hand on his weapon?

A.    Well, yes, but that needs elaborated on. Whenever you have a law enforcement belt on, it weighs approximately 25 pounds and it's actually kind of comfortable when you have your hand on your firearm. It's not --- it's just a comfortable stance.

Q. But what the persons who are being detained see is an officer in full uniform with a weapon and their hand on their weapon; is that right?

A. I think that's a fair statement, but I don't think that ---.

Q. I don't want you to speculate to Trooper Petrosky's frame of mind.

A. Okay.

ATTORNEY THOMPSON: And Your Honor, I know you have something at 1:00. I'm not sure how you want me to proceed.

JUDGE GIBSON: What I was going to do so that we use our time effectively was to keep my eye on the phone and I'll see the phone call come up there, and then perhaps we can take our recess so that I don't take time away from you waiting for a call that may or may not be timely. But I'll let you know when I see the call, and then perhaps we can --- I appreciate you asking about that. Go ahead.

ATTORNEY THOMPSON: Thank you.

BY ATTORNEY THOMPSON:

Q. I want to go to around about 26 minutes. And first, before I start the video again, Trooper Marmol, when you perform searches is it important for you to document the items in the vehicle for your reports?

A.    I don't --- I don't know what you're speaking because sometimes there can be so many documents inside of a vehicle --- or so many items.  If it's of importance, I document it, but ---.

Q.    When you take possession of a vehicle, is it important to create a receipt inventory?

A.    I'm not sure.  I don't know that I've ever done one.

JUDGE GIBSON:  Counsel, I believe the call is coming in now.

ATTORNEY THOMPSON:  Okay.

JUDGE GIBSON:  Is this a natural time to break?

ATTORNEY THOMPSON:  Yes, absolutely.  That's fine.

JUDGE GIBSON:  All right.  We'll take a recess.  I'm going to remain in the courtroom and take this conference call and then everyone else can go on recess.  And let's try to start again at 20 minutes after.

(BRIEF RECESS)

JUDGE GIBSON:  Please, be seated.  Attorney Thompson, you may continue with your Cross Examination.

ATTORNEY THOMPSON:  Thank you, Your

Honor.

BY ATTORNEY THOMPSON:

Q.     Trooper Marmol, I think we left off I was asking you about receipt inventory lists?

A.     Yes.

Q.     And whether or not you create them, and you're saying that you never do?

A.     I can't think of an instance when I have.

Q.     As a Pennsylvania State Police Patrolman, aren't you trained that when you take possession of a vehicle that you inventory the property within the vehicle?

A.     We search the vehicle and we take the things of value, things of evidence, and we enter those into evidence on a property receipt.  But I can't think of a time where I did an inventory of a vehicle.

Q.     So I understand you said you don't do them.  I asked you about training.  Are you trained to do them?

A.     I can't remember if we were.  I don't remember.

Q.     And do you receive training as Pennsylvania State Police Trooper that the importance, if you recall, the importance of a receipt inventory list is to relieve the department and the state of liability when the department takes control of a vehicle?

A.     I'm not sure, ma'am.

Q.     And also for April 4th, 2018, you were acting in

your capacity as a Pennsylvania State Trooper; is that right?

A.    Yes.

Q.    So you were operating with the authority of the state; is that right?

A.    Yes.

Q.    So you were not operating under any federal authorities?

A.    I was not.

Q.    And when you filed the criminal complaint April 4th, 2018, you filed it as a state act with the county of Somerset County; is that right?

A.    I filed it in Somerset County at the magistrate, yes, ma'am.

Q.    And operating as a Pennsylvania State Trooper on behalf of the state filing in the county court, you were operating and following under Pennsylvania state law; isn't that right?

A.    At that time, yes.

Q.    I'm going to go to the video at about 27 minutes.  I'll start the video at 26:50.

(VIDEO PLAYED)

BY ATTORNEY THOMPSON:

Q.    I'm stopping it at 26:55.  At this time, you're searching the trunk of the vehicle; is that right?

A.    That's correct.

Q.    And there appears to be through the video a multitude of items in that trunk; isn't that right?

A.    It appears that way, yes, ma'am.

Q.    And one of the biggest items that seems to be visible is a big box of diapers; isn't that right?

A.    I'm not sure what those are.

Q.    Okay.  So you don't recall ---?

A.    I can't definitively say.

Q.    And you can't tell by the video?

A.    I mean it looks like there's a baby on there, but I can't tell exactly what kind of box it is whether it's diapers or something else.  I'm not sure.

