## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | ) | Case No. 3:18-cr-24 |
|---|---|---|
| | ) | |
| v. | ) | **JUDGE KIM R. GIBSON** |
| | ) | |
| **JOHN T. TERRY, a/k/a TYREE TERRY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

### I. Introduction

Before the Court is Defendant John T. Terry's ("Defendant") Motion to Suppress Evidence (ECF No. 26). This Motion has been fully briefed (ECF Nos. 26, 32, 51, 52) and is ripe for disposition. The Court has jurisdiction over this matter pursuant to 18 U.S.C. § 3231.

This matter arises from a three-count federal grand jury indictment, returned on October 16, 2018, charging Defendant with (1) possession with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine and cocaine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(viii), 841(b)(1)(B)(ii)(II); (2) unlawful possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1); and (3) unlawful possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. §§ 924(c)(1)(A)(i), 924(c)(1)(C)(i). (*See* ECF No. 1.) On November 28, 2018, Defendant filed the present Motion to Suppress Evidence (ECF No. 26). After the United States of America (the "Government") filed its Response (ECF No. 32), the Court held a Suppression Hearing on February 25, 2019. (*See* ECF No. 43.)

At the Hearing, Pennsylvania State Police Trooper Ryan Marmol ("Trooper Marmol") testified for the Government. (*See id.*) The Government introduced the following exhibits into evidence: (1) a DVD copy of a dash camera recording taken from Trooper Marmol's patrol vehicle of the April 4, 2018 vehicle stop (the "MVR") (Gvm't Ex. 1); (2) a photocopy of Trooper Marmol's *Miranda* card (Gvm't Ex. 2); (3) a document entitled "Police Criminal Complaint" dated April 4, 2018 and signed by Trooper Marmol (Gvm't Ex. 3); and (4) a Pennsylvania State Police Incident Report dated May 4, 2018 and signed by Trooper Marmol (Gvm't Ex. 4).

On cross-examination of Trooper Marmol, the defense introduced the following exhibits into evidence: (1) a Preliminary Hearing Transcript in *Commonwealth v. Terry*, Docket No. 00050-2018 (Def. Ex. 1); and (2) a Pennsylvania State Police Property Record, unsigned (Def. Ex. 2).

Following the Hearing, Defendant submitted Proposed Findings of Fact and Conclusions of Law in Support of Defendant's Motion to Suppress Evidence (ECF No. 51) and the Government filed a Response thereto (ECF No. 52).[1]

In his Motion, Defendant moves to suppress all physical evidence seized and statements made on April 4, 2018, as a result of the traffic stop of a 2010 Ford Taurus (the "Ford Taurus" or "Taurus") in which Defendant was a passenger. (ECF No. 26 at 1.) Defendant raises five grounds for the suppression of this evidence.

First, Defendant argues that Trooper Marmol lacked reasonable suspicion to believe that a motor vehicle offense occurred when he stopped the Ford Taurus on April 4, 2018. (*Id.* ¶ 28.) Second, Defendant contends that the traffic stop was longer than necessary to resolve the alleged

---

[1] Defendant was also given a five-day window to file a reply brief, but he did not do so. (*See* ECF No. 44.)

motor vehicle violations and that the extension of the stop was unsupported by reasonable suspicion to believe a non-motor-vehicle offense occurred. (*Id.* ¶ 29.) Third, Defendant asserts that the Taurus driver's consent to the search of the vehicle was involuntary. (*Id.* ¶ 30.) Fourth, Defendant argues that, to the extent the driver's consent was voluntary, the consent was limited to the interior and trunk of the vehicle and that Trooper Marmol's search exceeded the scope of this consent. (*Id.* ¶ 31.) Fifth, Defendant contends that Trooper Marmol did not properly advise Defendant of his *Miranda* rights before questioning him. (*Id.* ¶ 32.)

The Court disagrees with Defendant on these issues, and, for the reasons that follow, the Court will **DENY** Defendant's Motion to Suppress Evidence (ECF No. 26).

## II. Findings of Fact

The Court makes the following findings of fact based on the evidence and testimony[2] presented at the Suppression Hearing on February 25, 2019:[3]

### A. Trooper Marmol's Background and Experience

1. Trooper Marmol has worked for the Pennsylvania State Police for over six years. (ECF No. 48 at 4.)

2. In 2013, prior to becoming a State Police trooper, Trooper Marmol graduated from the Pennsylvania State Police Academy (the "Academy"). (*Id.* at 4-5.)

3. At the Academy, Trooper Marmol received training on the Pennsylvania Motor

---

[2] The transcript of the Suppression Hearing is docketed at ECF No. 48.

[3] "It is settled that at a hearing on a motion to suppress, 'the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge.'" *United States v. Leveto,* 343 F. Supp. 2d 434, 442 (W.D. Pa. 2004) (quoting *United States v. McKneely,* 6 F.3d 1447, 1452-53 (10th Cir. 1993); citing *United States v. Matthews,* 32 F.3d 294, 298 (7th Cir. 1994); *United States v. Cardona-Rivera,* 904 F.2d 1149, 1152 (7th Cir. 1990); *Government of the Virgin Islands v. Gereau,* 502 F.2d 914, 921 (3d Cir. 1974)).

Vehicle Code. (*Id.* at 5.)

4. Once Trooper Marmol graduated from the Academy, he served as a patrol office for two-and-a-half to three years. (*Id.* at 6.)

5. Trooper Marmol was then transferred to the Safe Highway Initiative through Effective Law Enforcement Detection ("SHIELD") unit. (*Id.*)

6. At the time of the Suppression Hearing, Trooper Marmol still worked as a SHIELD officer. (*Id.* at 6.)

7. Trooper Marmol underwent specialized training to become a SHIELD officer. (*Id.* at 6-7.)

8. His SHIELD training was approximately forty hours and included training on conducting traffic stops, deceptive behaviors, hidden compartments, and commercial motor vehicles. (*Id.* at 7.)

9. With respect to deceptive behaviors, Trooper Marmol has received approximately fifty hours of training on this subject. (*Id.*)

10. As to identifying hidden compartments, Trooper Marmol has received some training on this subject and has had personal experience locating hidden compartments in vehicles. (*Id.* at 7-8.)

11. Over his career, Trooper Marmol has conducted thousands of traffic stops, including approximately 500 stops in the last year. (*Id.* at 9-10.)

12. Trooper Marmol has conducted traffic stops based on Pennsylvania Motor Vehicle Code Section 3310—following too closely, Section 3309—roadways laned for traffic, and the general lighting requirements provisions, among others. (*Id.* at 5-6.)

4

13. Trooper Marmol has also searched hundreds of vehicles over his six-year career. (*Id.* at 10.)

14. About forty to fifty of Trooper Marmol's vehicle stops in the last year led to vehicle searches. (*Id.*)

15. When conducting searches, Trooper Marmol is particularly looking for: (1) contraband, (2) tooling on certain panels, (3) air fresheners that are methodically placed, and (4) glued carpet, black-over spray, and other indications of aftermarket hidden compartments. (*Id.* at 12.)

16. Trooper Marmol has located approximately thirteen hidden compartments during his vehicle searches. (*Id.* at 7-8, 130.)

17. Furthermore, he has found hidden compartments when backing up other officers at their traffic stops. (*Id.* at 8.)

18. Of the thirteen hidden compartments Trooper Marmol has located during his vehicle searches, approximately ten contained contraband, including guns or drugs. (*Id.* at 13, 130.)

19. In Trooper Marmol's training and experience, when he locates a hidden compartment, he suspects drug trafficking is occurring because such compartments are used for only one purpose—concealing contraband. (*Id.* at 12-13, 44; Gvm't Ex. 4 at 6.)

## B. Trooper Marmol's April 4, 2018 Vehicle Stop of the Ford Taurus

20. On April 4, 2018, Trooper Marmol was working in his capacity as a SHIELD officer. (ECF No. 48 at 13; Gvm't Ex. 3.)

21. Trooper Marmol was in uniform. (Gvm't Ex. 1; Gvm't Ex. 3; Gvm't Ex. 4 at 3; Def. Ex.

1 at 9.)

22. Trooper Marmol was patrolling a 50-mile stretch of the Pennsylvania Turnpike in Somerset County, Pennsylvania. (ECF No. 48 at 13-14.)

23. This portion of the Pennsylvania Turnpike is a four-lane highway with two lanes traveling eastbound and two lanes traveling westbound. (*Id.* at 16.) The lanes of the Turnpike are clearly marked. (*See* Gvm't Ex. 1.)

24. Around 2:30 p.m., Trooper Marmol was travelling in a marked Pennsylvania State Police patrol vehicle that was equipped with lights, sirens, a dash camera on the windshield that faced toward the front of the vehicle, and a camera that captured the inside of the vehicle. (ECF No. 48 at 14-16; Gvm't Ex. 3; Gvm't Ex. 4 at 3; Def. Ex. 1 at 9, 16.)

25. Trooper Marmol was wearing a lapel microphone on his person that began recording when the police vehicle's emergency lights were activated and was also manually turned on and off at certain times. (ECF No. 48 at 15, 85; Gvm't Ex. 4 at 3; Def. Ex. 1 at 16.)

26. Trooper Marmol was in the left lane of the Turnpike, traveling westbound, heading home after the completion of his shift. (*Id.* at 17-18, 73; Gvm't Ex. 4 at 3.)

27. The speed limit on this portion of the Turnpike was 70 miles per hour. (ECF No. 48 at 17, 73.)

28. At this time, Trooper Marmol conducted a traffic stop of a Ford Taurus with two adult occupants. (*Id.* at 17, 29, 73; Gvm't Ex. 1; Gvm't Ex. 3; Gvm't Ex. 4 at 2.)

29. Trooper Marmol's dash camera recorded this traffic stop. (ECF No. 48 at 18-19; Gvm't

6

Ex. 4 at 3; *see* Gvm't Ex. 1.)

30. Trooper Marmol explained that the dash camera truly and accurately captures what he sees as he travels in his vehicle; however, he noted that the dash camera footage has some limitations in terms of capturing distance and events that take place at the sides of the police vehicle. (ECF No. 48 at 21, 84-85.)

31. A portion of the audio from the stop was recorded on Trooper Marmol's lapel microphone. (*Id.* at 19; *see* Gvm't Ex. 1.)

32. The Ford Taurus was traveling in the left lane of the Turnpike, in front of Trooper Marmol. (ECF No. 48 at 24; Gvm't Ex. 1; Gvm't Ex. 4 at 3.)

33. Although Trooper Marmol did not remember exactly when, at some point while he was driving behind the Ford Taurus, he noticed that the Taurus had tinted taillights, which he believed violated the Pennsylvania Motor Vehicle Code. (ECF No. 48 at 18, 24; Gvm't Ex. 4 at 3.)

34. In spite of the tinted taillights, the brake lights of the Taurus appeared to be red and the right turn signal light appeared to be yellow. (ECF No. 48 at 84; *see* Gvm't Ex. 1.)

35. As Trooper Marmol's marked patrol vehicle approached the Ford Taurus in the left lane, Trooper Marmol was passing the vehicles that were travelling in the right lane. (ECF No. 48 at 73; Gvm't Ex. 1.)

36. When Trooper Marmol's patrol vehicle came up behind the Ford Taurus, the Taurus decelerated, allowing the vehicle that was traveling beside it in the right lane to pull ahead. (ECF No. 48 at 79-80; Gvm't Ex. 1.)

37. The Ford Taurus then activated its right turn signal and quickly changed lanes such

7

that the Taurus was in the right lane following only one vehicle length behind the vehicle in front of it. (ECF No. 48 at 24, 76, 78-79, 81, 151; Gvm't Ex. 1; Gvm't Ex. 4 at 3; Def. Ex. 1 at 11-12.)

38. Following the lane change, the Ford Taurus decelerated. (ECF No. 48 at 81; Gvm't Ex. 1.)

39. Trooper Marmol thought this lane change was unsafe. (ECF No. 48 at 24; Gvm't Ex. 4 at 3.)

40. Trooper Marmol also thought the Ford Taurus was following the vehicle in front of it too closely because the Taurus was only one vehicle length behind the vehicle in front of it. (ECF No. 48 at 25-26, 83.)

41. Moreover, Trooper Marmol's understanding of the Pennsylvania Driver's Manual was that the Manual required a four-second following distance between vehicles, which, based on Trooper Marmol's training and experience, was not met in this case. (*Id.* at 25-26, 83, 151; Gvm't Ex. 4 at 3.)

42. Trooper Marmol then maneuvered his patrol vehicle into the right lane behind the Ford Taurus, activated his lights, and conducted a traffic stop on the side of the Turnpike. (ECF No. 48 at 24-25, 77, 82; Gvm't Ex. 1; Gvm't Ex. 4 at 3.)

43. Trooper Marmol's basis for conducting the traffic stop was (1) the tinted taillights, (2) the unsafe lane change, and (3) following too closely. (ECF No. 48 at 25; Gvm't Ex. 3; Gvm't Ex. 4 at 3; Def. Ex. 1 at 9.)

44. After pulling the Taurus over, Trooper Marmol approached the vehicle on the passenger side and requested the driver's license, which the driver provided. (ECF

No. 48 at 27-28, 90; Gvm't Ex. 1; Gvm't Ex. 4 at 3.)

45. When the driver gave Trooper Marmol his license, Trooper Marmol did not immediately retrieve it. (ECF No. 48 at 28, 90-91; Gvm't Ex. 4 at 3.)

46. At this time, Trooper Marmol observed the driver's hand to be visibly shaking, which Trooper Marmol noted as nervous behavior. (ECF No. 48 at 28, 91; Gvm't Ex. 4 at 3-4.)

47. The license provided by the driver indicated that the driver was Gerald Terry.[4] (ECF No. 48 at 29; Gvm't Ex. 4 at 3.)

