IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

_____

UNITED STATES OF AMERICA,
                    Plaintiff,

                                        Criminal Action
          vs                            No. 18-24
                                        (Day 1, Vol. 1)

JOHN T. TERRY,
                    Defendant.

_____

          Transcript of Day One Jury Selection Trial
proceedings held on Monday, August 22, 2022, United States
District Court, Johnstown, Pennsylvania, before the Honorable
Kim R. Gibson, U.S. District Court Senior Judge.


APPEARANCES:

For the Government:            ARNOLD P. BERNARD, JR., Esq.
                               MAUREEN SHEEHAN-BALCHON, Esq.
                               U.S. Attorney's Office
                               319 Washington Street, Suite 200
                               Johnstown, PA  15901
                               arnold.bernard@usdoj.gov
                               Maureen.Sheehan-Balchon@usdoj.gov


For the Defendant:             SANDRA THOMPSON, Esq.
                               351 E. Princess Street
                               P.O. Box 1902
                               York, PA  17405
                               sthompsonLLC@gmail.com


Court Reporter:    Shirley Hall, RDR, CRR
                   U.S. Courthouse, Suite 204
                   Penn Traffic Building
                   319 Washington Street
                   Johnstown, PA  15901
                   shirleyhall_uscra@yahoo.com


Proceedings recorded by digital stenography; transcript
produced by computer-aided transcription.

P R O C E E D I N G S

(In open court, with defendant and jury panel seated.)

THE COURT:  Good morning.

ALL PRESENT:  Good morning.

THE COURT:  Are the parties ready to proceed?

MR. BERNARD:  Yes, Your Honor.

MS. THOMPSON:  Yes, Your Honor.

THE COURT:  All right.  Good morning to counsel and to the parties.

Miss Gorgone, if you would please call 49 prospective jurors.

What will happen is when she calls your name, if you'd please stand so that the attorneys and parties can see who you are and identify you with what's called.

So go ahead.  Miss Gorgone.

MS. GORGONE, DEPUTY CLERK:  Okay.  Craig Dunmeyer, Juror No. 115, in Seat No. 1.

David Fetchko, Juror No. 110 in Seat No. 2.

Mark Miller, Juror No. 66, in Seat No. 3.

Sharon Lavick, Juror No. 130, in Seat No. 4.

Wanda Yaudes, Juror No. 99, in Seat No. 5.

Sheryle Johns, Juror No. 89, in Seat No. 6.

Lindsay Carns, Juror No. 77, in Seat No. 7.

Ryan Chuff, Juror No. 121, in Seat No. 8.

Natasha Mehta, Juror No. 78, in Seat No. 9.

Myriah Reasy, Juror No. 106, in Seat No. 10.

Patricia Glessner, Juror No. 80, in Seat No. 11.

Donovan Mock, Juror No. 135, in Seat No. 12.

Alexander Waite, Juror No. 143, in Seat No. 13.

Vickie Swisher, Juror No. 76, in Seat No. 14.

Suzanne Molosky, Juror No. 91.

Seth Forry, Juror No. 126.

Johnathan Chaney, Juror No. 112.

Lisa Ebersole, Juror No. 114.

Earl Cyphert, Juror No. 67.

Mark Middleton, Juror No. 145.

Jesse Ringler, Juror No. 136.

Paula Clouser, Juror No. 73.

Justin Redinger, Juror No. 134.

Deanna Lynn Robertson, Seat No. 93 -- Juror No. 93.

Catherine Rossi, Juror No. 117.

Joanne Myers, Juror No. 87.

David Dufour, Juror No. 68.

William Schoeneman, Juror No. 102.

Cheri Clinton, Juror No. 95.

Anthony Simkovic, Juror No. 132.

Roxanne Baker, Juror No. 104.

Amanda Scalice, Juror No. 140.

Lonny Lallemand, Juror No. 111.

Roger Burkhart, Juror No. 127.

Robert Snyder, Juror No. 142.

Natausha Jacobs, Juror No. 94.

Janet Diehl, Juror No. 107.

Pam Evans, Juror No. 84.

James Smolleck, Juror No. 90.

Marlene Mingle Lynch, Juror No. 85.

Carol Pizzella, Juror No. 129.

Sarah Brenize, Juror No. 86.

Eugenie Bryant, Juror No. 105.

Amy Jo Churner, Juror No. 139.

Donald Hanna, Juror No. 97.

Lahne Macey, Juror No. 133.

Zachary Niper, Juror No. 116.

Cynthia Brown, Juror No. 119.

And Judith Opdenhoff, Juror No. 83.

Will you please raise your right hands.

(Jury panel sworn.)

MS. GORGONE, DEPUTY CLERK:  Please be seated.

THE COURT:  Well, again, good morning.  I am Judge Gibson.  I am the trial judge in this case, and you have been called to this courtrooms as a panel of prospective jurors in the case of *United States versus John T. Terry*, Criminal No. 18-24.  From this panel we will select the jurors who will sit on the jury who will decide this case.

We will also select alternate jurors who will be part

of the trial and will be available if one of the regular jurors becomes ill or is otherwise unable to continue on the jury.

First, let me thank you for your appearing today. We rely on people to appear when we send out notices, and it's appreciated that you're all here today timely. We rely on juries in this country to decide cases tried in our courts. So service on a jury is an important duty of citizenship. Jurors must conduct themselves with honesty, integrity and fairness.

Under our system of justice, the role of the jury is to find the facts of the case based on the evidence presented during the trial. In or words, from the evidence seen and heard in this courtroom, the jury decides what the facts are and then applies those facts to the law that the Court will provide to them in the instructions.

My role as the trial judge is to make legal decisions during the trial and to explain to the jury the legal principles that will guide its decisions.

We recognize that you are all here at some sacrifice. However, we cannot excuse anyone merely because of personal inconvenience unless serving on this jury would be a compelling hardship.

A few moments ago you swore to answer truthfully questions about your qualifications to sit as jurors in this case. This questioning process is called voir dire. I will conduct the questioning and the lawyers for the parties will

participate also. It is essential that you answer these questions truthfully. A deliberately untruthful answer could result in severe penalties.

The voir dire examination will begin with a brief statement about the particulars of this case. The purpose of this statement is to tell you what the case is about and to identify the parties and their lawyers. Questions will be asked to find out whether any of you have any personal interest in this case or know any reason why you cannot render a fair and impartial verdict.

I will want to know whether you are related to or personally acquainted with any of the parties, the lawyers, or any of the witnesses who may appear during the trial and whether you already know anything about this case.

Other questions will be asked to determine whether any of you have any beliefs, feelings, life experiences, or other reasons that might influence you in rendering a verdict. The questions are not intended to embarrass anyone.

Since you may have a response that you are uncomfortable sharing publicly, we do the questionings here at the bench on an individual basis, and that will be to the area to my right, to your left.

After this questioning is completed, the parties on either side may ask that a member of the panel be excused or exempted from service on the jury in this case. These are

called challenges.

First, a prospective juror may be challenged for cause if the voir dire examination shows that a juror might be prejudiced or otherwise unable to render a fair and impartial verdict in this case. I will excuse a prospective juror if I decide that there is sufficient cause for the challenge. There is no limit to the number of challenges for cause.

Second, the parties have the right to a certain number of challenges for which no cause is necessary. These are called peremptory challenges, and each party has a predetermined number of peremptory challenges.

The peremptory challenge is a right long recognized by the law as a means of giving the parties some choice in the makeup of the jury. If you are eliminated from the jury panel, you should understand that it is not a reflection on your ability or integrity.

During this voir dire process, there may be periods of silence when the attorneys and I are not speaking openly. During those times and at all other times you must not talk about this case or about the voir dire questions and answers. Please be patient. We will attempt to keep those times as brief as possible.

You should answer the questions that are put to you with complete candor and honesty as you have sworn or affirmed to do.

The questions are designed to disclose whether you should serve as a juror in this case or whether you should be excused. The questions that will soon be asked of you are in addition to the written questions you answered earlier this morning.

During voir dire, it will be necessary for me to invite certain members of the jury panel up to the bench in order for the attorneys or myself to ask questions based upon any of your previous responses outside of the hearing of the other jury panel members.

We have -- you provide your answers at the bench so you can speak to the attorneys and to me freely without having to be concerned that the rest of the people in the courtroom will hear your answers. Please be patient as we conduct the questioning this morning. I know this can be a lengthy process; but with your help, we can expedite the proceeding and finish in a reasonable amount of time.

When I call on members of the jury panel today and question you, I will refer to you by your juror number. If you do not remember your juror number, please take a moment to familiarize yourself with this number again. If I call you forward for questioning at the bench, please approach the bench and recite your juror number and name.

If any of the following questions apply to you, please raise your hand. When I subsequently call upon you, please

stand and announce your name and juror number. If no one raises his or her hand in response to a question, I will assume that the question is not applicable to any juror.

This trial is scheduled to begin today, August 22, 2022, and is scheduled to conclude on or about Friday, August 26, 2022. This is an estimate. The exact length of the trial may vary depending on many factors. This information is provided for your planning purposes and to assist you in making necessary arrangements with your family and places of employment.

The normal juror day will begin at 8:30 a.m. and conclude at approximately 5:00 p.m. This schedule may vary to ensure that we complete the trial within a reasonable period.

I have two initial questions for all prospective juror members. First, would serving as a member of the jury in this case create an extraordinary hardship on you or your family? And by "extraordinary" I mean just that, more than an ordinary hardship? Additionally, if you have already raised a hardship, the Court has considered that particular hardship and has determined that it is not an extraordinary hardship.

Any members of the juror panel in the jury box that have -- want to respond to that question?

Yes. Please stand and give us your juror number.

THE JUROR: Juror No. 89.

THE COURT: Eighty-nine.

If counsel will approach, please.

(At side bar.)

(Juror approaches side bar.)

THE JUROR:  Juror No. 89.

THE COURT:  Okay.  Stand where you can hear.

THE JUROR:  Okay.

THE COURT:  You're Juror No. 89?

THE JUROR:  Eighty-nine, Sheryle Johns.

THE COURT:  You have a document for the Court?

(Hands paper to the judge.)

THE COURT:  Maybe before I review it, can you just summarize what is in the document?

THE JUROR:  In my letter, I said that my father is 93, my mother is 92.  I care for them daily.  They are in their own home.  Two weeks ago yesterday my father had severe chest pain, and he went by ambulance, and it was to rule out a myocardial infarction.  These are the papers from the emergency room.  He was allowed to leave and come home, and I took him to the cardiologist; and we are waiting further testing that's going to be done in September.

THE COURT:  All right.  So in terms of your involvement then --

THE JUROR:  I have a brother in Hollidaysburg, and he can take them in case of emergency.  And so it's a personal emotional hardship that should one of my parents pass until I

would get the notification, I live in Hollidaysburg. And if it's bad, then it's bad. Now, I try to tell myself what will be, will be, and just relax; so I'm leaving it totally up to you. Thank you.

THE COURT: All right. My question to you, I understand what you're telling us. Do you believe that that pending at this time, that you would be able to concentrate on the evidence.

THE JUROR: Oh, yes; yes. Most definitely.

THE COURT: And I know it's not something that anyone can forecast, but have you been given information or have you been told anything that leads you to believe that something would be imminent in terms of --

THE JUROR: No, I have not.

THE COURT: Okay. But, emotionally, you're --

THE JUROR: I'm still -- yeah.

THE COURT: Okay.

THE JUROR: This is an everyday thing, as the time comes.

THE COURT: I understand.

Any question, counsel?

MS. THOMPSON: I heard you answer to the Judge that you won't be distracted, but you're emotional and near tears right now. So do you think --

THE JUROR: It's just talking about it. Once --

MS. THOMPSON: Okay.

THE JUROR: I've been praying. And I will -- I will do whatever God has asked me to do, so I'm leaving it up to you. I'll be fine. I'm a strong person. I am.

THE COURT: All right. What I'm going to do is I'm going to wait on react to your response to the questioning at this point.

THE JUROR: I'm sorry.

THE COURT: And -- and we'll let the jury selection play out.

THE JUROR: Okay.

THE COURT: And at the end we can take another look at.

THE JUROR: That's fine.

THE COURT: So when the questions apply to you, you just continue to come forward with it and answer.

THE JUROR: Okay, I will do that.

THE COURT: Thank you very much. You can take your seat.

THE JUROR: Thank you.

THE COURT: Counsel can stay here.

(Juror leaves side bar.)

(In open court.)

THE COURT: Anyone else in the jury box that wants to respond to that -- on the left side of the courtroom, your

right side -- yes, ma'am?

THE JUROR:  Juror No. 87, Joanne Myers.

THE COURT:  Please come forward.

(Juror approaches side bar.)

THE COURT:  Please come forward.  If you would just stand right there -- that's good.

Your juror number again?

THE JUROR:  Eighty-seven.

THE COURT:  Eighty-seven, all right.  If you can tell me --

THE JUROR:  Same thing that I wrote in the letter, I'm raising my 12-year-old granddaughter by myself.  She goes to counseling twice a week, and I would hate to see it disrupted for -- she's dealing with the issue of both her parents being in jail.

THE COURT:  Okay.  How long has she been doing this?

THE JUROR:  She has been in counseling probably since she's been five, but we just went to a new counselor three months ago because the other ones weren't -- she was over what was going on, and then her mother went back to jail again, her pap just mistreated her, and so we started counseling all over again.

THE COURT:  You say she's twelve now.

THE JUROR:  Yes.

THE COURT:  You said "we."  Is there someone else who

does this with you?

THE JUROR: No, me. I'm by myself. My ex-husband goes in once in a while, but that's all.

THE COURT: Mainly it's you.

THE JUROR: Yeah, meaning me and meaning her.

THE COURT: How often a week does she go?

THE JUROR: Twice, Tuesdays and Thursdays.

THE COURT: So as a result of the trial -- and I'm not saying yes or no.

THE JUROR: Okay.

THE COURT: -- but as a result of the trial, it appears she would miss two sessions because we are going to be done by Friday probably.

THE JUROR: Okay.

THE COURT: Any reaction to that?

THE JUROR: I have no reaction to that except she has the video visit set up through counseling with her dad at the jail. She calls her mother on the phone for one other session, and they talk back and forth with the counselor, and all of the above.

THE COURT: When you take her to these sessions, that's where she does this.

THE JUROR: Yes. Yes -- I mean she talks to her dad other times, but the counselor suggested we set it up through Zoom, so that's what we're doing.

THE COURT: All right, okay.

Well, it's very commendable that you are doing this. I don't want to take her way from this, but I'm just trying to put it in perspective, that it will be only two days.

THE JUROR: I understand, that sir.

THE COURT: Can you tell me is there anyone else who could possibly do this?

THE JUROR: From her perspective?

THE COURT: No, from yours.

THE JUROR: Well, from my perspective, I could have other people take her; but from hers, I'd say no because I'm her rock. I mean just -- and she'll tell everybody that. She doesn't like anybody else being in there during the discussing, and she really won't talk to them unless I'm there.

THE COURT: I understand. Okay.

THE JUROR: So --

THE COURT: All right.

Any questions, counsel?

MR. BERNARD: No, Your Honor.

MS. THOMPSON: No.

THE COURT: I'm going to wait to rule on this until we've finished our questioning.

THE JUROR: Okay.

THE COURT: And we'll let you know. So if there are any other questions that are applicable to you, will just come

forward and then answer them.

THE JUROR: Okay. Anything I could -- well, he's been in jail for 12 years, so -- that's how come I have her.

Okay. Thank you.

THE COURT: All right, thank you. Please have a seat.

THE JUROR: Uh-huh.

(Juror leaves side bar.)

(In open court.)

THE COURT: Anyone else -- yes, sir?

THE JUROR: Dave Dufour, No. 68.

THE COURT: All right, No. 68. Please come forward.

(Juror approaches side bar.)

THE COURT: I want to make sure you're hearing --

THE JUROR: (Nods head.)

MS. THOMPSON: Yes.

THE COURT: All right, sir. Just stand right here please. Your juror number is 68?

THE JUROR: Yes, sir.

THE COURT: What is it you want to tell me, sir?

THE JUROR: I'm presently -- I just got unemployed, and I was doing -- supposed to meet with a UC rep every time, and we're re-scheduling this trial, and I haven't -- I can't meet with her now until like the 29th, so I won't have a paycheck from them.

If I was picked, they told me that I would be -- I

wouldn't receive any benefits because I wouldn't be ready and available for work if I was picked for trial.

THE COURT:  You realize this is only until Friday?  I mean it's one week.

THE JUROR:  A whole week long?

THE COURT:  Yeah.

THE JUROR:  So I would not have any benefits for that week.

THE COURT:  And when did you become unemployed, sir?

THE JUROR:  August 4th, at Danone North America, in Dubois.

THE COURT:  I didn't --

THE JUROR:  At Danone North America in Dubois.

THE COURT:  What did you do there, sir?

THE JUROR:  I was a filler operator.

THE COURT:  And your job --

THE JUROR:  I'm terminated; they closed the plant.

