IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

_____

UNITED STATES OF AMERICA,
                    Plaintiff,

                                        Criminal Action
          vs                            No. 18-24
                                        (DAY 2)
JOHN T. TERRY,
                    Defendant.


_____

          Transcript of Day Two Jury Trial proceedings held on
Tuesday, August 23, 2022, United States District Court,
Johnstown, Pennsylvania, before the Honorable Kim R. Gibson,
U.S. District Court Senior Judge.


APPEARANCES:

For the Government:            ARNOLD P. BERNARD, JR., Esq.
                               MAUREEN SHEEHAN-BALCHON, Esq.
                               U.S. Attorney's Office
                               319 Washington Street, Suite 200
                               Johnstown, PA  15901
                               arnold.bernard@usdoj.gov
                               Maureen.Sheehan-Balchon@usdoj.gov


For the Defendant:             SANDRA THOMPSON, Esq.
                               351 E. Princess Street
                               P.O. Box 1902
                               York, PA  17405
                               sthompsonLLC@gmail.com


Court Reporter:     Shirley Hall, RDR, CRR
                    U.S. Courthouse, Suite 204
                    Penn Traffic Building
                    319 Washington Street
                    Johnstown, PA  15901
                    shirleyhall_uscra@yahoo.com


Proceedings recorded by digital stenography; transcript
produced by computer-aided transcription.

P R O C E E D I N G S

(In open court, without jury.)

THE COURT: Please be seated.

I'll first note that the jury has not been brought into the courtroom yet, so these remarks are outside the hearing of the jury.

And I believe counsel have some issues they want to discuss?

MS. THOMPSON: Yes, Your Honor. Good morning.

On behalf of Mr. Terry, I actually wanted to object to the Commonwealth's 404(b) -- I'm sorry, the Government's 404(b) notice. In fact, they are using the information for propensity, stating that it is based on his character that shows that he is likely to engage in drug sales because there was some drug discussions before.

I think there is other issues with the evidence that the Government is intending to present, especially when it goes to the text messages, that they are hearsay and lack authentication. So for all of those reasons, I do object to the information that the Government intends to present under 404(b).

THE COURT: Just generally as to all of it or any particular items you want to focus on?

MS. THOMPSON: As I understand -- and obviously the Government can clarify -- but particular to the Government's

Exhibits 31, where it's -- they are making an allegation that the -- particularly, the iPhone-8 contains chats that refer to some intent to deliver drugs, contraband; and also -- I believe it would also be the Government's exhibits up to 34C. And -- I'm sorry, Your Honor, it would also include Commonwealth's Exhibit 24, which is a disk data of the iPhone-8, and looks like Commonwealth's Exhibit 22, which is the disk data of the Samsung. So those are physical disks.

THE COURT: Anything additional, counsel?

MS. THOMPSON: No, Your Honor.

THE COURT: All right.

Attorney Bernard, can you specifically address each item and your justification for it.

MR. BERNARD: Yes, Your Honor.

So as the Court's well aware, this case involves a traffic stop that occurred on April 4th, 2018. During that traffic stop of the vehicle that was driven by Gerald Terry, John Terry was seated in the passenger seat. In front of John, where John Terry was seated, in the air bag/glove compartment area there was a hidden vehicle trap, which the state police trooper conducted the stop discovered after receiving consent to search the vehicle from Gerald Terry.

Inside that vehicle trap were located three kilograms of methamphetamine-laced cocaine, as well as a stolen handgun, a bottle of codeine, and several pills.

The Court has ruled that the codeine bottle is inadmissible, as its risk of prejudice substantially outweighs its probative value. The Government does not intend to present evidence of the pills.

In addition to the drug and gun evidence that was seized from the vehicle trap, the state trooper also recovered two cellphones during the search of the car and the arrest of John Terry. The Government executed search warrants on those two cellphones and conducted a forensic imaging of each device, thereby extracting the data from those devices. That data was processed, loaded into a program which would allow the case agent to review that data. And from that program, the case agent generated a report which includes relevant text messages, images, and other cellphone data pertinent to his investigation. Those are what are contained in the items that the Defendant has objected to.

So, starting with Government's Exhibits 22 and 24, those disks will be offered into evidence through the senior forensic examiner of the FBI who conducted the extraction of those devices, and they will testify that those disks contain a copy of the data that was stored on the iPhone and the Samsung respectively.

From there, Government's Exhibit 31 is the report that was generated by the case agent upon reviewing the data from the Samsung and the iPhone. Agent Simpson will testify that he

conducted a review of that data through the Cellebrite program, identified items that he believed pertinent to the investigation, and then those items were generated into the report that is Government's Exhibit 31.

I'll note that throughout Government's Exhibit 31 there are numerous redactions. Those are items that were deemed relevant to the investigation but perhaps not relevant to the trial. If the Court recalls, some of these items were presented at a previous detention hearing and evidentiary hearing in this case.

Turning to Government's Exhibits 32A, these -- this is -- the sub-exhibits to Exhibit 32 are what begin the actual substantive items that were found on the iPhone. So this first exhibit is a demonstrative depicting a text conversation that was found on the iPhone. That exact conversation is contained verbatim in the generated report that was generated from the actual data from the cellphone.

This particular exhibit, 32A, is offered to show ownership and use of the phone by John Terry. This particular conversation includes a message sent from the user of the iPhone-8 which reads, "I apologize bro sincerely. I'm so embarrassed. I couldn't find my fucking ID. So here's -- so here nothing. I got a duplicate. Be down before one. Got a bag for you too. Again my fault."

Below that message is a picture message which includes

a photograph of the front and back side of an identification card belonging to John Terry.

Exhibit 32B is a blown-up version of the front of that ID card.

And 32C is the blown-up photo of the back of that ID card.

Similarly, Exhibit 32D is an image that was recovered from the iPhone which is a screen shot from -- of an email that is addressed to John Terry. Again, this exhibit is offered to show ownership and use of that iPhone by John Terry.

32E is the metadata associated with that screen shot of the email. It includes the file name, the file path, the modified date, and the source of that image.

Exhibit 32F is a demonstrative depicting a text message that was on the iPhone from a contact who is identified in the phone contact directory as Gees, G-E-E-S, at telephone number (215)494-8544. That text message states, "Meet me at our parents house."

The Government will present testimony through Case Agent James Simpson that it is his opinion that the contact Gees and that telephone number pertains to Gerald Terry. And that's based on a number of factors including the subscriber information for that particular telephone number as well as the content of the message itself, which says "Meet me at our parents' house," indicating that the two people involved in

that conversation are siblings.

Government's Exhibit 32G is several relevant contacts that were included in the contact directory on the iPhone. You'll see there a contact by the name of Floc, F-L-O-C, Gees, G-E-E-S, and Gees Good. It is the Government's position and the Government will show through testimony that contact Floc refers to Kelli Royster who was the individual to whom the vehicle was registered to, the vehicle that contained the vehicle trap.

The fact that this individual is included in the contacts of Mr. John Terry's phone is offered to show that John Terry knows the owner of that vehicle and therefore makes more likely that John Terry was aware of the vehicle trap and the contents that were found therein.

32I is a text conversation between John Terry's iPhone and the contact named Floc. This conversation includes photos sent to the iPhone by the contact named Floc which depict Kelli Royster holding a newborn baby and posing with a significant other. Again, these images, this text communication would be offered to show the relationship between John Terry and the owner of the vehicle.

32J is one of those photos blown up.

32L is also the photo of Kelli Royster with the newborn baby, blown up.

32M is vehicle registration information which shows

that the red Ford Taurus involved in the traffic stop belonged to Kelli Royster.

It also includes a driver's license photo of Kelli Royster which is offered to show the jury that that photo matches the photos that were included in the text messages on John Terry's iPhone; that is, the driver's license photo depicts the same individual depicted in the messages sent from Floc to John Terry's iPhone.

Government's Exhibit 32N was one of the exhibits that was the subject of the Government's 404(b) notice. This image depicts a half kilogram of cocaine -- what appears to be cocaine on a scale. The half kilogram of cocaine depicted bears an imprint of a backwards number two.

Exhibit 32O is the metadata associated with that image. That metadata shows that that particular image was captured on March 8th of 2018, which is 27 days prior to the traffic stop. It shows that that image was taken by a camera model iPhone-8-Plus, which is the type of phone that was seized from within the red Ford Taurus and which the Government is attributing to John Terry. And it also shows that the file path where that image was stored includes what is known as the DCIM folder. And that is the digital camera image folder. The relevance of that is because that indicates that that photograph was captured by the camera of the phone itself as opposed to having been sent through a multi-media message or

downloaded from the Internet, and that file path is where images taken by the camera of the phone are stored.

Government's Exhibit 32P is another image recovered from the phone of that half kilo of cocaine.

32Q is the metadata associated with that image.

32R is again another photo of the half kilo of cocaine.

32S is another -- is the metadata associated with that message. I would note these are not the same image; they are pictures depicting the cocaine as it's rotated on the scale.

32T is another image of the half kilo of cocaine. This one clearly shows the backwards number two on that half kilo of cocaine.

And Exhibit 32U is the metadata associated with that image.

The relevance of the half kilos of cocaine as set forth in the Government's 404(b) notice, I don't think I need to restate that at this time; but essentially the imprint on the kilos found in the car and the half kilo of cocaine depicted on the iPhone match.

Exhibit 32V is a zoomed-in photo of Government's Exhibit -- this is a zoomed-in photo of 32P. That is offered to show the weight of that half kilo of cocaine. You can see the numbers on the scale. It depicts 4-9 and the third number I can't exactly make out; but I suggest that that is, in fact,

approximately a half kilogram of cocaine, about 490 some grams.

Exhibit No. 32AA is a text conversation found on the iPhone between the user of the iPhone, the Government is alleging is John Terry, and an individual identified in the contact directory as Nas.

In that communication, which occurred about 32 days prior to the traffic stop, John Terry states, "My folks was in accident. Ima leave the hospital in a hour or two. Real trap."

Nas replied, "Rd, I hope they cool and da heat or defrost don't work in this lemon."

John Terry responds, "Ima give you the [sic] lex when I get situated."

Nas states, "Rd, call me when u close."

John Terry replies, "If you take the thing off the radio where I put my pistol it would come on."

Nas states, "How u take it off?"

John Terry states, "Be there in a hour."

Nas responds, "Rd."

This exhibit would be offered to show that John Terry possesses and owns a pistol, and that fact makes it more likely the fact that John Terry possessed the drugs that were found in the hidden compartment, as those drugs were found in direct proximity to a pistol. There is a handgun along with those three kilos found within that vehicle trap.

Government's Exhibit 32AB is a text communication from contact Gees to John Terry, which was sent approximately five days prior to the traffic stop, and includes the address 1429 Grant Street, Braddock, PA. That message is relevant because that is the address for the Government's cooperating witness, Robert Dillard, who the Government is calling to testify that he was the individual to whom the Terry brothers were delivering the three kilos of cocaine that were seized from the compartment. That message corroborates Mr. Dillard's testimony.

Text messages contained in Government's Exhibit 32AC are a conversation between contact Gees and John Terry. On April 3rd, 2018, at approximately 8:16 p.m., Gees writes, "You ready Pooh?"

On April 4th, 2018, at approximately 5:52 a.m., John Terry responds, "We can't be ready til nine. Was rushing. I got to[sic] Do all over. Hour apiece. My fault bro."

That message from John Terry was sent on the same day as the traffic stop. It was sent at approximately 5:52 a.m., indicating that they could not leave until approximately three hours later, at 9:00 a.m. And in that communication John Terry alleges that he has to do something all over again and it would take an hour apiece, or three hours total to do what he had to do.

As there were three kilograms of cocaine found in the

Ford Taurus, it is the Government's position and the Government will present expert testimony to the effect that this message pertains to the pressing and packaging of the three kilograms of cocaine that were seized from the vehicle trap.

Government's Exhibit 32AD is cellphone data extracted from the iPhone which shows that on March 30th, 2018, John Terry entered into his Apple Maps program the address for Robert Dillard.

Government's Exhibit 33 is the generated report based on the content of the Samsung phone. And then Government's Exhibits 34A through 34C are those -- the contents that were extracted, presented in demonstrative form.

The first item, 34A, is a text message conversation between the user of phone number ending in 7901 and the user of the Samsung phone. In this text message conversation the user of the telephone number ending in 7901 states, "This is big bro wife. 1429 Grant Street, Braddock, PA, 15104." Again, Mr. Dillard's address is being sent to a phone that the Government will attribute to John Terry.

The next message in the conversation which followed less than a minute after the first says, "Your bro other phone is down." It is the Government's position that in this conversation Gerald Terry texted John Terry's -- excuse me, texted Robert Dillard's address to John Terry from Gerald Terry's wife's phone, and he indicated in the subsequent

message that this is your brother and -- Gerald Terry, and that his other phone is down, which explains why he's sending the message to John Terry from this number and not the number that we know as Gees.

John Terry responded from the Samsung to Gerald's number that is saved in the iPhone as Gees, and it states, "Other phone died. It's me big bro." It's the Government's position that this text message establishes that this is John Terry who is using the phone. He sends a text message to his brother Gerald, telling Gerald that his other phone -- that is, John's other phone, meaning the iPhone -- died and identifying his number on the Samsung phone to Gerald. That's Government's Exhibit 34B.

Government Exhibit 34C is a message that the Samsung received from a contact known as Wifey. It reads, "Gerald, (215) 494-8544." That's the same number to which the previous message that was referenced in Government's Exhibit 34B was sent to. That message indicates that John Terry on his Samsung received Gerald Terry's number from the contact saved in his Samsung phone known as Wifey, and then sent the previous message to Gerald indicating that this was his number on the Samsung phone.

THE COURT: Anything additional, Attorney Thompson?

MS. THOMPSON: Yes, Your Honor.

So, Your Honor, again, the Government continues to say

that the iPhone -- and they keep referring to the iPhone as John Terry's iPhone. That has not been authenticated at all. There's no subscriber information to Mr. Terry, and the text messages also within that do not link to Mr. Terry. For almost all of the text messages that the Government has referenced is, again, uncorroborated, unauthenticated, or are uncorroborated, unauthenticated conversations. No person with knowledge that's a party of those conversations ever said that they had the conversation with John Terry. All of the Government is offering is supposition.

In reference to -- and, at best, the argument of -- I believe it's Page 8 of the Government's Exhibit 31, where they mention that 12/18/2017 there was a photo of John Terry's driver's license. And that's only on that particular day. But that's not to say that Mr. Terry didn't use someone else's phone, so that's not indicative of it being his phone.

In reference also -- I believe it was Page 16 of their Exhibit 31, which I believe is a screen shot -- yes, Page 16 of Exhibit 31 it looks like -- they say it's Image 12. It's a screen shot of Mr. Terry's -- I think they're saying it's Mr. Terry's Samsung information. So, again, that is not to say who took the screen shot or what the purpose was for.

So the Government doesn't have any evidence to actually link that back to Mr. Terry. So all they're relying on is prejudicial suppositions. Misstatements in the opinions

of Agent Simpson should be declared inadmissible. I mean they're hearsay, there's no exception, and they lack foundation of knowledge.

So, for all of those reasons, each one that is -- even the reference to the parents' house or parents being in an accident, again, there's no surrounding information to show those circumstances are attributed to John Terry. So there's no subscriber information, the substance of the numerous text messages do not link back or are not recognizable as being from Mr. Terry. Mr. Terry did not respond in the way that is the foregone conclusion that it was him. And, again, there's no corroborative evidence about these texts.

So I believe that, Your Honor, that these text messages are more prejudicial than probative; and, again, I think that the Government has, again, shown that their intent is propensity because again they're attributing somebody speaking about a pistol on a desk or something and then saying that that's Mr. Terry who mentioned that about a month earlier; therefore, that meant he possessed the pistol on April 4th, 2018. So that's all about propensity.

Thank you.

THE COURT: All right, thank you.

Attorney Bernard?

MR. BERNARD: Judge, with respect to the Samsung phone, I'll represent that there's going to be testimony to

show that that phone is actually subscribed to in John Terry's name; that he is the registered subscriber with the service provider to that telephone number that was assigned to that telephone, in addition to the circumstantial evidence to the text communications on the phone between the user of that phone and Gerald Terry.

Furthermore, to suggest that there isn't evidence to authenticate or demonstrate that the iPhone belongs to John Terry, the Defendant's argument overlooks the basic concept here of the fact that these phones were seized from within a vehicle in which there were two occupants. One of those occupants was Gerald Terry, one of those occupants was John Terry.

Within that iPhone the Government will establish were communications between the user of that iPhone and Gerald Terry. Therefore, basic logic would suggest that that iPhone did not belong to Gerald because Gerald would not be texting himself. Therefore, it must belong to the other occupant of that vehicle, who was John Terry. I mean that's the basic circumstantial evidence that supports this attribution, in addition to all of those other factors that we set forth through the summons in this, which show use by John Terry.

With respect to the conversation involving the pistol, the nature of that conversation is that Nas is stating that,

"Da heat or the [sic} defrost don't work in this lemon." That's the verbatim text that he sends. Agent Simpson will testify based on his training and experience and knowledge of the investigation that that text communication is Nas complaining that the heat or the defrost will not work in the car that he is driving.

In the next message, John Terry states, "Ima give give you lex when I get situated." Agent Simpson will indicate that that communication means that John Terry will swap cars, provide him a different car, in this case a Lexus, once he has an opportunity to do so.

Nas replies, "Rd call me when u close."

John Terry responds -- in response to the earlier message about the heat and the defrost not working, John Terry responds, "If you take the thing off the radio where I put my pistol it would come on."

That communication is in reference to removing some piece of a vehicle to store a firearm in that vehicle. Therefore, that text communication shows John Terry's knowledge of vehicle traps and opportunity to use vehicle traps and possession of a pistol, which makes more likely that the pistol that was found in the hidden trap in the Ford Taurus was his and, therefore, that the drugs that were found in that same vehicle trap were his as well.

Thank you, Your Honor.

THE COURT: All right, thank you.

(Off the record discussion.)

THE COURT: All right. The following order is entered based on the arguments presented today by both parties.

This oral order supplements the findings of this Court that are set forth in Docket No. 207 with regard to 404(b) evidence.

With reference to the referenced -- with reference to the exhibits and the evidence referenced by both counsel today, which encompassed many different exhibits, the Court finds that this evidence and these exhibits are not offered to demonstrate or show character of John Terry and that he acted in accordance with that character. In other words, they are not propensity evidence.

The Court finds that the evidence referenced by the Government is proper 404(b) evidence in that it is offered for identity, knowledge, preparation, opportunity. And, in addition, certain items are offered to show additional likelihood that the iPhone is the iPhone of the Defendant.

The Court finds that the Government's evidence reasonably and sufficiently demonstrates ownership of the iPhone by Defendant, and the Court finds that the probative value of that evidence substantially outweighs any unfair prejudice to the Defendant.

The items discussed today in oral argument are quite

extensive, and the arguments were arguments that should be addressed in a follow-up written order, which the Court will issue subsequent to today's proceeding.

However, the issues that need to be resolved prior to trial ensuing with regard to these issues have been established sufficiently by the Government to permit the use of these exhibits and this evidence. That concludes the oral order.

As I said, we will follow this up with a more extensive written order later in the proceeding. At this point in time the Court would like to bring the jury in so that we can move to opening statements.

MS. THOMPSON: One other issue, Your Honor, for clarity. Since this is a bifurcated trial, it's my understanding that we were not bringing in evidence of the firearm, and the Government's Exhibits 1 and Exhibit 6 and 6A are of the firearm.

Exhibit 1 is a video showing the firearm with the drugs at 3.11, the time on the video clip. So I'm asking for clarification of that.

MR. BERNARD: Judge, we're not offering the firearm through the counts that have been set aside for the bifurcated portion of this hearing. However, the presence of a firearm is in and of itself indicative of drug trafficking, specifically drug trafficking amounts of drugs with intent to distribute. Guns are a tool of the trade as far as drug trafficking is

concerned and they indicate that intent to deliver.

We have approximately three kilos of methamphetamine-laced cocaine involved in this case, with a street value of anywhere between 60- and $100,000. This firearm is relevant to show that those kilos were possessed with intent to distribute them and used to protect those kilos and any drug profits realized that were a result of the sale of those kilos.

MS. THOMPSON: Your Honor, I think that again goes to the second phase, so I'd ask that the Government's Exhibit 1, which is the sixth clip, the time of 3:11, and Exhibit 6 and 6A would be excluded from the first phase of the trial, as again it's offered -- really, again, would be prejudicial and not probative of whether or not Mr. Terry is the person that possessed the drugs or contraband with knowledge.

THE COURT: All right.

Attorney Bernard, we granted bifurcation in this case to separate the weapons offenses from this part of the case. Can you go into additional detail as to why this particular reference to the weapons should be permitted when the other evidence is not?

MR. BERNARD: Well, Your Honor, my understanding of the basis for bifurcation was because the fact that the Defendant's prior conviction was what was prejudicial to the trial of these charges that are part of phase one of this

bifurcated trial. The evidence of his prior conviction is not going to be offered.

THE COURT: The Court agrees that primarily what we were keeping from the jury was that he had been previously convicted of a firearm offense, and that would be prejudicial to his defense in this particular portion of the case; but for the limited purposes that the Government has set forth for the firearm being found in the location where it was, the Court will permit that and believes that the probative value of that outweighs the prejudicial effect.

We're not going to permit any evidence that Mr. Terry had previously been convicted of any weapons offense, so that will not connect him to the weapon. But the fact that the weapon was there and the drugs were there, I'm going to permit the jury to hear that.

All right. Thank you, counsel, for those arguments and presentations. Anything additional before we bring the jury in, counsel?

MS. THOMPSON: No, Your Honor.

MR. BERNARD: No, Your Honor.

THE COURT: All right. I thought the arguments were very well presented, and it is a very valid issue, and I'm glad you brought that up to the Court before we proceeded.

Let's bring the jury in, and we will then proceed with opening statements.

(Jurors seated.)

THE COURT: Please be seated. The jury has entered the courtroom, and we are ready to proceed with opening statements.

Counsel?

MR. BERNARD: May it please the Court, Attorney Thompson, Mr. Terry, members of the jury, good morning.

My name is Arnold Bernard, and I'm an Assistant United States Attorney, and it's my job to represent the United States or the Government in the trial against Mr. John Terry. Seated at counsel table with me is Assistant United States Attorney Maureen Sheehan-Balchon.

MS. SHEEHAN-BALCHON: Good morning.

MR. BERNARD: And next to her is our automated technician specialist, Jonathan Flannigan. He will be assisting in this trial.

You were introduced yesterday to Case Agent James Simpson, and he will be seated back there as well during the trial.

Members of the jury, the case you're going to hear today and for the next few days involves a traffic stop that occurred on the Pennsylvania Turnpike approximately four years ago, on April 4th, 2018.

During that traffic stop, a state police trooper

discovered a hidden vehicle trap and in that trap located approximately three kilograms of cocaine mixed with methamphetamine.

The trial here today and for the next few days involves two central questions that you are going to be asked to resolve. Question one is whether or not John Terry conspired to possess with intent to distribute and to distribute the drugs that were found in that vehicle trap; and, number two, whether John Terry was the person or one of the persons who possessed with intent to distribute those drugs. Those are the two questions that you're going to be tasked with answering.

In order to prove those questions -- in order to prove that your response to those questions should both be yes, that it was John Terry who conspired to possess those drugs and that it was John Terry as well who did, in fact, possess with intent to distribute those drugs, the Government will present you a series of witnesses and a number of exhibits that you will be using to consider those questions and reach your conclusion.

This morning, as soon as we wrap up with opening statements, the Government will call to testify State Trooper Ryan Marmol. Trooper Marmol will explain how he was patrolling the turnpike on April 4th, 2018; and how at approximately 2:30 p.m. he effected a traffic stop of a red Ford Taurus that was heading westbound. That traffic stop occurred right

between the Bedford and Somerset County turnpike exits.

Trooper Marmol will tell you and you will see video of his interaction with the individuals in that car. The Government's going to present actual video of that interaction. You will hear audio that was recorded on Trooper Marmol's body microphone, and Trooper Marmol will also tell you what he observed from his perspective during that traffic stop.

You'll see how during that traffic stop the driver of the vehicle, who was identified as Gerald Terry, consented to a search of that car. And you'll actually see Trooper Marmol as he goes through his search and discovers a hidden vehicle trap. You'll see him finally access that trap sometime later, and you'll see what items he recovered from that.

Following Trooper Marmol's testimony, you're going to hear from Brian Wright, who is an automotive mechanic with the Pennsylvania Office of Attorney General. Mr. Wright will tell you how he's had approximately 20 years of experience in examining vehicles that are seized by the Office of Attorney General or the Pennsylvania State Police, and how he has personally examined hundreds of hidden compartments within vehicles.

He understands how they operate and how he specifically examined the hidden compartment in the red Ford Taurus. He'll tell you how he conducted that examination, how he was able to determine how that vehicle trap door operated

and where those parts that built the vehicle trap could have come from.

Following Mr. Wright's testimony, you're going to hear from a forensic scientist from the Pennsylvania State Police Crime Lab. Her name is Morgan Wiermusz. And she will tell you how she tested the suspected drug evidence that was seized from the red Ford Taurus. And she'll opine as to what the contents of that suspected drug evidence were and how much it weighed.

