IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

_____

UNITED STATES OF AMERICA,
                    Plaintiff,

                                        Criminal Action
        vs                              No. 18-24
                                        (Day 3)
JOHN T. TERRY,
                    Defendant.


_____

            Transcript of Day Three Jury Trial proceedings held
on Wednesday, August 24, 2022, United States District Court,
Johnstown, Pennsylvania, before the Honorable Kim R. Gibson,
U.S. District Court Senior Judge.


APPEARANCES:

For the Government:             ARNOLD P. BERNARD, JR., Esq.
                                MAUREEN SHEEHAN-BALCHON, Esq.
                                U.S. Attorney's Office
                                319 Washington Street, Suite 200
                                Johnstown, PA  15901
                                arnold.bernard@usdoj.gov
                                Maureen.Sheehan-Balchon@usdoj.gov



For the Defendant:              SANDRA THOMPSON, Esq.
                                351 E. Princess Street
                                P.O. Box 1902
                                York, PA  17405
                                sthompsonLLC@gmail.com




Court Reporter:     Shirley Hall, RDR, CRR
                    U.S. Courthouse, Suite 204
                    Penn Traffic Building
                    319 Washington Street
                    Johnstown, PA  15901
                    shirleyhall_uscra@yahoo.com


Proceedings recorded by digital stenography; transcript
produced by computer-aided transcription.

P R O C E E D I N G S

(In open court, without jury.)

THE COURT: Please be seated.

I'll first note that the jury is not in the courtroom, so these remarks are outside the hearing of the jury.

It's my understanding that counsel have some issues they want to address before we bring the jury in. You may proceed.

MS. THOMPSON: Yes, Your Honor; good morning.

THE COURT: Good morning.

MS. THOMPSON: I apologize for the late notice, but I just received a copy of the exhibits from the Government, and they just handed over three exhibits, 32K, 32H, and 32W marked.

We specifically have an objection to 32K, and more so for the second page of the document, which is dated 3/12/2018, time 2:37:50 a.m., E-T-C. So it's a statement that they're attributing to Mr. Terry. It basically says, "Shall punch you in the face at 50 percent me a plus."

And I'm just concerned with the type of prejudice that even the statement of "punch you in the face" could lead to the jury, especially these times me truisms and things like that. I think the Government can make their argument. They have an attachment that appears to be Mr. Terry and some woman, so I think they can make their argument without that particular statement.

THE COURT: All right, and this is from the phone?

MS. THOMPSON: Yes.

THE COURT: Okay. Was this produced to you before today?

MS. THOMPSON: No.

THE COURT: And this is 32K, Page 2, did you say?

MS. THOMPSON: Yes.

THE COURT: Anything else? Is that --

MS. THOMPSON: So -- I mean that's basically what I would say more prejudicial, so -- that specific line.

THE COURT: Okay. And this was something you had not seen prior to today?

MS. THOMPSON: No, I had not seen that before. I mean I guess they're going to say that it was somewhere in that disk, but we had a detention hearing, that was not an exhibit that they were highlighting before, so, no.

THE COURT: Okay. Thank you.

Counsel?

MS. SHEEHAN-BALCHON: Yes, Your Honor. This particular image has been disclosed to defense before, not only in the Rule 16 materials, it's included in the general scope of Government's Exhibit 24 which was litigated yesterday. It's also included in a summary, Exhibit 31, which will be proffered today.

Your Honor, the Government's intention with 32K -- and

I think, to backtrack a little bit, if the Court reads the context of that communication between John Terry and the unknown female, it's certainly a conversation that's light-hearted, it's in jest. Nobody can perceive that as him actually being violent toward this woman.

However, for purposes zero of moving this along today, the Government is willing to redact. On Page 2 of that Exhibit, Your Honor, the defense is objecting to, "Shell, I will punch you in your face." The Government's willing to redact that part, specifically redact it in the portion that is going to be shown to the jury and goes out with the jury.

We are asking the Court to keep the relevant portion indicating, "That pic you sent me of us," which I think satisfies both sides' needs.

THE COURT: Okay.

Counsel, with the redaction, are you still objecting?

MS. THOMPSON: I'm trying to -- the Government just stated that it was mentioned in the Government's Exhibit 31, and I would ask the Government to point that out, where Exhibit 31 has referred to this exhibit.

MS. SHEEHAN-BALCHON: Your Honor, it was definitely included in Government's 24. I may have misspoken indicating it was included in 31 as well, which is just a summary of 24.

THE COURT: You're presenting to the Court, though, that this was presented to defense prior to today.

MS. SHEEHAN-BALCHON: Absolutely.

THE COURT: Okay. With the redaction of that one portion that would be prejudicial or could be prejudicial to the Defendant, I will permit the exhibit to be used.

Let me just comment that we're falling behind in this trial, and these sorts of things need to be resolved other than during jury time. I'm very concerned at this point that we're not even going to finish by Friday. So please try to move this along at a much faster pace than we've been moving at so far. I'm not attributing that to any counsel or any party, I'm just saying generally this case is proceeding very slowly and I would rather not have to keep the jury over until Monday, unless we absolutely have to. So to the extent we can move this along, I would appreciate you doing so.

All right. Let's bring the jury in, then. We'll all stay in court and we will proceed with your next witness.

(Jurors seated.)

MR. KEYS, LAW CLERK: Court is in session.

THE COURT: Please be seated.

Ladies and gentlemen, we're starting a little bit later again than I anticipated, but we're going to try to move this a long as quickly as we can. So far I have not been very successful with that, but I hope to improve my performance maybe today.

MEMBER OF THE JURY: I can't hear you very well.

THE COURT: You can't -- let me turn my microphone up and speak -- is that better?

MEMBER OF THE JURY: Yes.

THE COURT: Okay, thank you for telling me that. Because if I'm talking and you can't hear me, we're both wasting our time.

Go ahead, counsel. You can call your next witness.

MS. SHEEHAN-BALCHON: Thank you, Your Honor.

The Government calls agent James Simpson.

JAMES SIMPSON, a witness herein, having been first duly sworn, was examined and testified as follows.

DIRECT EXAMINATION

BY MS. SHEEHAN-BALCHON:

Q   Sir, would you please introduce yourself to the members of the jury.

A   Yes, my name is James Simpson. I'm with the FBI. I'm a Special Agent. I'm up here in Johnstown, Pennsylvania, part of the Pittsburgh field office.

Q   What is your current title in that agency?

A   I'm currently the Southwest Pennsylvania Safe Streets Task Force coordinator.

Q   And you're also a Special Agent?

A   And a Special Agent.

Q   Okay. And so being the coordinator of the Southwest Pennsylvania Safe Streets Task Force is a subset of you being a

Special Agent?

A    Yes, ma'am.

Q    Are you the senior special agent in that office in the Laurel Highlands.

A    Yes, ma'am.

Q    And how would you describe your duties and responsibilities?

A    We work all sorts of violent crime cases, to include guns, drugs, child pornography, financial crimes, pretty much everything out in the mountains.

Q    How long have you supervised the Southwestern PA Safe Streets Task Force?

A    Since 2017.

Q    And what is the mission of that task force?

A    The task force is to combat violent crime in the Laurel Highlands, comprised of seven counties, specifically drug trafficking, gangs, and gun trafficking.

Q    What is a task force officer and how many do you supervise?

A    We have eight full-time task force officers, over 20 part-time task force officers.  The task force officers are local detectives from Johnstown Police Department, Indiana Borough Police Department, and other local departments, the state police; and they basically bring investigations to us that they need assistance from the FBI.

Q    So are they from various agencies throughout your area of

responsibility?

A    Yes, ma'am.

Q    Do the investigations of the task force largely involve gun and drug trafficking?

A    Yes, ma'am.

Q    How long in general have you worked with the FBI?

A    I've worked since 2008 with the FBI.

Q    What prior assignments have you had before the Laurel Highlands office?

A    I was in the FBI-Newark, where I worked -- first, hispanic drug trafficking organizations.  Then I worked computer intrusion, specifically Iranians.  Then I worked financial crimes, Pakistani/Indian credit card fraud.

Q    And were those all in the Newark office?

A    Yes, ma'am.

Q    How much of your time in the Newark office was spent investigating drug trafficking and gun crimes?

A    Approximately nine months.

Q    What type of training have you received related to drug trafficking while you have worked with the FBI?

A    When you -- after you complete your 22 weeks at the FBI academy, you're assigned to a squad.  I was specifically assigned to the drug squad up in Newark.  You're assigned a training agent who basically walks you through all the steps of handling sources, interviews, arrests, searches.  There's a log

book that has to be completed to make sure you complete each step they need to know to be an FBI agent.

Q    And were you assigned a field training officer?

A    Yes, ma'am.

Q    And for how long?

A    You're assigned a field training officer for one year.

Q    And does that field training officer handle you specifically in the training mechanisms of drug investigations?

A    Yes, ma'am.

Q    And is that a senior agent who has conducted multiple, if not dozens of, drug investigations?

A    Yes, ma'am.

Q    And they teach you aspects of a drug investigation.

A    Yes, ma'am.

Q    Okay.  And tell us the various aspects that they train you hands-on.

A    So they train you on how to basically wire up sources for consensual recordings, the proper paperwork that you need to be authorized to allow a source to consensually record a conversation with somebody that they're buying narcotics off of, how to test narcotics, how to package and handle narcotics, how to download that -- those consensual recordings, how to store them this evidence.  You know, when you're doing searches, you know, how to label the rooms, photograph the rooms, photograph the evidence.  All the paperwork that's

associated with that, as well as arrests, transportation, documenting the arrest, and then going through the court process of, you know, proffers, interviews, and working with the attorneys.

Q   Is there also hands-on training regarding the identification of drugs, illicit drugs?

A   Yes.

Q   And what about conducting wiretaps?

A   Yes.  So they'll work with you on basically how to listen to wiretaps, you know, review wiretaps, go through our system of wiretaps, and basically pull out evidence to bring for proffers or interviews.

Q   Okay.  And, generally speaking, are wiretaps a recording that a judge authorizes that the person that's being recorded is not aware of?

A   Yes, ma'am.

Q   All right.  So since you've been working for the FBI, can you estimate for the jury the number of individuals you have assisted in prosecuting for violations of drug trafficking laws?

A   I'd say around 150.

Q   Okay.  Is that on the federal level?

A   Yes.

Q   And, additionally, with your work with the Safe Streets Task Force, are there additional numbers that you have assisted

cases that those were actually prosecuted by state agencies?

A   Yes.

Q   For drug crimes, I'm sorry.

A   Yes, the task force, you know, works tons of state cases that I assist on.

Q   Okay.  So can you estimate how many of those cases you assisted on?

A   I'd say over 200.

Q   Of those people, how many of them were drug dealers from the Western District of Pennsylvania?

A   They would have all been from the western district.

Q   Now, what types of drugs were those particular defendants in the Western District of Pennsylvania accused of distributing?

A   So it would be crack cocaine, cocaine, heroin, fentanyl, marijuana, methamphetamine.

Q   As part of your duties, have you participated in interviews of individuals involved in the use of illegal narcotics -- or addicts for a better -- lack of a better term?

A   Yes.

Q   How many?

A   I would say at least 300 --

Q   Okay.

A   -- interviews.

Q   And did they describe the use and the flow of the same

types of drugs that you've already identified.

A   Yes, they'll basically give you an understanding of how it works from a low level distributor to an addict and how the drugs are packaged, what type of drugs, terminology that they use to order the drugs, and the dollar amounts, and how they basically communicate those dollar amounts to their dealers.

Q   Did those individuals confirm any experience that you had regarding street level sales or low-level sales?

A   Yes.  Many of the addicts that we'll work with we'll try to sign up as confidential sources, so then we'll have them basically agree to wear a recording device that records audio and video.  And, you know, we'll record the phone call; and this is how we corroborate what they're telling us in terms of the phone number, how much, you know, this distributor is dealing in the area, and what their process is of distributing the narcotic.

Q   Also as part of your duties, have you had the opportunity to interview individuals that were involved in the actual distribution of narcotics or drugs?

A   Yes, ma'am.

Q   And how many?

A   I would say probably around a hundred.

Q   And did they discuss with you the methods and mechanisms used to distribute cocaine, methamphetamine, heroin, for example?

A    Yes.

Q    And you have indicated you have worked with confidential sources or -- also known as informants?

A    Yes.

Q    So, generally speaking, describe for us what an informant is -- or a source.

A    An informant is, for my position, is typically brought to myself from our task force officers.  They're somebody that, you know, the task force officers met in the past through either somebody they arrested, and they're trying to work off, you know, charges; or they're somebody that, you know, they interacted with a law enforcement officer in the past, and they want to work and earn money for their work.  And then some just want to work for -- to help the community.

Q    And you've obviously used those types of individuals in your drug investigations?

A    Yes, ma'am.

Q    Have you arranged for the purchase of drugs from -- using the confidential source?

A    Yes, ma'am.

Q    And have you used intel from the interviews that you have just indicated, whether it's from drug users, confidential sources, drug traffickers, in furtherance of your drug investigations?

A    Yes, ma'am.

Q   Did those interviews permit you to become more knowledgeable about drug trafficking?

A   Yes, ma'am.

Q   And more knowledgeable about terminology, language that's used amongst people in the drug business?

A   Yes, ma'am.

Q   Have you conducted search warrants at residences associated with drug dealers?

A   Yes, ma'am.

Q   Approximately how many?

A   Approximately about 45.

Q   And how many of those approximately in the Western District of Pennsylvania?

A   About 30.

Q   Did those search warrants result in the seizure of drugs?

A   Yes, ma'am.

Q   Seizure of firearms?

A   Yes, ma'am.

Q   Seizure of other evidence pertaining to drug trafficking?

A   Yes, ma'am.

Q   As part of your job, do you review evidence and provide an opinion about whether drugs are possessed consistent with an intent to distribute?

A   Yes, ma'am.

Q   As opposed to drugs that are just possessed for personal

use, say.

A    Yes, ma'am.

Q    And can you make that distinction?

A    Yes, ma'am.

Q    Based on your training and experience.

A    Yes, ma'am.

Q    What sort of experience have you had, if any, on cases that involved intercepted communications like wiretaps or conversations with a confidential source and a target?

A    So we've done, I'd say, you know, probably, since I've been in charge of the Safe Street Task Force, I'd say 3- to 400 controlled drug buys, all involved consensual recordings, consensual phone calls.

In addition, while I was in FBI-Newark, we did a -- approximately a five-month wiretap investigation on Dominicans who were distributing cocaine in the Newark area.  And since I've been out here in Johnstown, we've done four wiretap investigations involving Philadelphia -- a couple -- two of them were involving Philadelphia-based drug traffickers.

Q    And were you the affiant, actually, the agent swearing out the affidavit to the judge on any of those wiretaps?

A    Yes, ma'am.

Q    The ones in the Western District of Pennsylvania?

A    Yes, ma'am.

Q    Okay.  As part of those investigations, let's talk about

the wiretaps specifically.  Have you listened to drug trafficker talk about their drug business without them knowing that you're listening to them?

A    Yes, ma'am.

Q    And is that essentially what you do during a wiretap?

A    Yes, ma'am.

Q    Based on your experience, do drug traffickers talk more freely when they do not think that they're being listened to?

A    Yes, ma'am.

Q    Can you estimate the number of hours that you have spent monitoring wiretaps, meaning actually listening, analyzing what you're hearing?

A    I'd say around 4500 hours.

Q    Okay.  Is it a very labor-intensive endeavor, to conduct a wiretap?

A    Yes, ma'am.

Q    And are monitors listening -- how many hours a day?

A    Typically 16 hours a today we have monitoring.

Q    As the case agent or the affiant on those cases, are you responsible to review all of the important communications?

A    Yes, ma'am.

Q    So based upon that and the other experience you've indicated, are you familiar with the language that drug traffickers and their customers use?

A    Yes, ma'am.

Q   Did those experiences inform you with an understanding of the prices, packaging, and distribution of kilograms -- kilogram quantities of cocaine in western Pennsylvania?

A   Yes, ma'am.

Q   What sort of experience have you had on cases involving the analysis of communications of drug traffickers that are later found on cellular phone?  And by that I mean it's static, it's already on their phone, there's no live monitoring or anything.  Do you have any experience in that area?

A   So -- so the buildup for a lot of these wiretap investigations requires a lot of historical background.  So a lot of times we'll end up arresting lower level distributors underneath, you know, the main targets that we're looking to investigate.

        And then we'll seize their phones, we'll get search warrants for their phones, and then we'll go through their phones to understand, you know, who they're talking to, we'll start learning their language, how they're texting their street level distributors or users, so we'll learn how they, you know, communicate the narcotic, how they communicate the amounts.  We'll also see some text communication with their, you know, suppliers or higher level distributors.

        In addition, we'll look for images on those phones and videos to try and -- you know, sometimes they'll post pictures of the actual drugs that they are, you know, distributing.

Q    Through your training and experience, have you obtained a specialized knowledge within the area of illegal drugs and drug trafficking?

A    Yes, ma'am.

Q    And does that knowledge include how illegal drugs are valued or priced?

A    Yes, ma'am.

Q    Including their street value?

A    Yes, ma'am.

Q    Does it include how illegal drugs are packaged?

A    Yes, ma'am.

Q    How they're distributed?

A    Yes, ma'am.

Q    Does it also include the methods and practices of drug dealers?

A    Yes, ma'am.

Q    Does that knowledge include understanding what common tools of the trade are as far as drug trafficking?

A    Yes, ma'am.

Q    Including whenever paraphernalia is needed to package materials?

A    Yes, ma'am.

Q    Whatever items are needed to protect or defend a supply of drugs?

A    Yes, ma'am.

Q   Does that knowledge also include understanding the terminology used by drug traffickers, whether it's coded or plain speaking?

A   Yes, ma'am.

MS. SHEEHAN-BALCHON:  Your Honor, at this point I would offer the witness for voir dire as to his expertise in drug trafficking and into the coded language of drug trafficking.

THE COURT:  All right.

Attorney Thompson?

MS. THOMPSON:  No objection.

THE COURT:  All right.  The witness, Agent Simpson, is going to be permitted to give opinion testimony with regard to the field of drug trafficking and drug trafficking -- what was the term you used?

MS. SHEEHAN-BALCHON:  Drug trafficking and the coded language of drug trafficking, Your Honor.

THE COURT:  -- and drug trafficking coded language.

Okay.  Go ahead.

MS. SHEEHAN-BALCHON:  Thank you, Your Honor.

BY MS. SHEEHAN-BALCHON:

Q   Agent Simpson, what were you asked to do as far as this investigation of John Terry?  What was your participation?

A   We were asked to adopt the investigation of the traffic stop and investigate further into other co-conspirators and

figure out, you know, if we could develop the investigation further.

Q   Okay.  I'm having a little bit of trouble hearing you --

A   Oh.

Q   -- so just -- if you want to sit a little bit closer to the microphone?

A   Yes, ma'am.

Q   Thank you.

So for all intents and purposes, the street work, the interdiction, the traffics, all of that was over by the time you got involved.

A   Yes, ma'am.

Q   Okay.  And during this investigation, have you had any -- any -- strike that.

Did you apply for and receive two search warrants for the cellular telephones that were seized during this investigation?

A   Yes, ma'am.

Q   Okay.

MS. SHEEHAN-BALCHON:  I'm going to ask to publish Government's 21 and 22, Your Honor, that have already been admitted.

THE COURT:  Any objection, counsel?

MS. THOMPSON:  One moment, Your Honor.

(Brief pause in proceedings.)

MS. THOMPSON:  No objection, Your Honor.

THE COURT: Twenty-one and 22 may be published to the jury.

MS. SHEEHAN-BALCHON: And for brevity's sake, Your Honor, I ask that Page 2 of both those exhibits be published at the same time.

THE COURT: Permitted.

MS. SHEEHAN-BALCHON: Your Honor, correction for the record, I'm sorry. It will be Government's 21 and 23.

THE COURT: All right.

Counsel, would that change -- do you have any objection?

MS. THOMPSON: No objection; I think that's what I presumed she meant.

THE COURT: All right, 21 and 23 may be published to the jury.

MS. SHEEHAN-BALCHON: Put up Page 2 of 21, please.

BY MS. SHEEHAN-BALCHON:

Q    So, Agent Simpson, take a look at your screen there.  The first image that you see is Page 2 of Government's 21, second image is first page of Government's 23.

Are those the two search warrants that you applied for and received authorization from Judge Keith Pesto?

A    Yes, ma'am.

Q    Okay.  And can you indicate for the record what date those were signed by Judge Pesto?  Let's start with Exhibit 21.

A    October 10th, 2018.

Q    Okay, we're referring you to the bottom portion of the page displayed for 21.  October 10 of 2018?

A    Yes, ma'am.

Q    Okay.  And indicate for us the date and time issued from Government's Exhibit 23, Page 1.

A    January 3rd, 2019.

Q    Okay.  Thank you.

Now, was one of your primary responsibilities reviewing and analyzing cellular telephone extraction reports?

A    Yes, ma'am.

Q    Describe for us generally what that means.

A    We take the cellphone into evidence; and then once I get the search warrant, I provide a lead to our forensic examiner to then process the cellphone and put it up on our internal review system.  And then I'll go through and I'll mark items that are of interest that I might want to investigate further or that I might want to use as evidence later in the investigation.

Q    Okay.  And are you familiar with Justin Sarvey, the forensic analyst from the FBI?

A    Yes, ma'am.

Q    Did you actually receive the extraction reports from Justin Sarvey?

A    Yes, ma'am.

Q   And that -- as he explained, was that the entire dump from each of these particular cellphones?

A   Yes, ma'am.

Q   Okay.  Once you received those full extraction reports, did you work with Justin Sarvey regarding him creating a more focused report?

A   Yes, ma'am.

Q   All right.  So let's back up a little bit.  During the investigation did you take an iPhone-8 into custody after the April 4, 2018, traffic stop?

A   Yes, ma'am.

Q   When did you take that into custody and where did you receive it -- from whom, I mean.

A   A special agent in our office, Eric Pryor, he received the phone from the Pennsylvania State Police, Trooper Shaun Reynolds.  He received it on September 6th, 2018.

Q   And Agent Pryor then maintained the integrity and the custody protocols for that device?

A   Yes, ma'am.

Q   What steps would be taken once you receive an electronic device to preserve the contents?

A   Well, per the initial ones, seized device, we will attempt to put in airplane mode and then turn the device off.

Q   Once you secure a search warrant for a device, what do you do with it?

A    We will then package it up and then transport to the evidence control center in FBI-Pittsburgh, for secure storage.

Q    And is that where Justin Sarvey works?

A    Yes, ma'am.

Q    Was that -- were those devices then transferred back to you after evidence control analyzed them?

A    Not until this trial.

Q    Okay.  But they were -- it was transferred back to you; we're speaking about the iPhone-8 exclusively?

A    Correct.  So once it's over in Pittsburgh, evidence control, then we cut the lead to Justin Sarvey to put it up on the internal review system.  He'll basically check the phone out of evidence, he'll put it up on internal review system, and he'll check it back into evidence, and it will remain there until trial.

Q    Okay.  Now, did you actually transport that iPhone here today -- the last few days for trial?

A    Yes, ma'am.

Q    Okay.

        MS. SHEEHAN-BALCHON:  May I approach the witness, Your Honor?

        THE COURT:  You may approach.

BY MS. SHEEHAN-BALCHON:

Q    First I'm going to have you take a look at what's been previously marked as Government's Exhibit 7.

The contents of that Exhibit 7 evidence bag, is that the iPhone-8 that was seized and analyzed?

A    Yes, ma'am.

Q    Okay.  Following your search warrant -- the execution of your search warrant, you received that cellphone extraction report from Mr. Sarvey as we discussed?

A    Yes, ma'am.

MS. SHEEHAN-BALCHON:  I'm going to ask to publish previously admitted Exhibit 24.

THE COURT:  Any objection?

MS. THOMPSON:  I think that's a disk, so I would object to that --

MS. SHEEHAN-BALCHON:  Thank you, Attorney Thompson.

That is a physical exhibit.  If I may approach, Your Honor?

THE COURT:  You may.

BY MS. SHEEHAN-BALCHON:

Q    Is the -- take a look at what has been previously marked as Government's 24.  Is that the disk containing the full extraction report from the iPhone?

A    Yes, ma'am.

Q    And in your analysis and your work with Justin Sarvey, did you review and analyze that report in its entirety?

A    Yes, ma'am.

Q    From that report -- so from that report, did you and

Justin Sarvey then distill it and create a more refined report of what was relevant pursuant to the investigation?

MS. THOMPSON: Your Honor?

THE WITNESS: Yes, ma'am.

MS. THOMPSON: I'm sorry. I've been giving a little leeway, but the Government is leading the witness.

THE COURT: I'll permit that question. You are correct, it was somewhat leading, but I'll permit the question.

Go ahead.

BY MS. SHEEHAN-BALCHON:

Q   The question was: Did you and Mr. Sarvey create a summary, refined report --

A   Yes.

Q   -- from the full extraction?

A   Yes, ma'am.

Q   Okay. I'm going to hand you what's marked -- previously marked as Government's 26. And indicate for the record, please, if you recognize that.

A   Yes, ma'am.

Q   Okay. Describe for us what -- what that particular Exhibit 26 is?

A   That's some of the items I selected from the full extraction report that I wanted to basically maintain on a separate document for potential trial or other legal process.

Q   Okay, fair enough.

Once you received the summary that you and Mr. Sarvey created, did you then prepare a further summary, distilling that information even further?

A    That -- that is a -- is the summary that I created.

Q    Okay.  I'm going to have you take a look in the exhibit book next to you --

A    Oh --

Q    -- at Government's 31.

A    I'm there.

Q    Okay.  Take a look at that document.  It consists of 18 pages.  Tell us where you recognize that from.

A    Yes, ma'am.  This is from the -- the more focused report of the iPhone, of some of the items that I selected that were on the iPhone.

Q    Okay.  And Exhibit 31, did you cause that particular document to be created based upon what you wanted presented from the full extraction report?

A    Yes, ma'am.

Q    Okay.

MS. SHEEHAN-BALCHON:  Your Honor, at this point I would seek to admit Government's 31.

THE COURT:  Attorney Thompson?

MS. THOMPSON:  I have no objection, Your Honor.

THE COURT:  Thirty-one is admitted.

MS. SHEEHAN-BALCHON:  Thank you, Your Honor.

BY MS. SHEEHAN-BALCHON:

Q   Agent, did you identify specific communications within Exhibit 31 that's been admitted that you can share and explain for the jury?

A   Yes, ma'am.

Q   Okay.  And is that a series that we're going to walk through that have been marked as Exhibit 32 and sub-exhibits?

A   Yes, ma'am.

Q   Okay.  Before we get there, let's talk about the Samsung Galaxy telephone for a few minutes.  Did you take a Galaxy Samsung into custody after the April 4th, 2018, traffic stop?

A   Yes, ma'am.

Q   When and from who?

A   Special Agent Eric Pryor received the phone from Pittsburgh State Police Trooper Shaun Reynolds on September 6th, 2018.

Q   What steps were taken, if any, to preserve the contents?