Q.    You did not make a report of the items to refresh your recollection of what was in the trunk; is that right?

A.    I don't have a report indicating that.

Q.    Okay.  And the property that is located within the vehicle can help identify the owner and occupier or user of a vehicle; isn't that right?

A.    I'm sorry, can you repeat that?

Q.    Sure.  The property that's located within the vehicle can also help to identify the owner and/or user of that vehicle; isn't that right?

A.    It could possibly, yes.

Q.    I'm going to continue the video at 26:55.  I'm going to keep it going.

(VIDEO PLAYED)

BY ATTORNEY THOMPSON:

Q.    Okay.  So I started at about 26:55 and paused it again at 27:06.  In between that time, you now see Trooper Petrosky again to the right side of the video frame in front of the Terry brothers engaging them in conversation; is that right?

A.    I'll be honest with you; I was watching my search of the vehicle.  I wasn't paying attention to Trooper Petrosky.

Q.    I'll back that up.  I'm starting at 26:28.

(VIDEO PLAYED)

BY ATTORNEY THOMPSON:

Q.    Do you see him engaging them in conversation?

A.    I do see that.

Q.    And do you see him still having his hand by his weapon?

A.    I did not see that.  I was just looking for him to make conversation.  I wasn't looking ---.

Q.    Do you see it now?

A.    Yes.

Q.    Okay.  And that was about 27 minutes.  I stopped it at 27:10.  So around about 27 minutes in that was

again where you could see that Trooper Petrosky still had his hand by his weapon while engaging the Terry brothers; is that right?

A.   That's what it appears, ma'am.

Q.   And you continued to search the vehicle during that time; is that right?

A.   Yes.

Q.   And I will take it to about 32 minutes, the video.  I'll start it at about 31:54.

(VIDEO PLAYED)

BY ATTORNEY THOMPSON:

Q.   So around about 32 minutes --- I stopped it at about 32:53 but a couple of seconds before that around about 32:50 is when you then approached the Terry brothers and tell them to put their hands behind their back; right?

A.   Yes, ma'am.

Q.   I'm going to start again.  And at that time that you tell them to put their hands behind their back you don't tell them exactly why.  You said I'll tell you within a minute; is that right?

A.   I'd have to refer to my report, but I think it was something like that.

Q.   I'll start at 32:53.

(VIDEO PLAYED)

BY ATTORNEY THOMPSON:

Q. So I stopped it at 33:23. You were asked why or something like that from either of the Terry brothers; is that right?

A. Yeah, I think Gerald had mentioned something along those lines.

Q. And then you said you'll tell them later?

A. In a few minutes, yeah.

Q. I'm going to start again at 33:23.

(VIDEO PLAYED)

BY ATTORNEY THOMPSON:

Q. So I'm stopping it at 34:09. But a couple of seconds before that, you told the Terry brothers you have to figure something out; right?

A. That's correct.

Q. So you really didn't know what you saw or what it was at that time?

A. Well, basically, I had to confirm or deny whether the trap was --- contained contraband and also try to figure out how to open it. And also, you know, additional to that to get a better look at the compartment.

Q. I'm going to restart the video at 34:09.

(VIDEO PLAYED)

BY ATTORNEY THOMPSON:

Q. So I stopped it at about 34:57. You had just told him you believe that you found a trap?

A. Yes, ma'am.

Q. And you still had to investigate further but you weren't really sure?

A. I believe I had found a compartment.

Q. Right. So you weren't really sure?

A. I was fairly certain, ma'am.

Q. So around about 34:57 you were fairly certain you might've found a trap, and then you continued to search the vehicle; right?

A. Yes.

Q. And telling the Terrys that --- you put them in the car; you tell them that you will explain more later basically?

A. I'd have to go back and watch the video, but I instructed Gerald that, you know, I believe I had found an aftermarket compartment and was going to investigate that.

Q. And during that period of time, you didn't inform the Terrys that they had the right to terminate their consent?

A. No.

Q. I'm going to go to around about 37 minutes. I'm starting at 36:53.

(VIDEO PLAYED)

BY ATTORNEY THOMPSON:

Q.    Now, here I stopped at 36:57 seconds.  You can see yourself on the phone; is that right?

A.    That's correct.

Q.    And you said you were calling your supervisor?

A.    Yes, ma'am.

Q.    Were you calling your supervisor to gain some direction on how to deal with what you suspected?

A.    I was calling to notify him first and foremost of the notification, but you know, I may have been calling to get some guidance on how to open the compartment or perhaps to find the wires.

Q.    And this is one of the points in the video where there's no sound, so as you stated previously you would've cut that off; is that right?