48. Trooper Marmol then asked if the driver owned the vehicle. (ECF No. 48 at 29; Gvm't Ex. 1; Gvm't Ex. 4 at 3.)

49. The driver responded that the vehicle belonged to a friend. (ECF No. 48 at 29; Gvm't Ex. 4 at 3.)

50. Trooper Marmol asked for the name of the friend and the driver simply handed Trooper Marmol the vehicle's registration. (*See* Gvm't Ex. 1.)

51. To Trooper Marmol, it seemed as though the driver did not know to whom the vehicle was registered. (Gvm't Ex. 4 at 4.)

52. Trooper Marmol then asked if the owner was a "girl," and the driver said that his friend's wife owned the vehicle. (ECF No. 48 at 29, 93; Gvm't Ex. 1; Gvm't Ex. 4 at 3.)

53. Trooper Marmol's suspicion was raised by the fact that the vehicle was owned by a third party, which is indicative of narcotics smuggling because the occupants of the

---

[4] Gerald Terry will be referred to as "the driver" so as to distinguish between Gerald Terry and Defendant John Terry.

9

vehicle can distance themselves from the contraband that is located within the vehicle. (ECF No. 48 at 29, 94; Gvm't Ex. 4 at 3-4.)

54. Trooper Marmol then explained the reasons for the stop, stating that when the Ford Taurus changed lanes, it was too close to the vehicle in front of it. (ECF No. 48 at 86-87; Gvm't Ex. 1; Gvm't Ex. 4 at 3.)

55. Trooper Marmol explained that such a lane change and close following distance could cause an accident if, for example, a deer jumped in front of the car in front and the car in front then had to stop suddenly. (Gvm't Ex. 1.)

56. Trooper Marmol then asked for the toll ticket (*id.*), which the driver provided, so that he could verify where the driver and Defendant got on the Turnpike. (ECF No. 48 at 87, 96; Gvm't Ex. 4 at 3.)

57. Trooper Marmol did not need the toll ticket to issue a traffic citation, but he always asks for the toll ticket when he conducts a traffic stop. (ECF No. 48 at 88.)

58. Trooper Marmol asked where the Taurus was coming from—to which the driver responded that they were coming from Philadelphia—and where they were going— to which the driver responded that they were heading to Pittsburgh. (ECF No. 48 at 30, 97; Gvm't Ex. 1; Gvm't Ex. 4 at 3-4.)

59. Trooper Marmol asked how long they would be in Pittsburgh. The driver responded that they were returning to Philadelphia a few hours later, after he spoke at a Narcotics Anonymous ("NA") meeting. (ECF No. 48 at 31, 97, 99; Gvm't Ex. 1; Gvm't Ex. 4 at 3.)

60. Trooper Marmol was suspicious because, in his training and experience, Philadelphia, Pennsylvania, is a known source area for the distribution of narcotics and Pittsburgh,

10

Pennsylvania, is a consumption and local distribution area for narcotics. (ECF No. 48 at 31; Gvm't Ex. 4 at 3-4.)

61. Moreover, Trooper Marmol was suspicious because, in his experience, quick trips such as this one are made to evade law enforcement. (ECF No. 48 at 32; Gvm't Ex. 4 at 4.)

62. Furthermore, Trooper Marmol felt that the trip's purpose was implausible, as they were traveling four-and-a-half hours to speak at an NA meeting and then turning around and traveling directly back. (ECF No. 48 at 32, 99; Gvm't Ex. 4 at 4.)

63. Trooper Marmol found this purpose odd particularly because he thought that there would be NA meetings in the Philadelphia area that the driver and Defendant could have attended. (ECF No. 48 at 32; Gvm't Ex. 4 at 4.)

64. Trooper Marmol then asked for the passenger's driver's license, which the passenger provided. (ECF No. 48 at 102; Gvm't Ex. 1; Gvm't Ex. 4 at 4.)

65. The license identified the passenger as Defendant John Terry. (ECF No. 48 at 29; Gvm't Ex. 4 at 4.)

66. Defendant's carotid artery was pulsating, which Trooper Marmol noted as nervous behavior. (ECF No. 48 at 30, 103; Gvm't Ex. 4 at 4.)

67. Trooper Marmol returned to his vehicle and conducted a criminal history check on the driver. (ECF No. 48 at 32, 104; Gvm't Ex. 4 at 4.)

68. The check indicated that the driver had previously been arrested. (ECF No. 48 at 33, 105.)

69. At this point, Trooper Marmol contacted police dispatch and requested backup for a vehicle search. (*Id.* at 33-34, 104-05; Gvm't Ex. 1; Gvm't Ex. 4 at 4.)

70. Trooper Marmol then conducted various criminal history queries on the driver and Defendant, driver's license queries, and registration queries. (ECF No. 48 at 35; Gvm't Ex. 4 at 4.)

71. The criminal history query for the driver showed that the driver had been arrested for drug and firearm offenses. (Gvm't Ex. 4 at 4.)

72. The criminal history query for Defendant indicated that Defendant had been arrested for various firearm-related offenses, assaults, and robberies. (*Id.* at 4-5.)

73. At some point, Trooper Marmol reviewed information regarding the identity of the vehicle's registered owner. (ECF No. 48 at 33; Gvm't Ex. 4 at 5.)

74. The vehicle was registered to a male, although the driver had said that his friend's wife owned the vehicle. (ECF No. 48 at 33; Gvm't Ex. 1; Gvm't Ex. 4 at 5.)

75. When Trooper Marmol ran a criminal history query on the vehicle's registered owner, he found that the owner had been arrested for drug and firearm offenses and was on federal probation. (ECF No. 48 at 37; Gvm't Ex. 4 at 5.)

76. After a roughly fifteen-minute wait, Trooper Nicholas Petrosky ("Trooper Petrosky") arrived from the Somerset Barracks to serve as Trooper Marmol's backup officer. (ECF No. 48 at 37; Gvm't Ex. 1; Gvm't Ex. 4 at 5.)

77. Trooper Marmol then approached the Ford Taurus and asked the driver to exit the vehicle. (ECF No. 48 at 109-10; Gvm't Ex. 1; Gvm't Ex. 4 at 5.)

78. The driver exited the Ford Taurus and Defendant also got out of the vehicle. (Gvm't Ex. 1; Gvm't Ex. 4 at 5.)

79. Trooper Marmol told the driver he was going to give him a verbal warning but no

12

ticket for the traffic violations. (ECF No. 48 at 110; Gvm't Ex. 1; Gvm't Ex. 4 at 5.)

80. Trooper Marmol also mentioned for the first time that the Ford Taurus had tinted taillight covers. (ECF No. 48 at 110; Gvm't Ex. 1.)

81. Trooper Marmol told the driver in a conversational manner that he was aware of his extensive criminal history. (ECF No. 48 at 114; Gvm't Ex. 1; Gvm't Ex. 4 at 5.)

82. Trooper Marmol asked the driver if there was anything illegal in the Ford Taurus, to which the driver responded, "no." (ECF No. 48 at 38, 114, 116; Gvm't Ex. 1; Gvm't Ex. 4 at 5.)

83. Trooper Marmol then asked the driver if he could search the vehicle, to which the driver responded, without hesitation, "yeah, yeah." (ECF No. 48 at 38, 113-14, 116; Gvm't Ex. 1; Gvm't Ex. 3; Gvm't Ex. 4 at 5; Def. Ex. 1 at 10.)

84. The driver did not limit the scope of the vehicle search. (ECF No. 48 at 40; Gvm't Ex. 1.)

85. Trooper Marmol did not inform the driver that he could withhold or terminate his consent to search. (ECF No. 48 at 126; Gvm't Ex. 1.)

86. Trooper Marmol asked for the driver's consent to search the Ford Taurus about twenty minutes into the traffic stop. (*See* Gvm't Ex. 1.)

87. The driver was not handcuffed when he gave Trooper Marmol his consent to search. (*See id.*)

88. During Trooper Marmol's encounter with the driver, Defendant was standing a few feet away from where Trooper Marmol and the driver were speaking. (ECF No. 48 at 38, 115; *see* Gvm't Ex. 1.)

13

89. Defendant gave no indication during the driver and Trooper Marmol's conversation that he was responsible for the Ford Taurus. (ECF No. 48 at 40; Gvm't Ex. 1.)

90. Trooper Marmol then said he was going to give the driver and Defendant's documentation to Trooper Petrosky. (Gvm't Ex. 1.)

91. Trooper Marmol asked if the driver "had anything on him." (*Id.*; Gvm't Ex. 4 at 5.)

92. Trooper Marmol asked the driver if he could pat the driver down, to which the driver consented. (ECF No. 48 at 39; Gvm't Ex. 1; Gvm't Ex. 4 at 5.)

93. Trooper Marmol patted down the driver. (ECF No. 48 at 39; Gvm't Ex. 1; Gvm't Ex. 4 at 5.)

94. The pat-down yielded negative results. (Gvm't Ex. 1; Gvm't Ex. 4 at 5.)

95. Trooper Marmol then asked Defendant if he "had anything on him" and asked if he could pat him down. (Gvm't Ex. 1; Gvm't Ex. 4 at 5.)

96. Defendant consented to the pat-down and Trooper Marmol conducted a pat-down that yielded negative results. (Gvm't Ex. 1; Gvm't Ex. 4 at 5.)

97. Trooper Marmol gave the licenses, registration, and toll ticket to Trooper Petrosky, who had been standing close by during Trooper Marmol's conversation with the driver. (ECF No. 48 at 111; Gvm't Ex. 1; Gvm't Ex. 4 at 5.)

## C. Trooper Marmol's Search of the Ford Taurus

98. Trooper Marmol then began the vehicle search. (ECF No. 48 at 42; Gvm't Ex. 1; Gvm't Ex. 4 at 5.)

99. During at least a portion of the search, Trooper Petrosky stood by Trooper Marmol's patrol vehicle with the driver and Defendant and with his hand on his weapon. (ECF

14

No. 48 at 117, 123-24; Gvm't Ex. 1.)

100.    Trooper Marmol started the vehicle search on the passenger side of the vehicle, then searched the driver's side, the back seat, the trunk, and the glove compartment/passenger-side dash area. (ECF No. 48 at 42; Gvm't Ex. 1.)

101.    Neither the driver nor Defendant interrupted the search to revoke consent to search. (ECF No. 48 at 42; *see* Gvm't Ex. 1.)

102.    Furthermore, Defendant never interrupted the search to say that he had authority over the vehicle. (ECF No. 48 at 42; *see* Gvm't Ex. 1.)

103.    According to Trooper Marmol and as shown by the MVR, neither the driver nor Defendant said anything to him during the search of the Ford Taurus, prior to the point at which Trooper Marmol handcuffed them. (ECF No. 48 at 42-43; Gvm't Ex. 1.)

104.    Eventually, Trooper Marmol believed that he located a hidden aftermarket compartment in the passenger-side dash area. (ECF No. 48 at 43; Gvm't Ex. 1; Gvm't Ex. 4 at 6; Def. Ex. 1 at 10.)

105.    Trooper Marmol located the aftermarket compartment by opening the glove compartment and dropping the compartment down the entire way so that he could look into the dash area. (ECF No. 48 at 43.)

106.    When doing this, Trooper Marmol noticed a metal box and "some welds," that, to him, indicated the presence of an aftermarket compartment. (*Id.* at 43, 143; Gvm't Ex. 1; Gvm't Ex. 4 at 5.)

107.    This box was located in the passenger's dash area where the passenger's airbag would have normally been located. (ECF No. 48 at 44; Gvm't Ex. 4 at 5.)

15

108.   But the box was not consistent with the airbag mechanisms that Trooper Marmol
       had previously observed in vehicles and Trooper Marmol knew that in order for the
       welded box to fit in that area, the air bag had to be removed. (ECF No. 48 at 44; Gvm't
       Ex. 4 at 5.)

109.   Trooper Marmol then handcuffed the driver and Defendant and placed them in
       Trooper Petrosky's patrol vehicle. (ECF No. 48 at 124, 126; Gvm't Ex. 1; Gvm't Ex. 4
       at 6.)

110.   Trooper Marmol explained to the driver and Defendant that he believed he found
       an aftermarket compartment in the Ford Taurus and that he was going to investigate
       it. (ECF No. 48 at 126; Gvm't Ex. 1.)

111.   Based on Trooper Marmol's training and experience that aftermarket
       compartments are used to smuggle contraband and his belief that he had located an
       aftermarket compartment, he believed he had probable cause to search the
       compartment and he accessed the compartment by prying it open. (ECF No. 48 at 45-
       46, 135, 139.)

112.   It took Trooper Marmol approximately fifty-five minutes to open the aftermarket
       compartment. (*See* Gvm't Ex. 1.)

113.   Inside the compartment, Trooper Marmol located three kilograms of a substance,
       a Smith & Wesson pistol, a vial of liquid, and some circular pills. (ECF No. 48 at 46,
       131; Gvm't Ex. 3; Gvm't Ex. 4 at 6; Def. Ex. 1 at 9; Def. Ex. 2.)

114.   Trooper Marmol placed the contents of the compartment on the hood of his police
       vehicle after he rendered the firearm safe. (ECF No. 48 at 46-47, 141; Gvm't Ex. 1.)

16

115.    A tow truck towed the vehicle back to the Pennsylvania State Police Somerset County barracks. (ECF No. 48 at 48, 65, 143.)

### D. Defendant's Arrest and Statement at Somerset County Barracks

116.    Trooper Marmol placed the driver and Defendant under arrest and read *Miranda* warnings to them using a *Miranda* card that he carries. (ECF No. 48 at 49-64, 142-43; Gvm't Ex. 2; Gvm't Ex. 3; Gvm't Ex. 4 at 6.)