THE COURT:  And you say that if you go to the unemployment office and report --

THE JUROR:  I have to the 29th for -- to see a UC rep, because my scanning and all the stuff they do didn't go through.

THE COURT:  Okay.  This trial will be over before then.

THE JUROR:  Oh, okay.  But even to backdate that, I

wouldn't get paid for that week because that's what they're going to do is log back for my wait week and two weeks of pay.

THE COURT: I understand. You lose one week.

THE JUROR: I would lose one week of pay.

THE COURT: Okay. I'm just letting you know you wouldn't miss your appointment.

THE JUROR: No, I understand that.

THE COURT: Okay.

All right, any questions, counsel?

MR. BERNARD: No, Your Honor.

MS. THOMPSON: Just a question. The fact that you'll lose one week of pay, I don't know if it would affect your household bills -- my question is would that be a problem in your mind as this trial goes on?

THE JUROR: I personally would try to make it as quick as possible.

MS. THOMPSON: Okay.

THE COURT: I didn't hear the question, sir.

MS. THOMPSON: My question? I was saying that would that affect his thought process as this trial went on if he was worried about his bills and the weekly income; and I think he said that he would make the trial go as quick as possible.

THE JUROR: I would probably make a -- a quick decision.

THE COURT: All right. Are you going to be able to

concentrate on the trial, though, from this point on?

THE JUROR: I would try. I mean I -- but I have a lot going on.

THE COURT: Okay, I understand.

Thank you, sir. Have a seat; I'm not going rule on this right now.

THE JUROR: Thank you.

(Juror leaves side bar.)

(In open court.)

THE COURT: All right, on my left side of the courtroom, your right side, anyone else? This side -- I see no further hands.

Okay, you can just stay up here then.

MR. BERNARD: Thank you.

THE COURT: My second question, ladies and gentlemen the jury panel, do you have any physical, mental, or emotional disability or condition that would make it difficult for you to hear and concentrate on the testimony of the witnesses in this case? Anyone?

I see no hands.

I now have some questions to ensure that you are both willing and able to consider the issues in this matter. I'm going to read to you the caption of the case, and then I'm going to read to you a brief description, and then we're going to read the indictments.

The reason for this is I want to find out if any of you have any knowledge of the case and also to familiarize you a little bit with the parties and that sort of thing. We're going to introduce everyone to you, the attorneys up here and the witnesses and that sort of thing; but right now I'm trying to find out whether you know anything about the allegations in the case, okay?

The caption of this case is *United States of America versus John T. Terry*, Criminal No. 18-24. In summary, the Government has charged Mr. Terry with violating federal law, specifically with: One, conspiring to distribute and to possess with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine and cocaine, both Schedule II controlled substances. And, two: Possessing with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine and cocaine, both Schedule II controlled substances.

The charges against Mr. Terry are contained in the first superseding indictment. An indictment is simply a description of the charges against a Defendant. It is an accusation only.

In just a few moments I will read to you the charges in the first superseding indictment. The purpose of reading the charges in the first superseding indictment is to put forth

the allegation in this case so that you may notify the Court as to whether you know any of the persons involved or possess information regarding the allegation.

Again, an indictment is just a formal way of specifying the exact crime the Defendant is accused of committing. It is an accusation only. An indictment is not evidence of anything, and you should not give any weight to the fact that the Defendant has been indicted in making your decision in this case.

Now, with respect to the Defendant, the specific indictment that the Court will reference in this case is the first superseding indictment. I'm going to read to you the charges contained in the indictment. They aren't very lengthy, they're relatively brief, and I gave you a summary already; but this is the actual charges that have been brought against Defendant.

Count 1: Between on or about March 30, 2018, to on or about April 4, 2018, in the Western District of Pennsylvania and elsewhere, the Defendant, John T. Terry, and Gerald Terry and others known to the Grand Jury did knowingly, intentionally, and unlawfully conspire, confederate, and agree together and with one another to distribute and to possess with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine and a detectable amount of cocaine, both Schedule II controlled

substances, in violation of Title 21 United States Code Sections 841(a)(1), 841(b)(1)(A)(viii), and 841(b)(1)(B)(ii), in violation of Title 21 United States Code Section 846.

Count 2: On or about April 4, 2018, in the Western District of Pennsylvania, the Defendant, John T. Terry, did knowingly, intentionally, and unlawfully possess with intent to distribute 500 hundred grams or more of a mixture and substance containing a detectable amount of methamphetamine and a detectable amount of cocaine, both Schedule II controlled substances, in violation of Title 21 United States Code Sections 841(a)(1), 841(b)(1)(A)(viii), and 841(b)(1)(B)(ii).

Mr. Terry denies these allegations, and he has pleaded not guilty in this case to both counts.

Has any member of the jury panel heard or read anything about this case; and, if so, please raise your hand. When called upon, state your name and juror number, and we will invite you to come to the bench for follow-up questions.

Anyone in the jury box?

Anyone on this side of the courtroom?

Yes, sir; in the front.

THE JUROR: Seth Forry, Juror No. 126.

THE COURT: Can you come forward, please, sir.

(Juror approaches side bar.)

THE COURT: All right, sir. Your juror number is 126?

THE JUROR: That's correct.

THE COURT: Since you responded to the question, I assume you have some information or knowledge about the crimes. Please keep your voice down so no one else hears what you're saying.

Go, ahead.

THE JUROR: I found online a document the defense filed to suppress evidence, so I read those pretty much in-depth and found the details of the traffic stop involving this, and basically your decision on that matter as well.

THE COURT: You did that when, sir?

THE JUROR: Friday night.

THE COURT: And your reason was what?

THE JUROR: I was just trying to research what the whole process was about, trying to figure out what kind of case I was going to be on, and came across the case number and found it online.

THE COURT: So you read the decision.

THE JUROR: Yes, sir.

THE COURT: Did you read anything else?

THE JUROR: No, there was the two documents there that were on the court's website that I read.

THE COURT: All right. Based on that knowledge, have you come to any conclusions on the case at this point?

THE JUROR: I have some preconceived notions that the charges brought forth are pretty much a slam dunk case. I

think that the defense was kind of pulling and they couldn't to try and get it thrown out, but I believe that it would be pretty hard to defend someone in that situation.

THE COURT: And having made these conclusions, sir, do you believe you could render a fair and impartial verdict based solely on the evidence presented at trial and the instructions that I give you?

THE JUROR: I'd be lying to say that I probably wasn't biased.

THE COURT: So you've pretty much already reached a conclusion?

THE JUROR: Yeah -- I mean would it take a lot to change my mind at this time.

THE COURT: All right.

Anything further, counsel? Do you have any questions?

MR. BERNARD: No, Your Honor.

MS. THOMPSON: No, Your Honor.

THE COURT: Okay.

All right, thank you, sir. Appreciate your candor.

THE JUROR: Thank you.

MS. THOMPSON: One question. I just wanted to know did you speak to anybody else on the jury panel --

THE JUROR: Not on the jury.

MS. THOMPSON: Okay, all right.

THE COURT: Let me just tell you, sir, since you do

have knowledge of this, you're not supposed to talk about the case at all, not in the jury panel. But you in particular, I direct you do not discuss with your fellow jury panel members, anything you know about the case, especially since you've pretty much decided which way it should go.

Okay? Can you do that?

THE JUROR: Understood; yes, sir.

THE COURT: Okay, please have a seat.

(Juror leaves side bar.)

(In open court.)

THE COURT: All right, on that side of the courtroom?

Yes, sir in, the back?

THE JUROR: 127.

THE COURT: Please come forward.

(Juror approaches side bar.)

THE COURT: Sir, if you would stand here, sir; and since you responded to the question, I assume you possibly know something about the case or something related to the case.

THE JUROR: Yes.

THE COURT: Please keep your voice down, tell us what you know, sir.

THE JUROR: From what I read, it was a SHIELD stop, a State Police SHIELD stop. And I didn't really read the whole thing, I just have minor knowledge. I know there was a suppression hearing for the evidence --

THE COURT: Where did you learn this, sir?

THE JUROR: On -- online.

THE COURT: Did you actually read the court documents?

THE JUROR: I didn't read them; I perused them. And the reason why is when I came for jury duty, I was seeing if it's a civil case because your schedule's online. And every time I get a jury letter, I get selected for every single case down here I've been selected in, the state I've been selected, so I was hoping it was not a civil case.

THE COURT: Okay. Now, you said that you -- that you looked at certain materials and documents and there's somewhat of a background. Based on that, have you reached any conclusions about the case?

THE JUROR: I wouldn't say I've reached a conclusion, but I'm a retired trooper myself, so -- honestly, if a SHIELD guy said he did it and found everything, I would -- I would lean on his side.

THE COURT: So you are sort of prejudiced to one side or the other?

THE JUROR: Yes.

THE COURT: You would favor the state trooper?

THE JUROR: Absolutely.

THE COURT: Okay. Based on that, do you believe that you could render a fair and impartial verdict in this case based solely on the evidence and the law as I give it to you,

or would you be influenced by what you've already reviewed?

THE JUROR: Yeah, I would be influenced by my old job, in doing that kind of work, more than what I've read. That doesn't really matter to me.

THE COURT: And where were you a trooper, sir?

THE JUROR: Washington County for seven years, and then a detective in Somerset and Cambria County until I retired.

THE COURT: Okay, all right. Well, I appreciate your want candor.

Questions?

MS. THOMPSON: You answered in the questionnaires that because of your prior employment, you believe that the State Police would not bring charges unless they absolutely could prove the case. Is that right?

THE JUROR: That is right.

MS. THOMPSON: Okay.

THE JUROR: Yes, I do believe that.

THE COURT: Okay. Again, sir, I appreciate your candor. I'll send you back to your seat, but I'm not going to rule on this right now.

THE JUROR: Okay, that's fine. Thank you, sir. Thank you.

MS. THOMPSON: Your number?

THE JUROR: It's 127.

(Juror leaves side bar.)

(In open court.)

THE COURT: On the right side of the courtroom, your left, my right, anyone?

I see no further hands. Thank you.

(At side bar.)

THE COURT: I'm going to have you introduce yourselves to the jury and also witnesses, so you can go back to your -- I'll have you introduce the Defendant at this point.

MS. THOMPSON: Okay.

(Attorneys return to their counsel tables.)

(In open court.)

THE COURT: All right, at this time I'm going to have counsel for the Government and counsel for the Defendant introduce themselves to the members of the jury panel.

And, Mr. Bernard, for the Government, you may go first.

MR. BERNARD: Good morning, Your Honor; good morning, members of the jury panel.

My name is Arnold Bernard. I'm an Assistant United States Attorney. I'm prosecuting this case along with co-counsel, Maureen Sheehan-Balchon, who is also an Assistant United States Attorney. But due to an emergency, she's unable to be here today; she'll be sitting with me tomorrow and throughout the course of the trial.

Seated next to me is Special Agent James Simpson from the Federal Bureau of Investigation. He's the case agent on this case, so he'll be seated at counsel table with me for the purposes of this trial as well.

THE COURT: Thank you.

Attorney Thompson, if you would introduce yourself and also the Defendant, please.

MS. THOMPSON: Thank you, Your Honor.

I'm Sandra Thompson; and this is John Terry, my client.

THE COURT: All right, thank you.

We're also going to have them introduce the witnesses that they would call in the case, but right now we're just proceeding with the attorney and the parties.

Do any members of the proposed jury panel know any of these attorneys or the Defendant or the officer?

I see no hands; thank you.

All right. Attorney Bernard, if you would please introduce or state the names of all witnesses who may be called to testify during your case-in-chief so that I can inquire whether any members of the jury panel know any of these people.

MR. BERNARD: Your Honor, the Government anticipates calling in its case-in-chief Ryan Marmol, trooper with the Pennsylvania State Police; Brian Wright, who works for the Pennsylvania Office of Attorney General; Morgan Wiernusz, who

is a forensic scientist for the Pennsylvania State Police; Justin Sarvey, a senior forensic examiner for the FBI; James Simpson, Special Agent with the FBI; Robert Dillard; and Robert Manns, Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives.

THE COURT: All right. Thank you, Counsel.

Do any members of the proposed jury panel know any of these persons who have been identified as possible witnesses in the case?

I see no hands.

Attorney Thompson, would you please introduce or name the possible witnesses that you'll call during your case.

MS. THOMPSON: Whether or not, Your Honor, they're actually called in the case, these are also some names that may be heard.

One name may be Kelli Royster, also Gerald Terry, Tracena Baker, John T. Butz, Senior, Niddarah Winters, Tanya Ballard Jones, Gary Long. Thank you.

THE COURT: Thank you.

Do any members of the proposed jury panel know any of these individuals who have been identified as possible witnesses in this case?

I see no hands.

I have some general questions at this point to ask of the prospective jury panel.

Members of the jury panel, the law is that you must decide this case on the facts and not be swayed by any sympathy or passion. Is there anyone who could not put aside all sympathy or passion and decide this case solely on the facts? If so, please raise your hand.

I see no hands.

To be fair and impartial, a juror must be able and willing to apply the law as the judge relates it to you at the end of the case. Do any of you believe that you would not be capable of and willing to apply the law that I give you in this case? And would you agree to do so even if you personally thought the law was wrong?

If you do not believe could you do that, please raise your hand.

I see no hands.

Suppose that, by following the law, you would be forced to return a verdict that you believe might be unpopular in your community, with your friends, or with your co-workers. Would you still be able to do your duty and apply the law regardless of what you feel the reaction in the community to such a verdict might be? If not, please raise your hand.

I see no hands.

If you are selected to sit on this case, you must render a verdict solely on the evidence presented at trial and in the context of the law as I give it to you in my

instructions, disregarding any other ideas, notions, or beliefs about the law that you may have encountered in reaching your verdict. Would any of you not be able to do that?

I see no hands.

Is there any other reason you could not sit on this jury and render an absolutely fair and impartial verdict?

I see no hands.

All right. At this time, members of the jury panel, in the jury assembly room you filled out questionnaires, and those questionnaires have been provided to counsel for the Government and for the Defendant, and this is their opportunity to individually question you about those answers that you gave. And what we're going to do is we're going to call you forward and question you at side bar as we have previously.

So at this time would counsel please approach, bringing with you your questionnaires that you wish to utilize.

(Counsel approach side bar.)

(At side bar.)

THE COURT: All right. We're going to go back and forth; and, Attorney Thompson, can start if you'd like.

MS. THOMPSON: So, Your Honor, one of the things -- the one -- how we viewed the questionnaire wasn't right in order of the list, so I know this may not be in the order of the list.

THE COURT: No, I just -- whatever questionnaire you

pick out, I'm going to call the juror up here by number, and there's no sequence to follow.

MS. THOMPSON: Okay. I have some grouping that can probably do a couple of numbers at once, and this is the first one, is have an issue with African Americans.

THE COURT: Do you have specific numbers with jurors? I'm going to call them up individually. I realize that there may be more than one or two, but we'll deal with them individually.

So the first one you would like to call.

MS. THOMPSON: Well, Forry was one. I'm not sure if we would even need to address him. Foray is 126, he was up here.

THE COURT: I can tell you 126 and 127 are going to be stricken for cause.

MS. THOMPSON: So we don't have to worry about them.

THE COURT: No.

MS. THOMPSON: I think so, too.

Ninety-nine.

THE COURT: Ninety-nine. All right.

(In open court.)

THE COURT: Juror No. 99, if you would approach, please.

(Juror approaches side bar.)

THE COURT: Please stand here.

And you're Juror No. 99?

THE JUROR: Ninety-nine, Wanda Yaudes.

THE COURT: All right, thank you.

Counsel has some questions for you.

MS. THOMPSON: Hi. I'm just trying to -- one of the things I'd like to say is when we do this, it's not to change any of your beliefs; so whatever beliefs you have, you have every right to have them. It's just in this type of venue, we have to pry a little bit into your beliefs; so just thank you for being honest about them.

But on your questionnaire you mentioned that you would have a problem with African Americans.

THE JUROR: I did?

MS. THOMPSON: That's what I had.

THE JUROR: I don't think.

MS. THOMPSON: It was Question No. 4 --

MR. BERNARD: Showing you your jury questionnaire, you answered to Question No. 4, which says: Do you have beliefs about African Americans and African American men that would affect your ability to render a fair and impartial verdict in this case?

THE JUROR: I thought I was --

THE COURT: Can you stand so I can hear you --

THE JUROR: I thought I was answering that I wouldn't.

THE COURT: Would or wouldn't?

THE JUROR: Wouldn't.

THE COURT: Would not.

THE JUROR: Would not. You know, I thought when it says do you believe --

MS. THOMPSON: Okay, okay.

THE JUROR: I don't have no problem.

MS. THOMPSON: Okay. All right, thank you.

MR. BERNARD: So to clarify your answer to Question No. 4, it should have been no.

THE JUROR: Yes.

MR. BERNARD: Okay.

THE JUROR: I just read it wrong; I'm nervous.

MR. BERNARD: I understand.

MS. THOMPSON: Thank so you much.

THE COURT: Thank you.

(Juror leaves side bar.)

THE COURT: Next? Attorney Thompson?