Following Forensic Scientist Wiermusz's testimony, you'll going to hear from a senior forensic examiner with the FBI, Justin Sarvey. Mr. Sarvey will tell you how he received two cellphones that were seized by Trooper Marmol during the traffic stop, and how he digitally imaged those cellphones, extracted the data from them, and processed that data to make it available for Special Agent Jim Simpson to review.

After Mr. Sarvey testifies, you will hear from Special Agent Simpson himself, and he will tell you about what he found on those two cellphones. He'll talk about some photos that he found; you'll see the pictures on the screen. He'll tell you about some text message conversations he found; and those will be presented to you through demonstratives as well. And he'll tell you about other interesting data that was found on that phone, including an entry into Apple Maps for a specific address in Braddock, PA.

Following Agent Simpson's testimony, you're going to

hear from one other witness during the Government's case, and that witness is Mr. Robert Dillard. Now, Mr. Dillard is what we would refer to as a cooperating witness. He'll tell you that he has an agreement with the Government to testify in this case, and he'll tell you that in exchange for his testimony he is hopeful that he will receive some consideration on charges that he himself faces. He'll be upfront with you about that.

He'll tell you that for his whole life he's essentially been a drug trafficker; he'll be upfront with you about that. And what he'll also tell you is that on April 4th, 2018, when John and Gerald Terry were stopped on the turnpike with three kilos of meth-laced cocaine, that that cocaine was intended to be delivered to him at his home in Braddock. He will tell you the address where he lived matches the address that was entered into the Apple Maps program on John Terry's iPhone.

One other specific item of note that you're going to hear about, and it will be through Special Agent Jim Simpson's testimony as well as through the presentation of evidence through Trooper Marmol and Forensic Scientist Wiermusz. You're going to hear about some images on John Terry's cellphone that depict a half kilogram of cocaine.

The importance of that is that that particular half kilogram of cocaine has a very specific imprint on it. You're going to see that imprint, you're going to see the actual kilos

of meth-laced cocaine that were seized from the vehicle trap, and you're going to be able to decide whether you believe those two imprints match.

Essentially, members of the jury, that is the case that you're going to be hearing from the Government's perspective.

Ultimately, this case is a case that comes down to possession. Now, under the law you're going to hear from the judge at the end of the presentation of evidence that there are two types of possession. There's what we call actual possession and there's what we call constructive possession. The judge will instruct you that actual possession is just that, actually possessing something. If I have my phone in my pocket, I actually possess that phone.

But he's also going to instruct you on what is known as constructive possession. Constructive possession is different. Constructive possession means that you can possess an item even though you don't have it on your person, okay? As long as you have access to that item, knowledge of its presence, and an intent to exercise dominion and control over that item, you can be deemed to possess it.

So if I had my cellphone in my pocket, it would be actual possession. But if I had my cellphone sitting on the podium, and I knew it was there and I could easily access it, it's my phone, I control it, then I can be said to have

constructively possessed that phone.

So the case that you're hearing is one that involves that second type of possession, constructive possession, because you're going to hear that none of the drugs were found on Mr. Terry's person. However, they were located in an area over which he had access and control. That is what the Government will attempt to prove to you through the presentation of our evidence.

Lastly, I'd ask you to consider carefully the testimony that you hear in this case. Use your own reasoned judgment, judgment that you've gained through the years of experience that you have in listening to people. Watch the witnesses as they testify. Watch their body language. Listen to how they characterize the testimony that they're given. What is their degree of certainty? What is their ability to perceive the events? What motives might they have for their testimony? What biases might they have?

And if you find that they're a difficult witness to believe, ask yourself: Is there anything to corroborate what this witness is telling me? Keep all of those things in mind as you listen to the evidence in this case.

And after you hear from the witnesses that the Government will present, after the close of the case -- of this case, when you're charged with going back to deliberate, just before that, when we deliver our closing arguments, I'll appear

before you again and I'll ask you in light of all the evidence that you've heard to find a verdict of guilty as to both counts against John Terry.

Thank you.

THE COURT: All right, Attorney Thompson?

MS. THOMPSON: Thank you, Your Honor.

May it please the Court, Mr. Terry, Attorneys Bernard and Sheehan-Balchon. Good morning, ladies and gentlemen of the jury now.

JURORS: Good morning.

MS. THOMPSON: I am Sandra Thompson. I am representing Mr. Terry. And the Government has told you what he is charged with. He's charged with conspiracy and he's charged with possessing -- possession with intent to deliver.

And the judge gave you instructions yesterday, and he'll be giving you instructions as we go forward, especially in closing. And one of the things that we talked about yesterday that we try to make very clear is, as you remember the process, it was a lot of people back there that got dwindled down to about 12 to 14 of you, and and that's because you all stated that you would be able to follow the judge's instructions.

And what is key is that the Government decides who to charge, the Government decides what to charge, and so therefore the Government maintains the burden of proof. That's why

you'll see the Government starts, first word is from the Government, last word is from the Government.

The judge also explained to you that Mr. Terry stands under the presumption of innocence. He said the mere indictment is not evidence against him. The mere indictment doesn't mean he actually did something wrong. And, again, the reason why you 12 or 14 sit here is because you stated that you understood that and you would hold to that. And so looking at all the evidence that the Government says they have, you have to view it under that presumption.

So we talked about yesterday as well there's some people who say: Of course we believe law enforcement; of course, that is how we grow up. But in here, as the judge explained, that they don't -- you don't start with that. You have to start with he sits with a cloak; and even the judge said the term of "cloak." He sits with a cloak of innocence.

And just imagine -- you know, depends on the age, some it's Harry Potter, some may be Star Trek. You remember the cloaking systems? So the whole time as he sits here, as you view it, whatever the Government presents, you have to view it under that colored glass of cloak of innocence.

So on April 4th, 2018, John Terry was along for the ride. His brother, Gerald Terry, asked him to take a ride to Braddock. Now, Gerald Terry sort of speaks -- he was involved with NA, AA, others that you will hear, and he speaks at NA, AA

events.

So Gerald Terry -- you'll hear that Gerald Terry explained to John Terry: Hey, come with me. I'm going to this narcotics convention to speak. So, John Terry was along for the ride for a day trip. It was a trip down to the conference and going to be a trip back. And that's what John Terry knew.

For these charges that the Government has presented, "knowing" and "intentional" are key words because it's not about just merely being around bad company. And you're going to hear the judge instruct that. It's not just mere presence because, again, you're around bad company or where you were located or found there were also drugs and a gun found. It's not about that.

So Gerald Terry was driving a vehicle that he says to Trooper Marmol -- I'm bad at pronouncing names sometimes, so please excuse me -- Trooper Marmol that, again, he was going to the conference. Trooper Marmol asked who the car was registered in, and Gerald Terry answered that: It's my friend's wife vehicle.

So Trooper Marmol stated that he executed the traffic stop because -- I guess two reasons. One is he said that they were intent on the rear lights or something; and then, also -- so the Gerald Terry was driving in the left lane, so Trooper Marmol came behind him in the left lane, so really what do we all do when an officer comes behind us in the left lane?

We move. So Gerald Terry moved out of the way, but Trooper Marmol said: Well, you moved too suddenly. So he stopped them. So he said that: You only allowed a car length in between you and the other vehicle. So he stopped them.

So when he stopped him, he started questioning him about where you going, what are you doing, whose the car, all of that other type of stuff. And so Gerald Terry provided the answers. So Trooper Marmol took him out of the vehicle.

Now, John Terry -- Trooper Marmol noticed that he was sitting like sort of feet propped up, no socks; so he was just sort of relaxing in the vehicle. He wasn't the driver; it was Gerald Terry.

So this was a pretty cold day, so Trooper Marmol took Gerald Terry out the vehicle. And when -- I guess when he asked him to get out the vehicle, John Terry also got out of the vehicle. Now, Trooper Marmol states that: Well, Gerald Terry was suspicious because his hand was shaking. And then he said: John Terry was suspicious because -- he said something was pulsating. Maybe it was the neck, I don't know; he said something was pulsating.

So he asked Gerald Terry, who was in possession of the vehicle, said he borrowed it from a friend, who was the driver, he had -- Trooper Marmol said that he asked Gerald Terry for permission to search the vehicle. And he says that Gerald Terry gave him permission to search the vehicle, so he

started searching the vehicle.

So then Trooper Marmol states that he found an indication of some trap that's in the vehicle. Now -- so, then, he takes them into custody because he found some traps and he wanted to investigate the trap. And then from the trap, I think it took -- and he will tell you specifically -- but I think there was a video, and I believe it took probably about a half hour or more to actually find the trap. But the thing about that is then it started turning. I'm going to suggest to you that the evidence is going to show because John Terry was there, now it was "they."

So Trooper Marmol put in his report that John Terry took responsibility for the car. I'm going to suggest to you that you're not going to see the video clip of that. It was Gerald who said: I borrowed the car from my friend's wife. There's no written statement saying John Terry took responsibility for the car, there's no body cam footage, there's no dash cam footage; but they're attributing this to John Terry.

Then -- now, Trooper Marmol, you may hear that, so filed state charges. But then the Federal Government decided to pick it up. However their communication happened, I don't know. So then Agent Simpson then testified in front of two Grand Juries. And to make John Terry responsible, first Trooper Marmol stated: John Terry said I'm responsible for the

car. Now Agent Simpson is testifying to two Grand Juries that John Terry said: I'm responsible for the hidden compartment, the car, the drugs and gun. So twice he testified to this. So that wasn't even what Agent -- I'm sorry -- Trooper Marmol has stated.

So there were two phones found in the vehicle. So, again, to make John Terry responsible, they're trying to make in particular an iPhone-8 his responsibility. Because the Government is saying on this iPhone-8 there is photographs that are similar to the drugs that were found in the compartment.

So that -- and so -- I'm going to present to you and argue to you as we go through this, is that just as from Trooper Marmol to Agent Simpson with the Grand Jury is also what's happening with the cellphone and cellphone records. So I'm going to ask you that listen intently to that because possession is important and I think they're trying to use like a screen shot or something like that. And so -- and I'll ask you to use common sense about the use of cellphones.

Also, there -- to try to prove intentional and knowing to John Terry, they're also bringing in Robert Dillard. So Robert Dillard, as the Government has said, was a cooperating witness; but he didn't cooperate until he was being investigated and arrested around about October 2018.

So now all of a sudden, again, why? Because they want to try to connect John Terry to this, so now Robert Dillard is

saying: Oh, yeah; I not only met with Gerald Terry, but I met with John Terry, too. So just -- that's it, just his word.

So I believe Robert Dillard was saying that Gerald Terry and he were both at SCI -- state correctional facility in Pine Grove, so those two knew each other. But, again, they just trying to throw in John Terry.

So, ladies and gentlemen, I'm going to ask that you view all that the Government presents because it is their burden of proof. And it is their burden of proof not to bring suspicion or hunches or any windows or any of that, but to beyond a reasonable doubt; and I'm going to ask that you view all the Government's evidence under the presumption of innocence, and I'm going to ask you to come back if you find Mr. Terry not guilty.

Thank you.

THE COURT: Thank you.

Ladies and gentlemen of the jury, we're now going to move to the evidentiary phase of the trial, and the United States will present its evidence first.

And, Attorney Bernard, your first witness, sir?

MR. BERNARD: Your Honor, the United States calls Pennsylvania State Police Trooper Ryan Marmol.

RYAN MARMOL, a witness herein, having been first duly sworn, was examined and testified as follows.

DIRECT EXAMINATION

BY MR. BERNARD:

Q   Good morning, Trooper Marmol.

A   Good morning.

Q   Please introduce yourself to the jury and tell them by whom you're employed.

A   Yes.  My name is Ryan Marmol, and I am employed by the Pennsylvania State Police, and I'm a trooper.

Q   For how long have you been a state police trooper?

A   Nearly ten years.

Q   Prior to becoming a state police trooper, were you required to graduate from the academy?

A   Yes.

Q   How long does the academy last?

A   Approximately six months.

Q   When did you graduate?

A   In 2013.

Q   Prior to becoming a state trooper, do you have any other prior education?

A   Yes.

Q   What is that?

A   I completed high school and graduated from high school, and I have a little bit of college experience.

Q   Now, after you graduated the Police Academy, were you assigned to any particular unit within the state police?

A   After graduate the academy, I was contained to a patrol

unit.

Q   And from there, were you assigned to any other specialized units?

A   Yes, from there I was eventually assigned to the SHIELD unit.

Q   And tell the jury what the SHIELD unit is.

A   The SHIELD unit stands for Safe Highway Initiative through Effective Law Enforcement Detection.

Q   And what are your duties as a SHIELD unit officer?

A   Our dues duties a SHIELD officer, we work the main thoroughfares throughout the Commonwealth.  We work Interstate 80, Interstate 76, State Route 22; like I said, the main throughfares in the Commonwealth.

During those times we are very visible.  We make a lot of traffic stops.  And during the traffic stops, we ferret out criminal activity.  But, again, we bring a safety aspect to it.  Again, we're highly visible out on the highways.

While we're out on the highways, we encounter drug smuggling, people that are smuggling firearms, people that are smuggling cigarettes, money, missing people, things of that nature.

Q   So how long have you been a member of the SHIELD unit?

A   I've been a member of the SHIELD unit for almost six years.

Q   All right.  Did you undergo any specialized training to become a member of the SHIELD unit?

A    Yes.

Q    Have you undergone any specialized training as it pertains to drug interdiction?

A    Yes.

Q    Have you received any training in identifying or locating hidden compartments in vehicles?

A    Yes.

Q    And over the course of your career, have you personally located hidden compartments within vehicles?

A    I have.

Q    Approximately how many hidden compartments have you encountered?

A    I've encountered approximately 23 after-market hidden compartments.  Those are compartments that I have, myself, located and are my traffic stops.  But that number does not include other troopers that I have worked with and assisted during their traffic stops and/or training.

Q    Over the course of your career, you mentioned traffic stops.  Have you conducted traffic stops for alleged violations of the Motor Vehicle Code?

A    Yes.

Q    Approximately how many traffic stops you would say you've conducted?

A    Over the course of my career?

Q    Yes, sir.

A    I would say several thousand, several thousand.  Probably in the ballpark of -- north of five thousand traffic stops.

Q    And of those traffic stops, have any of them led to a vehicle search?

A    Yes.

Q    Can you estimate approximately how many vehicle searches you've conducted?

A    Several hundred.

Q    Is there a particular method that you use when you're searching a vehicle?

A    Yes, but it -- it could change.  Typically, if you're looking at a vehicle, if we start, say, on the passenger side of the vehicle, we will go in either a counterclockwise motion or a clockwise motion and then ultimately end where we started. That's what we try to do, at least.  But it doesn't always necessarily go that way, but that's -- we try to do that as much as we can.

Q    What are some of the things you're looking for when you're conducting one of these roadside searches?

A    We are look for any sort of contraband, any sort of drugs, guns, bulk United States currency, illicit currency.  We are looking for any -- any indicia that would essentially tie those items together, any sort of paraphernalia, after-market hidden compartments, things of that nature.

Q    Okay.  Now, on April 4th, 2018, were you working in your

capacity as a SHIELD officer?

A   Can you say the date again?

Q   Sure; April 4th, 2018.

A   Yes.

Q   Were you on patrol that day?

A   Yes.

Q   Do you recall what shift you were working?

A   Yes.  I was working on daylight shift, 8:00 a.m. to 4:00 p.m.

Q   Where specifically were you patrolling that day?

A   The Pennsylvania Turnpike.

Q   And that would be Interstate No. --

A   Seventy-six.

Q   What kind of vehicle were you traveling in?

A   I was driving a marked -- a designated state police patrol SUV.  It was a Ford Explorer.

Q   Did you have a partner with you?

A   I did not.

Q   Did you have a canine with you?

A   No.

Q   Are you a canine officer?

A   I'm not.

Q   Generally, within your marked patrol car, is there any type of recording equipment?

A   There is.

Q   Is there a video recording equipment or audio or both?

A   There's video and audio, the microphone and a dash camera.

Q   Okay.  So from that dash cam, can you explain what the dash cam video recorder would capture in terms of its perspective?

A   Yes.  It captures -- it's forward facing, so it's attached to the windshield and faces forward towards the front end of the vehicle.  You can, however, turn the camera to go to -- to capture, you know, certain things.

And there's also a camera that's up right above the passenger seat during this time, and it faces the rear of the vehicle, specifically like the rear passenger area.  Then there's also a lapel microphone that we attach to a portion of our body or our uniform.

Q   So you mention you wear a body microphone.  Do you also wear a body camera or did you at that time?

A   No.

Q   Do you currently?

A   No.

Q   And you did not on April 4th of 2018.

A   That's correct.

Q   Is that per personal choice or is that the policy of the state police?

A   To my knowledge, we don't have body cameras in our department.

Q   So can you tell the jury where you began your patrol from

on April 4th of 2018.

A    Yes.   It was directly right around the New Stanton area, which would be mile marker 75 on the Pennsylvania Turnpike. And that's in Westmoreland County.

Q    From that starting point, which direction did you head?

A    From that point, I started working my way towards -- per eastbound, in the easterly direction, toward Somerset County.

Q    At some point did you turn around and head back westbound?

A    Yes.

Q    Around 2:30 that afternoon, approximately where were you located?

A    I was on the Pennsylvania Turnpike, traveling westbound.

Q    Do you recall what turnpike exits you would have been near at that time?

A    At that time I was approximately nine miles -- nine to ten miles east of the Somerset Interchange, the Somerset exit along the turnpike.

Q    Do you know what county that particular stretch of highway is located in?

A    Somerset County.

Q    What's the speed limit at that point of the turnpike?

A    70 miles per hour.

Q    Now, on April 4th, 2018, do you recall what the weather conditions were like?

A    Yes.   It was cold, windy, and there were some snow

flurries.

Q   Now, around 2:30 in the afternoon on April 4th, 2018, did you conduct any vehicle stops?

A   Yes.

Q   What kind of vehicle was it that you stopped at that point?

A   It was a 2010 red Ford Taurus.

Q   What lane was that vehicle traveling in?

A   It was traveling in the left lane at one point and then changed from the left lane to the right lane.

Q   What lane were you traveling?

A   Can you -- can you specify -- I was traveling in the left lane at one point and then eventually changed lanes.

Q   Okay.  While you were traveling in the left lane, were there any cars between your vehicle and the red Ford Taurus?

A   No.

Q   Do you recall for approximately how long you followed the red Ford Taurus?

A   I don't -- I don't remember of -- it would be an estimation.  I would say 45 seconds to a minute.

Q   Okay.  Now, at some point while you're behind that red Ford Taurus, did you believe that you observed the driver of that vehicle commit a traffic violation?

A   Yes.

Q   And what were the violations that you observed?

A   It would be an unsafe lane change and following too

closely.

Q    And what observation was that based on?

A    Based on -- the unsafe lane change was based on whenever the vehicle -- the red Ford Taurus maneuvered from the left lane to the right lane.  And at that point they were following another vehicle, I would say approximately one vehicle length away.  So, you know, in the event that there was an obstruction in the roadway or an animal ran across the roadway, the driver of the Ford Taurus wouldn't have -- if the vehicle that they were following too closely applied their brakes, they wouldn't have enough reaction time and would ultimately rear end the vehicle.

Q    While you were behind the Ford Taurus, was your vehicle dash cam recording?

A    Yes.

Q    Was your body microphone recording?

A    It wasn't at the time when the camera comes on, but eventually it came on.

Q    Now, at some point based on your observations of the Ford Taurus, did you conduct a traffic stop of that vehicle?

A    Yes.

Q    Did your dash cam and body microphone capture that traffic stop?

A    Yes.

Q    Following your traffic stop, do you know whether or not the

dash cam video and your body microphone audio were downloaded and transferred to a disk?

A    Yes.

Q    And since that stop, have you had an opportunity to review the audio and video recording of that stop?

A    I have, yes.

Q    All right.  Trooper Marmol, I'm now handing you what's been marked for identification purposes as Government's Exhibit 1. Do you recognize what it is I've just handed you?

A    Yes.  Am I able to open the --

Q    Sure.

A    Yes.  I recognize it.

Q    Can you tell the jury what that is?

A    It appears to be a DVD-R disk that contains some writing on it, and it appears to be the same -- same CD that we utilize to download our dash camera footage.

          MR. BERNARD:  Your Honor, I'd now move for the admission of Government's Exhibit 1 into evidence.

          MS. THOMPSON:  Your Honor, just maintain the objections as stated earlier.

          THE COURT:  All right, so noted.  And I'll admit exhibit.

          Go ahead.

          MR. BERNARD:  Thank you, Your Honor.

BY MR. BERNARD:

Q   Now, Trooper Marmol, we're going to play some clips from the dash cam with you and ask you some questions as we go through them, okay?

A   Okay.

Q   All right.  First we're going to show you what we'll refer to as Video Clip A from Government's Exhibit 1, which starts at 43 seconds into Government's Exhibit 1 and runs until approximately three minutes and four seconds into that clip. If you'll just turn your attention to the monitor, you'll see it there.

     (Video played in open court.)

BY MR. BERNARD:

Q   Now, Trooper Marmol, we saw on that video clip that the red Ford Taurus pulled over, and it appears your car pulled behind it.  What was the first thing that you did once you pulled behind the red Ford Taurus on the side of the road?

A   I entered the traffic stop into our CAD system.  The CAD stands for Computer Automated Dispatch system.

Q   Why do you enter the stop into that system?

A   When we enter the traffic stop into that system, it automatically generates an incident number.  And then that incident number's utilized for traffic citations, traffic warnings or any subsequent investigation that follows that or that rises from the traffic stop.

Q   Now, it appears on the video that you approached the passenger side of that red Ford Taurus.  Why did you go to the passenger side as opposed to the driver's side of that?

A   The passenger side approach is -- it's more -- it's safer. When we're alongside of the road, that's just -- it's better to be on the right-hand side of the vehicle as opposed to being on the driver's side because that's where the traffic is.  So if we're along the passenger side, then we can maintain our contact with the occupants of the vehicle, the motorist, as well as watch traffic, if we can, as it's approaching us.

Q   Now, when we heard you start interacting with the occupants of the vehicle, with whom were you talking during that interaction?  Was it primarily the driver or the passenger?

A   Primarily the driver.

Q   Okay.  Did you obtain a driver's license from that driver?

A   Yes.

Q   And who was that driver identified as by their license?

A   Gerald Terry.

Q   How you would describe Gerald Terry's demeanor during your interactions with him?

A   Nervous, but cooperative.  He was -- whenever he handed me his driver's license, his hand was visibly shaking.

Q   And during your interaction with him -- it was hard to hear due to the wind noise -- did Gerald Terry tell you where he was headed?

A    Yes.

Q    Did he say how long he would be there for?

A    He said he'd be there for approximately three to four hours.

Q    And then would return from where he came from?

A    Yes.

Q    Did he say who that vehicle belonged to or who it was registered to?

A    He said it belonged to his friend's wife.

Q    Did he provide you with a vehicle registration for that car?

A    Yes.

Q    Was that what you looked at when -- I believe you asked: Is this a girl or -- you said: Is this a guy? Is that the document you were referring to?

A    I'm not sure.

Q    Now, how would you describe the demeanor of the passenger in that vehicle during your interaction?

A    The passenger had a -- he was staring straight ahead. We did converse at some point during the conversation because he didn't have any socks on. And it just -- just brought it up in general conversation. Also, I noted that his carotid artery on the right side of his neck was pulsating; so nervous behavior, but cooperative as well.

Q    Okay. Did you ask for identification from the passenger?

A    I did.

Q    Did he provide that to you?

A    He did.

Q    And who did that ID identify the passenger as?

A    John Terry.

Q    Do you see Mr. Terry in the courtroom here today?

A    Yes.

Q    Can you please describe where he's seated and what he is wearing.

A    He's seated over here to my right-hand side, gray jacket on.

          MR. BERNARD:  Your Honor, I ask that the record reflect the identification of the Defendant by the witness.

          THE COURT:  The record will so reflect.

          MR. BERNARD:  Thank you, Your Honor.

BY MR. BERNARD:

Q    Now, after your initial interaction with Gerald and John Terry, you returned to your patrol car; is that right?

A    That is correct.

Q    Okay.  What did you do while you were in the car?

A    I conducted a query initially upon returning to the vehicle, and then I subsequently contacted Troop T, which is the Pennsylvania Turnpike dispatch center, and I requested a -- another vehicle for a vehicle search.

Q    Did a backup officer eventually arrive at your location?

A    Yes.

Q    Do you recall who that officer was?

A    Trooper Petrosky.

Q    Once Trooper Petrosky arrived on the scene, did you re-approach Gerald Terry?

A    At some point, yes.

Q    Okay.  I'm now going to show you Video Clip B from Government's Exhibit 1.  Video Clip B runs from approximately 2101 to 2146 on Government's Exhibits 1.

Go ahead.

(Video clip played in open court.)

BY MR. BERNARD:

Q    Now, Trooper Marmol, at the very beginning of that video you asked Gerald Terry if you could search the car, right?

A    Yes.

Q    And what was his response?  It was hard to hear.

A    Yeah, yeah.

Q    Did he appear to nod towards the car?

A    I'm not sure.

Q    We can --

A    Can we play that back?

        MR. BERNARD:  Play the beginning of that again, please.

(Beginning of video clip re-played.)

        MR. BERNARD:  Okay.

BY MR. BERNARD:

Q   Now, having seen that, did he appear to nod towards the car?

A   Yes.

Q   All right.  And having watched that again, was "Can I search the car" the first thing you asked or did you ask him something prior to that?

A   I believe that I asked him something before that.