A   Again, the phone was already turned off at that point.  It was in airplane mode.  Agent Pryor took it into custody, he put it in a bag for -- labeled it and then put it in secure storage over in FBI field office in Pittsburgh.

Q   The same steps you've indicated that were taken with the iPhone, they were taken with the Samsung as far as transferring it into evidence control?

A   Yes, ma'am.

Q   Okay.  And did you receive it back from evidence control?

A   Yes, ma'am, for the trial.

Q   Okay.  And did you, in fact, transport that Samsung telephone to the courtroom for the last few days of trial?

A   Yes, ma'am.

Q   Can you take a look at Government's 8 that is behind your monitor there, please.  Indicate if you recognize it.

A   Yes, ma'am; this is the Samsung.

Q   Following the execution of your search warrant on that telephone, did you receive the full extraction report for that cellphone?

A   Yes, ma'am.

Q   Okay.  I'm going to hand you what's been marked as Government's 22.  Do you recognize that exhibit?

A   Yes, ma'am.

Q   And what is that?

A   That's the full extraction report that Justin Sarvey created for me to review of the Samsung.

Q   Okay.  And did you review, that, the contents of Government's 22, in their entirety?

A   Yes, ma'am.

Q   And from that report did you and Justin Sarvey work to create a more focused report?

A   Yes, ma'am.

Q   I'm going to hand you what's been previously marked as Government's 25.  Do you recognize that exhibit?

A   Yes, ma'am.  This is the focused report that -- of the items that I selected from the full extraction report that were presented either at trial or to get additional legal process for.

Q   Okay.  And as you refined your analysis -- did you refine your analysis any further?

A   No, ma'am.  Just created a report for trial.

Q   Okay.  I would like you to take a look at Government's 33 that's in the book in front of you.

A   Yes, ma'am.

Q   That's a three-page report.  Do you recognize it?

A   Yes, ma'am.  This is the report I created.

Q   And was that based upon the full extraction from the Samsung phone that we've been talking about in Exhibit 22?

A   Correct.  It was items I selected from the full extraction.

Q   And the same as the iPhone, did you identify any specific communications from the Samsung that you wanted to further explain to the jury?

A   Yes, ma'am.

Q   So let's pivot back to the iPhone at this point.  Can you describe any process that you took to determine who may have owned or possessed the iPhone?

A   So some of the first steps I'll do when I try to attribute phones or phone numbers for any of our investigations, if I have a search warrant for the phone, I'll look to find the

phone number of the phone, I'll subpoena that to see who the subscriber is to try and get an indication. In addition, I'll go through text messages to see if they give their name, if they give any indicia like driver's licenses. I'll go through their videos to see -- you know, sometimes people will take videos of themselves. That's a further indicator. Or they'll take pictures with their friends or girlfriends. Those are some of the things I'm looking for to identify the phone as that person's.

Q   Let's talk about subscriber information for a moment. Based on your experience, have you found it to always be reliable?

A   It's not reliable. It's just the first step in the process of trying to attribute a phone to a person that you're investigating.

Q   Is there -- have there been occasions in your experience where a drug trafficker has actually told Verizon, "This is my phone and my name is John Smith and this is my address" and it was accurate?

A   Yes, you see both. You see -- you see real names, like they give their actual name, all their correct identifiers. You'll see where they'll give fake names, like -- pretty much somebody who doesn't exist. And then you'll see where they'll use third party names, typically of their friends or people they know.

Q   Okay.  What was -- based on your analysis, what was the telephone number associated with the iPhone-8?

A   215-934-2482.

Q   Okay.  So, Agent, is it easier at this point to just refer to it as the iPhone-8 --

A   Yes, ma'am.

Q   -- for your purposes?  Okay.

When you look into the data that was taken from the iPhone-8, were you able to identify any telephone numbers on that telephone that were associated with Gerald Terry?

A   Yes, we identified two phone numbers for Gerald Terry on the iPhone.

Q   And can you tell us the last four digits of those numbers?

A   9615, it was listed as Gees Good in the contact information, and then 8544 as Gees.

Q   Can you indicate for us for the first number, the 9615 Gees Good, how do you attribute that number to Gerald Terry?

A   We attribute that number to Gerald Terry based on the Pennsylvania state probation.  I got a report from them that Gerald Terry listed that number as his contact information.

Q   And as you may describe -- will you describe further any communications that were actually on the iPhone that involved 9615, Gerald Terry's number?

A   That -- that phone number wasn't the key number texting.

Q   Okay.  So describe for us then the second number listed as

Gees in the contacts on the iPhone, the 8544?

A    Right.  That number was also -- Gerald Terry listed that as his contact number for his Pennsylvania state probation officer.  In addition, on the Samsung, which we'll show here later, that number is texted to the Samsung, Gerald, and then the number.

Q    Meaning the content of the text said "Gerald" and then the number ending in 844?

A    8544.

Q    8544, I'm sorry.

A    Yes, ma'am.

Q    Did you identify any telephone numbers on the iPhone that you attribute to a Kelli Royster?

A    Yes, ma'am.

Q    And through the course of the investigation, did you come to understand the name Kelli Royster and their connection to the case?

A    Yes, ma'am.

Q    And what was that connection?

A    So Kelli Royster was the registered owner of the Ford Taurus that was pulled over by Trooper Marmol on April 4th, 2018.  In the iPhone I found images of Kelli Royster with his seemed like an other child.  The phone number associated with those images that was sending those to the iPhone, the administrative subpoena, and it came back to Kelli Royster as a

subscriber.

Q   And was that number also saved in the contact list on the iPhone?

A   Yes, ma'am; it was saved as Floc.

Q   Can you spell that for the court reporter?

A   F-L-O-C.

Q   In addition to those -- identifying those two individuals that were on the iPhone, were there specific communications that you took from the full extraction report on the iPhone and also from your summary refined reports on the iPhone?

A   Yes, ma'am.

Q   Okay.  So I'm going to have you take a look at the exhibit book in front of you, please.

A   Yes, ma'am.

Q   Please refer to Government's 32A, as in apple.

A   Yes, ma'am, I'm there.

Q   Okay.  Take a look at that photograph, please.

A   Yes, ma'am.

Q   Do you recognize it?

A   Yes.  It's an image of a driver's license -- actually, a Pennsylvania identification card for John Terry.

Q   Okay.  And --

        MS. SHEEHAN-BALCHON:  Your Honor, may I have a moment with defense counsel?

        THE COURT:  Yes.

(Off the record discussion between opposing counsel.)

BY MS. SHEEHAN-BALCHON:

Q   So, Agent, for the sub-exhibits that we're going to go through with Exhibit 32, did you first observe those in the full extraction report for the iPhone?

A   Yes, ma'am.

Q   And then were they included with Mr. Sarvey's assistance in the first summary report for the iPhone?

A   Yes, ma'am.

Q   And as well included in your report --

MS. THOMPSON:  I'm sorry, I just want to object to leading, Your Honor.

MS. SHEEHAN-BALCHON:  Your Honor, we had a private discussion.  I was just trying to streamline how these were admitted.  It's my understanding we're taking from the full extraction report and then the two summary reports and then Agent Simpson is identifying the 32 sub-exhibits, protecting your interests as you voiced them.

MS. THOMPSON:  I don't know how much you want us to discuss in front of the jury, but I just --

THE COURT:  You can approach.

MS. THOMPSON:  Okay.

(At side bar.)

MS. THOMPSON:  So we did discuss that.  I apologize if there's any confusion.

The point I was trying to clarify with counsel is that we need to -- she asked whether or not he could testify that these are the information he received from the extraction report, these 32 series exhibits was his report that he interpreted from the extraction report.

So I was saying that when she makes that clear, she doesn't have to keep repeating it.

THE COURT: When you say interpreted, you mean removed from or took from --

MS. THOMPSON: Well -- he made his own report. He added his own interests. This is John Terry; it has "JT" in certain exhibits, so that's his creation.

THE COURT: All right. Well, I think he can make clear that he took this information from the prior reports and then he added certain conclusions that he reached or he'll explain those. I think that needs to be clear, though, that this is not direct. This doesn't say John Terry, it says "JT." And he says this -- I interpreted this to be John Terry.

MS. SHEEHAN-BALCHON: Correct, Your Honor.

I just want to make it clear for the record that the umbrella for all of this evidence is 24, and that the rest of it flows under Rule of Evidence 1006 as a summary of that particular voluminous information.

As I get through -- this is the first one, so it's rough. As I get through, we'll talk about 32A, and he's going

to take that apart, 32A, what does the caption mean, what does the header mean, where did that information come from.  Then the rest I think will be in compliance with the way Attorney Thompson --

THE COURT:  As long as it's made clear to the jury that this is taken from these other reports and he has added some of his own -- I guess you would call expertise or interpretation as to what these things mean.  As long as that's clear, I think that's fair.

MS. SHEEHAN-BALCHON:  Does that satisfy you?

MS. THOMPSON:  Sure.

MS. SHEEHAN-BALCHON:  Thanks, Judge.

(In open court.)

BY MS. SHEEHAN-BALCHON:

Q    So Agent, you were looking at 32A --

A    Yes, ma'am.

Q    -- in the exhibit book in front of you.

A    Yes, ma'am.

Q    Now, you have indicated that you recognize that photograph --

A    Yes, ma'am.

Q    -- as depicted in 32A.  And do you recognize that from the iPhone full extraction, Government's 24?

A    Yes, ma'am.

Q    And did you and Justin Sarvey also include it in the

summary extraction at Government's 26?

A    Yes, ma'am.

Q    Did you further review that and include it in your trial summary at Government's 31?

A    Yes, ma'am.

Q    Okay.

MS. SHEEHAN-BALCHON:  Your Honor, at this point I would seek to admit 32A.

MS. THOMPSON:  Your Honor, we do object because it does contain hearsay statements, but I understand from the discussion at side bar.

THE COURT:  All right.  I'll permit the exhibit to be admitted.  And as long as counsel explains to the jury where this information came from and, starting with the phones, working through these different initials.

MS. SHEEHAN-BALCHON:  Yes, Your Honor.  May I publish 32A, Your Honor?

THE COURT:  Yes.

BY MS. SHEEHAN-BALCHON:

Q    So, Agent, since this is the first that we're going through, I'd like to start at the header information and work our way through to the bottom of this photo exhibit.

So, at the top of the exhibit it indicates John Terry's iPhone-8, and then it has that number that we've been discussing ending in 2482.

A    Correct.

Q    Okay.  So is that inclusion -- let's go with the first line, John Terry's iPhone-8.  Is that a conclusion that you made after your analysis?

A    Correct.

Q    Okay.  The phone number ending in 2482, is that data that was actually from the extraction report itself?

A    Yes, that's included in the extraction report.  That's how you identify the phone number for the phone.

Q    Okay.  So this data is coming from that phone number, 2482.

A    Correct.

Q    The third lines, which appears to be a circle with the letters EGOOD, G-O-O-D, did that data come from the actual extraction or is that an interpretation of yours?

A    That's -- that's -- that should be the Gees Good contact, so that's like a shortened version.

Q    It says EGOOD.

A    Oh, EGOOD; no, that's -- I'm sorry.  That's -- that's another contact in the phone, EGOOD.

Q    So that data, EGOOD, was populated by the actual phone itself.

A    Yes.

Q    That was not an entry that you made.

A    Correct.

Q    All right.  The number following EGOOD, (215)554-5453, is

that data from the cellphone extraction?

A    Yes.

Q    That's not data that you entered.

A    Correct.

Q    Okay.  So this first blue bubble that we see -- let's start on the right hand side.  It has the initials "JT."

A    Yes, that stands for John Terry.

Q    Okay.  So, generally speaking, is that telling us the direction of that communication?  Meaning, did it come from the phone or did it come into the phone?

A    That's telling us that came from the phone itself.

Q    Okay.  Now, the inclusion of the initials JT, is that your analysis?  That's your determination after the analysis of all this data.

A    Correct.

Q    Okay.  So you -- okay.  Strike that.

Now, in the bubble itself, it has the date 12/18 of 2017. And then it has a time, 5:15:31 a.m., EST.

A    Yes.

Q    So tell us the significance of that.

A    So the phone extraction part comes in UTC, so you have to do the -- that's universal time.  So you have to do the conversion to eastern standard time; which after these summer months, it's going to be four hours behind, and then during winter months we're going to be five hours behind.  So those

conversions are done to make it easier to read.

Q   Okay.  So the date that's listed there -- well, let's start with the time.  So this has been converted for ease of understanding?

A   Yes.

Q   It's been converted from UTC time, which is in the full extraction --

A   Correct.

Q   -- to eastern standard time, which is what we sit in right now.

A   Yes, ma'am.

Q   Okay.  So this communication occurred, to the best of your analysis, at 5:15 in the morning, eastern standard time, on that particular date.

A   Yes, ma'am.

Q   So the dates of these communications should be -- should be static, meaning if it was that date on the full extraction, it should be the date on the communication unless you had to adjust for the conversion to eastern standard time.  Is that accurate?

A   Yes, ma'am.  I converted all of them from UTC to EST for people to be able to easily understand, you know, how the messages are coming through, the time -- times.

Q   If there was an occasion where the conversion to eastern standard time didn't change the date, like if it wasn't around

that midnight hour, would you retain the original date of the communication?

A    Yes, ma'am.

Q    All right.  Now, the content of the communication itself, read that to the jury, please.

A    "I apologize bro sincerely.  I'm so embarrassed.  I couldn't find my fucking ID, so here nothing.  I got a duplicate.  Be down before one.  Got a bag for you, too.  Again my fault."

Q    Okay.  The contents of all these communications that we're going to talk about, did you change the content in any way?

A    No, ma'am.

Q    What is the following -- describe for us the following text message that's contained within 32A.

A    The following text message is a photo, a Pennsylvania identification card for John Terry, the front and the back of the card.

Q    Take a look at the book in front of you, please, Exhibits 322B and 32C.

A    Yes, ma'am.

Q    Do you recognize those two photographs?

A    Yes, ma'am.  The -- 32B is the front-facing photo of the identification card for John Terry.  And 32C is the image of the back of the identification card for John Terry.

Q    And are those the same images that are contained in 32A

that we're looking at right now?

A    Yes, ma'am.

MS. SHEEHAN-BALCHON:  Your Honor, I would seek to admit Government's 32B and C.

MS. THOMPSON:  No objection.

THE COURT:  32B and 32C are admitted without objection.

MS. SHEEHAN-BALCHON:  And may I publish those at the same time for the jury, Your Honor, 32B and C?

THE COURT:  Yes.

(Exhibits published.)

BY MS. SHEEHAN-BALCHON:

Q    So, Agent, describe for us as far as 32B.

A    32B, you can see it's a Pennsylvania identification card. It has the Pennsylvania ID number, it has John T. Terry listed as the name for the identification card, the address 5048 North Hutchinson Street, Philadelphia, PA, 19141.  Has his height, has an issuance, 12/16/2017.

Q    I'm sorry, the date of issue is December 16 of 2017?

A    Yes, and also it's the date of birth of July 17th, 1975.

Q    Did you know that -- did you come to learn through the investigation that date of birth is consistent with John Terry's date of birth?

A    Yes, ma'am.

Q    And what's the expiration date on that identification card?

A    May 31st, 2021.

Q    Thank you.  Let's move in your exhibit book to 32D and E.

A    Yes, ma'am.

Q    Do you recognize those two exhibits?

A    Yes, ma'am.

Q    As well, Agent Simpson, did you track those through the progression that we've already talked about, through the full extraction in Exhibit 24, the summary extractions at 26, and then your summary analysis at 31?

A    Yes, ma'am.

Q    Okay.  And you recognize D and E from that same series.

A    Yes, ma'am.

Q    Okay.

        MS. SHEEHAN-BALCHON:  Your Honor at this point I'd seek to admit Government's 32D and E.

        MS. THOMPSON:  No objection.

        THE COURT:  32D and 32E are admitted without objection.

        MS. SHEEHAN-BALCHON:  May I publish 32D and E side by side, Your Honor?

        THE COURT:  You may publish.

    (Exhibits published.)

BY MS. SHEEHAN-BALCHON:

Q    Okay.  First, Agent, 32D, can you describe for us -- it's a little bit difficult to read from our vantage point.  Can you

describe --

A    Yes.

Q    -- what that is, 32D?

A    Yes, this was a image I found through going through the photos of the full extraction report that I selected.  It is a photo taken of an email.  You see it's from T-Mobile to John Terry.  It's for a Samsung.  We know we seized a Samsung on this investigation.  And that's -- the phone number for that Samsung which we'll discuss later is actually subscribed to John Terry.

Q    But to be fair, there's no phone number listed in 32D; correct?

A    Correct.

Q    Okay.  This is a communication from T-Mobile.

A    Yes, ma'am.

Q    Okay.  So take a look at 32E, then, please.

A    Yeah, 32E is the exit data for this image, which gives you some clues as to how the image was found in the extraction of the phone.  If you look at the file path, you'll see SMS --

        MS. THOMPSON:  Your Honor, I'm sorry, I am going to object to him giving expert testimony about metadata, phone extraction data.  He is not an expert in that area.

        MS. SHEEHAN-BALCHON:  Your Honor, may I rephrase the question --

        THE COURT:  Yes, go ahead.

MS. SHEEHAN-BALCHON: -- to clarify?

Can we put the full exhibit back up, please.

BY MS. SHEEHAN-BALCHON:

Q   While Mr. Flannigan is doing that, Agent Simpson, Justin Sarvey described for the panel yesterday what metadata was and how that's an important piece of an investigation.

A   Yes, ma'am.

Q   Okay.  And, generally speaking, have you become familiar with looking at cellphone extraction and just gleaning basic information, meaning did this communication come to the cellphone or did it come from the cellphone, basic information like that?

A   Yes, ma'am.

Q   Okay.  So without getting into specifics about file paths and expertise as to analysis, do you have a basic understanding of incoming, outgoing?

A   Yes, ma'am.

MS. THOMPSON:  Your Honor, I just want to -- so to try to get this Agent to give any conclusion would be expert opinion, so it's improper as he is not qualified to do so.  So I would object to this whole line of questioning.  This would have been better for Mr. Sarvey yesterday.

THE COURT:  I'll permit the question based on the fact that it's not expert testimony regarding metadata, but just basically being able to glean whether something is sent or

received -- is that basically what you're saying?

MS. SHEEHAN-BALCHON: Yes, Your Honor.

THE COURT: Okay.

Can you explain, then, Special Agent, how you learned the -- this sort of information.

THE WITNESS: So -- I mean just looking at this data, you can see it came from SMS messages. So basically it was in a text message. We don't know whether it was to the phone or sent, you know, from the phone or that, we just know it was from the messages.

BY MS. SHEEHAN-BALCHON:

Q   Okay. So this letter from T-Mobile just lives in the text messages for the iPhone.

A   Right. I wasn't actually able to find the text message for that, but it was a -- a image found within the extraction of the phone.

Q   Okay, fair enough.

I'm going to have you take a look in your book at 32F, as in Frank.

A   Yes, ma'am.

Q   Do you recognize that communication?

A   Yes, ma'am.

Q   And that came through the same path that we've been discussing?

A   Yes, ma'am.

MS. SHEEHAN-BALCHON: Your Honor, I'm going to at this point seek to admit 32F.

MS. THOMPSON: Same objection in reference to the hearsay testimony statements indicated on the exhibits, but again I think that that was preserved by Your Honor to all 32 series, so --

THE COURT: All right. I'll permit the exhibit to be admitted.

Go ahead.

MS. SHEEHAN-BALCHON: Your Honor, may I publish 32F?

THE COURT: You may.

(Exhibit published.)

BY MS. SHEEHAN-BALCHON:

Q   Agent Simpson, so please describe the content of this communication and the direction and the other participant -- at least the phone number.

A   So starting from the top, you see this was a message that was extracted from the iPhone-8. The second line, you have the iPhone-8's phone number. Then the third line you see Gees. That's actually the content that comes directly from the phone that sent this message. And then you can see -- inside the conversational view you can see the message is coming from the contact Gees, which we've identified as Gerald Terry's phone number, and it was sent on February 12, 2018, at 4:30 p.m., eastern standard time. And the message reads, "Meet me at our

parents house."

Q   Okay.  Please review in the exhibit book 32G, as in George.

A   Yes, ma'am.

Q   Do you recognize that from the full extraction and the summary extractions?

A   Yes, ma'am.

MS. SHEEHAN-BALCHON:  At this time I would seek to admit 32G, Your Honor.

MS. THOMPSON:  No objection.

THE COURT:  32G is admitted without objection.

MS. SHEEHAN-BALCHON:  May I publish, Your Honor?

THE COURT:  You may publish.

(Exhibit published)

BY MS. SHEEHAN-BALCHON:

Q   Agent, please describe what's contained within 32G and also whether or not there's any of your interpretation included within this exhibit.

A   32G is just three contacts that I selected from the full extraction report of the iPhone.  The first one is contact Floc, which we identified as Kelli Royster's phone number, the one ending in 0342; didn't alter any of the time zones, they are still in UTC.

The next one is -- if you look at No. 2, it's contact Gees, which I identified as Gerald Terry's phone number.  That's the one ending in 8544.

And then you have the third contact that I selected out of the full extraction report, Gees Good, which ends in 9615. Again, none of the contacts there created dates or modified dates; I didn't -- I didn't change any of that to eastern standard time.

Q   Okay, fair enough.  This came directly from the contact lists within the iPhone.

A   Yes, ma'am.

Q   Okay.  I'd like you to take a look at 32I, 32J and 32L.

A   Yes, ma'am.

Q   And do you recognize those three particular exhibits?

A   Yes, ma'am.

Q   And are they related to each other in the sequence?

A   Yes, ma'am.

Q   Okay.  Do you recognize those from the full and the summary extractions of the iPhone?

A   Yes, ma'am.

Q   And from your summary that we're using for trial.

A   Yes, ma'am.

Q   Okay.

        MS. SHEEHAN-BALCHON:  Your Honor, I'd seek the admissions of 32I, J, L.

        MS. THOMPSON:  No objection.

        THE COURT:  I, J, L are admitted without objection.

        MS. SHEEHAN-BALCHON:  May I publish 32I, first,

please.

THE COURT:  You may.

(Exhibit published.)

BY MS. SHEEHAN-BALCHON:

Q   So, Agent, describe for us this communication, what form it's in.

A   All right.  So, again, it's set up the same way that we've been going through these messages.  At the top we have what phone these messages were taken from.  It was taken from the iPhone-8.  We have the contact's phone number that was taken, you know, directly from the phone, 1-8-2-4-8 -- there's a typo on -- okay, never mind, sorry.

So that's the phone number for iPhone-8.  And then you have the contact Floc, and then you have -- again, identified as Kelli Royster, and then you have that phone number underneath it.  It just says it was taken from the iPhone.

Then we have the direction in conversation view, you can see Floc, that we identify as Kelli Royster, is sending images of himself holding a child in the first image.  The time was converted to eastern standard time, so this is March 13th, 2018, which is pretty close to the April 4th, 2018, law enforcement interaction.

Then we have the second message where he sends a picture of -- Kelli Royster, himself, with a female companion who appears to be pregnant.  This is on -- again, on March 13th,

2018.

Q   So these were incoming text messages that contained photographs into the iPhone-8?

A   Yes, ma'am.

Q   Okay.  So I'm going to ask you then to take a look at 32J and 32L.

A   Yes, ma'am.

Q   At the same time.

Agent, do you recognize those photographs as blow-ups essentially of the photographs depicted in 32I?

A   Yes, ma'am.

Q   Okay.  So the first one, 32J, that's the one you've indicated with Mr. Royster with a significant other?

A   Yes, ma'am.

Q   And 32L, with an -- Mr. Royster with an infant?

A   Yes, ma'am.

Q   Please take a look at your exhibit book, review Exhibit 32M, as in Mary.

A   Yes, ma'am.

Q   Do you recognize what's depicted in 32M?

A   Yes, ma'am.  It's a -- PennDot license information for Kelli Royster.

Q   Okay.  And did you secure this information from the Pennsylvania Department of Motor Vehicles?

A   Yes, ma'am.

Q   Now, does it contain a photograph of Kelli Royster and some identifying information?

A   Yes, ma'am.

Q   Okay.

MS. SHEEHAN-BALCHON:  I would seek to admit 32M, Your Honor.

MS. THOMPSON:  No objection.

THE COURT:  32M is admitted without objection.

MS. SHEEHAN-BALCHON:  May I publish Page 1 of 32M, please.

THE COURT:  You may.

BY MS. SHEEHAN-BALCHON:

Q   Agent, please describe what we're looking at.

A   Yes, ma'am.  You're looking at a record check with PennDot for Kelli Royster.  On there you see a photograph of Kelli Royster with his signature.  That's in the lower left-hand corner.

At the top you'll have -- you'll have the driver's name, Kelli Arthur CA Royster; the address, Philadelphia, PA -- I see part of it is redacted.  You have the issue date of that driver's license of October 5th, 2021; the expiration date of October 4th, 2025, and other general information.

MS. SHEEHAN-BALCHON:  And, Mr. Flannigan, can we please see the photographs side by side from 32J and the one that you have displayed right now?

(IT complies.)

MS. SHEEHAN-BALCHON: Thank you.

BY MS. SHEEHAN-BALCHON:

Q Let's move on, Agent. Please review in your exhibit book what's been marked as 32H and 32K.

A Yes, ma'am.

Q First, do you recognize the photo -- the single page photo that's depicted in 32H?

A Yes, ma'am.

Q And in 32K do you recognize the two-page communication that's depicted there?

A Yes, ma'am.

Q And, Agent, as well, were those taken from the general extraction of the iPhone?

A Yes, ma'am.

Q And then from the summary extraction, were these included in a summary extraction, 26, by you and Mr. Sarvey?

A No.

Q Okay. So you had -- did you refer back to the primary, full extraction Government's 24 to secure 32H and 32K?

A Yes, ma'am.

Q Okay.

MS. SHEEHAN-BALCHON: Your Honor, at this point I would seek to admit 32H and 32K.

MS. THOMPSON: I'm just making the prior objection,

Your Honor, that we discussed.

THE COURT: I couldn't hear you very well.

MS. THOMPSON: I'm just resting on the prior objection that was already discussed.

THE COURT: All right, thank you.

32H and 32K are admitted, and they may be displayed to jury.

MS. SHEEHAN-BALCHON: Thank you.

May we display 32H please, Mr. Flannigan.

(Exhibit displayed.)

BY MS. SHEEHAN-BALCHON:

Q   Agent, describe for the record what's depicted in this photograph.

A   This is a picture of Mr. John Terry with a significant other, an unknown female.

Q   Okay. Now, please take a look --

MS. SHEEHAN-BALCHON: Please publish 32K. And can we please start in reverse and look at Page 2 first.

(Exhibit published.)

BY MS. SHEEHAN-BALCHON:

Q   Okay, the bottom of your screen there is depicting Page 2 of 32K. Is that where the image came from that we've just described in 32H?

A   Yes, ma'am.

Q   Okay. Was that -- tell us was that image embedded in a

conversation?

A   Yes, ma'am.

Q   All right.  So we can go back to the first page of 32K. Just for brevity's sake, is this a friendly conversation with the iPhone?

A   Yes, ma'am.