A.    That's correct, yes.

Q.    And why would you have done that?

A.    For a potential wiretap violation.  I didn't want to be on the phone and have my recording device going at the same time.

Q.    It would be a wiretap violation against who?

A.    Against me.  I don't know.  That's why I turn it off because I don't know much about the wiretap violation, and I don't want to commit a violation.

Q.   Whose privacy rights did you believe were going to be effected?

A.   His.

Q.   His being whose?

A.   My supervisor.

Q.   So you did not want to get on the audio recording what your supervisor was saying to you?

A.   Yeah, I never told him that I was recording, so I didn't want to record that phone call.

Q.   But you did tell him that you were in the middle of a criminal investigation?

A.   Well, I told him that I located a compartment, yes, a trap.

Q.   And so then you could've as well told him that you were since you were actively investigating your audio microphone was also on; right?

A.   I could've, but I didn't.

Q.   And so you stay on the phone with your supervisor or another person for a matter of at least another eight or so minutes; is that right?

A.   I'm not entirely sure how long I was on the phone.

Q.   I'm going to skip to around about 43 minutes. I'm starting at 42:53.

(VIDEO PLAYED)

BY ATTORNEY THOMPSON:

Q. So here there's still no sound, so it means your mic remains off; is that right?

A. That's correct.

Q. So you see that you're still on the phone about 43:29?

A. Yes, ma'am.

Q. So were you still speaking to your supervisor?

A. I would assume so. I wasn't able to watch from where you stopped the video initially and then fast-forwarded.

Q. Well, do you recall calling someone else during that period of time?

A. I don't, no.

Q. So I stopped about 44:21. As you approached around about a couple seconds earlier, it appeared that you are now off or terminated the phone call. Your phone was not in your hand; is that correct?

A. It appears that way.

Q. I'm going to restart it at 44:21.

(VIDEO PLAYED)

BY ATTORNEY THOMPSON:

Q. And all this time you're still searching; right?

A. Yes. Right now, I'm working to gain access to the compartment.

Q.  I'm going to stop at 44:48.  So you had just stated that you were working to gain access to the compartment; right?

A.  Yes.

Q.  And previously on Direct you said that you had encountered maybe about 13 compartments in your career; is that right, for yourself?

A.  That's correct, yes, ma'am.

Q.  And you said of the 13 I believe you said at least maybe three that you searched hidden compartments did not contain contraband?

A.  I believe I said two.

Q.  Two?

A.  Yes.

Q.  You believe you said two.  So through your training and experience then you have learned that not all hidden compartments contain contraband?

A.  Yeah, I mean there are those times that those compartments don't contain anything at all.  They're empty.

Q.  So seeing that there's a hidden compartment does not necessarily lead to that there is contraband within the hidden compartment?

A.  It's a possibility.

Q.  I'm going to restart the video at 44:48.

(VIDEO PLAYED)

BY ATTORNEY THOMPSON:

Q. Okay. So I stopped the video at 45:20. About a second or so before that, then we started hearing sound again; is that right?

A. That's what it sounds like.

Q. So then at that time you reengaged your microphone; is that right?

A. Yes.

Q. I'm going to restart the video at 45:20.

(VIDEO PLAYED)

BY ATTORNEY THOMPSON:

Q. I stopped the video at 45:36. A couple of seconds before that you had just made a statement that you see a package but you're not sure what the package is; is that right?

A. That's correct, ma'am.

Q. So from seeing the package, you were not able to determine upon sight that it was contraband; is that right?

A. I was not able to determine the substance of that package. I knew in my training and experience that they were either kilograms or blocks of heroin, but at that time I did not know the substance of the contraband.

Q.    But what you actually said in the video is you see a package but you're not quite sure what it is?

A.    Correct, I'm not sure what the package is.

Q.    I'm going to restart the video at 45:36.

(VIDEO PLAYED)

BY ATTORNEY THOMPSON:

Q.    So I stopped the video at about 46:43. A couple of seconds prior to my stopping, did you hear you sort of complain that you had a flashlight that sucked?

A.    Yes.

Q.    Did that indicate that it wasn't really working for you for you to see what was in that compartment?

A.    No, that's not accurate. I could just --- I think I could tell at that point that it was dying. That the flashlight was dying. At that specific point, that's what I would assume that is because it happens often.

Q.    So you're assuming that's what occurred?

A.    Uh-huh (yes).

Q.    I'm going to restart the video at 46:43.

(VIDEO PLAYED)

BY ATTORNEY THOMPSON:

Q.    All right. So I stopped the video again at 47:07. And at that time, you're speaking --- are you speaking just in the mic in general?