117.    The driver and Defendant were transported to the Somerset County police barracks. (ECF No. 48 at 65, 143; Gvm't Ex. 4 at 6.)

118.    At the barracks, the driver and Defendant were seated on prisoner benches in the patrol room. (ECF No. 48 at 65-66.)

119.    Trooper Marmol processed the evidence while in the same room as the driver and Defendant. (*Id.* at 66, 146.)

120.    Trooper Marmol then interviewed Defendant in the interview room. (*Id.* at 66.)

121.    Trooper Marmol stated that during the interview, Defendant did not request to have an attorney present and did not indicate at any time that he wished to terminate the interview. (*Id.* at 67.)

122.    According to Trooper Marmol, "nothing of substance" was discussed during the interview. (*Id.* at 66.)

123.    Then, in the patrol room with the driver sitting across from him, Defendant told Trooper Marmol that he borrowed the Ford Taurus and that he was responsible for it. (*Id.* at 67, 147, 148, 150; Gvm't Ex. 3; Gvm't Ex. 4 at 6; Def. Ex. 1 at 10, 18.)

124.    Trooper Marmol could not remember whether Defendant's statement was made

17

in response to questioning or a dialogue between Trooper Marmol and Defendant. (ECF No. 48 at 67-68.)

## III. Conclusions of Law

As discussed *supra,* Defendant's Motion to Suppress Evidence (ECF No. 26) raises five grounds for the suppression of the physical evidence seized and statements made as a result of the April 4, 2018 traffic stop. First, Defendant argues that Trooper Marmol lacked reasonable suspicion to believe that a motor vehicle offense occurred when he stopped the Ford Taurus on April 4, 2018. (*Id.* ¶ 28.) Second, Defendant contends that the traffic stop was longer than necessary to resolve the alleged motor vehicle violations and that the extension of the stop was unsupported by reasonable suspicion to believe a non-motor-vehicle offense occurred. (*Id.* ¶ 29.) Third, Defendant asserts that the vehicle driver's consent to the search of the vehicle was involuntary. (*Id.* ¶ 30.) Fourth, Defendant argues that, to the extent the driver's consent was voluntary, Trooper Marmol's search exceeded the scope of the consent. (*Id.* ¶ 31.) Fifth, Defendant contends that Trooper Marmol did not properly advise Defendant of his *Miranda* rights before questioning him. (*Id.* ¶ 32.)

The Government filed a Response to Defendant's Motion to Suppress Evidence (ECF No. 32). The Government addressed Defendant's arguments as follows. First, the Government contends that Trooper Marmol had reasonable suspicion that vehicle code violations occurred, justifying the stop of the Ford Taurus. (*Id.* at 11-13.) Second, the Government avers that while Trooper Marmol's call for backup extended the traffic stop, at this moment Trooper Marmol had reasonable suspicion to justify the continued seizure of Defendant and the driver. (*Id.* at 17.) Third, the Government claims that Defendant has no standing to challenge the consent search

and that, even if he did, the driver had actual and apparent authority to consent to the search and his consent was voluntary. (*Id.* at 18-21.) Fourth, the Government contends that the search did not exceed the scope of consent until Trooper Marmol discovered the aftermarket compartment, at which time the search became a lawful probable cause search. (*Id.* at 22-26.) Fifth, the Government argues that *Miranda* does not apply to traffic stops and that Defendant was given *Miranda* warnings at the appropriate time. (*Id.* at 26-27.)

The Court addresses each of these issues in turn.

## A. Reasonable Suspicion for the Vehicle Stop

### 1. The Parties' Arguments

Defendant argues that evidence obtained as a result of the stop of the Ford Taurus must be suppressed because Trooper Marmol did not have reasonable suspicion to believe that a motor vehicle offense occurred. (ECF No. 26 ¶ 28; ECF No. 51 at 9, 10-11.) According to Defendant, Trooper Marmol's stated reason for executing the stop—following too closely, in violation of 75 Pa. Cons. Stat. § 3310—was pretext for performing a criminal investigation. (ECF No. 26 at 7; ECF No. 51 at 9, 11.) Moreover, Defendant argues that Trooper Marmol did not have reasonable suspicion or probable cause to believe a traffic violation occurred because (1) Trooper Marmol did not observe the tinted taillights until after the stop; (2) the tint did not change the colors of the taillights, and thus did not violate the Pennsylvania Motor Vehicle Code; and (3) the Ford Taurus did not unsafely change lanes or follow too closely. (ECF No. 26 at 7-9; ECF No. 51 at 10.) On this last point, Defendant asserts that Trooper Marmol was traveling at a high rate of speed when he approached the Taurus. (ECF No. 26 at 7.) The Taurus allowed the vehicle to its right to pull ahead, activated its right turn signal, and switched lanes behind the other vehicle. (*Id.* at

19

8.) Defendant claims that no reasonable police officer would believe that the Taurus violated a traffic law under these circumstances. (ECF No. 51 at 10.)

In response, the Government contends that Trooper Marmol had reasonable suspicion that three traffic violations occurred, including violations of (1) 75 Pa. Cons. Stat. § 3309—driving on roadways laned for traffic ("Section 3309"); (2) 75 Pa. Cons. Stat. § 3310—following too closely ("Section 3310"); and (3) 67 Pa. Code § 175.66(g)—tinted vehicle lights ("Section 175.66"). (ECF No. 32 at 11-12.) According to the Government, when Trooper Marmol's patrol vehicle approached the Ford Taurus, it was still a substantial distance behind the Ford Taurus when the driver activated his turn signal and "darted from the left lane to the right lane, less than one car length behind a vehicle traveling in the right lane of traffic." (*Id.* at 12; ECF No. 52 at 8.) These circumstances gave Trooper Marmol reasonable suspicion that the lane change was unsafe, in violation of Section 3309, and that the Ford Taurus's distance behind the vehicle in front of it was not reasonable and prudent, in violation of Section 3310. (ECF No. 32 at 12.) As for the tinted taillights, the Government explains that the tint is difficult to discern on the video of the traffic stop but that an experienced highway patrolman like Trooper Marmol—who received numerous trainings on traffic stops and conducted hundreds of stops over his career—would be able to spot tinted taillight covers more easily than untrained eyes. (*Id.* at 12-13.) Finally, the Government indicates that as long as a traffic stop is supported by reasonable suspicion, an officer's subjective motives for the stop are irrelevant. (ECF No. 52 at 8.)

### 2. Legal Standard

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches

and seizures." U.S. Const. amend. IV. A traffic stop by police is a "seizure" of "persons" under this Amendment and thus must be "reasonable" to pass constitutional muster. *See Whren v. United States,* 517 U.S. 806, 809-10 (1996); *United States v. Clark,* 902 F.3d 404, 409 (3d Cir. 2018); *United States v. Delfin-Colina,* 464 F.3d 392, 396 (3d Cir. 2006).

A traffic stop is reasonable under the Fourth Amendment when a law enforcement officer has reasonable suspicion that a traffic violation occurred. *See United States v. Green,* 897 F.3d 173, 178 (3d Cir. 2018) (citing *Navarette v. California,* 572 U.S. 393 (2014); *Delfin-Colina,* 464 F.3d at 396-97)). The reasonable suspicion standard is a lower standard than probable cause. *See Navarette,* 572 U.S. at 397 (quoting *United States v. Sokolow,* 490 U.S. 1, 7 (1989)); *Delfin-Colina,* 464 F.3d at 396 (quoting *Illinois v. Wardlow,* 528 U.S. 119, 123 (2000)). But reasonable suspicion must be based on more than a hunch. *Navarette,* 572 U.S. at 397 (quoting *Terry v. Ohio,* 392 U.S. 1, 21-22 (1968)). "Though reasonable suspicion is a generally undemanding standard, a police officer does have the initial burden of providing the 'specific, articulable facts' to justify a reasonable suspicion that an individual has violated the traffic laws." *Delfin-Colina,* 464 F.3d at 397 (citing *United States v. Cortez,* 449 U.S. 411, 416 (1981)). And the reviewing court must consider the totality of the circumstances when evaluating the reasonableness of the stop, including the "content of the information possessed by police and its degree of reliability," *Navarette,* 572 U.S. at 397 (quoting *Alabama v. White,* 496 U.S. 325, 330 (1990)), and "whether the 'rational in[ferences] from those facts reasonably warrant [the] intrusion,'" *Delfin-Colina,* 464 F.3d at 397 (second alteration in original) (quoting *Terry,* 392 U.S. at 21).

### 3. Analysis

The Court finds that Trooper Marmol did have reasonable suspicion of a traffic violation to support the traffic stop of the Ford Taurus.

Trooper Marmol executed the stop of the Ford Taurus based on two provisions of the Pennsylvania Motor Vehicle Code and one Pennsylvania Department of Transportation regulation.

The first provision—Section 3309—states:

> Whenever any roadway has been divided into two or more clearly marked lanes for traffic the following rules in addition to all others not inconsistent therewith shall apply:
> (1) Driving within single lane.—A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from the lane until the driver has first ascertained that the movement can be made with safety.

75 Pa. Cons. Stat. § 3309(1). Here, the Turnpike was divided into two or more clearly marked lanes and thus Section 3309 applies. (*See* Gvm't Ex. 1.) Under Section 3309, whether the Ford Taurus's lane change provided reasonable suspicion for the traffic stop depends on whether the lane change was safe. *See United States v. Prado*, 3:15-CR-151, 2017 WL 1653957, at *4 (M.D. Pa. May 1, 2017) ("[A] violation of section 3309(1) occurs when a driver's 'deviations from his lane of travel create[s] a significant safety hazard on the roadway'" (quoting *Commonwealth v. Feczko*, 10 A.3d 1285, 1292 (Pa. Super. Ct. 2010))); *Commonwealth v. Thrower*, No. 258 WDA 2012, 2013 WL 11276824, at *5 (Pa. Super. Ct. Feb. 28, 2013) (explaining that whether a police officer can stop a vehicle pursuant to Section 3309(1) "depends largely upon whether a driver's movement from his lane is done safely").

Here, Trooper Marmol credibly testified that he observed the Ford Taurus make an abrupt lane change that resulted in the Taurus driving only one car length behind another vehicle on a 70 mile-per-hour stretch of the Turnpike. (ECF No. 48 at 17, 24, 81, 151.) And the MVR supports Trooper Marmol's reasonable belief that the lane change was unsafe. (*See* Gvm't Ex. 1.) Thus, the Court finds that Trooper Marmol had reasonable suspicion to believe that the Ford Taurus violated Section 3309(1) by changing lanes without ascertaining that the change could be made safely.

The Court recognizes that the driver of the Ford Taurus acted in response to a fast-approaching, marked police vehicle. (ECF No. 48 at 14, 73; *see* Gvm't Ex. 1.) The driver's deceleration and lane change may have been reasonable responses to his situation and may have been done in a safe manner. However, to establish reasonable suspicion, "an officer need not be factually accurate in her belief that a traffic law had been violated but, instead, need only produce facts establishing that she reasonably believed that a violation had taken place." *Delfin-Colina*, 464 F.3d at 398. And here, the Government has met its burden of identifying facts that show that Trooper Marmol was reasonable in believing that the Ford Taurus violated Section 3309, even if his belief was factually inaccurate.

Although Section 3309 provided a basis for stopping the Ford Taurus, the Court will nevertheless address Trooper Marmol's other reasons for executing the stop. Trooper Marmol justified the stop based on Section 3310(a) of the Motor Vehicle Code, which provides:

(a) General rule.—The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of the vehicles and the traffic upon and the condition of the highway.

23

75 Pa. Cons. Stat. § 3310(a). "[T]he purpose of the statute is to prevent accidents. Requiring a reasonable and prudent distance allows a driver to stop or take evasive maneuver if the vehicle in front stops or slows suddenly." *Commonwealth v. Tarrach*, 42 A.3d 342, 348 (Pa. Super. Ct. 2012) (citing *Commonwealth v. Phinn*, 761 A.2d 176 (Pa. Super. Ct. 2000)).

Trooper Marmol testified that when determining whether the Ford Taurus was following the car in front of it too closely in violation of Section 3310, Trooper Marmol followed a standard that he claimed came from the Pennsylvania Driver's Manual. (ECF No. 48 at 25.) Trooper Marmol said that "following too closely" referred to following another vehicle at less than a four-second following distance. (*Id.*) After observing the following distance in this case, Trooper Marmol concluded that the gap between the vehicles was less than the four seconds recommended by the Pennsylvania Driver's Manual. (*Id.* at 26.)

While it is difficult for the Court to assess the distance between the Ford Taurus and the car in front of it based on the MVR, the MVR does support a reasonable belief that the Ford Taurus was following the car in front of it closer than was safe, particularly considering the 70 mile-per-hour speed limit. (ECF No. 48 at 17; *see* Gvm't Ex. 1.) Trooper Marmol identified his particular safety concerns during the stop when he stated that following that closely could cause an accident if, for example, a deer jumped in front of the car in front of the Taurus and the car in front then had to stop suddenly. (*See* Gvm't Ex. 1.) And while Trooper Marmol admitted that, after the Ford Taurus changed lanes, it decelerated such that it was a greater distance from the car in front of it (ECF No. 48 at 81), he stated that he still believed the Ford Taurus was following too closely. (*Id.*) The Court finds that based on Trooper Marmol's experience and training on traffic stops

24

and the Motor Vehicle Code, his testimony, and the MVR footage, he reasonably believed that the Ford Taurus was following too closely in violation of Section 3310(a).

And finally, Trooper Marmol relied on a tinted taillight violation to execute the stop of the Ford Taurus. Title 67 of the Pennsylvania Code, Section 175.66(g) states that vehicle lamps shall "not be so obstructed by a screen, bar, auxiliary equipment or a device as to obscure, change the color of or obstruct beam." 67 Pa. Code § 175.66(g).