MS. THOMPSON: So 84 left that question blank -- actually, --

THE COURT: We'll call them; if they left it blank, we'll call them.

(In open court.)

THE COURT: Juror No. 84, please come forward.

(Juror approaches side bar.)

THE COURT: Just stand right here so we can hear you;

and counsel has some questions for you.

MS. THOMPSON: Hello.

THE JUROR: Hello.

MS. THOMPSON: So I like to explain that whatever your beliefs are, you're entitled to your beliefs and you're entitled to hold them. And we just have to pry into them a little bit in this process. And on the questionnaire there was a particular question about whether you would have a problem with African Americans or African American men, and you left that question blank.

I'm just trying to pry -- again, whatever you believe is your beliefs -- but just trying to find out what are they.

THE JUROR: Okay.

THE COURT: Can you answer so I can hear also; come closer.

MS. THOMPSON: You can be honest; it's okay.

THE COURT: Please speak this way so I can hear you.

THE JUROR: You want me to be honest about men --

MS. THOMPSON: Whatever it is, whatever -- the question was specifically about after American men; but if it's men, whatever. What is your belief?

THE JUROR: I believe that everybody is created equal.

MS. THOMPSON: Okay.

THE JUROR: Did you hear?

THE COURT: Yes.

THE JUROR:  I can lend you my hearing aid.

THE COURT:  As long as I can hear you.

(Off the record discussion between counsel.)

MR. BERNARD:  Can you give one minute to pull her questionnaire, Judge?

THE COURT:  I can, yes.

MS. THOMPSON:  Either way, you said you just believe everybody is equal; so even if you didn't answer it --

THE JUROR:  Everybody equal until they prove theirself different.

Did you hear?

THE COURT:  I did.

THE JUROR:  Okay.

MS. THOMPSON:  I understand.

THE COURT:  We called you up here because you didn't answer the question, so we didn't know what your response was.

Attorney Bernard, do you have other questions for this juror on a different topic?

MR. BERNARD:  Okay, yes.

So this is your jury questionnaire.

THE JUROR:  Okay.

MR. BERNARD:  You left blank Question No. 4.

THE JUROR:  Okay.

MR. BERNARD:  That is what Attorney Thompson's questions to you were in regards to, whether or not you had any

beliefs about African Americans or African American men.

You also left blank No. 6, which reads: Since it is the Government's burden to prove every element of every charge beyond a reasonable doubt, and since it is not Mr. Terry's burden to prove his innocence, Mr. Terry has the right to remain silent and not present any witnesses or testimony on his behalf. Would you have a problem following the Court's instruction that Mr. Terry has no burden to prove himself innocent?

THE JUROR: No, I have no problem.

MR. BERNARD: Okay. You just forget to mark that one?

THE JUROR: Yeah, I was going from page to page and --

MR. BERNARD: Okay. All right.

Thank you, that's all.

MS. THOMPSON: Thank you.

THE COURT: Thank you; you can have a seat.

(Juror leaves side bar.)

THE COURT: Yes?

MS. THOMPSON: Seventy-eight.

THE COURT: Seventy-eight, okay.

(In open court.)

THE COURT: Juror No. 78, if you would come forward, please.

(Juror approaches side bar.)

THE JUROR: Good morning.

THE COURT: Good morning. You're Juror No. 78?

THE JUROR: Yes.

THE COURT: Okay. Counsel has a question for you.

Would you stand here, please, because I have to hear you, the court reporter has to hear you, and the attorney have to hear you. Sort of speak in this direction.

THE JUROR: Sure, sure.

MS. THOMPSON: Okay, I just -- all right. So there were a few that you answered I guess --

THE JUROR: Uh-huh.

MS. THOMPSON: -- answers on what the judge may ultimately instruct you.

So whatever you believe, you're entitled to your beliefs; I just want to make sure you fully understand that.

THE JUROR: Uh-huh.

MS. THOMPSON: It's just that, again, we just have to know what your beliefs are. So I just ask if you'd be honest.

And one of the things was I think you answered Question No. 4, that you would have an issue with African Americans or African American men. And it's not to change your beliefs, you're entitled to your belief; we just need to know what are they.

THE JUROR: I'm -- could I see what I wrote 'cause --

THE COURT: Please speak this way; I can't hear you if you --

THE JUROR: Okay.

MR. BERNARD: Right there, the question.

THE JUROR: Do you have beliefs about African American men that would affect -- yeah. My belief -- you want to know what my belief is? Okay, I do feel that they are discriminated against.

MS. THOMPSON: Okay.

THE JUROR: Yeah.

MS. THOMPSON: Okay, okay.

THE JUROR: And people have preconceived notions, yes.

MS. THOMPSON: Okay, okay.

Now, also, here again I think the Judge is going to be ultimately instructing you to the effect that a person charged -- and I think the Judge already said this -- charged is not evidence that the person actually did something.

THE JUROR: Uh-huh.

MS. THOMPSON: So the person charged really has a constitutional right to sit and remain silent and not produce anything if they don't want to and leave the total burden up to the Government.

So here you said he should also prove his innocence.

THE JUROR: Yes.

MS. THOMPSON: So -- and I understand everybody walks in the door with a certain belief. But if the Judge instructs you like this, that he has no burden to prove himself innocent,

would you follow the Judge's instruction or you would go with your heart that says he needs to prove something to me?

THE JUROR: No, I'd follow the Judge's because that's what we're supposed to do.

MS. THOMPSON: Well, not just what you're supposed to do, but you're not supposed to do any damage to your own heart or personal beliefs.

THE JUROR: Okay.

MS. THOMPSON: So do you think that you would be warring with your personal beliefs?

THE JUROR: Maybe -- I've never been in this sort of situation before or been in a court, so I --

MS. THOMPSON: Okay.

THE JUROR: Yeah.

MS. THOMPSON: Okay. Thank you.

MR. BERNARD: So is it your belief that it's your obligation and duty, if you were selected as a juror, to follow the Judge's instructions, whatever those may be?

THE JUROR: Yes, yes.

MR. BERNARD: Would you have any difficulty in doing that, given what you've written on the questionnaire in response to Question six.

THE JUROR: I may -- like I said, since I've never had to -- like been in this situation before, I don't -- I may, but -- I mean I would do my best to follow, as -- what the

Judge instructs us to do.

MR. BERNARD: Okay.

MS. THOMPSON: Then there's No. 12. It says again -- I guess this here says: Would the fact that a Defendant -- or I guess this may also be a witness -- receive a reduced sentence for cooperating against another Defendant, would that cause you to necessarily discount or reject the testimony of a cooperating witness or Defendant?

So what is your opinion on this? What was your thought about that.

THE JUROR: I know some of the stuff -- okay, I don't know much about the judicial system at all, so -- the fact that a Defendant -- it's like -- for me, it's saying like it's a negotiation.

MS. THOMPSON: Uh-huh.

THE JUROR: So --

MS. THOMPSON: Okay.

THE JUROR: Um --

MS. THOMPSON: So basically it depends on the facts you hear?

THE JUROR: Yes, yes.

MS. THOMPSON: I get that.

MR. BERNARD: May I follow-up on that?

THE JUROR: Yeah, sure.

MR. BERNARD: So you would not automatically discount

the testimony of a cooperating witness or a Defendant who had reached an agreement?

THE JUROR: I guess so, yes.

MR. BERNARD: You would not.

THE JUROR: I would not. Yes, I would not.

MR. BERNARD: You would listen to that testimony and --

THE JUROR: Oh, I would definitely listen, yes.

MR. BERNARD: Okay.

MS. THOMPSON: And this here -- for -- do you have any beliefs about the Pennsylvania State Police or FBI that would affect your ability to render a fair and impartial verdict in the case? You said that --

THE JUROR: I'm not sure if they are always fair and non-discriminating.

MS. THOMPSON: You weren't wasn't sure when you read that?

THE JUROR: Non-discriminatory, yeah.

MS. THOMPSON: All right.

MR. BERNARD: Do you believe that they are discriminatory?

THE JUROR: No. I mean -- I think we're human and some individuals could be, but -- yeah.

MR. BERNARD: So you heard --

THE JUROR: I'm not using like a blanket statement

that everybody is or everybody isn't.  I think, you know, we're human and people do have --

MR. BERNARD:  Yes.

THE JUROR:  Just the human nature, we do have prejudices.

MR. BERNARD:  You heard my list of potential witnesses, and you heard that --

THE JUROR:  Yes.

MR. BERNARD:  -- one of the potential witnesses --

THE JUROR:  Yes.

MR. BERNARD:  -- would be a state trooper from the Pennsylvania State Police?

THE JUROR:  Yes, yes, yes.

MR. BERNARD:  Would you be able to listen to that witness's testimony --

THE JUROR:  Oh, absolutely.

MR. BERNARD:  -- and evaluate it based on its own merit as opposed to --

THE JUROR:  Oh, a blanket statement?

MR. BERNARD:  -- considering that?

THE JUROR:  Yes.

MR. BERNARD:  Yes.

THE JUROR:  Yes.  Personally, I have never had any issues with, you know, law enforcement or anyone.  But, yeah, I just wrote what came -- you know, what I -- what I thought I

felt --

MR. BERNARD: Sure, yeah. We appreciate the candor.

THE JUROR: Yeah.

MR. BERNARD: Absolutely, thank you.

MS. THOMPSON: Thank you.

THE JUROR: Thank you very much.

THE COURT: Thank you, you may take your seat.

THE JUROR: Thank you; bye.

(Juror leaves side bar.)

THE COURT: Mr. Bernard, we've had Attorney Thompson call three in a row. Do you have some you would like to call?

MR. BERNARD: Yes. The first one is the first gentleman that's seated in the first seat, Juror No. 115.

(In open court.)

THE COURT: Juror No. 115, please come forward.

(Juror approaches side bar.)

THE COURT: All right, sir. If you could come and stand here and -- counsel has some questions for you.

MR. BERNARD: Good morning, Mr. Dunmeyer. How are you doing?

THE JUROR: Good.

MR. BERNARD: It's important, again I just want to let you know that I appreciate your candor in answering the forms and your truthfulness in your answers to my questions today.

And if you recall on the form, one of the questions

was:  Do you have beliefs about the Pennsylvania State Police or the FBI that would affect your ability to render a fair and impartial verdict in this case?

Now, you're entitled to your own beliefs and opinions; I'm not here to try and change those.  My only concern is whether or not you possess those opinions and whether they may affect the outcome of this case.

THE JUROR:  Yeah.

MR. BERNARD:  So in response to that question, you stated:  Don't trust them.

THE JUROR:  I don't trust any policeman, any Statey; I think they're all corrupt.

MR. BERNARD:  Okay.  So you've heard my potential witnesses that I'd be calling at trial.

THE JUROR:  Yes.

MR. BERNARD:  It included a Pennsylvania State Police Trooper, a special agent of the FBI, and some other law enforcement witnesses.

THE JUROR:  Yes.

MR. BERNARD:  If they were to take the stand, do you believe you would be able to evaluate their testimony independently or would that preconceived notion of those --

THE JUROR:  No, it should be all right.

MR. BERNARD:  -- agencies affect your ability --

THE JUROR:  Should be fine.

MR. BERNARD: Should be fine.

THE JUROR: Yep.

MR. BERNARD: Okay. So you would not be affected by your --

THE JUROR: No.

MR. BERNARD: -- your belief that you think they are all corrupt or whatever the case maybe.

THE JUROR: No; not for this situation, no.

MR. BERNARD: Okay. What makes this situation different than your generalized beliefs?

THE JUROR: The guy's here. I trust for the district itself, I feel like they're more reasonable and not as corrupt because they -- they'd rather work with you, unlike the other cops or stateys, they don't work with judges; they're, just in my opinion, dicks.

MR. BERNARD: Okay. So if you heard testimony from these law enforcement officers during this trial, you'd be able to assess its credibility and afford it whatever weight you deem appropriate based solely on that testimony that you hear, and that would not be affected by any beliefs you have about other law enforcement.

THE JUROR: Yes.

MR. BERNARD: Okay.

MS. THOMPSON: Nothing.

THE COURT: In spite of your belief that the state

police and law enforcement are corrupt, do you believe that you can decide this case fairly and impartially on the evidence presented during trial and on the law as given to you by the court?

THE JUROR: Yes.

THE COURT: You do.

THE JUROR: Yeah.

THE COURT: Thank you.

THE JUROR: All right.

(Juror leaves side bar.)

THE COURT: All right. Attorney Bernard?

MR. BERNARD: Sixty-six.

(In open court.)

THE COURT: Juror No. 66, if you would come forward, please.

(Juror approaches side bar.)

THE COURT: All right, sir. If you would stand here, please; and you're Juror No. 66?

THE JUROR: Yes.

THE COURT: All right. Counsel has some questions for you.

THE JUROR: Sure.

MR. BERNARD: Good morning, Mr. Miller.

THE JUROR: Good morning.

MR. BERNARD: Filling out your juror questionnaire, I

noticed that On question No. 11, which reads:  The Government may also call cooperating witnesses.  Cooperating witnesses are Defendants or informants who assist the Government in the investigation and prosecution of other Defendants, often as a term of a plea bargain.  Do you have any strong personal beliefs one way or the other regarding the Government's use of cooperating witnesses and plea bargaining?

And you responded:  Yes.  And when asked to explain, you wrote:  They did something wrong, too; punishment is less in their cases.

So my question to you would be if you were selected as a member of the jury in this trial, and if you were to hear testimony from a cooperating witness or cooperating Defendant, would you be able to independently assess and evaluate that testimony without any preconceived notions, biases or prejudices against that witness, simply because they were a cooperating witness or Defendant?

THE JUROR:  I wouldn't have a problem doing that.  But I stated -- that's the next question, I think, would you have a problem being unbiased about it?  And I said no.

MR. BERNARD:  Yes, I just wanted to confirm based on what you wrote before that that was the case.

THE JUROR:  No problem.  I just understand how it works; it's a deal cut, that's all.

MR. BERNARD:  Okay.

Anything, Attorney. Thompson?

MS. THOMPSON:  No.  No, nothing.

THE COURT:  You can take your seat, sir.

MR. BERNARD:  Thank you.

THE JUROR:  Thank you.

(Juror leaves side bar.)

THE COURT:  One more, Attorney Bernard?  And then we'll go back to Attorney Thompson.

MR. BERNARD:  No. 77.

(In open court.)

THE COURT:  Juror No. 77, if you would come forward, please.

(Juror approaches side bar.)

THE COURT:  All right, if you'd stand right here, please.

THE JUROR:  Uh-huh.

THE COURT:  Counsel has a question for you.

MR. BERNARD:  Good morning, Miss Carns.

So there are several questions that you answered in your juror questionnaire that I just wanted to ask some follow-up questions about.

THE JUROR:  Uh-huh.

MR. BERNARD:  So the first one is Supplemental Question 1.  It reads:  Would you have difficulty with the instruction that everyone who walks into Federal Court has

equal standing and none are given greater or less credibility despite their position or profession, accused or accuser?

And you wrote: Yes, and stated: Because that's really not true.

Can you explain your answer for me?

THE JUROR: I guess I just feel like when you walk in, I feel like a certain amount of percentage of people, you look -- people already have their mind made up. I mean -- that's just how I feel.

MR. BERNARD: So do you have a -- your mind made up as to the credibility of any witness that may be called in this case?

THE JUROR: No.

MR. BERNARD: Okay. So I guess I'm just trying to understand what you mean by your response. Do you mean you're less inclined to believe someone because they're accused of committing a crime or more inclined to believe someone who is making the accusation?

THE JUROR: I think -- I think I would -- when I come in, I think I'm looking at the case overall. But I would say in general I feel like decisions and things are already made up, you know; things have already been decided regardless of what I say.

I mean people skew the truth. I mean I think another one of the questions on there was if -- we're going to have

people that come in that are plea bargaining.  So, they're going to plea bargain; so they were actually involved in this as well, potentially, to lessen a sentence.  That's all.

MR. BERNARD:  That's correct.  Yeah, that was another question that I wanted to follow-up with you on.

THE JUROR:  Yeah.  So I mean if they're committing a crime or hypothetical crime or whatever kind of language we need to use there, they're -- whatever they're accused of, so they're accused of the same thing, but they're going to get off because they're going to turn against someone else.  I mean is that -- I guess I just feel like is that trustworthy?  Like --

MR. BERNARD:  Well --

THE JUROR:  Do you understand what I'm saying?

MR. BERNARD:  I do, and I think you've sort of explained what your role, if you were selected as a juror would be, is to assess the credibility of the witnesses that appear before you, considering a number of factors.

THE JUROR:  Right.

MR. BERNARD:  You know, including their potential motives --

THE JUROR:  Right.

MR. BERNARD:  -- for testifying.

THE JUROR:  Right.

MR. BERNARD:  And you would base your decision whether to afford weight to that witness's testimony based on your

assessment of that testimony.

THE JUROR: Right.

MR. BERNARD: So with that in mind, would the fact that someone is a cooperating witness or Defendant, and that person has made an agreement with the Government, would that fact automatically, without that witness even opening their mouth, cause you to discredit what they had to say?