Q   Do you recall what that was?

A   I asked him if there was anything illegal in the car.

Q   And what was his response?

A   No.

Q   Now, after Gerald Terry indicated his consent to search the car, did he say anything additional to limit the scope of your search in any way?

A   No.

Q   It appeared from the video that John Terry stepped out of the car at that time, too; right?

A   Whenever -- I asked Gerald Terry to exit the vehicle, and John Terry then subsequently exited as well, without instruction.  But then I told him that -- that he was good and that he could come back as well.

Q   That part wasn't depicted on that video clip, correct, John Terry exiting the car?

A   I don't recall seeing it.

Q   Did you say anything to John Terry that may not have been picked up by your body microphone during that interaction?

A   No.

Q   I presume that upon receiving consent to search the car that you went about searching it, is that right?

A   Yes.

Q   Can you tell us what your process was for searching that particular Ford Taurus.

A   I just -- I started on the passenger side of the vehicle. Eventually I worked my -- went over to the passenger side and then started working counterclockwise, so coming back from the driver's side, ultimately to the trunk, and then back in the passenger side area of the vehicle.

Q   And what, if anything, did you find during that initial search?

A   During my search of the vehicle, I located an after-market hidden compartment that was in the passenger side dash area of the vehicle.

Q   Can you describe what particular area you were looking at when you discovered that vehicle trap and what you saw that indicated that traps existed in this vehicle?

A   Yes.  So if you're seated in the passenger seat and you're looking directly in front of you, there's the -- where the glove compartment is.  Just above the glove compartment, where the air bag is, the compartment was fabricated in there.

So whenever I had dropped the glove compartment completely, I inspected or visually inspected the undercarriage of the dash area, and I observed a piece of sheet metal with spot welds securing that and holding that together.

Q   Now, upon -- excuse me, strike that.

Now, we're going to look at Video Clip C from Government's Exhibit 1.  Video Clip C runs from approximately 34 minutes and 38 seconds to 36 minutes and 55 seconds.

(Video clip played in open court.)

BY MR. BERNARD:

Q   Now, Trooper Marmol, as we saw in that video clip, at this point in the traffic stop it appeared you had just discovered what you believe to be the hidden compartment of the vehicle. At that time when you were looking at that compartment, were you able to tell what, if anything, was contained inside it?

A   No.

Q   Okay.  Did you try to open the trap?

A   At that specific point in time?

Q   Yes.

A   Not at that specific point in time.

Q   Okay.  Eventually did you attempt to open it?

A   Yes.

Q   Were you able to access it?

A   Yes.

Q   And what process did you use to access the vehicle trap?

A    Well, initially, I believe I was trying to find the source of power that -- that supplies power to the compartment.  So oftentimes these compartments are operated off of linear actuators or pistons or a snake wire or cable.  And also like trunk latches or things of that nature.  And basically what that does is it assists with the access points for the doors to open and close.

So I was trying to determine where the power was possibly going to at that point.  And then eventually I was not able to find that -- those things, so I -- I had to pry it open.

Q    Okay.  Initially, though, you were trying to access it without damaging the trap, is that correct?

A    Yes.

Q    Now, at some point were you able to open it enough so you were able to see the contents inside?

A    Yes.

Q    Okay.  I'm now going to play Video Clip D from Government's Exhibit 1.  This clip runs from approximately 45 minutes and 20 seconds to 47 minutes and 15 seconds.

(Video clip played in open court.)

BY MR. BERNARD:

Q    Now, Trooper Marmol, it appeared from that video that at that point in the traffic stop you had identified that there was something contained within the trap, but you weren't sure what it is.  Is that fair to say?

A    That's correct.

Q    At that point did you determine how the trap was operated?

A    I'm not sure.

Q    Okay.  But ultimately were you able to get that trap open?

A    Yes.

Q    All right.  Approximately how long did it take from the time when Gerald Terry granted consent to search to when you were able to open that vehicle trap?

A    It was approximately -- I'm sorry, 'til the time --

Q    Until when you were able to access the trap and remove what items you found inside.

A    It was approximately an hour and ten minutes.

Q    How were you able to open it?

A    So I was able to pry open the access point and retrieve the items that were inside of the compartment.

Q    What did you use to pry that open?

A    Some sort of pry tool.

Q    Okay.  You indicated that you did find some items inside there?

A    Yes.

Q    Okay.

        MR. BERNARD:  We're now going to play the video clip that's marked Government's Exhibit 1, Clip E.  This clip starts at approximately one hour and 29 minutes and 56 seconds and runs through the end of the video, which is one hour and

31 minutes and eight seconds.

(Video played in open court.)

BY MR. BERNARD:

Q   Now, Trooper Marmol, it appears in this video clip there is now a tow truck in front of the Taurus.  Did you request that tow there?

A   I'm not sure if I requested the tow truck or Trooper Petrosky did, I'm not sure.

Q   Would that have been to tow the Taurus?

A   Yes.

Q   Where would it take the Taurus at that point?

A   From this point back to the Somerset -- Pennsylvania State Police Somerset Barracks.

Q   Now, at the beginning of the video we saw what appeared to be a man in a green/white jacket.  Do you know who that man was?

A   Yes, that was the tow truck driver.

Q   At the end of the last video clip we saw you place several items on the hood of your car.  Can you please describe what those items were.

A   Yes.  They are three kilogram-sized packages that were wrapped in black duct tape and clear cellophane wrapping.  Also a Smith & Wesson 40-caliber pistol that was loaded, and there was one round in the chamber and six rounds in the magazine, for a total of seven rounds.

Q   Now, you removed the magazine from that firearm.  Why did you do that?

A   To render it safe.

Q   We heard in the video clip -- I believe you stated you had found three kilos of an unknown substance but you would test it shortly.  How would you go about testing an unknown substance?

A   Via a field test, and it basically gives a positive presumptive case for, you know, whatever substance it may be or it may not be.

Q   Did you eventually conduct a field test on that substance?

A   Yes.

Q   What was the result?

A   It was the result of a positive test for suspected cocaine.

Q   Now, that field test, does that rule out the presence of any other controlled substances from within a particular sample?

A   I'm not sure.

Q   Were the suspected drugs logged into the PSP evidence property record system?

A   Yes.

Q   Trooper Marmol, I've placed in front of you a black binder marked Government Exhibits.  Can you please open that and turn to the page marked Government's Exhibit 12.

A   (Witness complies.)

Q   I'll also display that on the screen.  Do you recognize the

Q    document that's been marked Government's Exhibit 12?

A    Yes.

Q    And what is that?

A    It is the Pennsylvania State Police property record.

Q    Okay.  Does that record include the items that were seized from the Ford Taurus?

A    Yes, with -- it appears to be two items possibly removed.

Q    Okay.  Now, that's a two-page document that you're looking at, right?

A    Yes.

Q    Okay.  Does that property record include the incident number and property number for those items?

A    Yes.

Q    Can you tell us what those numbers are?

A    Yes.  It is the -- the case number is PA 2018-358259.

Q    The property number?  What's the property number?

A    It is A061-1175.

Q    Now, does Government's Exhibit 12 to be a true and accurate copy of the property record that you created regarding the items sized from the Ford Taurus of John Terry with those noted redactions?

A    Yes, it -- this is a true and accurate depiction of the items that I had entered into evidence.

        MR. BERNARD:  I'd now move for the admission of Government's Exhibit 12 into evidence.

MS. THOMPSON: No objection.

THE COURT: Twelve is admitted without objection.

MR. BERNARD: Thank you, Your Honor.

BY MR. BERNARD:

Q    Now, Trooper Marmol, regarding the kilos of suspected cocaine that you seized, did you submit those kilos for any further chemical testing?

A    I did.

Q    Can you tell us the process for submitting drugs to be tested?

A    Yes.  So we have a system that we log onto, and at that point we create a -- a lab request or a submission for whatever items that we would like to be tested, whether that be the drugs or -- whatever was seized and going to the lab.

At that point a request is created, and we are able to print it, at which point whenever the -- like the item is transported from the state police barracks to the lab, that request follows whatever item is to be tested.

Once those items get to the lab, at that point there is a lab submission number that is generated, and that -- that number follows the -- follows that item throughout the testing process.  And then once there is a report generated with the findings, that lab number is on the -- on the lab report, and also there's an invoice that's attached to it as well, that lab number is attached to it.

Q   Okay.  Would you please now turn to the page in the binder marked Government Exhibit 13, and we'll also publish that on the screen.

A   Yes.

Q   Do you recognize that document?

A   Yes, that is the -- a lab request that I created.

Q   Does that document include your incident number from the John Terry traffic stop?

A   Yes.

Q   Okay.  Does it include the property numbers that were assigned to the property that was seized from that traffic stop?

A   Yes.  It is on the left-hand side, below where it says analysis to request information.

Q   Trooper Marmol, does Government's Exhibit 13 appear to be a fair and accurate copy of the lab submission request you generated in the John Terry case?

A   Yes.

        MR. BERNARD:  Your Honor, I move for admission of Government's Exhibit 13 into evidence.

        MS. THOMPSON:  No objection.

        THE COURT:  Thirteen is admitted without objection.

BY MR. BERNARD:

Q   Trooper Marmol, can you now please turn to what's been marked as Government's Exhibit 14.

Can you tell us, do you recognize that document, sir?

A   Yes.

Q   Can you tell us what that document is?

A   This is the lab report invoice that I was speaking of earlier.  It is -- was completed by the Pennsylvania State Police Bureau of Forensics Services Laboratory, and it is signed at the bottom by the crime laboratory manager.  And basically it just has the cost of the drug analysis on it -- on this piece of paper.

Q   Is that a fair and accurate copy of the lab user fee statement that you received with respect to the submission of the drug evidence from the John Terry case?

A   Yes.

MR. BERNARD:  Your Honor, I would now move for the admission of Government's Exhibit 14 into evidence.

MS. THOMPSON:  No objection.

THE COURT:  Fourteen is admitted without objection.

MR. BERNARD:  Thank you, Your Honor.

BY MR. BERNARD:

Q   Does that document include your traffic stop incident number?

A   Yes.

Q   Okay.  Does it also include a lab report number that was assigned to that particular request?

A   Yes, it does.

Q    Trooper Marmol, I've now handed you what's been marked for identification purposes as Government's Exhibit 2.  Can you please describe what it is I've just handed you.

A    Am I able to handle it?

Q    Yes, sir.

A    What you handed me was a clear plastic bag, and it appears to be -- it is marked Government Exhibit 2.  There's also a tag on here of FBI drug evidence.  Inside of that plastic bag it appears to be another clear plastic bag.  And there is a rectangular white brick inside of that bag.  It appears some other things may be on the bottom.

Q    Other than that white brick, if you turn that over, are there any other contents in that large plastic bag?

A    Yes, there appears to be -- appears to be some clear wrapping as well as -- as well as some black duct tape.

Q    Do you recognize the clear wrapping and black duct tape that you see inside that exhibit?

A    Yes.

Q    What does that appear to be?

A    It appears to be the same packaging that was -- that was on the packages that I had seized from the Ford Taurus.

Q    Okay.  Now turning that item back over, when you look at that rectangular substance, do you see any markings on the bag that that is contained in?

A    Yes.  I see the number or letter G18-02212, Item 1.1A, and

then the letters MIW.

Q    Now, that first number that you read that began with the letter G, do you recognize that number?

A    Yes.

Q    What is that number?

A    That is the lab submission number.

Q    Okay.  Does that number match the lab report number that appears on the lab user fee statement which was Government Exhibit 14?

A    Yes.

Q    Now, at the time you submitted the drug evidence to the lab, had you removed the white brick of suspected cocaine from the black duct tape and clear plastic wrap?

A    No.

Q    How were you able to test one of the kilos?

A    Just a very small incision, just enough to get a little bit of the substance from the package, and then that was placed into the NIK test, the field kit.

Q    So when you sent those items to the lab, were they sent in the black duct tape packaging?

A    The clear Saran Wrap packaging and the black duct tape-like packaging, yes.

        MR. BERNARD:  Your Honor, at this point I'd ask to read into the record a stipulation of fact to the jury.

        THE COURT:  You may do so.

MR. BERNARD:  The stipulation reads as follows:  The chain of custody of all seized evidence was unbroken, proper, and in accord with the procedures of the Pennsylvania State Police and Federal Bureau of Investigation.  The evidence seized was maintained in constant law enforcement custody.  It was logged into and secured in evidence at all times.  It has been securely transported by law enforcement members to the federal courthouse in Johnstown for trial.  Proper documentation reflects any movement of the items.

THE COURT:  And do you have a written document to offer or do you just want the oral presentation to be --

MR. BERNARD:  Just the oral presentation at this time, Your Honor.

THE COURT:  It's in evidence at this point.

MR. BERNARD:  Does the Court wish to give an instruction as to stipulations at this time?

THE COURT:  Yes, I will; thank you.

MR. BERNARD:  Thank you, Your Honor.

THE COURT:  All right.  The instruction with regard to stipulation is as follows:  The parties have agreed that certain facts are true.  You must therefore treat these facts as having been proved for the purposes of this case.

Counsel has read into the record the stipulated facts. There is no written stipulation admitted into evidence. However, the oral stipulation is part of the record.

All right, go ahead.

MR. BERNARD:  Thank you, Your Honor.

BY MR. BERNARD:

Q   Trooper Marmol, based on the black duct tape and the clear shrink-wrap wrappings that you observed, and based on the lab submission number on the clear plastic bag, is Government Exhibit No. 2 one of the three kilos that you seized from the hidden compartment in the Ford Taurus on April 4th, 2018?

A   Yes.

MR. BERNARD:  Your Honor, I would now move for the admission of Government's Exhibit 2 into evidence.

MS. THOMPSON:  Your Honor, no objection except to the extent if there is any testimonial markings they're trying to attribute that to John Terry.  I have not seen any other markings on there, but otherwise I have no objection.

MR. BERNARD:  Would you like to take a look at it?

MS. THOMPSON:  Sure.  May I approach, Your Honor?

THE COURT:  Yes, you may.

(Counsel examine the exhibit.)

MS. THOMPSON:  No objection, Your Honor.

THE COURT:  Two is admitted without objection.

BY MR. BERNARD:

Q   Trooper Marmol, I now ask you to open the binder on front of you.  And we're going to put up on screen what has been marked as Government's Exhibit 2A.  Did you find that, sir?

A    Yes.

Q    Can you describe what we're looking at in that picture?

A    Yes.  I'm looking at a kilogram-sized package which has -- looks like a dark colored duct tape with -- with shrink-wrap on it inside of another plastic bag and a ruler at the bottom.

Q    Does that duct tape appear to be the black duct tape and shrink-wrap wrappings that was contained around one of the kilos that you seized from the Ford Taurus?

A    Yes.

Q    Does that picture fairly and accurately depict that wrapping?

A    Yes.

        MR. BERNARD:  Your Honor, I'd now move for the admission of Government's Exhibit 2A into evidence.

        MS. THOMPSON:  No objection.

        THE COURT:  2A is admitted without objection.

        MR. BERNARD:  Thank you, Your Honor.

BY MR. BERNARD:

Q    Next, Trooper Marmol, can you please turn the page in the binder and find Government's Exhibit 2B.  We're going to show that on the screen as well.

    Can you please tell the jury what we're looking at in this picture.

A    Yes, we are looking at a white -- a white brick that contains the numbers Golf 18-02212, Item 1.1A, and then the

letters MIW. It's a white brick that -- it appears to be broken into several pieces. And it also appears to have a stamp on it that looks like the backward two inside of a clear plastic bag. And it appears that there's some packaging below the bottom half of that white brick.

Q    Does the writing that appears on the photo in Government's Exhibit 2B match the writing that is contained on the packaging of the kilogram of cocaine -- suspected cocaine as contained in Government's Exhibit 2?

A    Yes.

Q    So does that appear to be a fair and accurate picture of Government's Exhibit 2?

A    Yes.

        MR. BERNARD:  Your Honor, I now move for the admission of Government's Exhibit 2B into evidence.

        MS. THOMPSON:  No objection.

        THE COURT:  2B is admitted without objection.

        MR. BERNARD:  Thank you, Your Honor.

BY MR. BERNARD:

Q    Next, Trooper Marmol, please turn the page of the binder and find Government's Exhibit 2C and I'll put that up on the screen. Can you please tell the jury what we're looking at in this photo.

A    Yes. We are looking at another clear plastic bag with a white -- white brick that is broken into several pieces. And

there's even some loose parts under the left hand side. It appears that it is -- there's a stamp with a backwards two, has the markings G18-02212, Item 1.1A, and the initials MTW. And then there's a ruler at the bottom of the screen.

It also appears that there is black duct tape or black packaging on the bottom half.

Q   So, Trooper Marmol, does the white brick in that photograph contain the same lab number and writing as the brick contained in Government's Exhibit 2?

A   Yes.

Q   Does that appear -- does Government's Exhibit 2C appear to be a fair and accurate depiction of Government's Exhibit 2?

A   Yes.

MR. BERNARD:  Your Honor, I'd now move for the admission of Government's Exhibit 2C into evidence.

MS. THOMPSON:  No objection.

THE COURT:  2C is admitted without objection.

BY MR. BERNARD:

Q   Trooper Marmol, I've now handed you what has been marked for identification purposes as Government's Exhibit 3. Can you please describe what it is that I've handed you?

A   Am I able to handle it?

Q   Yes, sir.

A   Okay.  It's a clear plastic bag, looks like there's another clear plastic bag inside of that which contains a white brick

with the -- there's a stamp on there, looks like a backward letter two and four.

There is writing on that package that says Golf 18-02212. There's an Item Number 1.1B, and MTW is written below that. And there's -- looks like there's also some black duct tape packaging behind that.

Q   Do you recognize that black duct tape packaging?

A   Yes.

Q   Does that appear to be the same black duct tape packaging that was wrapped around one of the kilos that was recovered from the Ford Taurus?

A   Yes.

Q   You mentioned that number that was written on the inner clear packaging.  Does that number match the lab report number that was assigned to the kilos of cocaine that were seized from the Ford Taurus?

A   Yes.

Q   Based on the presence of the black duct tape as well as the lab report number, does Government's Exhibit 3 -- is Government's Exhibit 31 of the three kilos that you seized from the Ford Taurus?

A   Yes.

MR. BERNARD:  Your Honor, I'd now move for admission of Government's Exhibit 3 into evidence.

MS. THOMPSON:  No objection.

THE COURT: Three is admitted without objection.

MR. BERNARD: Thank you, Your Honor.

BY MR. BERNARD:

Q   Trooper Marmol, now I would ask you to open the binder once again and turn to what's been marked as Government's Exhibit 3A. Can you tell the jury what's depicted in that exhibit?

A   Yes. There is a -- like a clear plastic envelope with a white brick inside of it. The white brick has a stamp, looks like a backwards two and a four.

It looks like there is something that is dark below that. And then there -- this brick is also -- it looks like -- appears to be broken in half, and then there's some crumbles in the left-hand side with a ruler on the bottom.

It is marked -- looks -- black writing G as in Golf, 18-02212, Item 1.1B, and the letters MIW.

Q   So, Trooper Marmol, does that picture appear to be a true and accurate photograph of what's contained in Government's Exhibit 3?

A   Yes.

MR. BERNARD: Your Honor, I'd now move for the admission of Government's Exhibit 3B into evidence.

MS. THOMPSON: No objection.

THE COURT: 3B is admitted without objection.

MR. BERNARD: I'm sorry, Your Honor, I misspoke. I move for the admission of Government Exhibit 3A.

MS. THOMPSON:  No objection.

THE COURT:  Correction, 3A is admitted without objection.

MR. BERNARD:  Thank you.

BY MR. BERNARD:

Q   Now, Trooper Marmol, please turn the pages of the binder to what have been marked as Government's Exhibit 3B and 3C.  Can you please tell us what's depicted in those photographs.

A   Yes.  There is a -- a white -- there is a clear plastic envelope or bag that is -- that contains a white brick.  That is stamped with a -- looks like a backwards two and four.

There is a -- there's black writing G18-02212, Item 1.1B, and the letters MTW above that.

It looks like self -- it looks like cellophane and black -- appears to be duct tape.

Q   And that's true of both Government's Exhibits 3B and 3C?

A   Yes.

Q   Okay.  Based on the presence of the lab number on that item, does Government's Exhibit 3B and Government's Exhibit 3C appear to be true and accurate depictions of Government's Exhibit 3?

A   Yes.

MR. BERNARD:  Your Honor, I'd now move for the admission of Government's Exhibits 3B and 3C into evidence.

MS. THOMPSON:  No objection.

THE COURT: 3B and 3C are admitted without objection.

BY MR. BERNARD:

Q   Trooper Marmol, I've now placed in front of you what's been marked for identification purposes as Government's Exhibit 4. Can you please describe what that items is?

A   Yes -- am I allowed to handle it?

Q   Yes, sir.

A   Yes.  It's a clear plastic bag that has an FBI drug evidence tag attached to it.  There is a case ID, there's a date, there's a bunch of information on the FBI drug evidence tag.

Inside of that clear plastic bag there appears to be another clear plastic bag with a -- a white -- a white brick that is broken into several pieces, and there's crumbles.  And on the back side of it it appears that there's a dark packaging material and as well as a clear cellophane wrapping.

Q   Does that dark packaging material and cellophane wrapper appear to be the same wrappings that was wrapped around the three kilos of cocaine that were seized from the Ford Taurus?

A   Yes.

Q   Does that white brick contained within that bag include the same lab report number that was assigned to the three kilos?

A   Yes.

Q   Based on the presence of those two items, do you believe Government's Exhibit 4 to be one of the kilos that was seized

from the red Ford Taurus?

A    Yes.

MR. BERNARD:  Your Honor, I'd now move for the admission of Government's Exhibit 4 into evidence.

MS. THOMPSON:  No objection.

THE COURT:  Any objection, counsel?

MS. THOMPSON:  No objection.

THE COURT:  Okay, 4 is admitted without objection.

MR. BERNARD:  Thank you.

BY MR. BERNARD:

Q    Trooper Marmol, now if you would please look in the binder again in front of you and turn to the items marked Government's Exhibit 4A and 4B.  Starting with 4A, can you please briefly describe what's depicted in that image?

A    Yes.  It appears to be a clear -- clear plastic bag with what appears to be packaging material.  This is on the -- this is 4A that I'm talking about, with -- it appears to be cellophane, a dark -- dark tape, duct tape; and there appears to be some white powder on the bottom side of that.

Then 4B appears to be a white brick that is broken into several pieces.  And it is marked Golf 18-02212, Item 1.1C, and the letters MIW.

And also, below that, the white brick appeared to be -- have some sort of dark packaging and clear packaging as well.

Q    Does the dark packaging contained in Government's --

depicted in Government's Exhibits 4A and 4B appear to be the same dark packaging contained in Government's Exhibit 4?

A   Yes.

Q   And is the white brick contained within Government's Exhibit 4 marked with the same markings as depicted in Government's Exhibit 4B?

A   It appears so, yes.

Q   So, based on that, does Government's Exhibit 4A and 4B appear to be fair and accurate depictions of Government's Exhibit 4?

A   Yes.

MR. BERNARD:  Your Honor, I'd now move for the admission of Government Exhibit 4A and 4B into evidence.

MS. THOMPSON:  No objection.

THE COURT:  4A and 4B are admitted without objection.

At this time, counsel, I'd like to take a fifteen minute recess, give everyone a chance to get up and move around, use the restroom.

Ladies and gentlemen of the jury, we're going to take our first recess of the day.  I remind you of the instructions I have given you earlier.

During this recess and any other recess, you must not discuss this case with anyone including your fellow jurors, members of your family, people involved in the trial, or anyone else.  If anyone does try to talk to you about the case, do not

tell your fellow jurors but report that to me immediately through court staff.

Do not read, watch, or listen to any news reports of the trial, if any, or conduct any research or investigation including on the Internet.

Do not use any electronic tools to communicate with anyone about the case or to do research related to the case.

Remember to keep an open mind until all the evidence has been received and you have heard the views of your fellow jurors, which will be at the end of the trial.

I have about 11:27, and I'd like to resume at a quarter to 12. Thank you.

We'll be in recess.

(Jurors exit courtroom.)

THE COURT: Please be seated. The jury has left the courtroom, so these remarks are outside the hearing of the jury.

Anything from either of the parties before you take your recess?

MR. BERNARD: No, Your Honor.

MS. THOMPSON: No.

THE COURT: Okay. Let's try to be back in our seats at approximately a quarter to twelve, and we'll resume with this witness.

You'll still be on the stand. During the recess, sir,

do not speak with anyone about the testimony including your own counsel --

THE WITNESS:  Yes, sir.

THE COURT:  -- counsel for the Government.

THE WITNESS:  Yes, sir.

THE COURT:  Okay?  Thank you.

(Morning recess taken at 11:30 a.m.)

(Jury seated.)

THE COURT:  Please be seated.

All right, counsel, you may continue with your direct examination.

MR. BERNARD:  Thank you, Your Honor.

BY MR. BERNARD:

Q   Trooper Marmol, before we took the break, we were going through the evidence that you had recovered in this case. Before we get back to that, I want to redirect your attention now to what's up on the screen.

This is a still frame from Government's Exhibit 1, Video Clip A.  Looking at that still frame, is that you who appears to be leaning outside of the car?

A   Yes.

Q   Okay.  And can you tell the jury who is seated in the passenger seat nearest to you in that picture.

A   This is right at the beginning of the traffic stop?

Q   Yes, sir.