Q   Okay.  And let's take a look at the final two entries of that conversation.  Does the user of the iPhone -- in your conclusion, Mr. John Terry -- does the user indicate anything about that photograph there?

A   Yes.  Yes, ma'am.  You'll see that the conversation direction's coming from the iPhone, and essentially says, "That pic you sent me of us."  And then the next conversation comes from, presumably, the unknown female in that picture, and it's a picture of John Terry and the unknown female.

So this would be something I would reference as attribution, where the person is indicating in the message, you know, that this -- this is his phone.

MS. SHEEHAN-BALCHON:  And, Mr. Flannigan, can we please compare side by side 32H, which you just displayed, and. 32B, as in boy.

(Exhibits displayed.)

MS. SHEEHAN-BALCHON:  For clarity of the record, Your Honor, 32B is the driver's license containing the photograph of John Terry.  32H is the photograph that we just

had the agent describe.

BY MS. SHEEHAN-BALCHON:

Q    Okay.  Moving on, Agent, the process that you have already described in detail that you took to prove ownership and possession of the iPhone, did you do the same analysis with the Samsung Galaxy?

A    Yes, ma'am.

Q    Did you consider the same factors in determining who the owner of the Samsung Galaxy was?

A    Yes, ma'am.

Q    First of all, describe for us who the subscriber was on the Samsung?

A    The Samsung subscriber is John Terry.

Q    At what address?

A    I don't have that in front of me to reference, so --

Q    What was the telephone number associated with that Samsung?

A    (267)902-7556.

Q    So when we're referring to that -- to the Samsung Galaxy subscribed to John Terry, we're talking about the telephone number ending in 7556.

A    Yes, ma'am.

Q    Did you identify any telephone numbers on that Samsung that were attributable to Gerald Terry?

A    Yes, ma'am.  The one from the iPhone labeled Gees ending in 8544.

Q   How did you -- did you use the same attribution for that number for Gerald Terry as you've already described for the iPhone?

A   Yes, ma'am.

Q   Okay.  So did you also observe some specific communications on the Samsung that were related either to the attribution or to the police encounter incident?

A   Yes, ma'am.

Q   I'm going to have you take a look in your book at 34C.

A   Yes, ma'am.

Q   Do you recognize what's depicted there?

A   Yes, ma'am.

Q   And is that a text communication over the Samsung, Mr. John Terry's Samsung?

A   Yes, ma'am.

          MS. SHEEHAN-BALCHON:  Your Honor, I'd seek to admit 34C.

          MS. THOMPSON:  Thirty-four series will be the same objection as made by 32 series, that these are Agent Simpson's impressions.

          THE COURT:  All right.  34C may be admitted.

          MS. SHEEHAN-BALCHON:  May I publish, Your Honor?

          THE COURT:  Yes.

BY MS. SHEEHAN-BALCHON:

Q   Please take a look at 34C, Agent Simpson.  Since this is

the first one we're talking about with the Samsung, please describe the header here as well.

A    The header is the -- we'll start with the top of the slide.

We have John Terry's Samsung Galaxy S8.  So we're describing which phone these messages are coming from.  Right below it we have the phone number for that phone, previously described ending in 7556.

Within that phone we kept the contact just as it was in the extraction.  This is from the contact Wifey, phone number ending in 7569.  And we have that conversation direction, and the contact Wifey is texting Gerald, and that's the number 8544 that we were attributing to Gerald Terry.

Q    And is that number ending in 8544, is that actually subscribed to by Gerald Terry?

A    It was eventually subscribed to by Gerald Terry, but not during the time that this message was sent.

Q    Okay.  And are you aware of -- was there a connection to Mr. Gerald Terry as far as the subscriber at the time of this message, if you know?

A    I don't -- I don't -- I didn't investigate the actual subscriber that was listed for that phone number at the time of this message, so I wouldn't know.

Q    Okay.  So in further explanation, you have indicated that this -- did this message -- was it incoming to the Samsung?

A    It was incoming to the Samsung.

James Simpson - Direct Examination

Q   Okay.  And it lists Gerald's name and the number we've been discussing, 8544.

A   Correct.

Q   All right.  And describe for the record the date that it was received by John Terry's Samsung.

A   It was on March 29th, 2018, at 6:15 p.m.

Q   Okay.  Did you have to do the same eastern standard time conversion for the Samsung entries?

A   Yes.

Q   Okay.  Did the Samsung entries also come in UTC time?

A   Yes, ma'am.

Q   Okay.  So this is a conversion time that you included.

A   Yes, ma'am.

Q   Okay.  Can we please take -- take a look at -- in your book, Agent, at 34B as in boy.

A   Yes, ma'am.

Q   Do you recognize what's depicted there?

A   Yes, ma'am.

Q   What is -- describe generally what's depicted there.

A   This is a outgoing message from the Samsung to Gerald Terry's 8544 number.

Q   Okay.

        MS. SHEEHAN-BALCHON:  I'm seeking to admit Government's 34B as in boy, Your Honor.

        MS. THOMPSON:  The same objection, Your Honor.

THE COURT: 34B is admitted and may be published.

MS. SHEEHAN-BALCHON: Thank you, Your Honor.

BY MS. SHEEHAN-BALCHON:

Q   So, Agent, describe for us what we're seeing in 34B.

A   So, again, starting at the top, this is from the Samsung Galaxy phone, the extraction phone number ending in 7556.  This is from phone number -- this is a message from the Samsung to Phone No. 8544, that says, "Other phone died.  It's me big bro."

And this was sent about four minutes after the previous message you viewed on March 29, 2018.

Q   Okay.  So in the previous message, in C, it's Gerald announcing himself and a telephone number.

A   It's a -- he -- the Samsung received the contact information for Gerald Terry.

Q   Okay.  And then the one -- I'm sorry --

A   I'm sorry.

Q   Go ahead.

A   Oh, then the next message, the Samsung after receiving the phone number for Gerald Terry, then texts a message to Gerald Terry's phone number, basically stating, you know, that the other phone for John Terry wasn't working, and just letting Gerald Terry know that it's him on the phone, this is his other phone.

Q   Fair enough.  So take a look at 34A, please.

A    Yes, ma'am.

Q    Do you recognize that communication?

A    Yes, ma'am.

Q    It's from the same stream that we've been identifying from the full extraction in Government's 22?

A    Yes, ma'am.

MS. SHEEHAN-BALCHON:  Your Honor, I seek to admit and publish 34A.

MS. THOMPSON:  Just continuing objection.

THE COURT:  Thirty-four A is admitted and may be published.

BY MS. SHEEHAN-BALCHON:

Q    So describe for us, Agent, the contents of 34A.

A    So, again, this is a text message conversation that we extracted from the Samsung Galaxy phone number ending in 7556. You can see the conversation direction.  This is from -- there's two text messages here, both from phone number ending in 7901 to the Samsung Galaxy.

The text messages go, "This is big bro wife, 1429 Grant Street, Braddock, PA, 15104."  That address is significant as that's the address we identified where the three kilograms of cocaine were going to.  That message was sent to the Samsung on March 29th, 2018.

This is another ten minutes after the previous exhibit we saw, and then there's a second message that comes from 7901 to

the Samsung, "Your bro other phone is down." This message indicates that Gerald Terry's phone had died and he couldn't text John Terry. So this number was getting the information across to John Terry.

Q   Understood. I'm going to have you refer back in your exhibit book, Agent, to Government's 33.

A   Okay, I'm back on 33.

Q   Just a general question. If there were communications within 33 or the other extraction reports that didn't need to be converted to eastern standard time, you used what would be accepted as eastern standard time; is that correct?

A   Correct, correct.

Q   Okay. So let's go back to -- I want to refer back to the iPhone at this point, and let's talk about if you discovered any communications on the iPhone related to the April 4, 2018, law enforcement interaction.

And did you isolate some communications that you'd like to present to the jury in that regard?

A   Yes, ma'am.

Q   Okay. I'm going to first have you take a look at what's been marked as 32W.

A   Yes, ma'am. I'm there.

Q   32W, for the record, is a two-page document. Can you describe what's contained on that document?

A   So it's call logs from the iPhone for a number ending in

7569.

Q   Okay.  So when you say call logs, can you be -- can you describe that more generally for the jury?

A   It would be like toll records, so it would be like incoming and outgoing calls from a phone number -- specific phone number to the iPhone.

Q   All right.  Tell us the date range of these communications that are included within 32W.

A   So the date range is from April 1st, 2018, to April 4th, 2018, when the law enforcement encounter happened.

Q   So a three-day period leading up to the seizure?

A   Yes.

Q   Approximately.

A   Yes, ma'am.

Q   Okay.  And these communications with the iPhone, are they all with one specific telephone number?

A   Yes, ma'am.

Q   What's the last four digits of that telephone number?

A   7569.

Q   And who do you attribute that to?

A   This phone number was found to be a common number on the iPhone with the Samsung Galaxy.  So if you remember Exhibit 34C, the phone number contact Wifey ending in 7569 texted Gerald and then the 8544 number.

    So one of the things we'll do on basically on wiretap

investigations is we'll try to find common numbers because there's -- most people who distribute narcotics will use multiple phones, and this is a way to basically find their other phone.

Q   Okay.

MS. SHEEHAN-BALCHON:  So can we please display 34C.

(Exhibit displayed.)

BY MS. SHEEHAN-BALCHON:

Q   You've already described this, but I just want to be clear.

So the number that you're saying is in the contact information of the Samsung as Wifey that ends in 35 -- I'm sorry, 7569 --

A   Yes, ma'am.

Q   Okay.  You've described that that number texted to the Samsung on March 29 the name Gerald and the number ending in 8544.

A   Yes, ma'am.

Q   Okay.  Now, you've also -- you've already testified you concluded that that was Gerald using that number.

A   Yes, ma'am.

Q   And announcing himself to Mr. John Terry on the Samsung.

A   Yes, ma'am.

Q   Okay.  So now we get to 32W --

MS. SHEEHAN-BALCHON:  Your Honor, at this point I would seek to admit 32W as identified by the agent.

66

James Simpson - Direct Examination

(Fire alarm ringing.)

THE COURT: All right, ladies and gentlemen. We don't know if this is a drill or not, but we're going to be -- we don't know if this is a drill or not, but we are going to evacuate the building.

Marshal, would you take charge.

(Building evacuated, recess taken.)

(Jury seated.)

(In open court.)

THE COURT: Please be seated.

Before we again, just so we have the record clear, what occurred was the alarm went off, so we evacuated the courtroom and the courthouse, and the jury was taken to the evacuation point that we have designated. And then we found out that it was a false alarm, and we gave the jury that time as their morning recess, so we're back in session now.

And thank you for everyone's cooperation. We think it was a workman, but we don't know. So, sorry for that.

We may proceed, then, with the witness. Thank you.

MS. SHEEHAN-BALCHON: Thank you, Your Honor.

May I ask Ms. Hall, the court reporter, to read back the last entry, please?

THE COURT: Other than the alarm?

MS. SHEEHAN-BALCHON: Yes, after the alarm.

MRS. HALL, COURT REPORTER: The last request was that

the exhibit, 32W, be admitted as identified by the agent.

THE COURT: All right. Attorney Thompson, any objection?

MS. THOMPSON: Thirty-two --

THE COURT: -- W.

MS. THOMPSON: W. I believe I was maintaining the same objection.

THE COURT: Okay; thank you, counsel.

32W is admitted, and you may publish to the jury if you choose.

MS. SHEEHAN-BALCHON: Thank you.

Mr. Flannigan, can we please display both pages at the same time, two pages to 32W.

(Exhibit displayed.)

BY MS. SHEEHAN-BALCHON:

Q   Agent Simpson, you had indicated that -- just to refresh for one moment, since we had that break in the action -- 32W was a summary of a call history between which dates and was it on the iPhone?

A   So what you're looking at on Exhibit 32W is the call history from the iPhone. Specifically, I focused on the call history for one phone number to see if it was in common with a number of significance on the Samsung. And you'll see the dates -- date range that we're looking at is April 1st, 2018, to April 4th, 2018. You'll see that there are 33 contacts

between this specific phone number and the iPhone.

You'll also see call duration. So you'll see if it actually connected, you'll see whether it's incoming, outgoing. And, you know, as I explained before the fire alarm, the purpose of looking at common numbers is typically a way of identifying distributors' other phones. So -- and one of the things that I found interesting on the Samsung is on Exhibit 34C was it was labeled Wifey.

So, common sense, you would expect that to be somebody of significance. And what I found from, you know, the numerous wiretap investigations that typically a spouse or a girlfriend or somebody close, you'll find that that phone number hits on typically almost all the person's phones that you're investigating. So it's a good way to find other phones.

Q   So in this entry, in 32W, we have how many specific communications did you say?

A   Thirty-three.

Q   Okay. And these are all between the iPhone and that number that you've already identified as ending in 7569 that, when you discussed the Samsung, the communication was from Wifey, giving Gerald's contact information.

A   Yes, ma'am.

Q   Okay. And if you indicate -- take a look at entry No. 1 that's on 32W. If there is a duration of zero, what does that mean?

A    Oh, it could mean that either went to voicemail or could have been a text message.  You'd have to actually investigate further to be able to figure it out.

Q    Okay.  If there is a duration of some seconds or minutes even, does that indicate a connected phone call?

A    It indicates that it was a phone call.  Whether or not the other person picked up, you'd have to -- typically you'd want to see a duration of over a minute, based on my wiretap experience.

Q    Okay.  All right.  So let's take a look now at 32AA in the book in front of you, Agent Simpson.

A    Yes, I'm there.

Q    So just to refresh, we have moved from what you were naming the attribution of these two phones, the iPhone and the Samsung, and now we're talking about the iPhone again regarding any communications about the law enforcement interaction.

So, take a look at 32AA.  Do you recognize that?

A    Yes, ma'am.

Q    Okay.  And do you recognize it from the same pattern that we've been talking about, from the full extraction to the summary to your summary prep?

A    Yes, ma'am.

Q    Okay.

MS. SHEEHAN-BALCHON:  Now, Your Honor, at this time I would seek to admit 32AA.

MS. THOMPSON: Maintain the same objections.

THE COURT: Thirty-two AA is admitted.

MS. SHEEHAN-BALCHON: May I publish, Your Honor?

THE COURT: It may be published.

(Exhibit published.)

BY MS. SHEEHAN-BALCHON:

Q   So tell us, Agent Simpson, this series of communications was on the iPhone, is that accurate?

A   Yes, ma'am.

Q   Okay.  And who, if you know, were the communications with?

A   So, again, like we walked through the other messages on the iPhone, you can see the contact in the iPhone is labeled Nas, and the phone number is underneath it, ending in 9237.

You can see it's in conversation view with John Terry labeled on the right in blue and the messages from Nas on the left in gray.

In this conversation Nas is talking about a vehicle when he says, "Rd, I hope they cool and da heat or defrost don't work in this lemon."  So one of the reasons why I selected this message is so, A, they're talking about a vehicle and then, B, if you come down to John Terry's message on March 2nd, 2018, at 3:37 p.m. eastern standard time, I'm going read it to you, "If you take this thing off the radio where I put my pistol it would come on."

So, two things is it's talking about a firearm, a pistol,

and he's saying it's in a vehicle. In addition, we found a firearm on law enforcement interaction with April 4th, 2018.

And then the other -- the other indication here that it's a trap in the vehicle is, "Take the thing off the radio," and I know from working with my task force, behind radios you can remove them and store things behind those radios. They can be set up as traps.

Q  Fair to say that the investigation did not reveal who Nas was, N-A-S?

A  Correct.

Q  Okay. And can you indicate for us approximately how much time before the actual law enforcement encounter on April 4 did this communication -- series of communications happen?

A  Slightly over a month.

Q  Please take a look at 32N and 32O, as in Nancy and Ohio.

A  Yes, ma'am.

Q  Do you recognize those communications?

A  Yes, ma'am.

Q  So is it fair to view those two communications in tandem, N and O?

A  Yes, ma'am.

Q  And do you recognize those from the same thread that we've been talking about?

A  Yes, ma'am.

MS. SHEEHAN-BALCHON: Your Honor, at this time I would

seek to admit 32N and 32O.

THE COURT:   32N and 32O are admitted and may be published.

MS. SHEEHAN-BALCHON:   First, may we publich 32O.

(Exhibit published.)

BY MS. SHEEHAN-BALCHON:

Q   Agent Simpson, describe for us 32O and its significance to your analysis.

A   So one of the first things I try to do when I'm trying to corroborate evidence from a law enforcement interaction when I'm going through a phone, you know, I'll look for any significant photos that may match up to items of evidence that could have been found.

And going through the phone, I found this image of a backwards two which matched, you know, the kilograms that were seized out of the vehicle on April 4th, 2018.  I also saw it was on a scale being weighed.  And I could tell from the kilograms that were seized, which were approximately 1,000 grams, that this picture was of a half kilogram, which is 500 grams of cocaine.  It had the same backwards two on it.

Q   So tell us as far as Exhibit 32O the genesis of that photograph.

A   So this photograph was basically found in the extraction of the images found somewhere on the iPhone, and it was on -- the portion that's significant is it was on March 8, 2018, which is

under a month from the time that -- the law enforcement interaction on April 4th, 2018.

In addition, you see the camera model, which is an iPhone-8 Plus, which is the actual description of the phone that was seized.

Q   When you say the description of the phone, the camera model that took this photograph was the iPhone-8?

A   Yes.

Q   Okay.  So then let's take a look at 32N.

While that's being displayed, 32N is actually the image that was taken from 32O, correct?

A   Yes.

Q   Okay.

MS. SHEEHAN-BALCHON:  And can we -- can you focus in on the actual white substance and the item beneath it.

(Exhibit published.)

BY MS. SHEEHAN-BALCHON:

Q   Now, you've described for the record what's depicted in that photograph.  Can you -- now that the jury is looking at it, can you indicate for the record first the appearance of the white brick-like object on top?

A   So as you saw from one of the kilograms of cocaine with methamphetamine in it that was seized from the vehicle on April 4th had a backwards two and four on it.  We know that's 1,000 grams.  You can see that this is just an image of the

backwards two, which would be half of that, so you would estimate that it would be approximately 500 grams.

In addition, if you look at the scale, you can see on the bottom right, 2,000 grams. So that would be like the -- that would be the max capacity that that scale could weigh.

Q   Please take a look at 32P as in Paul, Q as in queen, V as in Victor.

A   Yes, ma'am.

Q   Do you recognize those three exhibits and are they related?

A   Yes, ma'am.

Q   Are they from the same extraction process that we've been discussing?

A   Yes, ma'am.

Q   Okay.

MS. SHEEHAN-BALCHON:  So let's take a look at 32P and Q on the split screen, please.

(Exhibit displayed)

BY MS. SHEEHAN-BALCHON:

Q   So we'll start with the image first in 32P.  Can you describe for the record what's depicted there?

A   Yes, this is a -- the half kilogram of cocaine depicted upon the scale.  It's a side view of it.

Q   And can you tell us at the bottom of the photograph what's depicted?

A   The bottom you have -- looks like a -- bags, so that would

be like -- that would be drug paraphernalia that, you know, like drug traffickers would store their narcotics in because you don't want to lose pieces of the product, so you need a way to store it, transport it.

Q   Does that appear to be a box of Ziploc bags?

A   Yes, ma'am.

Q   And what size?

A   Gallon size.

Q   Would a gallon size, based on your experience and training, be enough to hold a half kilogram of cocaine?

A   Yes, ma'am.

Q   And from your vantage point, is that the same scale that was depicted in the previous photograph series?

A   Yes, ma'am.

Q   Okay.  So take a look -- it's already displayed -- 32Q. Does that indicate to you the time and date that that was taken on the iPhone?

A   Yes, ma'am.

Q   So indicate what that is.

A   So you'll see it's the same date, March 8, 2018.  It was taken from an Apple iPhone-8 Plus camera model.

         MS. THOMPSON:  Again, Your Honor, I'm going to object to Agent Simpson interpreting the metadata.

         THE COURT:  Counsel?

         MS. SHEEHAN-BALCHON:  Same response, Your Honor.  He's

giving a summary indication of the data that's clearly visible on the exhibit itself without any expert interpretation as to the forensic science other than the forensic examination of it.

THE COURT:  Agent, are you reading from that message?

THE WITNESS:  Yes.  Yes, sir.

THE COURT:  All right.  Objection overruled, go ahead.

BY MS. SHEEHAN-BALCHON:

Q   Agent, you have indicated the time -- I'm sorry, the dates and the time of this image?

A   Yes, it was March 8, 2018, at 7:37 p.m., UTC, which is a little under a month from the April 4th, 2018, law enforcement interaction.

Q   Okay.  And if you can refer to Q first, is that image captured approximately fifteen seconds after the first one that we saw in 32O?

A   Yes, ma'am.

Q   Finally, take a look at 32V as in Victor.  Do you recognize that photograph in your exhibit book?

A   Yes, ma'am.

Q   That photograph was taken from the same extraction process we've been describing?

A   Yes, ma'am.

MS. SHEEHAN-BALCHON:  Your Honor, I'd seek to admit 32V and publish.

MS. THOMPSON:  No objection.

James Simpson - Direct Examination

THE COURT: 32V is admitted and may be published.

(Exhibit published.)

BY MS. SHEEHAN-BALCHON:

Q   Agent, describe what we're looking at in 32V.

A   So Exhibit 32V is a Zoomed-in image of Exhibit 32P, of that scale that weighs in grams. You can make out that there's three numbers there. You can see the four, the nine and then you can't make out the third number.

So this scale is reading approximately 490-some grams of cocaine that's sitting on the scale.

Q   And just for those of us that are mathematically challenged, how many grams in a kilogram of cocaine?

A   A thousand grams.

Q   So a half kilogram of cocaine would contain --

A   500 grams.

Q   Please review Government's 32 R and S.

A   I'm there.

Q   Do you recognize those two single page exhibits?

A   Yes, ma'am.

Q   All right. And are they from the same extraction process and documents we've been describing?

A   Yes, ma'am.

MS. SHEEHAN-BALCHON: Your Honor, I seek the admission of R and S and ask to publish.

MS. THOMPSON: Same objection for Exhibit 32S.

James Simpson - Direct Examination

THE COURT: Those exhibits may be admitted and published.

MS. SHEEHAN-BALCHON: May I have them on the split screen, please, Mr. Flannigan.

(Exhibits published.)

BY MS. SHEEHAN-BALCHON:

Q  Agent, please describe first what we're looking at in 32R.

A  Thirty-two R is the back side of that half kilogram of cocaine.

Q  And in the second, 32S?

A  The second is the data for that image that was found in the iPhone. You can see the date was March 8, 2018. This is a few seconds after the previous photo that you saw, the side view on the scale. The camera make, Apple camera, Model Apple iPhone-8 Plus.

Q  And then let's take a look at 32T as in Tom, U as in union. Do you recognize the images on those two single page documents, agent?

A  Yes, ma'am.

Q  And are they from the extraction process we've described?

A  Yes, ma'am.

MS. SHEEHAN-BALCHON: Your Honor, I'd seek to admit 32T and 32U and publish?

MS. THOMPSON: Same objection to 32U.

THE COURT: 32T and U are admitted and may be

published to the jury.

MS. SHEEHAN-BALCHON:  Mr. Flannigan, may I have those on a split screen, please.

(Exhibits published.)

BY MS. SHEEHAN-BALCHON:

Q   Agent, please describe what we're looking for in -- looking at in 32T.

A   Again, Exhibit 32T is another image of the half kilogram of cocaine with the backwards two, which matches the kilogram of kilogram cocaine imprints that we seized on April 4th, 2018. You can see a portion of the scale is visible.

Q   Okay.  That is the same scale we've been discussing?

A   Yes, ma'am.

Q   Okay.  And in 32U, as far as the date and time stamp the image was taken?

A   Again, the image was taken on March 8th, 2018, at 7:37 p.m. UTC, which is just seconds after the previous images that you viewed of this half kilogram of cocaine.  The camera make is Apple, the camera model is iPhone-8 Plus.

Q   Let's move to 32AB and 32AD.  Would you please review those in your exhibit book.

A   Yes, I'm there.

Q   Do you recognize both of those, AB and AD?

A   Yes, ma'am.

Q   Do you recognize those from the same extraction process on

James Simpson - Direct Examination

the iPhone?

A   Yes, ma'am.

MS. SHEEHAN-BALCHON:  Your Honor, I'd seek to admit 32AB and AD and publish.

MS. THOMPSON:  May I approach, Your Honor?

THE COURT:  Yes.

(Off the record discussion between opposing counsel.)

MS. THOMPSON:  Maintain the same objection, Your Honor.

THE COURT:  Thirty-two AB and 32AD may be published to the jury.  They are admitted.

MS. SHEEHAN-BALCHON:  I'm sorry, may I have it on a split screen, please.

(Exhibits published.)

BY MS. SHEEHAN-BALCHON:

Q   So, please start, Agent, with 32AB which is on the left side of the screen that the jury is viewing.

A   Yes.  So going through as same example that we've gone through, the messages, you can see this message is from the iPhone-8 ending in 2482.  This message is from contact Gees, just as it appears in the extraction from phone number ending in 8544.

It's a conversation view, so you can see that this message is incoming to the iPhone from Gees, which we identified as Gerald Terry's phone number.  The message is on March 30th,

2018.  And note the time, 11:21 a.m. eastern standard time. This is also just days prior to the law enforcement interaction on April 4th, 2018.

The address is significant, 1429 Grant Street Braddock, PA. That was the address that we identified who the kilos of cocaine were being supplied to.  Then if you look over at Exhibit -- 32AD, this is Google Maps.  If you look at the time -- I'll do the conversion for you.  It's in UTC at 4:39 p.m. UTC.  It would be -- it's four hours ahead, so it would be 12:39 p.m. eastern standard time on March 30th, which is, you know, a little over an hour from the time the iPhone received this message from contact Gees, it's then entered into the Google Maps.

Q   So, Agent, what is the time gap between these two, the incoming communication from Gerald Terry with the address and the entry into Goggle Maps on the iPhone, the same address?

A   One hour and 18 minutes.

Q   Okay.  And I believe you indicated Google Maps.  Was it actually entered into Apple Maps, if you know?

A   The -- I wouldn't be sure because it says Google Maps at the top, but it also says in the category Apple Maps.

Q   Okay, understood.

A   So it's entered into a mapping program.

Q   Okay.  So these were within an hour of each other on March 30th of 2018, is that your testimony?

A    Repeat one more time.  Sorry, I was looking at something.

Q    The incoming text message with the address from Gerald Terry until the entry of the address into the iPhone is -- did you say approximately within an hour of each other?

A    It was an hour, a little over an hour.

Q    Okay.  So let's have you refer back to Exhibit 34A as in apple.

MS. SHEEHAN-BALCHON:  Can we display Slide 34A, please.

(Exhibit displayed.

BY MS. SHEEHAN-BALCHON:

Q    So this refers back to the Samsung cellphone, John Terry's Samsung?

A    Correct.

Q    So compare for us when this message came in related to the two that you just discussed.

A    So on the Samsung, we see that same address the day prior, on March 29, 2018, at 6:29 p.m.  So these are some commonalities that we look for to attribute phones to a person. And in this instance this address is also on the Samsung and on the iPhone.