A.    Just speaking into the mic in general just to kind of, you know.

Q.    Make a record?

A.    Yeah.

Q.    And at that time, you're again saying that you believe you found a trap, but you don't know what's in it?

A.    I found a trap, but it sounded like it was unintelligible.  I couldn't hear exactly --- if you want to play it back maybe.

Q.    Sure.  I'll start the video at 46:57.

(VIDEO PLAYED)

BY ATTORNEY THOMPSON:

Q.    So I stopped it again at 47:07.  Did you hear yourself say I don't know of what?

A.    Yeah, I heard that, yeah.

Q.    So again, what you're communicating is you don't really know what's in the trap?

A.    I don't know what the substance is.

Q.    I'm going to go to shortly before 49 minutes. I'm starting the video at 48:58.

(VIDEO PLAYED)

BY ATTORNEY THOMPSON:

Q.    So I stopped the video at 49:43, so between that period of time you returned to the vehicle, the red

Ford Taurus, and reengaged the search, and then you again cut off your microphone; is that right?

A.    Yes, ma'am.

Q.    And why was that?

A.    I'm not sure.  I'm not sure.  It appears that perhaps I was making a phone call, but I'm not entirely sure.

Q.    I'm going to restart the video at 49:43.

(VIDEO PLAYED)

BY ATTORNEY THOMPSON:

Q.    I'm stopping the video at 50:28.  So can you now see that you actually are on the phone?

A.    Yes, ma'am.

Q.    And would you have been on the phone then when you cut the sound off?

A.    Yes.

Q.    Okay.  And do you know if you were still talking to your supervisor or another person?

A.    I don't recall exactly who I was talking to at that time.

Q.    All right.  I'm going to go to 60 minutes around about.  I'm going to start this video at 59:57.

(VIDEO PLAYED)

BY ATTORNEY THOMPSON:

Q.    And so the sound remains off; is that right?

A.    That's what it sounds like.

Q.    Now, I stopped the video at 1:00:27.  And can you see it looks in your left hand you have some type of tool?

A.    Yes.

Q.    And what tool is that?

A.    That's an upholstery tool that I think I was talking about in my Direct testimony.  Basically what it is is a tool that's utilized to pop side panels off of the dash or the center console, things of that nature.  It's a tool that's kind of --- it doesn't really do --- it doesn't do any damage if you know how to use it right to pop panels off of vehicles.  It's an upholstery tool.

Q.    So if you had previously opened the hidden compartment and see items within the hidden compartment, why did you still need the tool at about the hour mark?

A.    I don't know.  I don't know if I was still trying to pry it open.  I'm not quite sure what's going on there.

Q.    I'm going to go to about 72 minutes, 1:12:00. I'll start the video at 1:11:51.

(VIDEO PLAYED)

BY ATTORNEY THOMPSON:

Q.    So again, the sound remains off; is that right?

A.    That's correct.

Q.    And now, you're also speaking to Trooper Petrosky; is that right?

A.    That's what it appears, yes.

Q.    And you still had the tool in your hand, so you're still working with the tool; is that right?

A.    Yes, ma'am.

Q.    I stopped the video again at 1:12:08.  I'm going to go to about 1:21:00.  First of all, where I first stopped and I said you both were at the vehicle with the tool again in your hand, had you discovered what was in the compartment at that time?

A.    I'm not entirely sure if I had accessed the compartment completely at this point, but previously to that I was able to see inside the apartment and I was not able to --- compartment and I was not able to see the --- I was able to see the kilogram packages but was not able to determine the substance.

Q.    So actually, you did not in any of your recording statements say that you could even see kilo packaging; did you?

A.    I could see --- I couldn't see the substance. And I'd have to go back into the record to see what I said specifically, but they were kilogram-sized

packages and I think I before mentioned something about maybe they were either kilogram-sized packages or perhaps brick packages.

Q.    Well, actually what you said was played to you and neither brick or kilo was mentioned in your statements; is that right?

A.    I don't recall.

Q.    Okay.  I'm going to start the video at 1:20:53.

(VIDEO PLAYED)

BY ATTORNEY THOMPSON:

Q.    At this time the sound is off again; is that correct?

A.    Yes, ma'am.

Q.    Or actually it just remained off that entire time; isn't that right?

A.    I'd have to watch the video again in its entirety to answer that accurately.

Q.    So this is where the tow truck arrives, and I stopped the video at 1:21:20.  And you can see the tow truck in front of the red Ford Taurus; is that right?