Defendant argues that Trooper Marmol did not observe the tinted taillights until after the stop. (ECF No. 26 at 8.) Defendant explains that Trooper Marmol did not mention the tint until twenty minutes into the stop, after he observed the rear of the Ford Taurus for a period of time. (ECF No. 26 at 8; ECF No. 51 at 3.) However, although Trooper Marmol did not mention the tinted taillights until he told the driver he was going to give him a verbal warning for the traffic violations (ECF No. 48 at 110; *see* Gvm't Ex. 1), Trooper Marmol credibly testified that he observed the tinted taillights prior to the stop. (ECF No. 48 at 18, 24-25.) Moreover, the Police Criminal Complaint written and signed by Trooper Marmol on the date of the stop and Trooper Marmol's testimony at Defendant's preliminary hearing in state court less than ten days after the traffic stop support Trooper Marmol's assertion that he observed the tinted taillight covers prior to stopping the Ford Taurus. (Gvm't Ex. 3; Def. Ex. 1 at 9.) Thus, the Court rejects Defendant's argument that Trooper Marmol did not have reasonable suspicion to believe a traffic violation occurred because Trooper Marmol did not observe the tinted taillights until after the stop.

Defendant's next argument on this provision—that the tinted taillights did not violate the Motor Vehicle Code—is more persuasive. Trooper Marmol testified that the taillights on the Ford Taurus were tinted. (ECF No. 48 at 24.) However, there was no testimony or evidence that the

taillights were obscured or obstructed or that their colors were changed. In fact, there was testimony that suggests that the taillight covers did not change the color of the light beams. (*Id.* at 84.) While the Court accepts Trooper Marmol's "reasonable explanation that there are some limitations on what the MVR can capture because of its position in the vehicle, as opposed to what he is able to see in real time from his vantage point," *United States v. Meran,* Criminal No. 16-222, 2017 WL 4803927, at *8 (W.D. Pa. Oct. 23, 2017) (Conti, C.J.); (*see* ECF No. 48 at 84-85; *see also* ECF No. 32 at 12-13), without testimony that the Ford Taurus's covers obscured or obstructed the light beams, the Court cannot determine whether Trooper Marmol had reasonable suspicion that the Ford Taurus violated Section 175.66(g). The Court thus finds that the Government has not met its burden of identifying specific facts that justify a reasonable suspicion that the driver of the Ford Taurus violated Section 175.66(g).

However, because Trooper Marmol did have reasonable suspicion that the Ford Taurus violated Sections 3309(1) and 3310(a),[5] the stop of the Ford Taurus was reasonable under the Fourth Amendment and the Court will not suppress the evidence obtained as a result of the stop.

### B. The Extension of the Traffic Stop

#### 1. The Parties' Arguments

Defendant next asserts that that the traffic stop was longer than necessary to resolve the alleged motor vehicle violations and that the extension of the stop was unsupported by

---

[5] As for Defendant's argument of pretext, "any technical violation of a traffic code legitimizes a stop, even if the stop is merely pretext for an investigation of some other crime." *United States v. Mosley,* 454 F.3d 249, 252 (3d Cir. 2006) (citing *Whren,* 517 U.S. 806). Thus, because the Court finds that Trooper Marmol had reasonable suspicion that the Ford Taurus violated Sections 3309(1) and 3310(a), Trooper Marmol's alleged pretext is irrelevant to the present Motion to Suppress.

reasonable suspicion to believe a non-motor-vehicle offense occurred. (ECF No. 26 ¶ 29; ECF No. 51 at 11.) According to Defendant, the traffic stop was extended beyond its traffic-based purpose the moment Trooper Marmol requested the driver's toll ticket. (ECF No. 51 at 11.) This began Trooper Marmol's criminal investigation, which included calling for backup and conducting background checks. (ECF No. 26 at 9.) Trooper Marmol continued to investigate without terminating the traffic stop—he kept the driver and Defendant's identifications, the vehicle registration card, and the toll ticket during the entire encounter. (*Id.*; ECF No. 51 at 11.)

In response, the Government assumes that the stop was extended when Trooper Marmol called for backup. (ECF No. 32 at 17.) The Government contends that at this time, Trooper Marmol had reasonable suspicion justifying the continued seizure of Defendant and the driver. (*Id.*) The Government identifies the following facts supporting reasonable suspicion: (1) during the stop, the driver's hand was shaking, which is an indicia of nervousness; (2) the driver did not know to whom the vehicle was registered; (3) the Ford Taurus belonged to a third party, which indicates drug smuggling activity; (4) the Ford Taurus was coming from Philadelphia, a known source city for narcotics; (5) the Ford Taurus was traveling to Pittsburgh, a known consumption/distribution city for narcotics; (6) the trip was short, which is typical of drug-smuggling activities; (7) the reason for the trip seemed implausible to Trooper Marmol; (8) Defendant's carotid artery was pulsing, which Trooper Marmol identified as nervous behavior; and (9) the driver had an arrest record. (*Id.* at 6-7, 17.)

### 2. Legal Standard

"[A] seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*,

27

543 U.S. 405, 407 (2005). "An unreasonable extension occurs when an officer, without reasonable suspicion, diverts from a stop's traffic-based purpose to investigate other crimes." *Green*, 907 F.3d at 179 (citing *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015)).

The analysis of whether a traffic stop was unreasonably extended involves three separate inquiries. First, the Court must determine whether the traffic stop was extended to facilitate the investigation of non-traffic-based crimes. *Id.* Second, if an extension occurred, the Court must identify the *Rodriguez* moment—the moment at which the stop was "measurably extend[ed]" longer than necessary to effectuate its traffic-based purpose. *Id.* (alteration in original) (quoting *Rodriguez*, 135 S. Ct. at 1615). Finally, the Court determines whether the facts known to the police officer at the *Rodriguez* moment were sufficient to establish reasonable suspicion that criminal activity was afoot, justifying a prolonged stop. *Id.*

The United States Supreme Court has explained that a police officer executing a lawful traffic stop may conduct "ordinary inquiries incident to such a stop." *Caballes*, 543 U.S. at 408; *Rodriguez*, 135 S. Ct. at 1615. For example, the officer may check the driver's license, determine whether there are outstanding warrants against the driver, and inspect the vehicle's registration and proof of insurance. *Rodriguez*, 135 S. Ct. at 1615. Such inquiries are permissible because they serve the purpose of the traffic stop: ensuring roadway safety. *Id.*; *Clark*, 902 F.3d at 410. However, "measures aimed at detecting criminal activity more generally," such as a dog sniff, cannot be performed in a way that measurably extends the stop unless the officer has reasonable suspicion. *Green*, 897 F.3d at 179-80 (citing *Rodriguez*, 135 S. Ct. at 1615).

### 3. Analysis

Under *Rodriguez* and *Green*, the Court must first determine whether this traffic stop was extended beyond the time necessary to address the traffic violations that warranted the stop. *See Rodriguez*, 135 S. Ct. at 1614; *Green*, 897 F.3d at 179. In this case, there is no dispute that the traffic stop was extended to include a criminal investigation that culminated in the search of the Ford Taurus and the arrest of Defendant and the driver. The dispute here centers on when the extension occurred and whether Trooper Marmol had reasonable suspicion to justify the extension at that point. *See Green*, 897 F.3d at 179.

Defendant argues that when Trooper Marmol asked for the driver's toll ticket, he "initiated a criminal investigation" without reasonable suspicion. (ECF No. 51 at 11.) The Court disagrees. Although not specifically mentioned by the Supreme Court in *Rodriguez*, the Court finds that requesting the driver's toll ticket during a traffic stop on the Turnpike is an "ordinary inquir[y] incident to [the traffic] stop." *Rodriguez*, 135 S. Ct. at 1615 (quoting *Caballes*, 543 U.S. at 408). Such a request, though not necessary to complete the traffic citation (ECF No. 48 at 88), allows the police officer to ensure that vehicles on the Turnpike are operated responsibly and in compliance with Pennsylvania traffic regulations. *See Rodriguez*, 135 S. Ct. at 1615 (describing a police officer's mission during a traffic stop as "ensuring that vehicles on the road are operated safely and responsibly"); 67 Pa. Code §§ 601.12-601.13 (requiring each vehicle to obtain a toll ticket upon entering the Turnpike and providing certain penalties for evasion of fares). Thus, taking a

29

toll ticket when stopping a vehicle on the Turnpike is "fairly characterized as part of the officer's traffic mission."[6] *Rodriguez*, 135 S. Ct. at 1615.

Aside from addressing the request for the toll ticket, Defendant does not identify any other potential *Rodriguez* moments. However, before proceeding to discuss the later *Rodriguez* moment identified by the Government (Trooper Marmol's call for backup), the Court will address the events between Trooper Marmol asking for the toll ticket and his call for backup to ascertain that there was no earlier moment at which the stop was extended beyond its traffic-based purpose. The following events occurred in this time frame:

1. Trooper Marmol asked where the Taurus was coming from and going to. He then asked how long the driver and Defendant would be in Pittsburgh. (ECF No. 48 at 30-31; 97-99; Gvm't Ex. 1; Gvm't Ex. 4 at 3-4.)

2. Trooper Marmol asked for Defendant's driver's license, which Defendant provided. (ECF No. 48 at 102; Gvm't Ex. 1; Gvm't Ex. 4 at 4.)

3. Trooper Marmol returned to his vehicle and conducted a criminal history check on the driver. (ECF No. 48 at 32, 104; Gvm't Ex. 4 at 4.)

Turning first to Trooper Marmol's itinerary questions, questions about a driver's travel plans are ordinary inquiries incident to a traffic stop. *See United States v. Caraballo*, 104 F. App'x 820, 822 (3d Cir. 2004) (finding that a traffic stop was not improperly extended by questions about vehicle occupants' travel plans); *United States v. Givan*, 320 F.3d 452, 459 (3d Cir. 2003)

---

[6] In this case, Trooper Marmol agreed on cross-examination that the reason he took the toll ticket was to verify the Ford Taurus's point of origination on the Turnpike. (ECF No. 48 at 96.) This information does not change the Court's conclusion that taking a toll ticket is part of a police officer's traffic mission. Assuming that Trooper Marmol's reason for taking the ticket indicates that he was attempting to "detect[] evidence of ordinary criminal wrongdoing,'" *Rodriguez*, 135 S. Ct. at 1615 (quoting *Indianapolis v. Edmond*, 531 U.S. 32, 40-41 (2000)), the constitutionality of a traffic stop does not depend on the subjective motivations of the involved officers. *See Whren*, 517 U.S. at 813; *United States v. Hawkins*, 646 F. App'x 254, 256 n.4 (3d Cir. 2016); *United States v. Richardson*, 504 F. App'x 176, 181 n.7 (3d Cir. 2012).

("[Q]uestions relating to a driver's travel plans ordinarily fall within the scope of a traffic stop.");[7] *United States v. Quintanilla*, No. CRIM. 3:2006-17, 2006 WL 3392439, at *5 (W.D. Pa. Nov. 22, 2006) (Gibson, J.) ("Questioning of the driver as to any 'travel plans' . . . [is] within the 'proper scope of a traffic stop.'"); *United States v. Campbell*, 912 F.3d 1340, 1354 (11th Cir. 2019) ("Generally, questions about travel plans are ordinary inquiries incident to a traffic stop."); *United States v. Dion*, 859 F.3d 114, 125 (1st Cir. 2017) (explaining that an officer involved in a routine traffic stop may inquire into the driver's itinerary); *United States v. Englehart*, 811 F.3d 1034, 1040 (8th Cir. 2016) (stating that, during a traffic stop, an officer may complete routine tasks related to the stop, including asking questions about the driver's itinerary); *United States v. Spears*, 636 F. App'x 893, 901 (5th Cir. 2015) ("The time reasonably required to complete the mission of issuing a traffic ticket can include the time it takes to . . . ask the purpose and itinerary of the trip."); *United States v. Pena-Gonzalez*, 618 F. App'x 195, 198 (5th Cir. 2015) (stating that inquiries related to a driver's itinerary are related to the "mission" of the traffic stop); *United States v. Bowman*, 660 F.3d 338, 343 (8th Cir. 2011) (finding that inquiring about occupants' destination, route, and purpose during a traffic stop is a routine matter related to the traffic violation); *United States v. Williams*, 271 F.3d 1262, 1267 (10th Cir. 2001) ("[W]e have repeatedly held (as have other circuits) that questions relating to a driver's travel plans ordinarily fall within the scope of a traffic stop."). Thus, the conversation regarding the driver and Defendant's itinerary did not extend the stop beyond its traffic-based purpose.

---

[7] Although the cited Third Circuit cases were decided prior to the Supreme Court's decision in *Rodriguez*, the Court finds that the rationale of these decisions still stands post-*Rodriguez*. Moreover, at least four circuit courts have determined post-*Rodriguez* that questions relating to travel plans are ordinary inquiries incident to a traffic stop. The Court finds these decisions persuasive.

Next, as to Trooper Marmol's request for Defendant's driver's license, most courts confronted with the issue have determined that checking a passenger's driver's license in addition to the vehicle driver's license is not an impermissible extension of a traffic stop.