THE JUROR: I -- on that one there, I can't -- I -- I'll be perfectly honest with you. I'm a salesperson, so it would be a read thing. It would be what do I think of this person, looking at them. Do I think that they're telling -- it would be a judgment call.

I mean I can't -- I can't say yes a hundred percent with truth and mean that, in all honesty. I would have to say -- I would have to see what the person looked like.

MR. BERNARD: Okay.

THE JUROR: You know what I mean? I'm just --

MR. BERNARD: So you're saying automatically, just because they are a cooperating witness, you would not automatically discount their testimony.

THE JUROR: Exactly. That's what I'm seeing.

MR. BERNARD: You would wait to hear it and evaluate it on its own merit.

THE JUROR: Exactly, exactly.

MR. BERNARD: Okay, thank you.

Do you have any questions?

MS. THOMPSON: Nothing.

THE COURT: Despite of what you just said about your feelings on certain things, do you believe you can decide this case fairly and impartially and render a fair and impartial verdict based solely on what you hear in the court and based on the law that you're given?

THE JUROR: Yes.

THE COURT: Thank you.

You can have a seat, please.

THE JUROR: Thank you.

(Juror leaves side bar.)

THE COURT: All right, Attorney Thompson, back to you.

MS. THOMPSON: It would be 76.

(In open court.)

THE COURT: Juror No. 76, if you would come forward, please.

(Juror approaches side bar.)

THE COURT: Ma'am, come stand here, please.

And your juror number is?

THE JUROR: Seventy-six.

THE COURT: Seventy-six. Counsel have some questions for you.

THE JUROR: Okay.

MS. THOMPSON: Thank you. All right. So, first of

all, I just wanted to let you know that whatever your beliefs are, you're entitled to them. We just get to pry a little bit; but it's not to change anything that you truly believe in your heart, okay?

THE JUROR: Okay.

MS. THOMPSON: So one of the -- I guess let me start with -- you say that -- the Court is going to instruct you basically that everybody, whether they're law enforcement, a person charged, even an expert comes in with equal credibility as they take that stand --

THE JUROR: Okay.

MS. THOMPSON: -- unless and until you view them and you decide for yourself, something to that effect.

THE JUROR: Okay.

MS. THOMPSON: Your answer was: I believe in law enforcement. So would that mean because you do believe in law enforcement, you're going to automatically take what they say as believable?

THE JUROR: No.

MS. THOMPSON: Okay. You recognize they can make mistakes?

THE JUROR: Absolutely.

MS. THOMPSON: Okay. The other thing is No. 4, it asks about beliefs and African Americans and African American men, would that affect your ability to be fair and impartial.

You say:  I don't believe in BLM -- I'm going to take that as Black Lives Matter.

THE JUROR:  Yeah.

MS. THOMPSON:  So explain that.  And, again, whatever you believe is fine.

THE JUROR:  I just don't believe in their movement that they had.  I mean it was so destructive.

MS. THOMPSON:  Uh-huh.

THE JUROR:  And it's just like now everything they do or everything, they can get way with it.

MS. THOMPSON:  So let me ask you this, then?  When you say -- ma'am, do you have any beliefs that, again, under the Black Lives Matter movement that black people try to get away with things?

THE JUROR:  Yes, I do.

MS. THOMPSON:  Okay.  And so would the fact of believing that -- and, again, there's obviously a black man sitting on trial, and you heard the Judge read the charges and, he said he's not guilty.

Do you believe that you would take that belief about the Black Lives Matter -- and the Government said their witnesses are police, law enforcement -- would you believe that Mr. Terry is one of those that's trying to get away with something?

THE JUROR:  Well, I have a grandson that's in jail

right now on account of drugs --

MS. THOMPSON: Okay.

THE JUROR: -- and I had a nephew that overdosed two months ago; so when it comes to drugs, I really have a hard time.

MS. THOMPSON: And so because of those -- from your beliefs of Black Lives Matter to your family experiences with addiction and drugs, do you believe that you cannot sit as a fair and impartial juror in this particular type of case?

And, again, it's okay to be -- tell us how you really feel.

THE JUROR: I don't think I can.

MS. THOMPSON: Okay. Okay.

THE COURT: I couldn't hear your answer.

THE JUROR: I don't think I can. I had -- there's -- family members that was involved in drugs, and it's just -- very hurtful.

THE COURT: And that would make you tend to think the Defendant was --

THE JUROR: -- guilty.

THE COURT: Okay. And you said you did have a relative in jail for drugs?

THE JUROR: Yes, a grandson.

THE COURT: A grandson. And another relative --

THE JUROR: A nephew that overdosed.

THE COURT: Did he pass away?

THE JUROR: Yes.

THE COURT: All right.

Anything further?

MR. BERNARD: No, Your Honor.

MS. THOMPSON: Thank you.

THE COURT: Please be seated, thank you.

(Juror leaves side bar.)

MS. THOMPSON: There was another one, but it -- it didn't have a juror number. It said 767, but I couldn't tell --

MR. BERNARD: What was the number?

MS. THOMPSON: It said 767 -- I might have to try to -- but 104 is another one.

THE COURT: Here's the list. Do you have the number that you have --

MS. THOMPSON: I do, I do have it.

MR. BERNARD: This one here? Hanna?

MS. THOMPSON: Yeah, that's where she put --

MR. BERNARD: Those were mine, so --

MS. THOMPSON: So she's 97, Juror No. 97.

THE COURT: Ninety-seven.

MS. THOMPSON: Yeah.

THE COURT: Okay, all right.

(In open court.)

THE COURT: Juror No. 97, if you would approach, please.

(Juror approaches side bar.)

THE COURT: If you would stand here, sir.

You're Juror No. 97?

THE JUROR: (Nods head.)

THE COURT: Okay. Counsel have some questions for you.

MS. THOMPSON: Hello, how are you?

THE JUROR: Hello.

MS. THOMPSON: So I'm going to be speaking in these questions. We get to pry, but that is not to change your personal beliefs because it's not to say that any person's believes that you have are or wrong or anything like that. You are entitled to them, okay? So I'm going to start with that to go through your questionnaire.

So, starting with Question 2, in reference to -- so the Judge basically gives instructions on the law and says that almost everybody that -- everybody that comes in the courtroom doors to take the stand, they start on an even plane, whether they're a person charged, law enforcement, experts. They all start out with an even plane of credibility.

Now, you answered that -- I believe you said law enforcement does a great job and most arrested are guilty?

THE JUROR: (Nods head.)

MS. THOMPSON: So the question is, again, do you believe if the police say he's guilty or arrested him, therefore he must be guilty?

THE JUROR: I do.

MS. THOMPSON: Okay. And do you believe -- this may be saying the same thing in a different way, I don't know. But do you believe that John Terry, because he is charged with a crime, is guilty?

THE JUROR: I believe that -- yeah. I -- I believe that the State Police and the FBI just don't go out and find someone to accuse.

MS. THOMPSON: Okay. Okay. And then you -- No. 4, it says: Do you have beliefs about African American or African American men that would affect your ability to render a fair and impartial verdict?

And you say: A lot of African Americans are arrested.

So, again, I'm not trying to change your beliefs, just trying to see what they are.

THE JUROR: I'm not against anyone, but --

MS. THOMPSON: All right.

THE JUROR: -- being in the area that I grew up, I don't know too many; and then when you see it on TV, it's usually -- down here it's usually African Americans who are arrested.

MS. THOMPSON: So coupled with your belief that if the

police arrest you, you're guilty, and you see a lot of African Americans being arrested, do you sort of equate that African Americans are more -- tend to commit -- have more of a tendency to commit crimes?

THE JUROR: I believe that in this area.

MS. THOMPSON: Okay. Let me see if there's anything else.

And then also you are asked, No. 8: Do you have any beliefs about Pennsylvania State Police or FBI? And I guess you're saying that you have a lot of state trooper friends?

THE JUROR: Uh-huh.

MS. THOMPSON: And you're saying they would not lie.

THE JUROR: I -- I feel like they don't, yeah.

MS. THOMPSON: Okay. So because the Government is going to present state troopers as some of their witnesses, then would you automatically believe them because you don't believe state troopers lie?

THE JUROR: Yeah, I would.

MS. THOMPSON: Okay. Thank you.

MR. BERNARD: No questions, Your Honor.

THE COURT: Okay. Thank you, sir.

(Juror leaves side bar.)

MS. THOMPSON: The other one would be 104.

(In open court.)

THE COURT: Juror No. 104.

62

(Juror approaches side bar.)

THE COURT: 104, if you would stand here, please.

THE JUROR: Okay.

THE COURT: Counsel has some questions for you.

THE JUROR: Okay.

MS. THOMPSON: Hello; how are you doing?

THE JUROR: Good. How are you?

MS. THOMPSON: Good.

So I always like to start with you are entitled to whatever you believe.

THE JUROR: Okay.

MS. THOMPSON: So my asking you these questions is not to change what you truly believe.

THE JUROR: Okay.

MS. THOMPSON: We just get to pry, okay?

THE JUROR: Okay.

MS. THOMPSON: But whatever you believe is your belief, and you're entitled to it. Okay?

THE JUROR: Okay.

MS. THOMPSON: So a couple of things that you did answer. And then I guess it's Supplement No. 1, that you -- let me see -- this is not yours particularly, but I just wanted to get the question.

THE JUROR: Okay.

MS. THOMPSON: So basically that the Judge will

instruct you that people who walk into the Federal Court have equal standing, and none have less credibility unless and until they take the witness stand and the jury finds that. But when they first take the witness stand, they are on an even plane.

So do you -- do you still believe, as you filled out your questionnaire, that if they're arrested, they have less credibility?

THE JUROR: I do.

MS. THOMPSON: Okay. And do you believe -- do you believe -- the Judge explained that the mere fact that somebody is indicted is not evidence against them that they actually committed the crime, but do you actually have a problem with that type of instruction?

THE JUROR: I do not. I just feel that people don't end up here by accident; but I am also open to hearing the facts and making a decision based on that sort of information.

MS. THOMPSON: Now everybody charged -- Mr. Terry specifically because we're here -- they sit with a presumption of innocence.

THE JUROR: Uh-huh.

MS. THOMPSON: So that means that's where you start. You start looking at them as they are innocent. So based on what you're saying, are you starting with him being perceived as guilty and he has to prove his innocence?

THE JUROR: I am.

MS. THOMPSON: Okay. And, again, it's not to do damage to your own heart and to your own beliefs, so because -- do you believe that to change that mindset would do damage to your heart to try to flip it to say: I have to look through everything under a presumption of innocence?

THE JUROR: I think it would be tough for me to change my opinion; but, yes.

THE COURT: I couldn't hear you.

THE JUROR: I said I think it would be tough for me to change my opinion, yeah.

MS. THOMPSON: Okay, all right. So there was a couple other things, too. Let me try to get to that -- all right.

You also said you had some dealings with the Pennsylvania State Police in Question 7, and I guess they investigated your brother at a motorcycle accident or something?

THE JUROR: Yeah.

MS. THOMPSON: Okay. So I think it was Ebensburg State Police?

THE JUROR: Yeah.

MS. THOMPSON: So did you have a favorable -- not favorable, because obviously you lost your brother, which I'm sorry about, but how they treated you, did they give you a favorable opinion of the Pennsylvania State Police?

THE JUROR: I would just say indifferent. I wish I

could say that was the only time I had any dealing with them. It was not, to be swayed one way or the other.

MS. THOMPSON:  Okay.  All right.

Okay, thank you.

MR. BERNARD:  I have a question.

THE JUROR:  Sure.

MR. BERNARD:  You answered Question 11, which refers to the Government potentially calling cooperating witnesses.

THE JUROR:  Uh-huh.

MR. BERNARD:  The question asks whether you have any strong personal beliefs one way or the other regarding the Government's use of cooperating witnesses and plea bargaining.

You answered yes, and stated that:  It depends on his or her involvement of the act or crime.

So I just want to clarify that is it your belief that if a cooperating witness were to be called in a trial in which you were sitting as a juror, you would evaluate that witness's testimony on its own merit or do you have a preconceived idea of whether or not that testimony should be credited or discredited?

THE JUROR:  Was this the question where they would potentially get a reduction in sentencing or something of that sort if it was a cooperating witness?  Is that the question you're referring to?

MR. BERNARD:  Yes, that's correct.

THE JUROR: I think I would approach it with an open mind, but I definitely would have -- I am a skeptic. Like I'm a very skeptical person, so I would probably just, as I am with the Defendant, I would probably feel the same way with the witness.

MR. BERNARD: So you would listen to the testimony, weigh it on it own merits --

THE JUROR: Yeah.

MR. BERNARD: -- and take into consideration all of the factors that you're made aware of during that testimony, you know, such as the Defendant's ability to perceive the events they're testifying about, what possible motives they may have for testifying, you'll take all of that and reach an independent conclusion.

THE JUROR: Yeah.

MR. BERNARD: Okay. All right.

All right, thank you.

THE JUROR: Okay?

THE COURT: Okay. Thank you.

THE JUROR: Okay, thank you.

(Juror leaves side bar.)

THE COURT: Counsel, we've had the jury in here for probably about an hour and 40 minute or so, I believe. Do you know how many more jurors you're going to question and call up to side bar today?

MS. THOMPSON: There were four that I was waiting for cause, that I would probably want to know for strikes, but at least four.

THE COURT: And you, Attorney Bernard? Just an estimate.

MR. BERNARD: It looks like four or five more jurors I would like to question.

THE COURT: Let's just say ten -- I think we're going to take a small recess at this point to let them use the restroom and that sort of thing -- other people also if you need to. I don't think we're going to finish in the next ten or fifteen minutes.

MR. BERNARD: No.

THE COURT: Okay. If you just have a seat at counsel table, I'm going to give them probably about 20 minutes because we have about 50 people to use the restrooms and stuff, so I'm going to give them about 20 minutes.

Anything else?

MS. THOMPSON: No.

MR. BERNARD: No.

THE COURT: Okay. Thank you.

MR. BERNARD: Thank you.

(In open court.)

THE COURT: All right, ladies and gentlemen. We've been in here doing this for a little less than two hours. I'm

going to give you a recess at this point to go use the restroom, get up, move around; and then we'll come back in and finish the voir dire and the jury selection.

We're moving along at a reasonable paste, but we're not going to finish in the next few minutes, so we're going to go ahead and give you a recess at this point.

Please note where you're sitting. You'll need to sit in that same place again when you come back into court so that we know which juror is in which seat. Obviously you don't know enough about this case to even discuss the case; but in any event, I'm going to direct you that you are not to discuss this case with anyone, even yourselves.

So, I'm going to read you a brief recess instruction, which if you're selected to sit on the case, you'll hear frequently. But it's important. And as I said, you don't have enough information now to even discuss the case, even if you wanted to, but --

We are about to take our first recess. You must not discuss the case with anyone, including your fellow jurors, members of your family, people involved in the trial, or anyone else.

If anyone does try to talk to you about the case, do not tell your fellow jurors, but tell me about it immediately through one of my court staff.

Do not read, watch, or listen to any news reports, if

any, about the trial or conduct any research or investigation including on the Internet. Do not use any electronic tools to communicate with anyone about the case and do not do any research on electronic tools.

Remember to keep an open mind until all the evidence has been received and you have heard the views of your fellow jurors, and that would be at the end of the case, not now.

All right. At this time we're going to take a recess. I have 12:13. Let's try to start coming back into court at about 12:33, which would give you 20 minutes. And at this time we're going into recess, and we'll have the court staff take you to the jury assembly room. And there's bathroom facilities there if you need to use them, and then we'll bring you back into court, as I said, about 12:33.

All right, we'll be in recess until call of court.

MS. GORGONE, DEPUTY CLERK: All rise; court's in recess.

(Jury panel exits courtroom.)

(In open court, without the jury panel.)

THE COURT: Please be seated. The prospective juror panel has left the courtroom, so these remarks are outside the hearing of those individuals.

Anything counsel need to address to me at this point?

MR. BERNARD: No, Your Honor.

MS. THOMPSON: Your Honor, I do have a question. In

reference to Gerald Terry, I believe he's at -- was it NEOCC? Northeast Ohio Correctional Facility, which is about five hours round trip from here. Considering whenever the Government's case is going to be completed, is there a way -- and I know there's a separate order for Mr. Terry, John Terry -- is there a way to house Gerald Terry separately in Cambria County? Because also I need a chance to talk with him before we actually call him.

THE COURT: Mr. Bernard, do you have any information on that?

MR. BERNARD: Judge, I generally defer to the marshals in terms of inmate placement and confinement, so I would defer to their discretion. I think -- I mean they're aware of the habeas corpus order and the need for Mr. Terry's presence at the trial, so I trust they would have him available when needed.

THE COURT: All right.

Mr. Horgus, do you have any information for us, sir, as to the marshals?

MARSHAL: Can I ask the attorney a question?

THE COURT: Do you have any information for us from the marshals as to Mr. Terry's transportation from his Ohio facility to here?

MARSHAL: I gave them a heads up of the possible date he needs to be here. We can bring him in early if she needs to

speak with him.