A    The passenger was John Terry -- was identified as John Terry via Pennsylvania driver's license.

Q    And who was the driver?

A    The driver was Gerald Terry.

Q    Okay.  Trooper Marmol, I'm showing you a still frame of the first few seconds of Video Clip B to Government's Exhibit 1. Is that you right in the middle of the frame there?

A    Yes.

Q    Okay.  Who are you talking to at that time?

A    I'm speaking to Gerald Terry.

Q    And if you look at the bottom or in the right-hand side of the screen there, you see it looks like the back of somebody, a grayish green coat?

A    Yes.

Q    Who is that individual?

A    That is John Terry.

Q    All right.  Thank you.

    All right, Trooper Marmol, turning back to the evidence that you recovered, we saw in the video clips that were played earlier that you recovered a firearm from within the vehicle trap, is that correct?

A    Yes.

Q    Do you recall what the make and model of that firearm was?

A    Yes, Smith & Wesson, a 40 caliber pistol.

Q    And that firearm -- was that firearm loaded when you pulled

it out of the Taurus?

A    I found that it was loaded when I brought the kilogram packages and the firearm back to my vehicle.

Q    And we watched you remove the magazine and the round from the chamber, is that correct?

A    I removed a magazine and a round from the chamber, correct.

Q    All right.  Do you recall how many total rounds of ammunition were in the magazine and the chamber combined?

A    There was one in the chamber and there was six in the magazine, for a total of seven.

Q    Okay.  Were seven rounds of ammunition logged into your property record?

A    Yes.

Q    If you can turn to Government's Exhibit 12 to confirm that.

A    Yes.

Q    Okay.  I'm now handing you what's been marked for identification purposes as Government's Exhibit No. 5 and Government's Exhibit No. 6.

Sir, could you please take a look at what's been marked as Government's Exhibit 5 and tell us what is contained within that item?

A    Yes, it's a clear plastic bag that contains -- that contains seven rounds of ammunition.

Q    Are you able to see the head stamp on those rounds?

A    Yes.  The one I'm looking at currently has W-I-N written on

one part of it, and then the number 40 S&W on the bottom part.

Q   Okay.  Are those rounds consistent with the round that you removed from the firearm that you recovered from the Ford Taurus?

A   Yes.

Q   Okay.  So those appear to be the rounds that you removed from the firearm recovered from the Ford Taurus?

A   Appear to be, yes.

MR. BERNARD:  Your Honor, I'd now move for the admission of Government's Exhibit 5 into evidence.

MS. THOMPSON:  No objection.

THE COURT:  Five is admitted without objection.

MR. BERNARD:  Thank you.

BY MR. BERNARD:

Q   Turning to Government's Exhibit 6, can you please identify what that item is.

A   Yes.  It appears to be a firearms evidence box.

Q   Would you open it up and tell us what, if anything, is inside.

A   Yes.  Inside is a Smith & Wesson handgun.  There is a serial number on it reading HSU6371.  And there appears to be a silver magazine.  The firearm is -- the firearm appears to be clear and is zip-tied to the box.  It also has a yellow tag attached to it -- or a yellow or manila tag attached to it.

Q   Does the serial number on that firearm match the serial

number of the firearm that you seized from within the hidden compartment in the Ford Taurus?

A   I believe it is.  Yes.

Q   Based on your examination, then, does Government Exhibit 6 appear to be the same firearm that you seized from the Ford Taurus on April 4th, 2018?

A   Yes.

MR. BERNARD:  Your Honor, I would now move for the admission of Government's Exhibit 6 into evidence.

MS. THOMPSON:  No objection.

THE COURT:  Six is admitted without objection.

MR. BERNARD:  Thank you, Your Honor.

BY MR. BERNARD:

Q   Now, Trooper Marmol, I'd ask you to please take the binder and open to Government's 6A and 6B.  Beginning with 6A, can you tell us what's depicted in that photograph?

A   6A, yes, there is a -- what appears to be a Smith & Wesson -- the same Smith & Wesson handgun on the right-hand side of the picture with a manila tag zip-tied to it.

Next to it is a silver magazine that has -- it appears to be room for seven rounds of ammunition.  And the number 40 S&W written on the bottom.  There also appears that there is -- appears to be seven rounds below the magazine.

Q   So based on your review of Government's Exhibit 6A, does Government's Exhibit 6A appear to fairly and accurately depict

the items that were admitted into evidence as Government's Exhibit 5 --

A    Yes.

Q    -- and Government's Exhibit 6?

A    Yes.

Q    Okay.

MR. BERNARD:  Your Honor, I'd now move for the admission of Government's Exhibit 6A into evidence.

MS. THOMPSON:  No objection.

THE COURT:  6A is admitted without objection.

MR. BERNARD:  Thank you, Your Honor.

BY MR. BERNARD:

Q    And now, Trooper Marmol, turning to Government's Exhibit 6B, can you describe what's depicted in that photograph, please?

MS. THOMPSON:  I'm sorry, can I stop for a minute -- can I amend my response?  That I'm actually going to object as previously argued to Government's 6A.

THE COURT:  The record will so note that subject to previous comments and objections.

Go ahead.

BY MR. BERNARD:

Q    Trooper Marmol, can you please describe what's depicted in Government's Exhibit 6B.

A    Yes.  It appears to be a closeup picture of a firearm,

Smith & Wesson, out of Springfield, Massachusetts, USA.  The slide appears to be open, and there is a serial number written -- or engraved on the -- on the firearm.

Q   Does that appear to be the same serial number that is engraved on the firearm that was Government's Exhibit 6?

A   Yes.

Q   So does Government's Exhibit 6B appear to fairly and accurately depict the firearm that is Government's Exhibit 6?

A   Yes.

MR. BERNARD:  Your Honor, I'd now move for the admission of Government's Exhibit 6B into evidence.

MS. THOMPSON:  Your Honor, I maintain the same objection for Government's Exhibit 6, 6A and 6B as previously stated.

THE COURT:  6B is admitted subject to the prior objections of counsel.

Go ahead.

BY MR. BERNARD:

Q   Now, Trooper Marmol, going back to your actions during the traffic stop, once you discovered those three kilos of suspected cocaine and the firearm in the Ford Taurus, did you place John and Gerald Terry under arrest?

A   At one point I did, yes.

Q   Did you advise them of their Miranda warnings?

A   Yes.

Q   Did you give them -- did you issue the Miranda warnings to them individually?

A   I issued the Miranda warnings together, while they were seated in the back of Trooper Petrosky's patrol car.

Q   And is that where they were seated during your search of the Ford Taurus?

A   Yes.

Q   Okay.  So they were permitted to sit there rather than stand out in the cold.

A   Yeah, we put them in the back of Trooper Petrosky's patrol vehicle.

Q   Okay.  Where were they taken after that?

A   To the Somerset State Police Barracks, Somerset County barracks.

Q   Who transported them there?

A   Trooper Petrosky and I.

Q   And what happened to the Ford Taurus?

A   The Ford Taurus was -- it was eventually entered into evidence.  It was -- and secured in the impound lot at the State Police Barracks in Somerset.

Q   Was it provided to any other agency for inspection or proceedings?

A   Yes.  There was asset forfeiture paperwork completed on the vehicle, and then that paperwork was sent to the Attorney General's office.

Q   At some point did the Attorney General's office get custody of that car?

A   Yes.

Q   Now, other than the items that we saw you place on the hood of your car, did you seize any other items as evidence?

A   That evening I seized --

MS. THOMPSON:  I'm going to object --

THE COURT:  Do you want to approach counsel.

(At side bar.)

MS. THOMPSON:  I'm going to object because it seems like it's going to open the door for the pills or codeine or something else that was found that was already excluded.

MR. BERNARD:  I apologize, that's not the intent of my question.  I meant the cellphones that were seized.  I can ask that question.

THE COURT:  Not to mention cocaine bottles.

MR. BERNARD:  I can ask that question more pointedly if you prefer.

MS. THOMPSON:  Sure.

THE COURT:  You'll be permitted to ask him a leading question to make sure he doesn't get into other areas.

MS. THOMPSON:  Yes.

MR. BERNARD:  Sorry about that.

THE COURT:  Thank you.

(In open court.)

THE COURT: Go ahead, counsel.

BY MR. BERNARD:

Q   Trooper Marmol, allow me to rephrase my question.  Did you seize any electronic devices as evidence during the traffic stop or as a result of the traffic stop of the Ford Taurus?

A   Yes.

Q   What kind of electronic devices did you seize?

A   I seized an iPhone, and I also seized a Samsung Galaxy cellular device.

Q   Are those items listed on your property record which is Government's Exhibit 12?

A   Yes, they are listed as Item 6 and Item 7.

Q   Okay.  Trooper Marmol, I'm going to hand you what's been marked for identification purposes of as Government's Exhibit 6 and Government's Exhibit 7.  Can you please describe what it is I've handed you.  Take them one at a time, please.

A   Yes.  Yes, it's a clear evidence envelope from the Federal Bureau of Investigation.  It appears that there is an iPhone -- iPhone inside of it that has a -- has some sort of a case on it -- a white iPhone with some sort of case on it.  There's also, it appears, to be some information written on the envelope.

Q   Okay.  And for clarification purposes, that's Government's Exhibit 7 or 8?

A   That is Government Exhibit 7.

Q    Okay.  Does that appear to be the iPhone that you recovered from the Ford Taurus during the traffic stop?

A    It appears to be, yes.

MR. BERNARD:  Your Honor,  I'd move for the admission of Government Exhibit 7 into evidence.

MS. THOMPSON:  Your Honor, we object for reasons previously stated.

THE COURT:  All right, 7 is admitted subject to prior objections by counsel.

MR. BERNARD:  Thank you, Your Honor.

BY MR. BERNARD:

Q    Now, looking at Government's Exhibit 7 and comparing that to Government's Exhibit 12, which is your property record, can you please tell the jury how that item is described on your property record form.

A    Yes, it is described as an iPhone-7 belonging to John Terry.

Q    Okay.  Did you know specifically that that device was an iPhone-7?

A    At that time I did not.  It appeared that it was an iPhone-7, which is why I wrote it on the property record as such.

Q    Okay.  Did you conduct any type of search of the iPhone at that point?

A    No.

Q   Looking closely at Government Exhibit 7 and, if necessary, you can even open the packaging if it helps, do you see anywhere on that device where it specifies that that iPhone is an iPhone-7?

A   It's difficult to see because it looks like there appears to be some sort of a chip that is maybe secured to the back of it.

Q   Like I said, if you need to open that plastic back, you're welcome to do so.  Do you have anything to open that with or are you able to open it?

MS. THOMPSON:  Your Honor, I'm just going to object to lack of foundation.  I'm not sure if Trooper Marmol had made his decision based on that writing.

MR. BERNARD:  Your Honor, I'm just trying to clear up the identification of that device on the property record with how I expect it will be identified in future testimony.

THE COURT:  All right.  I'll permit it for purely identification purposes then, if you need to make sure that you identify the correct item.

MR. BERNARD:  Yes.  Thank you, Your Honor.

BY MR. BERNARD:

Q   Were you able to access that device, Trooper Marmol, or do you need some assistance?

A   I need a pair of scissors -- I think I'm going to need scissors. --

(Bag opened.)

THE WITNESS: Am I able to remove the case?

MR. BERNARD: Yes.

THE WITNESS: (Witness does so.)

BY MR. BERNARD:

Q  So, again, the question, Trooper Marmol, was:  Is there anything on the iPhone itself that specifically identifies it as an iPhone-7?

A  Not physically.  Again, I was just going off of its appearance.

Q  Okay.  All right.  You can put that back into its packaging and then turn to what's been marked as Government's Exhibit 8, please.

A  (Witness complies.)

Q  Do you recognize what's been marked as Government's Exhibit 8?

A  Yes.

Q  Can you tell us what that is?

A  It's a clear plastic evidence envelope from -- that is sealed by the Federal Bureau of Investigation.  Inside of that it appears to be a -- an evidence -- yellow evidence envelope. This is consistent with evidence envelopes that we use in the state police.  Also, inside it appears that a property record is attached to that envelope, and then inside there's also a cellular device.

Q   Do you recognize the cellular device?

A   Yes.

Q   Can you tell us what type of device it is or what brand?

A   A Samsung Galaxy.

Q   And you had listed a Samsung cellphone on your property record, is that correct?

A   Yes.

Q   Okay.  Does Government's Exhibit 8 appear to be the Samsung Galaxy phone that you seized from the Ford Taurus on April 4th of 2018?

A   It was seized as part of the investigation, yes.

MR. BERNARD:  Your Honor, I now move for the admission of Government's Exhibit 8 into evidence.

MS. THOMPSON:  No objection.

THE COURT:  Eight is admitted without objection.  And I'll note that the -- when the Court says subject to, with regard to prior exists, that is a way of taking note of prior objections which were denied.

Go ahead.

BY MR. BERNARD:

Q   Now, Trooper Marmol, once you returned to the state police barracks did you have an opportunity to more closely inspect the vehicle trap?

A   Yes.

Q   Did you document your inspection?

Ryan Marmol - Direct

A    I did.

Q    How did you document that?

A    Via my department-issued cellphone.

Q    Did you take photographs or record a video?

A    I recorded a video of it.

Q    Okay.  Now I'm going to play what's been marked as Government's Exhibit 9, which is included on the disk that is marked as Government's Exhibit 1.

     (Video played in open court.)

BY MR. BERNARD:

Q    Okay, Trooper Marmol, having watched Government's Exhibit 9, do you recognize that video clip?

A    Yes.

Q    Does that appear to be a copy of the video that you recorded on your cellphone?

A    Yes.

Q    And was Government's Exhibit 9 a true and accurate copy of the video that you recorded on your cellphone of the vehicle trap in the Ford Taurus?

A    An accurate video, yes, without the --

Q    Without audio?

A    -- audio, yes.

Q    All right

        MR. BERNARD:  Your Honor, I'd now move for the admission of Government's Exhibit 9 into evidence.

MS. THOMPSON: No objection.

THE COURT: Nine is admitted without objection.

BY MR. BERNARD:

Q   Trooper Marmol, since you recorded this video, I'd like to play it one more time and have you sort of narrate what we're looking at as it's going.

(Video plays as witness testifies.)

A   Okay. So at this point I'm standing on the passenger side of the vehicle. What you're looking at, there is a -- you're looking at the passenger seat, the passenger foot area, and then also the passenger side dash area.

There is a black -- or a dark in color, black shiny piece that you see just beside the air vent. As I'm -- that point there, where the air vent is, this little piece that you see at the -- the upper left-hand corner of the screen, that is the access point of the after-market hidden department. The piece that you're looking at is actually -- it comes with the vehicle, but that is the access door.

So as -- you can continue to play the video -- so as I'm moving in, I'm trying to show the actual compartment. It's kind of hard to see -- if you could play it just a little further -- right there.

So at this point you could see the inside of the apartment -- compartment, excuse me, and it is -- it was operated off of a -- what we call a snake wire or a wire.

So what happens is there's a certain sequence to these compartments. And when that sequence is activated, there is -- for this specific compartment, the -- it would release tension so that the wire would loosen up essentially, create slack. So that door would come open. And then once the sequence is made to make it close, then the access door will go back on.

And this is just a -- this picture right here, it's difficult to see, and I apologize for the graininess of the video. But if you look at the screen there, you have a piece of a sheet metal that -- and there's spot welds on the -- like in the middle of the screen and -- which is consistent with an after-market hidden compartment.

Q   So at this point in particular, this image here, is this what you first saw at which point you recognized that there was a vehicle trap?

A   That's what I first recognized, correct. When I dropped the glove box and completely opened it, I looked up and this is what I saw.

Q   All right. Now, after you brought John Terry back to the barracks, did you go through your routine booking and processing?

A   Yes.

Q   Okay. And during that process, did John Terry make any statements in your presence?

A   Yes. He stated that he was -- or related that he was

responsible for the vehicle and that he borrowed the vehicle.

Q    Was that in response to any questioning by you?

A    I can't remember exactly how it came up.

Q    Okay.  Did he elaborate at all as far as what he meant by that statement?

A    I don't remember.

Q    Now, once the booking process was completed, what did you do with the evidence that you had seized?

A    It was entered into the property room at the State Police Somerset Barracks.

Q    Okay.  And would that be the same for the cellphone evidence as well as the drug and firearm evidence?

A    Yes, as well as the -- then the car was secured in the impound lot.

Q    Do you know whether the drugs were actually delivered to the crime lab for testing?

A    Yes.

Q    And after testing, were those drugs returned to your property inventory?

A    Yes.

Q    Now, at some point did another agency take possession of the evidence you seized?

A    Yes, sir.

Q    What agency was that?

A    The FBI.

MR. BERNARD: Thank you, Trooper Marmol. That's all the questions I have.

THE COURT: All right, this would be a natural break then for our luncheon recess. I don't want you to start, Attorney Thompson, and then be interrupted immediately. So let's take our luncheon recess at this point.

It's about 20 minutes after twelve; let's try to start at 1:30, which would give you sufficient time to go get lunch and come back and we won't be rushing anyone. So we'll reconvene at 1:30, and you'll be back on the stand, Trooper.

THE WITNESS: Yes, sir.

THE COURT: And during the recess do not discuss your testimony with anyone, not even the Assistant United States Attorney.

THE WITNESS: Yes, sir.

THE COURT: Okay. I'm not going to read the recess instructions to you again, but I will tell you that you are subject to the same instructions, restrictions and admonitions that I advised you prior to this with regard to recesses.

We'll be in recess until 1:30 p.m.

(Jurors exit courtroom.)

THE COURT: Please be seated. The jury has left the courtroom, so these remarks are outside the hearing of the jury.

Do the parties have anything for the Court before you

take your luncheon recess?

MR. BERNARD: No, Your Honor.

MS. THOMPSON: No, Your Honor.

THE COURT: All right. Then you have a little over an hour to get something to eat and use the restroom and that sort of thing. So we'll be in recess.

And when you come back, Trooper, you'll be back on the stand again.

THE WITNESS: Yes, sir.

THE COURT: All right. Thank you.

(Whereupon, the luncheon recess was taken.)

(Jury seated.)

THE COURT: Please be seated.

Trooper Marmol is still on the stand and you may proceed, Attorney Bernard.

MR. BERNARD: Thank you, Your Honor.

Your Honor, I just have one additional question for Trooper Marmol. I would ask permission to publish Government's Exhibits 2, 3, 4, 5, and 6 to the jury.

THE COURT: They have all been admitted, so you may publich.

MR. BERNARD: Trooper Marmol, would you please step down and give me a hand.

THE WITNESS: (Witness complies.)

THE COURT: For the record, can you tell us which

exhibit that is?

MR. BERNARD:  Trooper Marmol is displaying Government Exhibits 5 and 6 to the jury at this time.

Thank you, Trooper Marmol.

He is now displaying Government Exhibit 2.

BY MR. BERNARD:

Q   If you can show the front and the back of that, please.

A   (Witness complies.)

Q   Please display Government Exhibit 3.

A   (Witness complies.)

Q   And Government Exhibit 4.

A   (Witness complies.)

MR. BERNARD:  Thank you, Trooper Marmol.  You may have a seat back on the witness stand.

(Witness resumes witness stand.)

MR. BERNARD:  Your Honor, I'd now offer this witness for cross examination.

THE COURT:  All right.

Attorney Thompson, you may cross examine.

MS. THOMPSON:  Thank you, Your Honor.

CROSS EXAMINATION

BY MS. THOMPSON:

Q   Good afternoon, Trooper Marmol.

A   Good afternoon, ma'am.

Q   I'm Sandra Thompson, I'm representing Mr. John Terry.

I wanted to start you from the beginning. You were actually stationary when you saw two black males in a 2010 Ford Taurus, is that right?

A   I was stationary at one point, yes.

Q   Okay. And then when that vehicle passed you, then you decided to follow them; is that right?

A   No. It was a short time after the vehicle had passed and then I had pulled out into traffic, yes.

Q   And you actually -- you said the speed limit was about 70 miles per hour, right?

A   On that stretch of highway. After -- if you're traveling from the Bedford side of the Allegheny Tunnels, once you pass through the tunnels, continuing west, once you get out of the tunnels, it turns into a 70 mile per hour zone, yes.

Q   Do you recall, you were actually bearing down on the Ford Taurus, passing other vehicles in that left lane; is that right?

A   I was passing vehicles in the left lane.

Q   And so as you were in the left lane passing other vehicles, bearing down on that Ford Taurus, when you got behind the Ford Taurus and the Ford Taurus activated its right turn signal -- is that right?

A   Yes.

Q   And then it decelerated so that the vehicle that was in the right lane could pass, is that right?

A   I'm not sure what the intentions are of the operator.  I'd have to see the video again.

Q   Okay.  Do you recall that the vehicle before the Taurus decelerated?

A   I believe so, yes.

Q   And you testified in this case or cases related to John Terry at least on two occasions, is that right?

A   Yes.

Q   And you testified at a preliminary hearing for the state case, right around -- April 13, 2018.  Isn't that right?

A   I'm not sure what the day was exactly, but I did testify.

Q   I'm going to ask you to direct your attention to the Defense Exhibit book under Tab B.

A   It's --

Q   The one I had handed to you.

A   It was moved to that table, ma'am; I'm sorry.

Q   Okay.

        MS. THOMPSON:  May I approach, Your Honor?

        THE COURT:  Yes, you may.

BY MS. THOMPSON:

Q   Okay.  Just for the first page of Defense Exhibit B, does that refresh your recollection that you testified on April 13th, 2018, at the preliminary hearing?

A   On Page 1?

Q   Yes.  Exhibit B.

A   Yes, it appears the hearing took place on Friday, April 13th, 2018, at 10:40 a.m.

Q   Okay.  And you do recall testifying at the preliminary hearing.

A   Yes.

Q   Okay.  And then you also testified at another hearing before the federal court in February 25th, 2019; is that right?

A   I'm not sure what the date was again, but I remember testifying in this court.

Q   I'm going to ask you to turn to Defense Exhibit C, first page, and see if that refreshes your recollection as to the date.

A   Yes, ma'am.

Q   Okay.  And the date indicates February 25th, 2019?

A   That's what it indicates, yes.

Q   Okay.  And you don't have any reason to dispute the dates as being accurate, is that right?

A   I don't, no.

Q   So on Page 78 -- I'm going to ask you to review Defense Exhibit C.

A   Okay.

Q   And just recall -- if you can refresh your recollection on Paragraphs 18 and 19 --

A   Yes, ma'am.  I see the number 18, that line.

Q   Okay.  And does it refresh your recollection of whether or

not the vehicle decelerated when you approached, bearing down on them?

A   I appeared -- it appears that I answered, "That's correct." That's what it appears in the video.

Q   Okay.  And so because you were bearing down on them again, they activated their lights, decelerated, and let the car that was in the right lane pass.  That's what visually occurred, isn't that right?

MR. BERNARD:  Your Honor, I'm going to object to the question, the form of the question insofar as it includes facts not in evidence.

THE COURT:  I couldn't hear you, sir.

MR. BERNARD:  I would object to the form of the question as it includes facts not in evidence.  It includes the phrase "bearing down," and I believe --

THE COURT:  Well, I'll permit the witness to answer in his own words.

But I think it's an understandable question that you can respond to, sir.  Go ahead.  You can respond.

THE WITNESS:  Yes --

THE COURT:  Unless you want her to repeat it.

THE WITNESS:  Can you repeat it, ma'am, please?

BY MS. THOMPSON:

Q   I was asking you isn't it correct that you were bearing down on the 2010 Ford Taurus, what you observed is that it

activated its right turn signal and decelerated, and a car that was in the right lane passed it before it got into the other lane, the right lane.

A    I recall the vehicle approaching -- or I was approaching the Ford Taurus.  The vehicle did decelerate.  It deactivated the -- the turn signal and changed lanes from the left lane to the right lane behind the silver vehicle.

Q    And whether it's bearing down, would you agree that you classified it as at least closing in on the 2010 Ford Taurus?

A    I would say that's a fair statement.

Q    Okay.  And I'm going to ask you to refer to Page 76, Lines 20 to 22 of the Exhibit C, February 25th, 2019, hearing.

A    I'm sorry, what line was it again?

Q    Lines 20 to 22.

A    Okay.

Q    Okay.  And so you already testified that you were closing in on them, is that right?

A    I was closing in and approaching the vehicle.

Q    And so then at the stop you approached, as shown in the video, on the passenger side; but you did that for safety reasons, to avoid other traffic; is that right?

A    That's correct.

Q    Okay.  And while you approached on the other side, you were on the side of the passenger, and you say it was Mr. John Terry?

A    John Terry was seated in the passenger seat, yes.

Q    Okay.  But who you were speaking to was Mr. Gerald Terry, the driver, isn't that right?

A    I spoke to both of them during the course of my initial approach, but a majority of the conversation was with Gerald Terry.

Q    So when you were speaking about driving or who the vehicle belonged to, that was all Gerald Terry -- to Gerald Terry; isn't that right?

A    That's correct.

Q    And so -- and you had mentioned as far as Mr. Gerald Terry seeming suspicious because his hand was shaking, is that right?

A    That's right.

Q    But, in fact, after you asked for the driver's license, you actually stated in testimony previously that you didn't immediately take the driver's license.  So he had his hand just up in the air lingering for a while before you took the license, isn't that right?

A    Yes, ma'am.

Q    Okay.  So while he had his hand lingering for a while, then you saw his hand was shaking.

A    Can you describe "a while"?