Q    And did it come in both instances from phone numbers related to Gerald Terry?

A    Well, the second one, on the Samsung, it was sent by presumably somebody who knows Gerald Terry or on his behalf.

Q   Fair enough.  So let's move on to 32AC.  Do you recognize that single page document that's in your exhibit book, Agent?

A   Yes, ma'am.

Q   And is it from the extraction process we've been describing?

A   Yes, ma'am.

MS. SHEEHAN-BALCHON:  I would seek to admit and publish at this time Your Honor Government's 32AC.

MS. THOMPSON:  Just maintain the same objections, Your Honor.

THE COURT:  Thirty-two AC is admitted and may be published.

(Exhibit published.)

BY MS. SHEEHAN-BALCHON:

Q   Agent, please describe this conversation that we're viewing in 32AC.

A   So going through the message the same way, you see at the top it's -- this message was extracted from the iPhone-8, number ending in 2482.  This is a message with Gees's number ending 8544 that we identified as Gerald Terry's phone number. In conversation view you can see Gees on the left in gray; and then if you note the date, April 3rd, 2018, at 8:16 p.m. eastern standard time, this is the day before law enforcement pulled over the vehicle with John and Gerald Terry.

Gees is asking John Terry, are you ready?  And then on

April 4th, 2018 -- take note of the time, 5:52 a.m. -- John Terry responds, "We can't be ready til nine.  Was rushing. I got do all over hour apiece.  My fault bro."

So it's approximately six a.m. and you can't be ready 'til nine, so that's three hours, right?  So now it says, "I got to [sic] do all over, an [sic] hour apiece."  We seized three kilograms of cocaine; and if you remember the packaging, it was a bunch of black duct tape and cellophane.

I also know from numerous interviews, the wiretaps, sources that -- you know, you don't just take your supply of cocaine and give it as is.  You have to add either some sort of non-narcotic addition to it, or it could be another narcotic to it to then sell it to be able to make more money.

So I would estimate that it would take him approximately an hour, like he says in the text message, to package each one of those kilograms of cocaine, so then that they could leave sometime after nine a.m.

Q   And that's John Terry making that portion of the statement?

A   Yes, ma'am.

Q   I'm going to have you take a look at what we've marked as Government Exhibit 37.  Do you recognize what's depicted there?

A   Yes, ma'am.

Q   And can you indicate, is that a series of photographs that have already been identified included on one depiction?

A   Yes, ma'am.

Q   And are you able to indicate the exhibit numbers that are included within that 37?

A   Yes, ma'am.

Q   And what are those exhibit numbers?

A   Exhibit 3A, 2C, it looks like 4B, 32W, I believe.  It's hard to see on this.

Q   Just for clarity's sake, that last exhibit, is that 32N, as in Nancy?

A   It appears to be from what I'm looking at in the book here.

Q   Okay.

MS. SHEEHAN-BALCHON:  At this time, Your Honor, those four exhibits that are contained within this comparison photograph have already been admitted.  2C, 3A, 4B, and 32N.  I would seek then to publish Government's 37 -- admit and publish.

MS. THOMPSON:  No objection.

THE COURT:  Thirty-seven is admitted without objection and it may be published.

(Exhibit published.)

BY MS. SHEEHAN-BALCHON:

Q   So, Agent, take us through -- the jury's already heard testimony regarding 2C, 3A and 4B.  Were those the three kilograms that were seized during the traffic stop on April 4 of 2018?

A   Yes, ma'am.

James Simpson - Direct Examination

Q   Okay.  And the exhibit that you have identified from the iPhone on -- depicted in 32N as in Nancy, as a side-by-side comparison?

A   Yes, ma'am.

Q   Okay.  So can you describe for the record the similarities between those four kilogram and half kilogram depictions.

A   As you can see, we describe like each kilogram as -- you know, it's pretty much broken up.  Depending where they printed it, the two backwards two and the four.  If you broke it in half, it would be approximately a half kilogram, which is 500 grams.

You can see clearly on two of the kilograms that were seized that the backwards two exists.  And when you look at the photo obtained from the search of the iPhone, you can see just a half of the two, which would be a half kilogram of cocaine that we observed.

Q   Now, Agent, based on the information that you know about this case, have you developed an opinion about whether or not these three kilograms of cocaine that are mixed with methamphetamine were possessed consistent with the intent to distribute them?

A   Yes.

MS. THOMPSON:  I'm sorry.  Right now this question as asked is not in evidence.

THE COURT:  I couldn't hear you, ma'am.

MS. THOMPSON: I object that there's no foundation for this question as the question involves facts that is not yet in evidence.

THE COURT: I'm not -- will you approach, please.

(At side bar.)

THE COURT: I thought this should be out of the hearing of the jury.

Go ahead.

MS. THOMPSON: So counsel is asking about the cocaine mixed with meth. There is no evidence that the cocaine was mixed with meth. I believe that was entered -- so I believe that the lab tech is coming after this witness, so I don't think that this officer can bring that type of opinion when the lab tech is coming after this witness.

MS. SHEEHAN-BALCHON: I'll rephrase, Your Honor. She's accurate.

THE COURT: Okay, thank you; appreciate that.

(In open court.)

BY MS. SHEEHAN-BALCHON:

Q   Agent, let me rephrase that last question. Based upon the information that you know about this case, do you have an opinion about whether these three kilograms appear to be consistent with just cocaine?

A   Yes, ma'am.

Q   Okay. And did you develop an opinion about whether or not

those kilograms were possessed consistent with the intent to distribute them?

A   Yes, ma'am.

Q   What is that opinion?

A   The opinion comes from wiretap experience, interviews of people who actually distribute this amount of narcotic, and then also from sources and controlled buys.  So, for example, a user would buy, you know, just a half gram or up to maybe sometimes three-and-a-half grams of cocaine.  They're not going to purchase 1,000 grams.

And I know from the way these are packaged, they're packaged to -- with the duct tape, the cellophane wrapper, they need to be transported to a high level distributor in an area where they can be broken down into those smaller quantities or they'll be packaged up and broken up into ounce quantities and then distributed to mid-level distributors who then break it up into smaller quantities like a gram, half gram.

So when you -- you see these wrapped, you know, as 1,000 grams in a -- what appears to be -- what is black duct tape and some sort of cellophane wrapping material, you know that those are being used to supply an area.

Q   So what is your opinion?

A   That these -- this was a recent buy for somebody in the Western District of Pennsylvania.

Q   -- to distribute.

A    To distribute.

Q    And you have indicated previously and we've acknowledged or recognized on Government 37 that there's a stamp or a branding on these that's consistent among these four photographs?

A    Yes, ma'am.

Q    Does that factor into your distribution opinion?

A    Yes, ma'am.

Q    Okay.  And is that -- tell us, are you familiar with the branding of cocaine -- of kilograms of cocaine?

A    I'm familiar with branding in general with narcotics.  In this instance, these are branded with a backwards two and a backwards four.

Q    Okay.  Would your opinion -- just as to the possession with the intent to distribute, would that opinion change if there was a lab analysis to determine that there might have been another substance included with the cocaine?

A    It would not have changed.

Q    Okay.  Do you hold that opinion and the opinions that you've rendered here today to a reasonable degree of scientific certainty?

A    Yes, ma'am.

        MS. SHEEHAN-BALCHON:  I would offer the witness for cross examination, Your Honor.

        THE COURT:  Attorney Thompson, you may cross examine.

                    CROSS EXAMINATION

BY MS. THOMPSON:

Q    Good afternoon, Agent Simpson.

A    Good afternoon, ma'am.

Q    As you may know, I'm Sandra Thompson representing Mr. John Terry.

     Okay.  So I'm going to start from the beginning here you initially testified about your training.  And I understand that you said how you were trained how to investigate; is that right?

A    Yes, you're trained through doing an actual investigation on how to investigate different crimes, federal crimes.

Q    Okay.  And did your training include that if other names came up in investigation, that you actually sort of follow the names?

A    Yeah, you'll -- you'll follow different leads, different evidence, different names that appear.

Q    And would following the names include interviewing them?

A    Yes, ma'am.

Q    Would your training include, if you have physical evidence, that you would seek fingerprints?

A    Not all the time, ma'am.

Q    So are you saying that your training -- you -- I just want to make sure I understand your answer when you say not all the time.

     First of all, I asked you did your training include seeking

fingerprints when you have physical evidence.

A    Yes, ma'am.

Q    Okay.  So it did include that.

A    Yes, ma'am.

Q    Okay.  Did your training include seeking DNA when you have physical evidence?

A    Yes, ma'am.

Q    Did your training also include how to present evidence to a jury?

A    Yes, ma'am.

Q    You actually trained how to testify?

A    You learn through experience how to testify.

Q    And that means good or bad.  Sometimes if you lost from your testimony, then you learn what not to do; is that right?

A    You just learn through experience, ma'am.

Q    I also heard that -- you say that through your experience and training, if you found a suspect involved in drug activity, then you may follow up with a search warrant of their residence, is that right?

A    Depending on the situation; yes, ma'am.

Q    So would the situation where you would do a search warrant versus residence include the person being a suspected drug dealer?

A    Yes, ma'am.

Q    Now, through -- in this particular case, it is correct that

you did not send any of the evidence for fingerprints; is that right?

A   Yes, ma'am.

Q   And it is correct that you did not send any of the evidence for DNA, is that right?

A   Yes, ma'am.

Q   Okay.  And it is correct that you did not do a search warrant on John Terry's residence; is that right?

A   That's correct, ma'am.

Q   And I guess I'm going to -- for ease, let me go through the Government's exhibits.  And I guess I'm going to clarify, make sure that it is clear that the Government's Exhibit 21 and 23, which are the search warrants, that is something that you prepared to present to the Court.  Is that right?

A   Yeah -- the search warrants?

Q   Yes.

A   Yes.

Q   Okay.  And the Government Exhibit 23 was a search warrant requested of the iPhone on around January 14th -- or January 3rd, 2019.  Is that right?

A   Yes, ma'am.

Q   Okay.  Now, isn't it correct that you did not see any of the contents of the iPhone that you can attribute to the iPhone until sometime after that January 2019, is that right?

A   Yes, ma'am.

Q   Okay.  But it is still correct that since April 4th, 2018, both you and Trooper Marmol kept stating that the iPhone was John Terry's.  Isn't that right?

A   Yes, ma'am.

Q   And then on -- isn't it correct that on request for reviews and all documentation related to the iPhone, that either you or Trooper Marmol would say this iPhone belonged to John Terry; isn't that right?

A   Yes, ma'am.

Q   And Government's Exhibits 22 and 24, as I understand your testimony, was the original extraction data that came from Mr. Sarvey, and it was all put on that disk; is that right?

A   It was put on the disk as evidence.

Q   So it was -- you put it on the disk?

A   I didn't put it on the disk.

Q   Okay.  Some -- but it came from Mr. Sarvey, is that right?

A   Yes, ma'am.

Q   Okay.  And then the Government's disk, which was stated Exhibit 25 and 26, are things that you highlighted that were of importance.  Is that right?

A   Yes, ma'am.

Q   Okay.  And then that was put on a disk, is that right?

A   Yes, ma'am.

Q   Okay.  But then the Government's Exhibits 31, 32 and all the other subsections, and 34A -- I'm sorry, 34 and all the

subsections to 34, are your creations; isn't that right?

A   Yes, ma'am.  They are a derivative of what was highlighted in the report, to make ease for viewing.

Q   I understand you say they're -- they came from what was highlighted in the report.  I want to make it clear that these are something that you created.

A   Yes, for presentation.

Q   And, in fact, you've testified, I believe, in this federal court, I believe the date was July 26 of 2019, and those particular reports were mentioned, and you said that it was you who created the reports.  Do you recall that?

A   Yes.

Q   Okay.  And the Pages 31 -- the first page of 31, it says it's from an extraction report, and it has a source distraction -- I'm trying to see where is the -- and 33, if you can turn to Page 33 and 31 -- it seems like the first page of Exhibit 33 is more extensive for a source extraction than the first page of the Government's Exhibit 31.  Would you agree with that?

A   Yes, ma'am.

Q   Do you have any reason or do you have any explanation -- do you have knowledge of why the Government Exhibit 33, the first page, is more extensive than for the iPhone, Government Exhibit 31?

MS. SHEEHAN-BALCHON:  Your Honor, I'm going to object

at this point.  It's outside this witness's knowledge.  She's asking for testimony regarding a forensic extraction.

MS. THOMPSON:  And I just -- that was the question, do you know.

THE COURT:  I'll let him answer.  If he doesn't know, he can so state.

THE WITNESS:  I don't know.

BY MS. THOMPSON:

Q   Okay.  And I think what I included -- I think I may have neglected to mention 33 is also your creation.  So 33 is also something that -- 31, 32, 33, and 34, and all the subsections are all your creations; isn't that correct?

A   Yes, ma'am.

Q   Okay.  And in reference to Page 3 of Exhibit 31 -- do you see it there?

A   I'm on Page 3.

Q   Okay.  There is a notation on 3/2/2018 saying, "My folks was in an accident."  Do you have any indication that John Terry's folks was in an accident or in a hospital on or around 3/2/2018?

A   I do not know, ma'am.

Q   Did you do any investigation to try to link it to see if it could have any relation to John Terry?

A   I did not, ma'am.

Q   On Page 5 of Exhibit 31 is your note that 8544 is Gees, and

is your note that says, "Meet me at our parents house." Is that right?

A   Yes, ma'am.

Q   And in your investigation, did you learn how many brothers or siblings Gerald Terry has?

A   No, I did not, ma'am.

Q   Okay. Through your course of, I guess, sort of street investigations I'm going to say, have you learned that there are people that also consider other people unrelated as family?

A   Yes, ma'am.

Q   Okay. Do you -- have you learned that there are people who are actually unrelated who still regard that person's parents as their own parents?

A   Yes, ma'am.

Q   Okay. But with that note alone, you concluded that Gerald Terry had to be talking to John Terry.

A   It wasn't just from that note alone.

Q   On Page 7 of Government's Exhibit 31 is your note that on March 30 of 2018 that there was a text from Gees to the iPhone; is that right?

A   Yes, ma'am.

Q   And that text was of the 1429 Grant Street, Braddock, PA, address; is that right?

A   Yes, ma'am.

Q   Okay. In your knowledge through your investigation

experience, do people text notes to themselves?

A   People do next notes to themselves, ma'am.

Q   And in your Government Exhibit 33, with the Samsung, I believe that you noted or stated that on March 29th Gerald Terry texted the address to the Samsung, is that right?

A   Gerald did not text the address to the Samsung.

Q   You said Gerald did not text the address?

A   Did not.  It was from another unknown person, from 7901.

Q   Okay.  So on your Page 2 of Government's Exhibit 33 is your note that says that the address was text to the Samsung, is that right?

A   Correct.  It's an incoming text to the Samsung.

Q   Okay.  And it was from the number (215)617-7901.  Isn't that right?

A   Yes, ma'am.

Q   And did you look up subscriber information for that number?

A   I did, ma'am.

Q   And was that number to Gerald Terry?

A   It was not to Gerald Terry -- actually, I don't remember. I'd have to look back at the subscriber information.  But I did subpoena, but I don't remember who the subscriber was without looking back at my case file.

Q   So I just want to make sure that you're not testifying to something that would not be true.  So is your answer actually I don't recall?

A    I don't recall the subscriber information.

Q    Okay.  So since you don't recall who was the actual subscriber to that number, isn't it correct that you cannot say that that was not Gerald Terry's cellphone or at least he was the subscriber?

A    I don't -- I don't know whose cellphone number that was.

Q    Okay.

THE COURT:  Attorney Thompson, would this be a good break?

MS. THOMPSON:  Yes.

THE COURT:  It's almost 12:30.

We're going to take our luncheon recess, members of the jury.  Same instructions that I've given you previously and restrictions and admonitions apply to this recess as all others.

I'd like to start at 1:15 because we're running a little bit behind, not only because of the fire drill, but because of some other factors.  So I'd beg your indulgence and allow you 45 minutes today instead of an hour.  Please be back, ready to go in session at 1:15, and we'll be in recess until call of court.

MR. KEYS, LAW CLERK:  All rise.  Court is in recess.

(Jurors exit courtroom.)

THE COURT:  Please be seated.  The jury has left the courtroom and these remarks are outside the hearing of the

jury.

Anything for the Court before you take your luncheon recess?

MS. THOMPSON:  No, Your Honor.

MS. SHEEHAN-BALCHON:  No, Your Honor.

THE COURT:  And, Agent, as you're aware, you are not to discuss your testimony with anyone while you're on the stand, including the Assistant United States Attorney.

THE WITNESS:  Yes, Your Honor.

THE COURT:  Okay, thank you.

All right, please be back and ready to start at 1:15. And if there are issues that need to be addressed before we start, I will be available earlier than that and we can probably take care of that rather than having the jury wait.

So thank you.

MS. THOMPSON:  Thank you.

(Luncheon recess taken.)

(Jurors seated.)

(In open court, with the witness on the stand.)

THE COURT:  Please be seated.

I hope everyone had sufficient time to get lunch; and I did cut fifteen minutes off, but hopefully that will help us move along a little quicker.

So, okay, Attorney Thompson, you can proceed with your examination of Agent Simpson.

MS. THOMPSON: Thank you, Your Honor.

BY MS. THOMPSON:

Q    Agent Simpson, I believe we were last on Exhibit 31 on Page 5, as well as speaking about Exhibit 33, Page 2. -- well, actually, Page 3, I'm sorry, Page 3 to Exhibit 33.

Do you recall that? Was that correct?

A    Page 3 of Exhibit 33, I'm on it.

Q    Okay. So on Page 3 of Exhibit 33 you testified that and you created a document that says on March 29th of 2018 that the phone number 7901 texted, "This is big bro wife. 1429 Grant Street, Braddock." Is that right?

A    Yes.

Q    Okay. And did you investigate the subscriber information for that?

A    I did investigate the subscriber information, but I don't remember what it was at this moment.

Q    So you're saying that you're unable to state to this jury who was the subscriber of that number.

A    Correct.

Q    Okay. And going back to the number on -- for Exhibit 31, Government's Exhibit 31, Page 5 -- I'm sorry -- it's actually Page 7 where it says on March 30th, 2018, that same address was texting to the iPhone. Is that right?

A    Yes, ma'am.

Q    So you said that the day before, March 29th, it was texting

to the Samsung and then on March 30th that address was texting to the iPhone.

A   Yes, ma'am.

Q   And the number on Page 7 of Government's Exhibit 31, I believe you said also you don't recall who was the subscriber of that number.  The last four is 8544.

A   That is correct.

Q   But it was you who attributed that to Gees or Gerald Terry.

A   That is correct.

Q   Okay.  And so it would be correct also you're not able to dispute that that number is actually registered to Gerald Terry's wife.

A   I am not able to speak to that.

Q   Okay.  So, again, on the bottom of that Page 7, on 8/4/2018, that number, last four 8544, that you noted as Gees said, "You ready Pooh," is that right?

A   Yes, ma'am.

Q   Okay.  And it would be correct that you are not able to dispute that that could have been sent by Gerald Terry's wife.

A   It could also have been sent by anybody.

Q   Okay.  And then you have 2482, "We can't be ready til nine," and then you made the opinion that the person who said that, said that because they were packaging the drugs.

A   Yes, ma'am.

Q   You testified also on direct on Page 8 of the Government's

Exhibit 31, in reference to the 12/18/2017 text message, and whereas there was some attachment -- I believe you said there was some attachments found in the messages for the iPhone. Is that right?

A   Yes, ma'am.

Q   Okay. And some attachments in there was an ID -- by your testimony, was an ID of John Terry.

A   Yes, ma'am.

Q   Okay. Isn't it correct that you're unable to state whether or not somebody screen shot it or forwarded that text messages?

A   I would be unable to state that.

Q   And isn't it correct that you're unable to testify that it was that iPhone who took the screen shot of the driver's license?

A   That's correct, ma'am.

Q   And than on Page 12 -- well, first of all -- actually, before we get there, isn't it correct, Agent Simpson, that you also found other drivers' license copies in the iPhone?

A   Yes, ma'am.

Q   Okay. And did you investigate those people who also had the -- their driver's license in the iPhone?

A   We ran basic records checks on those individuals.

Q   Did you interview them?

A   No; we did not, ma'am.

Q   Okay. And the other drivers' license, at least two of them

that you found in the images, right -- is that basically where you found them, in the images?

A    Yes, ma'am.

Q    Okay.  Those other drivers' license you found was Harry Ellis, Junior; is that right?

A    Yes, ma'am.

Q    And also a Daniel Allen, is that right?

A    Yes, ma'am.

Q    Okay.  And did you investigate whether or not they knew who owned this cellphone?

A    No; I did not, ma'am.

Q    You didn't ask them any questions.

A    No, ma'am.

Q    And because you have their driver's license, you also had their address; right?

A    Yes, ma'am.

Q    And so then you would have been able to send someone to interview them if you chose, is that right?

A    Yes, ma'am.

Q    And within the images was also of other people and their girlfriends, isn't that right?

A    Yes, ma'am.

Q    And would it be correct that you do not know if there was screen shots or forwarded text messages on that iPhone?

A    Not for every image, no.

Q   And even though it was images of other males and their girlfriends, isn't that right?

A   Yes, ma'am.

Q   And on Page 12 you chose to submit at least Kelli Royster's image that was found, you say, on the iPhone; is that right?

A   Yes, ma'am.

Q   Now, what is Government's Exhibit 31, due to multiple pages, which I believe is about 18, would you agree that you basically copied and pasted to create your report?

A   Yes, ma'am.

Q   And then for Government's Exhibit 31, would you agree that you would also add text to the exhibit?

A   Not -- I wouldn't -- not at least for Exhibit 31.  It was for the other exhibits that we're focused in on as part of the PowerPoint presentation.

Q   Would you agree that you also added text to the exhibit -- Government Exhibit 31?

A   I didn't add anything to Exhibit 31.  It's a derivative of the items I selected off of the extraction of the cellphone.

Q   Going to Page 16 of Government's Exhibit 31, would you agree that under what you numbered 12 is a line of text that you added?

A   Oh, you're talking about the "Image of John Terry T-Mobile letter."  When you create or mark something for evidence, you can describe what you believe it is.

Q   And in -- so this Government Exhibit 31 also includes your added text of what you're saying it is.

A   Yes, from the initial review of the cellphone.

Q   And Government's Exhibit 32A is, again, your creation of attributing the iPhone to John Terry; isn't that right?

A   Yes, this is the stuff from the derivative stuff put into a PowerPoint for ease of viewing.

Q   Right.  But the report didn't say "John Terry's cellphone." That's just your conclusion, is that right?

A   That -- that's my opinion.

Q   And then you copied and pasted a circle -- like it's a bubble conversation circle, right, and put it on that document.

A   Yes, ma'am.

Q   And then you -- in that circle, like it's a conversation, you add "JT" as though it was actually coming from somebody as JT.  Is that right?

A   I believed that was coming from John Terry.

Q   Just clarifying, that's from your belief, so you put "JT" there as though it was true.

A   Yes, ma'am.

Q   Okay.  And I believe you had testified earlier that you actually cannot say whether it was coming from John Terry directly, if it was forwarded.  You cannot say that, is that right?

A   I didn't observe John Terry send the text message on his

phone.

Q   And then in Government's Exhibit 32E is also your creation where you copied and pasted and then added your text to it, is that right?

A   That's the identification of how I identified it as evidence and why I thought it was significant, so I would mark it "Image of John Terry, T-Mobile letter," so I would know what I was looking at the next time I reviewed it.

Q   And then Government's Exhibit 32F was, again, because you had already deemed the iPhone as belonging to John Terry, and you titled it as such; is that right?

A   Yes, ma'am.

Q   Okay.  And although you don't recall who the subscriber is for that last four digit phone number of 8544, you again attribute that to Gees?

A   Yes, ma'am.

Q   Okay.  And for Government Exhibit 32G, again you copied and pasted that to the document.  Is that right?

A   Yes, ma'am.

Q   And then for the numbers in Government Exhibit -- telephone numbers in Government Exhibit 32G, for what you have identified as Gees and Gees Good, I understand your prior testimony as stating that you do not recall who the phone is registered to.

A   That is correct, ma'am.

Q   Would it be correct that you did not investigate whether or

not Gerald -- well, first of all, let me ask you this: Did Gerald Terry have a wife?

A I believe he did, ma'am, but I'm not sure.

Q Did you investigate whether or not Gerald Terry's wife had a cellphone?

A I did check into a cellphone for who I believed was Gerald Terry's wife.

Q And do you recall which numbers was that?

A I believe it was Rhonda, nickname Pack, Rhonda Terry; and the 7901 number was her number.

Q So when you say, "I believe," are you sort of guessing right now? Because I don't want you to guess.

A I'm not guessing. I just -- I would always like to look back at the document just to confirm in my mind.

Q So your sentence just actually has to be conclusive, and I would rather you not speculate. So are you -- are you actually --

A I'm not a hundred percent certain, but you were asking whether I investigated, so I was trying to give you information.

Q So as I understand your testimony, all you can testify to conclusively in your opinion about is that you checked into other phones.

A I did check into other phones.

Q Okay.

And for Government's Exhibit 32I, we have, again, your opinion noted of that was 8 -- 2482 is John Terry's iPhone; and then these are photographs of Kelli Royster. Is that right?

A    Yes, ma'am.

Q    Did you ask Kelli Royster whose cellphone it was?

A    I talked to -- I got a report from his probation officer that said that was his cellphone number.

Q    You're talking about the 0342 number.

A    Yes.

Q    Okay. But Kelli Royster did not identify John Terry as being the owner of the iPhone.

A    Say -- say that question again.

Q    It's correct that Kelli Royster did not identify John Terry as being the owner of the iPhone.

A    No, he did not.

Q    And in Government's Exhibit 32K, this again is your creation; is that right?

A    Yes -- well, this is -- yes, this is my creation.

Q    And this also -- 32K is not something that Mr. Sarvey, who testified yesterday, noted as of importance in the case; is that right?

A    That is correct.

Q    Okay. So, again, Mr. Sarvey did not confirm that this was a part of the iPhone, is that right?

A    He did not confirm that, ma'am.

Q   And I believe I heard your testimony on direct -- and I'm just looking at the No. 32 -- Government Exhibit 32W -- and these were some outgoing and incoming calls you're saying with the last four digits 7569?

A   Yes, ma'am.

Q   And I believe you stated that Gerald Terry used that phone number.

A   No.  Gerald Terry did not use that phone number.  That phone number texted Gerald Terry's phone number to the John Terry Samsung.

Q   And I thought on your direct testimony you said Gerald Terry did so.

A   I don't believe I did, ma'am.

Q   So is your testimony that a phone number for Gerald Terry was text to the Samsung from the phone number (267)902-7569?

A   That's from the contact Wifey on the Samsung texted Gerald (215)494-8544.

Q   And going to Government Exhibit No. 32AD, is this another creation that you copied and pasted for the exhibit?

A   Yes, ma'am.

Q   Okay.  And did you also add the wording and emblem, "Open in Google Earth"?

A   No, ma'am.