A.    That's right.

Q.    I'm going to restart the video at 1:21:20.

(VIDEO PLAYED)

BY ATTORNEY THOMPSON:

Q.    As we watch this video, you can still see the

snow flurries in the camera; is that right?

A.    Yes.

Q.    So I stopped the video at 1:22:16.  The tow truck driver is now approaching you; is that right?

A.    Yes.

Q.    I'll restart the video at the same place.

(VIDEO PLAYED)

BY ATTORNEY THOMPSON:

Q.    I stopped the video at 1:22:20.  You had indicated to the tow truck driver for an item; is that right?

A.    I'm not sure what I was indicating to him.

Q.    But you held your two hands up, the index fingers in the air; would that have been the size of an item?

A.    I'm not --- it could've been.  I'm not sure.  I don't recall what I was indicating to him.

Q.    I'm going to reengage the video at 1:22:20.

(VIDEO PLAYED)

BY ATTORNEY THOMPSON:

Q.    So the tow truck driver returned to his vehicle after approaching you; right?

A.    I'm sorry?

Q.    After approaching you and you indicating to the tow truck driver, he returned to his vehicle; is that

right?

A.    He returned to his vehicle and it looks like he's coming back.

Q.    Yes.  And he's handing you a tool now; is that right?

A.    Yes.

Q.    I stopped the video at about 1:22:42, and it was a couple seconds prior to me stopping the video is when now the tow truck driver handed you a tool; is that right?

A.    That's what it looks like, ma'am.

Q.    And so you needed that tool to open the compartment?

A.    That's correct.

Q.    I'm going to continue the video at where I stopped it.

(VIDEO PLAYED)

BY ATTORNEY THOMPSON:

Q.    So the tow truck driver is still waiting by you. Are you having a conversation with him?

A.    I'm not sure.

Q.    And during this time with whatever conversation you were having with the tow truck driver you do not have on your microphone.  It's still cut off; is that right?

A.    It's still off, yes.  And I don't remember the conversation I was having with the tow truck driver.

Q.    I'm going to stop the video at 1:25:36.  So the tow truck driver is still standing around; is that right?

A.    Yes.

Q.    And during this period of time since he's arrived, you didn't see him hook up the vehicle; is that right?

A.    I'm not sure if he did or not.

Q.    Well, were you watching the video?

A.    I was just watching kind of what I was doing.  I wasn't really paying attention to the tow truck driver.

Q.    I'm going forward to about just before 1:19:00 --- I'm sorry, 1:29:00.  I'm going to start at 1:28:49.

(VIDEO PLAYED)

BY ATTORNEY THOMPSON:

Q.    So here you see about 1:29:06 the tow truck driver approaches the red Ford Taurus and engages you in conversation; is that right?

A.    That's what it appears.

Q.    And throughout this whole time your microphone is still off?

A.    Still off.

Q.    You don't recall the conversation?

A. I do not.

Q. So after about 1:30:04 then you recover contraband and then place that on the hood of your vehicle; is that correct?

A. The contra --- yes.

Q. Well, the drugs and the gun?

A. Yes, I wanted to put the contraband on camera so they can be visible.

Q. So I'm going to restart the video at 1:30:04.

(VIDEO PLAYED)

BY ATTORNEY THOMPSON:

Q. Okay. So around about 1:30:52 or a couple seconds difference, that's when you reactivate the sound; is that right?

A. Yes, ma'am.

Q. I'm going to restart the video at that mark.

(VIDEO PLAYED)

BY ATTORNEY THOMPSON:

Q. So then you terminated the audio. You terminated the audio and the visual of the video; is that right?

A. Yes.

Q. But you're saying that in between that time you then after finding the contraband you went to Trooper Petrosky's vehicle and began engaging the Terrys in

conversation; is that right?

A. Yes, sometime --- sometime after, you know, I located the contraband I went to Trooper Petrosky's vehicle and advised the Terrys both of their Miranda Warnings at the same time.

Q. So again, you're equipped with a camera at your vehicle and a body mic on your person at that time; is that correct?

A. During what time?

A. The time that you say that you're engaging the Terrys and reading them or telling them of their Miranda Rights you have available to you a video camera through your vehicle and an audio microphone through your body mic; isn't that right?

A. That is correct.

Q. And did Trooper Petrosky's vehicle or was Trooper Petrosky's vehicle similarly equipped with video of the outside as well as the inside of his patrol car?

A. It was, but I'm not sure if an MVR was downloaded from that.

Q. And so that is or would have been available?

A. It would've been.

Q. And isn't it correct that Trooper Petrosky also had a body microphone?

A.    He would've had one available to him, but I'm not sure if he was wearing it or not.  I never --- I don't recall seeing it.