Some courts have held that checking a passenger's identification during a traffic stop is appropriate because it is necessary to ensure officer safety, which is part of the "mission" of a traffic stop. *See Rodriguez*, 135 S. Ct. at 1614 ("[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend to related safety concerns." (citations omitted)); *United States v. Baldonado-Garcia*, Criminal No. 11-215, 2012 WL 135698, at *3 (W.D. Pa. Jan. 17, 2012) (finding that a police officer could request a passenger's identification during a traffic stop without violating the Fourth Amendment because such a request is "reasonably based on ensuring officer safety at the scene"); *Davila v. N. Reg'l Joint Police Bd.*, 2:13-cv-00070, 2019 WL 948833, at *6 (W.D. Pa. Feb. 27, 2019) (Hornak, C.J.) ("[T]here is a legitimate officer safety rationale for confirming the identities of individuals that are seized during a traffic stop."); *United States v. Reynolds*, 729 F. App'x 639, 643 (10th Cir. 2018) (explaining that an officer may protect his safety during a traffic stop by asking for identification from passengers); *United States v. Clark*, 879 F.3d 1, 5 (1st Cir. 2018) ("[D]ue to the 'inherent dangers of a traffic stop,' the police may request identification from passengers in the vehicle, so long as those requests 'do not measurably extend the duration of the stop.'" (quoting *United States v. Chaney*, 584 F.3d 20, 26 (1st Cir. 2009)); *United States v. Soriano-Jarquin*, 492 F.3d 495, 500 (4th Cir. 2007) ("If an officer may 'as a matter of course' and in the interest of personal safety order a passenger physically to exit the vehicle, he may surely take the minimally intrusive step of requesting passenger identification. . . . When an officer legitimately

32

stops a vehicle, the identity of the persons in whose company the officer suddenly finds himself may be pertinent to the officer's well-being." (citation omitted)); *United States v. Rice*, 483 F.3d 1079, 1084 (10th Cir. 2007) (explaining that an officer may ask for identification from passengers during a traffic stop because "passengers present a risk to officer safety equal to the risk presented by the driver"); *United States v. Hicks*, 18-CR-6041CJS, 2018 WL 6595934, at *7 (W.D.N.Y. Dec. 14, 2018) (report and recommendation) ("[A]lthough the Supreme Court has not explicitly held that inquiry into a passenger's identity is permissible, numerous lower courts have held that questions relating to the identity of a passenger are routine and ordinary inquiries to a traffic stop and, in any event, are permissible considering the inherent dangerousness of traffic stops." (citations omitted)); *United States v. Espinosa*, Case No. 1:17-cr-55-CW, 2018 WL 1972466, at *4 (D. Utah Apr. 26, 2018) (finding that, for reasons of officer safety, "as a part of a lawful traffic stop, an officer may request a passenger's identification information").

Other courts have determined that checking a passenger's license is permissible because it is a normal inquiry related to addressing a traffic violation. *See Hicks*, 2018 WL 6595934, at *7 ("[N]umerous lower courts have held that questions relating to the identity of a passenger are routine and ordinary inquiries to a traffic stop . . . ."); *see also United States v. Smith*, 601 F.3d 530, 542 (6th Cir. 2010) (finding that it was not an unnecessary extension of a traffic stop for a police officer to check whether the passenger had valid identification); *United States v. Pack*, 612 F.3d 341, 351 (5th Cir. 2010) (stating that a police officer may ask passengers in a traffic stop to identify themselves and may run license checks on them); *United States v. Rodriguez-Hernandez*, 353 F.3d 632, 635 (11th Cir. 2003) (finding that because the initial traffic stop was valid, the police officer could ask the driver and passengers to produce identification). *But see United States v. Landeros,*

33

913 F.3d 862, 868 (9th Cir. 2019) ("A demand for a passenger's identification is not part of the mission of a traffic stop. . . . The identity of a passenger . . . will ordinarily have no relation to a driver's safe operation of a vehicle." (citations omitted)); *United States v. Henderson*, 463 F.3d 27, 46 (1st Cir. 2006) (concluding that a police officer's request for a passenger's identification and his subsequent investigation of the passenger "expanded the scope of the stop, changed the target of the stop, and prolonged the stop").

The Court finds the reasoning of these cases persuasive under *Rodriguez*. Trooper Marmol's request for Defendant's driver's license was within the mission of the traffic stop and did not impermissibly extend the stop for purposes of criminal investigation.

Finally, in terms of Trooper Marmol's criminal history check on the driver, the Court finds that the check did not extend the stop outside of its traffic- and safety-related purposes. *See Rodriguez*, 135 S. Ct. at 1616 (recognizing that an officer may need to take safety precautions during a traffic stop and citing *United States v. Holt*, 264 F.3d 1215, 1221-22 (10th Cir. 2001), which explained that there are safety reasons for running criminal history checks on drivers); *United States v. Frierson*, 611 F. App'x 82, 85 (3d Cir. 2015) ("Upon initially detaining the men, [the officer] reasonably addressed the traffic violation that warranted the stop and attended to safety concerns. For example, any preliminary delay in checking [the driver's] license, registration, and criminal history was justified as part of the stop."); *United States v. Palmer*, 820 F.3d 640, 651 (4th Cir. 2016) ("A police officer is entitled to inquire into a motorist's criminal record after initiating a traffic stop."); *United States v. Sanford*, 806 F.3d 954, 956 (7th Cir. 2015) ("The trooper checked the occupants' criminal history on the computer in his car—a procedure permissible even without reasonable suspicion . . . .").

This brings us to the *Rodriguez* moment identified by the Government: Trooper Marmol's call for backup to assist in a vehicle search. (ECF No. 32 at 17; ECF No. 52 at 10.) The Court agrees that calling for backup to assist in a vehicle search is "a measure aimed at 'detect[ing] evidence of ordinary criminal wrongdoing.'" *Rodriguez*, 135 S. Ct. at 1615 (quoting *Edmond*, 531 U.S. at 40-41; citing *Florida v. Jardines*, 569 U.S. 1 (2013)). The Court will thus proceed on the assumption that this was the *Rodriguez* moment, although the Court need not definitively decide whether the call and wait for backup "measurably extend[ed]" the stop pursuant to *Rodriguez*.[8] *See Rodriguez*, 135 S. Ct. at 1615 (quoting *Johnson*, 555 U.S. at 333).

Having identified the call for backup as the earliest possible *Rodriguez* moment, the Court must now determine whether the facts known to Trooper Marmol at this moment were sufficient to establish reasonable suspicion that criminal activity was afoot and to justify prolonging the stop. *See Green*, 897 F.3d at 179.

Defendant claims that Trooper Marmol lacked reasonable suspicion to begin a criminal investigation. (ECF No. 26 at 9; ECF No. 51 at 11-12.) The Government contends, however, that at the moment Trooper Marmol called for backup, he possessed reasonable suspicion of criminal

---

[8] The Court need not determine whether the request and wait for backup—which lasted no more than fifteen minutes (Gvm't Ex. 1)—"measurably extended" the stop. *See Rodriguez*, 135 S. Ct. at 1615 (quoting *Johnson*, 555 U.S. at 333). As the Third Circuit explained in *Green*, there are divergent interpretations of *Rodriguez*'s "measurably extend" language. *Green*, 897 F.3d at 180. "Several [circuit courts] have applied *Rodriguez*'s language quite rigidly, holding that any diversion from a stop's traffic-based mission is unlawful absent reasonable suspicion." *Id.* at 180-81. However, "[o]ther [c]ircuits have applied *Rodriguez* more leniently, evaluating police actions by something more akin to a reasonableness standard." *Id.* at 181. In *Green*, the Third Circuit did not choose which approach to adopt. *Id.* at 182. Thus, this Court will "err on the side of caution and proceed on the assumption—not conclusion—that the '*Rodriguez* moment' occurred" when Trooper Marmol called for backup, as opposed to at a later moment. *Id.* at 182. Accordingly, the Court will next address whether Trooper Marmol had reasonable suspicion at the time he called for backup. *Id.* "Because we conclude that [Trooper Marmol] did possess reasonable suspicion at this moment, there will be no need to address the possible implications of a later '*Rodriguez* moment.'" *Id.*

35

activity based on the following facts: (1) the driver's hand was shaking when he handed his license to Trooper Marmol, exhibiting nervousness; (2) the driver gave confusing information about the vehicle's registered owner; (3) the Ford Taurus was owned by a third party; (4) the Ford Taurus was coming from Philadelphia, a known source city for narcotics; (5) the Ford Taurus was traveling to Pittsburgh, a known consumption/distribution city for narcotics; (6) the trip itinerary was short, which is typical of drug smuggling activities; (7) the travel itinerary given by the driver was implausible; (8) Defendant's carotid artery was pulsing, which is a nervous behavior; and (9) the driver had an arrest record. (ECF No. 32 at 17; ECF No. 52 at 10.)

The Court agrees that Trooper Marmol had reasonable suspicion to extend the traffic stop by calling for backup.

First, during Trooper Marmol's interaction with the driver and Defendant prior to his call for backup, he noticed two signs of nervousness—(1) the driver's hand was shaking when he gave his license to Trooper Marmol (ECF No. 48 at 28, 91; Gvm't Ex. 4 at 3-4); and (2) Defendant's carotid artery was pulsating (ECF No. 48 at 30, 103; Gvm't Ex. 4 at 4). Trooper Marmol had significant training on motor vehicle stops, deceptive behavior, and related subjects, and, at the time of this traffic stop, Trooper Marmol had about three years' experience as a patrol officer and experience as a SHIELD officer. (ECF No. 48 at 6-7.) Based on this training and experience and common sense, the Court finds that Trooper Marmol reasonably concluded that these signs indicated nervousness. *See Wardlow*, 528 U.S. at 124 ("[C]ourts do not have available empirical studies dealing with inferences drawn from suspicious behavior, and we cannot reasonably demand scientific certainty from judges or law enforcement officers where none exists. Thus, the determination of reasonable suspicion must be based on commonsense judgments and inferences

about human behavior."). Although nervous behaviors alone cannot establish reasonable suspicion, they can contribute to it. *See, e.g., id.* at 124 ("[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion."); *United States v. West*, 103 F. App'x 460, 462 (3d Cir. 2004) (explaining that nervousness is not necessarily enough to establish reasonable suspicion but concluding that nervous behavior accompanied by other conduct could establish reasonable suspicion); *United States v. Valentine*, 232 F.3d 350,357 (3d Cir. 2000) (finding that nervous behavior contributed to reasonable suspicion); *United States v. Bennett*, No. CRIM. A. 00-409, 2000 WL 1358480, at *2, *8 (E.D. Pa. 2000) (concluding that a pulsating carotid artery and other nervous behaviors contributed to reasonable suspicion); *United States v. Garcia*, No. CRIM. A. 99-64-1 MMS, 2000 WL 654377, at *8 (D. Del. 2000) (finding reasonable suspicion based on, among other factors, shaking hands that indicated nervousness).

Second, in addition to the indicia of nervousness, Trooper Marmol noticed various signs that, in his training and experience, pointed to narcotics smuggling. The occupants of the Ford Taurus were traveling from Philadelphia to Pittsburgh. (ECF No. 48 at 30-31.) Philadelphia is a known source area for the distribution of narcotics, and Pittsburgh is a local distribution and consumption area for narcotics. (*Id.*; Gvm't Ex. 4 at 3-4.) Moreover, the trip from Philadelphia to Pittsburgh and back was short—a day-trip only—and Trooper Marmol testified that quick trips are made to evade law enforcement. (ECF No. 48 at 32; Gvm't Ex. 4 at 4.) And, in light of the trip itinerary and his training and experience, Trooper Marmol reasonably found the explanation provided by the driver—that this long trip in a short period of time was being made to speak at an NA meeting—to be implausible. (ECF No. 48 at 32, 99; Gvm't Ex. 4 at 4.) Finally, the Ford Taurus was registered to a third party and the driver seemed confused about the identity of the

vehicle's registered owner. (Gvm't Ex. 4 at 4.) Trooper Marmol knew that third-party vehicles are often utilized to smuggle narcotics because the vehicle's occupants can distance themselves from any contraband that is located within the vehicle. (ECF No. 48 at 29, 94; Gvm't Ex. 4 at 3-4.) When considered together, the facts contributed to Trooper Marmol's reasonable suspicion that criminal activity was afoot. *See, e.g., United States v. Robinson*, 529 F. App'x 134, 136 (3d Cir. 2013) (noting that third-party vehicle ownership, coupled with an unusual travel itinerary, criminal history, and other factors, established reasonable suspicion of criminal activity); *Meran*, 2017 WL 4803927, at *9 (concluding that an officer possessed reasonable suspicion of drug smuggling based on, *inter alia*, the involvement of a third-party vehicle, the fact that Philadelphia is a major source and consumption area for drugs, and the vehicle occupants' attempt to travel a long distance in a short period of time); *United States v. Walker*, 719 F. Supp. 2d 586, 597, 599-601 (W.D. Pa. 2010) (Gibson, J.) (finding reasonable suspicion based on, *inter alia*, the stopped vehicle's origin and destination, the short stay at the destination, and the third-party vehicle).

Third, the driver had an arrest record. (ECF No. 48 at 33, 105); *see Robinson*, 529 F. App'x at 138 (finding that a driver's criminal history, among other factors, contributed to reasonable suspicion to expand the scope of a traffic stop).

The Court finds that these facts, taken together and considered in conjunction with Trooper Marmol's training and experience as a SHIELD officer, gave Trooper Marmol reasonable suspicion to extend the traffic stop by calling for backup in order to search the vehicle. Thus, Defendant's Motion to Suppress will be **DENIED** to the extent Defendant argues that the stop's extension was unsupported by reasonable suspicion.

## C. Involuntary Consent

### 1. The Parties' Arguments

Third, Defendant argues that the driver's consent to Trooper Marmol's search of the Ford Taurus was not valid or voluntary. (ECF No. 26 at 6.) Defendant explains that the driver did not take authority or responsibility for the Ford Taurus and thus could not give valid consent. (*Id.* at 11.) Furthermore, even if the driver had the authority to consent, his consent was involuntary because he merely submitted to Trooper Marmol's show of authority. (*Id.*) Defendant contends that because Trooper Marmol did not obtain voluntary consent to search and otherwise did not have a warrant or probable cause to search the Ford Taurus, evidence obtained as a result of the search must be suppressed. (*Id.* at 10-11.)