THE COURT: That was the request, if he could be here earlier so that Attorney Thompson can speak with him.

MARSHAL: For sure.

THE COURT: When did you tell them he would be here?

MARSHAL: I said possibly Wednesday they would need him here, but I'm waiting to hear.

THE COURT: Okay, Attorney Thompson, do you have -- or, Attorney Bernard, do you have any information that would help Mr. Horgus transport the prisoner?

MR. BERNARD: Judge, that's just an estimate. I mean Mr. Terry is a defense witness. I don't know when -- if they intend to call him, where in their case.

THE COURT: When do you believe your case will be completed?

MR. BERNARD: I would imagine on Wednesday, probably most likely Wednesday afternoon.

THE COURT: All right. Could we have him brought in then Wednesday afternoon so that Attorney Thompson would have access to him first thing in the morning and maybe in the evening?

MS. THOMPSON: So Wednesday morning -- can he be brought in Wednesday morning? Because if the Government does end their case, then he would be our first witness. That was the intent.

THE COURT: I certainly have no problem with that, I'm just trying to coordinate with the marshals.

Did you tell them to have him here on Wednesday?

MARSHAL: I just said keep an open mind about it, and I'll let you know when he needs to be here.

THE COURT: Are they going to keep him overnight here at some facility in this area?

MARSHAL: No, they'll take him back same day.

THE COURT: Okay. So --

MS. THOMPSON: So, yes, when we get to defense, he'll be our first witness and can -- you know, with the Court excusing him, and he can go back at their leisure.

THE COURT: Mr. Bernard, you believe that you'll finish up sometime on Wednesday, but you don't know when.

MR. BERNARD: Yes, Your Honor.

THE COURT: Would it be safe to bring him in on Wednesday and allow him to testify toward the day of the day, or do you believe we could break and then have him first thing Thursday morning?

MR. BERNARD: I mean it's difficult to try and estimate the length of cross-examination of some of the witnesses, that's my only hesitance in giving you an estimate. I would expect on Tuesday we'll likely get through four witnesses; that would be my guess. And then I would think on Wednesday the Government would have three more witnesses, and

then the witness's testimony that's been resolved by stipulation. So I think that would wrap up probably sometime mid-afternoon on Wednesday.

THE COURT: That would be kind of safe to bring him in on Wednesday, and then he could be taken back that evening after he testifies -- if necessary, we could go a little later on Wednesday, just to make sure that we hear from him on the day he's brought in, since I don't want to transport him twice if we can avoid it.

Why don't we plan then on bringing him in on Wednesday, sometime -- sometime in the morning, so that Attorney Thompson can have access to him perhaps over the lunch hour; and then we'll tell the jury that we may run a little late on Wednesday. I'm not going to tell them the reason, just that we may run a little late on Wednesday; and I'd like to get him on the stand and off.

MR. BERNARD: Attorney Thompson, have you had phone access to him as you need it?

MS. THOMPSON: Honestly, I've had difficulty getting through to a counselor or anybody at the facility to get information.

MR. BERNARD: Would that be helpful, if we're able to arrange at least a phone call in advance of Wednesday?

MS. THOMPSON: That may also help, yes, if it can be secure.

THE COURT:  What facility is he at?

MS. THOMPSON:  NEOCC, Northeast Ohio Correctional Center.

THE COURT:  And that's where he is now, Attorney Bernard?

MS. THOMPSON:  Yes.

MR. BERNARD:  Yes, he's in Youngstown -- he's just outside of Youngstown.

THE COURT:  And that's about a, what, five-hour trip?

MS. THOMPSON:  Round trip, yes.

THE COURT:  Round trip.

MS. THOMPSON:  Yes, round trip.

THE COURT:  So to get him here, maybe say -- count three hours?

MR. BERNARD:  Yeah.

THE COURT:  Maybe -- we could ask them, then, Marshal, to bring him to be here by lunch hour on Wednesday.  And then he could be kept here, correct, sir?

MR. BERNARD:  Correct.

THE COURT:  And then Attorney Thompson could have access to him.

MR. BERNARD:  Correct.

THE COURT:  Will that work?

MS. THOMPSON:  Yes, Your Honor.

THE COURT:  Okay, let's bring him in then Wednesday

morning, try to -- and have them under the instructions to try to have him here prior to lunchtime.

All right, does that take care of the issue then?

MS. THOMPSON: Yes, Your Honor; thank you.

THE COURT: Thank you.

And you all still have about ten minutes to use the restroom.

And Mr. Terry would be taken back to your holding area there, Marshal?

MARSHAL: Yes, sir.

THE COURT: Okay, so -- just have to make sure he's back in before we bring the jury panel back in.

Okay. Thank you.

All right, Mr. Terry, you can go with the marshals, and we'll allow you to use the restroom and that sort of thing, and then we'll bring you back in prior to the jurors coming back in. And we'll make sure that --

MS. THOMPSON: Just, Your Honor, one more procedurally. Once we do pick the jurors, are we going to break for lunch before opening?

THE COURT: Yes.

MS. THOMPSON: Okay, thank you.

THE COURT: Yes, we will.

I usually give them -- I usually give them about an hour for lunch; but sometimes on jury selection day it might be

something less.

Okay, we'll be back in court after Mr. Terry is back and forth and we can bring the jurors in.

Thank you.

(Whereupon, the morning recess was taken.)

(In open court, with defendant and jury panel seated.)

THE COURT:  Please be seated.  Hopefully, that allowed everyone to use the restroom, get up and move around a little bit, and you're ready to get back to work.

And would the attorneys approach, please, and we'll continue with the individual voir dire.

(Attorneys approach side bar.)

(At side bar.)

MR. BERNARD:  Me?

THE COURT:  Yeah, go ahead; either one is fine.

MR. BERNARD:  Juror 121.

(In open court.)

THE COURT:  Juror No. 121, if you would approach, please.

(Juror approaches side bar.)

THE COURT:  All right, sir, if you would stand here.

You're Juror No. 121?

THE JUROR:  Yes.

THE COURT:  All right, counsel have some questions for you.

MR. BERNARD: All right. Good afternoon, Mr. Chuff. I just have two questions about the answers to your juror questionnaire.

THE JUROR: Sure.

MR. BERNARD: So you answered Supplemental Question No. 11 and 12, those relate to -- well, 11 relates to cooperating witnesses or cooperating Defendants, and it asks: Do you have any strong personal beliefs one way or the other regarding the Government's use of cooperating witnesses and plea bargaining?

And you responded: People offered a deal are likely to say anything that helps them out.

Now, given your response, I just wanted to understand is it your belief then that if a cooperating witness is called to testify, that what they have to say should not be believed?

THE JUROR: Not that they shouldn't be believed. I guess I'd take it with a grain of salt, I would say it that way. I mean not that it's completely --

MR. BERNARD: So --

THE JUROR: -- you know.

MR. BERNARD: -- would you automatically afford it less weight than you would to a witness who was not a cooperating witness?

THE JUROR: I mean I think they -- I guess because they have a greater incentive maybe.

MR. BERNARD: Sure. And if you're selected as a juror, at the end of the case the Judge will instruct you on certain factors for you to consider when weighing the credibility of witnesses. One of those is a witness's motive, what reason do they have for testifying.

THE JUROR: Okay.

MR. BERNARD: So would you be able to follow that instruction and consider that factor along with all the other factors that he would tell you about in assessing --

THE JUROR: Right.

MR. BERNARD: -- a witness's credibility?

THE JUROR: Yeah, yes.

MR. BERNARD: Okay. So you would not automatically discount or discredit the cooperating witness's testimony just because they are a cooperating witness.

THE JUROR: Right, yes.

MR. BERNARD: Okay, all right. I think that's also what you indicated in Question 12. It says: Would the fact that Defendant could receive a reduced sentence for cooperating against another Defendant cause you to necessarily discount or reject the testimony of the cooperating Defendant?

You say --

THE JUROR: I think that's the same thing.

MR. BERNARD: You answered: Yes, I would keep that in mind when hearing their testimony.

THE JUROR: Right.

MR. BERNARD: So you would consider that factor along with everything else. You wouldn't automatically discount that testimony.

THE JUROR: Yes, yes.

MR. BERNARD: Okay.

THE COURT: Attorney Thompson, any questions?

MS. THOMPSON: Hello.

So on Question 1 and 2 of the supplemental questionnaire, basically you're answering: I believe professionals and I believe law enforcement.

So the Judge either did or will be giving instructions about how everyone who walks through that door, whether they're clergy, lawyers, experts, quote, unquote --

THE JUROR: Uh-huh.

MS. THOMPSON: -- persons charged, they all come dressed with an equal level of credibility. Would you have a problem with letting everybody be in an equal playing field until and unless you hear what they had to say?

THE JUROR: Judging them based on what they say?

MS. THOMPSON: Yes.

THE JUROR: Yes, yes.

MS. THOMPSON: I guess another way of saying the same thing is, like, would you believe -- well, because I respect police, if a police officer says it, it must be true?

THE JUROR:  Not that it must be true, no.

MS. THOMPSON:  Okay.  All right.  So --

THE JUROR:  I mean I guess weighing it, like he said, you know.

MS. THOMPSON:  Right.  But would you weigh it along with other -- every other piece of evidence or you would say: I have to give greater weight because he's a police officer?

And I always give this caution:  It's not to change your beliefs.  When we ask you these questions --

THE JUROR:  Uh-huh.

MS. THOMPSON:  -- it's not to change your beliefs. It's just something we need to know about you.

THE JUROR:  Yes, to verify what was put down, correct.

MS. THOMPSON:  Whatever you truly believe is okay to say.  If that's what you truly believe, we just need to know about it.

So the question is whether or not you would give -- like when a police officer starts --

THE JUROR:  Uh-huh.

MS. THOMPSON:  -- he's already up there, he already has a greater credibility in your mind.

THE JUROR:  I mean yeah, honestly; probably, yeah.

MS. THOMPSON:  Okay.

So, now, I want to say it also in a different way in reference to the person charged, that Mr. Terry stands with the

presumption of innocence.

THE JUROR: Right.

MS. THOMPSON: That means that that's where he starts --

THE JUROR: (Witness nods head.)

MS. THOMPSON: -- unless and until the jury finds differently. So --

THE JUROR: Right.

MS. THOMPSON: -- would you afford him that benefit --

THE JUROR: Yes.

MS. THOMPSON: -- of looking him as presumed innocent?

THE JUROR: Uh-huh.

MS. THOMPSON: Okay. Would you have -- would that be a hard conflict, if you're looking at police who charged him as automatically credible, and then him saying he has the presumption of innocence?

THE JUROR: No, I don't think that interferes. I don't think one interferes with the other, no.

MS. THOMPSON: Okay. Okay, thank you.

MR. BERNARD: Just a quick follow-up.

THE JUROR: Yeah.

MR. BERNARD: So if -- with regards to your beliefs about police officers, law enforcement, if the Judge were to instruct you specifically that you're not to give any more weight to the testimony of a law enforcement officer than any

other witness, do you believe that you'd be able to follow that instruction?

THE JUROR: Yeah, right, I could follow that instruction or any instructions, yes. I think so, yes.

MR. BERNARD: Okay, thank you.

THE COURT: Okay. Thank you, sir; have a seat.

(Juror leaves side bar.)

THE COURT: Attorney Thompson, next one?

MS. THOMPSON: Ninety-five.

THE COURT: Ninety-five.

MS. THOMPSON: Yeah.

(In open court.)

THE COURT: Juror No. 95, if you'd come forward, please.

(Juror approaches side bar.)

THE COURT: You can just stand here, please.

THE JUROR: Sure.

THE COURT: And counsel have some questions for you. You're Juror No. 95.

THE JUROR: Yes.

THE COURT: Okay, go ahead.

THE JUROR: I had to look at my number just to make sure.

MS. THOMPSON: Good afternoon.

THE JUROR: Hello.

MS. THOMPSON: I always start out with the fact that we have to ask you about your beliefs; but whatever you believe is your right. My questions are not intended to change what you truly believe, okay?

THE JUROR: Sure.

MS. THOMPSON: We just have to pry.

THE JUROR: Sure. Go ahead.

MS. THOMPSON: Okay. So you are a nurse in the medical field?

THE JUROR: Yes.

MS. THOMPSON: So I imagine you work with police a lot.

THE JUROR: I have, yes, in the past.

MS. THOMPSON: Anyway, I understand by your answer to Question No. 2 in the supplemental questionnaire that you feel law enforcement deserve respect, and that you believe their evidence and testimony. Is that right?

THE JUROR: Yes.

MS. THOMPSON: Okay. And so basically, because they deserve respect and you believe them, do you believe that when they charge somebody, the person is guilty?

THE JUROR: I would most of the time, I probably feel they are. Most of the time, yeah.

MS. THOMPSON: Right. And would you -- and this also, the reason we ask you these questions and to pry --

THE JUROR: Yeah.

MS. THOMPSON: -- is we don't want you to go in the back, deliberate, and do damage to your own heart because the Judge is going to give you instructions --

THE JUROR: Uh-huh.

MS. THOMPSON: -- and some of those instructions are about where police officers, clergy, professionals, a person charged, lay witnesses, they all come into court, take that witness stand on an equal playing field, like no one's credibility is higher than another unless -- just based on what they say, you understand?

So with your internal beliefs that police deserve respect and if they charge, the person must be guilty, would that do damage to your heart, to follow an instruction like that, that you cannot go into that deliberation room with those thoughts?

That's why I start with just tell us the truth.

THE JUROR: I would have to -- that's where my beliefs would start.

MS. THOMPSON: Right.

THE JUROR: I would have to honestly state that I'd have to have -- I would have to hear proof that I didn't feel that way, just -- honestly, I mean I'd do the best I could, but I'm telling you, that's my inner core.

MS. THOMPSON: And that's fine.

THE JUROR: And that's not only just from my past life experience as a nurse in the emergency room.

MS. THOMPSON: And that's why I say you are entitled to your inner beliefs, your core belief.

The other question with that is the Judge is going to instruct you that a person charged like Mr. Terry, he starts with a presumption of innocence. And that means you have to look at him up and until the time you go into -- well, you finish deliberations, you have to look at him as innocent.

THE JUROR: Uh-huh.

MS. THOMPSON: So would that be -- is that a conflict to any core beliefs if you're starting with police are believable and they wouldn't charge somebody who didn't do something?

THE JUROR: My core belief would be he was either in the wrong place at the wrong time, and that would have to be brought out, or -- I mean that's just really -- and, yeah, I get it. I mean we assume they're innocence before ---

MS. THOMPSON: Right.

THE JUROR: -- but it would have to be proven to me. I hate to see that, where I'm at.

MS. THOMPSON: And I just want -- I don't want to -- I'm going rephrase.

THE JUROR: Sure, go ahead.

MS. THOMPSON: I think I heard you say he has to prove

his innocence.

THE JUROR: Well, I would have to see the circumstances that would prove that he was in the wrong place at the wrong time --

MS. THOMPSON: Okay.

THE JUROR: -- as charged.

MS. THOMPSON: Okay. And then also on Question 8 of the supplemental you say: State police are doing their jobs, and you're partial to them.

THE JUROR: I would have to say so. What I've seen in my past year in the emergency room, where I worked at the hospital prior to where I'm at now, yeah.

MS. THOMPSON: So that, again, you -- in your mind, they start with a higher degree of credibility.

THE JUROR: In that case I would have to say yes.

MS. THOMPSON: Okay, thank you.

MR. BERNARD: I just have some follow-up questions.

So starting back with your perception of law enforcement officers --

THE JUROR: Uh-huh.

MR. BERNARD: -- if the Judge were to specifically instruct you that you're not to give any more weight to a witness's testimony --

THE JUROR: Uh-huh.

MR. BERNARD: -- just by virtue of that, because of

being a police officer, would you be able to follow that instruction?

THE JUROR: I'd do my best. I guess I would. I would. I'm just -- you know, it all depends on what you hear. But I would -- I would do my best if that's the instruction given and my work as a juror is to do that.

MR. BERNARD: Okay.

THE JUROR: I'm just telling you what would influence me, you know; but I'd do my best.

MR. BERNARD: Okay. And, similar to that, if the Judge were to specifically instruct you that the Defendant is cloaked with the presumption of innocence and is presumed to be innocent if and until the Government proves beyond a reasonable doubt all of the elements of the crimes against him, would you be able to follow that instruction?

THE JUROR: I would do my best. I --

MR. BERNARD: Okay. The last question for you, I noticed also in your questionnaire your response to Question 12 involved potential cooperating witnesses or cooperating Defendants. And it involved your view, your opinion --

THE JUROR: My opinion.

MR. BERNARD: -- as to the use of or the potential for a witness receiving a reduced sentence as part of an agreement with the Government.

I believe you indicated that reduced sentences are

used too much. Could you just explain that?

THE JUROR: That's just my perception because it seemed -- I don't know. You hear of that happening, but I've never been involved in a case, so that was only just my perception. No hard fact about that at all.