Q    Well, I mean don't know what your time is, but it was -- you know, how long would you say he had his hand there?

A    It was momentary.  It wasn't -- I didn't -- he didn't have

his hand out for several minutes; it was momentary.

Q   But you actually intentionally didn't take the driver's license at the time that he presented it to you, is that right?

A   That's right, yeah.  Like I said -- yeah.

Q   And then you also stated that Mr. John Terry said that he seemed suspicious because of -- I believe you said something pulsating, is that right, that his neck was pulsating?

A   Yes, I believe I stated that his carotid artery was pulsating.

Q   Okay.  And did you attach any observations of John Terry having a tumor on his back/neck area?

A   I did at one point, yes.

Q   Okay.  And do you know whether or not the effects of that tumor that he had at that time on his neck and back area caused the pulsating?

A   I do not know that.

Q   Okay.  In fact, did you ask him -- when you say you observed pulsating, did you ask him if he had any health conditions?

A   No, ma'am; I did not.

Q   Okay.  And then when you observed Mr. John Terry in the vehicle, he had no socks or shoes on in the vehicle; right?

A   I believe that's what I observed, yes, because we had -- I made a comment about something along those lines.

Q   And you generally said, "Get out of the vehicle" or "Please

exit the vehicle," isn't that right?

A   Who are you referring to?

Q   I'm asking you about your statement.  Isn't it right that you generally just said, "Would you please exit the vehicle?"

A   I'm not sure what you're referring to, ma'am.

Q   At the time that you asked -- that you say Gerald Terry exited the vehicle, I'm asking you isn't it correct that you didn't identify Gerald Terry specifically, you had just said, "Please exit the vehicle."

A   Um -- no, I don't -- I don't think that's correct, ma'am, because I conducted -- there were queries that identified him after my initial contact.

Q   Okay.  I just want to make sure you're on point with my question.  I'm specifically just referring to the fact of when you said, "Exit the vehicle," that you didn't specifically say, "Gerald Terry, you exit the vehicle."

A   I can't remember -- when I approached the driver's side, I can't remember how I addressed Mr. Terry.  I'm not really sure.

Q   Okay.  But then once you said something about "Exit the vehicle," John Terry then also put on his shoes and got out. Is that right?

A   He exited the vehicle, and I believe that he had put on shoes.  I'm not sure if he put his socks on or not, but he did exit the vehicle and put his shoes on.

Q   And that's when I believe you stated in direct that you

said to Mr. John Terry, "Well, I really didn't mean you, but, okay, you can come out."

A    I believe I said something to the effect that -- because he exited the vehicle without my instruction, and then I said that, "You're good, come on back," or something to that effect.

Q    But also I recall you just said a couple of minutes ago he wasn't going -- you don't remember your total instruction.

A    That was specific to Gerald.  But, again, I don't remember if I stated Geral's name, but it was -- I contacted Gerald on the driver's side of the vehicle.

Q    And Gerald Terry is the one who stated that he borrowed the vehicle, is that right?

A    No.  During my initial contact, he stated that it was his friend's wife.  But after we returned to the barracks, post-arrest, during the booking procedures, it was John Terry who stated that he had borrowed the car and that he was responsible for it.

Q    So in the video we just watched, it actually is Gerald Terry stating that he got the vehicle from his friend, and the vehicle was his friend's wife.  Isn't that right?

A    I believe he just said that it was his friend's wife; and, again, that was on my initial approach.

Q    And isn't it correct that you had asked Gerald Terry about -- because it was Gerald Terry who gave you the registration card, is that right?

A    Yes.

Q    Okay.  And on the registration card was the name Kelli Royster, isn't that right?

A    Yes, ma'am.  I can't remember if it was -- if there was any middle initial, but generally it was registered to Kelli Royster.

Q    Okay.  So you recall the vehicle was registered to Kelli Royster, even if you don't remember if there was a middle initial.

And you asked Gerald Terry whether or not that was a man or a women, isn't that right?  Because the name Kelli.

A    I believe I asked him if it was a girl.

Q    Okay.  And when -- and Gerald Terry is the one that answered all those questions, right?

A    What questions are you referring to?  I didn't --

Q    That we were just referencing, in reference to the registration card, Kelli Royster, whether Kelli Royster was a girl or not.  Gerald Terry was the one answering all those questions, isn't that right?

A    Those questions were directed to him, yes.

Q    Okay.  And when you went back and checked, you discovered Kelli Royster was a man, so then you disbelieved        Gerald Terry in that he received or borrowed his friend's wife's car.

A    Well, ma'am, the -- so whenever I had made my initial approach, I asked Mr. Terry who the vehicle belonged to.  And

he said that it was his friend's wife. And I felt that that was suspicious because somebody that's engaged in a legitimate travel would know who they borrowed the vehicle from.

Now, at that time they didn't state that. It was a general -- general statement. And I thought that, you know, it was suspicious that he said it was -- the vehicle belonged to his friend's wife, and then finding that the vehicle was actually registered to a male.

Q   And so you did discover Kelli Royster had either a wife or a girlfriend, right?

A   At what time?

Q   Through your investigation. Didn't you investigate further?

A   I'm not sure if I -- if I investigated that personally.

Q   So are you stating that you don't know if Kelli Royster actually had a wife or a girlfriend?

A   I don't know if he had a wife or a girlfriend.

Q   Okay. And would you agree that a car can be registered to a male, but is still primarily for that wife or girlfriend?

A   That's possible.

Q   And also when you're speaking -- you're asking where they're going to, is that right?

A   I -- yeah, I asked where -- where they were traveling to.

Q   And it was again Gerald Terry who was answering, isn't that right?

A    Yes.

Q    And it was Gerald Terry who said that he was going to be a speaker at a narcotics convention, isn't that right?

A    He said he was going to an NA meeting and speaking at an NA meeting in Pittsburgh, Pennsylvania.  I believe he said Pittsburgh; he didn't say Pittsburgh, Pennsylvania.

Q    Do you recall Gerald Terry referring you to his bag that had Narcotics Anonymous pamphlets and books in the back seat?

A    I believe he just reported something in the back seat.  It could have been that bag.  And I actually think that I had looked into the rear passenger compartment of the vehicle at that time.

Q    So when he spoke about the narcotics -- you say meeting -- he gestured to a bag that he said had Narcotics Anonymous information.

A    Yes.

Q    And you say you just glanced in the back, but you didn't look or search.

A    I believe I -- from -- I was standing outside of the vehicle, and I looked through the back rear window of the vehicle, but -- as I sit here today, I don't remember if I saw a bag or not.

Q    Okay.  I'm going to try to pull up the Government's Exhibit 1, Clip A.

     (Clip A played in open court.)

Ryan Marmol - Cross Examination

MS. THOMPSON: Could you pause it there?

BY MS. THOMPSON:

Q   Did you hear Gerald Terry say he's speaking?

A   Speaking...

Q   Did you hear Gerald Terry say that he was speaking at the event?

A   Yes.

Q   Okay. So wasn't it just a NA/AA meeting, isn't that right?

A   I believe he said he's speaking at a NA meeting.

Q   That's what you believe he said.

A   Yes, ma'am.

Q   Okay. And so then you basically did a search of NA/AA meetings around Philadelphia and concluded there was about 900 NA/AA meetings around Philadelphia, and therefore you concluded that it was not practical to believe that Gerald Terry would go to Pittsburgh for an NA/AA meeting.

A   That search was conducted after the traffic stop.

Q   But that's also what you testified to several times, isn't that right?

A   What did I testify to?

Q   In reference to -- that you did a search for NA/AA meetings around the Philadelphia area, found over 900 NA/AA meetings; isn't that right?

A   I did do that search, yes.

Q   And also that you didn't believe it was -- or that

Mr. Terry said that he was traveling to Pittsburgh to speak was a reasonable belief.

A   It seemed suspicious to me at the time, that they were traveling from Philadelphia to Pittsburgh, Pennsylvania, to -- for an NA meeting.  And I did that result -- or that search afterwards for the reader to see why I thought that.

Q   And then you also state that when you inquired about searching the vehicle, then you directed all that to Gerald Terry; isn't that right?

A   Yes.

Q   Because it was Gerald who was in possession of the vehicle.

A   He was the operator of the vehicle; he was in care, custody, and control of the vehicle.

Q   Right.  And Gerald Terry actually never said that he was not in custody and control of the vehicle, isn't that right?

A   No, I don't remember him saying that.

Q   Okay.

A   Not at this time.

Q   And, in fact, you did not look to John Terry being in the custody and control of the vehicle to ask him for consent to search, isn't that right?

A   I did not ask him for consent to search.

     (Off the record discussion.)

        MS. THOMPSON:  I'm about to play Clip B of the Commonwealth's -- I'm sorry, Government's Exhibit 1.

(Video played in open court.)

BY MS. THOMPSON:

Q   Did you hear Mr. John Terry when you asked him about not having socks on at the time that he was just relaxing, along for the ride?

A   Yes, and that it was a long trip.

Q   Okay.  Isn't it correct that you searched the vehicle even before finding the compartment, the hidden compartment, and in the trunk of the vehicle was sort of baby stuff?

A   I remember there was a box with a baby on it and -- but I can't really recall the other items that were in the trunk.

Q   And you did not make what's called a receipt inventory of the items in the car itself, is that right?

A   I just made a receipt for the property that was seized.

Q   Okay.  And so you did not note the NA/AA pamphlets and you did not note the items in the trunk, is that right?

        MR. BERNARD:  Objection, Your Honor.  That question includes facts not included in evidence.  No one has testified that there were NA/AA pamphlets anywhere in the car.

        THE COURT:  I will permit the question.

        Go ahead sir.

        THE WITNESS:  Could you re-ask the certain?

BY MS. THOMPSON:

Q   I was asking you isn't it correct that you did not note in your reports the NA/AA pamphlets in the bag that Gerald had

referred you to in the back seat of the car or of the items in the trunk. Isn't that right?

A   I did not make any notes of those items.

Q   Okay. I'm going to show you a screen shot that would be located on the full video that's on the Government's Exhibit 1.

(Off the record discussion.)

MS. THOMPSON: There you go; we figured it out.

THE COURT: We've had a lot of problems with our system, so it's good you got it working.

BY MS. THOMPSON:

Q   So, just -- you see a person leaning into the trunk of the 2010 Ford Taurus. Would that be yourself?

A   That would be.

Q   Okay. Then you see like a purple and green box to the right of the person that is yourself. Was that like a box of diapers?

A   I'm not sure what it's a box of. I just -- I can tell that it is a box with -- it appears to be a small child on it, the face of a small child.

Q   In your investigation, do you recall Kelli Royster having a baby?

A   I don't know if he does or not.

Q   Now, the Commonwealth -- I'm sorry, the Government showed the contrabanded drugs, the Government showed the firearm. Did you submit any of that for fingerprints or DNA?

A   I didn't personally, no.

Q   And I understand that the drugs were wrapped up in tape?

A   There was, I guess, some sort of tape, masking tape or -- excuse me, duct tape and like Saran Wrap or some sort of clear wrapping.

Q   And so that tape had ridges, do you recall?

A   Can you describe "ridges"?

Q   Rough areas; like if somebody is touching it, it may scrape the skin.

A   I don't know if I can answer the answer to that.  You know, with the clear plastic and the duct tape, it should be smooth; but I don't -- I don't remember what the texture of the kilograms were that day.

Q   And in reference to the firearm as well, as far as the trigger mechanism, as far as the magazine, that also -- they're capable of collecting fingerprints and DNA.  Is that within your knowledge?

A   I'm not sure, ma'am.  I don't know that I can testify to that.  I know that, you know, that's the goal sometimes, if those items are submitted to the lab.  But I can't testify to that.  I'm not a lab technician or have very minimal knowledge on that.

Q   You remain the affiant, meaning the, sort of, officer who filed the charges from around about April 4th, 2018, through about October of 2018, would you say?

A    I was the -- I was the trooper, the affiant that filed the initial charges, but I'm not sure when the -- when the indictment came.

Q    Okay.  And are you saying that during the time where the case was in your control, you didn't submit anything for fingerprints or DNA?

A    I believe that I submitted the drugs for -- the drugs for weight and identification.  And I believe I also did a -- there was, I believe, a lab submission for DNA.  But I don't know -- I don't think that the -- that was ever completed.

Q    Okay.  So do you have in your record anywhere that you actually submitted it for DNA?

A    With me currently?

Q    Well, sure.

A    I don't know.  I don't know what exhibit that would be, ma'am.

Q    Okay.  So would it be more accurate that you either don't know that you actually submitted it for DNA?

A    No, I believe a request was submitted, but also a -- with that request was a drug ID and weight submission.  It was all in one submission.  But for some reason there was a -- another submission that was just the drugs only, not the firearm, magazine, ammunition.

Q    And so I guess I hear you saying that there was some mistake, is that what you're saying?

A    I don't know if there was a mistake.  I just -- I know that the drugs were taken to the lab and tested.  But I don't believe on my submission that the firearm and the magazine and the ammunition went to the Pennsylvania State Police Crime Lab in Greensburg.

Q    Okay.  And you didn't follow up with it, would that be right?

A    I don't remember.

Q    Okay.  And it was Gerald Terry who said Kelli Royster was his friend, isn't that right?

A    It was Gerald Terry that said it's his wife's friend -- or his friend's wife, excuse me, I'm sorry.

Q    Right.  So we know the registration of the vehicle was to Kelli Royster, so that would conclude that Kelli Royster was Gerald's friend, isn't that right?

A    That's what he's saying.

Q    Now, when you testified April 13th, 2018, at the preliminary hearing, the first hearing, at that time you gave the reason for the stop was just, you said, unsafe lane change and the tint on the lights.  Is that right?

A    I would have to look at the transcript to see that.

Q    And if you could turn to Exhibit B, and if you could turn to Page 10.

A    (Witness complies.)

Q    See if it refreshes your recollection.

A    That's what the transcript says.

Q    Okay.  So being that that's what the transcript says, that means that is what you said; right?

A    Yes, ma'am.

Q    Okay.  And then also on Page 12 you were asked again and you had the same answer, that the reasons for the stop was unsafe lane change and tint to taillights; is that right?

A    Are you referring to Line 7?

Q    The conversation would be from Line 7 through 10.

A    Yes.

Q    Okay.  But then when you testified in federal court on February 25th, 2019, almost ten months later, then that's when you added following too closely.  Isn't this right?

A    I didn't add anything.  This was -- when you're at the preliminary hearing, it's a prima facie case, and that is what I testified to.  But I did not add anything to my report for following too close.

Q    Well, it was a prima facie case, but you were testifying as to the reason for the stop on April 13th, 2018.  Isn't that right?

A    Yes; some of the reasons for the stop, yes.

Q    So you're saying that you -- on April 13th, 2018, you just neglected to mention some of the reasons for the stop?

A    I'm not quite sure what happened, but that's what I did say on April -- on that day, yes.

Q   I'm sorry, what are you saying?

A   I did testify to the tinted taillights and unsafe lane change.  I did testify to that.

Q   You did, right.

A   Yeah.

Q   But following too closely is a different issue, and you didn't bring that up 'til February 25th, 2019, isn't that right?

A   No, I didn't.  I brought that up in my report, my incident report that was typed by myself.

Q   And when did you type that up?

A   It was completed on, I believe, a month after the fact.

Q   So you testified at the preliminary hearing that would have been about nine days after the fact, and by the time that you wrote up your written report a month after the fact that's when you put following too closely.

A   Well, I didn't just put it in there.  It was a true statement because it did happen, which was observed on the video.  I didn't just put that in my report.

Q   I'm going to ask you to refer to Defense Exhibit C, at Pages 29.

A   Okay.

Q   Just one moment -- well, first of all, I'm going to take you to the bottom of Page 30, starting at Paragraph 23 to 31, Paragraph 4.  And that's Defense Exhibit C, February 25th,

2019; here.

A   Okay.

Q   Okay.  So does that refresh your recollection, again, the fact that, again, Gerald said that he was going to be speaking?

A   I remember that he said he was speaking at the -- at an NA meeting in Pittsburgh.

Q   Now, this compartment, wasn't it correct that it was not visible to someone sitting in the car?

A   That's correct.

Q   So when Mr. John Terry is sitting in the passenger seat, around -- he was around the compartment, doesn't mean that Mr. John Terry knew of the compartment; isn't that right?

A   Just because he was sitting there?  I would say that's -- it's reasonable.

Q   And did it take you -- did I hear you say it took you about an hour and ten minutes to actually enter into the compartment?

A   It took me approximately an hour and ten minutes to access the compartment and retrieve the items that were inside.

Q   And the compartment you're saying was in a missing air bag area?

A   Yes.

Q   And you found two cellphones in the vehicle and two persons in the vehicle, isn't that right?

A   I did.  I did find two cellphones.  I don't remember if they were in the vehicle or on somebody's person.  And, yes,

there were two people in the vehicle.

Q   So I hear you saying that you don't recall if any cellphone was taken off of any person.

A   I can't -- I can't remember.

Q   So as best that you remember is that the cellphones were found somewhere in the vehicle.

A   They were found during the investigation.

Q   Well, during the investigation -- and I guess again maybe that goes back to you don't know if it was in the vehicle or on a person.  Is that what you're saying?

A   I don't know if it was on somebody's person or in the vehicle.

Q   And would you say that if you found cellphones on a person, you would note it?

A   Yes.  And I document -- well, it depends.  You know, I -- I don't think I did a -- I should have did a better job in documenting that.  But I do remember on the property record something to the effect of an iPhone-7 belonging to John Terry.

Q   Yeah, but that's the whole point.  That's just something you wrote, isn't this right?

A   That is something I wrote.

Q   Right.  So you can't refer back to the Government's Exhibit 12 to prove your own point, can you?

A   No.  What I'm saying is that I did write the iPhone-7 did -- or belonged to John Terry, which that's what I wrote on

my property record.  But I don't remember, as I sit here today, where I found that.  I don't know if it was on his person or if it was in the car or how I identified it to be his cellphone.

Q   Or just because you put it to him because you charged him.

A   That's not true.

Q   But you don't remember any other.

A   Not in relation to that, I don't.

Q   And the iPhone-7, the iPhone-8 -- because there, I guess, where you marked on the Government's Exhibit 12 under 6, you identified as an iPhone-7, then it was later found out it's not an iPhone-7; right?

A   It was later found that it was not an iPhone-7, that is correct.

Q   So you're not infallible, is that right?

A   Can you rephrase?

Q   You make mistakes, isn't that right?

A   Oh, absolutely.  I'm human.  I make mistakes.

Q   Now, I heard you testify that Mr. Terry took responsibility for the vehicle.  Mr. John Terry, you said, took responsibility for the vehicle, isn't that right?

A   At one point, yes.

Q   Okay.  But, again, going by the Government's Clip A, on video is Gerald Terry; is that right?

A   I would have to -- I'm sorry, I'd have to refer to that.

Q   Well, again, it was Gerald Terry who is referring to the

car from his friend's wife.  Isn't that right?

A   He said that the car was his friend's wife's.

Q   Okay.  And you were wearing the entire time a audio microphone, is that right?

A   It's an audio microphone, correct.

Q   Okay.  And you presented no evidence on the audio microphone of John Terry saying anything about taking responsibility for the vehicle, is that right?

A   That's correct.

Q   Okay.  And there's no dash cam of John Terry takinging any responsibility for the vehicle, is that right?

A   That's correct.

Q   And there is no video of any interview room -- well, first of all, that -- do your interview rooms have video -- audio video?

A   At that point, I don't remember.  They may now; I know some of them do.

Q   So you're saying you don't remember, so that also means it could have.

A   They could have, but I -- I'm not sure at the time.

Q   Okay.  So if at the time of April 4th, 2018, if your facility did have audio video in their interview rooms, you also don't have audio video of Mr. John Terry allegedly taking responsibility for the vehicle; is that right?

A   That's correct.

Q   Okay.  And there's no written statement, like if you say John Terry took responsibility for the vehicle, you didn't say, "Hey, can you write that down?"

A   I didn't make a written statement.

Q   And you noted that it was John Terry who took responsibility, saying that it was John Terry who borrowed the vehicle.

A   John Terry stated that at some point, again, that he was responsible for the vehicle and that he borrowed the vehicle.

Q   John Terry, in fact, did not say he knew anything about a hidden compartment.  Is that right?

A   That's correct.

Q   John Terry did not say he was taking any responsibility for any drugs, is that right?

A   That's correct.

Q   John Terry did not say he was taking any responsibility for a firearm, is that right?

A   That's correct.

Q   Would you have told Agent Simpson that John Terry did take responsibility for the compartment, firearm, and drugs?

A   Not that I remember.

Q   Does that mean you could have told him that, but you just don't remember?

A   I don't think I told him that.

Q   Okay, so you don't think so.  Okay.  But if you would have

told him that, would you agree that would not have been true?

MR. BERNARD: Object -- objection, Your Honor. I believe that question calls for speculation.

THE COURT: I'll sustain the objection; you can rephrase.

MS. THOMPSON: Certainly.

THE COURT: Attorney Thompson.

BY MS. THOMPSON:

Q   I think you said, Trooper Marmol, that you don't remember if you told Agent Simpson that John Terry said he was responsible for the vehicle compartment, drugs and firearm. Was take your testimony?

A   Yes, I don't remember that.

Q   Okay. So -- in -- again, it is your testimony that John Terry did not take responsibility for the hidden compartment, firearm, and drugs. Isn't that right?

A   Specifically, that's correct.

Q   And on the Government's Exhibit 1, you use your cellphone to document the trap, right?

A   That's correct.

Q   So if you say John Terry took responsibility for anything, couldn't you also use your cellphone to document that?

A   That's possible. I could have, yes; but I didn't.

Q   Do you think you just confused Gerald and John Terry?

A   No.

MS. THOMPSON:  One moment, Your Honor.

(Brief pause in proceedings.)

MS. THOMPSON:  Your Honor, I am done.

THE COURT:  Mr. Bernard, any redirect?

MR. BERNARD:  Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. BERNARD:

Q    Trooper Marmol, Attorney Thompson had asked you on cross examination that you had pulled out of your stationary location on the turnpike after observing two black males had passed you by.  Was the purpose of you pulling out of your location specifically to follow the red Ford Taurus?

A    No.

Q    You had mentioned on direct examination the shift that you were working that day.  Can you please remind the jury what that was?

A    Yes, it was a 8:00 a.m. to 4:00 p.m. shift, daylight shift.

Q    And at the conclusion of your shift, are you required to return to your headquarters?

A    Required to -- not necessarily.  I don't work at a barracks, so we have our cars that we park elsewhere.

Q    Right.  So at the end of your shift you would head home, correct?

A    Yes.

Q    Correct.  You don't have to get into specifics, but from

where you were located on that day, is your house -- would your house be eastbound or westbound from where you were positioned in your stationary location?

A   Westbound.

Q   Okay.  Now, the Pennsylvania Turnpike, Interstate 76, is that one highway with traffic that travels in both directions?

A   Yes.  It is -- there's two lanes that travel -- well, it just depends.  Certain areas there's four lanes, two east, two west, and then sometimes it broadens to three lanes.

Q   Is that a divided highway?

A   It is divided in most parts.  There are, however, some medians and crossovers -- emergency crossovers, yes.

Q   Okay.  But if you're traveling on the turnpike, are all of the vehicles on one side of the road traveling the same direction while all of the other vehicles are traveling in another direction?

A   Can you rephrase?  I'm sorry.

Q   Sure.  I guess my point is from your stationary location where you pulled out on the turnpike, did you have any other option but to head westbound?

A   There was a -- there was a crossover immediately upon exiting the Allegheny Tunnels westbound.  But after that, there isn't a crossover for approximately -- probably 20 miles or so.

Q   So upon entering the westbound lanes of traffic, you essentially would be committed to traveling in that direction

for 20 miles?

A   Essentially, unless I made a left turn at the -- upon exiting the tunnel.

Q   So you initiated this traffic stop around 2:30 in the afternoon, is that right?

A   That's correct.

Q   Okay.  And that would have been near the end of your 8:00 to 4:00 shift?

A   It would have been near the end, yes.

Q   Okay.

A   My -- basically that day I was -- I started in New Stanton, Pennsylvania, which is approximately at Mile Marker 75.  And you definitely work up to the Allegheny Tunnels and then you work back.  That's -- sometimes we do that, and that's what I was doing that day.

Q   So from your position there when you turned westbound onto I76, can you tell the jury where you were headed?

A   I was headed home.

Q   Now, Trooper Marmol, there were some questions regarding whom you were speaking to when you first approached the Ford Taurus.  And we observed that you were on the passenger side, but it was mentioned on cross examination that you were addressing the driver.  Is that correct?

A   I was talking to the driver, yes.

Q   Is it typical that you would address the driver of a

Ryan Marmol - Redirect Examination

vehicle when you first approach a vehicle following a traffic stop?

A   It is typical because, like I said there, they're in care and custody, control of the vehicle.  They're operating the vehicle.  So that's why I was contacting him.

Q   Okay.  And during your interaction with Gerald Terry, he told you that the car was registered to -- the car belonged to his friend's wife, is that right?

A   It was his friend's wife's.

Q   He said, "It is my friend's wife's."

A   Yes.

Q   Okay.

A   Something to that -- his friend's wife, something to that effect, yes.

Q   Did Gerald Terry say, "I borrowed the car from my friend's wife"?

A   I don't remember him saying "borrow."

Q   Okay.  At any point did he say "borrow"?

A   Not that I remember.

Q   Okay.  Now, you mentioned during cross examination that you agreed that a vehicle can be registered to a male but can be used by a female, is that correct?