Q   Okay.  And then -- but the category -- or underneath category says "Apple Maps," is that right?

A    Yes, ma'am.

Q    Okay.  Do you have any explanation why category says "Apple Maps" but on top it has "Open in Google Earth"?

A    I do not.  That's why I testified it was in his maps.

Q    In reference to 34A -- so this here is again a creation by you stating that it's from the Samsung.

A    Yes, ma'am.

Q    Okay.  And is this something that you copied and paste?

A    Yes, ma'am.

Q    In 34B, is this a number -- I mean is this also a copy and paste by you?

A    Yes, ma'am.

Q    Okay.  And, again, you're saying it came from the Samsung.

A    Yes, ma'am.

Q    Did you check subscriber information for the 7569 number?

A    Where is the 7569 number?

Q    They're in Exhibit 34C.

A    I don't recall whether I did or not, ma'am.

Q    Okay.  Now, Agent Simpson, there was -- there was an interview done of Kelli Royster who was the registered owner of the vehicle, isn't that right?

A    Yes, ma'am.

Q    Okay.  I'm not sure if you have in front of you --

        MS. THOMPSON:  May I approach to give him the defense book, Your Honor?

THE COURT:  Yes, go ahead.

THE WITNESS:  Right here?

BY MS. THOMPSON:

Q    Oh, you have it?

A    Yeah, I can turn to it.

What letter is it under, ma'am?

Q    I'm going to ask you to refer to L.  And, actually, I'm going to ask you to go -- well, first of all, let's start with L.

Is that a -- have you had a chance to review this Exhibit L?

A    Yes, ma'am.

Q    Okay.  Is that a true and accurate copy of a report that you made on or around January 15th, 2019?

A    Yes, ma'am.

MS. THOMPSON:  Your Honor, I would move for admission of Defendant's Exhibit L.

MS. SHEEHAN-BALCHON:  Your Honor, may we approach?

THE COURT:  You may approach.

(At side bar.)

MS. SHEEHAN-BALCHON:  Your Honor, my concern is in Exhibit L, there are inadmissible hearsay statements within this particular document.  This witness has indicated he did not interview Mr. Royster.  Mr. Royster is obviously not here to testify.  And I believe that this exhibit is attempting --

attempted to be entered to provide statements --

THE COURT: Let me see the statement --

MS. THOMPSON: Also, if I can just say, for L I was just actually going to ask him as far as that Mr. Royster has --

THE COURT: Ask him what?

MS. THOMPSON: -- had an infant with him. That's where I was going next; and that's the last sentence, I believe.

THE COURT: You can have him refer to the document and ask him the question without offering it.

Is that acceptable?

MS. SHEEHAN-BALCHON: Yes, Your Honor.

MS. THOMPSON: Well, while we're here, to save time, I'm going to go to M as well. I believe M is also Royster's interview -- is that M -- yes, that's Royster's interview.

So, yes, he made some admissions and he admitted that he was -- I think that statement's against interest -- he admitted that he did own the vehicle. The officers -- he did qualify it to say that he also sold the vehicle. But then the officers pointed out that the registration was still in his name 'til 2018, after the time of the stop.

He also stated to officers who he sold the vehicle to. So that also is pertinent to the officers' investigation, and that's what I would also be asking the agent about, the fact

that he learned of another name and whether or not he investigated that other name.

THE COURT: Do you believe he saw this, then?

MS. THOMPSON: Yeah, absolutely.

MS. SHEEHAN-BALCHON: We're not going to have Mr. Royster testify now. They're not calling him, I'm not calling him. He's not a Government witness, Your Honor.

MS. THOMPSON: It also could be used for course of conduct, Your Honor.

THE COURT: For what?

MS. THOMPSON: Course of conduct, to explain again his investigation. He learned of, A, said he had a name; what did do you -- the fact that he owned the car, his statement against interest, the fact that he said he sold the car to a particular person I think would be admissible to explain the officer's course of conduct, not the truth that he actually sold it; not presented for the truth of the matter.

THE COURT: Well, I think you can ask him whether he has any information about the ownership of the vehicle.

Did he question Mr. Royster or not? Did he do the questioning here?

MS. SHEEHAN-BALCHON: He did not, Your Honor, which is why the Government's objecting to Defense M in its entirety. This is not a competent witness to provide information from that interview. If defense wants to ask do you know this name,

do you know that name, perfectly fine.  It doesn't have anything to do with the admission --

THE COURT:  You can question him about his knowledge.  He can't just read this into the record.  You can say:  Did you know this?

MS. THOMPSON:  No, I wasn't planning on reading the record.  But also because -- and I'll put a foundation -- but as an agent, they relied on other officers.  So they would receive other reports from other officers, they would rely on that officer to do their work, and they performed more investigation based on those reports.

THE COURT:  You can ask him about his own investigations; but I agree with counsel, this statement by Mr. Royster is not permissible to come into evidence itself because he's not here.  He's not testifying.  But if he's familiar with this information, you can ask him about it.  He might tell you he followed up on it or he didn't.

MS. THOMPSON:  Okay.

MS. SHEEHAN-BALCHON:  Your Honor, that's the same ruling for L and M, correct, those reports?

THE COURT:  Yes.  Yes.

MS. THOMPSON:  So what I understand is I can ask him about it, but I can't admit the exhibit.

THE COURT:  Correct, yes.  You can hand these to him and --

MS. THOMPSON:  -- refresh his recollection.

THE COURT:  -- and provide counsel with a copy, and then ask him if he has information about this area.  But I'm not going to permit you get the document in from statements of a witness who is not here.

MS. SHEEHAN-BALCHON:  Thank you, Your Honor.

(In open court.)

BY MS. THOMPSON:

Q   First of all, Agent Simpson, you actually testified earlier on direct about the number of investigations that you were involved in, is that right?

A   Yes, ma'am.

Q   Okay.  And I believe you stated violent crimes, I believe you mentioned that it was financial crimes -- I'm not sure exactly how you worded it -- Hispanic, Dominican, various different organizations; and would it be correct that in performing investigations, you rely on other agents of the FBI?

A   Yes, ma'am.

Q   Okay.  And so since you can't do everything yourself, if you're here in western Pennsylvania, somebody is in eastern Pennsylvania, you sort of farm out that work to one of your other -- would it be departments in Philadelphia?

A   Yes, ma'am.

Q   Okay.  And then you would take -- would that department, say, in Philadelphia would do, and then you would receive their

reports; isn't that right?

A    Yes, ma'am.

Q    Okay.  And in receiving their reports, then that should direct your investigation further.  Is that right?

A    It does, depending on the report.

Q    Okay.  Well, it could or it could not; is that right?

A    Yes, ma'am.

Q    But you would use the reports that you receive from other agents to determine what you need to investigate, is that right?

A    Yes, ma'am.

Q    And then I also heard you say that you spoke with some state and federal probation officers, is that what you said?

A    By email, sometimes by phone.

Q    Okay.  And then you would also receive or use those reports to determine further investigation, is that right?

A    Yes, ma'am.

Q    And then did you engage in this practice with Kelli Royster?

A    Yes, ma'am.

Q    Did you wind up reviewing the dash cam video for Trooper Marmol?

A    I reviewed -- I reviewed it, but not super closely; but I did review it.

Q    Did you know or learn of whether or not there was some baby

items in the trunk?

A    I saw that from the presentation at trial.

Q    Okay.  And did you learn through your investigations of Kelli Royster that Kelli Royster had an infant?

A    I only surmised that he had an infant based on those photos found on the iPhone.

Q    I'm sorry?

A    I surmised he had a child based on the photos in the iPhone of him holding a baby.

Q    Oh, okay.  But did you also receive reports from the other people that you asked to speak to Kelli Royster?

A    Right, we have the interview report with Kelli Royster.

Q    Okay.  So did you learn it also from that?

        MS. SHEEHAN-BALCHON:  Objection, Your Honor same objection as side bar.

        MS. THOMPSON:  So, again, Your Honor, it's offered for course of conduct for the agent, to explain his course of conduct.

        THE COURT:  You can show him the report and ask him if he's familiar with it, you can do that.

BY MS. THOMPSON:

Q    Now I'm going to ask you to turn to Defense Exhibit L.

A    I'm on L.

Q    Again, this is a report that you received based on the process that we had -- I believe you undertook, where you speak

to other agents or departments; is that right?

A    Yes, ma'am.

Q    Okay.  And so you received information, and then you created this report that's marked as Defense L.

A    Yes, ma'am.

Q    Okay.  And in the report that you created, it notes that Kelli Royster had a ten-month-old daughter.

A    Yes; it does note that, ma'am.

Q    Okay.  And Kelli Royster did admit that --

MS. SHEEHAN-BALCHON:  Objection, Your Honor.  Hearsay. This witness is not competent to testify about an interview with Kelli Royster that he did not participate in.

MS. THOMPSON:  That would be an admission, Your Honor, statement against interest that Kelli Royster was the owner of the vehicle --

THE COURT:  Well, we're going to -- I'll permit you to ask this witness about any reports he generated and what the source was for that, but not to bring in statements from other reports that he did not generate.

BY MS. THOMPSON:

Q    Did you learn who the owner of the 2010 Ford Taurus?

A    I believe so.

Q    Okay.  And through your investigation, who did you learn was the owner of the 2010 Ford Taurus?

A    I ran the record checks, and it came back to Kelli Royster.

Q   Okay.  And through your investigation of Kelli Royster, was there any other names that came up that was connected to the Ford Taurus?

A   In another report done by -- I believe it was a task force officer out of Philadelphia, Kelli Royster provided a third party name.

Q   And was that ** Khalil Madison?

A   Yes, ma'am.

Q   Did you investigate the name provided of Khalil Madison?

A   I did not, am.

Q   And is Khalil Madison a real person?

A   I do not know, ma'am.

Q   Okay.  And because you actually had made statements, I believe, on direct that cellphones could be in other people's name and they may not be real people -- is that what I heard you say?

A   Yes, ma'am.

Q   Okay.  So are you saying that these agencies don't require any identification, like Verizon or Sprint or other places?

A   Depending on where you purchase the phone -- I mean I've seen many phones have no subscriber information as well as real, fictitious.

Q   But in actuality, I guess the iPhone did have a subscriber information; is that right?

A   Yes, ma'am.

Q   And that subscriber was Antwon Chambers, is that right?

A   Yes, ma'am.

Q   And did you investigate Antwon Chambers?

A   I did not, ma'am.

Q   Okay.  And I just want to be clear.  So -- do you know if Antwon Chambers was a real person?

A   I believe it was a real person, but I'm not sure.

Q   All right.  So would it be correct that you did not seek or have anybody in your department seek to interview Antwon Chambers to learn of his connection to the iPhone?

A   That is correct, ma'am.

Q   And for the iPhone, it had a subscriber of Antwon Chambers, and it had emails at -- emails of a Juice Jones and a Sam Marshall, is that right?

A   That was on the extraction report from the iPhone itself.

Q   And did you learn if Sam Marshall was -- Samuel Marshall was a real person?

A   Yes, he's a real person.

Q   Okay.  And did you interview a Sam Marshall about the iPhone?

A   I did not, ma'am.

Q   So you didn't ask Sam Marshall who owned the iPhone that his email was attached to.

A   I didn't interview Sam Marshall.

Q   And you didn't have anybody in your department to interview

him, nor did you ask any state or federal probation office if it was relevant.

A    No, ma'am.

Q    Okay.

You at some point worked with or started working with the CI, Robert Dillard, is that right?

A    Yes, ma'am.

Q    And he identified sort of bald-headed guy from West Philadelphia with a beard that was a supplier of his, isn't that right?

A    I was not focused on outside -- other information that he was providing on other investigations.

Q    Did you look through -- well, first of all, you did a subpoena of Sam Marshall, Juice Jones, email history; is that right?

A    The search warrants, ma'am?

Q    A search warrant?  Okay.

A    Yes.

Q    So you did a search warrant, is that right?

A    Yes, ma'am.

Q    Okay.  And isn't it correct that Sam Marshall, Juice Jones, is bald with a beard?

A    Yes, ma'am.

Q    And I'm going to ask you to turn to Defense Exhibit Q.  If you would please take a look at it and let me know --

A    I'm there, ma'am.

Q    Okay.  So is it correct that Defense Exhibit Q is two pages -- well, three pages, I'm sorry.

A    Yes, ma'am, three pages.

Q    Okay.  So the first two pages of Defense Exhibit Q, is it correct that they are a photo?

A    Yes, ma'am.

Q    And would these be true and accurate depictions of Samuel Marshall?

A    It appears to be Samuel Marshall.

Q    And in Defense Exhibit Q2, does it look that Samuel Marshall is leaning on a red vehicle?

A    Yes, ma'am.

Q    And would it be correct that these photographs were in and as a result of your search warrant of Samuel Marshall's email?

A    It was in the search warrant of the email count itself.

Q    And then --

          MS. THOMPSON:  And I would move for admission of Defense Exhibit Q, 1 and 2.

          MS. SHEEHAN-BALCHON:  Objection, Your Honor.  I don't believe the proper foundation has been laid.

          She's indicated that these came from some email account for a Mr. Marshall.  She has not tied it to any piece of physical evidence in this case other than the iPhone or the Samsung.

THE COURT: Perhaps you can attempt to lay a better foundation by questioning the witness additionally about this photo, if he has knowledge of it.

MS. THOMPSON: Yes. Sure.

BY MS. THOMPSON:

Q   I believe, Agent Simpson, just to say again, the iPhone-8 that is -- isn't it correct that Government's Exhibit 7, the iPhone-8, had an -- emails attached to it for Juice Jones and Sam Marshall?

A   It just had the -- didn't actually have any emails on the phone.  It just had the actual email account listed as the Apple ID attached to that phone.

Q   Okay.  So, again, if I understand you correctly, the Apple ID attached to the iPhone-8 had Juice Jones, Sam Marshall email accounts.

A   Correct.

Q   Okay.  And then you did a search warrant of those email accounts, is that right?

A   Yes, ma'am.

Q   Okay.  And then -- and you did a search warrant of Google or AOL?

A   Google and AOL.

Q   Okay.  And then pursuant to that search warrant request, you received the email history of Samuel Marshall.  Right?

A   Yes, ma'am.

Q   So you were able to identify that Samuel Marshall was the owner of those Juice Jones, Sam Marshall email attached to the iPhone-8.

A   Yes, ma'am.

Q   In Government's Exhibit 7.

A   Say that last question again.

Q   And that's in Government's Exhibit 7.

A   Right, those were the two email accounts found on the exhibit.

Q   Okay.  And then for Defense Q1 and 2, you've stated that they were -- these photographs were in the answer to your search warrant request.  Right?

A   Right, they were a part of the search warrant.

Q   Okay.  And then these photographs are true and accurate depictions of what was in the response to your search warrant request, right?

A   Yes, ma'am.

Q   And then these photographs are true and accurate depictions of Samuel Marshall, is that right?

A   Yeah, I believe that's Sam Marshall.

        MS. THOMPSON:  So, Your Honor, I would present Defense Exhibit 1 and 2.

        MS. SHEEHAN-BALCHON:  Your Honor, same objection with the addition that defense has not characterized a time frame, a time stamp, any metadata for these photographs to permit their

inclusion within the time period that we're talking about, which is 2018.

THE COURT: Wasn't it retrieved from the phone?

MS. SHEEHAN-BALCHON: Exactly, Your Honor. It was not.

THE COURT: Agent, perhaps you can clarify this a bit. These pictures that are being requested to be admitted, do you have some familiarity with them? Can you tell me what you know about their origin, where they came from, and that sort of thing?

THE WITNESS: Yes, sir. Those pictures, the time stamps on them, if you want -- the binder here, it's February 2015 for Image 0362. That John Terry iPhone wasn't activated until September 30th, 2017.

Same holds true for Item Q2, March 22nd, 2017, for Image 367. Additionally, there were no emails actually found on iPhone itself.

THE COURT: These were produced in response to a search warrant?

THE WITNESS: Right, because I found the Apple IDs, and I wasn't as familiar with Apple IDs in 2019 as I am now. Basically, it's an email account you have to have attached to your iCloud account. So -- you know, how those are there -- I mean could it have been any reason. It could be a friend of his, it could be he's using a third party email -- you know,

that's -- that's the extent.

THE COURT: And they appear to predate any sort of investigation in this particular case, do they not?

MS. THOMPSON: So, Your Honor, as the agent has testified, that this -- although the pictures themselves in the email predated, the activation of the iPhone was connected to that email, and these -- Q1 and Q2 is all for -- just to present, one, how he looked and, two, that he had a red vehicle.

THE COURT: This is a new name in the case at this point. Are you going tie this up later?

MS. THOMPSON: Well, Your Honor, it's not new to Agent Simpson, and that was again why I am asking Agent Simpson about his investigation of the person and the fact that this -- he had the information, obviously he has the reports in front of him, because he was able to speak exactly where it was. So he had this information, and I'm asking him about his course of conduct of performing an investigation toward this iPhone.

THE COURT: I'll permit you to question him about any involvement that this individual may have had that he is aware of and what investigation he did. But as far as the -- the exhibit that you're offering at this point in time, without additional linking into this case, I deny the request.

But you can certainly continue to question the agent about this individual and whether he investigated him.

BY MS. THOMPSON:

Q   And again, just to be clear, Agent Simpson, you did have information about Samuel Marshall, and you say at least in 2019.  Is that right?

A   From the email account.

Q   Okay.  And as I -- I believe you testified, but just to clarify, you did not seek to have Samuel Marshall interviewed. Is that right?

A   No, ma'am.

Q   Okay.  So you did not seek to ask him about his connections to the iPhone.

A   No, ma'am.

Q   And you did not seek to ask him if he knew John Terry.

A   No, ma'am.

Q   You did not seek to ask him if he knew Gerald Terry.

A   No, ma'am.

Q   Okay.  And I heard you respond in reference to the Court, you said it could have been this, it could have been that, it could have been this.  Right?  Is that what I heard you say?

A   Yes, ma'am.

Q   But you could have been more conclusive had you actually interviewed him, isn't that right?

A   That would have been one step that I could have taken, ma'am.

Q   One -- an important, instead of relying on your guesses,

right?

A    I don't believe I was guessing, ma'am.

Q    Well, you're saying something that you don't know to be true.  Isn't that right?

A    I believe those emails were third party emails used to hide the identity of the true user of the phone.

Q    And, again, you're relying on your belief; isn't that right?

A    That's my belief from lots of experience dealing with phones.

Q    But you're choosing to rely on your belief rather than to go to the source, isn't that right?

A    No, ma'am.  I did other steps to identify the user of the phone.

Q    Well, again, from what you said, is that right?

A    Right.  If you actually go interview Sam Marshall and you don't know who Sam Marshall is or his relation to the case, you could end up, you know, hurting the investigation without enough knowledge of what's going on.

Q    Well, you already had charged John Terry, so how could you hurt it; right?

A    We were looking to further the investigation.

Q    Well -- but you didn't further the investigation by actually interviewing the names that came up in the investigation?

A   No, ma'am.

Q   And you testified twice to a Grand Jury to have John Terry indicted, is that right?

A   Yes, ma'am.

Q   And one of the times that you testified was October 16th, 2018.  Is that right?

A   I believe; I don't have the report in front of me.

Q   I'm going to ask you to turn to Defendant's Exhibit A.
    Okay, so does that refresh your recollection that you testified October 16th, 2018?

A   Yes, ma'am.

Q   And that was before a federal Grand Jury?

A   Yes, ma'am.

Q   Okay.  And isn't it correct that you were under oath then?

A   Yes, ma'am.

Q   Isn't it correct that John Terry did not state that the drugs and the firearm were his?

A   So during that time when --

Q   I'm sorry.

A   Oh.

Q   Can you answer my question?

A   I'm going to answer the question.  So I believed, based on the report and the information --

Q   I'm sorry.  I'm not actually asking what you believe.  My question is:  Isn't it correct that John Terry did not say the

drugs and the firearm were his?

A   He didn't specify guns and drugs.

Q   All right.  Isn't it correct that Trooper Marmol did not ask John Terry for permission to search the vehicle?

MS. SHEEHAN-BALCHON:  Objection, Your Honor, outside the scope of this witness's knowledge.  He wasn't present at the traffic stop.

MS. THOMPSON:  Your Honor, this witness presented testimony to a Grand Jury on two occasions saying that it is within his knowledge.

MS. SHEEHAN-BALCHON:  Objection, Your Honor.  This is not proper use of prior testimony in transcripts.

THE COURT:  Well, I'll permit him to answer the question to the extent of his knowledge from his review of the file.  But obviously he was not there at the time of the search of the vehicle.

Go ahead, Agent.

THE WITNESS:  He asked Gerald Terry, he didn't ask John Terry.

BY MS. THOMPSON:

Q   And is it correct that at the time of the stop on April 4th, 2018, that Gerald Terry stated that he was speaking at a Narcotics Anonymous conference?

A   I can only go with the report that Trooper Marmol, you know, provided me, and that's what he provided.

Q    I'm sorry?

A    That's what Trooper Marmol provided in the report.

Q    And what Trooper Marmol provided in the report was that John Terry stated he was speaking at a Narcotics Anonymous conference.

MS. SHEEHAN-BALCHON:  Objection, Your Honor, asked and answered.

THE COURT:  I'll permit him to answer one more time, just to be certain.

This is based on your review of the file, correct, sir?

THE WITNESS:  Right, just a review of the file.

THE COURT:  Go ahead.

THE WITNESS:  Trooper Marmol put it in his report that it was Gerald Terry who said that he was speaking on a conference on drugs.

BY MS. THOMPSON:

Q    Not just a regular NAA meeting, it was actually a conference.

A    Either a meeting or a conference, I'm -- you know, I'm not sure.

Q    Okay.  I'm going to ask you to turn to Page 6 of Defense Exhibit A.  And I'm going to ask you to refer to Lines 24 and 25.

A    Yes, ma'am.

Q   And does take refresh your recollection as to how you testified to the Grand Jury?

A   Yeah, I testified it was a Narcotics Anonymous conference.

Q   Okay.  So not just a normal AA/NA meeting.  Is that right?

A   I would consider a conference and a meeting to be pretty much the same.

Q   Okay.  I'm going to ask you to turn to Page 9.

You testified to the Grand Jury that the welded box, being the trap, was the one on John Terry's passenger side, is that correct?

A   Which line are you looking at?

Q   That would be from -- you can review from Page 9, 7 to 16, review that and see if that refreshes your recollection.

MS. SHEEHAN-BALCHON:  Your Honor, my objection to this line of questioning is she has not laid the foundation that this witness does not recall that statement and now is trying to use a transcript to refresh his recollection --

THE COURT:  Yes, I don't think it's a refreshing recollection.  I think he had just indicated he wanted to know what line she was referring to.  So I'll permit him to refer to that and answer the initial question.

What was the initial question, Shirley?  Before the recollection reference.

MS. THOMPSON:  I believe I asked something to the extent:  Was it correct you testified to the Grand Jury that

the welded box was on the passenger side where John Terry was sitting.

THE WITNESS: Yes, ma'am.

BY MS. THOMPSON:

Q   Okay.  And is it correct that you did not testify to the Grand Jury on October 16th, 2018, that all the triggering mechanisms to open and close the trap was on the driver's side location.

A   I did not testify to that.

Q   And isn't it correct that on October 16th, 2018, you testified under oath to a Grand Jury that John Terry admitted to, quote, those being his, the gun and the suspected cocaine?

A   What was the term you used for the cocaine and the gun, ghost or --

Q   Well, let he rephrase.  Just -- I'm not sure of your question.

Isn't it true that you testified to the Grand Jury on October 16th, 2018, that John Terry admitted to those being his, the gun and the suspected cocaine?

A   Yes, ma'am.

Q   And when, in fact, that was not true; isn't that right?

A   It was true, he was responsible for the vehicle, to Trooper Marmol.

Q   You didn't -- you didn't testify to the Grand Jury: John Terry said I'm responsible for the vehicle.  Isn't that

right?

A   It was at that time an admission of the article -- of the stuff inside the vehicle.

Q   That was your interpretation, isn't that right?

A   Yes, from his --

Q   You didn't testify to the Grand Jury:  John Terry said I'm responsible, therefore I interpreted this meant the guns and the drugs.  Is that right?

A   I didn't testify that way.

Q   Right.  You, in fact, say that:  When asked about the hidden compartment, he admits that those were his, the gun and the suspected cocaine.  Isn't that right?

A   That's what I -- Trooper Marmol was indicating to him from my conversations with Marmol, were the guns and the drugs in the vehicle.

Q   So are you saying that you testified on October 16th, 2018, to the Grand Jury because that's what Trooper Marmol told you?

A   Well, based on the reports and my conversations with Trooper Marmol, that was my understanding.

Q   Okay.  But you don't testify to the Grand Jury that:  This is what Trooper Marmol told me.

A   It's from the reports.

Q   My question is:  Isn't it correct you don't tell the Grand Jury:  This is just based on what somebody else told me.

A   It wasn't just based on what somebody told me.  It was

based on reports.

Q   Well, reports are what somebody else said and write down, isn't that right?

A   Yes, ma'am.

Q   Okay.

And then, again, you testify under oath to the Grand Jury that -- in answer, that John Terry accepted the responsibility for the drugs and the gun, isn't that right?

A   Yes, ma'am.

Q   Okay.  But it is correct again that John Terry did not say: I have responsibility for the drugs and the gun.

A   He did not use that term.

Q   It is correct you testified a second time, around about July 9th, 2019, before another Grand Jury; is that right?

A   I don't remember the exact date, but I did testify a second time.

Q   Okay, I'm going to ask you --

MS. THOMPSON:  First of all, Your Honor, I'm going to move to admit Defense Exhibit A, specifically Pages 6, 9, 11, and 17, as discussed with the agent.

MS. SHEEHAN-BALCHON:  Your Honor, no objection, if they are redacted specifically to the excerpts that she inquired about with Agent Simpson, those particular pages.

THE COURT:  Can you be more specific in what portions of those pages you want the Court to admit, starting with

Page 6?

MS. THOMPSON: Okay. So at Page 6 I specifically asked him about Lines 24 and 25.

THE COURT: Okay.

MS. THOMPSON: On Page 9 I asked him to review Lines 7 through 16. More specific question was about what he said about the welded box, which were Lines 9 and 11.

THE COURT: You asked him to review 7 through 16, but what -- did he only testify as to 9 and 11?

MS. THOMPSON: Yes, that's correct.

THE COURT: So I will consider that you're asking that 9 and 11 be admitted.

Okay, go ahead.

MS. THOMPSON: And then that would be Page 11, which would be Lines 5 and 1eight -- well, actually -- his answer would be Lines and 1eight.

THE COURT: Five and 8, okay.

MS. THOMPSON: I'm sorry, 5 through 8.

THE COURT: Five through 8, all right, okay.

And Page 17?

MS. THOMPSON: Oh, Page 17, Lines 2 and 3.

THE COURT: Two and 3?

MS. THOMPSON: Yes.

THE COURT: All right.

With that clarification, Attorney Sheehan-Balchon, do

you have any objection?

MS. SHEEHAN-BALCHON: No, Your Honor.