Q.    So while you say that you informed the Terrys and that's at the scene you're talking about you say you informed them of their Miranda Rights as they sat in Trooper Petrosky's vehicle; is that right?

A.    Yes.

Q.    So why don't you engage your body microphone that that could be memorialized?

A.    I'm not sure.  It was a mistake.  I should've had it on when I read those Miranda Warnings but ---.

Q.    And also, you did not get them to sign a Miranda Warning card; is that right?

A.    That's correct.  I did not.

Q.    So then you and Trooper Petrosky then transported the Terrys to the barracks?

A.    Yes, sometime once the tow truck got the vehicle secured and we went back to the barracks.

Q.    Going back to the time you were out on the scene on Direct you mentioned something about the hidden compartment you believe that there was one because of welding inside the glove box; is that what you said?

A.    Well, I saw the welded box --- or the box and there was weld marks on the box.

Q.     When you say the box, are you saying the glove box compartment?

A.     No, the box that's manufactured as the trap, the aftermarket hidden compartment.

Q.     And isn't it correct that how that compartment was situated, the driver could not see that as simply just being the driver of the vehicle?

A.     I don't think.  It's not in plain view.  I don't think he could see it.

Q.     And isn't it correct that the hidden compartment as it was situated would not be visible to a front seat passenger as they sat in the passenger seat?

A.     That's true.

Q.     Now, did you create a receipt inventory list --- a property record rather of the items found in the vehicle?

A.     Yes.

Q.     I'm going to take it out of order and show you what's marked as Defendant's Exhibit 2.

                        *   *   *

        (Whereupon, the document was marked as Defendant's Exhibit No. 2 for purposes of identification.)

                        *   *   *

BY ATTORNEY THOMPSON:

Q. Just let me know if that's a true and accurate copy of your receipt property --- or your property record?

A. No.

Q. It is not?

A. It's not. It's not.

Q. What is inaccurate?

A. Basically, this is just a copy of the evidence that was submitted. It's not the copy of the official signed copy that was submitted that evening.

Q. Okay. So I'm trying to have some understanding. Where it says the title on the first page where the Defense Exhibit 2 indicator is it says Pennsylvania State Police property record; is that correct?

A. That's correct.

Q. And that is a two-page document, and it has item numbers 1 through 10; is that correct?

A. As property, yes.

Q. Okay. The items that's listed under paragraph 15 then individually numbered 1 through 10, is that a true and correct indication of what was found in the vehicle on April 4th, 2018? And I'm sorry, that you entered into evidence?

A. Yes.

Q. Okay. So when you got to the barracks, you

placed the Terrys into the same room?

A.    They were in the same room, correct.

Q.    And was that room equipped with audio or videotape?

A.    I'm not sure.

Q.    You're not sure.  And how long have you worked at those barracks?

A.    For probably about a year I would say at the Somerset Barracks, but you know, we're not there all the time.  Our primary office is out of Harmarville.

Q.    Okay.  So how often would you say that you would take suspects to the Somerset Barracks?

A.    I don't --- I'm not sure.

Q.    If you're having suspects and you're going to engage in interviews, would you inquire of whether or not audio or video are available to get the interviews recorded?

A.    I could, but I didn't.

Q.    So you didn't inquire about audio or video in the room, but you are still in your uniform, you still have your body microphone; is that right?

A.    I'm not sure if I have my body microphone at this point.

Q.    And why would that be any different?

A.    I never --- once I terminate the traffic stop, I

don't use my body microphone for anything other than traffic stops. I don't take it inside buildings or anything to be used.

Q. So you were as you say interviewing John Terry in the barracks, but you don't use your body microphone to catch the conversation?

A. That's correct. I don't.

Q. And you do not have a written statement from John Terry; is that right?

A. No, that's correct.

Q. And you indicate that John Terry took responsibility for the vehicle; is that right?

A. Yes.

Q. And in that responsibility, he informed you that he borrowed the vehicle; isn't that right?

A. Yes.

Q. And that was the extent of responsibility he took just to say he borrowed the vehicle; isn't that right?

A. He had said that he borrowed the vehicle and that he took --- or that he was responsible for the vehicle, and you know, I took that as that he was responsible for the vehicle and everything inside.

Q. Okay. You testified April 13th, 2018 in front of District Magistrate Susan Mankamyer; is that

correct?

A.    Yes.

Q.    I'm going to hand you what is marked as Defense Exhibit 1.

                    *   *   *

      (Whereupon, the document was marked as Defendant's Exhibit No. 1 for purposes of identification.)