In response, the Government asserts that Defendant's argument fails for two reasons: (1) Defendant lacks standing to challenge the search because he did not own, borrow, or drive the vehicle; and (2) the driver had apparent and actual authority to consent to the search and his consent was voluntary. (ECF No. 32 at 18-19.)

### 2. Standing

#### a.     Legal Standard

"[T]he Fourth Amendment's protection against unreasonable searches is predicated on the invasion by the government of a person's reasonable expectation of privacy . . . ." *United States v. Mosley*, 454 F.3d 249, 253 (3d Cir. 2006) (citing *Rakas v. Illinois*, 439 U.S. 128 (1978)); *see also United States v. Burnett*, 773 F.3d 122, 131 (3d Cir. 2014) ("An individual challenging a search has the burden of establishing that he had a reasonable expectation of privacy in the property searched and the item seized." (citing *Minnesota v. Olson*, 495 U.S. 91, 95-97 (1990)). "A person must show

39

both that he had a subjective expectation of privacy in the area searched and that his expectation was objectively reasonable." *Burnett*, 773 F.3d at 131. "To demonstrate that he had a subjective expectation of privacy, the defendant must show that he 'took normal precautions to maintain his privacy.'" *Id.* (quoting *Rawlings v. Kentucky*, 448 U.S. 98, 105 (1980)); *see United States v. Correa*, 653 F.3d 187, 190 (3d Cir. 2011) ("Regarding the subjective prong, 'we ask whether the individual, by his conduct, has exhibited an actual expectation of privacy; that is, whether he has shown that "he [sought] to preserve [something] as private."'" (alteration in original) (quoting *Bond v. United States*, 529 U.S. 334, 338 (2000))).

In the vehicle context, "[p]assengers in cars, unlike owners or licensees, have no reasonable expectation of privacy in the interior of the vehicle in which they are riding." *Mosley*, 454 F.3d at 253; *see Burnett*, 773 F.3d at 131; *United States v. Baker*, 221 F.3d 438, 441-42 (3d Cir. 2000) (citing *Rakas*, 439 U.S. at 133-34). Thus, "passengers are generally held to lack 'standing' to object to evidence discovered in a search of a vehicle." *Mosley*, 454 F.3d at 253 (citing *Rakas*, 439 U.S. at 128); *Baker*, 221 F.3d at 441-42.

However, in *United States v. Baker*, 221 F.3d 438, 442 (3d Cir. 2000), the Third Circuit acknowledged an exception to the aforementioned rule for those who borrow vehicles. *See Baker*, 221 F.3d at 442. In *Baker*, the court found that a defendant had a reasonable expectation of privacy in a borrowed vehicle because the defendant (1) was driving the car alone; (2) had substantial control over the car because he borrowed it and had been driving it for four to six weeks; and (3) carried the keys to the car with him. *Baker*, 221 F.3d at 442. Moreover, there was no evidence that the car was stolen. *Id.* The Third Circuit articulated the following rule for standing in cases involving borrowed vehicles: "whether the driver of a car has the reasonable expectation of

40

privacy necessary to show Fourth Amendment standing is a fact-bound question dependent on the strength of his interest in the car and the nature of his control over it; ownership is not necessary." *Id.; see United States v. Jones*, CRIMINAL NO. 16-27, 2017 WL 1190501, at *3 (W.D. Pa. Mar. 31, 2017) (Conti, C.J.).

### b. Analysis

Here, Defendant did not have an objectively reasonable expectation of privacy in the Ford Taurus. Although there is evidence that Defendant borrowed the vehicle, there is no evidence that Defendant had "substantial control" over the vehicle. *See Baker*, 221 F.3d at 442. Unlike the facts in *Baker*, Defendant was not driving the vehicle and was not its sole occupant. *See Baker*, 221 F.3d at 442; *United States v. Schofield*, 80 F. App'x 798, 802 (3d Cir. 2003) (explaining that the unique facts of *Baker*—that the defendant was alone in the borrowed car and had been driving it with permission for four to six weeks—created the expectation of privacy). Moreover, unlike *Baker*, there is no evidence that Defendant borrowed the Ford Taurus for a significant period of time. *See Baker*, 221 F.3d at 442 (noting that the defendant borrowed the car for four to six weeks and had a reasonable expectation of privacy in it); *Schofield*, 80 F. App'x at 802; *United States v. Pete*, Criminal No. 09-82, 2010 WL 887364, at *6 (W.D. Pa. Mar. 10, 2010) (finding that a driver had no reasonable expectation of privacy in a borrowed vehicle because he was a one-time borrower of the vehicle); *see also United States v. King*, No. 2:13cr136, 2015 WL 3457484, at *2 (W.D. Pa. May 29, 2015) ("Rakas and its progeny have made clear that more than temporary occupancy or possession of a vehicle is needed to maintain standing."). Thus, Defendant failed to meet his burden of establishing that he had a reasonable expectation of privacy in the vehicle that would confer standing on him to challenge the search of the vehicle. *See Rakas*, 439 U.S. at 130 n.1 ("The

41

proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure.").

Furthermore, Defendant lacks standing to object to the search of the Ford Taurus because he did not manifest a subjective expectation of privacy in the vehicle. *See Burnett*, 773 F.3d at 131. During the search, Defendant did not object or give any indication that he was responsible for the vehicle and that he had the authority to consent or withhold consent to the search. (ECF No. 48 at 40, 42); *see United States v. Anderson*, 859 F.2d 1171, 1177 (3d Cir. 1988) ("Moreover, it is uncontroverted that while the car was being searched, [the defendant] stood by and watched without objection. Such behavior is completely inconsistent with the contention that [the defendant] retained an expectation of privacy."); *see also United States v. Valle-Irizarry*, Crim. Action No. 14-00103 (JLL), 2014 WL 3673139, at *6 (D.N.J. July 22, 2014) (finding no expectation of privacy when the defendant did not express ownership over the searched item before or during the vehicle search). Defendant also failed to introduce other evidence suggesting that he took steps to maintain his privacy in the borrowed vehicle. Therefore, Defendant failed to establish a subjective expectation of privacy in the Ford Taurus and lacks standing to challenge the search of the Ford Taurus.

Accordingly, the Court will **DENY** Defendant's Motion to Suppress to the extent Defendant challenges the consent search because Defendant lacks standing to object to the search.

### 3. Voluntary Consent

Assuming *arguendo* that Defendant has standing to object to the search of the Ford Taurus, the Court will nevertheless deny Defendant's Motion to Suppress to the extent it is based on the driver's involuntary consent because the driver's consent was voluntary.

### a. Legal Standard

The Fourth Amendment prohibits searches conducted without search warrants unless an exception applies. *See Katz v. United States*, 389 U.S. 347, 357 (1967). One such exception is voluntary consent. *United States v. Wilson*, 413 F.3d 382, 388 (3d Cir. 2005); *Givan*, 320 F.3d at 459.

For this exception to the warrant requirement to apply, the individual who consents to the search must have authority to consent. *See United States v. Shabazz*, 533 F. App'x 158, 161 n.2 (3d Cir. 2013) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *United States v. Matlock*, 415 U.S. 164, 171 (1974)); *United States v. Morales*, 861 F.2d 396, 399 (3d Cir. 1988). "A driver of a vehicle has the authority to consent to a search of that vehicle." *Morales*, 861 F.2d at 399; *see Shabazz*, 533 F. App'x at 161 n.2; *United States v. Gooch*, 915 F. Supp. 2d 690, 712 (W.D. Pa. 2012) (Gibson, J.); *United States v. Skeffery*, CRIMINAL NO. 2005-2J, 2006 WL 8446120, at *5 (W.D. Pa. May 22, 2006) (Gibson, J.). "As the driver, he is the person having immediate possession of and control over the vehicle." *Morales*, 861 F.2d at 399. "As driver, he also has general access to all areas of the vehicle." *Id.* "Therefore, a driver has the requisite 'joint access and control' giving rise to the authority to consent to a full search of a vehicle." *Id.*

Furthermore, the driver's consent must have been voluntary. "The voluntariness of an individual's consent is a question of fact to be determined from all the circumstances." *Wilson*, 413 F.3d at 388; *Givan*, 320 F.3d at 459. Relevant factors include "the setting in which the consent was obtained, the parties' verbal and non-verbal actions, and the age, intelligence, and educational background of the consenting individual." *Givan*, 320 F.3d at 459. The Government has the burden of demonstrating that voluntary consent to search was given by a preponderance

of the evidence. *Skeffery*, 2006 WL 8446120, at *5 (citing *Matlock*, 415 U.S. at 177); *Gooch*, 915 F. Supp. 2d at 712 (citing *United States v. Price*, 558 F.3d 270, 277 (3d Cir. 2009)).

### b. Analysis

Based on the sources above, the driver of the Ford Taurus clearly had authority to consent to the search of the vehicle. *Morales*, 861 F.2d at 399; *Shabazz*, 533 F. App'x at 161 n.2; *Gooch*, 915 F. Supp. 2d at 712; *Skeffery*, 2006 WL 8446120, at *5. Defendant's silence during Trooper Marmol's search supports this conclusion. *Morales*, 861 F.2d at 400.

In terms of the voluntariness of the driver's consent, the MVR footage shows that Trooper Marmol asked for the driver's consent to search the vehicle, to which the driver responded "yeah, yeah," without hesitation. (ECF No. 48 at 38, 113-14, 116; Gvm't Ex. 1.) Applying the factors listed above, the Court finds that the driver voluntarily consented to the search.

Trooper Marmol asked for the driver's consent while on the side of the Turnpike in the middle of the afternoon. *See United States v. Velasquez*, 885 F.2d 1076, 1082 (3d Cir. 1989) (finding no coercion when "consent took place on the shoulder of a major highway during daylight hours"); *Givan*, 320 F.3d at 459. The driver was not handcuffed when Trooper Marmol asked for his consent. *Givan*, 320 F.3d at 459. Although another officer was present, there is nothing particularly coercive or intimidating about this presence, aside from the normal intimidation inherent in formal encounters with police.

Moreover, Trooper Marmol's verbal exchange with the driver cannot be considered coercive. While Trooper Marmol told the driver that he knew about his criminal history before asking if he could search the car, Trooper Marmol did so in a civil manner. (ECF No. 48 at 114; *see* Gvm't Ex. 1.) And Trooper Marmol did not extensively question the driver in an intimidating

44

way. (*See* Gvm't Ex. 1); *United States v. Kim,* 27 F.3d 947, 955 (3d Cir. 1994) (finding voluntary consent when, among other factors, the officer was polite and courteous and there was no repeated or prolonged questioning); *United States v. Mendoza,* Criminal No. 06-167, 2007 WL 1795663, at *6 (W.D. Pa. June 20, 2007) (Conti, J.), *aff'd,* 334 F. App'x 515 (3d Cir. 2009). Furthermore, while Defendant argues that Trooper Petrosky's non-verbal actions were coercive— namely, standing by Trooper Marmol with his hand on his firearm—there is no evidence that Trooper Petrosky had his hand on his firearm before or during Trooper Marmol's request for consent. Instead, the MVR footage does not show what Trooper Petrosky was doing when Trooper Marmol asked for the driver's consent.[9] Thus, there is no evidence of coercive language or physically threatening behavior on the part of Troopers Marmol and Petrosky that suggests the driver's consent was involuntary.[10]

And while no specific evidence about the driver's age, educational background, or intelligence is before the Court, the MVR footage shows that the driver was an adult who understood English and was capable of understanding and responding to Trooper Marmol's questions. (*See* Gvm't Ex. 1.) There is no evidence that the driver suffered from any mental

---

[9] And even if Trooper Petrosky was standing with his hand on his firearm when Trooper Marmol asked for the driver's consent, the Court would still conclude that, considering the totality of the circumstances, the driver's consent was voluntary.

[10] Moreover, Defendant's citations to support his argument that the driver was seized by means of physical force or a show of authority are inapposite. (ECF No. 26 at 12.) For example, *United States v. Mendenhall,* 446 U.S. 544 (1980), did not discuss the nature of voluntary consent. Instead, the Court in *Mendenhall* was discussing the definition of a "seizure." *Id.* at 552-53. According to *Mendenhall,* "a person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained." *Id.* at 553. Here, whether Defendant and the driver were seized is not at issue. The pages to which Defendant cites in *Wilson,* 413 F.3d at 386-87, *California v. Hodari D.,* 499 U.S. 621, 628 (1991), and *Kim,* 27 F.3d at 951, also discuss whether the defendant was seized and are similarly unpersuasive as to the issue of voluntary consent.

45

impairment that would have impeded his ability to understand the events that were occurring. *See Gooch*, 915 F. Supp. 2d at 713. Furthermore, the driver had at least some experience with the criminal justice system due to his prior arrests (ECF No. 48 at 33, 105), which further supports the conclusion that his consent was voluntary. *See Gooch*, 915 F. Supp. 2d at 713; *Mendoza*, 2007 WL 1795663, at *5-6 (explaining that when a court evaluates whether consent to a search was voluntary, the court may consider a defendant's previous experience with the criminal justice system).

Defendant points to other relevant facts. First, Defendant notes that the driver had to wait in the Ford Taurus for about twenty minutes before Trooper Marmol asked for consent to search. While the length of time of a police encounter is relevant to whether consent was voluntary, *see Gooch*, 915 F. Supp. at 713-14, the twenty-minute wait here is not lengthy enough to become coercive. In fact, twenty minutes seems to be a reasonable time to wait in a traffic stop situation, even without a police search of the vehicle.

Second, Defendant argues that Trooper Marmol did not inform the driver that he could withhold consent to the search. "While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective consent." *Schneckloth*, 412 U.S. at 227; *see Price*, 558 F.3d at 279; *Velasquez*, 885 F.2d at 1082; *Meran*, 2017 WL 4803927, at *15. Thus, while Trooper Marmol's failure to inform the driver that he could withhold consent is relevant to this inquiry, it is not dispositive.