MR. BERNARD: Okay. So would the fact that a witness testifying is considered a cooperating witness or a cooperating Defendant, and they have an agreement with the Government, would that fact on its own cause you to discount or discredit that witness's testimony automatically?

THE JUROR: No, I'd probably hear him out; but I -- that would always be in the back of my mind, but I would hear them out.

MR. BERNARD: Sure, and there's a reason for that. And my next question actually touches on that.

So if that witness were to testify, if you were to be a juror on the panel, and at the conclusion of the case the Judge will talk to about assessing the credibility of the witnesses and will discuss certain factors you are to consider.

One of those factors is motive for the individual testifying. There are also other factors such as the ability to perceive events, things like that. Would you be able to consider that witness's testimony in light of all of those factors?

THE JUROR: I'd always be curious as to what his

motive was.

MR. BERNARD:  Well, I'm sure that's --

THE JUROR:  That would probably -- you know, I hate to say it.  I mean -- again, knowing, I'd have to -- that would always be in the back of my mind.

MR. BERNARD:  I'm sure those questions would be posed to that Defendant or that witness, so --

All right.  Well, thank you.

THE JUROR:  Thank you.

THE COURT:  Thank you.

(Juror leaves sidebar.)

THE COURT:  Mr. Bernard?

MR. BERNARD:  135.

(In open court.)

THE COURT:  Juror 135, please come forward.

(Juror approaches side bar.)

THE COURT:  You can stand right here, sir.

You are Juror 135?

THE JUROR:  Yes.

THE COURT:  Okay.  Counsel have some questions for you.

MR. BERNARD:  Good afternoon, Mr. Mock.

The first question I have for you, in reviewing your juror questionnaire, you answered in response to Question No. 2, which reads:  Would you have a problem following the

Court's instructions that law enforcement testimony deserves no greater or less weight than other evidence?

Your answer was yes, and you stated: With the current country events going on, it's hard to believe cops.

THE JUROR: Yeah, I've been watching a lot of news lately, and with our states and everything that's been going on with them, and I just -- where I stand right now, with all the current events, not with -- the FBI, I still have full confidence in; but just more like local cops, with what I've been seeing.

MR. BERNARD: Hum.

So you heard my list of potential witnesses at the beginning, and you likely heard that one of those witnesses was a state trooper with the Pennsylvania State Police. If that witness were called to testify, would you be able to listen to that testimony and assess the credibility of that witness on the testimony that's presented alone?

THE JUROR: Yeah, I can do that.

MR. BERNARD: Okay. So your opinion as to police officers and generally based on what you've heard from the news would not affect your ability to assess the testimony you hear in court?

THE JUROR: No, that won't affect me.

MR. BERNARD: Okay.

And, similarly, you had in answer to No. 8 in a

supplemental questionnaire, which said: Do you have beliefs about the Pennsylvania State Police or the FBI that would affect your ability to render a fair and impartial verdict in this case?

And you wrote: It depends if they are corrupted.

So I think you may have clarified that through your answer before, but I just want to be very clear. Is it your opinion that a Pennsylvania State Police officer or FBI agent is automatically less trustworthy than any other witness?

THE JUROR: No, they're to be treated equally.

MR. BERNARD: Treated equally, as every other witness?

THE JUROR: Yes.

MR. BERNARD: And assessed on the basis of their testimony.

THE JUROR: Yes.

MR. BERNARD: Counsel, do you have any?

MS. THOMPSON: No I don't.

THE COURT: Thank you, sir. You may have a seat.

(Juror leaves side bar.)

THE COURT: Attorney Thompson?

MS. THOMPSON: 133.

(In open court.)

THE COURT: Juror No. 133, if you would approach, please.

(Juror approaches side bar.)

THE COURT: All right, if you would stand right here, please.

THE JUROR: Okay.

THE COURT: And you are Juror No. --

THE JUROR: 133.

THE COURT: -- 133?

THE JUROR: Yes.

MS. THOMPSON: Hi.

THE JUROR: Hi.

MS. THOMPSON: I always preface that I'm going to ask you some prying questions.

THE JUROR: Okay.

MS. THOMPSON: But this is not to change anything that you strongly believe --

THE JUROR: Okay.

MS. THOMPSON: -- in this venue because what we know about; but whatever you believe, you have the right to believe. Okay?

THE JUROR: Yeah, sure.

MS. THOMPSON: Now -- so in Supplemental Questionnaire No. 1 and 2 --

THE JUROR: Uh-huh.

MS. THOMPSON: -- and may be even 3 -- they all are similar -- whereas the Judge will instruct that everyone who takes that stand who walks through those doors they start on an

even plane of credibility, whether they're a preacher, a doctor, lawyer, police officer, even a person charged --

THE JUROR: Uh-huh.

MS. THOMPSON: -- unless and until you hear what they say.

THE JUROR: (Nods head.)

MS. THOMPSON: So it seems as though by your answers that you start with professionals are more believable, so that is what you believe or you would be able to follow the Judge's instructions that for trial everybody starts on an even plane of credibility, believability?

THE JUROR: Oh, absolutely. I think I kind of misunderstood.

MS. THOMPSON: Okay.

THE JUROR: I was thinking about that. I definitely believe in the evidence, the truth, and the facts.

MS. THOMPSON: Right.

THE JUROR: And I thought it was if there would be someone who, okay, there was a disparity maybe in the same issue --

MS. THOMPSON: Uh-huh.

THE JUROR: -- and somebody with 30 years of experience in the same field would give you documentation and proof of like a coroner, ballistics or whatever, I would respect that because that's knowledge and expertise, I guess,

as opposed to, if I had to choose, if there was someone, maybe a layperson that would -- came upon the scene, do you know what I mean? The decision, so -- but -- I think you have to take it all. You have to take all the input to try to come to the truth.

MS. THOMPSON: So let me ask you this --

THE JUROR: So it's not like being prejudiced and saying: Oh, because you're a doctor -- I mean you have to look at what they're presenting.

MS. THOMPSON: Now, let me ask you a different way.

THE JUROR: Okay.

MS. THOMPSON: So you heard the Government say they have professionals. They have a person that may qualify as an expert, they have professionals who are police officer professionals. Then you have Mr. Terry, who is a layperson. So would you automatically believe the professionals over Mr. Terry because he's a layperson?

THE JUROR: No.

MS. THOMPSON: Okay.

THE JUROR: I would look at the evidence. I would look at everything brought to make my decision, yes.

MS. THOMPSON: Okay. Okay. So -- I think you're probably going to ask about the other one.

MR. BERNARD: Sure.

So in response to Question 8, it reads: Do you have

beliefs about the Pennsylvania State Police or the FBI that would affect your ability to render a fair and impartial verdict in this case?

I believe you answered yes -- you kind of checked both boxes.

THE JUROR: Yes. I felt like, okay, because I highly respect, you know, definitely the people in authority, and I think, pertaining to this case, absolutely, whatever they would present, I would just listen to the evidence try to -- you know, and you have to look at everything.

But I felt my no was -- I think there's a part of me concerned just globally because of all the political stuff that's going on, and I felt guilty not putting that.

MR. BERNARD: Sure.

THE JUROR: Do you know what I mean? I don't want to say it's a bias, it's just a little one, but it has to do more in the political arena, I guess. So that's what popped into my head.

But as far as an individual situation, like I say, you have to take into account everything and everybody.

MR. BERNARD: Right.

THE JUROR: You know, everything that's presented --

MR. BERNARD: Okay. So --

THE JUROR: -- not just one person.

MR. BERNARD: Okay. So in the event you were selected

to be a juror and the Government were to call an FBI Special Agent to testify, you would treat that Special Agent as you would any other witness and evaluate their testimony based on what they say.

THE JUROR: Absolutely.

MR. BERNARD: Okay. All right.

And then, additionally, you responded to Question 12: Would the fact that a Defendant could receive a reduced sentence for cooperating against another Defendant cause you to necessarily discount or reject the testimony of the cooperating Defendant?

You said yes, and you wrote: I find the changing of laws to make deals dishonest.

Would you just explain your position.

THE JUROR: Could I read that again?

MR. BERNARD: Absolutely.

THE JUROR: Because I think --

(Jury reads silently.)

THE JUROR: I think it's from watching too much television, to be honest.

MR. BERNARD: Okay.

THE JUROR: I felt that I would -- you know, I just think we should find the truth.

MR. BERNARD: Uh-huh.

THE JUROR: And I felt like if that's altered and

there's manipulation and that sort of thing, and people -- if justice isn't served --

MR. BERNARD: Uh-huh.

THE JUROR: -- I find that to be dishonest.

Does that make sense?

MR. BERNARD: I think we would all agree with that.

THE JUROR: Yes, I think that when I read that, that's what I was thinking. That bothers me --

MR. BERNARD: Sure.

THE JUROR: -- in society and in general.

MR. BERNARD: Okay. Well, in this case --

THE JUROR: But whatever is determined by the Judge, of course, I'm -- I mean who am I --

MR. BERNARD: Well, it's your determination to make, so --

THE JUROR: Yes.

MR. BERNARD: -- in this case you may hear testimony from somebody who is a cooperating witness or a cooperating Defendant.

THE JUROR: Okay.

MR. BERNARD: And at the end of the trial the Judge would instruct you as to certain factors that you are to consider when assessing the credibility of the witnesses.

THE JUROR: Okay.

MR. BERNARD: Among those factors are things like

motive, whether the Defendant --

THE JUROR: Right, okay.

MR. BERNARD: -- what's driving the witness to testify --

THE JUROR: Uh-huh.

MR. BERNARD: -- if anything. There's a number of other factors. Would you be able to listen to that witness's testimony and assess it in light of all of the factors or would you automatically discount anything --

THE JUROR: No, no.

MR. BERNARD: -- or anything that you heard --

THE JUROR: No, absolutely analytical.

MR. BERNARD: Okay.

THE JUROR: To me, evidence, truth is very important.

MR. BERNARD: Okay.

THE JUROR: So you just have to look at it all --

MR. BERNARD: Okay.

THE JUROR: -- before you make a decision, yes. You have to process things.

MR. BERNARD: Thank you.

THE COURT: Have a seat.

(Juror leaves side bar.)

THE COURT: How many more do you think we have?

MS. THOMPSON: So I understated -- six.

THE COURT: Six -- and you have how many, counsel?

MR. BERNARD: Five.

THE COURT: Okay. So we still have 11 -- it's good we took the recess.

MR. BERNARD: Yes, very good. You had six?

MS. THOMPSON: Yes.

THE COURT: I'll let you go next.

MS. THOMPSON: Okay, 134.

MR. BERNARD: Okay.

(In open court.)

THE COURT: Juror No. 134.

(At side bar.)

MR. BERNARD: That means we only have nine -- that means we only have nine because that was one of mine as well. We have some duplicates.

THE COURT: Okay. Well, we're making progress.

MR. BERNARD: Yes.

(Juror approaches side bar.)

THE COURT: Okay. Sir, if you'd just stand right there.

And you are 134?

THE JUROR: One-thirty-four, Justin Redinger.

THE COURT: Okay. Counsel has some questions for you.

MR. BERNARD: Go ahead.

MS. THOMPSON: Hi, how are you doing?

THE JUROR: I'm doing good.

MS. THOMPSON: Good. I want to start with I'm going to ask you some prying questions, but it is not to change anything that you truly believe. Okay?

THE JUROR: Okay.

MS. THOMPSON: You are entitled to your beliefs. You're entitled not to do any damage to your heart by changing your beliefs just because I ask a question. Okay?

THE JUROR: Okay.

MS. THOMPSON: We just got to know what you truly believe, okay?

THE JUROR: Okay.

MS. THOMPSON: So basically for Question No. 6 on the supplemental questionnaire, it explains to you how it's actually the Government that has the burden of proof; and that, you know, just because he was charged doesn't mean that he's guilty of anything.

THE JUROR: Okay.

MS. THOMPSON: And he stands under a presumption of innocence, with no burden to prove his innocence. And he can remain silent, not present any witnesses or testimony on his behalf.

But you did answer that basically, you know, if he's innocent, he would tell his side of the story.

THE JUROR: Correct.

MS. THOMPSON: Okay. And a lot of people say that, so

there's not really unexpected.

THE JUROR: Okay.

MS. THOMPSON: Now, this is the question, going back to this is what you truly believe, and that's it, and that's fine; we just need to know.

But with the understanding that the Judge is going to instruct you differently, the Judge is going to say he sits with the presumption of innocence; so that's where you start. He's innocent. And he doesn't have to say anything; it remains the Government's burden of proof. Mr. Terry doesn't have to present a witness; if he doesn't testify, he doesn't have to. And you can't use it against him.

Would you have a problem with that?

THE JUROR: I feel you should be able to defend yourself. I truly believe that in my heart, I do. If you didn't do it, then you should be able to prove you didn't do it by just remaining silent.

MS. THOMPSON: You said not just remaining silent.

THE JUROR: Yeah, or speaking for himself, he should be able to.

MS. THOMPSON: Okay --

THE JUROR: Say one way or another.

MS. THOMPSON: And so even when the Judge is going to obviously explain it better than I could, even though the Judge is going to give you instructions that he doesn't have to do

so, again, would that type of instruction do damage to your heart where sort of it won't compute to you? Do you know what I mean?

THE JUROR: I understand.

MS. THOMPSON: Okay, would you able --

THE JUROR: I still think someone should.

MS. THOMPSON: Okay. Even if so instructed by the Judge, you would still hold those same beliefs, then. If he's innocent, he should be saying something.

THE JUROR: Correct.

MS. THOMPSON: Okay. Let me see -- that's it, I think.

MR. BERNARD: Mr. Redinger, I just have one question for you.

THE JUROR: All right.

MR. BERNARD: In response to the question concerning cooperating witnesses, you wrote: I believe that plea bargains are wrong.

THE JUROR: Correct.

MR. BERNARD: Would the fact that you heard testimony from a witness who may have reached an agreement with the Government cause to you automatically discredit or discount the testimony of that witness?

THE JUROR: I feel there should be no plea bargain. It should be what it is is what they get. I don't think there

should be anything that should step it down or we'll give you this if you'll just give us information.

MR. BERNARD: Okay.

THE JUROR: It should be all or nothing.

MR. BERNARD: So you wouldn't be able to -- or you would not credit the testimony of someone who's reached a bargain with the Government?

THE JUROR: No.

MR. BERNARD: Would you also the fact that the Government reached the bargain with a cooperating witness against the Government?

THE JUROR: I'm not sure I understand on that what you mean.

MR. BERNARD: Sure. Would your personal disagreement with the use of plea bargains cause you to disfavor the case that would be presented by the Government that reached the plea bargain with that witness?

THE JUROR: To take like a lighter sentence or something like that?

MR. BERNARD: Correct.

THE JUROR: No, I feel there should be no bargaining. It should be -- what stands should be standing.

MR. BERNARD: Okay. All right. Thanks.

THE COURT: In spite of what you said, sir, would you be able to be fair and impartial based solely on the evidence

and the law as I give it to you?

THE JUROR: I could.

THE COURT: Thank you.

THE JUROR: Yep.

THE COURT: You can have a seat, sir.

THE JUROR: All right.

(Juror leaves side bar.)

THE COURT: Next?

MR. BERNARD: 117.

(In open court.)

THE COURT: Juror No. 117, if you would approach, please.

(Juror approaches.)

THE COURT: If you would stand right there, please.

THE JUROR: Okay.

THE COURT: You're Juror 117?

THE JUROR: Yes.

THE COURT: Counsel have some questions for you.

THE JUROR: Okay.

MR. BERNARD: Okay. Good afternoon, ma'am. I just have one follow-up question to your response to Question No. 8 in the supplemental questions.

It reads: Do you have beliefs about the Pennsylvania State Police or the FBI that would affect your ability to render a fair and impartial verdict in the case?

You answered yes and said: Right now I am having trouble trusting the FBI given what has been happening.

Now, you likely heard the list of witnesses that I intend to call at this trial.

THE JUROR: Uh-huh.

MR. BERNARD: One of them would be a special agent with the FBI.

THE JUROR: Right.

MR. BERNARD: Do your personal beliefs regarding the FBI, would that prevent you from impartially hearing and weighing the testimony of an FBI agent?

THE JUROR: I think, yes, just because I am not trusting anybody right now.

MR. BERNARD: Okay.

THE JUROR: It's just a sad state of affairs, but that's how I feel right now, that our country is really messed up. And I feel like -- I just don't have a lot of faith in what's happening everywhere, so --

MR. BERNARD: So you would have a hard time believing the testimony of an FBI agent specifically or is it all law enforcement?

THE JUROR: I think -- I -- I think the FBI right now just because of everything that's been happening. I just feel like the top, if there's that much stuff going on at the top, I just don't have a lot of faith in what's happening right now.

MR. BERNARD: Okay. Thank you.

MS. THOMPSON: Nothing.

THE COURT: Thank you.

(Juror leaves side bar.)

THE COURT: Attorney Thompson?

MS. THOMPSON: Yes, it would be 104.

(In open court.)

THE COURT: Juror No. 104, please approach.

(Juror approaches side bar.)

THE COURT: She's been here before -- okay.

THE JUROR: I'm back.