A   Yes.

Q   That same vehicle can be used by any other person, right?

A   Correct.

Q   What do you call a vehicle that's being used by an individual who's different from the registered owner of that vehicle?

A   A third-party vehicle.

Q   What is the significance of the use of third party vehicles based on your training and experience and in your line of work?

A   The significance of a third party vehicle, these vehicles are utilized so that it's essentially an automatic defense.  So if there is anything that is found within the vehicle, then they -- whoever was in the vehicle can distance themselves from whatever is located within the vehicle.

Q   Now, following your arrest of John Terry, there was a question as to whether you submitted the drugs and firearms for DNA and fingerprints.  Do you recall whether you made a lab submission request for those particular testings?

A   Yes.

Q   Okay.  And do you recall whether the testing was completed?

A   I recall the testing being completed for the drugs.

Q   Do you recall whether or not the initial request that you made requesting those different forms of testings, whether that was returned and you were required to submit a second request?

A   Yes, something -- something happened.  I'm not quite sure what.  But then there was an additional submission made with -- for the drugs only.

Q   And that submission, is that what you were presented as I

believe it's Government's Exhibit 13?

A    Can I refer to that?

Q    Yes.  Yes, please do.

A    Yes, this would be the submission.

Q    The second submission.

A    Correct.

Q    Includes only the drugs.

A    Yes, one sealed -- it gives -- it lists the property inventory number, the item, which would be one, one sealed envelope, three packages containing suspected cocaine for drug identification.

Q    Okay.  What's the date of that lab submission?

A    5/7/2018.

Q    What was the date of the traffic stop in this case?

A    It was -- April 4th of 2018.

Q    Would the request regarding the DNA fingerprint analysis of the drugs and firearm have occurred prior to the request that is Government's Exhibit --

A    Yes.  That was -- I believe it was made on April 25th of 2018.

Q    Okay.  Now, you had mentioned that you were the affiant in state court, correct?

A    Yes.

Q    Okay.  So what does that mean, just generally?

A    Generally, that I am the -- the police officer that is

going to be filing the charges.

Q   Okay.  Ultimately, did the charges that you filed go to trial?

A   No.

Q   In state court, I should say.

A   No, it did not go to trial.

Q   Right.  Is that because they were adopted by federal authorities?

A   Yes.

Q   Okay.  And as a result, the state court filing was -- was that dismissed?

A   Yes.

Q   Now, at some point in time when the federal authorities adopt the case, do they take custody of the evidence from you?

A   Yes.

Q   Okay.  Is that documented anywhere that you know of?

A   I'd have to refer to my report.

Q   Okay.  I'm going to show you what's been marked for identification as Government's Exhibit 4.  Looking at that item, does that indicate whether or not federal authorities took custody of that item?

A   It indicates that the -- the FBI drug evidence field office, and the case ID number, and the date that it was collected, and the date it was sealed on, and also the sealing official's printed name, and some other things as well.

Q   So once that evidence is acquired by the federal authority, do you retain access to it?

A   No.

Q   Okay.  So you're not able to go in and submit that evidence for any testing, right?

A   No.

Q   Okay.  Ultimately, during your investigation you recovered two cellphones, correct?

A   Yes.

Q   One of those was an iPhone and one of those was a Samsung?

A   Yes.

Q   All right.  And on cross examination you agreed that there were two cellphones seized during the investigation of the vehicle and the Terrys, and there were two people in that car. Is that right?

A   Yes.

Q   In your experience, have you ever encountered individuals who may possess or use more than one cellphone?

A   Yes.

Q   And in your training and experience, what significance does the possession and use of multiple cellphones indicate to you?

A   Essentially a work phone, personal communications is conducted on one and business is conducted on the other.

Q   Does that always mean legitimate business?

A   It doesn't always necessarily mean legitimate business.

Oftentimes we see the people that are involved in criminal activity, they will possess multiple cellphones.

Q   Now, once you returned to the barracks, would you have been recording on your body microphone?

A   No.

Q   Is it standard to record audio or video within the state police barracks?

A   It's not standard.

Q   Why wouldn't you do that?

A   I don't know.

Q   Do other troopers --

A   No.

Q   -- record --

        MS. THOMPSON:  Your Honor, I'm just going to object to that response and question.  I think it lacks foundation.  He doesn't know what other troops do.  Personal knowledge it lacks as well.

        THE COURT:  Well, I'm going to infer that he's talking about his personal knowledge of what they do.

        Is that what you meant, sir?

        THE WITNESS:  Yes, sir, from what I've seen in my experience.

        THE COURT:  Okay, go ahead.

BY MR. BERNARD:

Q   Now, once you were back at the barracks, did you conduct

any sort of formal interview with John or Gerald Terry?

A   With John I attempted to conduct an interview, but nothing of substance came from that.

Q   All right.  So was it during that interview that he made the remark that he was responsible for the vehicle?

A   No, it was sometime after.

Q   Okay.  So you attempted to conduct an interview with him, right?

A   Yes.

Q   Did he decline to say anything at this time?

MS. THOMPSON:  Your Honor, I'm going to object.

THE COURT:  Leading?

MS. THOMPSON:  May -- can we approach?

THE COURT:  Yes.

(At side bar.)

MS. THOMPSON:  So I think the Government is infringing upon Mr. John Terry's right to Fifth Amendment because he's talking about Mr. Terry declining to give any statement or declining to say anything.  I think it's improper for the jury to infer even the exercise and invoking of the Fifth Amendment.

MR. BERNARD:  Judge, he did make a statement, and that's the whole point.  It was the subject of much cross examination, about the circumstances under which that statement is made:  Did you have the possibility or opportunity to record that statement, essentially implying how can we believe that

this statement was made and that your interpretation of this statement is accurate.

And so I think the fact that there was an opportunity where those capabilities to audio and video record that interview, to request a witness statement, the fact that that was available and that that was denied by the Defendant, but that the Defendant chose to make a statement at another point is relevant to essentially rehabilitate the attacks that the defense has made against this witness.

THE COURT: I think put on the record that he declined to make a statement at that time and just leave it at that, not any sort of inference or that this was any evidence of guilt or anything like that. So if you're going to leave it just like that, and move to another topic.

MR. BERNARD: Okay.

(In open court.)

BY MR. BERNARD:

Q So, Trooper Marmol, when John Terry told you he was responsible for the vehicle, were you in a location where there was audio and video recording equipment available?

A I don't -- I believe it occurred in the patrol room, and I don't -- I don't know if there is audio and video there.

Q Is that an area in which you would typically conduct audio and video recorded interviews?

A In the patrol room?

Q   Yes.

A   No, but they -- they can occur there.  But it's -- I don't know if it's -- if there's cameras there or not.

Q   Okay.  So, to be clear, the statement -- what was the statement that he made to you?

A   That he was responsible for the vehicle.

Q   When he told you that he was responsible for the vehicle, did you take that to mean that he was responsible for the contents of the vehicle as well?

A   Yes, based on that admission, based on his proximity to the compartment, and the totality of the circumstances.

       MR. BERNARD:  Thank you, Your Honor.  No other questions at this time.

       THE COURT:  Any recross, counsel?

       MS. THOMPSON:  Yes, Your Honor.

                RECROSS EXAMINATION

BY MS. THOMPSON:

Q   So, Trooper Marmol, you just made statements in reference to a third party vehicle, and I think you identified or defined "third party vehicle," any time that the registered owner is not driving the vehicle.  Would that be correct?

A   Anytime the registered owner is not in the vehicle.

Q   Not in or driving the vehicle?

A   Not in or driving the vehicle.

Q   Okay.  So if my daughter was driving my vehicle, then

that's a -- she's in a third party vehicle.

A   Yes.

Q   And are you concluding that that is indicative of crimes?

A   No.  No, a third party in and of itself is innocent. However, when you take it in the totality of the circumstances, it, you know, is -- it does mean something.

Q   So then you're saying that if, say, my daughter was driving my vehicle, she was stopped and something was found in the vehicle, she could say:  Hey, I don't know because it's my mother's car.

A   She could say that.

Q   But in saying that, that also doesn't mean that it wasn't true; isn't that right?

A   Her saying that it wasn't --

Q   Yeah, she has no knowledge because it's somebody else's car.

A   Can you rephrase or can you ask the question again?  I'm sorry.

Q   Sure, sure.  I'm not trying to -- I'm trying to figure out whether or not you're imputing liability every time somebody else is driving someone else's car.  So are you intending to do that?

A   No.  Like I said, ma'am, when they're -- in and of itself is innocent.  Again, when you take it in the totality of the circumstances, that's -- that's when it means something to me

as a trained interdiction officer.

Q   So, again, basically are you concluding that if a person is found in a vehicle and contraband is found in the vehicle, then they are being dishonest when they state that they knew nothing about it?

A   I don't know.  I think they're -- you know, you have to look at the totality of the circumstances.

Q   And I -- I believe you were last asked by the Government in your -- you state -- was that a quote, where you're saying that John Terry said, "I take responsibility for the vehicle," is that a quote?

A   No, it's not in quotes.  But the -- it was, you know, related.  He took responsibility for the vehicle.  I wouldn't say that it was a specific quote.  Whether that he said that, "I was responsible for the vehicle" or "I'm taking responsibility for the vehicle," it was something to that effect.

Q   And I heard you just state that it was -- in your mind, you concluded that, therefore, he must be taking responsibility for everything found in the vehicle.  Is that right?

A   Based on the totality of the circumstances.

Q   But it is also correct that -- and, again, as you, I believe, testified to, that he did not take responsibility for the drugs or the gun or the compartment.  Isn't that right?

A   He did not take responsibility for -- specifically for the

drugs, guns, or the compartment.  However, you know, when I was taking a look at everything and analyzing everything, you know, based off of that statement and other things that I've testified to, I believe that he was -- at the time he was the most culpable.

MS. THOMPSON:  Your Honor, I did want to move to admit Defense Exhibits B and C, which was on the initial cross of Trooper Marmol.

THE COURT:  What did you -- I didn't catch the exhibit --

MS. THOMPSON:  Exhibits B and C.

THE COURT:  B and C?

MS. THOMPSON:  Yes.

THE COURT:  They've been admitted or not?

MS. THOMPSON:  No, I did not move to admit them, so I just wanted to do so.

THE COURT:  Any objection?

MR. BERNARD:  Yes, Your Honor.  May we approach?

THE COURT:  Yes.

   (At side bar.)

THE COURT:  What is B and C?

MS. THOMPSON:  Transcripts.  They're the transcripts of -- B is the April 13th, 2018, preliminary hearing transcript of his testimony.  C is the February 25th, 2019, transcript of the federal suppression hearing.

MR. BERNARD:  Are you offering the excerpt only or the entire transcript?

MS. THOMPSON:  Well, for the record, I was offering -- for the record -- I mean I referred to certain pages -- I mean I really -- that --

MR. BERNARD:  I don't have an issue whether it's certain pages, but the transcript would be the full record, not that it's going back to the jury.  That was my only concern.

MS. THOMPSON:  I wouldn't think that the transcripts go back to the jury.

MR. BERNARD:  There's things in there that are excluded from trial that I wouldn't want to be presented to them through those transcripts.

THE COURT:  You would be able to give specific page references?

MS. THOMPSON:  I believe so.

THE COURT:  Initially I'll deny it, but I will permit you to offer specific pages and look at them.  I don't think we have to admit the entire transcript in there when most of it's not relevant.

MS. THOMPSON:  Okay.

THE COURT:  I'll definitely look at the pages and -- perhaps you can agree which ones --

MR. BERNARD:  Sure.

THE COURT:  She referenced certain parts of the

transcript; I would probably admit those pages.

MR. BERNARD:  Yes.

MS. THOMPSON:  Okay.

MR. BERNARD:  All right, thank you.

THE COURT:  Thank you.

(In open court.)

THE COURT:  Anything additional from either counsel?

MS. THOMPSON:  No, Your Honor.

MR. BERNARD:  No, Your Honor; I'd ask that this witness be excused.

THE COURT:  You can step down, Trooper Marmol.  And you are excused.

THE WITNESS:  Yes, sir.

(Witness excused.)

THE COURT:  And this would probably be a good time to take our mid-afternoon recess.  It's approaching the time I would do it anyway since -- okay.

All right, we're going to take our mid-afternoon recess, ladies and gentlemen of the jury.  Again, I'm not going to read to you the entire recess instruction, but the same instructions, restrictions and admonitions apply to this recess as applied to prior recesses.

We'll take about 20 minutes.

We'll be in recess.

(Whereupon, the jurors exited the courtroom.)

THE COURT: Please be seated. The jury has left the courtroom, so these remarks are outside the hearing of the jury.

Anything from either counsel or the parties before you take your recess?

MS. THOMPSON: No, Your Honor.

MR. BERNARD: No, Your Honor.

THE COURT: Okay. Let's try to be back in our seats and ready to start again at about 3:30. Thank you.

(Whereupon, the afternoon recess was taken.)

(Jury seated.)

THE COURT: Please be seated.

All right, counsel, you may call your next witness.

MS. SHEEHAN-BALCHON: Your Honor, the United States calls Brian Wright.

BRIAN WRIGHT, a witness herein, having been first duly sworn, was examined and testified as follows.

THE COURT: Attorney Sheehan-Balchon, you can proceed.

MS. SHEEHAN-BALCHON: Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. SHEEHAN-BALCHON:

Q   Sir, would you please introduce yourself to the members of the jury, tell them how you're currently employed.

A   Yes. My name is Brian Wright. I am a full-time employee of the Pennsylvania Office of Attorney General.

Q   What division and section of that office are you assigned, what is your position?

A   I'm in the criminal law division and the asset forfeiture administration unit, and my job title is automotive vehicle and equipment inspector.

Q   How long have you worked in that position?

A   Approximately 24 years, since 1998.

Q   And your specific position, auto vehicle and equipment inspector, why is that in the criminal division, the asset forfeiture division, of the Office of Attorney General?

A   Because I deal solely in seized assets, mainly the vehicles.

Q   Do you have any automotive vocational training?

A   Yes, two years of automotive technology in high school.

Q   Would you explain what you do as an automotive vehicle and equipment inspector.

A   I process all of the seized vehicles that are forfeited to the Commonwealth of Pennsylvania.  I inspect them prior to them being re-titled and organize the auctions and then distribute the revenue.

Q   Must vehicles being forfeited and sold at auction be determined to be safe, meaning they don't have any hidden compartments in them that could harm the public?

A   Yes.  Compartments are removed prior to auction.

Q   Explain for us what a vehicle hidden compartment is.

A    A hidden compartment is a after-factory modification to a vehicle that is designed to secretly conceal items out of sight.

Q    And is there a street term that you're aware of?

A    Traps.

Q    Traps, okay.  And how much on-the-job time do you have spending inspecting vehicles?

A    An inspection can take 20 minutes, it could take several hours.  It all -- it varies.

Q    All right.  So the portion of your job where you're actually hands-on examining or inspecting vehicles, what would you say the portion of your actual job is?

A    That's probably -- half of my job is spent doing the inspections.

Q    In your experience, how many vehicles have you inspected that had concealed compartments?

A    In excess of a hundred.

Q    Have you received any law enforcement training regarding the detection of vehicle concealed compartments?

A    Yes.  In 2008 I attended a DEA basic hidden compartment class and in -- also in 2008 I attended the VAS hidden compartment class.  In 2010 I attended the Desert Snow hidden compartment training as well, Fort Indiantown Gap.

Q    Okay.  DEA is the Drug Enforcement Administration?

A    That's correct.

Q   And the last training that you indicated, Desert Snow, who provided that training for you?

A   That was provided through the Northeast Counter-drug Training Center at Ford Indiantown Gap.

Q   Have you provided yourself any training to law enforcement officers in the same area?

A   Yes, I have.

Q   And can you explain that for us; what does take training involve?

A   The training involves recognizing after-factory modifications to vehicles, the components to construct traps or hidden compartments, and how to safely access the hidden compartments.

Q   Do you -- as part of your employment, do you actually maintain vehicles that have hidden compartments that are used for these various trainings?

A   Yes.  I have ten hidden compartment -- functioning hidden compartment vehicles at the Northeast Counter-drug Training Center at Fort Indiantown Gap.

Q   Based on your experience with the Office of Attorney General, during those 24-plus years of experience, did you actually compile a catalog with all of the vehicle concealed compartments that you've encountered?

A   Yes, I have handwritten notes for every vehicle that I've ever performed an inspection on since 1998, and I compile

pictures, notes, and share that information with law enforcement as needed.

Q   And do you also yourself refer back to some of those compartments if you encounter a new compartment that may be similar?

A   Yes.

Q   Did you inspect the vehicle that's involved in this case?

A   Yes, I did.

Q   What documentation do you review when you receive a vehicle for inspection?

A   I review the CARFAX history, I review the police report, the -- from the Pennsylvania State Police.

Q   And did you -- in this particular case, did you actually have conversations with the trooper that seized the vehicle?

A   Brief conversations about was he able to find any of the components or how did you get into it, that was basically it.

Q   And which trooper made this seizure?

A   Trooper Ryan Marmol.

Q   And what was the year, make, and model and the color of this vehicle that we're talking about that you did your inspection on?

A   It's a 2010 Ford Taurus Limited.

Q   And do you know the color?

A   Red; I'm sorry.

Q   Did you take photographs when you inspected this vehicle?

A    Yes, I did.

Q    Approximately when did you inspect it, if you recall.

A    20-- -- I think it was May of 2019.

Q    Okay.  The exhibit book that's right in front of you, I'd like you to take a look at -- please review Government's Exhibit 15.

See it?

A    Yes, I do.

Q    Do you recognize the photograph?

A    That's the 2010 Ford Taurus.

Q    And where do you recognize that from?

A    That picture was taken inside the asset forfeiture administration unit warehouse in Lemoyne, Pennsylvania.

Q    Did you personally take that photograph?

A    Yes, I did.

Q    And the vehicle that's depicted in the photograph, is it accurate as to when you viewed it in person?

A    Yes.

MS. SHEEHAN-BALCHON:  Your Honor, I'd ask at this point to admit Government's 15 and publish to the jury.

MS. THOMPSON:  No objection, Your Honor.

THE COURT:  Fifteen is admitted and may be exhibited to the jury.

MS. SHEEHAN-BALCHON:  Your Honor, I don't think my microphone is on, but I don't have any indication that anybody

is having any trouble hearing me.

THE COURT:  Can you tap on it for a minute?

(Nothing heard from tapping.)

THE COURT:  It's showing up here, so I'll turn the volume up a bit --

MS. SHEEHAN-BALCHON:  Test, test -- purely user error, Your Honor; I turned the switch on.

THE COURT:  That's usually the extent of my knowledge also.

BY MS. SHEEHAN-BALCHON:

Q   So, Mr. Wright, I'm going to have you take a look at Exhibit 15 and describe for us what you're viewing there.

A   So I took this picture during the inspection process.  As you can see, a lot of the interior trim has been removed.  Some of it is sitting on the roof, some's on the windshield, and some is off to the side out of view.

The vehicle was partially dismantled inside to gain access to the trap or hidden compartment and the components used to build the compartment.

Q   Dismantled by the state police prior to you receiving the vehicle?

A   I dismantled it myself.

Q   Okay.  So when you received it, it was intact.

A   It was intact.

Q   And the components and parts that you see are the ones that

you personally removed.

A    That's correct.

Q    In your inspection of this vehicle, did you observe how Trooper Marmol gained access to the concealed compartment?

A    Yes.  Where the air bag -- where the passenger air bag would deploy, there's a soft material that allows the air bag to protrude through it upon deployment, and that cover was pried up, forced up with pressure to gain access.

Q    Okay.  Now, describe your approach or your process when you begin an inspection of a vehicle that you already know has a concealed compartment.

A    First I locate the compartment, and then I look for any after-factory modifications surrounding the compartment, wires, actuators, relays, hidden switches; and then I begin to draw schematics and try to figure out how that compartment works by tracing back all those components.

Q    Okay.  Let's take that apart a little bit.  What is an after-factory or non-factory modification?

A    That's a modification that's performed to a vehicle that was not done by the factory.  It was done after the vehicle was built and sold to the public.

Q    How can you tell the difference?

A    The factory uses stamped sheet metal, the welds are robotic welds.  With this particular vehicle, there was sheet metal -- non-stamped, rusted sheet metal inside the hidden compartment

and there were tack welds, very sloppy tack welds all along the crush beam that runs the full length of the vehicle from the driver's side to the passenger side.

Q   Okay.  Now, the process that you just described, that's the approach you take to every vehicle that has a concealed compartment.

A   That's correct.

Q   And did you use that same process or method inspecting the Terry vehicle?

A   That's correct.  Yes, I did.

Q   Now, what modifications -- I'm sorry, non-factory modifications did you find in the Terry vehicle?

A   The cover over the air bag was reinforced with sheet metal, and it had a power window motor or, as some call it, a snake wire affixed to it.  And then there is -- the motor was actually mounted deep inside the dashboard behind the radio.  I found sheet metal fashioned -- in the area where the air bag should be, the whole entire air bag module and unit was removed to create a void.  And then that void was -- there was sheet metal placed in that void to create what we call a box.  It wasn't a perfect sealed box, but we call it a box because that's where items are then secured.

Q   And you referred to a window motor in this area where the air bag should have been.  Is there any other reason that there would be a window motor in that location?

A    No.

Q    Other than a concealed compartment.

A    No reason.

Q    So let's take a look at the -- we'll call them the after-factory modifications.  Let's take a look at them one at a time.

I'm going to have you take a look at the book in front of you, Government's 16.  Do you recognize what's depicted there?

A    Yes.

Q    Where do you recognize it from?

A    That is the air bag compartment in the 2010 Ford Taurus. That would be sitting in the front passenger seat, looking straight ahead, into the dash, where the air bag unit should be.

Q    Did you take that photograph?

A    Yes.

Q    And does it accurately depict the way that the vehicle in that area looked on that day.

A    Yes.

MS. SHEEHAN-BALCHON:  Your Honor, I'm seeking to admit Government's 16 and publish to the jury.

MS. THOMPSON:  No objection.

THE COURT:  Sixteen is admitted and may be published.

BY MS. SHEEHAN-BALCHON:

Q    So please describe for us precisely what we're looking at

in Government's 16.

A   Sure.  The circled area is just an approximate location of where the power window motor was.  And if you look towards the lower end portion of the picture, towards the center, you'll see that snake wire or -- the power window actuator wire coming out.  That would be attached to the cover of the old air bag.  And if you look inside that void, you see the rusted, non-factory sheet metal.  And you can see where it's tack welded to the crush beam, just above the rusted sheet metal.

Q   Is there anything else of note in this photograph that you want us to focus on?

A   Um, the fact that the air bag has been completely removed.

Q   Okay.  And can you see in this photograph where the window motor is installed?

A   You can see part of that black -- there's a small plastic -- black plastic cylindrical part in the center of that photo.  That's part of that actuator.

Q   So, sir, I'm going to mark an area where I think you're talking about the window motor.  Is that accurate?

A   Yes.  Yep, yep.

Q   Okay.  And the item that you called the snake wire, is that this item here (indicating)?

A   Yes, ma'am.

Q   The items that you are singularly identifying, these are all non-factory components; correct?

A   That's correct.

Q   All right.  So with the exhibit book in front of you, please take a look at Government's 17.  Do you recognize that, what is depicted in this photograph?

A   Yes.

Q   Did you take that photograph?

A   Yes, I did.

Q   And what is documented in the photograph, does that accurately depict the way that that area of the vehicle looked on the day you took the photograph?

A   Yes.

MS. SHEEHAN-BALCHON:  Your Honor, I seek to admit Government's 17 and publish to the jury.

MS. THOMPSON:  No objection.

THE COURT:  Seventeen is admitted and may be published to the jury.

BY MS. SHEEHAN-BALCHON:

Q   So let's see how I can get these markings off the screen --  thank you.

So describe for us what we're looking at here, Mr. Wright.

A   Okay.  This would be -- if you're sitting in the driver's seat, looking to your left, where the air vent that's closest to the driver door is located, that's the air vent removed from the orifice where it would normally be fashioned in and turned upside down, and you can see there's a microswitch that was

fastened to the air vent housing.

Q   So would this vent be on the door itself or on that pole near the driver?

A    It would be in the dash to the left of the instrument cluster.

Q   Understood.  And the green marking that you made, that is the microswitch that you want us to look at?

A    That's correct.

Q   Okay.  Is there anything else significant about this photograph?

A    Well, the microswitch is detached from -- you can see there's a hole in the -- the vent housing.  That's where the microswitch was intact.  And it was positioned such that when you turn the air vent all the way over to the left side, it makes contact with that microswitch and completes a circuit.  And that has to be done in order to access the trap.

Q    Is there any legitimate reason for that microswitch to be embedded in that vent?

A    No.

Q    Please review Exhibit 18 in front of you.

A    Yes.

Q    Do you recognize that photograph and what's depicted in it?

A    That is the reverse side of the microswitch showing the epoxy glue and soldered wires going into the bottom of the microswitch.

Brian Wright - Direct Examination

Q   Did you take that photograph?

A   Yes.

Q   And what's depicted, was it an accurate depiction of the way you saw it on the day of examination?

A   Yes.

MS. SHEEHAN-BALCHON:  Your Honor, I'd seek to admit Government's 18 and publish to the jury.

MS. THOMPSON:  No objection.

THE COURT:  Eighteen is admitted and may be published to the jury.