THE COURT: All right, then I'll admit portions of Defendant's Exhibit A, namely Page 6, Lines 24 and 25; Page 9, Lines 9 and 11; Page 11, Lines 5 through 8; and Page 17, Lines 2 and 3.

Okay. So we'll need a redacted version of that, if you want that to go out with the jury.

MS. THOMPSON: Yes, Your Honor.

MS. SHEEHAN-BALCHON: Your Honor, do you mind if I grab an extra defense exhibit book?

THE COURT: No, go ahead.

MS. SHEEHAN-BALCHON: All right, thank you.

MS. THOMPSON: Okay, thank you.

BY MS. THOMPSON:

Q   So, Agent Simpson, you again testified to another Grand Jury on July 9th, 2019. Is that right?

A   Yes, ma'am.

Q   Okay. And, again, you testified about the trap being on the passenger side of the vehicle; is that right?

A   Yes, ma'am.

Q   Okay. But, again, by July 9th, 2019, you did not tell the Grand Jury how the opening closing mechanisms were on the driver's side.

A   I did not, ma'am.

Q   And then, just for the record, can you look to Defense Exhibit E, Page 6, Lines 11 to 13.

A   Yes, ma'am.

Q   And is that where you testified to the Grand Jury about the trap being found on the passenger side of the 2010 red Ford Taurus?

A   Yes, ma'am.

Q   And on July 9th, 2019, do you recall when you testified to the second Grand Jury that you testified that Gerald and John stated that they got their friend's vehicle from a friend's wife?

A   Where is that on the Grand Jury?

Q   I assume you're answering you don't recall.  So if you --

A   Right.

Q   -- would turn to Page 9 of Defense Exhibit E, I'm going to ask you to look to Lines 20 to 25.

A   Yes, I testified to that.

Q   Okay.  So on July 9th, 2019, you're telling the Grand Jury that it was both Gerald Terry and John Terry who said who the vehicle was registered and he said it was his friend's wife; is that right?

A   Yes, ma'am.

Q   Okay.  And that is not true, is that right, because only Gerald Terry answered.

A   I don't know, ma'am.  I wasn't the one doing the traffic

stop.

Q    Well, you had the report of Trooper Marmol --

A    Right.

Q    -- available for -- at least since October 2018, isn't that right?

A    Right, that's what I believed at that time when I was answering that question.

Q    But you didn't -- you didn't -- when you testified to the Grand Jury on October 16th, 2018, you didn't say that same thing, that it was both of them; isn't that right?

A    If I didn't say it on the first Grand Jury, then I didn't say it.

Q    Right.  But now on July 9th, 2019, you threw John Terry in there, isn't that right?

A    I put his name in there; yes, ma'am.

Q    Okay.  And then also you testified to the July 9th, 2019, Grand Jury that Trooper Marmol gave a warning to them, isn't that right?

A    A traffic warning?

Q    Yes.

A    I believe when he came up to the passenger side of the vehicle, he let them know that they were following too closely to another vehicle.  I believe that was testifying to Trooper Marmol informing them of their traffic violation.

Q    So, again, it is not their traffic violation because there

James Simpson - Cross Examination

is only one driver, right?

A   Yes, ma'am.

Q   Okay.  And you had available to you since at least October 29 -- I'm sorry, October 2018 Trooper Marmol's dash cam video, right?

A   Yes, ma'am.

Q   And also his reports, is that right?

A   Yes, ma'am.

Q   And so -- and you had testified previously on October 16th, 2018, and you did not say that the warnings were given to them at that time.  Isn't that right?

A   Correct, ma'am.

Q   Okay.  But as shown on Page 10, Lines 18 to 25, you're saying he explains to them he's going to give a warning, right?

A   Right, because they're both in the front of the vehicle and he's talking, it appears, to both of them.

Q   Well, actually, he was just talking to Gerald Terry; isn't that right?

A   Correct.

Q   And then you tell the Grand Jury that Trooper Marmol asked them for consent to search the vehicle, and they gave him consent.  Isn't that right?

A   If that's what I said in the Grand Jury, that's what I said.

Q   Well, if you look at Page 10, Lines 24 to 25, isn't that

what you said?

A    Yes, ma'am.

Q    Okay.  But isn't it correct that actually, again, Trooper Marmol did not speak to John Terry about searching the vehicle.  He only spoke to Gerald Terry.

A    That's correct, ma'am.

Q    So you testified to the Grand Jury to something you either knew was not true or should have known was not true, isn't that right?

A    No, ma'am.

Q    And then again on July 9th, 2019, you testified to the Grand Jury that John Terry admits that the gun and the drugs, the suspected cocaine were his.  Isn't that right?

A    Yes, ma'am.

Q    In fact, he did not admit that the gun and the suspected cocaine were his, is that right?

A    He did not specify the gun and drugs.

Q    You did not qualify to the Grand Jury when you testified under oath that John Terry did not specify the gun and the drugs, isn't that right?

A    I did not give them the exact quote.

Q    And I am referring to Page 13, Lines 8 to 11.  And does that show what you testified to the Grand Jury?

A    Yes, ma'am.

Q    And then, upon further inquiry -- I'm going to direct you

to Page 16 -- a grand juror asked you: Did he admit to it being his? Isn't that right?

A   Yes, ma'am.

Q   And you answered: He admitted that the firearm and the cocaine being his property.

Isn't that how you testified?

A   Yes, ma'am.

Q   And I'm referring to Page 16, Lines 2 to 5.

MS. THOMPSON: Your Honor, at this time I would move to admit Defendant's Exhibit E -- I'm going to state specifically. That would be Page 6, Lines 11 to 13; Page 9, Lines 20 to 25; Page 10, Lines 18 to 25; Page 13, Lines 8 to 11; Page 16, Lines 2 to 5.

MS. SHEEHAN-BALCHON: No objections to the admission of those excerpts only, Your Honor.

THE COURT: All right. Then I'll admit Exhibit E with regard to the specifics at Page 6, 11 and 13; Page 9, 20 to 25; Page 10, Lines 18 to 25; Page 13, Lines 8 to 11; Page 16, Lines 2 to 5; and I'd ask that counsel for Defendant make sure that the copies that are submitted for viewing by the jury have those -- only those lines.

MS. THOMPSON: Thank you, Your Honor.

THE COURT: Thank you.

MS. THOMPSON: Your Honor, nothing further.

THE COURT: All right, thank you. Do you have any

redirect, counsel?

MS. SHEEHAN-BALCHON:  I do, Your Honor.

REDIRECT EXAMINATION

BY MS. SHEEHAN-BALCHON:

Q   So, Agent Simpson, let's address this -- this issue first.

Attorney Thompson took you through machinations through various Government exhibits, 32, the series of 32s, the series of 34s, the exhibits above those, 31 and 33.  In each of those instances she asked you:  Did you create this?  Did you copy and paste this?  And in those instances, you indicated yes.

Now, let's be specific.  Did you create the content in those exhibits?  And by "content" I mean what was in the communications themselves?

A   No, ma'am.

Q   Okay.  You had indicated that -- clearly, that you put the header that said "John Terry iPhone" on those exhibits, correct?

A   Yes, ma'am.

Q   And that you translated for us UTC to eastern standard time.  Right?

A   Yes, ma'am.

Q   And also when you're sorting some of the images that we saw --

MS. THOMPSON:  Your Honor, I'm sorry.  I just want to object to leading the witness.

THE COURT: I didn't hear you, counsel.

MS. THOMPSON: I'm sorry. I wanted to object to counsel leading the witness. This is still redirect.

MS. SHEEHAN-BALCHON: Your Honor, I'm asking for a yes or no answer, not necessarily leading; but I'll follow the Court's instruction.

THE COURT: Well, I'll permit the question. I think, given the nature of the question, it's probably the most effective way of asking it.

Go ahead.

BY MS. SHEEHAN-BALCHON:

Q So, in addition, when you identified some exhibits that we were talking about metadata, how is this found on the phone, was it incoming, outgoing, that there was a comment or note above those particular exhibits. Did you create that comment?

A I create the comment when I mark it as evidence so I know what it is.

Q In the box itself -- and let's look at one specifically so that we know exactly what we're talking about.

MS. SHEEHAN-BALCHON: Can you please display 320, previously admitted.

(Exhibit displayed.)

BY MS. SHEEHAN-BALCHON:

Q Now, in this -- in 320, is that comment section actually removed?

A    It's removed.

Q    Okay.  So can you, in the exhibit book right in front of you, take a look at Government's Exhibit 31, and refer directly to Page 17.

So next to the item number, can you indicate is that the comment that you entered?

A    Are you looking at --

Q    State 4, Item No. 16 or Item No. 17 specifically.

A    So if you come -- if you have Item 16, images, blank space, then I put in "image of possible cocaine."

Q    Okay.  The same for Item 17.

A    Correct.

Q    Okay.  So in those two instances, did you change or alter what is followed beneath, which is captioned "file info" -- "additional file info"?

A    No, ma'am.  None of that was changed.

Q    And that is what is pulled directly from the full extractions, is -- is that fair to say?

A    Yes, ma'am.

Q    So in every instance when Attorney Thompson asked you did you create, did you copy, did you paste, is that your same answer?

A    Right, the way you explained it.

Q    Attorney Thompson asked you the number ending in 8544 as it appears on the iPhone.  And the instance she referenced was

March 30th of 2018 when 844 texts or communicates the address of 1429 Grant Street. You -- she asked you about the subscriber information, 844; and what was your response?

A    To those referenced to 844, that it was not subscribed to Gerald Terry.

Q    Okay. Yet, did you attribute that phone to Gerald Terry?

A    Yes, ma'am.

Q    And how did you do that?

A    Through the Pennsylvania State Probation Office.

Q    Okay. Now, Miss Thompson asked you if you found in the iPhone we're talking about other copies of drivers' licenses in that iPhone; correct?

A    Yes, ma'am.

Q    Okay. And she asked you specifically did you find one for Harry Ellis, Junior. Correct?

A    Yes, ma'am.

Q    And a Daniel Allen.

A    Yes, ma'am.

Q    Okay. Harry Ellis, Junior, or Daniel Allen, were either one of them arrested on April 4, 2018, with John Terry and Gerald Terry where three kilograms of cocaine and a gun were found?

A    No, ma'am.

Q    At the time of that traffic stop, April 4 of 2018, who was that vehicle that the Terrys were in, who was it registered to?

A   Kelli Royster.

Q   Now, Attorney Thompson also got into some subscriber information that she's connecting to the iPhone, an individual that she asked you about, Antwon Chambers.  Do you remember that?

A   Yes, ma'am.

Q   Okay.  And what was your response when she said:  Well, did you investigate him further?

A   I did not investigate Antwon Chambers further.

Q   Was Antwon Chambers present on April 4th of 2018 and arrested with John Terry, Gerald Terry, three kilograms of cocaine, and a gun?

A   No, ma'am.

Q   Same as to the Sam Marshall.  Was he there when John Terry and Gerald Terry were arrested with three kilograms of cocaine and a gun?

A   No, ma'am.

Q   Now, there are various questions about your prior testimony, the information that you received from Trooper Marmol about John Terry's statement about this vehicle.  Do you recall those questions on cross?

A   Yes, ma'am.

Q   Okay.  And what was your understanding of the statement that John Terry gave to Trooper Marmol?

A   That he was taking ownership of everything found in the

vehicle, to include the cocaine and the gun.

Q   Tell us, though, what was the exact statement that you knew of from Trooper Marmol's report?

A   He advised Trooper Marmol that he would take responsibility for everything in the vehicle.

Q   The three kilograms of cocaine, the gun, the iPhone, the Samsung, were they all found within that vehicle or on one of those people?

A   Yes, ma'am.

Q   Gerald Terry or John Terry?

A   Yes, ma'am.

Q   Agent Simpson, I'm going to hand you what I've marked as Government 43.  Do you recognize that single page document?

A   Yes, ma'am.

Q   And where do you recognize it from?

A   It was a report I requested from Pennsylvania Probation.

Q   And who is depicted in that report?

A   Gerald Terry.

        MS. SHEEHAN-BALCHON:  Your Honor, at this point I would seek the admission of Government 43.

        MS. THOMPSON:  Your Honor, may we approach?

        THE COURT:  You may.

   (At side bar.)

        MS. THOMPSON:  This is not relevant, a probation evaluation, it's not probative whether or not John Terry

committed these crimes so -- this is offered for no other reason but to sort of disparage Gerald Terry or prejudice the jury against Gerald Terry. There's no reason to submit a mugshot, probation, Pine Grove history to the jury.

MS. SHEEHAN-BALCHON: Your Honor, it's relevant that -- I would like to point out to the Court towards the bottom of the exhibit where it indicates phone number, cellphone number, and date. This indicates clearly that on February 1st of 2018, immediately two months before this incident, that Gerald Terry provided these two contact numbers that we have been wrestling about all day as contact numbers for himself, Gerald Terry.

THE COURT: You can ask the agent if he got this information from the worksheet from probation without submitting this entire document in.

MS. SHEEHAN-BALCHON: I can ask him, Your Honor, but I do submit that it's admissible under 803(6) as a business record of US -- PA Probation and Parole.

MS. THOMPSON: This is not certified.

THE COURT: I think it would probably qualify, but I think it would be prejudicial at this point to include all this other stuff in here when all you want is the phone number.

MS. SHEEHAN-BALCHON: And the date.

THE COURT: Ask him about that; you can.

MS. SHEEHAN-BALCHON: Okay. Thank you, Your Honor.

(In open court.)

BY MS. SHEEHAN-BALCHON:

Q   So, Agent, you indicated that you received this information about Gerald Terry from the Pennsylvania Board of Probation and Parole.

A   Yes, ma'am.

Q   And can you indicate what date the -- let's say biographical information on this form was provided to the Pennsylvania Department of Probation and Parole?

A   February 1st, 2018.

Q   Okay.  Tell us approximately how long that is before the April 4th, 2018, incident.

A   Approximately two months.

Q   Okay.  And did Mr. Gerald Terry provide two telephone numbers for probation or parole to contact him on on that date, February 1st of 2018?

A   Yes, ma'am.

Q   And what were those numbers?

A   (215)494-8544 and then (215)989-9615.

Q   The first one ending in 8544, is that the one you have been referring to as Gees?

A   Yes, ma'am.

Q   And the second one, 9615, is that the number that you've been referring to as Gees Good?

A   Yes, ma'am.

MS. SHEEHAN-BALCHON:  Offer for recross, Your Honor.

THE COURT:  Attorney Thompson, any recross examination?

MS. THOMPSON:  Briefly, Your Honor.

RECROSS EXAMINATION

BY MS. THOMPSON:

Q   So, Agent Simpson, you were asked by the Government whether or not those people were on the scene at the time of April 4th, 2018.  Isn't that right?

A   Yes, ma'am.

Q   Okay.  But through your investigation that I think I heard you say on direct, I believe you said that people involved in drug sales are not often on the scene of drug activity.  Isn't that right?

A   That happens; yes, ma'am.

Q   And, in fact, I heard you say that people involved in drug sales actually try to distance themselves from the actual drug activity.  Isn't that right?

A   Yes, ma'am.

Q   Okay.  So then if you have an iPhone with information that is drug-related with subscribers, then when they fall into a drug investigation that you would follow up with those subscribers?

A   It would be -- depending on what I find on the phone would lead me in the right direction of what I would prioritize when

I'm investigating.

Q   And if -- and I'm going to ask you:  Are you basically saying it depends on what you give priority to?

A   No, it depends on -- I follow the investigation.

Q   Right.  You decide what is important.

A   The investigation didn't -- didn't need to go in that direction to identify those two people further because there was other stuff out on the phone that led me in a different direction.

Q   Right.  And that was your conclusion, is that right?

A   Yes.

Q   Okay.  And the other stuff found on the phone also included the drivers' license of other people, isn't that right?

A   Yes, ma'am.

Q   Okay.  And in reference to the phone numbers that were given, you said -- I believe you state probation and parole, isn't it correct that people often give family members' phone numbers so that Government agencies can contact them?

A   They do that, ma'am.

Q   Okay.  So they don't necessarily always give the phone number that can be linked to them directly, isn't that right?

A   Correct, ma'am.

Q   And isn't it correct that you actually did not check -- or don't have records of your check of the subscriber information for those phones; isn't that right?

A   That's correct, ma'am.

MS. THOMPSON:  Okay, nothing further.

MS. SHEEHAN-BALCHON:  Nothing further, Your Honor, thank you.

THE COURT:  All right.  Agent, you can step down, please.

(Whereupon, the witness was excused.)

THE COURT:  We're going to take our mid-afternoon recess.

We're about to take our recess.  I want to remind you of the instructions I gave you earlier about your conduct as jurors.

During this recess and all other recesses, do not discuss this case with anyone including your fellow jurors, other people involved in the trial, members of your family, friends or anyone else.

Do not speak at all with any of the parties, the witnesses or the attorneys.

Do not permit anyone to discuss the case with you.  If anyone approaches you and tries to talk to you about the case, please report that to me through my courtroom staff.

I do not know whether there will be any news coverage of this case, but do not watch or listen to any news reports concerning this case on television or on radio and do not read any news accounts of this trial in the newspaper or on the

Internet.

Do not use the Internet to search for information about the parties, witnesses, lawyers, or anyone else associated with the trial.  The only information you are to consider in deciding this case is what you learn in this courtroom.

Please keep an open mind and do not make up your mind about the case until you've heard all the evidence, and that will happen at the end of the case.

I have approximately 3:02.  Let's resume at 3:20.  We'll be in recess until then.

MR. KEYS, LAW CLERK:  All rise; court is in recess.

(Jurors exit courtroom.)

THE COURT:  Please be seated.  The jury has left the courtroom, so these remarks are outside the hearing of the jury.

Do the parties have anything for the Court before you take your recess?

MS. THOMPSON:  No, Your Honor.

MS. SHEEHAN-BALCHON:  I'm sorry, just briefly, Your Honor.

Our next witness is Morgan Wiernusz from the Pennsylvania State Police Crime Lab, Your Honor.  Speaking with defense counsel at the break, defense counsel has agreed to stipulate to her qualifications as an expert and to stipulate

to the admission of Government's 10, so that will short circuit some of her testimony.

THE COURT: Okay. It's appreciated to try to move the trial along. And then, after that, who do you have?

MR. BERNARD: Mr. Dillard.

THE COURT: Mr. Dillard; and that will be the end of the witnesses for the Government?

MR. BERNARD: Yes, that will end the Government's case-in-chief, Your Honor.

THE COURT: Do you think we can get Mr. Dillard in today?

MR. BERNARD: I believe we can.

THE COURT: Okay. That would be good if he could finish your case today and move on to the Defendant tomorrow.

Since the marshal is here, I'll ask: Have we been able to make arrangements to have the first witness here, available first thing in the morning?

MARSHAL: Yes, he's scheduled to be here tomorrow. If possible, I can send him back now so he can get some better sleep tonight.

THE COURT: Have you already had a chance to talk to him, Attorney Thompson?

MS. THOMPSON: I have. I have spoken to him, and I understand he has to come back tomorrow as well, that's going to be a long drive back and forth -- what time do you think --

MARSHAL: He got here this morning at 7:00.

MS. THOMPSON: If I can come in early to talk to him before we start tomorrow again --

THE COURT: All right, please explain to the officials with him and the witness that we really thought he would testify today, and we're sorry that he had to make the trip and then make it again tomorrow; but we're going to need to have him here no later than 8:00 in the morning so that Attorney Thompson can meet with him and then we can get him into court by 9:00.

Okay. Thank you, marshal.

All right, we'll be in recess.

(Whereupon, the afternoon recess was taken.)

(Jurors seated.)

(In open court, with Defendant present.)

THE COURT: Please be seated.

Mr. Bernard, you can call your next witness.

MR. BERNARD: Judge, Attorney Sheehan-Balchon will be conducting the examination of the next witness. Before we get to that, I just wanted to clean up --

THE COURT: I just assumed since you were at the lectern -- I apologize, Attorney Sheehan-Balchon.

MR. BERNARD: Of course, no problem.

I just wanted to clean up one item from the previous witness's testimony. We admitted a lot of exhibits during that

time, and I did my best to keep score. I could not recall if we moved for the admission of Government Exhibit 33 and if that had been admitted. So at this time if it has not been admitted, I would move for its admission. That is the Samsung extraction report.

THE COURT: I do not have it marked as having been admitted.

Any objection, Attorney Thompson?

MS. THOMPSON: I believe that the agent testified about it, but I do maintain the same objections as Exhibits 31 and 34.

THE COURT: So noted.

I'll admit Exhibit 33.

MR. BERNARD: Thank you, Your Honor.

THE COURT: Thank you.

All right, Attorney Sheehan-Balchon, you can call your witness.

MS. SHEEHAN-BALCHON: Your Honor, the United States calls Morgan Wiernusz.

THE COURT: Would you come forward and be sworn.

MORGAN WIERNUSZ, a witness herein, having been first duly sworn, was examined and testified as follows.

MS. SHEEHAN-BALCHON: Your Honor, with the Court's permission, Agent Simpson is sitting in a chair close to the witness stand just to handle drug evidence if that's

acceptable.

THE COURT: I didn't even see him over there.

Sure, he can sit there unless there's some objection from counsel.

MS. THOMPSON: No, Your Honor.

THE COURT: Okay. All right, Attorney Simpson -- or Agent Simpson. I can see you sitting over there now, but I didn't know you were there.

Okay, go ahead.

MS. SHEEHAN-BALCHON: Your Honor, before we begin the inquiry, defense and defense counsel, Attorney Thompson, have agreed to stipulate to Miss Wiernusz's qualification as an expert in drug identification.

In support of that, Your Honor, the Government has prepared Government Exhibit 10, which is the curriculum vitae establishing the training, experience and credentials of Miss Wiernusz. Attorney Thompson is stipulating to the admission of Government's 10.

THE COURT: All right. Thank you, Attorney Thompson, to move this along; that helps. Ten is admitted then.

Do you want to cover any parts of it or are you just going to admit it?

MS. SHEEHAN-BALCHON: Just admit it, Your Honor, thank you.

THE COURT: Okay.

All right, then, we can then move along.  Thank you.
Go ahead.

DIRECT EXAMINATION

BY MS. SHEEHAN-BALCHON:

Q    Ma'am, can you please introduce yourself to the jury, spell your last name, please.

A    My name is Morgan Wiernusz.  W-I-E-R-N-U-S-Z.

Q    And where are you currently employed?

A    I'm a forensic scientist with the Pennsylvania State Police Crime Lab.

Q    What section, division of the Bureau of Forensic Services are you assigned?

A    Drug identification.

Q    How long have you worked in the drug identification section?

A    About four-and-a-half years.

Q    And you understand that you've been qualified to testify here as an expert in drug identification.

A    Yes.

Q    Okay.  Have you worked in any other areas of the Bureau of Forensic Services with the Pennsylvania State Police?

A    I was a chemistry technician, but I am mostly a forensic scientist.

Q    Okay.  And so tell us the majority of your working day, do you deal with drug identifications?

A    Yes.

Q    And can you tell us generally the type of procedures that you take and the type of analysis that you do.

A    With a case, I will inventory the contents, obtain a net weight of any of the items, and then perform chemical analysis on it, and draft a report.

Q    The section and division of the lab that you work in, are you responsible for the identification and comparison of fingerprint evidence?

A    No.

Q    What about the identification and analysis of DNA evidence?

A    No.

Q    Okay.  For this particular matter, were you asked to analyze suspected narcotics that were received at your lab at the state police?

A    Yes.

Q    And do you recall when you received the submission, were those suspected narcotics in a paper bag?

A    Yes.

Q    Was that bag sealed?

A    Yes.

Q    Can you describe the contents -- and just for identification purposes, we are working from Lab No. G, as in George, 18-2212-1.

A    Three plastic wrapped bricks containing compressed white

powder.

Q   Did you analyze those three individually wrapped bricks?

A   Yes.

Q   Okay.  I'm going to ask you to take a look at what's been previously marketed as Government's Exhibit 2.  Do you recognize that item?

A   Yes.  I recognize the -- my markings that are on the item.

Q   Okay.  And when you say your markings, can you be very specific about what you're referring to as your markings.

A   There are markings on the internal plastic bag that have the lab number as well as the item number and my initials.

Q   Okay.  And tell us exactly what the initials are.

A   MTW.

Q   Okay.  For Morgan -- middle name?

A   Taylor.

Q   -- Taylor Wiernusz, thank you.

        MS. SHEEHAN-BALCHON:  So, Agent Simpson, would you kindly hand the witness Exhibit Government's 3 as has been previously marked.

BY MS. SHEEHAN-BALCHON:

Q   Ma'am, do you recognize what Exhibit No. 3 is?

A   Yes.

Q   And where do you recognize it from?

A   It is part of Item 1.1.

Q   Okay.  And do you recognize any specific handwritten

notations on Exhibit 3?

A    Yes.  It has that lab number, the item number, as well as my initials.

Q    Okay.  So let's finally take a look at previously marked Government 4.  Let us know if you -- you recognize Exhibit 4.

A    Yes.

Q    And where do you recognize that from?

A    It is part of Item 1.1.

Q    Now, let's talk -- Exhibit No. 2.  You had referred to the items as 1.1.  Are there any other specific notations on Exhibit 2 as far as identification by the lab?

A    Yes.  It is labeled Item 1.1A.

Q    Okay.  And how about Exhibit 3, is that labeled 1.1 with a sub?

A    Yes, it is labeled 1.1B.

Q    And Exhibit 4?

A    1.1C.

Q    All right.  Those items, 1.1A -B, -C, is that specific to the lab?

A    Yes, it is specific to this case.

Q    All right.  Tell us how those item numbers were assigned.

A    When I received the paper bag and was inventorying the three -- the three items here all were consistent in appearance.  So they all were designated as 1.1.  And then for my analysis, I broke it up further as A, B and C.

Q   Okay.  So you made that designation, A, B, C.

A   Correct.

Q   All right.  Now, did you prepare a report with your findings after you analyzed these three separate substances?

A   Yes.

Q   And we indicate the number assigned to your report as G18-2212-1.

A   Correct.

Q   And can you indicate for the record, is that a specific or unique number that is assigned to this case?

A   Yes, it is a unique alphanumeric number that the lab gives to each case.

Q   All right.  So only this particular case would have that particular lab number.

A   Correct.

Q   All right.  Now, I'm going to ask you to take a look in the exhibit book that's on the witness bench.

    Can you please refer to Exhibit 11.

    Did you find that exhibit?

A   Yes.

Q   Okay.  Do you recognize it?

A   Yes.

Q   Is that the lab report that you created regarding your findings?

A   Yes.

Morgan Wiernusz - Direct Examination

Q   And is that your signature at the bottom of that page?

A   Yes.

MS. SHEEHAN-BALCHON:  Your Honor, as this point I'd seek to admit Government's 11 and request to publish.

MS. THOMPSON:  Your Honor, if we could approach?

THE COURT:  You may approach.

(At side bar.)

MS. THOMPSON:  So typically with these exhibits -- my objection to this is that again it has prejudicial information on the exhibit.  So what calls the Commonwealth a victim, those things are typically found prejudicial to the jury.

THE COURT:  Where does it say that?

MS. THOMPSON:  (Pointing.)