                    *   *   *

BY ATTORNEY THOMPSON:

Q.    I'm going to direct you to page 19 and ask if you can take a moment to read that page?

A.    Okay.

Q.    Did that refresh your recollection?

A.    Of?

Q.    Of what Mr. Terry said to you and what he took responsibility for?

A.    He took responsibility for the vehicle and that he borrowed the vehicle.

Q.    Right.  Because back on April 13th, 2018, you were asked whether or not he admitted that he knew gun or drugs were inside the vehicle; isn't that right?

A.    Which line is that, I'm sorry?

Q.    Page 19, lines 23 to 25.

A.    Okay.

Q.   And then going onto page 20 as well it continues.  Let me know when you're ready.

A.   I'm ready.

Q.   So does that refresh your recollection as you had testified back on April 13th, 2018 that Mr. Terry did not admit knowing that the guns and drugs were present in the vehicle?

A.   He did not admit that the guns or drugs were in the vehicle.

Q.   That he knew the guns or drugs were in the vehicle?

A.   He did not admit that.

Q.   And then also further as your testimony continues on page 20, Mr. Terry did not admit knowing that there was a secret compartment; isn't that right?

A.   He did not admit that.

Q.   And it is correct that you did not have any evidence knowing or evidence indicating that John Terry knew about the secret compartment?

A.   Not at that time, no.

Q.   And when you say that time just going to --- this is on April 4th, 2018.  These are where you're having the conversations with John Terry about his knowledge; is that right?

A.   About his --- regarding his knowledge about ---?

Q.    Yes, and what he was taking responsibility for.

A.    He said he was claiming responsibility --- or admitted to taking responsibility for the vehicle.

Q.    For borrowing the car; is that right?

A.    Borrowing the car.

Q.    Yes, okay.  Now, you were asked about the citations and the citation in reference to general lighting states that the color of the lights in the rear should not be changed; isn't that right?

A.    I'm not sure exactly what the section says.

Q.    And your understanding of what the section says, would that have been true on April 4th, 2018 as it is today?

A.    From what I understand, it is my knowledge that the taillights should not be tinted on a motor vehicle that is registered in Pennsylvania.

Q.    And then the same with changing lanes, it is correct that the state law actually says that a driver should only change lanes as they feel is reasonably safe; isn't that right?

A.    Again, I'm not sure exactly what the title states verbatim, but I believe --- I have an accurate depiction of the Vehicle Code, not all of it but a majority of it.

Q.    But you're not able to say even generally what

it says?

A.    I can't recite the language.

Q.    And it references as well following too closely the law also does not say maintaining the --- what did you say, four ticks; is that what you said?

A.    A four-second following distance.

Q.    Four-second follow line.  That's not actually written into the statute; is that right?

A.    It's my interpretation of it.  It is not.

ATTORNEY THOMPSON:  One moment, Your Honor.

BY ATTORNEY THOMPSON:

Q.    And more specifically for Section 3310 of the Vehicle Code, do you know that it says the driver of the motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the safe speed of the vehicles and the traffic upon and the condition of the highway?

A.    That sounds right.

Q.    And in this case, Mr. Terry had just made a lane change and then space was developing between the two vehicles at the time that you stopped him; is that right?

A.    I would say that space was developing, but he was still following too closely in my opinion.

ATTORNEY THOMPSON: Your Honor, at this point, Defense would move for the admission of its Exhibits 1 and 2.

ATTORNEY BERNARD: No objection, Your Honor.

JUDGE GIBSON: Defendant's 1 and 2 are admitted.

*   *   *

(Whereupon, the documents marked as Defendant's Exhibit Nos. 1 and 2 for identification were received in evidence.)

*   *   *

ATTORNEY THOMPSON: And no further questions at this time.

ATTORNEY BERNARD: The Government has no Redirect Examination, Your Honor. At this point, we would be open to argument if you wish, or we'd like to discuss a briefing schedule.

JUDGE GIBSON: Attorney Thompson, does the Defendant have any witnesses to present?

ATTORNEY THOMPSON: No, Your Honor.

JUDGE GIBSON: What I would prefer, and I'll certainly listen to Counsel if you think there's some better way to do it, but I would prefer to order a transcript and have you present Proposed Findings and

Conclusions referring to the transcript. As I said before we started, I found the briefs of both parties to be excellent but they were not tied in directly into the hearing transcript and I would like to have you do that. Just one second. Let me speak with the court reporter.

(OFF RECORD DISCUSSION)

JUDGE GIBSON: The court reporter indicates that he can have the transcript ready by March the 8th. If that's correct, how soon thereafter could Counsel have their briefing done? How long are you asking for to have your briefing?