And finally, Defendant indicates that Trooper Marmol withheld the driver and Defendant's licenses and toll ticket so they were unable to leave. (*See* ECF No. 48 at 111.) While relevant, *see United States v. Chatterpaul*, 200 F. App'x 147, 151 (3d Cir. 2006); *Givan*, 320 F.3d at

46

459, the MVR shows that Trooper Marmol did not tell the driver that he was withholding the licenses and toll ticket until after the driver had already consented to the search. (*See* Gvm't Ex. 1.) Thus, the Court finds that at the time Trooper Marmol asked for the driver's consent, that consent was given voluntarily.

In light of the factors discussed above, the testimony at the Suppression Hearing, and MVR footage, the Court finds that the Government has established by a preponderance of the evidence that the driver voluntarily consented to the search of the Ford Taurus.

The Court will therefore **DENY** Defendant's Motion to Suppress to the extent Defendant challenges the voluntariness of the driver's consent.

### D. Scope of Consent

#### 1. The Parties' Arguments

Next, Defendant asserts that Trooper Marmol's search of the Ford Taurus exceeded the scope of the driver's consent. (ECF No. 26 at 13; ECF No. 51 at 12.) According to Defendant, a reasonable person who consented to a vehicle search would understand such a search to involve examining the passenger compartment and trunk of the vehicle—not using tools to take the vehicle apart. (ECF No. 26 at 13.)

In response, the Government again argues that Defendant lacks standing to challenge the scope of the consent search. (ECF No. 32 at 22.) Furthermore, the Government contends that Trooper Marmol stayed within the scope of the driver's consent throughout the search, until the search became a valid probable cause search when Trooper Marmol discovered the hidden compartment. (*Id.*; ECF No. 52 at 12-14.)

## 2. Legal Standard

"When a warrantless search is authorized by voluntary consent, the extent of that search is limited to the terms of the consent." *United States v. Birt*, 120 F. App'x 424, 428 (3d Cir. 2005) (citing *Kim*, 27 F.3d at 956). "An objective reasonableness standard is used to measure the scope of a suspect's consent." *Id.* (citing *Florida v. Jimeno*, 500 U.S. 248, 251 (1991)). To determine whether an officer stayed within the scope of consent, the Court must ask what the typical reasonable person would have understood by the exchange between the officer and the suspect. *Id.* (quoting *Jimeno*, 500 U.S. at 251).

If a police officer's search does exceed the scope of consent, the Court then considers whether the search falls within a different exception to the Fourth Amendment's warrant requirement, rendering the search constitutionally permissible.

One such exception is the automobile exception. Under the automobile exception, "law enforcement [may] seize and search an automobile without a warrant if 'probable cause exists to believe it contains contraband.'" *United States v. Burton*, 288 F.3d 91, 100 (3d Cir. 2002) (quoting *Pennsylvania v. Labron*, 518 U.S. 938,940 (1996)); *see Maryland v. Dyson*, 527 U.S. 465, 467 (1999) ("[W]here there was probable cause to search a vehicle 'a search is not unreasonable if based on facts that would justify the issuance of a warrant, *even though a warrant has not been actually obtained.*'" (quoting *United States v. Ross*, 456 U.S. 798, 809 (1982))); *United States v. Donahue*, 764 F.3d 293, 300 (3d Cir. 2014). Provided that the police have probable cause to believe a vehicle contains contraband, the police may search "every part of the vehicle and its contents that may conceal the object of the search." *Ross*, 456 U.S. at 825. The Government must establish the

applicability of the automobile exception by a preponderance of the evidence. *Donahue,* 764 F.3d at 300.

The Third Circuit has explained probable cause as follows:

The probable cause inquiry is "commonsense," "practical," and "nontechnical;" it is based on the totality of the circumstances and is judged by the standard of "reasonable and prudent men." We evaluate "the events which occurred leading up to the . . . search, and then . . . [decide] whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to . . . probable cause."

*Id.* at 301 (alterations in original) (citations omitted). In general, "[i]f there was a 'fair probability that contraband or evidence of a crime' would have been found, there was probable cause for the search." *Id.* (quoting *Illinois v. Gates,* 462 U.S. 213, 302 (1983)).

### 3. Analysis

First, for the reasons explained *supra,* Defendant lacks standing to challenge the execution of the consent search. Thus, Defendant's Motion to Suppress will be **DENIED** on this basis.

Second, even if Defendant does have standing to challenge the consent search, the Court finds that Trooper Marmol did not exceed the scope of the driver's consent because the consent search morphed into a vehicle search based on probable cause.

Defendant and the Government agree that a reasonable person in the driver's position would have understood the driver to be consenting to a search of the passenger compartment and the trunk.[11] (ECF No. 26 at 13; ECF No. 32 at 23.) It is clear from the MVR and Trooper Marmol's testimony that he stayed within the bounds of this consent during the initial part of his

---

[11] Because the Government does not argue that the scope of the consent search included the search of the aftermarket compartment, *see Meran,* 2017 WL 4803927, at *16-17, the Court will not address this argument. The Court thus proceeds under the assumption that the scope of the driver's consent included searching the passenger compartment and the trunk, but not accessing the aftermarket compartment.

search of the Ford Taurus—he searched the areas around the passenger seat, the driver's seat, the back seat, the trunk, and the glove compartment. (ECF No. 48 at 42, 121.) And Defendant does not argue that the initial part of Trooper Marmol's search exceeded the scope of the consent.

Instead, Defendant focuses on Trooper Marmol's accessing of the aftermarket compartment. Defendant argues that accessing the compartment went beyond the scope of the driver's consent and was thus impermissible. However, the Court concludes that Trooper Marmol had probable cause to believe that he located the aftermarket compartment and that contraband would be found within the compartment. Thus, the search of the aftermarket compartment was constitutional pursuant to the automobile exception to the warrant requirement.

In addition to the various facts identified in the reasonable suspicion analysis, *supra*, which contributed to probable cause, Trooper Marmol knew the following: (1) the registered owner of the vehicle had a criminal history that included drug and firearm offenses (ECF No. 48 at 37; Gvm't Ex. 4 at 5); (2) the driver had been arrested for drug and firearm offenses (Gvm't Ex. 4 at 4); (3) Defendant had been arrested for firearm violations, assaults, and robberies (*id.* at 4-5); (4) when searching the glove compartment, Trooper Marmol could see a box with "some welds" where the air bag should have been that, in his experience and based on his training on the subject, led him to believe that an aftermarket compartment had been added to the vehicle (ECF No. 48 at 7-8, 43-44; Gvm't Ex. 4 at 5-6); (5) in his training and experience, aftermarket compartments are "used for one purpose and one purpose only"—concealing contraband (ECF No. 48 at 12-13, 44; Gvm't Ex. 4 at 6); and (6) of the thirteen hidden compartments that Trooper Marmol personally

located in past traffic stops, approximately ten of those compartments contained contraband (ECF No. 48 at 13, 130).

These facts and beliefs have ample support in the record and lead the Court to determine that, under these circumstances, a reasonable police officer with similar training and experience would conclude that there was a fair probability that (1) the Ford Taurus was outfitted with an aftermarket compartment and (2) the compartment contained contraband. *See Meran*, 2017 WL 4803927, at *18 (concluding that an officer's discovery of an aftermarket compartment, "which he knew was used to hide contraband based on his training and experience," in conjunction with the other facts of the case, led to probable cause to search the compartment); *Gooch*, 915 F. Supp. 3d at 719 (explaining that "evidence of a hidden compartment within a suspect's automobile can contribute to, and, under appropriate circumstances, may even single-handedly establish, a finding of probable cause"). Thus, Trooper Marmol's accessing and search of the compartment (ECF No. 48 at 45) did not violate the Fourth Amendment and the seized contraband is admissible.

The Court will therefore **DENY** Defendant's Motion to Suppress to the extent Defendant challenges the scope of the consent search.

### E. *Miranda* **Warnings**

#### 1. The Parties' Arguments

Finally, Defendant argues that the statements[12] the driver and Defendant made to the police during and after the vehicle stop must be suppressed because they were obtained in violation of their constitutional rights. (ECF No. 26 at 6-7, 14-15; ECF No. 51 at 11.) Defendant

---

[12] Defendant does not identify the particular statements that he claims were obtained in violation of his Fifth and Fourteenth Amendment rights.

states that the driver and Defendant were detained by Trooper Marmol and unable to leave when Trooper Marmol first approached the vehicle. (ECF No. 26 at 14.) Because Trooper Marmol then questioned the driver and Defendant without advising them of their *Miranda* rights, Defendant claims Trooper Marmol violated Defendant and the driver's rights under the Fifth and Fourteenth Amendments to the Constitution. (*Id.* at 15.)

In response, the Government explains that *Miranda* does not apply to traffic stops because those detained through traffic stops are not "in custody." (ECF No. 32 at 26-27.) Thus, any statements made by Defendant during the traffic stop did not implicate his *Miranda* rights and should not be suppressed. (*Id.* at 27; ECF No. 52 at 14.) The Government also asserts that Defendant was appropriately apprised of his *Miranda* rights at the time of his arrest. (ECF No. 32 at 26-27; ECF No. 52 at 14.) Moreover, any statements Defendant made after he was arrested were spontaneous utterances. (ECF No. 32 at 27.)

### 2. Legal Standard

Under the Fifth Amendment of the Constitution, "[n]o person shall . . . be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In *Miranda v. Arizona*, 384 U.S. 436 (1967), the Supreme Court explained that, in order to protect a suspect from compelled self-incrimination, a suspect who has "been taken into custody or otherwise deprived of his freedom of action in any significant way" must be provided with warnings of his Fifth Amendment rights—called "*Miranda* warnings"—before he is interrogated. *Id.* at 437; *see also United States v. Valenta*, Criminal No. 15-161, 2017 WL 2131375, at *3-*9 (W.D. Pa. May 17, 2017) (Conti, C.J.) (discussing *Miranda*, its progeny, and the legal standard applicable to custodial

interrogations). *Miranda* warnings are required because custodial interrogation involves "inherently compelling pressures." *Miranda*, 384 U.S. at 467.

Here, the Government does not contest that Defendant was interrogated during the traffic stop before he was given *Miranda* warnings. Therefore, the Court's focus is on whether Defendant was in custody when he was subjected to that questioning.

There are two discrete inquiries in determining whether an interrogation was custodial: "(1) the circumstances surrounding the interrogation and, (2) given those circumstances, whether a reasonable person would have felt free to terminate the interrogation and leave." *Yarborough v. Alvarado*, 541 U.S. 652, 653 (2004). "Once the . . . players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). Courts should consider all the circumstances surrounding the interrogation, including any circumstance that would have affected how a reasonable person in the suspect's position would perceive his or her freedom to leave. *J.D.B. v. North Carolina*, 564 U.S. 261, 270-71 (2011). The mindset or subjective views and opinions of either the person being questioned or the interrogating officer is irrelevant to the inquiry. *Id.* at 271.

The Third Circuit has compiled a list of five factors which courts must consider as part of a *Miranda* custody inquiry: "(1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect

voluntarily submitted to questioning." *United States v. Willaman*, 437 F.3d 354, 359-60 (3d Cir. 2006); *see United States v. King*, 604 F.3d 125, 138 (3d Cir. 2010).

Beyond these five factors from *Willaman*, the Third Circuit has also instructed courts to consider "the information known by the officer concerning the suspect's culpability," *United States v. Jacobs*, 431 F.3d 99, 105 (3d Cir. 2005) (citing *Steigler v. Anderson*, 496 F.2d 793, 799 (3d Cir. 1974)), and "whether the officer revealed his or her belief that the suspect was guilty." *Id.*; *Stansbury v. California*, 511 U.S. 318, 325 (1994) ("An officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned."). The application of the five *Willaman* factors and the two additional considerations from *Jacobs* to determine whether a suspect is in custody is an objective inquiry, *J.D.B.*, 564 U.S. at 270-71, which is determined on a case-by-case basis. *United States v. Leese*, 176 F.3d 740, 743 (3d Cir. 1999).

"As a general rule, the burden of proof is on the defendant who seeks to suppress evidence." *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995) (citing *United States v. Acosta*, 965 F.2d 1248, 1256 n.9 (3d Cir. 1992)). "However, once the defendant has established a basis for his motion . . . the burden shifts to the government." *Johnson*, 63 F.3d at 245 (citing *United States v. McKneely*, 6 F.3d 1447, 1453 (10th Cir. 1993)). A defendant "satisfies that burden if he alleges that he was subjected to custodial questioning without the benefit of *Miranda* warnings," at which point the government must "prove by a preponderance of the evidence that 'there was no custodial interrogation implicating *Miranda*, there was some exception to the *Miranda* rule, or . . . [the defendant] was properly Mirandized and waived his rights.'" *Valenta*, 2017 WL 2131375, at *4 (quoting *United States v. Tudoran*, 476 F. Supp. 2d 205, 216 (N.D.N.Y. 2007)); *see Colorado v. Connelly*, 479 U.S. 157, 168 (1986); *United States v. Kofsky*, Criminal Action No. 06-392, 2007 WL

54

2480971, at *14 (E.D. Pa. Aug. 28, 2007) ("Where a defendant seeks to suppress a statement under *Miranda*, the government bears the burden of establishing by a preponderance of the evidence that the statement was not the product of custodial interrogation conducted in the absence of Miranda warnings.").