MS. THOMPSON: Did I already ask you this question? I'm not sure then -- like I said earlier, whatever you believe is what you believe.

THE JUROR: Right, right.

MS. THOMPSON: I'm not sure, did I ask you Question Number 1, in reference to everybody coming into Federal Court with equal standing, and none have greater or lesser credibility, you answered: Ending up in a courtroom does not result from skepticism. So what are you saying?

THE JUROR: I'm saying there is a reason that the Defendant is in the courtroom.

MS. THOMPSON: Okay. Okay.

THE JUROR: You just don't end up here by accident.

MS. THOMPSON: Okay. All right. And I may be

repeating myself --

THE JUROR:  Yeah, that's okay.

MS. THOMPSON:  -- because you were up here, so -- so did I already ask the questions in reference to the presumption of innocence.

THE JUROR:  Yes, yes.

MS. THOMPSON:  Okay, all right; I'm sorry.

MR. BERNARD:  Thank you.

THE COURT:  Thank you.

THE JUROR:  Sure.

(Juror leaves side bar.)

THE COURT:  Next, Mr. Bernard?

MR. BERNARD:  132.

(In open court.)

THE COURT:  Juror No. 132.

(Juror approaches side bar.)

THE COURT:  Okay.  Sir, if you would stand right there, counsel have some questions for you.

132, correct?

MR. BERNARD:  Good afternoon.

THE JUROR:  Good afternoon.

MR. BERNARD:  I just had a couple of followup questions to your response to what is Question No. 11 in the supplemental questionnaire.

It reads:  The Government may also call cooperating

witnesses.  Cooperating witnesses are Defendants or informants who assist the Government in the investigation and prosecution of other Defendants, often as a term of a plea bargain.  Do you have any strong personal beliefs or any other regarding the Government's use of cooperating witnesses and plea bargaining?

And it appears that you answered no, but then --

THE JUROR:  Yeah.

MR. BERNARD:  -- you explain, and you said --

THE JUROR:  Well, I was trying to -- get the thing done and I don't know if I understood it right; but pretty much what I was saying is if you get in trouble, take it like a man rather than tell on everybody.

MR. BERNARD:  Okay.

THE JUROR:  Yeah.

MR. BERNARD:  So in this case, if you were to hear the testimony of a cooperating witness, would your beliefs regarding cooperation cause you to automatically discount or discredit the testimony of that witness?

THE JUROR:  No.

MR. BERNARD:  Okay.

THE JUROR:  No, you know.

MR. BERNARD:  You would be able to fairly and impartially consider the testimony presented by that witness?

THE JUROR:  Correct.

MR. BERNARD:  And you would be able to assess his

credibility based on whatever factors you deem are important such as their motive, that is the reason why they needed for them to testify, along with other factors such as their ability to perceive the events in question, things like that.

THE JUROR: Yeah.

MR. BERNARD: All right. So the fact that they are a cooperating witness --

THE JUROR: I'd use a critical analysis to see what I thought about it, depending again -- yeah.

MR. BERNARD: Just the mere fact that they may have entered into a plea bargain with the Government, that alone would not cause you to just disbelieve everything that that witness says.

THE JUROR: Not necessarily, no.

MR. BERNARD: Okay. All right. Thank you.

Did you have anything for him?

MS. THOMPSON: (Shakes head.)

(Juror leaves side bar.)

THE COURT: Next, Attorney Thompson?

MS. THOMPSON: Is 105.

THE COURT: 105?

MS. THOMPSON: Yes.

(In open court.)

THE COURT: Juror No. 105, if you would come forward, please. 105.

(Juror approaches side bar.)

THE COURT: All right, thank you, 105.

Just stand right there; counsel has some questions for you.

THE JUROR: Okay. Hello.

MS. THOMPSON: Hi. Actually, I think the Judge asked about this, but you didn't raise your hand; but on your questionnaire you said that you were going to be -- like your attention would be on the fact you were supposed to start a new job today.

THE JUROR: Yes, I was.

MS. THOMPSON: So -- and I guess that was my question, is whether or not you are going to be distracted, worrying about losing employment while you're in this trial?

THE JUROR: Probably, because -- I've been off work for eight months due to an injury, and I was getting back into working now and -- yeah, it's -- yeah, probably.

MS. THOMPSON: And you would --

THE JUROR: I mean I'm going to be honest, yeah.

MS. THOMPSON: Correct. Would you have any fear of possibly losing your job --

THE JUROR: I have the fear of it being put off for another three months, which would hurt me financially, definitely.

MS. THOMPSON: If you were in trial for a week, which

is expected, about a week, if you are in this trial for a week, you believe that's going to lose you three months of employment?

THE JUROR: It's going to push me off. They'll put me in the next training class --

MS. THOMPSON: Okay.

THE JUROR: -- which would be in three months, and -- that's going to hurt me financially because I've been on long term disability up 'til this point. But, you know, that -- I gave up because of this job and -- now --

MS. THOMPSON: Okay.

THE JUROR: It plays a lot into today, yeah, and being here.

MS. THOMPSON: Okay. All right.

THE JUROR: Really.

THE COURT: Thank you; you can have a seat.

MR. BERNARD: Thank you.

THE JUROR: All right, thank you.

(Juror leaves side bar.)

MR. BERNARD: 142?

(In open court.)

THE COURT: Juror No. 142?

(Juror approaches side bar.

THE COURT: All right, if you'd stand right there, sir.

Juror No. 142?

THE JUROR: Yes.

THE COURT: Okay, they have some questions for you.

MR. BERNARD: Good afternoon, sir. I just have a few followup questions to your answers to Questions 11 and 12 of the supplemental questionnaire.

THE JUROR: Okay.

MR. BERNARD: They're regarding cooperating witnesses who may have made plea bargains with the Government.

You indicated to the question -- the question was: Do you have any strong personal beliefs one way or the other regarding the Government's use of cooperating witnesses and plea bargaining?

You checked yes and said: Everyone should be held accountable for their actions.

So my question for you, sir, would be if a witness were called to testify or reveal that he was a cooperating witness, who had reached a plea bargain with the United States, would that fact alone cause you to discredit or discount all of that witness's testimony?

THE JUROR: Quite possibly, yeah, because I figure he's getting a get out of jail free card.

MR. BERNARD: Okay. So if you were to be selected as a juror, at the conclusion of the trial the Government -- I mean the Judge would instruct you as to how you're to assess

the credibility of witnesses that you heard during the course of trial. And he's going to go over a list of factors for you to consider.

Among those factors are an individual's motive for testifying, that perhaps they're biased against the Defendant --

THE JUROR: Yeah.

MR. BERNARD: -- perhaps their ability to perceive or ability to recall the events they're testifying about. There's a laundry list of these types of factors.

Are you able to follow the Judge's instruction and weigh the Defendant's motive along with all of those other factors, or would your frequency ideas of plea bargains sort of overpower everything else and cause you to discredit that testimony?

THE JUROR: I guess I could -- would have to be -- you know, depend on the circumstances and -- it might. Possibly.

MR. BERNARD: Okay. It might. I know this is hard to answer --

THE JUROR: Yeah.

MR. BERNARD: -- because you don't know what testimony is going to be.

THE JUROR: Yeah.

MR. BERNARD: You don't know what you're going to hear; but I'm just trying to understand, you know, are you able

to -- well --

THE JUROR: Separate it?

MR. BERNARD: Are you able to separate it? Are you able to treat a cooperating witness the same as any other witness who takes the witness stand, whether it's a law enforcement officer, whether it's a priest, whether it's the Defendant?

THE JUROR: Yeah.

MR. BERNARD: You'd be able to consider the substance of their testimony.

THE JUROR: Yeah.

MR. BERNARD: You wouldn't assign greater weight to one or the other just by virtue of who they are.

THE JUROR: No.

MR. BERNARD: Okay. All right.

And I guess, following up, too, with Question 12, it's a related question. It says: Would the fact that a Defendant could receive a reduced sentence for cooperating against another Defendant cause you to necessarily discount or reject the testimony of the cooperating Defendant?

You said yes, and you said: If he did the crime, do the time.

Again, your belief as to the appropriateness of the plea agreements or whether they should be used in that respect, would that cause you to discredit the testimony of a --

THE JUROR:  That could possibly, yes.

MR. BERNARD:  Okay.  But, again, would you be able to consider that fact along with everything else or would that overwhelm --

THE JUROR:  That could overwhelm the rest of it.  I just -- my belief.

MR. BERNARD:  So if there were to be a witness who were to testify that they hoped to receive a reduced sentence as a result of their testimony, because of that fact, you would discredit the testimony of that witness automatically?

THE JUROR:  Probably, yeah.

MR. BERNARD:  Okay.

THE COURT:  Attorney Thompson?

MS. THOMPSON:  No questions.

THE COURT:  You can have a seat, sir.  Thank you.

     (Juror leaves side bar.)

THE COURT:  All right.  Attorney Thompson?

MS. THOMPSON:  I want to double check -- I think it's 130 -- we didn't call 130, right?  130 --

THE COURT:  I don't think we've had 130 yet.

MS. THOMPSON:  Yeah.

THE COURT:  No, I didn't think so.  Do you want to call 130?

MS. THOMPSON:  Yes.

     (In open court.)

THE COURT: Juror No. 130, if you would approach, please.

(Juror approaches side bar.)

THE JUROR: Hi.

MS. THOMPSON: Hi.

THE COURT: All right. You can stand right there, please.

And you're Juror No. 130?

THE JUROR: Yeah.

THE COURT: Okay. They have some questions for you.

THE JUROR: Okay.

THE COURT: Thank you.

MS. THOMPSON: Good afternoon. So you did not raise your hand when the Judge asked about any health conditions, but on your form you mentioned --

THE JUROR: I wasn't sure whether they would consider that or not.

MS. THOMPSON: Okay.

THE JUROR: I do take insulin.

MS. THOMPSON: And I saw that you take it --

THE JUROR: Five times a day.

MS. THOMPSON: Right. And being in the middle of the day as well.

THE JUROR: Yes.

MS. THOMPSON: And I have some knowledge of that,

diabetes and insulin. Does -- do you believe that your health condition could cause a distraction to you because you need to take your insulin shots?

THE JUROR: Yeah, I do, morning and afternoon, about then. I also worry, I lost my thyroid due to cancer.

MS. THOMPSON: Okay.

THE JUROR: So I take a thyroid medication, but it makes me tired.

MS. THOMPSON: That was going to be my next question, because of some of the shots, I was going to ask whether or not you suffer more fatigue. So is it particular in the morning or afternoon or --

THE JUROR: Afternoon it gets bad.

MS. THOMPSON: Okay.

THE JUROR: But I take levothyroxine, and that's supposed to replace the thyroid; but --

MS. THOMPSON: But you still have some --

THE JUROR: I still have issues because of it.

MS. THOMPSON: Okay. Okay.

And do you believe because of all the health issues, that that may cause you some distraction where you cannot be fair and impartial in the jury?

THE JUROR: Well, I do worry that if my sugar would drop low, because I did think of that, and I thought: Man, that would be awful right in the middle of that.

MS. THOMPSON:  Uh-huh.

THE JUROR:  And it has happened to me.

MS. THOMPSON:  Okay, okay.  Thank you.

THE JUROR:  So -- okay.

MR. BERNARD:  Thank you, ma'am.

THE COURT:  Thank you.

(Juror leaves side bar.)

THE COURT:  How many more do you have?

MR. BERNARD:  I have one.

THE COURT:  One?

MS. THOMPSON:  One.

THE COURT:  One, okay.

MR. BERNARD:  107, Judge.

THE COURT:  Making progress, okay.  107?

MR. BERNARD:  Yes, sir.

(In open court.)

THE COURT:  Juror No. 107, if you would approach, please.

(Juror approaches side bar.)

MS. THOMPSON:  I have to make sure --

THE COURT:  All right.  If you'd stand right there please.

You're 107?

THE JUROR:  Janet Diehl.

THE COURT:  Okay.  They have some questions for you.

THE JUROR:  Sure.

MR. BERNARD:  Good afternoon, ma'am.

The reason you were called up here, I just had some followup questions --

THE JUROR:  Okay.

MR. BERNARD:  -- based on your answers to the questionnaire.

So Question 7, the question asks:  This case resulted from an investigation by the Pennsylvania State Police with assistance from the Federal Bureau of Investigation, commonly referred to as the FBI.  Have you or any member of your family ever had any interactions with the Pennsylvania State Police or the FBI?

You checked yes, and you explained that your cousin George Lowmaster --

THE JUROR:  Yeah.

MR. BERNARD:  -- your uncle, Rodney Lowmaster --

THE JUROR:  They were all into drugs.

MR. BERNARD:  And your uncle, Joe Lowmaster.

THE JUROR:  Yes.

MR. BERNARD:  Do you know how --

THE JUROR:  I don't -- what do you need to know?  I don't know.  I don't associate with them --

MR. BERNARD:  Okay.

THE JUROR:  I don't know anything more than that.

MR. BERNARD: Does the fact that their investigation and prosecution by the FBI cause you to hold any --

THE JUROR: No.

MR. BERNARD: -- ill will towards the FBI?

THE JUROR: No, no. Absolutely not. Doing your job.

MR. BERNARD: Okay, all right. Thank you. That's all.

THE JUROR: That's it?

MS. THOMPSON: Thank you.

THE COURT: Thank you.

(Juror leaves side bar.)

THE COURT: Attorney Thompson?

MS. THOMPSON: Just double checking with 99.

THE COURT: Ninety-nine.

(In open court.)

THE COURT: Juror No. 99, if you would approach, please.

(Juror approaches side bar.)

THE COURT: She's been here before.

MS. THOMPSON: Ah, so I already asked that.

THE COURT: Just stand here.

THE JUROR: I'm 99.

MS. THOMPSON: I don't know if I already asked you --

THE JUROR: You did, I was the first one up here.

MR. BERNARD: That's why we forgot.

MS. THOMPSON: Okay. All right. If you just were up here, I would have asked you those question, I'm sorry.

MR. BERNARD: Thank you.

THE JUROR: All right.

THE COURT: Thank you.

(Juror leaves side bar.)

THE COURT: I didn't remember the number, but I recognized her when she was coming up.

Is that the end of the questions?

MS. THOMPSON: Yes.

MR. BERNARD: That's all.

THE COURT: Okay. Let's -- all right. We can go back and forth on this thing, too. Based on what I heard, I believe that 126 and 127 should both be stricken for cause. Any objection to that?

MS. THOMPSON: No, Your Honor.

THE COURT: They were one of the first two --

MR. BERNARD: No objection.

THE COURT: Okay.

Attorney Thompson, do you have initial motions to strike for cause?

MS. THOMPSON: Yes, I do. So starting with 95 and 104, they both --

THE COURT: 95.

MS. THOMPSON: Yes.

THE COURT: Let me find that -- okay. Go ahead.

And the other one?

MS. THOMPSON: 104.

THE COURT: 104 -- tell me why you think they should be stricken.

MS. THOMPSON: They both had and maintained that a Defendant must prove himself innocent. They both had issues with the instructions of remaining silent -- I'm trying to think --

THE COURT: Well, before you -- Attorney Bernard, do you object to those two or not?

MR. BERNARD: No, no objection.

THE COURT: You agree?

MR. BERNARD: I agree.

THE COURT: Ninety-five and 104 are stricken for cause.

Okay. Mr. Bernard, do you have any?

MR. BERNARD: Yes. I would move to strike for cause Juror No. 126 -- we already -- did we already rule him out?

MS. THOMPSON: Yes. The Judge did that.

THE COURT: 126 and 127 are removed.

MR. BERNARD: Okay. I would move for 117.

THE COURT: Okay. Your reason?

MR. BERNARD: This juror was -- she answered on her questionnaire that she didn't believe the FBI based on current

events. And when she was brought up here for individual voir dire, she held that belief. And I would submit that she's biased against them.

THE COURT: Attorney Thompson?

MS. THOMPSON: I do have a note that she doesn't trust anyone.

THE COURT: I also had a notation that she did -- would not believe FBI agents, so I'll grant the motion to strike for cause No. 117. Attorney Thompson?

MS. THOMPSON: I have 76 and also would be -- and 97 -- 76 and 97.

THE COURT: Seventy-six I'll leave -- go ahead, tell me why you want to strike No. 76.

MS. THOMPSON: Let me make sure -- 76. They both had issues with African Americans having some propensity to commit a crime if they were arrested or charged. They both felt -- let me see --

THE COURT: Attorney Bernard?

MR. BERNARD: I have no objection to 76. What was the second number.

MS. THOMPSON: Ninety-seven.

MR. BERNARD: Ninety-seven, what page?

MS. THOMPSON: He's the next to the last page.

MR. BERNARD: Next to the last --

No objection to 97.

THE COURT: All right, 76 and 97 are stricken for cause.

Mr. Bernard?

MR. BERNARD: 142. Judge, this was the individual who seemed to have a difficulty with potential cooperating witnesses, seemed to indicate that he would discredit or discount the testimony of a cooperating witness based on the fact that they were a cooperating witness.