BY MS. SHEEHAN-BALCHON:

Q   Okay, sir, would you please describe to us what we're looking at in Exhibit 18.

A   That's the microswitch removed from the air vent housing and then turned so you can see the back side where the wires are soldered to the pins on the microswitch.

Q   When you say microswitch, can you tell us generally what they're used for?

A   Microswitches are used in a lot of automotive racing applications.  They're used when you want -- when you need very light pressure to either complete a circuit or interrupt a circuit.

Q   When you say complete a circuit, that's how you want the electricity flowing through that particular component?

A   Correct.  In this -- if you look at the wires, one wire

brings current into that switch.  When the air vent is turned all the way to the right, there's no contact on that microswitch, so the switch is open, meaning the current cannot continue through and down the other wire.

When the vent is moved, then it completes that circuit, and then the current flows through the switch and back through that other wire.

Q   Okay.  So we'll talk about this in a little bit, but when you're talking about a hidden compartment, the objective is for somebody to be able to open and close that compartment, have access to it essentially.

A   Correct.

Q   When you see these different locations -- you've already described at least two different locations where there were magnets or microswitches.  Are they on a larger circuit that you have to complete that whole circuit to actually electronically open that hidden compartment?

A   Yes.  This is only one piece of the puzzle.  This is just part of the combination, as we call it, to gain access to the compartment.

Q   Okay.  So the more of these little combinations that are embedded, the more difficult it is to open that compartment.

A   Absolutely.

Q   All right.  Is there anything else in Government's 18 that you wanted to point out to us?

Brian Wright - Direct Examination

A    No.

Q    Okay.  Take a look at the book in front of you at Government's 19.  Do you recognize that photograph?

A    Yes, I do.

Q    Did you take that photograph?

A    Yes.

Q    Does it accurately depict the item as it appeared that day when you examined it?

A    Yes.

Q    All right.

        MS. SHEEHAN-BALCHON:  So at this point Your Honor, I'd ask to admit and publish Government's 19.

        MS. THOMPSON:  No objection.

        THE COURT:  Nineteen is admitted and may be published to the jury.

BY MS. SHEEHAN-BALCHON:

Q    Please describe for us what we see in 19.

A    That is a magnetic proximity switch that was secured behind the kick panel or center console panel in the driver's side of the compartment, down by your feet -- knees/feet.

Q    So as you inspected the vehicle, tell us what this looked like on the exterior.

A    You could not see it from the exterior.  You had to actually remove the trim, disassemble the interior of the vehicle to gain access to that switch.

Q   Are you able to find this third piece because you followed some wiring from the vent on the driver's side that we already talked about?

A   I actually found this -- I followed the wires from the actuator in the hidden compartment, just kept disassembling the vehicle as I was going, and found this as I was disassembling the vehicle.

Q   So in one sense you reverse engineered these combinations.

A   Exactly.

Q   Okay.  Is there anything else in Government's 19 you wanted to point out to us?

A   No.

Q   And generally tell us what a magnetic switch would be used for.

A   Sure.  A magnetic switch is -- it's a switch that can either have an open or closed circuit that when you apply a magnetic field in close proximity to the switch, the internal components inside that switch will receive that magnetic field and move and complete the circuit, therefore allowing the electricity to flow through it or, in the reverse, it could stop the electricity from flowing through it, disconnect it, interrupt it.

Q   So in this particular part of the combination, Government's 19, how would the user activate that magnet to make it do what -- to complete the circuit?

Brian Wright - Direct Examination

A    You would have to apply a magnetic field, a small magnet, to the area where the switch was secreted.  It was secretly hidden in the kick panel center console area.

Q    So the user could do that from outside the kick panel --

A    Yes, you --

Q    -- wave the magnet, and --

A    Yes.

Q    -- this circuit would be completed.

A    The magnetic field is strong enough to -- and the switches are sensitive enough that they can pick up that magnetic field through plastic interior trim.

Q    Please take a look at the exhibit book in front of you at Government's Exhibit 20.  Do you recognize that photograph?

A    Yes, I do.

Q    Did you take that photograph?

A    Yes.

Q    And does it accurately depict the area of the vehicle that you inspected on the day in question?

A    Yes.

Q    And I should note there were some notations on some of these exhibits.  Did you actually insert those notations, the ones we have been reviewing?

A    Yes.

Q    Okay.

        MS. SHEEHAN-BALCHON:  Your Honor, I would seek to

admit Government's 20 and publish to the jury.

MS. THOMPSON: No objection.

THE COURT: Twenty is admitted without objection, and it may be displayed to the jury.

BY MS. SHEEHAN-BALCHON:

Q   Describe for us, Mr. Wright, what we're looking at.

A   So you're looking at what would be underneath the front driver's seat. The seat has been moved all the way back. The carpet has been removed from the floor -- the carpeting, the insulation pad and noise dampening pad and padding have been removed, and these two switches, after-factory modifications, were located underneath the carpet.

Q   Would these two switches, based upon your inspection, would they be accessible if the carpet and the other pieces were intact?

A   Yes. They're pressure switches.

Q   So the owner or the operator knew where they were or they could activate them without removing the carpet.

A   You have to know where they are to be able to put the pressure right on the switch, correct.

Q   And, additionally, you would have to know which one opens and which one closes the compartment.

A   That's correct.

Q   So if all of these combinations and circuits are closed, they've done the right combination, you hit this push button to

Brian Wright - Direct Examination

open, what would happen?

A    The snake wire would push that front panel, air bag cover panel, off and then open -- give you complete access to the trap.

Q    Does the glove -- the door to the glove box have to be opened as well?

A    No.  It's above the glove box.

Q    Understood.  So the panel opening the compartment would lift literally --

A    It would just fall right out.

Q    So considering all of the after-market components you've inspected, how sophisticated or complicated was this entire combination and compartment inside the Terry vehicle?

A    In all the years I've been doing this and all the vehicles that I've evaluated and inspected, this is one of three that had this style of combinations.

Q    How about this number of combinations?

A    This number, yes; this number, I'm sorry.

Q    And are we saying that there are at least four total combinations to complete circuits, meaning four different steps?

A    Five if you count the fact you have to have the ignition switch on to power the vehicle.

Q    So five total.

A    Yeah.

Q   Have you inspected vehicles with concealed compartments that weren't as complex, like, for example, the false plate of a radio would pull off and there's a compartment?

A   Yes.

Q   Or with wiring issues in a vehicle that actually would defeat the air conditioning or the defrost so that the minute you turn on the car and try to put on the air conditioning, it didn't work, you would know that there was some disruption?

A   It's hard for me to say that that could be related directly to the installation of a hidden compartment or trap or modification.  Oftentimes the switches in the relays tap into the existing components of the vehicle, like the HVAC system or a defrost or a power window; and they use that power, but they don't necessarily disable that entire feature.

But -- I'm sure that it has -- I'm sure it's out there. I'm sure there are vehicles that are -- that do have that trap that would disable a certain component or feature of the vehicle.

Q   Okay.  Have you seen, for instance, compartments that were behind an actual vent that was meant to provide air conditioning or to provide defrost that didn't actually work because there was a compartment there?

A   Yes.  A lot of the times when you're adding a hidden compartment to a vehicle, you have to make space, so you have to remove it, you have to create a void.  And particularly in

the dash behind the surface of the dash, where you can't see when you're driving the vehicle, there's air ducts that run through that dash and connect to each one of those vents.

So in the process of making space, oftentimes those air ducts are cut, and that would eliminate air from flowing to certain vents because the ducts are modified.

Q   Did you observe during your inspection any system in the Terry vehicle that had a mechanism installed to avoid an accidental opening of this compartment?

A   Oh, absolutely.  The magnetic proximity switch, the microswitch, and the two push button -- push -- pressure switches underneath the carpet.

Q   So if I didn't know the combination and I just got into the vehicle, turned it on and starting pushing a bunch of different buttons, I couldn't accidentally open that compartment?

A   No.

Q   All right.  Tell us about the source of the components used in the Terry vehicle.  Were they readily available?

A   You can buy everything to build this hidden compartment for around $50, Home Depot, eBay, Amazon.  The magnetic proximity six switches, you can buy a six-pack of them on Amazon right now for about $7.  The pressure switches, you can get about ten of those for about $10.  The -- there's also another component which you'll see later on.  It's called a DEI power door lock module $20 on eBay.

Q   Okay.  We might not see it later.  Was it part of this system?

A   It was.

Q   And those components that you just mentioned, are they traceable?

A   No.

Q   Is it workable to try and trace them?

A   You can buy them over the counter.

MS. SHEEHAN-BALCHON:  I would offer the witness for cross examination, Your Honor.

THE COURT:  All right.

Attorney Thompson?

MS. THOMPSON:  Thank you, Your Honor.

CROSS EXAMINATION

BY MS. THOMPSON:

Q   I'm going to apologize.  I think I missed your title.

A   Automotive, vehicle and equipment inspector.

Q   Okay.  So I'd -- so should I say Inspector Wright?

A   You can call me Brian.

Q   Okay.  So I'm Sandra Thompson; I'm representing John Terry.

And I heard you mention the complexities of this hidden compartment.  And would you agree that it's complex?

A   Yes, it's a sophisticated compartment.

Q   Okay.  And the Government kept referring to the vehicle as the Terry vehicle.  But do you have any information as to who

owned the vehicle?

A   I -- it's been a while since I've seen the paperwork, but I do remember there was a third-party owner, which is not uncommon.

Q   And I believe you testified that you reviewed the CARFAX history.  Would the CARFAX history have identified the owner?

A   No, the CARFAX history tells me if the vehicle was involved in a prior accident.  I can see -- based on the CARFAX history, it will show you where the impact was.  And then I know when I'm inspecting and evaluating the vehicle if there's extra tool marks on fasteners or if I see Bondo, paint, or non-factory -- after-market parts added, then I can say:  Well, this had a front end collision, there was work done here, and I'll look a little harder since there's modifications.  But the CARFAX kind of fills in that blank for me.

Q   Okay, I understand.

So for the trap, as you referred to, the questioning, do you have any knowledge as to who built the trap?

A   I do not.

Q   Okay.  Through your experience -- I think you said -- you said about 100 compartments -- have you searched for fingerprints or DNA in trying to discover who is connected to it?

A   That's not within the scope of my duties.

Q   So you leave that to another investigating officer.

A    Yeah, correct.

Q    Okay.  And going to the Government's Exhibit 16, just trying to again explain or understand your testimony to these things.  The Government asked you is this a true and accurate depiction of how it looked on this day.

Would that have been -- that's not the day of the stop, right?  That's the day that you sort of took the vehicle apart, is that right?

A    Correct.  This is after the vehicle had been forfeited through the civil asset forfeiture process and had been collected and brought back to our unit; and I was performing the inspection to have the vehicle re-titled.  And in that process, I prepare what's called a used vehicle disposition report.  It's a window sticker, so to say, that details all of the blemishes, flaws, safety problems; anything that's wrong with the car is disclosed in that.  That STD556 is the technical form number of the used car disposition report.

Q    Okay.  And when you were explaining Government's Exhibit 15, I believe you had stated that Trooper Marmol basically pried the cover of the air bag open; that's how he accessed it?

A    Correct.

Q    Okay.  And would it be your experience that those who place traps in a vehicle would make it hidden to other occupants of the vehicle?

A   Generally the traps are constructed so that they are unseen.

Q   In Government's Exhibit 16 -- now, you have the wording "power window, motor behind radio open/closes trapdoor."  So what are you explaining in that?

A   That's the -- the actuator that actually opens and closes upon completing the combination or the triggers, the magnetic switch, the microswitch, and the push buttons on the floor.

Q   So the magnetic switch was found where?

A   It was behind the driver's kick panel near the center console.

Q   Okay.  So the magnetic switch behind the driver's kick panel.

A   Yes.

Q   And you say behind the driver's kick panel center console -- because I'm not a car expert, I use it to visualize -- is that still in the front or towards the driver's rear passenger?

A   It would be -- if you're sitting in the vehicle, it would be like kind of where your knees are.  They call it a kick panel, and it would be towards your right knee.

Q   And, again, when you say sitting in the vehicle, are you saying sitting in the driver's side?

A   That's correct.

Q   Okay.  So then a microswitch then is available to the

driver.

A   Uh-huh.

Q   Okay.

A   The microswitch was in the air bag.  The magnetic switch was -- was in the kick panel.

Q   Okay.  So the magnetic switch was in the kick panel --

A   Correct.

Q   -- on the driver's side, available to the driver.

A   That's correct.

Q   Okay.  And then the microswitch was on the driver's side air vent, and you said closer to the driver's side door.

A   That's correct.

Q   Okay.  And then the third, So we have a magnetic switch, a microswitch, and what was the third one?

A   The two pressure switches.  There's two pressure switches underneath the carpet below the driver's seat, just forward of where the driver's seat bolts to the unibody.

Q   And so the pressure switches, the microswitch, and the magnetic switch, all on the driver's side.

A   That's correct.

Q   All accessible to the driver, is that right?

A   Yes.

Q   Okay.  And these are the ways to open that compartment?

A   That's correct.

Q   And I understand you say that -- or were you saying that

they all three had to be activated before it would be opened?

A    That's correct.  You have to complete the circuits before you could get power to the pressure buttons underneath the carpet.

Q    So would you agree -- say the passenger tried to open up the glove box or something like that.  Would they be able to access that compartment?

A    If you open the glove box, you could -- if your -- to a trained eye, you could see the sheet metal, the after-factory modifications, by looking up behind the glove box.  But to actually get inside the compartment, you have to remove that panel.

Q    And then I think I just heard you say that unless you had to be trained on sheet metal and what was factory issue was not, is that right?

A    That's correct.

Q    Now, would it be correct -- you don't have any information that John Terry had any of this knowledge or experience, is that right?

A    I never met John Terry, never talked to him, don't know anything about him.

         MS. THOMPSON:  That's all.

         THE COURT:  Any redirect, counsel?

         MS. SHEEHAN-BALCHON:  Briefly, Your Honor, if I may.

                    REDIRECT EXAMINATION

BY MS. SHEEHAN-BALCHON:

Q   Mr. Wright, you described a complicated process to open this compartment.  Was it the same process to close the compartment?

A   Yes, you have to have the microswitch all the way to the left and you have to have the magnetic switch applied -- or the magnet applied to the switch, and then you just push the opposite button.  You push one button to open it and the other button to close.

Q   Okay.  And that's what we're looking at Government's 20?

A   Yes.

Q   So did you personally get the compartment to mechanically open after you did all the combinations and you got all of the circuits to close?

A   Yes.

Q   Were you able to mechanically close it as well?

A   Yes.  There -- it should be noted that it was somewhat damaged from being pried open from the day of the traffic stop.

Q   Okay.

MS. SHEEHAN-BALCHON:  Thank you.  That's all I have, Your Honor.

THE COURT:  Attorney Thompson, any recross?

MS. THOMPSON:  No, Your Honor.

THE COURT:  Is this witness excused?

MS. SHEEHAN-BALCHON:  May he be excused, Your Honor?

THE COURT:  Any objection>

MS. THOMPSON:  No, Your Honor.

THE COURT:  All right, sir.  You're excused from further attendance.

(Whereupon, the witness was excused.)

THE COURT:  And you may call your next witness for the United States.

MR. BERNARD:  Your Honor, the United States calls Justin Sarvey.

I'm going to go get him, Your Honor.

JUSTIN SARVEY, a witness herein, having been first duly sworn, was examined and testified as follows.

DIRECT EXAMINATION

BY MR. BERNARD:

Q   Good afternoon, sir.

A   Good afternoon.

Q   Please state your name and tell us by whom you are employed.

A   My name is Justin Sarvey, and I am employed by the Federal Bureau of Investigation.

Q   Is there a particular section that you work in?

A   I'm part of the computer analysis response team, which is also known as CART.

Q   For how long have you worked for the FBI?

A   Approximately eight years.

Q   Prior to joining the FBI, were you employed?

A   Yes.  From 2009 to 2014 I was a senior forensic analyst and project manager with Precise Litigation Technologies.  And then from 2006 to 2009 I was a forensic examiner with Vestige LT.

Q   Prior to joining the FBI, did you graduate from college?

A   Yes.

Q   What was your major?

A   I have a bachelor's of science degree in computer science and information assurance, with a minor in criminology; and I have an associate's degree in computer forensics.

Q   What's your title with the FBI?

A   I'm a senior forensic examiner.

Q   And what are the job duties of a senior forensic examiner?

A   So I assist with search and seizure operations.  I track data from electronic places, process them for case agent review.  I also conduct forensic examinations.

Q   Over the course of your career, approximately how many devices have you extracted or imaged and processed for review?

A   Over 800.

Q   And what types of criminal investigations have the devices that you've processed been involved in?

A   So anything from drug cases to child exploitation cases to financial crimes.

Q   Now, we mentioned data extractions.  Can you tell the jury what data extraction is.

A    Basically, a data extraction is simply copying the data from the device.  So things such as text messages, call logs, pictures, just making a copy of that data.

Q    Are there any additional steps involved in that process if the device to be extracted happens to be passcode protected?

A    Yeah.  So if a device is protected with an unknown passcode, we have to utilize additional software to try and obtain that passcode.

Q    Is there a common program that the FBI uses to extract data from devices that are passcode protected?

A    Yeah.  One of the programs that we use is called Gray Key.

Q    Is there a common program that the FBI uses to process cellphone data?

A    Yes, we use a program called Cellebrite.

Q    Once data is extracted from a phone, how is it staged for a case agent to review?

A    So once the data is extracted, we process it, get it to a readable or format, then we'll put it up onto an internal network for the case agent to review.

Q    So do you personally conduct a complete review of the devices for information relevant to whatever investigation is being conducted?

A    I do not.

Q    Okay.  Were you called upon to conduct a data extraction from any devices in the FBI's investigation into John Terry?

A    Yes.  It was asked that I extract data from two cellphones pursuant to search warrants.

Q    All right.  Mr. Sarvey, is there a binder in front of you there?

A    Yes.

Q    A black binder?

Can you please turn to the page marked as Government's Exhibit 21.

A    Okay.

Q    Do you recognize that document?

A    Yes.

Q    Would you tell us what that document is, please.

A    This is a search warrant for an iPhone-7 and a Samsung Galaxy cellphone.

Q    What was the date that that search warrant was issued?

A    It was issued on October 10th, 2018.

Q    Does that document appear to bear the signature of a judge?

A    Yes, it is a Keith A. Pesto, United States Magistrate Judge.

Q    Did you personally receive that search warrant?

A    I did.

Q    Okay.  Does Government Exhibit 21 appear to be a fair and accurate copy of the search warrant you received to search an iPhone-7 and a Samsung Galaxy phone?

A    It does.

MR. BERNARD:  Your Honor, I'd now move for the admission of Government's Exhibit 21.

MS. THOMPSON:  Your Honor, I would object in reference to the admission of the hearsay statements attributing the iPhone to John Terry.

MR. BERNARD:  The question is:  Is that a document that he viewed and is it a fair and accurate copy of the document that he viewed?  This is, in fact, the search warrant. I don't understand the objection to the contents of it.

MS. THOMPSON:  The exhibit contains those contents which I believe are inadmissible.

THE COURT:  All right.  This is offered to demonstrate the basis upon which the phones were examined?

MR. BERNARD:  Yes, Your Honor.

THE COURT:  And this witness would have no usage of who they belonged to at that point, correct?

MR. BERNARD:  That's correct, Your Honor.

THE COURT:  So any reference to names in the search warrant would not be something he is verifying.

MR. BERNARD:  That's correct, Your Honor.

THE COURT:  Okay.

All right.  Well, I'll permit the search warrant to be admitted, with the understanding that it's offered only to show the basis upon which these phones were examined and not to establish whose phones they were.

MR. BERNARD:  Thank you, Your Honor.

Permission to publish Government Exhibit 21.

THE COURT:  Permission to publish, yes.

MR. BERNARD:  Thank you, Your Honor.

BY MR. BERNARD:

Q   Now, Mr. Sarvey, based on this warrant, did you extract and process data from the two cellphones that are listed on the warrant?

A   I extracted data from the Samsung Galaxy cellphone.

Q   Why did you not extract and process the data for an iPhone-7 pursuant to that warrant?

A   So upon physical inspection of the iPhone itself, I noticed that the iPhone was actually an iPhone-8 and not an iPhone-7 as it was indicated on the search warrant.

Q   So what did you do at that point?

A   At that point I notified the case agent, Special Agent James Simpson, and let him know that the device was an iPhone-8, not an iPhone-7, and asked him if I should proceed.

Q   Do you recall whether there was a photograph of the iPhone attached to the warrant to further identify the specific phone that was to be searched?

A   Yes, there was.

Q   Were you advised whether to continue with the search of that iPhone based on this initial search warrant?

A   So it was advised that I could move forward with extraction

of the Samsung cellphone, and that a new warrant would be issued for the iPhone.

Q   Now, at some point did you receive a new warrant to conduct a search of that iPhone?

A   Yes, I did.

Q   All right.  I'd ask you now to turn to Government's Exhibit 23 in the binder we have in front of you.  Do you recognize that document?

A   Yes.

Q   Can you tell us what that document is, please.

A   So this is a search warrant for an iPhone-8, Model A-1897.

Q   Can you tell us what date that warrant was issued?

A   It was issued on January 3rd, 2019.

Q   Is it signed by a judge?

A   Yes, Keith A. Pesto, United States Magistrate Judge.

Q   Is that the warrant that you received to search the iPhone Model 8 -- excuse me, iPhone-8, Model A-1897?

A   Yes.

Q   Is the -- Government's Exhibit 23 a fair and accurate copy of that search warrant?

A   It is.

        MR. BERNARD:  Your Honor, I would move for the admission of Government's Exhibit 23 into evidence.

        MS. THOMPSON:  Your Honor, I have the same objection.

        THE COURT:  All right.

Same ruling, I will admit the document into evidence for the purpose of showing the justification for the search. However, any information in there with regard to ownership of the cellphone is not the purpose for the admission, so it's not to be used for that purpose.

MR. BERNARD:  Thank you, Your Honor.

Permission to publish to the jury?

THE COURT:  You have permission to publish.

BY MR. BERNARD:

Q   Now, Mr. Sarvey, in addition to the two search warrants that we've just observed, were you provided with the cellphones that were to be searched pursuant to those warrants?

A   Yes, I was.

Q   Okay.  Now, Mr. Sarvey, I'm handing you what's been entered into evidence as Government's Exhibit 7 and Government's Exhibit No. 8.  I'd ask you to please take a look at those items and describe what it is I've anded you.

A   Exhibit 7 is the Apple iPhone-8.  And Exhibit 8 is the Samsung cellphone.

Q   Were those the phones that were provided to you to be searched pursuant to the two warrants that we've previously discussed?

A   Yes, they were.

Q   With respect to the Samsung phone, which is Government's Exhibit 8, did you conduct a data extraction from that device?

A   I did.

Q   Did you process the data and make it available for the case agent to review?

A   Yes, I did.

Q   Did you copy that data to a physical format?

A   Yes.

Q   Mr. Sarvey, I'm handing you what's been marked for identification purposes as Government's Exhibit 22.  Do you recognize what I've just handed you?

A   Yes, I do.

Q   Would you please tell the jury what that is.

A   So these are the extractions of the Samsung Galaxy cellphone.  This is a copy of them.

Q   So would that be a complete extraction of the data that was contained on that device?

A   The data that I was able to extract, correct.

Q   And is that the disk that you personally created containing that copy?

A   Yes.

        MR. BERNARD:  Your Honor, I'd move for the admission of Government Exhibit 22 into evidence.

        MS. THOMPSON:  Your Honor, may we approach?

        THE COURT:  Yes.

    (At side bar.)

        MS. THOMPSON:  I'm going to object to admission of

Exhibit 22, which I believe would be the disk of the full report. This would be the same objection when it comes to Exhibit 24, that that full exhibit would contain irrelevant and prejudicial information, information also including things that this Court already excluded from use at trial.

So I think it would be similar to what was requested as to the transcripts by the defense, that if there's particular parts they're trying to admit, they just be allowed to admit particular parts.

MR. BERNARD: Judge, for purposes of completion of the record, these exhibits are being offered to show the process by which the phones were recovered, the data was extracted, the date that was made for review, and then it was reviewed by the case agent.

We do have a subsequent report that was prepared by Special Agent James Simpson that contains the relevant items from those phones. That will be presented at a later time.

THE COURT: Well, let's just offer that in for that limited purpose of -- what was it again?

MR. BERNARD: This is offered for the limited purpose of establishing essentially the chain of custody of the items that James Simpson will be presenting through his testimony, which is the report that he generated from the data that was extracted from the phones.

THE COURT: Any other purpose other than chain of

custody?

MR. BERNARD: It just shows that we didn't -- you know, this is the direct path that these traveled and the data that was found on them from their seizure during the traffic stop, to the forensic examiner, to copies of the data, to the case agent who reviewed the data and reviewed the report.

THE COURT: That is what this establishes?

MR. BERNARD: It establishes the foundation for a future witness's testimony.

MS. THOMPSON: So these exhibits, Exhibit 22 and Exhibit 24, are this witness's full reports. What I'm --

MR. BERNARD: That's incorrect.

MS. THOMPSON: It's not?

MR. BERNARD: No, these are exact, full copies of the data that were extracted from the --

MS. THOMPSON: That's what I meant by "this is his work product." So this particular witness created that work product which, again, part of that work product was or does also include inadmissible, irrelevant, prejudicial information.