THE COURT:  That's for identification purposes, correct?

MS. SHEEHAN-BALCHON:  Yes, Your Honor.

MS. THOMPSON:  I'm sorry?

THE COURT:  I just said that's just for identification purposes, isn't it?  That's the accused.

MS. THOMPSON:  Also alleges that the Commonwealth is a victim, so that is prejudicial.

THE COURT:  I understand what you're saying, but -- it's a crime against the Commonwealth -- at this point it was; now it's the United States -- but I understand.

(In open court.)

THE COURT:  All right, counsel, you may proceed.

MS. SHEEHAN-BALCHON:  Your Honor, Exhibit 11 has been admitted?

THE COURT:  I did not admit it yet, but --

MS. SHEEHAN-BALCHON:  That was the objection.

THE COURT:  Any further objection?

MS. THOMPSON:  No, Your Honor, that same objection.

THE COURT:  Okay.  Eleven is admitted.

MS. SHEEHAN-BALCHON:  May I publish, Your Honor?

THE COURT:  You may.

(Exhibit published.)

BY MS. SHEEHAN-BALCHON:

Q   Miss Wiernusz, take a look at the screen, Exhibit No. 11.  Can you see that clearly?

A   Yes.

Q   Okay.  So you've indicated that this is the report that you created based upon your analysis of the three bricks that you identified Exhibit 2, 3 and 4.

A   Yes.

Q   Okay.  So indicate for us -- does that reflect the same lab report number in the top right corner?

A   Yes.

Q   Okay.  And the item numbers as you have indicated?

A   Yes.

Q   That's the Items 1.1 that you've already described for us

that I have just put the mark on?

A    Yes.

Q    Okay.  So describe for us when you processed Exhibits 2, 3 and 4, describe the process that you took, the procedures that you took, first, to unpackage the drugs.

A    When I received the item and opened it, and after I inventoried it, I then cut through the layers of packaging that were around the powder, and then got the powder out into a box -- a box for weighing.

Q    All right.  And did you do that with each of those three exhibits, 2, 3 and 4?

A    Yes.

Q    And tell us the steps of analysis, just generally speaking, that you took with 2, 3 and 4.

A    I took -- I did a macroscopic examination, just with my eyes; I took a weight; and then performed a presumptive and a confirmatory test.

Q    And based upon those examinations and analysis, what were the substances detected in Exhibit 2?

A    Cocaine and methamphetamine.

Q    Exhibit 3?

A    Cocaine and methamphetamine.

Q    Exhibit 4?

A    Cocaine and methamphetamine.

Q    Are cocaine and methamphetamine both Schedule II controlled

substances?

A    Yes.

Q    Tell us, please, based upon your analysis and as reflected in your report, what the net weight of those three items were, being Exhibits 2, 3 and 4.

A    The powder had a net weight of 2995 grams, plus or minus ten grams.

Q    Explain that last portion for us, the plus or minus ten grams.

A    Plus or minus ten grams is the uncertainty of the balance that we use for our weighing.  That is determined within the lab.

Q    When you say a balance, that's physically an item that your lab used to test their weighing equipment.  Is that accurate?

A    Yes.

Q    Okay.  And so the plus or minus ten is a range that your lab conforms with, meaning that this particular net weight could be -- could it be between 2985 and 3005 grams?

A    So that plus or minus ten grams would be if somebody else were to come in and take a net weight of these items as well, it would fall within that plus or minus ten grams.

Q    Okay.  And also at the bottom of your lab it indicates: All weight uncertainties are reported at a minimum coverage probability of 95 percent.

    Can you explain what that means?

A   That is if a -- if a second analyst or if I were to go back and weigh these again, 95 percent of the time that weight will fall within that plus or minus ten grams.  And that 95 percent is commonly accepted within the lab as well as the scientific community.

Q   Okay.  I'm going to have you take a look at what has been previously marked as Exhibit 3B, as in boy.

Do you recognize what you had referred to as Item 1.1B or what we are referring to Exhibit 3 in that -- in that photograph?

A   Yes.

Q   Also in that photograph I see a package of what appears to be a dark material with a wrap around it.  Can you describe if you recognize that?

A   Yes.  Those are the layers of packaging that were around the substance on the left.

Q   Okay.  Can you describe the types of packaging that you took off of these three bundles to get to the substance to analyze it.

A   It was multiple layers of plastic wrap and black and gray tape.

Q   Were the three exhibits, meaning 2, 3 and 4, were they wrapped consistently with one another?

A   Yes.

Q   Okay.  Did they all have what you've described as a black

tape or a -- in the photograph, a silver tape and then an external layer of like a clear plastic wrap?

A   Yes.

Q   Now, when you indicated that your net weight was 2995 grams, does that weight include this packaging material on each of the bricks?

A   No, it's just the powder.

Q   Okay.  The opinions that you've rendered here today, do you hold those opinions to a reasonable degree of scientific certainty?

A   Yes.

Q   Okay.

MS. SHEEHAN-BALCHON:  I would offer the witness for cross examination, Your Honor.

THE COURT:  Attorney Thompson, you can cross examine.

CROSS EXAMINATION

BY MS. THOMPSON:

Q   Good afternoon.  I'm so very bad at pronouncing names; is it Miss Wiernusz?

A   Wiersnusz.

Q   Wiersnusz?

A   Right.

Q   I'm sorry for getting it wrong.

A   That's okay.

Q   Okay.  I'm Sandra Thompson; I'm counsel for John Terry.

And looking at your CV the Government has entered as Exhibit 10, by the time you tested what the Government has entered as Exhibit 11, you had been on the job for about eight months; is that correct?

A   Correct.

Q   Okay.  Did you have a trainer?

A   I trained with the technical coordinator of the drug section.

Q   And was that -- or how long before August 2018?

A   That was from January 2018 to about May -- April/May of 2018.

Q   Okay.  And then did you continue to have a supervisor after May?

A   Yes.

Q   I heard you say for weights, they were margins of error; is that right?

A   Yes.

Q   Isn't it correct that there are also margins of error for drug detection?

A   Yes.

Q   And what's the margin of error for drug detection?

A   I don't know.

Q   Okay.  So you know there is one, but you don't know what it is.

A   Yes.

Q   Okay.  And I heard you say that you did a microscopic examination with your eyes.  Is that right?

A   A macroscopic.

Q   Macro, okay, got you.  A macroscopic examination with your eyes.

A   Yes.

Q   Okay.  And is that looking through a scope?

A   No, that's just laying it out on my work bench and observing what I see.

Q   Okay.  And when you say you laid it out on the work bench, are you laying it -- meaning the Commonwealth's Exhibits 2, 3 and 4 -- I mean, sorry, Government's Exhibit 2, 3 and 4 in its packaging or outside of its packaging?

A   It's both in its packaging as well as out of the packaging.

Q   And is that work bench limited to your sole use or do other people use it as well in your office?

A   It's my bench.

Q   Okay.  And would you agree that you used that bench to test multiple different -- or actually do macroscopic examinations for multiple different types of controlled substances?

A   Yes.

Q   Is it a wood bench?

A   It's -- I'm not entirely sure; it's not wood.

Q   Okay.  But you're not sure of the material.

A   Not off the top of my head, no.

Q   Okay.  And cocaine is generally like a powder, right?

A   Yes.

Q   Okay.  And methamphetamine is also like a powder?

A   Yes, it can be.

Q   And a powder substance sort of spreads and gets in your pores, isn't that right?

A   I'm sorry?

Q   A powder substance could get into surfaces, isn't that right?

A   Yes.

Q   Okay.  When you received the packages, did you notice a slit, like a cut in the packages?

A   I don't recall.

Q   Okay.  So you didn't note it.

A   I didn't note it, no.

Q   If the -- I believe you said -- or, actually, the Government's Exhibit 11 notes that the -- attention was Ryan Marmol's.  Did you learn that the trooper involved was Ryan Marmol?

A   That name was on the request form that gets submitted to the lab.

Q   And did the trooper advise that he made a slit to do a presumptive test?

A   No.

Q   Okay.  So he didn't tell you, the lab tech, that he made a

slit.

A   No.

Q   Okay.  And you did not look for nor record a slit in the packages.

A   No, I did not note any slit.

Q   Is it important to try to avoid cross contamination?

A   Yes.

Q   Why is that?

A   To prevent any sort of unwanted result or -- like to prevent any sort of wrong person.

Q   And so then if someone, say, cut any packages prior to receiving or being received by the lab, would it be important for the lab to know that in advance?

A   Yes.

Q   Okay.  And is that to check and double check the cross contamination?

A   I just identify whatever I find.  I don't --

Q   So -- well, I understand you identify whatever you find.  But I just -- and just to try to see if it's there, although you identify what you find, do you try to rule out contamination?

A   I clean -- we have measures in place in the lab to prevent any sort of cross contamination.

Q   And also isn't it wise and important -- or it would be important for you to have information of, say, an officer

making a slit into a package that you have to analyze?

A   Yes.

Q   Now, you said that you also had a confirmatory test; and what did you do for that?

A   I performed an instrumental test.

Q   And using what instrument?

A   A gas chromatograph mass spectrometer.

Q   Okay.  Does that instrument produce a reading or a printout?

A   Yes.

Q   Did you provide it?

A   I'm sorry?

Q   Did you provide a reading or printout?

A   I -- like it's in the case file.

Q   So when you say it's in the case file, what does that mean?

A   When I write up a report, I also have a case file that is kept at the lab that consists of all my notes.

Q   Okay.  And do you know what the printout says?

A   Yes.

Q   Okay.  And what is -- was it that the printout says?  Do you have the printout with you?

A   I have my case file, yes.

Q   Okay.  And -- so did the Government not request your printout of the testing?

A   No.

Q   And so -- you noted that there's some indication of methamphetamine in one or all of the packages?

A   All of the packages.

Q   And did you test them all individually or all together?

A   Individually.

Q   And what was the -- well, actually you didn't provide the indication to the Government, so the Government didn't provide it to us; is that right?

        MS. SHEEHAN-BALCHON:  Objection, Your Honor, outside the scope of her knowledge.

        THE COURT:  I'll let her answer.

        Do you understand the question?

        THE WITNESS:  Can you repeat it?

BY MS. THOMPSON:

Q   Yes.  You did not provide the -- I believe I forget the term you said that had a printout.

A   The notes, case file.

Q   Okay.  You did not provide the results to the Government, is that right?

A   I didn't provide my case file to them.

Q   Okay.  Well, not just your case file, but the -- I forget the term you actually said.  What's the machine that you use?

A   The gas chromatograph mass spectrometer.

Q   Okay.  And the printout that came from that you didn't provide, is that right?

A    Right.

Q    Okay.  And that's because the Government didn't request it.

A    Correct.

Q    Okay.  Had they requested it, you would have provided it; is that right?

A    Yes.

Q    Okay.

        MS. THOMPSON:  I have nothing further, Your Honor.

        THE COURT:  Redirect, counsel?

        MS. SHEEHAN-BALCHON:  Briefly, Your Honor, thank you.

                    REDIRECT EXAMINATION

BY MS. SHEEHAN-BALCHON:

Q    Ms. Wiernusz, you indicated that there are, in fact, protocols and cleaning protocols present within the lab.  Can you describe what those are for us, specifically when you're changing from one case to another.

A    So, first, we wipe down our benches in between items, in between cases, even in between units.  And then we change gloves and -- yeah, so like we wipe everything down, we change our gloves after every item, unit, case.

Q    And the work that you perform in the lab, specifically the results and the report that you've indicated or identified here today, are they reviewed by your supervisor?

A    Yes.

Q    And are they reviewed before they're finalized?

A    Yes.

Q    Okay.  And does that supervisor take into account your entire case file?

A    Yes.

Q    Would you be able to sign a report and issue a report without your supervisor's approval?

A    No.

Q    These particular exhibits, 2, 3 and 4, you indicated that you tested each one of them individually?

A    Correct.

Q    And where did you take the samples from to test those particular exhibits?

A    From each of them -- I took them from like the middle of the brick.

Q    Was it a portion of the brick that had separated during unpackaging?

A    Yes, or I would have broken it to get the sample.

Q    The areas that you took the samples from, did they even have contact with your work surface?

A    No.

Q    Now, the -- let's talk about your specific responsibility. When you receive a drug exhibit in your lab, for instance Government's 2, 3 and 4, that you called Items 1.1, is it within your scientific concern where that item came from?

A    No.

Q   Is it within your scientific concern who touched it before you?

A   No.

MS. SHEEHAN-BALCHON:  I'd offer the witness for recross, Your Honor.

THE COURT:  Any recross examination?

MS. THOMPSON:  Yes.

RECROSS EXAMINATION

BY MS. THOMPSON:

Q   I just want to clarify.  Isn't it correct that even despite the cleaning procedure of the Pennsylvania State Police Forensic Lab that cross contamination has occurred?

A   I don't --

MS. SHEEHAN-BALCHON:  Objection, Your Honor.  If it's within this witness's knowledge.

THE COURT:  Well, you can answer it in your own knowledge.

THE WITNESS:  I mean within like my -- I followed all the procedures to prevent cross contamination.

BY MS. THOMPSON:

Q   That wasn't my question.  And I'm saying that as an employee of the Pennsylvania State Police Forensic Lab, isn't it correct that even with their procedures, false contamination has occurred in that lab?

A   I don't know off the top of my head.

MS. THOMPSON:  Thank you.

THE COURT:  Anything additional?

MS. SHEEHAN-BALCHON:  No, Your Honor.  May this witness be excused?

MS. THOMPSON:  Yes.

THE COURT:  You can step down and you are excused.  Thank you.

THE WITNESS:  Thank you.

(Whereupon, the witness was excused.)

THE COURT:  You can call your next witness.

MR. BERNARD:  Your Honor, the United States calls Robert Dillard.

ROBERT DILLARD, a witness herein, having been first duly sworn, was examined and testified as follows.

THE COURT:  Mr. Dillard, there are microphones here.  They're okay, but they require you to be fairly close to pick up, so please stay close to it if you can.  Thank you.

Go ahead.

DIRECT EXAMINATION

BY MR. BERNARD:

Q   Good afternoon, sir.  Could you please state your name and spell it for the court reporter?

A   Robert Dillard, R-O-B-E-R-T, D-I-L-L-A-R-D.

Q   And, Mr. Dillard, how old are you today?

A   Forty-nine.

Robert Dillard - Direct Examination

Q   And where do you live generally?  You don't have to give your address.

A   Pittsburgh.

Q   Is there any particular area of Pittsburgh?

A   Monroeville.

Q   Is that where you've always resided?

A   No; no, sir.

Q   In what area had you previously resided?

A   Braddock, Pennsylvania.

Q   Mr. Dillard, are you currently employed?

A   Yes.

Q   What do you do for a living?

A   I work at a package and labeling plant.

Q   And how long have you held that position?

A   The last six months.

Q   Now, Mr. Dillard, I'll cut straight to the heart of the matter.  Are you currently in jail?

A   No, sir.

Q   Are you awaiting sentences on charges that you pled guilty to?

A   Yes, sir.

Q   Are those federal charges?

A   Yes, sir.

Q   Were you indicted and arrested or did you plead guilty to what's called an information?

A    I pled guilty to an information.

Q    Do you recall what offense you pleaded guilty to?

A    Conspiracy to distribute 500 grams or more of cocaine.

Q    Okay.  Now, in front of you there are two documents.  I'd ask you to look at the one that's been marked for identification purposes as Government's Exhibit 35.

Did you find that, sir?

A    Yes, sir.

Q    Do you recognize that document?

A    Yes, sir.

Q    Is that the criminal information to which you entered a guilty plea?

A    Yes, sir.

Q    And does that document appear to be a fair and accurate copy of the criminal information to which you pleaded guilty?

A    Yes, sir.

MR. BERNARD:  Your Honor, I'd now move for the admission of Government's Exhibit 35 into evidence.

MS. THOMPSON:  No objection.

THE COURT:  All right, 35 is admitted into evidence.

Do you have a copy there that I can refer to?

MR. BERNARD:  It should be in your exhibit binder, Judge -- it's out of order, so it might be -- it's toward the back.

THE COURT:  Thank you.  All right.  You may proceed.

Thank you.

Did you give a date of that plea?

MR. BERNARD:  No, Judge, not yet.

BY MR. BERNARD:

Q   Now, Mr. Dillard, were you represented by an attorney at the time you pleaded guilty?

A   Yes, sir.

Q   And who is that attorney?

A   Paul Boas.

Q   Is your attorney present here with you today?

A   Yes, sir.

Q   Mr. Dillard, where did the guilty plea to that information occur?

A   In this courtroom.

Q   Okay.  At the time of that guilty plea, do you recall whether or not you signed any other document indicating your plea of guilty?

A   Any other document?

Q   Yes, sir; any other paper.

A   Yes.

Q   Do you see before you what's been marked for identification purposes as Government's Exhibit 36?

A   Yes.

Q   Have you seen that document before?

A   Yes.

Q    And what is it entitled?

A    It's arraignment/plea.

Q    Does your signature appear on that document?

A    Yes, sir.

Q    Did you sign that form at your guilty plea hearing?

A    Yes.

Q    Does Government's Exhibit 36 appear to be a fair and accurate copy of the arraignment/plea that you signed at your change of plea hearing?

A    Yes, sir.

MR. BERNARD:  Your Honor, I'd now move for the admission of Government's Exhibit 36 into evidence.

MS. THOMPSON:  No objection.

THE COURT:  Thirty-six is admitted without objection.

MR. BERNARD:  Thank you, Your Honor.

BY MR. BERNARD:

Q    Now, Mr. Dillard, that document is appearing on the screen in front of you.  The arraignment/plea is on the right-hand side, and the information is on the left-hand side.

With respect to the arraignment/plea, does that indicate a date on which that change of plea hearing occurred?

A    Yes.

Q    And does that indicate the plea that you entered with respect to that criminal information docketed at that criminal number that appears on the arraignment/plea form?

A    Yes, sir.

Q    Sir, can you please read the text there that appears, just below the headline of arraignment/plea.

A    "Defendant Robert Dillard, being arraigned, pleads guilty in open court this 2nd day of October, 2019."

Q    And is that number that's listed at the top of that arraignment/plea, 3:19-CR-17, the same number that appears on the information?

A    Yes, sir.

Q    Can you please read that criminal information for us.

A    "The United States Attorney charges between on or about March 30th of 2018 to April 4th, 2018, in the Western District of Pennsylvania the Defendant, Robert Dillard, and others known to the United States Attorney did knowingly, intentionally and unlawfully conspire, confederate and agree together and with one another to possess with intent to distribute and to distribute 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of Title 21 United States Code, Section 841."

Q    Thank you, sir.

So, Mr. Dillard, in connection with your guilty plea, did you enter into my sort of agreement with the Government?

A    Agreement?

Q    Yes, did you reach a plea agreement with the United States?

Robert Dillard - Direct Examination

A    Yes.

Q    Based on your guilty plea and on the agreement that you've entered into, do you know what the maximum penalty that you're facing is?

A    Forty years.

Q    Would that be 40 years in prison?

A    Yes, sir.

Q    Are you here testifying today as part of that plea agreement that you reached with the Government?

A    Yes, sir.

Q    As far as that agreement goes, has anyone promised you any specific sentence that you will receive in exchange for your testimony today?

A    No, sir.

Q    Nonetheless, is it your hope that you will receive some kind of reduced sentence based on your testimony?

A    Yes, sir.

Q    Has anyone promised you whether you will, in fact, receive any sort of reduced sentence?

A    No, sir.

Q    Has anyone promised you what any reduced sentence might be?

A    No, sir.

Q    Recalling your plea agreement with the Government, does your agreement include a provision that upon completing your cooperation -- that is, your testimony -- the Government will

file a motion with the Court indicating the extent of your cooperation as a basis for the Court to impose a reduced sentence?

A    Yes, sir.

Q    Did anyone guarantee that that motion will be filed under the Act?

A    No, sir.

Q    Did anyone guarantee what kind of sentence you will receive even if that motion is filed on your behalf?

A    No, sir.

Q    Have you received any considerations so far based on your cooperation to this point?

A    No, sir.

Q    Has anyone pressured you or coerced you into testifying here today?

A    No, sir.

Q    Are you here on your own free will?

A    Yes, sir.

Q    Now, you've said that you pleaded guilty to conspiring to distribute 500 grams or more of cocaine and that you're awaiting sentencing on that charge.

    Is that guilty plea the first time you've been convicted of an offense, Mr. Dillard?

A    No, sir.

Q    Do you recall how old you were when you first were

convicted of a criminal offense?

A    Eighteen or 19 years old.

Q    Is it -- back when you were 18, were you convicted in 1991 in the Allegheny County Court of Common Pleas of possession with intent to deliver cocaine?

A    Yes, sir.

Q    Did you receive a prison sentence for that case?

A    Yes, sir.

Q    Now, other than the guilty plea to the criminal information as well as that 1991 conviction, is that the first -- is that the only other criminal conviction that you've incurred in your lifetime?

A    No, sir.

Q    Do you know how many criminal convictions you've incurred over the course of your lifetime?

A    No, sir.  I've been in and out of jail since that time.

Q    So you've essentially been in and out of jail since you were 18 years old?

A    Yes, sir.

Q    And how old are you today, sir?

A    Forty-nine.

Q    Do you know what kind of offenses some of your prior convictions consist of?

A    Mostly drugs.

Q    Now, Mr. Dillard, prior to the job that you have now, what

would you consider your former livelihood to have been?

A   Selling, trafficking drugs.

Q   What was your drug of choice?

A   Cocaine.

Q   Were you a cocaine user or a cocaine dealer or both?

A   No, I never used contain before, just sold it.

Q   As recently as 2017 and 2018, were you still selling cocaine?

A   Yes, sir.

Q   During that time period, 2017 to 2018, what quantities of cocaine were you selling?

A   What time?

Q   2017 and 2018.

A   Multiple kilos of cocaine.

Q   What's the most you ever obtained at one time?

A   Probably like fifteen kilos.

Q   Is there a name or a moniker of the individual that you were primarily getting your cocaine from in 2017 and 2018?

A   The name or moniker, what do you mean by that?  Could you clarify that?

Q   Sure.  A name or a nickname of an individual that you were getting your cocaine from in 2017 and 2018, your primary source.

A   Yeah, a guy named Fats.

Q   And how much would a kilo cost when you purchased them from

Fats?

A    Like 32,000.

Q    What area was Fats from?

A    Philadelphia.

Q    When you would purchase the kilos of cocaine from Fats, what quantities would you resell them in?

A    I would sell anything from ounces to four-and-a-half ounces, nine ounces, however I could sell it.

Q    Let's say you purchased a kilo for $32,000 from Fats.  What would be your return on investment on one kilo of cocaine?  How much would you make?

A    Probably like 4,000.

Q    Where would you meet Fats at to receive the cocaine that you purchased from him?

A    He would come to the neighborhood, Braddock.

Q    Would you ever travel to Philadelphia and drive the kilos back to Braddock yourself?

A    No, sir.

Q    Would it always be Fats personally who delivered them to you?

A    No, sometimes he would send a runner or another person.

Q    So tell me as someone who's seen many kilos of cocaine in your experience, what does a kilo of cocaine look like?

A    It's a compressed powder form.  It's in the -- shaped like a rectangle.

Robert Dillard - Direct Examination

Q   Do they ever have any sort of markings on them?

A   Usually be wrapped up in some type of tape, and they could be -- a stamp on there.  Not all the time, though.

Q   A stamp on the tape or a stamp on the powder?

A   A stamp on the powder itself.

Q   So it would be pressed into that brick?

A   Yeah -- yes, sir.

Q   All right.  When you had purchased cocaine from Fats, would you mix anything into the cocaine you bought before selling it to other purchasers?

A   Yes, sometimes I would mix it with inositol before I sell it.

Q   Where would you get that from?

A   Sell it at GNC, any type of store like that.

Q   So that's like a wellness supplement of some kind?

A   I'm not absolutely sure.

Q   Okay.  But you would purchase it at GNC, right?

A   Yeah.  I mean that's where I actually get it from, but they sell it anywhere, though.

Q   Are you aware of whether other drug traffickers will cut other substances into their cocaine?

A   Yeah.  I mean different people, different time, different things might use inositol, mannitol, meth, any -- anything of that nature.

Q   Now, why -- what's the purpose of cutting another substance

into a kilo of cocaine?

A   To increase your profits.

Q   So -- so I'm understanding this correctly would you take a portion of the cocaine out of the kilo and then replace it with something or are you adding your cutting agent directly to the entire kilo itself?

A   Me, myself, I would take the -- some of the drugs out.  I might take four ounces of the cocaine out and put four ounces of the inositol in.

Q   Okay.  So if you do that, I mean some quick math, if you were to do that with seven kilos, right, you were to add four ounces of cut to the coke that you've taken out of those seven kilos, you now have eight kilos to sell; right?

A   Yeah, just a little bit short of another extra kilo.

Q   And so that's another way to increase your profit, right?

A   Yes, sir.

Q   Okay.  Now, you've indicated that Fats was your primary supplier.  Did you have any other suppliers during 2017 or 2018 from whom you would get cocaine?

A   Yes, sir.

Q   And who was that?

A   John Terry.

Q   Is John Terry the only Terry that you knew?

A   No, sir; his brother Gerald.

Q   So who did you meet first, John Terry or Gerald Terry?

A    I met Gerald in the -- in the jail, in the institution I was at before I came home.

Q    Do you recall what institution that was?

A    Pine Grove.

Q    Would that be a State Correctional Institution Pine Grove?

A    State, yeah.

Q    So who was released from Pine Grove first, you or Gerald?

A    I want to say Gerald was released first.

Q    And then you got out after him.  And did you make contact with him or did he contact you?

A    I want to say I reached out to him.  I got his number from somebody, but I ain't all the way sure.

Q    What was the purpose of reaching out to Gerald?

A    I was trying to see if he could connect me with somebody to get some drugs.

Q    Did you eventually meet up with him after you were released from Pine Grove?

A    Yes, sir.

Q    Where did you meet him at?

A    The first time I went up there and met him like downtown Philadelphia.  I was staying in a hotel down there.  And then a little bit -- maybe a few months after that, I went to his wedding.

Q    At some point --

A    Like in the summer.

Q   At some point did you meet John Terry?

A   Yes, sir.

Q   Do you recall where you first met John Terry at?

A   At Gerald's wedding.

Q   At that time did you discuss acquiring cocaine with John Terry?

A   Yes.

Q   And did you eventually acquire cocaine from John Terry?

A   Yes, sir.

Q   How much cocaine would you typically get from John Terry?

A   It would be one or two kilos at a time.

Q   How were those kilos packaged?

A   Wrapped up in black tape and then with a vacuum-seal package on the outside of it.

Q   Like a clear plastic?

A   Yeah.  Yes, sir.

Q   Did the kilos that you would buy from John Terry have any sort of identifying stamp on them?

A   Not all of the time.

Q   How much would you pay for a kilo of cocaine from John Terry?

A   It would be 28- or 29,000.

Q   What's the largest quantity of cocaine that you ever ordered off of John Terry at one time?

A   Three kilos.

Q   Did you actually receive the kilos that time?

A   No, sir.

Q   Do you recall when that would have been that you ordered up three kilos that never arrived?