ATTORNEY BERNARD: Your Honor, the Government would defer to the Defendant as the Government carries the burden of proof, so we ask that the Defense submit their brief first and then we be allotted say 14 days after that to file ours.

JUDGE GIBSON: Let's assume they are filed on the 8th. They may be filed before that but how much time would you request to have your Findings and Conclusions?

ATTORNEY THOMPSON: And when you say they, being the transcripts before the 8th?

JUDGE GIBSON: By the 8th, yes.

ATTORNEY THOMPSON: I was looking at

trial schedules.

JUDGE GIBSON: Would you like 30 days?

ATTORNEY THOMPSON: No, I know Mr. Terry would like me to be more prompt than that. Realistically, I probably would have to say 14 but if I can get it in earlier we can go from there.

JUDGE GIBSON: So you would have yours by 14 calendar days or 14 business days?

ATTORNEY THOMPSON: So from the 8th, say the 22nd, so that would be calendar days I believe.

JUDGE GIBSON: And then thereafter you could have yours in in another 14 days?

ATTORNEY BERNARD: Yes, Your Honor.

JUDGE GIBSON: So that would be the 22nd, and then what would be the date if we gave another 14 days thereafter, calendar days?

ATTORNEY BERNARD: I believe it would be April 5th.

JUDGE GIBSON: Then yours would be due on April 5th.

ATTORNEY THOMPSON: Your Honor, excuse me.

JUDGE GIBSON: Yes?

ATTORNEY THOMPSON: Are we able to say in case I'm able to get it in earlier are we able to

say that the Government will respond 14 days after Defense?

JUDGE GIBSON: Yes, yes. So we can put that in terms of Defendant will file the Findings and Conclusions no later than March 22nd or no later than 14 days after the transcript is filed. So you can actually have it earlier. And the Government will file its response 14 days after the Defendant has filed Findings and Conclusions. That will keep it to the least amount of time. So if we get the transcript filed earlier, then the whole process can move earlier. And then do you wish to have the right to file a brief rebuttal after the Government files its Findings and Conclusions?

ATTORNEY THOMPSON: Yes, Your Honor.

JUDGE GIBSON: Five days?

ATTORNEY THOMPSON: Yes, Your Honor.

JUDGE GIBSON: Then the Defendant will have five days after the filing of the Government's Proposed Findings and Conclusions. And if the Government believes that it needs to file a surrebuttal to that, then you can request it at that time, but I'm not going to build that into the briefing schedule. As far as costs for the transcript, they will be allocated equally between the parties. We are scheduled for

another hearing on the 28th. I believe that will start at 1:00. Anything further for the Court today?

ATTORNEY BERNARD: No, Your Honor.

ATTORNEY THOMPSON: No, Your Honor.

JUDGE GIBSON: All right. Thank you for your thorough presentations, both parties, and we will await the transcript being filed. I will note that this court reporter is usually very prompt in preparing and filing the transcripts, so we should definitely have them no later than March 8th.

ATTORNEY THOMPSON: With the payment, Your Honor, once I do know what the cost is, there would be some time of communication with the family to get the cost in, the payment in, so if perhaps there could be some modification that from the time the transcript is received. I mean I think the family would act promptly to pay the cost, but I can't say how many days after the transcripts are ready that they're going to make payment.

JUDGE GIBSON: It shouldn't be an extensive cost, but I can't give you an estimate. It would be split equally between the parties. Let me ask the court reporter again what their normal procedure is.

(OFF RECORD DISCUSSION)

JUDGE GIBSON: Counsel, he will be filing the transcript when it's ready and he would advise the parties what would be the cost at that time, so that won't hold up the filing of the transcript. Any questions about any of that, Counsel?

ATTORNEY BERNARD: No, Your Honor.

JUDGE GIBSON: Attorney Thompson, any additional issues or questions?

ATTORNEY THOMPSON: Just one extra thing, I'd just ask the court reporter when you have an indication of a possible fee, if you can let me know even before you file so I can start giving the family a heads up.

JUDGE GIBSON: I'm sure he can do that. Thank you very much. You can step down, Trooper. We'll be in recess until call of Court.

(Whereupon, at 2:55 p.m., the hearing was adjourned.)

* * *

<u>C E R T I F I C A T E</u>

I hereby certify, as the stenographic reporter, that the foregoing proceedings were taken stenographically by me, and thereafter reduced to typewriting by me or under my direction; and that this transcript is a true and accurate record to the best of my ability.


By:_____

Dale Curtis Rose, Jr.