### 3. Analysis

As a preliminary matter, the Court notes that Defendant lacks standing to challenge any purported violations of the driver's Fifth and Fourteenth Amendment rights. *See United States v. Salinas-Calderon*, 728 F.2d 1298, 1302 (10th Cir. 1984) (finding that the defendant did not have standing to object to the purported violation of other individuals' Fifth Amendment rights resulting from failure to give *Miranda* warnings); *United States v. Fredericks*, 586 F.2d 470, 480-81 (5th Cir. 1978) ("Although Alderman and most other 'standing' cases have involved Fourth Amendment violations, the principle has also been applied where, as in this case, one codefendant or coconspirator seeks to suppress evidence incriminating him that was obtained from a coparticipant in crime without proper compliance with the procedural requirements of Miranda or otherwise in violation of that party's Fifth or Sixth Amendment rights.") (listing cases); *Bryson v. United States*, 419 F.2d 695, 699 (D.C. Cir. 1969) ("Fifth Amendment rights are, a fortiori, personal rights . . . ."); *United States v. Richardson*, 1 F. Supp. 2d 495, 497 (D.V.I. 1998) ("So it is clear that the general rule is that defendants do not have standing to raise a third-party's Fifth Amendment violations for their own defense."); *State v. Baum*, 972 A.2d 1127, 1133 (N.J. 2009) ("This limitation on the Fifth Amendment, as affording an entirely personal right, has been

understood among the federal courts to support the conclusion that the Fifth Amendment 'cannot be asserted vicariously.'" (quoting *United States v. Fortna*, 796 F.2d 724, 732 (5th Cir. 1986))).

In terms of Defendant's challenge to his own questioning, the Court divides the interaction between Defendant and Trooper Marmol into three periods of time for purposes of the present analysis: (1) the initial, pre-*Rodriguez*-moment portion of the traffic stop and the extension of the traffic stop, prior to Trooper Marmol handcuffing Defendant; (2) the time period between Defendant's handcuffing and Defendant's arrival at the police barracks; and (3) Defendant's interrogation at the police barracks.

Regarding the initial portion of the traffic stop, the Court agrees with the Government that Defendant was not "in custody" during this interaction. Thus, Trooper Marmol had no obligation to inform Defendant of his *Miranda* rights.

Generally, "the questioning of a motorist detained pursuant to a routine traffic stop does not constitute custodial interrogation for *Miranda* purposes." *Meran*, 2017 WL 4803927, at *19 (citing *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984); *Anderson*, 859 F.2d at 1177); *see Berkemer*, 468 U.S. at 440 ("[P]ersons temporarily detained pursuant to [traffic] stops are not 'in custody' for purposes of Miranda."); *United States v. Ley*, 876 F.3d 103, 108-09 (3d Cir. 2017) (explaining that a roadside interrogation during a traffic stop is not "custodial interrogation" for *Miranda* purposes). Thus, at least during the pre-*Rodriguez*-moment portion of the stop, Trooper Marmol could question Defendant without implicating *Miranda*.

Furthermore, prior to Defendant being handcuffed, Defendant was not "subjected to treatment that render[ed] him 'in custody' for practical purposes." *Berkemer*, 468 U.S. at 440. Although Defendant was not told that he was free to leave, he was not told that he was under

arrest. He was on the side of the Turnpike during daylight hours. And, at the time Trooper

Marmol asked Defendant questions, the entire vehicle stop had only been taking place for about

twenty minutes. *See United States v. Caraballo*, 643 F. App'x 163, 169 (3d Cir. 2016) ("The afternoon

traffic stop was relatively brief and occurred in public—the same features found in *Berkemer* to

'mitigate the danger that a person questioned will be induced to speak where he would not

otherwise do so freely.'" (internal quotations omitted) (quoting *Berkemer*, 468 U.S. at 437)). The

questioning lasted even less time, taking no more than three minutes total. (*See* Gvm't Ex. 1.)

Moreover, Trooper Marmol and Trooper Petrosky did not act in a coercive manner.

Trooper Marmol's tone was polite and conversational and neither officer displayed his weapon

or physically restrained Defendant. *Caraballo*, 643 F. App'x at 169. While Trooper Marmol had

reason to believe that the driver and/or Defendant may have been involved in criminal activity,

as discussed above, there is no evidence that his beliefs caused him to "bear down in interrogation

and create the kind of atmosphere of significant restraint that triggers *Miranda*." *Jacobs*, 431 F.3d

at 105 (quoting *Steigler*, 496 F.2d at 799). Furthermore, although Trooper Marmol did imply to

the driver that he suspected criminal activity by telling the driver that he knew about his criminal

history and asking to search the vehicle, there is evidence that Defendant did not hear this

exchange. (ECF No. 48 at 115-16.) Even if Defendant did, Defendant was never informed that his

own detention would not be temporary or that he would be arrested. *Berkemer*, 468 U.S. at 441.

Finally, Trooper Petrosky's retention of Defendant's identification and the toll ticket weighs in

favor of finding that Defendant was in custody. However, based on the totality of the

circumstances, the Court determines that the brief questioning of Defendant in conjunction with

the traffic stop and vehicle search—in spite of the retention of Defendant's identification—did

not involve "restraint on freedom of movement of the degree associated with a formal arrest" and thus was not custodial interrogation. *Thompson*, 516 U.S. at 112. Trooper Marmol was therefore not obligated to give *Miranda* warnings to Defendant before questioning him and any statements made by Defendant during this time period are not subject to suppression.

During the second portion of the stop, the driver and Defendant were handcuffed, placed in a police vehicle, and ultimately arrested and taken to the police barracks. Defendant was clearly in custody when he was handcuffed and placed in the police car. *See, e.g., United States v. McMillan*, 227 F. Supp. 3d 432, 440 (W.D. Pa. 2017) (Hornak, J.) (finding that the defendant was in custody when, among other circumstances, he was handcuffed); *Meran*, 2017 WL 4803927, at *20 ("Obviously, one is not free to leave when sitting in a police car with handcuffs on. When defendants were placed in [the police officer's] vehicle, they were in custody for *Miranda* purposes because their freedom of movement was restricted to 'the degree associated with formal arrest.'" (citations omitted)). However, there is no evidence of any interrogation during this time period. Neither the MVR footage nor the testimony at the Suppression Hearing suggests that Defendant was interrogated between his handcuffing and his arrival at the police barracks.[13] Thus, to the extent Defendant made any statements during this time period, those statements were not the result of custodial interrogation and will not be suppressed.

Finally, while Defendant was at the police barracks, he was certainly in custody.[14]

---

[13] Nor is there any evidence that Defendant made any statements during this time period that Defendant would now seek to suppress.

[14] There is no evidence that Defendant was interrogated at the barracks when he gave his statement taking responsibility for the Ford Taurus. However, Trooper Marmol also could not remember whether Defendant admitted responsibility for the Ford Taurus in response to questioning or some sort of dialogue with Trooper Marmol. (ECF No. 48 at 67-68.) The Court will assume that Defendant made the statement regarding his responsibility for the vehicle during an interrogation.

However, by that point, Defendant was properly Mirandized and validly waived his *Miranda* rights.

"A defendant may waive his *Miranda* rights if the waiver is made knowingly, intelligently, and voluntarily." *United States v. Pruden,* 398 F.3d 241, 246 (3d Cir. 2005) (citing *Miranda,* 384 U.S. at 444). Two factors are relevant to this totality-of-the-circumstances determination. First, the relinquishment of the right must have been "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine,* 475 U.S. 412, 421 (1986). Second, the defendant must have waived his rights "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* Considerations relevant to this analysis include: "(1) evidence of police coercion; (2) the length and location of the interrogation; (3) the defendant's maturity, physical condition, mental health and level of education; (4) whether *Miranda* warnings were given; and (5) whether an attorney was present for the interview." *United States v. Clemons,* Criminal No. 16-76, 2017 WL 3394615, at *4 (W.D. Pa. Aug. 8, 2017) (Fischer, J.) (citing *United States v. Swint,* 15 F.3d 286, 289 (3d Cir. 1994)).

In addition to the Fifth Amendment's requirement of a voluntary waiver of *Miranda* rights, the Fourteenth Amendment's Due Process Clause requires a confession to be voluntary to be admissible.[15] *See Swint,* 15 F.3d at 289. When determining whether a confession was voluntary, courts consider the voluntary waiver factors referenced above. *Swint,* 15 F.3d at 289. The crucial factor in the voluntariness inquiry is police coercion—to find that a statement was involuntary, the court must conclude that it was the produce of "police overreaching." *Id.* While compliance

---

[15] Although Defendant does not explicitly argue that his statements to Trooper Marmol were involuntary, he does generally assert that his Fourteenth Amendment rights were violated in the context of his statements. Thus, the Court will address the Fourteenth Amendment's voluntary confession standard.

with *Miranda* does not conclusively establish that ensuing statements were voluntary, "cases in which a defendant can make a colorable argument that a self-incrimination statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of Miranda are rare." *Berkemer*, 468 U.S. at 433 n.20.

The Government bears the burden of proving by a preponderance of the evidence that Defendant voluntarily, knowingly, and intelligently waived his *Miranda* rights, *United States v. Nance*, Criminal No. 09-193, 2010 WL 4065478, at *10 (W.D. Pa. Oct. 15, 2010) (citing *Connelly*, 479 U.S. at 169), and that Defendant's statement was made voluntarily, *United States v. Griggie*, 105 F. App'x 431, 435 (3d Cir. 2004) (quoting *Swint*, 15 F.3d at 289).

Considering the totality of the circumstances, the Court concludes that the Government has met its burden of showing that Defendant voluntarily, knowingly, and intelligently waived his *Miranda* rights and voluntarily made a statement in which he took responsibility for the Ford Taurus. Defendant was taken into custody without force or threats of force, advised of his rights under *Miranda*, and then transported to the barracks. Throughout the interaction with Defendant captured by the MVR, Trooper Marmol spoke in a conversational manner and treated Defendant and the driver with respect and professionalism. At the barracks, Defendant was sitting in the open patrol room with the driver on prisoner benches when he told Trooper Marmol that he was responsible for the Ford Taurus. (ECF No. 48 at 65-66, 67.) Nothing about these circumstances suggests coercion.

Moreover, from the MVR footage, it is apparent that Defendant is an adult who understands English, (Gvm't Ex. 1); *see Skeffery*, 2006 WL 8446120, at *6, and there is no suggestion that his maturity, physical condition, mental health, or level of education would have prevented

him from understanding his *Miranda* rights, the circumstances, or the significance of waiving his rights. This conclusion is buttressed by the fact that Defendant had been arrested before (Gvm't Ex. 4 at 4-5), which suggests that he would have been familiar with his rights and the consequences of waiving his rights and speaking with police. *See United States v. Drayton*, Criminal No. 07-0135, 2009 WL 4262385, at *8 (W.D. Pa. Nov. 24, 2009); *Skeffery*, 2006 WL 8446120, at *6.

Based on these facts, the Court finds that Defendant's statement to Trooper Marmol at the barracks was voluntary and that Defendant voluntarily waived his *Miranda* rights. The Court will thus **DENY** Defendant's Motion to Suppress his pre- and post-arrest statements.[16]

## IV. Conclusion

In summary, Trooper Marmol did have reasonable suspicion of a traffic violation to support the traffic stop of the Ford Taurus. After Trooper Marmol executed the stop and took care of various inquiries incident to the traffic stop and numerous safety-related issues, Trooper Marmol presumably did extend the stop by calling for backup in order to search the vehicle. However, he did so based on reasonable suspicion that criminal activity was afoot and thus, the extension of the stop was constitutional. Furthermore, to the extent Defendant challenges the consent search of the Ford Taurus, this challenge fails for two reasons. First, Defendant lacks standing to challenge the search. Second, the driver—who had authority to consent—voluntarily consented to the search of the vehicle. And Trooper Marmol's search of the Ford Taurus did not

---

[16] In Defendant's Motion to Suppress Evidence (ECF No. 26), Defendant also argued that Defendant's statements should be suppressed because they were the fruit of the illegal stop, search, and seizure of the Ford Taurus. (*Id.* at 6-7.) Because the Court previously found that the stop and search of the Ford Taurus and the seizure of its occupants was constitutional, the Court rejects these alternative bases for suppressing Defendant's pre- and post-arrest statements.

exceed the scope of the driver's consent until the consent search permissibly morphed into a vehicle search based on probable cause. Therefore, Trooper Marmol's stop and search of the Ford Taurus and seizure of Defendant did not violate Defendant's Fourth Amendment rights and the evidence found as a result of the stop and vehicle search is admissible.

In terms of Defendant's arguments for suppressing his statements, the only time period in which Defendant was subjected to custodial interrogation was following his arrest at the police barracks. By this point, Defendant had been properly Mirandized. Defendant thereafter knowingly and voluntarily waived his *Miranda* rights and made a voluntary statement regarding his responsibility for the Ford Taurus to Trooper Marmol. Thus, there was no violation of Defendant's Fifth and Fourteenth Amendment rights and his statements are admissible.

Based on the foregoing, the Court will **DENY** Defendant's Motion to Suppress Evidence (ECF No. 26).

An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | **Case No. 3:18-cr-24** |
| | ) | |
| **v.** | ) | **JUDGE KIM R. GIBSON** |
| | ) | |
| **JOHN T. TERRY, a/k/a TYREE TERRY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER

NOW, this $\underline{20^{th}}$ day of May, 2019, upon consideration of Defendant John T. Terry's

Motion to Suppress Evidence (ECF No. 26), the Government's Response thereto (ECF No. 32),

Defendant's Proposed Findings of Fact and Conclusions of Law (ECF No. 51), and the

Government's Response (ECF No. 52), and for the reasons set forth in the accompanying

Memorandum Opinion, **IT IS HEREBY ORDERED** that Defendant's Motion to Suppress

Evidence (ECF No. 26) is **DENIED**.

**BY THE COURT**

**KIM R. GIBSON
UNITED STATES DISTRICT JUDGE**