Even through attempts of rehabilitating the juror, I don't believe he ever committed to being able to assess their testimony fairly and impartially.

THE COURT: He gave an answer that could have been taken as rehabilitating, but think I didn't believe it was sufficient.

MS. THOMPSON: Yeah, that's --

THE COURT: You concur with that?

MS. THOMPSON: Right.

THE COURT: Okay. So 142 is stricken for cause.

Attorney Thompson?

MS. THOMPSON: I have 134 --

THE COURT: 134?

MS. THOMPSON: Yes.

THE COURT: And based upon --

MS. THOMPSON: Let me make sure --

MR. BERNARD: I have no objection to 134.

MS. THOMPSON: Good.

THE COURT: 134 is stricken for cause.

Mr. Bernard?

MR. BERNARD: I have no other motions for cause.

THE COURT: All right.

Attorney Thompson, it's yours.

MS. THOMPSON: So -- who was the woman who just had the diabetes issue?

THE COURT: I agree, it sounded like she would not be able to concentrate on the evidence, so I'll -- rather than strike for cause, I will consider that a motion for hardship and I'll grant it.

MS. THOMPSON: The other one I guess would -- 87 and 89, they both would probably be motion for a hardship or however Your Honor would see it.

THE COURT: I have both of them. I was going to hold the other hardships until the end to make sure we have sufficient jurors.

MS. THOMPSON: Okay.

THE COURT: We probably will, but I just -- if you have any other cause challenges --

MR. BERNARD: Is that the woman who was starting a new job and the man who was on unemployment?

THE COURT: Well, 89 was the parents were 92 and 93.

MR. BERNARD: Oh.

THE COURT: Eighty-seven had the grandchild, and 68 had the employment issues; but I want to wait on those until the end.

MR. BERNARD: Sure.

MS. THOMPSON: All right. The other one -- but, again, I guess you said -- the other one, the unemployment was 68.

MR. BERNARD: Okay.

THE COURT: Yes, that would be a hardship also. I'm inclined to grant those, but I don't want to do that until we make sure we have enough.

MS. THOMPSON: I think -- 95, 104, 127 -- I'm thinking we may -- excused all the other ones I wanted to ask for -- I think that's it.

Did we say -- yep, we did say that -- I think we got it. That's it. Yep.

I will say 133, but I'm not sure if she was rehabilitated. You may say she was rehabilitated --

THE COURT: 133?

MS. THOMPSON: Yes.

THE COURT: Is that the right number?

MS. THOMPSON: Yes -- the gray-haired lady --

THE COURT: Do you know the issue with her?

MS. THOMPSON: She -- she had -- she was saying that the police arrested their lives -- did we call 133 up?

MR. BERNARD: Yes, we did; we called her.

THE COURT: Do you see 133 on the ones we called up? Did she come up?

MS. THOMPSON: See, it was a combination of valuing the police because they arrested their lives, believe in the experts, but also talking about the FBI was corrupt. So it's like if you remember her --

MR. BERNARD: Yeah, I -- I thought she was rehabilitated, and I thought her answers cleared up any doubts raised by her answers to the questionnaire. She was the gray-haired lady with the blue glasses.

THE COURT: Yes, I remember her.

MR. BERNARD: Yes, yes.

THE COURT: My recollection is that if she did say anything, that she was rehabilitated by the end.

I have --

MS. THOMPSON: And -- 87 -- I'm not sure -- well --

THE COURT: She's the hardship --

MS. THOMPSON: Oh, she's already a hardship. Oh -- oh, okay.

THE COURT: That's it? Any more?

MR. BERNARD: I just want to check on 87, was that a granted hardship or a potential hardship?

THE COURT: No, that's the granddaughter. I have that's a hardship.

Any other cause?

MR. BERNARD: No.

THE COURT: Okay. Well, let me see if we agree. I'll read the numbers of the ones that I have marked as stricken for cause: 126 and 127, 76, 97, 104, 95, 134, 117, 142, and 130.

MS. THOMPSON: Okay.

MR. BERNARD: 130?

THE COURT: Yes. Ten for cause at this point, do you agree?

MS. THOMPSON: Yes.

MR. BERNARD: Yes.

THE COURT: We have a sufficient number that we can grant the hardships if you agree.

MS. THOMPSON: Yes. So 130 was the one with the diabetes, were you going to do a hardship for her or cause for her?

THE COURT: That was a hardship, yeah. So I did say that was a hardship, not a cause. That's a hardship. So there are nine for cause and one for hardship, and then we have three other possible hardships.

MS. THOMPSON: Okay.

THE COURT: Do you wish to 68, 87 and 89 for hardship?

MR. BERNARD: Yes, Your Honor.

THE COURT: My concern is that they're -- they won't be concentrating on the evidence, they'll be worried about

these other things. No reason to disqualify them, but I just think they're not going to pay attention the way they should.

So that gives you four hardship and nine cause. Okay?

MS. THOMPSON: And we get six challenges?

THE COURT: You get ten peremptories and he gets six, and one for the alternate and one for the alternate; so you actually end up with 11.

MS. THOMPSON: Okay.

THE COURT: And you end up with seven.

MR. BERNARD: Yes.

THE COURT: But we do the alternate separately. We make sure you only strike from the bottom names on the list. There will be four left on there, and you can get rid of two.

MR. BERNARD: Yes.

MS. THOMPSON: Just to state the obvious, so we just count down in here and stricken --

THE COURT: We'll mark them off for you.

MS. THOMPSON: If they're not stricken up here, this is how you're calling them to sit in the jury box.

THE COURT: Correct. Down from the top and -- some are already in the seats.

MS. THOMPSON: Right, right.

THE COURT: The other ones will be called in that order and fill the seats. The last two will be alternates, 13 and 14.

MS. THOMPSON: Okay.

THE COURT: And we will get rid of the extras before you have to do your peremptories. All we're going to do is the Government will get two, then you'll get two --

MS. THOMPSON: Okay.

THE COURT: Government, you'll get two until we get to the end.

MS. THOMPSON: Okay.

THE COURT: And that will take care of the first sixteen peremptories.

MS. THOMPSON: Okay.

THE COURT: And then there will be two more; and before we do that, though, we'll have to show you on the sheet that you can only take the last two of the last four.

MS. THOMPSON: Okay.

MR. BERNARD: Got it.

THE COURT: All right. Thank you very much.

MS. THOMPSON: Thank you.

THE COURT: And we'll go through the list and get it ready for you to use the peremptories, we'll take off the ones that are already off.

MS. THOMPSON: Okay.

MR. BERNARD: Thank you.

THE COURT: Thank you.

(In open court.)

THE COURT: Ladies and gentlemen of the jury, please be patient. We're doing the peremptory challenges right now, and it will take a few minutes for counsel to do that; and then when we get to the end of that, we'll have the jury selected. So we're getting there. A little bit more patience and we'll be done. Thank you.

(Counsel make peremptory challenges.)

THE COURT: All right, ladies and gentlemen of the jury panel. Miss Gorgone is going to read off the names of those of you who have been excused or stricken from the panel. Do not leave the courtroom yet, but please stand; and when everyone has been read off and is standing, you can go to the back of the courtroom, and then we'll bring some of the jurors forward to fill in the seats until we have all the seats filled again. And when we've done that, then we'll have our jury.

We will ask the parties whether they're satisfied with the jury, we will then swear the jury, and then at that point in time we will dismiss those of you who have not been selected. But please do not leave the courtroom until we tell you to do that.

If your name is not called now, that means you are either on the jury or you're an alternate. So we're going to start with the jury box and work our way through the jury.

Go ahead, Miss Gorgone.

MS. GORGONE, DEPUTY CLERK: Juror No. 115,

Craig Dunmeyer.

Juror No. 130, Sharon Lavick.

Juror No. 99, Wanda Yaudes.

Juror No. 89, Sheryle Johns.

Juror No. 77, Lindsay Carns.

Juror No. 80, Patricia Glessner.

Juror No. 135, Donovan Mock.

Juror No. 76, Vickie Swisher.

Juror No. 91 Suzanne Molosky.

Juror No. 126, Seth Forry.

Juror No. 112, Johnathan Chaney.

Juror No. 114, Lisa Ebersole.

Juror No. 67, Earl Cyphert.

Juror No. 145, Mark Middleton.

Juror No. 73, Paula Clouser.

Juror No. 134, Justin Redinger.

Juror No. 93, Deanna Robertson.

Juror No. 117, Catherine Rossi.

Juror No. 87, Joanne Myers.

Juror No. 68, David Dufour.

Juror No. 95, Cheri Clinton.

Juror No. 132, Anthony Simkovic.

Juror No. 104, Roxanne Baker.

Juror No. 127, Roger Burkhart.

Juror No. 142, Robert Snyder.

Juror No. 107, Janet Diehl.

Juror No. 84, Pam Evans.

Juror No. 85, Marlene Mingle Lynch.

Juror No. 86, Sarah Brenize.

Juror No. 105, Eugenie Bryant.

Juror No. 133, Lahne Macey.

Juror No. 116, Zachary Niper.

Juror No. 119, Cynthia Brown.

And Juror No. 83, Judith Opdenhoff.

If you're standing in the jury box, have a seat in the back of the courtroom, and then everyone can have a seat.

Juror No. 143, Alexander Waite, please take Seat No. 1 in the jury box.

Juror No. 136, Jesse Ringler, please take Seat No. 2 -- No. 2, you can go back to where you were. You were in Seat No. 2 --

JUROR NO. 110: I was originally in two.

MS. GORGONE, DEPUTY CLERK: You can go back.

THE COURT: Take two, sir.

JUROR NO. 110: Okay.

MR. BERNARD: We just noticed you did not call out Juror No. 97 because he was excused for cause.

THE COURT: Which seat?

MR. BERNARD: I don't know, in the back -- Seat 45.

MS. GORGONE, DEPUTY CLERK: I thought I did; I must

have missed it.  I'm sorry.

MR. BERNARD:  It's okay, that might be --

MS. GORGONE, DEPUTY CLERK:  Ninety-seven?

THE COURT:  No, in Seat 45.

MR. BERNARD:  Yes.

MR. KEYS, LAW CLERK:  Seat No. 45, Judge.

THE COURT:  Yeah, he's called -- he's excused.

MR. BERNARD:  Yeah, just making sure.

(Off the record discussion.)

MS. GORGONE, DEPUTY CLERK:  Juror No. 102, William Schoeneman, please take Seat No. 5.

Juror No. 140, Amanda Scalice, please take Seat No. 6.

Juror No. 111, Lonny Lallemand, please take Seat No. 7.

Juror No. 94, Natausha Jacobs, take Seat No. 11.

Juror No. 90, James Smolleck, please take Seat No. 12.

Juror No. 129, Carol Pizzella, please take Seat No. 13.

And Juror No. 139, Amy Churner, take Seat No. 14.

And Juror No. 97, Donald Hanna, you are excused.

THE COURT:  Are the parties satisfied with this jury?

MR. BERNARD:  Yes, Your Honor.

MS. THOMPSON:  One moment, please, Your Honor -- yes, Your Honor.

THE COURT:  All right.

Miss Gorgone, if you would have them stand and administer the oath, please.

MS. GORGONE, DEPUTY CLERK: Would you please stand and raise your hand in the jury box.

(Jurors sworn.)

MS. GORGONE, DEPUTY CLERK: Please be seated.

THE COURT: The jurors who are seated in the jury box, you are the jury in the case of *United States of America versus John T. Terry*, Criminal No. 18-24. Now, these remarks are directed toward the other prospective jurors who are seated in the back of the courtroom.

I appreciate your service. The court system appreciates your service today because without your attendance, and participation, we would not have been able to seat the jury who is now seated to hear this case.

So thank you for your attendance today, thank you for your participation today -- and this is directed only at the jurors in the back of the courtroom, the prospective jurors -- you are excused from further jury duty and may leave the courtroom to be escorted back to the assembly room where you assembled earlier today.

Would you do that, please.

Miss Gorgone will take you back.

(Remaining jury panel excused.)

THE COURT: All right. As I advised you a few moments

ago, you are the jury in this case. The first 12 are jurors and 13 and 14 are alternate jurors, who may in fact end up having to participate in the decision in the case. So 13 and 14, you should operate under the presumption that you're going to end up having to decide the case, so please pay attention just as if you were a primary juror at this point.

What we're going to do is we're going to let the jury go and get their meal. Sorry we've run you so late, but unexpectedly it went longer than we had anticipated. Please be back in the courtroom at 4:00 p.m. That's about 45 minutes from now. Before you leave, I'm going to read you the recess instruction.

We are about to take our first recess since the selection of the jury. I remind you of the instructions I gave you earlier while you were not yet jurors. During this recess and any other recess you must not discuss this case with anyone including your fellow jurors, members of your family, people involved in the trial, or anyone else.

If anyone tries to talk to you about the case, do not tell your fellow jurors, but tell me about it immediately through one of my court staff.

Do not read, watch, or listen to any news reports, if any, of the trial or conduct any research or investigation including on the Internet. Remember I have told you previously not to use any electronic devices to communicate with anyone

about the case or to do research on the case.

Remember to keep an open mind until you've heard all the evidence and you discuss that with the views of your fellow juror at the end of the case. We haven't heard any evidence yet so there's nothing to discuss. But please do not discuss the case. You will be able to discuss the case fully with your fellow jurors, but that will be when you are sent back to deliberate toward the end of the trial.

If you need to speak with me about anything of a personal nature that would be an emergency or something like that, please send a note through one of my staff to me and I will react to it as quickly as I can.

All right, you have about 40 minutes to get something to eat. The personnel outside the courtroom can direct you to where the nearest restaurants are if you wish to do that. Please be back at 4:00 p.m. to come back into court and we will begin the trial at that point. We will go until probably about 5:00, maybe a little bit before that, and then we will have a recess at the end of the day.

Thank you for your participation and your attention to this point. And we'll be in recess until call of court.

MS. GORGONE, DEPUTY CLERK: All rise. Court's in recess.

(Jury exits courtroom.)

THE COURT: Please be seated. The jury is not in the

courtroom, so these remarks are outside the hearing of the jury.

That selection process took longer than we had anticipated. So when they come back, Counsel, I'm going to give them the preliminary jury instructions, but we're not going to have time today to give you sufficient opportunity to do your openings. So we will defer those until tomorrow. I would have liked to have gotten the openings done today, but we had to give you sufficient time to cover everything you wished to cover; so you can plan on that happening first thing in the morning.

I still have to administer the oath to my two law clerks, who will be the bailiffs, and I'll do that when they return shortly. They'll be taking the jury back and forth to the assembly room, which is also going to end up being the deliberations room.

Any matters that the parties need to bring up to me at this point before I let you take your recess and meal break?

MR. BERNARD: No, Your Honor.

MS. THOMPSON: No, Your Honor. Will we meet tomorrow morning at 8:30 a.m.?

THE COURT: Only if you wish to. If you wish to have a conference with me before court starts, I can do that each morning at 8:30. If -- unless you ask for it or I have something that comes up that's unexpected at this point, I

would not have you do that.

I do ask that you be here at a reasonable time so we can start right at 9:00. I know the juries become irritated and frustrated if we waste their time, so I like to start on time and utilize their time while they're here. And then -- so if you're ready, we'll be ready and we'll get started.

Mr. Terry will need to be in his seat prior to the jury being brought in in the morning, and we'll have you sit right there, sir, and that should work out okay.

I still have the Defendant's witness coming early on Wednesday. I don't know now how this failure to get the openings done today will affect the rest of the trial, but plans are, Marshal, until we tell you otherwise, to have him brought here Wednesday morning.

Anything else for the Court?

MR. BERNARD: No, Your Honor.

MS. THOMPSON: No, Your Honor.

THE COURT: It doesn't give you a whole lot of time to get something to eat and use the restroom, but I want to keep this moving, so --

MS. THOMPSON: Yes.

THE COURT: Thank you for your cooperation and professionalism to this point. And it just took a while -- I mean sometimes it does that. So there's no way to predict how long it will take exactly. But we're -- at least we've gotten

the jury picked at this point.

MR. BERNARD: Does the Court need the questionnaires returned?

THE COURT: I do, yes. What we do is we will eventually destroy those after the case has been completed.

Mr. Feldman, if you and Mr. Keys would come forward and take the oath as bailiff.

(Judge swears in the bailiffs.)

THE COURT: Okay, thank you.

So you can -- however you can work out between you -- how best to take them to the jury assembly room and that sort of thing.

All right. You can try to get a quick lunch if you can. If not, I'll see you back in here about 4:00, and we'll do the initial jury instructions, which I anticipate will take 35 to 40 minutes to read. They seem to get longer each time I do it. So that's about what it will take. So there's no way we can get to openings today. So, sorry about that.

All right, we'll be in recess until call of court.

MS. GORGONE, DEPUTY CLERK: All rise. Court is in recess.

C E R T I F I C A T E

I, Shirley Ann Hall, certify that the foregoing is a correct transcript for the record of proceedings in the above-titled matter.

s/Shirley Ann Hall
Shirley Ann Hall, RDR, CRR
Official Court Reporter