Now, what I'm hearing the Government say is that then Agent Simpson interpreted that work product and has produced a different report that they want to later admit, so I don't believe that that's a direct link.

MR. BERNARD: This is not work product, Judge. This is a direct copy. This is as if we were to take a photo of an

Justin Sarvey - Direct Examination

item and it would be handed to another person to tell you what that picture is.  This is like -- as if the person who took the photo were testifying.

THE COURT:  This is offered only to show chain of custody or what exactly?

MR. BERNARD:  What's the common agent's testimony is the report that contains the relevant pieces of data that he selected, that he identified from within the full data extraction.

THE COURT:  His presentation will be limited by our rulings regarding what can't be presented?

MR. BERNARD:  It will, yes.  And his report, the one that we have included in the exhibit binder, has been redacted to exclude any items that he has -- he actually identified items as relevant to the investigation but that are not admissible at trial.

THE COURT:  Is this exhibit -- does this exhibit contain anything that has been excluded?

MR. BERNARD:  It does, yes.  This is the full-on complete extraction of these devices to establish the foundation for the creation of Jim Simpson's report and his testimony about those.

THE COURT:  This exhibit, then, if displayed to the jury, they would see these items that were not permitted?

MR. BERNARD:  Yes, absolutely.

THE COURT: Correct?

MR. BERNARD: I do not intend to display this exhibit to the jury. I do not think it should go back to the jury for deliberations. I believe it's necessary to establish the foundation for Agent Simpson's testimony.

THE COURT: I'll approve its admission with the understanding that it cannot be displayed to the jury, and that this witness is not to reference anything that was excluded by the Court, and that Officer Simpson's testimony will be separate from this. Correct?

MR. BERNARD: Yes, sir.

THE COURT: Is that -- does that satisfy your --

MS. THOMPSON: I'm just going to maintain for the record and object; and then it would be -- I'll just be repeating that for Exhibit 24, is the same thing.

THE COURT: All right, I understand, and I think the objection is well taken. But I believe that what I just ruled takes care of the objectionable parts of it. So we'll have to remember, do not have this go out with the jury.

MR. BERNARD: Yes, Your Honor.

THE COURT: Thank you. This is 22?

MR. BERNARD: Twenty-four as well.

THE COURT: Twenty-two and 24.

MR. BERNARD: Yes, 24 will be --

THE COURT: You object to both of these at this time?

MS. THOMPSON:  Yes.

THE COURT:  Twenty-two and 24 will not be displayed to the jury, and this witness will basically be using this just to show chain of custody.

And then he will cover what exactly?

MR. BERNARD:  That's essentially it.  That's why my line of inquiry essentially ends after the admission of the next exhibit, and that's that for this witness.

THE COURT:  Okay.  All right.  Then that I believe satisfies Attorney Thompson's objections.

MR. BERNARD:  Yes.

THE COURT:  Thank you.

MS. THOMPSON:  Thank you, Your Honor.

(In open court.)

THE COURT:  All right, counsel, are you offering Exhibits 22 and 24?

MR. BERNARD:  Well, I have not yet presented 24; but 22 at this time, Your Honor.

THE COURT:  Twenty-two is admitted for the limited purpose of showing chain of custody.

MR. BERNARD:  Thank you, Your Honor.

THE COURT:  Go ahead.

BY MR. BERNARD:

Q   Now, Mr. Simpson -- or, excuse me, Mr. Sarvey, with regard to the iPhone-8, which is Government's Exhibit 7, were you able

to conduct a data extraction from that device?

A    I was not.  The device was protected with an unknown passcode.

Q    Is there a routine practice that you follow when you encounter that issue?

A    Yeah.  So we had to utilize additional software in order to try and obtain that passcode.

Q    Was that passcode ultimately determined and the device unlocked?

A    Yes.

Q    Okay.  Once the device was unlocked, was the data able to be extracted from the iPhone-8?

A    Yes, the data was extracted.

Q    Was the data from the iPhone-8 then processed and made available for the case agent's review?

A    Yes, it was.

Q    Did you copy the data from the iPhone-8 to a physical format?

A    I did.

Q    Mr. Sarvey, I'm handing you what's been marked for identification purposes as Government's Exhibit 24.  Would you please tell the Court what that is that I've handed you.

A    This is a Blue Ray containing the extraction of the Apple iPhone.

Q    Is that a copy of that extraction that you personally

created?

A    It is.

MR. BERNARD:  Your Honor, I'd move for the admission of Government's Exhibit 24 into evidence.

MS. THOMPSON:  Same side bar discussion, Your Honor.

THE COURT:  Okay, thank you.

Twenty-four is admitted strictly for the purpose of chain of custody at this time.

MR. BERNARD:  Thank you, Your Honor.

BY MR. BERNARD:

Q    Now, Mr. Sarvey, once the data is processed from a device and provided to the case agent, is the agent able to edit any of the content of the data?

A    So once the data is extracted and processed and we put it up onto our review system, in a read-only format for the case agent.  So nothing can be -- no text messages, no data can be deleted from that review.

Q    Is the case agent able to generate any reports which summarized information that he or she deems relevant to an investigation?

A    Yes, they're able to generate reports.

Q    Does the report generated by the case agent contain data other than the specific items that the agent identifies, such as is text messages, contact lists, or images?

A    Yeah.  So the report may also contain metadata for the

files that's listed in the report.

Q   Would you tell us what metadata is, please.

A   So metadata is basically information about a file.  So if you had a file that was a picture, the metadata would be information like the file name for that picture.  It would be where that picture is stored on a device.  It could contain the creation date, so the time that that photo was taken.  It may also include things like the type of device or the model of device, such as like an iPhone or a Samsung device, that took that photo.

Q   Okay.  And, Forensic Examiner Sarvey, who is the case agent to whom you would have provided the processed data from the Samsung and iPhone?

A   It was Special Agent James Simpson.

        MR. BERNARD:  Thank you.  No further questions at this time.

        THE COURT:  Attorney Thompson?

        MS. THOMPSON:  Thank you, Your Honor.

                    CROSS EXAMINATION

BY MS. THOMPSON:

Q   Is it Agent Sarvey?

A   I'm a forensic examiner.

Q   Okay, I'm sorry.  I'm sorry.  I'm Sandra Thompson representing John Terry.  Good afternoon.

A   Good afternoon.

Q    So just trying to understand some of the things that you stated, ultimately you're originally given a search warrant and a cellphone that was identified -- or misidentified as an iPhone-7.  Is that right?

A    I received a search warrant that identified it as an iPhone-7.

Q    And that was Government's Exhibit 21.

A    Correct.

Q    And then you stated that you processed data from the iPhone-8 as well as a Samsung, is that right?

A    So I extracted the data from the Samsung Galaxy, which was on Exhibit 21, the original search warrant.  And then once the new search warrant was received for the iPhone-8, then that data was extracted.

Q    Okay.  So ultimately you're saying you extracted data from both cellphones.

A    Data was extracted from both cellphones.

Q    Then you sent the files to Agent Simpson.

A    So we put it up onto an internal review system for them to review.

Q    Now, explain that.

A    How it's set up?

Q    Well, when you said -- we -- now, I said -- in answer to my question of did you send the files to Agent Simpson, you said you put it on an internal review system for them to review.  So

is that almost like a shared drive?

A    It's a internal server, and we can create cases on there and assign specific people to that case so that they can review the data.

Q    Okay.  So you create a case and you assigned it to at least Agent Simpson.

A    Correct.

Q    And then I heard you say that -- I believe I heard you say something about it's in a read-only format, is that right?

A    Correct.

Q    Okay.  Isn't it correct that things in a read-only format can still be printed?

A    Can be printed?

Q    Yes.

A    Correct.

Q    Isn't it correct that things in read-only format can still be saved?

A    So -- saved from the report itself?

Q    Yes.

A    Yes.

Q    If -- are you familiar with Adobe products?

A    Yes.

Q    Okay.  Are you familiar that if you save something in Adobe, that it can be changed?

A    So -- as in how?

Q   Well, I'm asking you if you're familiar.  You first said you're familiar with Adobe products, that if you -- are you familiar with the fact that if you save a document into Adobe format, that Adobe has an edit function?

A   So I know what's in Adobe Pro, that you can make adjustments.

Q   And would you agree that even read-only doesn't prevent saving or printing the document in, say, Adobe?

A   I'm sorry, can you repeat your question?

Q   Sure.  Would you agree with me that even having a file in read-only format does not prevent the file or pages being saved in Adobe PDF?

A   So -- items can be identified within the report that we set up, and it could be exported to a new PDF report, which is Adobe.

Q   Okay.  So, again, even though it's read only, the file can be exported to another program.

A   So when the files are exported, it's just really generating like a new report to -- it sort of segregates a -- like a whole library of data maybe down to one or two books.

Q   Okay.

A   It's meant to shrink your data set.

Q   I'm sorry, say that again.

A   It's meant to limit your data set to items of interest.  So if the case agent goes through, identifies items of interest to

the case, then they can generate that new report of only the items of interest.

Q   So -- and I just want to be clear because there was a point made of read-only format.  So I'm just trying to clarify that a read-only format doesn't prevent editing if you save it in a different program.  Isn't that correct?

A   Once it's outside of the program -- I mean it -- so when -- when Agent Simpson identified the items of interest, he let me know that he was done, and I generate a new report of the items that he marked of interest.  And I then copied that onto a compact disk.

Q   So I'm actually -- so I'm going to ask you to answer my question.  And my question is:  Isn't it correct that even though the file's in read-only format, if it's saved into another program, then it can be edited.

A   I guess it could be edited.

Q   Okay.

        MS. THOMPSON:  Thank you, nothing further.

        THE COURT:  Attorney Bernard?

    (Off the record discussion.)

                    REDIRECT EXAMINATION

BY MR. BERNARD:

Q   So, Forensic Examiner Sarvey, on cross-examination there was discussion about this review process conducted by the case agent.  Can you explain how that process works and who

ultimately creates the report of the material the case agent identifies as relevant?

A   Yes.  So once I extract the data and process it, then it's put up onto that internal review system.  The case agent goes through all the data on the phone, identifies their items of interest.  From that point SA -- Special Agent Simpson let me know that he was finished with his review and that he had tagged the items of interest.

At that point I generate a new report, which was in PDF format, of the items that he tagged.

Q   Did you copy that PDF format report to any sort of physical format?

A   Yes, I put it onto a compact disk and entered it into our evidence control.

Q   Is that true of both the report related to the Samsung phone as well as the iPhone-8?

A   It is.

Q   Okay.  And so once you create that report and put it on the disk, does that item get stored in evidence?

A   Yes, it does.

Q   So access to that item is logged on the property record?

A   Yes, it is.

Q   And anybody who accesses that data or those particular disks would have to sign that evidence in or out.  Is that correct?

A   That's correct.

Q   Is that kept under lock and key?

A   Yes.

Q   Is there someone who is in charge of managing the property storage area within FBI?

A   Yes, there is.

Q   Does that person track who has access to materials and who does not?

A   Yes, they do.

Q   So, Forensic Examiner Sarvey, I've handed you what's been marked for identification purposes as Government's Exhibit 25 and Government's Exhibit 26.  Can you tell the jurors what I've just handed you.

A   So this is a compact disk that contains the PDF report of the items that SA Simpson -- Special Agent Simpson had identified during his review.

Q   Is that the disk that you created?

A   Yes, it is.

Q   Is that the disk that was placed into secure evidence storage after your creation?

A   Yes, it was.

Q   All right.

        MR. BERNARD:  Your Honor, I'd move for the admission of Government's Exhibit 25 into evidence.

        MS. THOMPSON:  Your Honor, I guess they're just adding

disk 25 and 26 to the exhibit book, but I would maintain these same objections as we discussed for 22 and 24.

MR. BERNARD: Your Honor, may we approach?

THE COURT: Yes.

(At side bar.)

MR. BERNARD: So this is a disk of the full report that was -- of the items identified by Agent Simpson as relevant. It does include material that has been ruled out by this Court.

I was not expecting to have to put this item into evidence; but when the issue is raised as potentially editing data after the fact, I felt compelled to show that this item, created by the forensic examiner and placed into secure evidence storage, which contains the exact same report that Agent Simpson will be testifying to, must be admitted into evidence.

THE COURT: Does this contain information that we've ruled not to be admissible?

MR. BERNARD: Yes; so these items do not need to go back to the jury.

THE COURT: This is more expansive than the Special Agent's report, is that correct?

MR. BERNARD: It's the same report, but the one that will go back to the jury has redactions of the items that are excluded.

THE COURT: All right. So the purposes of this, then, you were asking for the same admission without displaying it to the jury?

MR. BERNARD: Yes, Judge. But here's the -- the only point that I would raise here is, you know, it -- through the questioning of the forensic examiner, it appears as if the defense was attempting to raise doubts that the case agent may have manipulated the data or changed the content included in his report, which is supposed to be the data directly taken from the phone.

These items contain that complete report created by the forensic examiner and stored into evidence, essentially protected until the time of trial. If there's a question as to the veracity of the report created by Agent Simpson -- and the jury does need the ability to compare side by side the report he's created and the report that was generated, because if they have a question about authenticity, the accuracy, the veracity of the information on there, they should have the ability to compare those two.

MS. THOMPSON: So I don't believe that the Government can try to backdoor inadmissible, prejudicial information.

So the Government on its direct brought out and made the fact that the file was just read only. So my cross examination was just following up on that fact, that -- what read only means, and it doesn't mean much.

If -- the Government could have submitted a copy of the pertinent report that this gentleman stated he created and the physical form, redacting all of the inadmissible and prejudicial information. But they chose not to do that and they chose not to bring the actual report out in front of this witness, and they're letting it be the interpretation of Agent Simpson.

So I think the Government should not be allowed to introduce inadmissible information. They should -- if they're going to do it, then they should present redacted physical reports to this witness.

THE COURT: My understanding is that how Agent Simpson used the report was that he took out the sections that he wanted to use, and then they are going to be admissible portions. Correct?

MR. BERNARD: Yes. So, Judge, the process was the forensic examiner copied the data from the phone, placed it on their internal server for case Agent Simpson to review. Case Agent Simpson reviews the data and tags the items that he believes pertinent to the investigation. Then he notifies Examiner Sarvey, who creates a report based on the tags that Agent Simpson has created.

That report was generated, was burned to a disk, and it was put in evidence storage.

THE COURT: That's what we're talking about now,

and 26.

MR. BERNARD:  That's the one we're talking about, yes.

Then, from that report, we had taken a copy of that original PDF file and then made the redactions to exclude items that would not be admissible at trial.

My only concern is that defense was raising the issue that Case Agent Simpson somehow manipulated or edited this data that was produced by the forensic examiner directly from the devices and locked into secure storage until today.

And I think that if they're going to raise that concern, then the jury should be able to compare the two to assure themselves that this did not occur.

THE COURT:  When you say compare the two, what are they going to be comparing, a printed-out version of both exhibits?

MR. BERNARD:  They would have to, yes.

THE COURT:  But if they had a printed-out version of 25 and 26, they would be viewing items that we have already found to not be admissible.  Is there not some way to --

MR. BERNARD:  Judge, that is what -- that is what they have.  That is what they will be presented through Agent Simpson.  They will be presented a printed-out version that is redacted.  But the defense is claiming that that printed-out version may have been manipulated or altered from the original, and so I presented the original.

THE COURT: Well, he can testify as to the fact that this is all taken from the CD or the printed -- the version he was relying on, correct?

MR. BERNARD: Yes.

THE COURT: Okay. And if in that time defense raises the issue that this was somehow changed or manipulated, we can deal with the issue as to whether or not we need a copy to compare it to. But I think at this point in time it's premature and we've already ruled on the inadmissibility of these exhibits. So --

MR. BERNARD: Sure, I have no problem with that. I'm suggesting that we don't rule out the possibility of sending it to the jury --

THE COURT: It's down the line.

MR. BERNARD: Right.

THE COURT: At this time we would not permit it to go out to the jury, and at this time we would not permit it to be published to the jury, subject to later developments which are perhaps fair or raise issues that should be in some form published to the jury; but that's -- at this point in time we don't need to do that.

MR. BERNARD: Sure.

MS. THOMPSON: Thank you.

(In open court.)

BY MR. BERNARD:

Q   So, Forensic Examiner Sarvey, I believe I handed you Exhibit No. 25.  Can you identify that again for us, please?

A   Sure.  Exhibit 25 is a compact disk that contains the items that were identified by Special Agent James Simpson during his review.

Q   Of which phone?

A   The Samsung Galaxy.

Q   And that's a disk that you created yourself, correct?

A   It is.

Q   Okay.

MR. BERNARD:  Your Honor, I move for the admission of Government's Exhibit 25 into evidence.

THE COURT:  Twenty-five is admitted subject to the restrictions discussed at side bar.

MR. BERNARD:  Thank you, Your Honor.

BY MR. BERNARD:

Q   Now, Examiner Sarvey, would you please take a look at Government's Exhibit 26 and tell us what that item is, please.

A   So Exhibit 26 is, again, a compact disk that contains the items that were identified by Special Agent Simpson during his review of the Apple iPhone.

Q   Is that a disk that you personally created?

A   Yes, it is.

Q   Where was that disk stored following your creation of it?

A   In evidence control.

MR. BERNARD:  Your Honor, I'd now move for the admission of Government's Exhibit 26 into evidence.

THE COURT:  Twenty-six is admitted subject to the restrictions discussed at side bar.

MR. BERNARD:  Thank you, Your Honor.

No further questions.

THE COURT:  All right.

Attorney Thompson?

MS. THOMPSON:  No questions, Your Honor.

THE COURT:  All right.  Is this witness excused, counsel?

MR. BERNARD:  Yes, Your Honor.

THE COURT:  All right.  Mr. Sarvey, you may step down and are excused from further attendance.

THE WITNESS:  Thank you.

(Whereupon, the witness was excused.)

THE COURT:  And I'll note -- not for you, Mr. Sarvey, just generally I'll note that we're almost at five o'clock. This would be a good time to break for the day, and we can start again in the morning with a new witness.

So at this time we're going to take our end of the day recess.  I will read to you one final time today the recess instructions.

We are about to take our end of the day recess, and I

remind you of the instructions I have given you previously.

During this recess and any other recess, you must not discuss this case with anyone, including your fellow jurors, members of your family, people involved in the trial, or anyone else.

If anyone tries to talk to you about the case, do not tell your fellow jurors, but tell me about it immediately through one of my court staff.

Do not read, watch, or listen to any news reports of the trial or conduct any research or investigation on the Internet.

Remember that I told you not to use any electronic tools to communicate with anyone about the case or to do research related to the case.

Remember to keep your mind open until all the evidence has been received and you have heard the views of your fellow jurors, which will be at the end of the case.

And with regard to research or investigation, do not conduct any over the Internet or otherwise.

All right, this is the end of the day recess. Thank you for your attention and your work today, members of the jury. We'll start again tomorrow -- well, we started a little bit later this morning; that was my fault. I'll take responsibility for that. We had to take care of a couple things that delayed us starting. But I will certainly do my

best -- and counsel have been doing their best -- to start on time in the morning, 9:00.

So please be here at 8:30, and we will put in a full day tomorrow, get in as much evidence as we can cover in one day.

All right. We'll be in recess until call of court.

MR. KEYS, LAW CLERK: All rise. Court s in recess.

(Jurors exit the courtroom.)

THE COURT: All right, please be seated. The jury has left the courtroom, so these remarks are outside of the hearing of the jury.

One issue I do want to address, which we addressed earlier in the trial.

You can be seated, sir, if you wish.

Is -- Mr. Gerald Terry, you were going to be bringing in and we had talked about bringing him in first thing in the morning. So with that in mind, Attorney Bernard, Attorney Sheehan-Balchon, is there any reasonable likelihood that we would get to Mr. Terry tomorrow, given the number of witnesses that you have?

MR. BERNARD: It's possible, Your Honor; I'm not sure.

THE COURT: Well, the reason I wanted to bring this up is they're going to be bringing him -- it's quite a lengthy journey, I guess, to get him here. And it may be a case where he is brought here, and then will have to be brought back the

following day.

Now, Attorney Thompson, if you advise me that you need to meet with him during the day tomorrow and you could fit that in, perhaps during the lunch hour or something, then we'll still have him brought over here so you have a chance to talk with him.

MS. THOMPSON: Yes, Your Honor; I would absolutely love that.

THE COURT: Okay. I think that's reasonable because otherwise he would not be getting here until later in the morning on Thursday, and you said you wanted to present him as your first witness.

MS. THOMPSON: Yes.

THE COURT: Okay. We'll -- then, Marshal, please continue to have the authorities bring him tomorrow. It's possible we'll get to him in the afternoon. If not, where would he be so that Attorney Thompson can access him?

MARSHAL: He's scheduled to come tomorrow at 8:00. He'll be picked up at 5:00. I'll have him brought the next day as well if you need him.

THE COURT: He'll be staying here?

MARSHAL: He'll be going back to NEOCC.

THE COURT: No, I mean while he's here.

MARSHAL: Yes, sir.

THE COURT: He'll be in your area, correct?

MARSHAL:  Yes.

THE COURT:  Okay.  Then Attorney Thompson could access him there?

MARSHAL:  (Nods head.)

THE COURT:  Perhaps during the lunch hour?

MARSHAL:  Yes, sir; whenever she is free.

THE COURT:  All right.

Attorney Thompson, hopefully that meets your requirements.

Back to the Government, who do you plan to present tomorrow?

MR. BERNARD:  Tomorrow, Your Honor, we plan to call Morgan Wiermusz, who is the forensic scientist from the state police.

THE COURT:  The name again is --

MR. BERNARD:  Morgan, M-O-R-G-A-N; Wiermusz, W-I-E-R-M-U-S-Z.

THE COURT:  Okay.  That witness is on your list of witnesses as D?

MR. BERNARD:  Yes.  I believe we took Mr. Sarvey out of order there on the list that you were provided.

THE COURT:  Who else then?

MR. BERNARD:  We'll  also call Special Agent James Simpson and Robert Dillard.

THE COURT:  Simpson is listed as I.

And who is the third one?

MR. BERNARD:  Robert Dillard.

THE COURT:  That is the individual who is the cooperating witness, correct?

MR. BERNARD:  Yes, Your Honor.

THE COURT:  Okay.  And he is J.

Anyone else tomorrow?

MR. BERNARD:  No, Your Honor.

THE COURT:  Okay.  So that would complete your --

MR. BERNARD:  (Nods head.)

THE COURT:  It's possible then, Attorney Thompson, we might, if we really push through, we'll get to your witness; but -- in any event, you'll have access to talk to him.

All right.  Anything further from either of the parties before we recess for the day?

MR. BERNARD:  No, Your Honor.

MS. THOMPSON:  No, Your Honor.

THE COURT:  All right.  Thank you.

Everyone have a safe trip back to their respective homes or where they're staying, and we'll see you in the morning.

MS. THOMPSON:  Thank you.

(Court recessed at 5:02 p.m.)

C E R T I F I C A T E

I, Shirley Ann Hall, certify that the foregoing is a correct transcript for the record of proceedings in the above-titled matter.

s/Shirley Ann Hall
Shirley Ann Hall, RDR, CRR
Official Court Reporter


I N D E X

Government Opens.................................... 22
Defense Opens...................................... 29

| WITNESS | DIRECT | CROSS | REDRECT | RECROSS |
|---------|--------|-------|---------|---------|
| Ryan Marmol | 36 | 96 | 124 | 135 |
| Brian Wright | 141 | 163 | 169 | 190 |
| Justin Sarvey | 170 | 186 | --- | --- |

E X H I B I T S

| NUMBER | IDENTIFIED | ADMITTED |
|--------|------------|----------|
| Govt. Ex. 1 | 45 | 45 |
| Govt. Ex. 2 | 62 | 65 |
| Govt. Ex. 2A | 66 | 66 |
| Govt. Ex. 2B | 66 | 67 |
| Govt. Ex. 2C | 67 | 68 |
| Govt. Ex. 3 | 69 | 69 |
| Govt. Ex. 3A | 69 | 69 |
| Govt Exs. 3B and 3C | 71 | 71 |
| Govt Ex. 4 | 72 | 73 |

E X H I B I T S

| NUMBER | IDENTIFIED | ADMITTED |
|--------|------------|----------|
| Govt. Exs. 4A and 4B | 45 | 45 |
| Govt. Ex. 5 | 78 | 79 |
| Govt. Ex. 6 | 79 | 80 |
| Govt. Ex. 6A | 80 | 81 |
| Govt. Ex. 6B | 81 | 82 |
| Govt. Ex. 7 | 85 | 86 |
| Govt. Ex. 8 | 88 | 89 |
| Govt. Ex. 9 | 90 | 91 |
| Govt. Ex. 12 | 58 | 58 |
| Govt. Ex. 13 | 60 | 60 |
| Govt. Ex. 14 | 61 | 61 |
| Govt. Ex. 15 | 146 | 146 |
| Govt. Ex. 16 | 150 | 150 |
| Govt. Ex. 17 | 152 | 152 |
| Govt. Ex. 18 | 153 | 154 |
| Govt. Ex. 19 | 156 | 156 |
| Govt. Ex. 20 | 158 | 159 |
| Govt. Ex. 21 | 173 | 174 |
| Govt. Ex. 22 | 178 | 183 |
| Govt. Ex. 23 | 176 | 177 |
| Govt. Ex. 24 | 184 | 185 |
| Govt. Ex. 25 | 192 | 198 |
| Govt. Ex. 26 | 198 | 199 |