A   Like March or April of 2018.

Q   Now, at some point did you learn this John and Gerald Terry had been stopped on the turnpike with three kilos that were intended to be delivered to you?

A   Yes, sir.

Q   Did you talk to John Terry after that?

A   Yes.

        MS. THOMPSON:  Your Honor, I'm going to object on hearsay.

        MR. BERNARD:  Your Honor, this would be a statement of a party opponent; what John Terry says is not hearsay.

        THE COURT:  I'll permit the answer.

        Go ahead.

BY MR. BERNARD:

Q   Let me ask you the question again, Mr. Dillard.

    Did you talk to John Terry after the traffic stop on April 4th, 2018, when three kilos that were intended for you were seized from a vehicle in which Mr. Terry was riding?

A   Yes, sir.

Q   What did John tell you?

A   He told me that they had got stopped due to -- well, they

had got pulled over, and the reason for the search was because they ran drills -- when they ran his license or something like that.

Q   Okay.  Had you ever provided your address to John or Gerald Terry?

A   Yes, sir.

Q   Now, back at that time in 2017 or 2018, what address would you have given them?

A   1429 Grant Street.

Q   And what city would that be located in?

A   North Braddock.

Q   Now, based on the fact that you're here testifying today, at some point did you tell police about John and Gerald Terry as being one of your sources of supply?

A   Yes, sir.

Q   Do you recall where you were when you first told investigators about John and Gerald Terry?

A   SCI-Greene.

Q   What were you there for?

A   Parole violation.

Q   Do you recall approximately when you told officers about John and Gerald Terry?

A   October 2018.

Q   Do you know what agency or department those investigators were from?

A    I want to say it was a district attorney's office.

Q    Was it your understanding that those investigators were there to talk to you about John and Gerald Terry specifically?

A    No, sir.

Q    So who brought up the involvement of John and Gerald Terry, the investigators or you?

A    I think they had asked me did I have a -- was there any other sources that I had, and I brought it up, I said it to them.

Q    Now, we've been talking a lot about John Terry.  Do you see John Terry here in the courtroom here today?

A    Yes, sir.

Q    Can you please describe where he's seated and what he is wearing.

A    To my right, with the black suit on.

        MR. BERNARD:  Your Honor, I'd ask that the record reflect the identification of the Defendant by the witness.

        THE COURT:  So noted.

        MR. BERNARD:  Thank you.

BY MR. BERNARD:

Q    Now, going back to your guilty plea, do you know what cocaine specifically your guilty plea to conspiracy to possess with intent to distribute 500 grams or more of cocaine related to?

A    Yes, sir.

Q   And which cocaine was that?

A   Three keys that was -- they got pulled over with.

MR. BERNARD:  Thank you, sir.

Offer for cross examination.

THE COURT:  Attorney Thompson?

CROSS EXAMINATION

BY MS. THOMPSON:

Q   Okay.  Good afternoon, Mr. Dillard.

I am Attorney Sandra Thompson.  I'm the attorney for John Terry.

And how old are you?

A   Forty-nine, ma'am.

Q   Forty-nine?

A   Yes, ma'am.

Q   And based on your testimony, it sounds like you've been a career criminal for 30 years, is that right?

A   Yes, ma'am.

Q   Okay.  And from multiple felony drug possessions or deliveries, is that right?

A   Yes, ma'am.

Q   Okay.  And, yet, you're saying that you pled -- was it October 2nd, 2019, to conspiring to deliver three kilos, and yet you're still walking the streets.  Is that right?

A   Yes, ma'am.

Q   So when you testified under direct that you have not

received a benefit, in fact you are already receiving a benefit.  Isn't that right?

A    By what, by being free?

Q    Yes.

A    If that's what you want to call it; yes, ma'am.

Q    And also looking at the Government's Exhibit 38 -- 35 -- my eyes aren't that good -- Government's Exhibit 35, you also received a benefit because you only pled to conspiracy, but you did not plead to the substantive charge of -- or even attempted possession with intent to deliver.  Is that right?

A    Yes, ma'am.

Q    And also you received the benefit because you were not charged with having a mixture of cocaine and methamphetamine, isn't that right?

A    Yes, ma'am.

Q    And you pled in October -- was it 2019?  You pled in October, 2019.  I know I just said it, right?  Was it October of 2019?  Let me look to be sure --

Yes, so Government's Exhibit 36, you pled in October 2019 and you haven't been sentenced in almost three years.  Isn't that right?

A    Yes, ma'am.

Q    Okay.  And that's because you are awaiting the benefit based on your testimony in this trial, isn't that right?

A    Could you repeat that?

Q   You haven't been sentenced in three years because your recommendation of sentencing depends on if you actually testify in this trial.  Isn't that right?

A   Yes, ma'am.

Q   Okay.  And the Government would out -- the maximum penalty is 40 years, but that is not what you are intending to get, the maximum; right?

A   Oh, I'm not sure, ma'am.

Q   Well, you actually, in fact, are sure that the maximum is not something that you are actually going to get.  It's something lower, isn't that right?

A   I'm not sure, ma'am.

Q   Isn't it correct that you would have received some type of plea letter from the Government?

A   A plea letter?

Q   Yeah, some type of letter or statement from the Government.

A   I'm not -- I'm not sure what you're saying.

Q   Did you receive a document, a letter, or plea statement from the Government that outlined what they expected of you and what they would consider?

A   No, ma'am.

Q   The Fats that you describe, is he a black male that's bald with a beard?

A   Yes, ma'am.

Q   And also from Philadelphia?

A   Yes, ma'am.

Q   And you mentioned that around October 2018 you were on state parole.  Is that right?

A   Yes, ma'am.

Q   Now, are you still on state parole?

A   No, ma'am.

Q   Okay.  When did that end?

A   I want to say February 19.

Q   Did you -- when you admitted to conspiracy to deliver or possess with intent to deliver three kilograms of cocaine, were you still on parole?

A   No, ma'am.

Q   So then you also received a benefit because the Government didn't take your plea 'til after your parole expired.  Isn't that right?

A   I don't know if that was their intention; but yes, ma'am.

Q   I believe, based on your direct testimony, that you were interviewed by agents of the Government while you were being held on a state parole violation.  Right?

A   Yes, ma'am.

Q   Or a detainer, not a violation, but a detainer.  Is that right?

A   Yes, ma'am.

Q   Okay.  So at least the Government knew that you were on state parole, and you would have been on a state parole on or

around April 4th of 2018.  Is that right?

A    Say that again.

Q    You would have been on state parole on or around April 4th, 2018.  Is that right?

A    No; no, ma'am.

Q    On October 29th, 2018, you said you were on state parole; right?

A    No, ma'am.

Q    I thought I heard you say that your parole didn't expire until 2019.

A    Yes, I had -- I would have had maxed out or -- I had -- my parole had expired, and I had an open case, and then I pled guilty to the case.  Then my -- my parole was -- the months that I owed them was reinstated.  That's how I was on parole in October of '18.

Q    So you re-offended and then they gave you a parole hit, is that right?

A    Yes, ma'am.

Q    Okay.  And that re-offense was not about April 4th, 2018; is that right?

A    No, ma'am.

Q    Okay.  That was a different offense, is that right?

A    Yes, ma'am.

Q    Okay.  In April -- I'm sorry October 29th, 2018 -- well, first of all, let's clarify you did not go to the Government on

your own on or around April 4th, 2018, to say: Hey, I am repentant. This is the bad big thing I'm involved in. Is that right?

A   No, ma'am.

Q   Okay. It wasn't until that -- actually, you and your girlfriend were being investigated for a drug operation that occurred on or about July 31st, 2018, in Allegheny County when you started offering up information; is that right?

A   Yes, ma'am.

Q   Okay. And when you spoke to the Government, isn't it correct that the Government asked you for information on John Terry?

A   Say it again.

Q   When you spoke to the Government, isn't it correct that the Government asked you for information on John Terry.

MR. BERNARD: Objection, Your Honor. I'm going to ask that she put a time frame on this particular question because there were subsequent interviews with Mr. Dillard.

THE COURT: All right. That seems like a reasonable request, if you could specify what time you're speaking of, Attorney Thompson.

BY MS. THOMPSON:

Q   Let me try to -- isn't it correct, Mr. Dillard, that your relationship was with Gerald Terry?

A   Relationship meaning --

Robert Dillard - Cross Examination

Q   Contact was with Gerald Terry.

A   No, ma'am.

Q   I'm sorry?

A   No, ma'am.

Q   Okay.  Well, you testified earlier that you reached out to Gerald Terry.

A   Yes, ma'am.

Q   Okay.  And you testified earlier that actually you and Gerald Terry were in SCI-Pine Grove together, isn't that right?

A   Yes, ma'am.

Q   Okay.  And, now, isn't it correct that when you were offering information or Gerald Terry, the Government said they wanted something on John Terry?

        MR. BERNARD:  Objection, Your Honor.  Again, I would ask that this question include a time frame so we know what she's referring to.

        MS. THOMPSON:  That is a time frame.  When he offered information on Gerald Terry, so that's the time frame.  It doesn't matter when, it's when he did offer information on Gerald, that the Government asked for John Terry.

        THE COURT:  I'll let him answer the question.

        Sir, do you understand the question?

        THE WITNESS:  No.  Can she repeat it, sir?

        MS. THOMPSON:  Sure.

BY MS. THOMPSON:

Q   So this is my question:  Isn't it correct that when you offered information on Gerald Terry, the Government asked for information on John Terry?

A   No, ma'am.

Q   Now, by your statement, both Gerald Terry and John Terry had cellphones, isn't that right?

A   By what statement?

Q   The statement that you gave to the investigators when you gave your statement about Gerald Terry and John Terry.

A   Oh, okay.  Yes, ma'am.

Q   Okay.  And it was your statement that you called both cellphones of Gerald and John Terry on April 4th, 2018, to discover where they were.

A   Yes, ma'am.

Q   And on around October 29th, 2018, you were found that you possessed a loaded 9-millimeter -- was it a weapon?  Did you have a gun in your home?

A   No, ma'am.

Q   So you just had the ammunition?

A   At my home?

Q   Yes -- was it your mother's house actually?  Maybe I -- maybe I misspoke.  Did you have a gun at your mother's house in a closet?

A   No, ma'am.

Q   Did you have just a magazine?

A   Yes, ma'am.

Q   And it was loaded?

A   Yes, ma'am.

Q   So that means you had a gun somewhere.

A   I ain't sure.

Q   Okay.  So you're saying that you had a loaded 9-millimeter magazine in your mother's closet, but you're not sure if you had a gun somewhere to put the loaded magazine in.

A   That could have been from a long time ago.  I didn't even know that was there.

Q   Because with your long history, you're actually not allowed to possess a firearm; is that right?

A   Yes, ma'am.

Q   Okay.  So then if you admitted that you actually possessed a firearm, then that would get you into more trouble; is that right?

A   Yes, ma'am.

Q   Did you produce any of your phone records to show that you made those calls and to whom you made calls?

A   Did I produce the phone records?

Q   Yes.

A   No, ma'am.

Q   Did the Government subpoena your phone records to your knowledge or even ask you for access to your phone records to

confirm that you actually made calls to anybody identified as either John Terry or Gerald Terry?

A   No, ma'am.

Q   So you say that you met John Terry at Gerald Terry's wedding, is that right?

A   Yes, ma'am.

Q   How many people were at that wedding?

A   It was a wedding; a lot, a lot of people.

Q   So if you build up some particular relationship with John Terry at that wedding, do you even have any pictures of you all together?

A   That was my first time meeting him; no, ma'am.

Q   And for the various times that you say that you contacted John Terry for the delivery of drugs, is it correct that you also don't have any phone record for that?

A   Why would I have phone records?

Q   Well, how would you get in touch?

A   No, ma'am; I don't have any phone records.

Q   Okay.  Well, you asked me the question, why would I have phone records.  So I just asked you how would you get in touch?

A   Oh, I would either go up there and talk to him or I would talk to him on the phone.

Q   Okay.  So, again, so you're saying that you would call, is that what you're saying?

A   Yes, ma'am.

Q   Okay.  Or you're saying you would drive just -- happen to drive all the way there.

A   Yes, ma'am.

Q   Okay.  But for the times that you say you would call, again, there's no phone records documenting that, any calls from you to John Terry.  Is that right?

A   Not that I know of; no, ma'am.

Q   Okay.  Do you have knowledge of Gerald Terry being involved in, like, speaking at NA/AA events and conferences?

A   Could you repeat that?

Q   Yeah.  Do you have knowledge of Gerald Terry being involved at -- speaking at NA conferences?

A   No.  I know he used to -- when we was incarcerated, I know he used to be running the NA/AA classes; but I don't know about conferences.  I'm not sure.

Q   But you do know that he would sort of give -- so even when you were in jail, he would give like the classes.

A   Yes, ma'am.

Q   Okay.  So he presented himself as knowledgeable in that area, is that right?

A   Could you repeat that?

Q   He presented himself as knowledgeable in that area, isn't that correct, of addiction and recovery?

A   I don't know, I wasn't going to the classes, ma'am.

Q   Oh, okay; you didn't.

Robert Dillard - Redirect Examination

A    I just knew that he did it.

Q    Okay, I understand.

MS. THOMPSON:  Nothing further, Your Honor.

THE COURT:  Redirect, counsel?

MR. BERNARD:  Yes, Your Honor; thank you.

REDIRECT EXAMINATION

BY MR. BERNARD:

Q    Mr. Dillard, on cross-examination there was some questions regarding consideration that you received.  Some of those questions pertained to the fact that you had pleaded guilty and not yet been sentenced three years after your guilty plea.

It was indicated that the reason you had not been sentenced was in order for you to testify at this trial.

Was the trial delayed because of you?

A    No, sir.

Q    Was it delayed at your request?

A    No, sir.

Q    Did your attorney request a continuation of this trial in order for you to remain free?

A    No, sir.

Q    Now, Mr. Dillard, there was also some questions about the methods of contact that you used for John Terry.  You indicated that you would meet with him in person or contact him over the phone.  And there were questions concerning whether or not you possessed telephone records.

Mr. Dillard, are you familiar with the term "burner phone"?

A    Yes, sir.

Q    Can you tell us what a burner phone means to you?

A    It's just a phone that you only use like for business, like -- but you -- you throw them away.  You wouldn't -- you don't keep them.  You might have them for a few weeks or maybe a month or something like that.

Q    When you say use them for business, you mean legitimate business?

A    No, sir; illegal activities.

Q    And in your particular situation, what type of illegal activity would that be?

A    Selling cocaine.

Q    Now, when you own a burner phone, do you typically remember or memorize the phone number for that particular phone?

A    No, sir.

Q    Have you ever had more than one burner phone at one time?

A    Yes, sir.

Q    What's the most phones you've ever had at one time?

A    I might have like five or six phones at one time.

Q    And you mentioned that you would have contacted John Terry either in person or by phone.  Would that contact with John Terry have been from one of those burner phones?

A    Yes, sir.

Q    Are there certain occasions in which you may choose to get

rid of your burner phones?

A   Yes, sir.

MS. THOMPSON:  Your Honor, I'm just going to object because the Government has been actually leading the witness and sort of suggesting the responses.

THE COURT:  I'll permit the question, but make sure they're not leading questions, Counsel.

BY MR. BERNARD:

Q   What type of things may cause you to get rid of a burner phone?

A   If somebody get arrested, go to jail or something like that.

Q   Somebody meaning who?

A   I mean somebody you was dealing with.

Q   After you found out that John Terry was arrested, did you retain the phones that you used to contact him?

A   No, sir.

Q   As you sit here today, do you know the telephone number of the phone that you had used to contact John Terry?

A   No, sir.

Q   Prior to coming here today, were you asked by anyone if you knew the telephone number for the phone that you used to contact John Terry?

A   Not that I recall.

Q   There was another question regarding the fact that you

Robert Dillard - Recross Examination

attended Gerald Terry's wedding, a friend of John, but that there are no photographs of you with John.

Mr. Dillard, would you personally photograph yourself with a drug supplier of yours?

A    No, sir.

Q    Why would you not want to take photos of yourself with your drug supplier?

A    Because it was -- if it was ever a problem, the police would be able to put you all two together through photos.

MR. BERNARD:  Thank you.

Your Honor, no further questions.

THE COURT:  Attorney Thompson?

MS. THOMPSON:  Yes, Your Honor.

RECROSS EXAMINATION

BY MS. THOMPSON:

Q    Mr. Dillard, did you take photographs with Gerald Terry?

A    Not that I recall; no, ma'am.

Q    So does that mean you could have?

A    No.  No, ma'am.

Q    What are you saying, "No, ma'am" to?  Which -- which are you saying?

A    I never -- I never took no pictures with Gerald, ma'am.

Q    So you go to Gerald's wedding, but you don't take any pictures, not even with them with the wedding -- at the wedding.

Robert Dillard - Recross Examination

A   No, ma'am.

Q   Okay.  And the Government was asking a lot of really hypothetical-like questions.  But were you -- are you saying that you only used burner phones?

A   When you say "only," what do you mean?

Q   Only.  Solely.  Exclusively.

A   No, ma'am.  I only used burner phones when conducting illegal activities.

Q   And so if you used a burner phone, that phone still has a phone number, is that right?

A   Yes, ma'am.

Q   Okay.  So then that phone number would still show up on the records that's produced on the number that you called.  Isn't that right?

A   I would assume so; yes, ma'am.

Q   Okay.  And you said something about you wouldn't take a picture of -- well, actually -- I'm sorry, I'll withdraw that.

You said something about you would get rid of a burner phone if someone got arrested, is that right?

A   Yes, ma'am.

Q   But, Mr. Dillard, isn't it correct that your pattern and practice is to testify against people; isn't that right?

A   I never done this before in my life, ma'am.

Q   You have not testified before?

A   Never in my life.

Robert Dillard - Recross Examination

Q  Okay.  So, isn't it correct that you have given information before, even if the person didn't choose to go to trial?

A  Yes, ma'am.

Q  Right.  So what I hear you saying is you have given information on people before, but that person just hadn't gone to trial -- or persons.  Is that right?

A  Yes, ma'am.

Q  And do you recall the number of people you might have given information on?

A  Two.

Q  Okay.  And is that in your 30-year career?

A  Career, what you --

Q  Yes, your criminal career that you testified about from age 18 to your current age.

A  Yes, ma'am.

MS. THOMPSON:  Something just went out of my mind -- nothing further.

MR. BERNARD:  No redirect, Your Honor.

May this witness be excused.

THE COURT:  Yes, you can step down, Mr. Dillard, and you are excused.  You can leave the courtroom.  You do not need to remain.

(Whereupon, the witness was excused.)

THE COURT:  Any additional witnesses, Attorney Bernard or Attorney Sheehan-Balchon?

MR. BERNARD: Not at this point, Your Honor, but we're at the end of the day, I presume. Could the Government wait until morning to formally close its case?

THE COURT: Well, I'm planning on having the Defendant's first witness here first thing in the morning, and I'd like to know now if you have any additional evidence.

(Off the record discussion between co-counsel.)

MS. SHEEHAN-BALCHON: Your Honor, the only thing we would ask the Court to consider at this time before we close our case-in-chief, it is our understanding that every Government exhibit has been admitted as presented with the exception of Exhibit 43. So we would just assure with the Court that those have all been admitted and with defense counsel input.

THE COURT: All right.

Attorney Thompson, if there was an exhibit that was not admitted by the Government, would you consent to the exhibit being moved into evidence following their close of the case?

MS. THOMPSON: Yes, with discussion; yes.

THE COURT: Assuming it's not objected to.

MS. THOMPSON: Yes, right.

THE COURT: If we find that you have not admitted an exhibit -- we have not admitted one of your exhibits and you want to move it into evidence, it's been discussed already and

it just hasn't come in, we'll permit you to do that.

MS. SHEEHAN-BALCHON: Thank you, Your Honor.

MR. BERNARD: Your Honor, at this time then the Government rests.

THE COURT: Thank you.

All right. That means that first thing in the morning, Attorney Thompson, you may present your first witness, and we have made arrangements accordingly, so -- okay.

So I'm about to recess for the day and let the jury depart for the day. In the morning we'll begin with Defendant's case. Defendant will be calling a witness or witnesses and offering evidence, and we will continue to accept that evidence tomorrow.

I'm going to give you your end-of-the day recess. I won't read the entire recess instructions to you again. You've heard it a sufficient number of times now.

But, basically, don't discuss the case with anyone else, even your family. Remember to keep your mind open. You've only heard the Government's portion of the case, you have not heard the Defendant's portion of the case yet, so please keep an open mind. And have a safe trip back to your respective homes.

Same restrictions, admonitions and instructions apply as applied previously. Thank you for your attention today. It was a full day, and you even got your lunch shortened by

fifteen minutes.  But as you can see, that allowed us to complete today's proceedings on time.

So thank you again.  We'll be in recess until call of court.

(Jurors exit courtroom.)

THE COURT:  Please be seated.  The jury has left the courtroom, so these remarks are outside the hearing of the jury.

Attorney Thompson, assuming we get started on time tomorrow at 9:00 and your first witness is Gerald Terry, do you have an estimate how many more witnesses you would be presenting?

MS. THOMPSON:  More likely than not -- I'll say if everything goes as planned -- Gerald Terry, John Terry, and maybe a couple of character witnesses.

THE COURT:  All right.  So we should -- should reasonably complete testimony tomorrow.

MS. THOMPSON:  Yes.

THE COURT:  Okay.  What I had planned to do, then, is after we do that, we can have our charging conference after court.  And then when we come back on Friday, assuming there's no rebuttal evidence, we could do the closings and get this to the jury sometime -- a reasonable time on Friday.

Remember, we still have the bifurcation issue that we have to deal with, and I'm going to try to keep that as

reasonably compact in time as we can. But there will be certain things we'll need to do to instruct the jury on what's going on. And so when we get to that, even if we get a verdict at a reasonable time tomorrow, we still have more work to do. So I'd like to make sure we move effectively tomorrow and not -- I won't say waste any time, but not utilize the time in best way we can.

So I appreciate counsel's cooperation on that to this point, and we will try to keep it moving tomorrow.

MS. THOMPSON: And, Your Honor, I just -- I was projecting we could probably be done by early afternoon, our part. So I don't know if that guides the Court if you wanted to do anything --

THE COURT: Well, what we could do is if -- I wish Mr. Keys was in here to confirm this, but we're pretty much very close to having our proposed final jury charge done, and our charges with regard to the bifurcation portion of the trial -- oh, there he is.

We were talking about the charging conference, Mr. Keys, and Attorney Thompson thought that she may finish tomorrow earlier than the end of the day. So I thought maybe if we could get the jury charges and the proposed verdict slips put together, we could email them to counsel so that they get a head start on reviewing them.

There's just a few that I -- I keep adding some things

to it because, as people testify, new issues come up that I need to cover in the instructions. But we're pretty much there. So that might help you in terms of getting that done quicker tomorrow.

Are you planning, perhaps, to start closings before Thursday morning or are you just saying we probably could --

MS. THOMPSON: So, yeah, I guess that would be Thursday afternoon or --

THE COURT: I still -- you have to give the closings; and then following your closings, I would give the jury instructions, and that usually takes close to an hour to get through all the instructions. So we could conceivably get through that tomorrow afternoon, if we went a little bit later.

Why don't we see how it goes tomorrow. If we were finished with testimony early enough, I'm certainly willing to move up the timetable on closings and jury instruction. So I'll keep that in mind.

But we can definitely, Mr. Keys, we can definitely email them proposed final instructions, proposed verdict slips, proposed instructions for the bifurcation portion of the proceeding. Okay, that will give you enough time to react to it and get back to us so we can make changes as necessary based on your comments.

Okay. Anything else?

MS. THOMPSON: No, Your Honor.

MR. BERNARD:  No, Your Honor.

THE COURT:  Okay.  Thank you.  We'll be in touch then after -- we'll need your emails for your -- do we have contact information?

MR. KEYS, LAW CLERK:  Yes --

(Off the railroaded discussion.)

THE COURT:  All right, we'll send it to your email then, and you can review it tonight.  I won't say it will be immediately, but we'll get it to you fairly quickly.

MS. THOMPSON:  Thank you.

MR. BERNARD:  Thank you, Your Honor.

THE COURT:  All right.  We'll be in recess.

(Evening recess taken at 5:01 p.m.)

C E R T I F I C A T E

I, Shirley Ann Hall, certify that the foregoing is a correct transcript for the record of proceedings in the above-titled matter.


                              s/Shirley Ann Hall
                              Shirley Ann Hall, RDR, CRR
                              Official Court Reporter

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| James Simpson | 6 | 143 | 143 | 151 |
| Morgan Wiernusz | 159 | 169 | 176 | 178 |
| Robert Dillard | 179 | 197 | 208 | 211 |

E X H I B I T S

| NUMBER | IDENTIFIED | ADMITTED |
|---|---|---|
| Govt. Ex. 10 | 158 | 158 |
| Govt. Ex. 11 | 163 | 165 |
| Govt. Ex. 31 | 27 | 27 |
| Govt. Ex. 32A | 18 | 38 |
| Govt. Exs. 32B and 32C | 42 | 43 |
| Govt. Exs. 32D and 32E | 44 | 44 |
| Govt. Ex. 32F | 47 | 48 |
| Govt. Ex. 32G | 49 | 49 |
| Govt. Ex. 32H and 32K | 54 | 55 |
| Govt. Ex. 32I, 32J and 32L | 50 | 50 |
| Govt. Ex. 32M | 52 | 53 |
| Govt. Ex. 32N and 32O | 71 | 72 |
| Govt. Ex. 32P and 32Q | 74 | |
| Govt. Ex. 32R and 32S | 77 | 78 |
| Govt. Ex. 32T and 32U | 78 | 78 |
| Govt. Ex. 32V | 74 | 76 |
| Govt. Ex. 32W | 63 | 67 |
| Govt. Ex. 32AA | 69 | 69 |
| Govt. Ex. 32AB and 32AD | 79 | 80 |
| Govt. Ex. 32AC | 83 | 83 |
| Govt. Ex. 33 | 30 | 157 |
| Govt. Ex. 34A | 62 | 62 |
| Govt. Ex. 34B | 60 | 61 |

E X H I B I T S

| NUMBER | IDENTIFIED | ADMITTED |
|---|---|---|
| Govt. Ex. 34C | 58 | 58 |
| Govt. Ex. 35 | 181 | 181 |
| Govt. Ex. 36 | 182 | 183 |
| Govt. Ex. 37 | 84 | 85 |
| Govt. Ex. 43 | 148 | |
| Deft. Ex. A | 129 | 137 |
|    Page 6, Lines 24-25 | | |
|    Page 9, Lines 9-11 | | |
|    Page 11, Lines 5-8 | | |
|    Page 17, Lines 2-3 | | |
| Deft. Ex. E | 138 | 142 |
|    Page 6, Lines 11-13 | | |
|    Page 9, Lines 20-25 | | |
|    Page 10, Lines 18-25 | | |
|    Page 13, Lines 8-11 | | |
|    Page 16, Lines 2-5 | | |
| Deft. Ex. L | 111 | |
| Deft. Exs. Q1 and Q2 | 122 | |