IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

_____

UNITED STATES OF AMERICA,
                    Plaintiff,

                                        Criminal Action
        vs                              No. 18-24
)                                       (Day 4)
JOHN T. TERRY,
                    Defendant.


_____

        Transcript of Day Four Jury Trial proceedings held on
Thursday, August 25, 2022, United States District Court,
Johnstown, Pennsylvania, before the Honorable Kim R. Gibson,
U.S. District Court Senior Judge.


APPEARANCES:

For the Government:          ARNOLD P. BERNARD, JR., Esq.
                             MAUREEN SHEEHAN-BALCHON, Esq.
                             U.S. Attorney's Office
                             319 Washington Street, Suite 200
                             Johnstown, PA  15901
                             arnold.bernard@usdoj.gov
                             Maureen.Sheehan-Balchon@usdoj.gov



For the Defendant:           SANDRA THOMPSON, Esq.
                             351 E. Princess Street
                             P.O. Box 1902
                             York, PA  17405
                             sthompsonLLC@gmail.com




Court Reporter:    Shirley Hall, RDR, CRR
                   U.S. Courthouse, Suite 204
                   Penn Traffic Building
                   319 Washington Street
                   Johnstown, PA  15901
                   shirleyhall_uscra@yahoo.com


Proceedings recorded by digital stenography; transcript
produced by computer-aided transcription.

P R O C E E D I N G S

(Jury seated, with Defendant present.)

(In open court.)

THE COURT:  Please be seated.

All right.  Are counsel ready to proceed?

MR. BERNARD:  Yes, Your Honor.

MS. THOMPSON:  Yes, Your Honor; but may we approach briefly please?

THE COURT:  You may, yes.

(At side bar.)

THE COURT:  Good morning.

MS. THOMPSON:  Good morning.

MR. BERNARD:  Good morning, Your Honor.

MS. THOMPSON:  So John Terry has decided he is going to testify, but he's decided -- Gerald was going to plead the Fifth for the iPhone.  So John Terry is not going to call Gerald Terry.

THE COURT:  Not.

MS. THOMPSON:  He's not.  So, so far that's what he's saying.  So he's going to testify first, so John Terry -- we said we want to have Gerald Terry first.  So right now John Terry is saying because Gerald is not really saying -- well, he's going to plead the Fifth to the iPhone.

THE COURT:  Gerald.

MS. THOMPSON:  Gerald -- that's what Gerald told me

this morning.

THE COURT: John would prefer he not get in there and do that, okay. All right. John is going to testify.

MS. THOMPSON: Yeah, so I just wanted to explain why we said our first witness was going to be Gerald and he's not.

THE COURT: Okay. I understand; those things happen.

MS. THOMPSON: Okay.

MR. BERNARD: So -- just so I'm clear, Gerald is not testifying because he's indicated that he would be pleading the Fifth as to questioning about contents on the iPhone or something else.

MS. THOMPSON: Yes.

MR. BERNARD: But John is planning on testifying.

MS. THOMPSON: Yes.

MR. BERNARD: Okay.

THE COURT: It will be your first witness?

MS. THOMPSON: Yes.

THE COURT: Do you have any after him?

MS. THOMPSON: I had character witnesses that were supposed to be here already, so they really are not -- character witnesses, that's it.

THE COURT: Okay. So do you think it may just be him then?

MS. THOMPSON: That's still a possibility.

THE COURT: I was wondering more for planning purposes

than anything else -- you got the emails last night?

MR. BERNARD: Yes, Your Honor.

THE COURT: They were very rough drafts. I just wanted to basically say everything that might apply and I'm sure some of it doesn't.

MS. THOMPSON: Right.

THE COURT: Okay. Well, as soon as we can, we'll go through our charging conference. We still have the bifurcation portion of the trial, which is going to take some time, too.

MR. BERNARD: Sure.

THE COURT: We're trying to reduce the instructions as much as we can, but there are some things you just have to cover, so -- okay. All right. I'll probably tell you this again at the end of the trial, but you both have done a very good job.

MR. BERNARD: Thank you.

MS. THOMPSON: Thank you.

THE COURT: Very impressed with both of you.

MS. THOMPSON: I apologize for the pacing.

THE COURT: It's one those trials that just takes a while. I'm very impressed with both of you, so thank you.

MR. BERNARD: Thank you.

MS. THOMPSON: Thank you, Your Honor.

(In open court.)

THE COURT: Attorney Thompson, you may call your first

witness for the defense.

MS. THOMPSON: Thank you, Your Honor. I would call John Terry.

THE COURT: Well, -- approach again, please.

MS. THOMPSON: Oh, okay.

(At side bar.)

THE COURT: We were going to have him seated in the witness chair --

MS. THOMPSON: Right.

THE COURT: -- before -- when we're ready for him to testify, so it probably would be best just to take a brief recess and let him go to the witness stand and not make him stand in front of the jury, so the jury's not aware.

I'll take the fall.

MR. BERNARD: Thank you.

(In open court.)

THE COURT: Ladies and gentlemen of the jury, we're going to take a very brief recess, and by that I mean five minutes at the most. We have something we have to take care of before we start with the testimony. I apologize; my fault.

And we'll bring you right back in, so don't get settled in your chairs in the assembly room because you won't be there very long. But we're going to take a brief recess.

Same instructions apply, same restrictions, admonitions as prior recesses. And I promise you we will be

started very quickly after we do this.  So thank you.

MR. KEYS, LAW CLERK:  All rise.  Court is in recess.

(Jurors exit courtroom.)

THE COURT:  Please be seated.  The jury has left the courtroom, so these remarks are outside the hearing of the jury.

We want to allow Mr. Terry to go to the witness stand and we'll bring the jury back in after we've accomplished that.

We were not anticipating you testifying immediately, sir, or we would have had this done prior to this.  I apologize.

(Defendant takes the witness stand.)

THE COURT:  We'll give the jury a couple minutes -- we don't want to get them before they've gotten to the assembly room; but we'll bring them back --

John, you could tell them that they can bring the jury back at this time.  Thank you.

(Jurors seated; defendant witness on witness stand.)

THE COURT:  Please be seated.

The jury is back in the courtroom and Attorney Thompson can call your first witness.

MS. THOMPSON:  Thank you, Your Honor; that would be John Terry.

THE COURT:  Swear the witness, please.

JOHN TERRY, a witness herein, having been first duly

sworn, was examined and testified as follows.

DIRECT EXAMINATION

BY MS. THOMPSON:

Q    Mr. Terry, please state your name to the jury.

A    John Terry.

Q    And in or around the spring of 2018, do you remember that time?

A    Yes.

Q    And where were you living?

A    The Frankford area.

Q    The Frankford area of Philadelphia?

A    Yes.

Q    Okay.  Do you have any brothers?

A    Yes.

Q    How many?

A    Three.

Q    And just for the record, what are the names of your brothers?

A    Gerald Terry, Lawrence Terry, and Anthony Terry.

Q    And do you have people that are like brothers that sort of call your parents parents?

A    Yes.

Q    And about how many people would you say that would be?

A    Fifteen -- a lot of people in the neighborhood.

Q    Why would that be?

A   That's just common in our area.  Like people call each other brothers, bro, sis, call your parents, each other parents mom, pops.  It's just common.

Q   So when you say call each other bros, does it always mean a natural brother?

A   No, bro is like -- in the area I'm from, like a term -- well, globally now, bro is like a term of somebody saying dude, friend, homey, what -- things like that.  It's --

Q   And who is the oldest of your brothers?

A   Gerald.

Q   Does big bro always mean older brother, big brother, like biological?

A   No, big bro, like I just mentioned, it's like -- just a term of somebody older, bigger than you, and is used a lot.

Q   And how about little bro?

A   It would be somebody littler than you or younger than you, you might call big bro -- I mean little bro, I'm sorry.

Q   Now, on or around late March of 2018, was there any conversation with Gerald Terry and you to go out to the Pittsburgh area?

A   Yes, there was.

Q   And -- well, first of all, let me even back up from that.

So you said there had been -- what were you doing for a living?

A   I was working for Butts Contracting.  I was a laborer.

Q   Anything else that you were doing?  Did you do any volunteer work or anything?

A   No.  I was just a laborer for Butts Contracting at the time.

Q   Okay.  And -- okay, so on or around late March 2018, I think you said you did have a contract -- a conversation with Gerald Terry about going to the Pittsburgh area.  What was that conversation?

A   Well, we had a conversation --

MR. BERNARD:  Objection, Your Honor.  The question calls for hearsay.

MS. THOMPSON:  It goes to his state of mind.

THE COURT:  Excuse me?

MS. THOMPSON:  It goes to his state of mind as far as what he knew when he was going to be traveling to Pittsburgh. So that's what it's offered for, so not offered for the truth of what Gerald Terry said, but what -- it goes to what his state of mind became.

THE COURT:  Well, you can ask him what his intentions were and what he believed they were doing, and the fact that it came from what Gerald Terry told him, you don't have to get the statement in.

So go ahead.

BY MS. THOMPSON:

Q   All right.  So around about late March 2018, based on the

conversation with Gerald Terry, did you agree to take a ride to Pittsburgh?

A    Yes.

Q    Okay.  And why?

A    Gerald called me and said he was going to be speaking.

Q    So they just said you can't specifically what Gerald said.

A    I'm sorry.

Q    I asked you why did you go?

A    I was going to support my brother because he was speaking at a conference for NA.

Q    And what did you know about Gerald Terry from your perspective at that time?

A    He was recovering -- well, he was at least seven years clean from recovering, from being an addictive -- addict prior, years prior.

Q    So had you -- I think through this case we learned that -- well, strike that.  Let me just move on.

So you knew that he was in recovery.

A    Right.

Q    Okay.  So when you heard about going to speak at a conference, did you have any reason to disbelieve it?

A    No.

Q    And so did you make any requests when you were asked to go?

A    Yes.  I requested to know how long the travel was.

Q    Okay.  So how was that answered?

A   He sent me an address, and it was a -- I Googled the address to see like approximately how far it would be.

Q   And then after you saw about how far it would be, then did you agree to go?

A   Yes, I agreed.

Q   On -- did you have any follow-up conversation with Gerald Terry after he sent the address?

A   Yes, I talked to him.

Q   And did you subsequently go with Gerald Terry on or about April 4th, 2018?

A   Yes.

Q   How did that happen?

A   He came -- he called me that morning, and then he came and picked me up.

Q   Now, what type of car did he come -- did he pick you up in?

A   A red Ford Taurus.

Q   Did you know whose car that was?

A   No.

Q   When Gerald came and picked you up on April 4, 2018, did he tell you anything about the car?

A   No, ma'am.

Q   Did you ask anything about the car?

A   No, ma'am.

Q   Okay.  What did you do?

A   I just got in and sat in the passenger seat.

Q    There was some remarks we saw on the trooper's dash cam by the time you all got stopped that said you had your socks and shoes off.  Was that right?

A    Yes, that's correct.

Q    So explain that.

A    Well, I was in the passenger seat.  I took my socks and my shoes off, had my foot like on the dash, relaxing.  And -- that was just basically it.

Q    And why was that?  Why did you do that?

A    Because I was just trying to be comfortable for the travel.

Q    Did you act to open the center console?

A    No, ma'am.

Q    Did you act to try to open the glove box?

A    No, ma'am.

Q    Was there any appearance to you as you sat in the passenger seat that an air bag could have been missing?

A    No, ma'am.

Q    Was any appearance as you sat in the passenger seat that there was any -- anything different for the glove box or that area?

A    No, ma'am.

Q    Had you seen any extra triggering mechanisms or things that would be unusual in the vehicle?

A    No, ma'am.

Q    Did you go over to the driver's side at all?

A    No, ma'am.

Q    So when Trooper Marmol did stop you, do you recall what you said to Trooper Marmol?

A    No, I don't understand your question -- what did I say to him?

Q    Yeah.  When he stopped you, did he ask you your ID?

A    Yes.

Q    Okay.  Did you give it to him?

A    Yes.

Q    Okay.  Did you talk about your socks, your shoes?

A    Yes, he talked about my socks and my shoes when I stepped out of the car, and he said something to the nature:  You ain't got no socks on or something.

Q    When -- you said when you stepped out of the car, why did you step out of the car?

A    Because he asked us to get out of the car.

Q    So he asked both of you to get out of the car?

A    Yes.

Q    And when you were standing over by the police vehicle as shown in the dash cam, do you recall making the statement to the two troopers that were around about, again, why you were there?

A    No, ma'am.

Q    On the video it looked like you said, "I was along for the ride."  I think Trooper Marmol testified about that, too.  Do

you remember saying that?

A    That I was along for the ride?

Q    Yeah, you were just along for the ride -- you were along for the ride.

A    I'm not positive.  I remember saying that it was cold outside -- I may have said I was along for the ride.

Q    So here, 2022, you don't remember the specific conversation --

A    No, I don't remember.

Q    -- of 2018, and I can understand that.

So after it was shown on the dash cam, did you have any other conversation with Trooper Marmol?

A    No -- well, he questioned -- he asked a question when we was back at District Court, whatever that thing's called, and -- but there was no conversation.

Q    Okay.  So basically you're saying you didn't answer a question.

A    Right.

Q    Trooper Marmol made a statement that you said you took responsibility for the vehicle.  Did you ever say that?

A    No, ma'am.

Q    Did you ever say that you were the one that borrowed the vehicle?

A    No, ma'am.

Q    Did you ever say that you had any knowledge of the drugs or

gun that were found in the vehicle?

A   No, ma'am.

Q   Do you -- did -- did you have any knowledge on or before April 4th, 2018, about the hidden compartment in that Ford Taurus?

A   No, ma'am.

Q   Did you before or on April 4th, 2018, have any knowledge of the firearm that was found in the hidden compartment of the Ford Taurus?

A   No, ma'am.

Q   Did you before or on April 4th of 2018 have any knowledge of the drugs that were found in the Ford Taurus?

A   No, ma'am.

Q   Did you have a cellphone on you in the -- in the car on April 4th, 2018?

A   Yes, ma'am.

Q   And what type of cellphone did you have?

A   A Samsung Galaxy.

Q   Do you know if Gerald Terry had a cellphone on him?

A   Yes.

Q   He had a cellphone when he was in the car?

A   Yes.

Q   Do you -- what type of cellphones -- I think you said on you, you had a Samsung Galaxy; is that right?

A   Yes, correct.

Q   Do you have another -- or did you April 4th, 2018, have another cellphone in your name?

A   No, ma'am -- yes, I did.  In my name, I did have another cellphone in my name.

Q   And what was -- and what was that type of cellphone?

A   That was also a Galaxy Samsung.

Q   And do you remember the last four digits of these Samsung Galaxies that you possessed, that -- that were registered to you?

A   I'm sorry, you say I don't?

Q   Why is it that you don't?

A   I haven't used a phone or had the phone in over four-and-a-half years.

Q   Is there one of them, however, that you may recall the number?

A   Yes.

Q   Okay.  And why is that?

A   Because she still has the phone and I call it often.

Q   Who is "she"?

A   My fiancee.

Q   Okay.  And would that be a 7569 number?

A   Yes.

Q   Okay.  I'm actually going to start -- the Government has introduced some exhibits, and the Government's exhibit in the two series -- and the book is in front of you, actually -- and

the two series, from 2A through 2C, those are all blown up photographs of some -- what appears to be cocaine.

When you get there, Government Exhibit 2A, 2C --

A    Yes.

Q    Okay.  And had you seen them prior to Trooper Marmol putting them up on the police vehicle?

A    No, ma'am.

Q    Had you touched them?

A    No, ma'am.

Q    Did you have anything to do with their packaging?

A    No, ma'am.

Q    I'm going to go to the Government's Exhibits 3, which is 3A and 3C, if you could turn there.

The same questions, had you seen that before Trooper Marmol put that on the hood of his vehicle?

A    No, ma'am.

Q    Okay.  And had you had anything to do with its packaging -- did you have anything to do with this packaging?

A    No, ma'am.

Q    I'm going to ask you to refer to Government's Exhibit 4A and B.  So I'm going to ask you the same question for 4A and 4B.

Did you go to 4A and 4B?

A    I'm on 4A and 4B now.

Q    Okay.  Did you see those before Trooper Marmol put that on

John Terry - Direct Examination

the hood?

A    No, ma'am.

Q    And did you have anything to do with that packaging?

A    No, ma'am.

Q    So it doesn't say that you didn't find the physical evidence, which is the bullet, and I believe the -- Exhibit 6 is the physical evidence of the firearm itself.

      Had you seen that -- and that would also be 6A and 6B.  Had you seen them prior to Trooper Marmol placing them on the hood of his vehicle?

A    No, ma'am.

Q    Had you touched that weapon?

A    No, ma'am.

Q    Did you know the weapon was in the vehicle?

A    No, ma'am.

Q    Okay.  So the Government's Exhibit 7 is, again, physical evidence of the iPhone.  Did you have an iPhone?

A    No, ma'am.

Q    Did you use an iPhone?

A    No, ma'am.

Q    Government's Exhibit 8 was the Samsung phone.  Did you have a Samsung?

A    Yes, ma'am.

Q    Did you use a Samsung?

A    Yes, ma'am.

John Terry - Direct Examination

Q    I'll ask you to turn to the Government's Exhibits 15.    That is a photo of a red vehicle that's the Ford Taurus --

    (Off the record discussion between opposing counsel.)

BY MS. THOMPSON:

Q    So, Mr. Terry, this Government Exhibit 15 -- I mean did you know whose car this was?

A    No, ma'am.

Q    Did you know where Gerald got the car from?

A    No, ma'am.

Q    So Government's Exhibit 16, did you know anything about any switch or operations that were constructed in this car?

A    No, ma'am.

Q    Had you seen it before?

A    No, ma'am.

Q    Had you touched it?

A    No, ma'am.

Q    Go to Government Exhibit 17.

    Did you know anything about this microswitch that was on the driver's side air vent?

A    No, ma'am.

Q    Had you seen it before?

A    No, ma'am.

Q    Had you touched it?

A    No, ma'am.

Q    Government Exhibit 18.

Do you know anything about the microswitch that was around the vent housing?

A    No, ma'am.

Q    Had you seen it before?

A    No, ma'am.

Q    Had you touched it?

A    No, ma'am.

Q    Go to Government's Exhibit 19.  It's a magnetic switch around the driver's side center console.

Had you seen this before?

A    No, ma'am.

Q    Had you touched it?

A    No, ma'am.

Q    Did you have any intent to touch any of these things?

A    No, ma'am.

Q    Go to Government Exhibit 20.  It's some push buttons to open and close; I believe the gentleman testified was underneath the carpet.

Had you seen this before?

A    No, ma'am.

Q    Did you move the driver's side carpet to look?

A    No, ma'am.

Q    Had you touched these buttons?

A    No, ma'am.

Q    So the Government's Exhibit 21 was James Simpson's

application for a search warrant for the phones.  And you see the notation that says:  IPhone belonging to John Terry?

A    Yes.

Q    Was that a true notation?

A    No, ma'am.

Q    And the Samsung was yours, right?

A    Yes.

Q    You never denied that the Samsung was yours, right?

A    No, ma'am.

Q    But your name is not next to the Samsung.

A    No, ma'am.

Q    Let's go to the reports that Agent Simpson created.  And that would be Exhibit -- Government's Exhibit 31.

On Government Exhibit 31, Agent Simpson -- did you go there?

A    Yes, 31.

Q    Okay.  So this says -- it's a -- Agent Simpson's report of the iPhone.  Did you use that iPhone, even to borrow it?

A    No, ma'am.

Q    Did you receive any text messages or send any text messages from the iPhone?

A    No, ma'am.

Q    I'm going to ask you to go to Page 3 of the Government's Exhibit 31.

Okay.  So did you have any folks connected to you that were

in an accident on around March 2nd, 2018?

A    No, ma'am.

Q    So these text messages that's attributed to the iPhone (215)934-2482, at Page 3, were they sent in or received by you?

A    No, ma'am.

Q    Now, just you explaining some terms used in the neighborhood, does "folks" always mean parents?

A    No, ma'am.

Q    What does "folks" -- what could "folks" mean?

A    "Folks" can mean different type of people, like just a friend, like a friend would be called my folks -- cousin, my folks; a brother also could be called my folks.  So it's different.

Q    Somebody important to you would you say.

A    Yes.

Q    Okay.  So again on around March 2nd, 2018, none of your folks were in an accident or in the hospital.

A    No, ma'am.

Q    I'm going to ask you to go to Page 5.  First, do you -- do you remember back in 2018 what Gerald's phone number might have been?

A    No, ma'am.

Q    Why is that?

A    Because that was four-and-a-half years ago.

Q    Okay.  Do you know the total number of phones that Gerald

used?

A    I knew of him having two phones.

Q    And did he also -- did Gerald have a wife?

A    Yes.

Q    Did she also have a phone?

A    Yes.

Q    Can you recall what his wife's phone number was?

A    No, ma'am.

Q    Did Gerald's wife refer to your mother and father as her parents?

A    Yes.

Q    Do -- on Page 5 of the Government's Exhibit 31, the 2/12/2018 notation, "Meet me at our parents house," did you receive in or send that text message?

A    No, ma'am.

Q    Do you know who may have sent it or who they may have sent it to?

A    No, ma'am.

Q    I'm going to ask you to turn to Page 7 of the Government's Exhibit 31.

    Under the notation -- I'm not sure --

    (Off the record discussion between defense counsel and Government tech.)

BY MS. THOMPSON:

Q    This says there was a message sent 3/30/2018 to the

1429 Grant Street, Braddock, PA.  And it was -- it was the -- alleged to be to the iPhone.  Had you used the iPhone on or around March 30th of 2018?

A    No, ma'am.

Q    Did anybody text you or did you text from an iPhone on or around March 30, 2018?

A    No, ma'am.

Q    On -- would -- and do you happen to know if the (215)494-8544 is the phone number for Gerald's wife?

A    No, ma'am.

Q    And then on 4/4/2018 there's a message from that same phone to the iPhone, as stated by the Government, "Are you ready Pooh?"

Do you happen to know who would have sent that message or who they would have sent it to?

A    No, ma'am.

Q    Were you using that iPhone on April 4th, 2018?

A    No, ma'am.

Q    Did you receive or send any text messages from that iPhone?

A    No, ma'am.

Q    And then going to Page 8 -- at the top part of Page 8 there's a statement that says, "We can't be ready til nine. Was rushing.  I got to do all over.  Hour apiece.  My fault bro."

I believe you explained the use of "bro."  Do -- in your

neighborhood, do men only call men bros or do you also call women bros?

A   They call everybody bro.

Q   And in -- did you send or receive this text message about "Can't be ready til nine.  Rushing.  Got to do it all over. Hour apiece"?

A   No, ma'am.

Q   Do you know who might have sent it or who they might have sent it to?

A   No, ma'am.

Q   Do you know who had been using that iPhone at that time?

A   No, ma'am.

Q   Now, on -- it says December 18, 2017, and it says outgoing from the number attributed to the iPhone, "I apologize bro sincerely.  I'm so embarrassed.  I couldn't find my fucking ID, so here nothing.  I got a duplicate.  Be down before one.  Got a bag for you too.  Again my fault."

Do you remember on or around December 18th, 2017, if you would have sent a copy of your ID to someone?

A   No, ma'am.

Q   Do you know if -- whether or not you could have sent your -- a copy of your ID to someone and it got forwarded to somebody?

A   That's possible.

Q   Do you have any memory of why the ID would have been sent

then?

A   Well, do I have an idea why the ID would have been sent somewhere?

Q   Yeah, if you do.

A   I wouldn't have an idea.  If I had a copy of my ID, it would have been in my Samsung phone.  I don't know why it would be forwarded or copied or anything; so, no.

Q   So if this -- if you did send this message back December 2018, would it have come from the Samsung phone?

A   Yes, if I had -- a copy of my ID, it would have been in the Samsung phone; yes.

Q   And if you would have sent that message saying, "I'm embarrassed, I couldn't find it" and sent a copy of your ID, that would have been from the Samsung phone?

A   Correct.

Q   Okay.  So this says it was on or from the iPhone.  Do you believe that's accurate?

A   No.

Q   Do you know Kelli Royster?

A   Yes.

Q   How do you know him?

A   Kelli Royster is a friend of the family.  He's my brother baby mom child's mother -- I'm sorry, my brother's child's mother's cousin.

Q   Okay.  So your brother has a child --

A    His cousin.

Q    Okay.  I'm just trying to follow.

A    I'm sorry.

Q    So your brother had a girlfriend and Kelli Royster is the girlfriend's cousin.

A    Yes.

Q    Okay, all right.  And which brother was that?

A    Lawrence.

Q    So did the family know Kelli Royster based on that relationship with Lawrence Terry?

A    Yes.

Q    And so Gerald knew Kelli Royster as well.

A    Yes.

Q    Do you know how deep Gerald's relationship or connection was with Kelli Royster?

A    We all grew up together.  We all know each other, so -- they had a pretty close relationship.

Q    Did you have any knowledge of -- again, of -- if there was drugs in the car or somebody had them put in the car, whether or not there was any agreement with him or Kelli Royster, would you have any knowledge of that?

A    No, ma'am.

Q    I'm going to ask you to turn to the Government's Exhibit 16.

A    Exhibit 16?

Q   I'm sorry -- I'm sorry, Page 16 of Exhibit 31.  I'm sorry, I apologize.

For -- do you see in the book there is -- on Page 16 of the Government's Exhibit 31, Image 12, there is a writing on there, "Image of John Terry's T-mobile letter."  Do you see that?

A   Yes.

Q   Okay.  And it says -- it has something under additional file information.  It says that this was something on March 16th, 2018.

Do you -- would you have taken any screen shots of the T-mobile letter?

A   No, ma'am.

Q   Well, would you recall if you would have?

A   Yes.

Q   Do you know if anybody else would have taken the screen shot of your T-mobile letter?

A   No.

Q   So do you --

A   I don't know what anybody else did, but --

Q   Would it be fair to say you don't totally recall whether or not somebody took a screen shot?

A   Correct.

Q   Okay.  And you thought that was a buy one/get one off Samsung promotion?

A   I can't see none of this, so -- so if you could put it up,

I might be able to see it.  I can't see it.

Q   I believe it's also in your binder, but I'll send that to you.  I'm not sure.

So -- staying on Page 16, there's some images on -- okay.

So we brought up 32D in reference to that T-mobile letter. So -- and this is a letter associated -- I mean that's a record to your name from T-mobile, right?

A   Right.

Q   Did you have any cellphones that were not in your name?

A   No.

Q   So even your girlfriend's cellphone, that was in your name, not her name.

A   Yes.

Q   Okay.  And so this looks like a BOGO, so, by one/get one off for Samsung.  So do you know if somebody was interested in that promotion and took a screen shot of the promotion?

A   So somebody could have took a screen shot of it, of the promotion, because -- that would have been in my phone, for sure, that's -- that's definitely my promotion about the phones that I purchased, and that would have been in my phone, the Samsung.

Q   So you said it would have been in your Samsung phone.

A   Yes, for sure.

Q   Okay.

A   So if it was a screen shotted or forwarded, that was

something totally different by someone else.  But that would have definitely been in my phone because I remember getting that.

Q   Okay.  And -- but would that have been in the iPhone to your knowledge?

A   No.

Q   Would you have made it be in the iPhone --

A   It wouldn't have been in that iPhone in case somebody had it screen shotted or forwarded.

Q   And, actually, it may be just me, but please keep your --

A   Okay, I was looking down.

Q   -- voice up for the jury.

A   Okay.

Q   Then on Pages 16 and 17, there's photographs of the -- some cocaine.  Do you have any knowledge of -- of any -- those photographs of cocaine and where they came from?

A   No, ma'am.

Q   And you see Image 12 on Page 16, of the Government's Exhibit 31 and Image 14?

A   Yes.  I see it on this page.

Q   Under the additional file information, do you see that the distinction -- so Image 12 is where the Samsung promotion is. Image 14 is started where the photos of the drugs are.

Did you see any different -- any additional file information?

A    Yes.  On the image of 12, it don't have much information, or say anything.  On the image of 14, with these drugs, it says Apple.

Q    So the drugs, it says the iPhone-8-Plus in Apple?

A    Yes.

Q    For Image 12, for your Samsung promotion, under additional file information, does it say Apple and iPhone Plus?

A    It don't say -- no, it doesn't.

Q    I'm going to ask you to turn to Government's Exhibit 32.

    (Off the record discussion between opposing counsel.)

BY MS. THOMPSON:

Q    All right.  So -- actually, can you turn to 32A?

A    I'm here.

Q    And, again, there's a notation this is again prepared by Agent James Simpson.  And in it he's stating that this text message is from an iPhone, and it's your iPhone.

    Every time it states John Terry's iPhone, is that true or false?

A    That's false.

Q    And I think you did testify -- but, again, because it's implicated -- do you know a person E. Good?  Do you recall?

A    I can't recall.

Q    And if -- and I think I heard you say this was December 2017.  You don't have any specific memory of it, under the circumstances; is that what you kind of said?

A   Excuse me, can you repeat that?

Q   For Government's Exhibit 32A --

A   Right.

Q   -- this was, as they say, was December 18th, 2017.  Do you remember that time frame?

A   No, I don't remember that.

Q   So you don't remember like the phone numbers that people had --

A   No, I'm sorry.  Like I have a bad memory, like long term bad.  So I can't say that.

Q   Okay.  But in reference to, again, whether or not you used the iPhone, is there any doubt about that?

A   I've never used a iPhone, so I'm not -- the picture I would say if it was a picture that wasn't pasted or copied, it would be in my Samsung.  I never used a iPhone.

Q   So you're saying that you don't specifically remember these text messages, December 18, 2017, but if you would have sent it, it would have been sent from your Samsung.

A   Yes, correct.  That's what I'm saying.

Q   Now, we also put 32B and C -- that's just blowups of that; is that right?

A   Correct.

Q   And then 32D, which was the blowup we already talked about, you said that also would have came from your Samsung?

A   Yes.

Q   32E is also a blowup of what we talked about on 31, Page 16.  And, again --

MS. THOMPSON:  Can you show 32?

BY MS. THOMPSON:

Q   And then again under additional file information, I think you testified it doesn't say Apple iPhone.  Is that right?

A   No.

Q   And 32F we already talked about in reference to, "Meet me at our parents house."

Now, in 32 -- then go to 32K.  So this is the -- do you see 32K?

A   It's on the screen.

Q   Oh, okay.  Do you -- so take a moment to look at it. There's two pages; take a minute to look at it.

Do you recall the conversation?

A   No, ma'am.

Q   Okay.  Do you recall -- and I guess I understand this is 2022 right now, so that's what you're speaking of; but do you -- if there was a -- well, actually, I'm going to ask you to --

A   I don't have it in the book.  It's hard to see.  It's hard to see this.

Q   The 32 page is not in that exhibit book?

A   No.  So I'm looking on here, and it's very hard to see the screen.

Q   Okay, all right.

A   Okay, I see that clear.

Q   Okay.  All right.  So do you recall getting a photograph from an old friend?

A   Yes.

Q   All right.  So -- and do you recall the circumstances of getting that photograph?

A   Do I recall the circumstances?

Q   I mean -- well, C is the text message conversation, so that's what I mean by circumstances.

A   Okay, yes.

Q   Okay.  And so where did that occur?  What -- where -- on what phone did that occur?

A   That would be my Samsung phone.

Q   So where -- on Government Exhibit 32K, where Agent Simpson prepared this report putting the number as 2482, would that be correct?

A   No.

Q   So if this message that you received from the woman and that message conversation that you all had, which phone did that occur on?

A   My Samsung.

Q   And there were also photos in there -- and I'm not going to go through all of them.  There were photos of Kelli Royster in there with his baby.

A    Oh, okay.  It was pages down, behind --

Q    Okay.

A    I'm sorry.  But I see the photos now.

Q    Okay.  Did Kelli Royster send any photographs to you of him and his baby or child's mother?

A    No, ma'am.

Q    Do you know if he would have sent photographs to Gerald?

A    He could.

Q    Now, I think you said you see a 32 number up front?

A    Okay, I see it now.

Q    Okay.  So can you go to 32N and 32O -- and go to 32 now. 32N is another photograph of the drugs.  And again --

A    N?

Q    Yeah.  N, 32N.

A    I'm looking for it -- okay.

Q    And, again, have you seen or touched those drugs before Trooper Marmol put it on the hood?

A    No, ma'am.

Q    And then 32O, which is a stated file information from Agent Simpson, that has Apple and iPhone-8 Plus.

A    Yes.

Q    And 32P is another photograph of the drugs.  And, again, had you seen or touched that before Trooper Marmol placed that on the hood?

A    No, ma'am.

Q   32Q has -- was stated as file information, Apple iPhone-8 Plus.  Is that right?

A   That's what it says.

Q   Okay.  32R is another photograph of the drugs.  Had you seen or touched that prior to Trooper Marmol putting them on the hood?

A   No, ma'am.

Q   32S has some file information of an Apple iPhone-8 Plus. Is that right?

A   Yes.

Q   And 32T, have you seen or touched that prior to Trooper Marmol putting them on the hood?

A   No, ma'am.

Q   Okay.  And 32U also has -- you see it has Apple iPhone-8 Plus?

A   It has Apple iPhone-8 Plus, yes.

Q   And 32V, have you seen this scale or the drugs on it on or before April 4th, 2018?

A   Excuse me?  You said you, --

Q   Page 32V.

A   V.

Q   Yes.  It's also on the screen.

A   No, I've never seen it.

Q   Going to 32W, Agent Simpson prepared this document and testified that these incoming and outcoming calls were from the

iPhone.  Is that -- is that accurate?

A   I don't have that page either, but I can't barely see it on here.

Q   32W -- maybe, it may be out of order; have a look real quick.

A   Okay.

Q   Can you see better on the screen now?

A   Yes.

Q   Okay.  So, again, Agent Simpson created this document, 32W, and testified that these are ingoing and outcoming logs from the iPhone.  Would that have been accurate?

A   No, ma'am.

Q   And the (267)902-7569, if that was calling you, wouldn't -- what phone would it have called?

A   It would be calling my Samsung.

Q   32AA -- this is a blowup of conversations we've already talked about.  Again, did you make any calls or text messages to or from -- well, from an iPhone-8, the number 2 -- last four are 2482?

A   No, ma'am.

Q   So this conversation that has JT on the exhibit, is that you?

A   No, ma'am.

Q   And 32AB, this conversation where it's saying John Terry's iPhone, is that you?

A    No, ma'am.

Q    32AC, this conversation where it says John Terry's iPhone and JT, is that you?

A    No, ma'am.

Q    32AD.  Okay -- now, you see on the top of 32AD it says "Open Google Earth."  Do you see that?

A    Yes.

Q    And then you see a category "Apple Maps."  Would you have --

A    Oh, I see it on this.

Q    Okay.

A    All right.

Q    Would you have used that iPhone even to search the address of 1429 Grant Street?

A    No, I would have used my Samsung phone.

Q    So going through the Government's Exhibit 33, which is the report that James Simpson created, saying it's from the Samsung --

A    I don't have a 33, but you could put it on the screen.

Q    You said you don't have 33?

A    Thirty-three -- oh, it's back in front.  Got you.

Q    So that's a three-page report?

A    Yes, correct.

Q    So on Page 2 it says -- well, first of all, take a minute to look at it.

There's four notations.  It says that there's a phone number (215)617-7901.  Do you have any specific memory of that phone number or who owned -- was the subscriber?

A   Can you repeat the number, please?

Q   Sure, (215)617-7901.  Could you see it on the form or -- do you have it?

A   Yes, I see it.

Q   Okay.  Do you have any memory of who used that phone number back in 2018?

A   No.

Q   And the phone number (215)494-8544, again, 2022, do you have any specific memory who used that phone number back in 2018?

A   No.

Q   But the -- it says on March 29th, 2018 -- and also the Samsung was UTC.  Do you know what the time was when your Samsung -- do you know if you set the time on your Samsung?

A   Did I set the time on my phone?

Q   Well, I don't know if you have any knowledge of this, but Agent Simpson is reporting that the time zone was UTC.

MR. BERNARD:  Objection, Your Honor.  I think that misstates the facts that were presented.

MS. THOMPSON:  Agent Simpson's report, and that's what's i there.

MR. BERNARD:  His report -- may we have a side bar,

Judge?

THE COURT: You may, yes.

(At side bar.)

MR. BERNARD: Judge, the testimony at trial from Forensic Examiner Sarvey and Agent Simpson was that the report regarding the iPhone, the software that generates the report, reports the time in universal time coordinates.

Agent Simpson testified that in preparing his slide exhibits for the purpose of this trial, that he converted that UTC time to Eastern standard time to make it more easily understandable. The testimony further showed that the report regarding the Samsung, in that report the software program had populated the times in Eastern standard time, so UTC minus four or whatever that is on the report. It's the software program that converts that time on the report, not the Agent.

THE COURT: All right. So the question itself, your introduction to the question was what?

MS. THOMPSON: My question was: Did you know anything about the UTC time, something to that effect? So --

THE COURT: This is the universal -- the four hours difference.

MS. THOMPSON: Or whether or not the formula was there; and I think to make it clearer, that that was something created from the report versus how his phone was actually set. Because I don't think that was really made very clear.

John Terry - Direct Examination

MR. BERNARD: I mean I have no objection if you want to ask him was the time on your phone in Eastern standard time. Like -- or was it in universal time coordinate. Was it in military time, was it in a.m./p.m. I have no objection to that.

THE COURT: Why don't you ask him about Eastern standard time versus UTC time and see if he even knows --

MS. THOMPSON: He -- that's --

THE COURT: -- what we're talking about.

MR. BERNARD: Yeah.

THE COURT: Quite frankly, it's the first time I'd ever heard of that in terms of technology for phones. You can ask him, but I don't think he would have any information.

MS. THOMPSON: Yeah, yeah.

MR. BERNARD: Thanks.

(In open court.)

THE COURT: Would you ask the question, again, please, Counsel.

MS. THOMPSON: Sure.

BY MS. THOMPSON:

Q Again, I want to be clear, Mr. Terry, that you do see the page I'm referencing, Page 2 to Government's Exhibit 33.

A Yes.

Q Okay. First let me be clear. Under the block where it says time, do you see a notation "UTC-4"?

A    Yes.

Q    Okay.  Do you know anything about how the phone may have been set at "UTC-4"?

A    No, I have no idea how it was set by UTC.

Q    Okay.  When you were using this cellphone -- and that's the Samsung.

A    Okay.

Q    And first let me ask you this question:  You have much knowledge of Eastern standard time and time zones?

A    Yes.

Q    Okay.  So when you were using the Samsung, what time zone were you in?

A    Eastern, like the regular time zone.

Q    Okay.  All right.  So -- so where it says UTC-4, that's not indicative of how you were actually using the phone or the time zone where you actually used the phone; is that right?

A    That's correct.

Q    Okay.  And the first notation from the number 7901, it says on 3/29/2018, there was a text message, "Your brother other phone is down."

And so, from that, did you know if it was your actual brother, do you recall?

A    I don't recall.

Q    Okay.  Well, if you can think back on the time frame of this conversation, because one of the next ones, 7901, also

3/29/2018, if you look, it says now, "This is big bro wife," and then gave the address of 1429 Grant Street, Braddock, PA.

Does that refresh your recollection of who that may have been?

A    Yes.

Q    Okay.  And so then who was that?

A    That was my brother wife.

Q    All right.  So if the first one that said, "Your brother phone is down," could that also have been --

A    Would have been his wife, yes.

Q    His?

A    His wife.  That -- it said, "Your brother's phone is down."

Q    The first one.

A    Okay.

Q    So the fourth block -- one, two, three, four -- on Page 2?

A    Correct.

Q    Okay.  So number one, go across, where it says messages. And it says your, "Brother other phone is down."

A    (Witness nods head.)  Right.

Q    So what brother was talking about 1429 Grant Street?

A    That was Gerald.

Q    Okay.  So then is it likely that that was Gerald who had sent that message?

A    Yes.

Q    Okay.  Then the second one says, "This is big bro wife" and

then gave the 1429 Grant Street.  So that -- well, you said that was his wife.

A    That's what I said.  That's his wife, correct.

Q    Okay.  So how many times did you receive the Grant Street address?

A    One time.

Q    And where did you -- on which phone did you receive the Grant Street address?

A    My Samsung.

Q    And why did you receive the Grant Street address?

A    To know where the meeting was at and the distance for the conference, for the NA meeting that he was going to.  I wanted to Google it and find out what the distance was.

Q    And then there was another phone number, 8544, that it says, "Other phone died.  It's me big bro."

     And then on four it's a message from the 7569 number that said Gerald is 8544.

     So -- now, who is Wifey?

A    That's my fiancee.

Q    And so was Gerald and his wife communicating from both the 8544 and 7901 numbers to you?

A    Yes.

Q    Okay.  And on Page 3 -- it looks like it's Agent Simpson's explanation of those Page 2 notations we just went through.  And Agent Simpson says that it was Gerald Terry texting from

both numbers, both times, 7901, even on the second time where it says "Big bro wife." Do you see that?

A    Yes.

Q    And so -- so I heard you testify that you had two Samsung phones, one was with your fiancee -- and that was the 7569 number, is that right?

A    Yes.

Q    But you couldn't recall your particular number.

And I'm going to ask you for Government's Exhibit 3 -- I'm sorry, 34 -- Government's Exhibit 34. Did you get there?

A    I don't have a 34. It goes from 32 to 37.

Q    It may be out of order, I think, when it was put in there.

A    Oh. I got 34.

Q    You got it?

A    Yes.

Q    Okay. So here where it says John Terry's Samsung, is that true?

A    Yes, I -- I owned the phone that my fiancee had at the time.

Q    Well, this particular number -- look at the phone number.

A    Okay.

Q    This is the (267) 902-7556.

A    Right.

Q    Okay. And then look at the other -- Page 3.

A    So that is the correct number that I had now that I'm

viewing it.

Q   Okay.  So I understand that you said you got the numbers, so --

A   Right.

Q   -- so, again, Page 3 shows (267)902-7569, and that's one Samsung you owned -- you had, is that right?

A   Yes.

Q   Okay.  And then -- but that was your fiancee's, is that right?

A   Yes.

Q   And then the (267)902-7556 is the Samsung that you carried, is that right?

A   Correct.

Q   Okay.  So here on the Government Exhibit 34 was a John Terry's Samsung.  Now, is this actually accurate when it says John Terry's?

A   Yes.

Q   Okay.

        MS. THOMPSON:  And so if you could just blow up the conversations that we've discussed --

BY MS. THOMPSON:

Q   Okay.  So we talked about Gerald Terry having a wife.  Do you have any specific memory of when Gerald got married?

A   Not exactly, but I believe it was September -- I mean -- it was sometime in '17.  I believe fall.  I'm not sure -- I'm not

accurate with the time.

Q   Okay.  And did you attend the wedding?

A   Yes.

Q   And do you recall the number of people that attended the wedding?

A   Did I call?

Q   Do you recall?  Do you know the number of people that attended the wedding?

A   No, I don't recall the number, but it was a lot of people there.

Q   You saw Robert Dillard testify yesterday.  Had you met Robert Dillard?

A   No.

Q   Could he have been at the wedding?

A   He could have been, but I didn't see him.

Q   All right.  Did you have any conversation or contact with Robert Dillard at Gerald's wedding?

A   No, ma'am.

Q   Did Gerald Terry introduce you to Robert Dillard for any drug sale purposes?

A   No, ma'am.

Q   Had you ever traveled to the Pittsburgh or Braddock area before April 4th, 2018?

A   No, ma'am.

Q   Had -- did Robert Dillard have your phone number?

A    No, ma'am.

Q    When you received the address -- the Grant Street, Braddock address, did you have any knowledge that that was Robert Dillard's address?

A    No, ma'am.

Q    Was there any name attached to what Gerald Terry sent?

A    No, ma'am.

Q    There was some conversation that the iPhone had an email attached to it for Samuel Marshall.  Do you know who Samuel Marshall is?

A    Yes, ma'am.

Q    Is that a real person?

A    Yes, ma'am.

Q    Do you know if Gerald Terry knows a Samuel Marshall?

A    Yes, ma'am.

Q    Had you known or heard of the name Khalil Madison before -- before April 4th, 2018?

A    No, ma'am -- I can't recall that.  I know a lot of Khalils, but I never recall a Khalil Madison.

Q    Do you happen to know -- or knowing a lot of Khalils, do you know a Khalil that's connected to or associated with Kelli Royster?

A    No, ma'am.

Q    Did you do these crimes that you're charged with?

A    No, ma'am.

Q   Did you have any knowledge of any drugs being in that compartment or did you have an agreement to put them there?

A   No, ma'am.

Q   Did you have any agreement or would you have provided any assistance in getting them out?

A   No, ma'am.

Q   Did you have any intent to get them out?

A   No, ma'am.

Q   Did you have -- or would you have had any agreement or knowledge of providing any assistance to transfer them from the car to another person?

A   No, ma'am.

Q   Are you able to state why Gerald Terry would have told you you were going to a conference in Pittsburgh when he may have had an agreement to deliver drugs to Robert Dillard?

A   No, ma'am.

MR. BERNARD:  Objection, Your Honor; question calls for speculation.

MS. THOMPSON:  I asked if he knew.

MR. BERNARD:  She's asking if he knew why Gerald would bring him along if Gerald is the one distributing drugs.  It's asking for what Gerald's intentions were, what his reasoning was.  It's not within John's knowledge.

THE COURT:  There would have to be some additional preface to that question as to how he would know this, if you

want to question him about that.

MS. THOMPSON: Your Honor, he already answered no, so that was just a foundation -- I asked him did he know, he said no, he didn't know.

THE COURT: All right, go ahead.

BY MS. THOMPSON:

Q   Just -- just another question, Mr. Terry.  There was testimony also that there were driver's license photo IDs found for Harry Ellis, Juror, and Daniel Allen in the iPhone.

Do you know the circumstances under which those IDs would have been in that iPhone?

A   No, ma'am.

MS. THOMPSON: Nothing further.

THE COURT: All right.  Before we start the cross examination, we're going to take a recess.  I have about five minutes before 11.  Let's come back in here at about 11:15.

Same admonitions, restrictions and rules apply to this recess as to all prior recesses; and we'll be in recess until approximately 11:15.

MR. KEYS, LAW CLERK: All rise.  Court is in recess.

(Jurors exit courtroom.)

THE COURT: Please be seated.  The jury has left the courtroom, so these remarks are outside the hearing of the jury.

I ask that the marshals have the Defendant back on the

witness stand prior to bringing the jury in; and if you can have him back on there a little bit before 111:15, that would be good.

Anything additional before we take our recess?

MR. BERNARD: No, Your Honor.

MS. THOMPSON: No, Your Honor.

THE COURT: All right.

Mr. Terry, you're on the stand; therefore, you can't discuss your testimony anymore at this point in time with anyone, even your own lawyer.

Do you understand that?

THE WITNESS: Okay.

THE COURT: Okay, thank you.

All right, we'll be in recess.

(Whereupon, the morning recess was taken.)

(Jurors seated; in open court with defendant present.)

THE COURT: Please be seated.

Counsel, you may cross examine the witness.

CROSS EXAMINATION

BY MR. BERNARD:

Q   Good morning, Mr. Terry.

A   Good morning.

Q   My name is Arnold Bernard; I'm the Assistant United States Attorney.  I'm sure you've seen me sitting across from you all trial, is that right?

John Terry - Cross Examination

A    I have.

Q    And you've been sitting next to your attorney,
Sandra Thompson; is that correct?

A    Yes.

Q    And you've been present throughout the trial, is that fair
to say?

A    Yes.

Q    You've been paying attention to what's been said, is that
right?

A    Yes.

Q    So you've heard the testimony of all of the Government's
witnesses to this point.  Is that correct?

A    Yes.

Q    Okay.  Now, you started your testimony on direct
examination by telling the jury that you're from the Frankford
area of Philadelphia; and prior to incurring the charges in
this case, you worked for Butz Contracting, is that right?

A    Yes.

Q    So as an employee for Butz Contracting, you would renovate
homes; is that correct?

A    I was a laborer.

Q    Right.  And the labor that you performed involved
renovation of homes or apartments?

A    Yes.

Q    On some of those jobs that you performed, did you

photograph the apartments that you renovated?

A    No.

Q    You never documented any of the work that you were proud of?

A    No.

Q    Now, you mentioned that you have three brothers, Gerald, Lawrence and Anthony.  Is that right?

A    Yes.

Q    So there's four of you all together, what -- brothers with last name Terry; is that accurate?

A    Yes.

Q    Gerald is the oldest, correct?

A    Correct.

Q    Where do you fall in line?

A    I'm the youngest.

Q    Okay.  So who comes after Gerald, Lawrence or Anthony?

A    Anthony, and then Lawrence, and then I.

Q    All right.  Do you know how old Gerald is?

A    No.

Q    He's older than you, though.

A    Yes.

Q    And how old are you?

A    Forty-seven.

Q    So it's fair to say that Gerald is your big brother, is that correct?

A    Yes.

Q    It's fair to say he's your big bro?

A    Yes.

Q    Gerald's wife's name is Ronda, is that right?

A    Yes.

Q    You said Gerald -- it's fair to say Gerald is your big bro, so it's fair to say Ronda would be your big bro's wife.  Is that correct?

A    Yes.

Q    Now, as we mentioned before, you were present during all of the testimony that was presented in this trial; right?

A    Yes.

Q    So you heard the testimony of Senior Forensic Examiner Justin Sarvey from the FBI, is that correct?

A    Yes.

Q    You heard how he said that he was provided with search warrants for two cellphones that were recovered as a result of the investigation of a traffic stop that occurred on April 4th, 2018.  Is that right?

A    Yes.

Q    He told you that those cellphones had been stored in secure FBI evidence, right?

A    Yes.

Q    He told you that upon receiving the search warrant to search each of those devices, that he conducted a forensic

imaging of those devices.  Is that right?

A    Yes.

Q    And he testified -- and you heard him testify -- that a forensic image is an exact copy of the data that is on the device.  Is that right?

A    No, I don't recall that.

Q    You do not recall him saying that.

A    I don't remember exactly what he said.

Q    Okay.  Do you recall him saying that after he conducts a forensic image of the device, that he produces that onto a physical format of a CD or a DVD.

A    Yes.

Q    Do you recall him saying that upon conducting that forensic imaging, the original copy of that CD again gets stored in the secure FBI evidence?

A    I don't recall him saying that.

Q    You do not recall him testifying that he put the original CD containing the extraction from each of the phones into secure FBI evidence.  Is that your testimony, Mr. Terry?

          MS. THOMPSON:  Your Honor, I'm going to object.  I don't know if you want me to state the objection or we need to approach Your Honor.

          THE COURT:  I'll permit him to ask the question.  That was the content of what he asked him, that if Mr. Terry doesn't remember, then that's his answer, he doesn't remember.

Go ahead.

BY MR. BERNARD:

Q   Are you saying that you do not remember that he testified to that or that you did not hear him to testify to that or that he did not testify to that?

A   I do not remember what he said.

Q   Okay.  So he may have said that once he makes a copy --

MS. THOMPSON:  Your Honor, it's not going to speculation.  It's not for Mr. Terry's memory of what did the forensic analyst testify about.  It's for the jury's memory.  So I don't even think this line of questioning is proper.

THE COURT:  I'm sustain the objection.

Go ahead.

BY MR. BERNARD:

Q   So after you were listening -- or as you were listening to Senior Forensic Examiner Sarvey's testimony, whether or not he said that he then places a secured copy of the extraction from the phone into secure FBI evidence, you heard that he then puts that data on an internal server for the case agent to review.

Do you recall that?

A   Yes.

Q   Do you recall that Senior Forensic Examiner Sarvey indicated that Special Agent James Simpson was the case agent to whom he provided access to those materials?

A   Yes.

Q   Do you recall the testimony of Special Agent James Simpson wherein he stated that he reviewed the data, tagged items of interest to his investigation, and then notified Senior Forensic Examiner Sarvey, the generator of court, based on the items that he tagged?

A   Yes.

Q   Okay.  Do you recall Senior Forensic Examiner Sarvey testifying that upon receiving those tagged items from Special Agent Simpson, that Senior Forensic Examiner Sarvey then generated a report of those items, burned that data to a disk, and placed that disk within secure evidence storage?

A   Yes.

Q   Okay.  So you have heard through the testimony of Senior Forensic Examiner Sarvey, as well as through the testimony of Special Agent James Simpson, that through each step of the extraction process, upon creating a copy of data, whether it be the original copy or items identified from that original copy, that the reports that were generated were placed in secure FBI evidence upon creation.

A   Yes.

        MS. THOMPSON:  I object because that mischaracterizes the testimony.  The disks --

        MR. BERNARD:  Your Honor, I'd ask that this discussion be held at side bar.

        THE COURT:  All right, go ahead.

(At side bar.)

THE COURT: Yes.

MS. THOMPSON: Counsel's questioning, stating that all the reports were held in a secure area, but that's not accurate, what was testified to.

Sarvey testified that the disk -- and that's all that Sarvey was shown, were the disks -- are what was secured. Agent Simpson's reports, which were 31, 32, 33 and 34, which were the written produced documents -- the physical documents, they were not in that secure facility. So that's why I said it mischaracterizes the testimony.

MR. BERNARD: Judge, I don't know if this is a misunderstanding of the process or an intent to mischaracterize this process to the jury. But it was testified to by Special Agent Simpson and Senior Forensic Examiner Sarvey -- and I believe we had this discussion at side bar when they were testifying -- that the process is the cellphones are recovered by the FBI, placed into secure FBI evidence.

A search warrant is obtained by the case agent. The search warrant is provided to the forensic examiner. The forensic examiner then removes the particular devices from secure evidence storage and conducts a full extraction of those devices, which is a direct copy of the data being stored on those devices.

They then process that data through a program which

was identified as either Cellebrite or Gray Key. That processed data is then made available to the case agent in read only format on a secure FBI server. The case agent can then go in and place tags -- just tags referencing which items are relevant to their investigation, at which point they then notify the forensic examiner. The forensic examiner then generates a report based on those tags, and then that report is placed into secure FBI evidence as well.

And we admitted those exhibits through both Senior Forensic Examiner Sarvey and Special Agent Simpson. Those reports are not created in the sense that they are edited or manipulated in any way by the case agent or the forensic examiner. The only thing that the Special Agent had the ability to do is tag items of interest for generation of the report and include comments to the data, but not manipulate the data itself.

THE COURT: This witness has no knowledge of that other than what you heard in court.

MR. BERNARD: Judge, that's correct; and I'm rehashing because here's the issue --

THE COURT: Really, what you're doing is you're reading the other witness's testimony into the record again, and you're asking this witness if he heard it or not.

Well, the jury has already heard all of this.

MR. BERNARD: Because it calls into question this

witness's credibility when he says that these messages were not on the iPhone because the process that was followed proves that those items came directly from that device.

THE COURT: That's your case. I mean --

MR. BERNARD: Well, it certainly --

THE COURT: It's what you'll tell the jury, and you have testimony to back that up. But -- that's his testimony. He says: I wasn't on there. You have evidence that evidently you believe that may show that that's not possible, that it had to be on there. This witness doesn't have any information about that.

MR. BERNARD: Well, he heard --

MS. THOMPSON: It's argument.

MR. BERNARD: Okay. It's cross examination, so it's leading questions.

THE COURT: I understand. But he doesn't -- I don't see how he has any -- other than say he heard it, that he doesn't have any information on any -- he doesn't know how this works.

MR. BERNARD: It calls into question the veracity of any other testimony. If you disbelieve that these items were not on the phone as a result of the process that was followed --

THE COURT: That's argument; you can make that argument --

MR. BERNARD: Well, I need to present that through his -- I need to show the contradiction between what he's saying and what he heard to articulate to the jury that these two things are contradictory things.

MS. THOMPSON: It's all argument.

THE COURT: He's testified already that this wasn't on there -- he doesn't think it was on there. You have what you believe is to show it was on there. That shows the contradiction, and then you argue that to the jury.

But I don't know how questioning him about this is going to get any more information other than him saying: No, it was not there. How do you explain that? I can't explain it.

MR. BERNARD: Okay, fine.

THE COURT: It's really -- you're getting into closing argument, aren't you, showing that he is not testifying truthfully because it had to be on there? Okay. You can make that argument.

MR. BERNARD: Okay.

THE COURT: Understand? I just don't see where it's additional evidence.

MR. BERNARD: Okay.

THE COURT: Where are you going with this -- ask him how he explains this --

MR. BERNARD: I'd like to know if he's implying

essentially that Senior Forensic Examiner Sarvey's a liar, Special Agent John Simpson's a liar, Trooper Marmol's a liar --

THE COURT: His testimony implies that; you can make that argument --

MR. BERNARD: Certainly.

THE COURT: -- to the jury, but I concur that this is really just -- you're just reiterating what Sarvey said and getting it in twice, basically.

MS. THOMPSON: And those are more direct cross examination questions --

MR. BERNARD: Okay. That's fine.

MS. THOMPSON: -- actually.

MR. BERNARD: I'm good.

THE COURT: I don't dispute what you're saying, I just don't think it's proper evidence. Okay?

MR. BERNARD: Okay, thank you.

(In open court.)

MR. BERNARD: Your Honor, may I proceed?

THE COURT: You may, yes.

MR. BERNARD: Thank you, Your Honor.

BY MR. BERNARD:

Q   So, Mr. Terry, is it your testimony that you never owned an iPhone-8?

A   Did I ever own one, ever?

Q   Did you own an iPhone-8?

A   Yes, I owned an iPhone-8 before.

Q   Okay.  Is it your testimony that you owned the iPhone-8 that was found inside a 2010 Ford Taurus on April 4th, 2018?

A   Can I correct myself first?

Q   No, sir.  Answer my question, please.

A   Oh, okay.  Well, I didn't own an iPhone-8; I owned an iPhone before.

Q   Did you happen to own an iPhone-6?

A   I don't know the number.

Q   Okay.  Did you own the iPhone-8 that was recovered as a result of the traffic stop on April 4th, 2018?

A   No.

Q   Okay.  You would agree that there was testimony that a substantial amount of information related to you was found on that device; is that fair to say?

A   No.

Q   You did not hear that testimony?

A   I heard the testimony, but I don't agree.

Q   Okay.  So that testimony started with Senior Forensic Examiner Justin Sarvey, is that right?  Do you recall his testimony?

A   Yes.

Q   Okay.  And you recall hearing him say that he completed a forensic extraction from that iPhone, right?

A   Yes.

Q   So, if I'm to understand this correctly, as a result of his extraction process, he -- he indicated that there were items related to you found on that device; but you're saying that that device did not belong to you.  Right?

A   Yes.

Q   Therefore, you're saying that Senior Forensic Examiner Sarvey is a liar.

MS. THOMPSON:  I am going to again object that it mischaracterizes Examiner Sarvey's testimony because he was not able to identify John Terry.

MR. BERNARD:  Judge, if the forensic examiner testified that he made an exact copy of the phone, and John Terry is testifying that these items found on the phone were not on there or should not be on there, then the inference is that Senior Forensic Examiner Sarvey must be lying.

THE COURT:  I'll sustain the objection to the form of the question.  There are other alternatives than what you've put forth as his answer.

BY MR. BERNARD:

Q   So, Mr. Terry, you do not believe that the items that were presented through Government's Exhibits -- the 32 series, if you want to look back at those -- you don't believe that those items related to you.

A   Thirty-two what?

Q   Were on that iPhone.

A    C?

Q    Let's go through them one by one.

        MR. BERNARD:  Mr. Flannigan, will you please display 32A.

BY MR. BERNARD:

Q    Mr. Terry, take a look at the screen.  You'd agree that 32A appears to depict a conversation which includes a photograph of your Pennsylvania identification card.  Is that right?

A    Yes.

Q    You'd agree that the time stamp on that communication says that that communication occurred on December 18, 2017.  Is that accurate?

A    I don't know about the time.

Q    That's not what it says on the exhibit?

A    Oh, that's what it says on exhibit.  You said do I agree that that's the time.

Q    Right.  All I'm asking is to confirm that the time --

A    Okay, that's what it says on the exhibit, yes.

Q    Okay.  So your testimony is that this conversation was not you.

A    I'm saying that that conversation, if it was me, was not on an iPhone because I don't have an iPhone.  I'm saying it was on the Samsung, correct.

Q    Okay.

        MR. BERNARD:  Would you please move to Government's

Exhibit 32D.

BY MR. BERNARD:

Q   Mr. Terry, take a look at this photo.  This appears to be a letter from T-Mobile addressed to you.  Is that correct?

A   Yes.

(Off the record discussion between Government counsel and the Mr. Flannigan, the IT technician.)

BY MR. BERNARD:

Q   Mr. Terry, we're also showing Exhibit 32E side by side with Exhibit 32D.

Now, I believe you testified regarding 32E on direct examination, is that correct?  Do you recall that?

A   Yes.

Q   Okay.  And you identified that this file does not indicate that it was from an iPhone-8.  Is that right?

A   I said what?  Excuse me?

Q   I believe your attorney asked if in that second box it indicates whether that file was from an iPhone-8.

A   Right.

Q   Okay.  So you see in that second box as well where it says modified?

A   Yes.

Q   You'd agree that the date that appears there is March 16, 2018.  Correct?

A   Yes.

Q   Okay.  So that indicates that that particular file was modified on that particular date.  Is that right?

MS. THOMPSON:  I'm going to object because it lacks foundation; he doesn't have metadata expertise.

THE COURT:  Well, if he knows, he can answer.

Sir, go ahead.  Is that what that means?

THE WITNESS:  That's what it appears to mean.  I'm not sure.

MR. BERNARD:  Mr. Flannigan, could you please display Exhibit 32F.

BY MR. BERNARD:

Q   Now, Mr. Terry, this 32F, you would agree, depicts a -- what appears to be a conversation between the telephone number ending in 8544; is that correct?

A   Yes.

Q   Do you see the time stamp listed in the conversation bubble next to the word "Gees"?

A   Yes.

Q   You would agree that that time stamp appears to say 2/12/2018, 4:30:42 p.m. eastern standard time; is that right?

A   Yes.

Q   Okay.  And the content of that text bubble says, "Meet me at our parents' house."  Is that right?

A   Yes.

Q   Do you recall during Special Agent Simpson's testimony

hearing whether or not he had learned whether Gerald Terry had provided any telephone numbers to the Pennsylvania Board of Probation and Parole?

A   Can you repeat that, please?

Q   Sure.  Do you recall Agent Simpson testifying whether or not he had received any information about telephone numbers that Gerald Terry had provided to Pennsylvania Probation and Parole?

A   No, I don't recall.

Q   Okay.  Were you listening to the trial, Mr. Terry?

A   Yes.

Q   Okay.

MR. BERNARD:  Mr. Flannigan, could you please display 32H and 32K.

BY MR. BERNARD:

Q   Mr. Terry, 32H, that's a photo you, right?

A   Yes.

Q   Okay.  And does it appear as if that photo of you was involved in the conversation displayed in 32K?

A   That photo is 15, 16 years old.

Q   Okay.  But does it appear that that photo also appears in Exhibit 32K?

A   Yes.

Q   Do you recall having this conversation?

A   Yes.

Q   It's your testimony that this conversation occurred on your Samsung phone, though, is that right?

A   Correct.

Q   Do you have any reason to doubt the time and date stamp that is depicted on that conversation?

A   Can you make the time bigger?

Q   Sorry?

A   You said time and date, right?

Q   Yes.  It appears that that conversation occurs between March 11th and March 12th, 2018.  Is that accurate per the exhibit that you see in front of you?

A   Yes.

Q   You have no reason to dispute that that's when that conversation occurred?

A   I don't know what date you're saying, but -- it could possibly happen that date.

Q   Okay.

     MR. BERNARD:  Mr. Flannigan, can you please display 32W.

BY MR. BERNARD:

Q   Mr. Terry, do you recall that Exhibit 32W purports to be a list of contacts between the iPhone and the number ending in 7569 from the dates April 1st through April 4th, 2018?

A   Yes.

Q   Okay.  And you've identified that the number ending in 7569

belongs to your fiancee, is that right?

A    Yes.

Q    And she's identified in your phone as Wifey?

A    Yes.

Q    Okay.  So you have no reason to dispute that you contacted that number 33 times between April 1st and April 4th, 2018?

A    No.

Q    Your only contention is that those conversations occurred on your Samsung, not on the iPhone.

A    Yes.

        MR. BERNARD:  Mr. Flannigan, could you please publish Exhibit 32AB -- I'm sorry, 34A and B, sorry.

BY MR. BERNARD:

Q    So, Mr. Terry, you agree that this conversation depicted here occurred on your Samsung Galaxy, is that correct?

A    Yes.

Q    All right.  And you'd agree that that conversation occurred between you and your brother's wife?

A    Yes.

Q    All right.  In that conversation, the first bubble states, "This big bro wife.  1429 Grant Street, Braddock, PA, 15104." Is that correct?

A    Yes.

Q    The second bubble states, "Your bro other phone is down," is that correct?

71

John Terry - Cross Examination

A   Yes.

Q   So you would interpret that as your brother identifying himself as being the person who's texting from that number, is that fair to say?

A   Yes.

Q   Okay.  So in that text, your brother, through his wife's phone, sends you the address 1429 Grant Street, Braddock, PA, 15104.  Is that right?

A   Yes.

MR. BERNARD:  Will you please publish 34B.

BY MR. BERNARD:

Q   Now, Mr. Terry, would you agree that this appears to be a communication also sent from your Samsung Galaxy ending in 7556?

A   Yes.

Q   Do you recall this text message having been sent?

MS. THOMPSON:  I'm sorry, I'm not sure, did you say it was sent from or to?

MR. BERNARD:  Text sent from.

BY MR. BERNARD:

Q   Do you recall having sent this text from your Samsung Galaxy?

A   Do I recall sending the text?

Q   Yes.

A   I don't recall sending the text, but I see the text date.

Q    Okay.  So backing up to Senior Forensic Examiner Justin Sarvey, Special Agent James Simpson again, do you dispute that the items that they have produced as coming from the Samsung phone, your Samsung phone, actually came from that device?

A    Repeat that, please.

Q    Sure.  You've indicated that you do not believe that all of the items found on the iPhone have come from the iPhone, is that right?

A    Correct.

Q    Do you believe that the items that were produced during this trial as having come from the Samsung did, in fact, come from the Samsung?

A    I believe that some of the items came from there, and there was a lot of things mixed up.

Q    So the ones that are incriminating, those did not come from the phones that they --

A    I don't know what's incriminating or not.  I'm just saying what I don't know.

Q    Conversations that show your identification on an iPhone containing half kilos of cocaine, that one didn't belong to you, right?

A    That don't belong to me.

Q    Okay.  Conversations between two parties wherein the user of that iPhone says "Can take the thing off the radio where I

keep my pistol," that wasn't your conversation?

A   That was not my conversation.

Q   Photos showing you and a female on the iPhone exactly five days after photos of half kilos of kilogram were taken by that iPhone, those were not yours?

A   Those were not mine.

Q   Communications with Gerald Terry that occurred from the iPhone, you did not have those conversations, is that right?

A   That's correct.

Q   The entering of the address 1429 Grant Street, Braddock, PA, into the Apple Maps Program on the iPhone, it's your testimony that you did not enter that address on that phone.

A   That's correct.

Q   Regarding that address, you did say that you entered it into your mapping program on your Samsung; is that right?

A   Yes.

Q   So you saw where that address was located?

A   Yes.

Q   You saw that it was a residence, right?

A   I don't recall what it was.

Q   You didn't think any -- you didn't have any concern about accompanying your brother to a so-called Narcotics Anonymous convention that was occurring at a private residence?

A   I didn't know if it was a private residence or not.

Q   Okay.  But you looked it up.

A    That don't mean that I knew it was a private residence.

Q    Okay.

So it's your testimony that you knew nothing about the three kilos and the firearm that were found in a hidden trap in the Ford Taurus, is that right?

A    Yes.

Q    And you deny ever stating to Trooper Marmol that you were responsible for the vehicle, is that right?

A    Yes.

Q    Okay.  Now, there was somebody else in the car that day, is that correct?

A    That was pulled over?

Q    Yes, sir.

A    Yes.

Q    And that was your brother Gerald Terry, is that right?

A    Yes.

Q    So he would have knowledge of what went on that day, right?

A    Yes.

Q    Okay.  Do you know where he is currently?

        MS. THOMPSON:  Your Honor, may we approach?

        THE COURT:  Yes.

    (At side bar.)

        MS. THOMPSON:  Perceiving he's going down an improper line of trying to say that why isn't he bringing Gerald Terry here to testify?  Gerald Terry is equally available to the

Government.

MR. BERNARD: And we will call him; we intend to.

MS. THOMPSON: But that is -- his current questioning, do you know where Gerald Terry is, and without calling Gerald Terry, would be totally improper because he doesn't have any burden to bring any witness forward.

MR. BERNARD: I just want to know if there's a corroborating witness who is available.

MS. THOMPSON: But that's improper. That's improper.

MR. BERNARD: I'm not going to ask him if he's calling him or didn't call him.

THE COURT: Well, what does this have to do with where he is currently?

MR. BERNARD: Just whether he's available.

THE COURT: I'll sustain the objection.

(In open court.)

BY MR. BERNARD:

Q   Mr. Terry, is it your testimony that you've never met Robert Dillard before?

A   Yes.

Q   Okay. So if Mr. Dillard came in here, as you saw, and said that he knew you, he'd be lying?

A   Yes.

Q   Okay. So if Agent Simpson said that your iPhone had contacted -- the contact you know as Wifey, was your fiancee,

33 times between April 1st and April 4th, 2018, he'd be lying?

A   You said if Dillard said what?

Q   No.

A   If Dillard came in here and said what?

Q   No, sir.  Agent Simpson.  Agent Simpson has testified that your -- that the iPhone had contacted your fiancee 33 times between April 1st and April 4th, 2018, he would be lying.

A   My Samsung contacted it; so, yes.

Q   Okay.  So if Senior Forensic Examiner Sarvey testified that he made an exact copy of the iPhone, and there appears conversations that you're saying came from the Samsung, therefore Senior Forensic Examiner Sarvey would be lying when he said he made a copy.  Is that right?

A   I don't know if he would lying when he said he made a copy. But he'd be lying if he said that the Samsung didn't send the messages.

Q   And, as well, it's your testimony that when Trooper Marmol said that you accepted responsibility for the vehicle, he was lying, too.

A   Yes.

Q   Okay.

MR. BERNARD:  No further questions, Your Honor:

THE COURT:  Redirect, Counsel?

MS. THOMPSON:  Briefly.

REDIRECT EXAMINATION

BY MS. THOMPSON:

Q   Mr. Terry, in the beginning you were asked on cross examination, you said you were 47 years old?

A   Yes.

Q   But you didn't even remember Gerald Terry's age; he's your big brother.  Can you do the math?  Do you remember how much older he is of you?

A   I don't know exactly, but -- I would think probably five or six years older.

Q   So you have yourself, then -- did you say Lawrence and then Anthony?

A   Yes.

Q   How much older is Lawrence of you?

A   I think two or three years.

Q   Okay.  And how much older is Anthony than Lawrence, if you know, or you.

A   Maybe three or four years.

Q   Okay.  And you were asked about -- there was no time given, but did you ever in your life own an iPhone?  And I guess specifically an iPhone-8, and you wanted to correct yourself.

     So did you own an iPhone-8 ever?

A   No.

Q   Okay.  Did you own an iPhone-8 Plus ever?

A   No.

Q   When is the last time you recall that you may have owned an

iPhone?

A   Maybe 2014.

Q   And do you remember what generation of iPhone that may have been in 2014?

A   No.

Q   You were asked a lot of questions about remembering somebody else's testimony.  Do you remember everything that everybody testified in the last three days or so?

A   No, ma'am.

Q   Were you trying to pay attention?

A   Yes.

Q   Okay.  So you were asked if all these people were liars. What is your truth about whether or not you used the iPhone-8?

A   My truth is I never used a iPhone-8 for nothing, calling, receiving, texts or anything.

Q   And on April 4th, 2018, how many cellphones did you have?

A   One cellphone.

Q   And what type of cellphone was that?

A   A Samsung Galaxy-8.

        MS. THOMPSON:  Nothing further.

        THE COURT:  Recross, counsel?

                RECROSS EXAMINATION

BY MR. BERNARD:

Q   Your brother Gerald's nickname is Geez, right?

A   Yes.

Q    Okay.

MR. BERNARD:  Mr. Flannigan, would you please publish Exhibit 32F.

BY MR. BERNARD:

Q    Mr. Terry, you would agree that that exhibit appears to show a conversation wherein the contact in the iPhone listed as Geez at a telephone number ending in 8544 sends a text message stating, "Meet me at our parents house."  Is that correct?

A    Yes.

MR. BERNARD:  Mr. Flannigan, would you please turn to Government's Exhibit 32AB.

BY MR. BERNARD:

Q    Mr. Terry, you would also agree that this exhibit appears to be a text message sent by the contact named Geez to the iPhone.  Is that correct?

A    Yes.

MR. BERNARD:  Mr. Flannigan, would you please turn to Government's Exhibit 32AC.

BY MR. BERNARD:

Q    Mr. Terry, you would also agree that this exhibit appears to show another message sent by a contact named Geez from telephone number ending in 8544 to the iPhone.  Is that correct?

A    Yes.

Q    Now, on April 4th, 2018, how many people were in the red

Ford Taurus that was stopped by Trooper Marmol?

A    Two.

Q    That would be you and your brother Gerald, right?

A    Yes.

MR. BERNARD:  Thank you.

No further questions, Your Honor.

THE COURT:  Any redirect, counsel?

MS. THOMPSON:  Just --

REDIRECT EXAMINATION

BY MS. THOMPSON:

Q    For the exhibits that the Government just showed you, 32F, 32AB and 32AC, do you know how they were created?

A    No.

Q    Do you know whether or not they are accurate in what they portray?

A    No, they are not.

MS. THOMPSON:  Thank you.

THE COURT:  Anything additional, counsel?

MR. BERNARD:  No, Your Honor.

THE COURT:  All right, that completes the direct and cross.

We're going to take our luncheon recess at this point, ladies and gentlemen of the jury.  I have a little bit after noon; we'll start again at 1:00 p.m.

During this recess, the same restrictions,

admonitions, and instructions apply as to prior recesses. Please be back by at least five minutes before 1:00 so we can try to get started.

I'm going to advise now that I have some administrative things that I need to do with counsel in the case. It's possible that I will have them in court going over that when you get back. So if you don't get back into court immediately, you can blame me. It's my fault. So we'll get started as soon as we can, though. Okay?

All right. Thank you. We'll be in recess.

(Jurors exit courtroom.)

THE COURT: Please be seated. The jury has left the courtroom, so these remarks are outside the hearing of the jury.

Attorney Thompson, that completes your testimony from the Defendant. What other witnesses, if any, are you calling?

MS. THOMPSON: So I have to look to see whether or not the character witnesses are out there. I also wanted to have another conversation with Mr. Terry about Gerald Terry, just to confirm. And -- so maybe -- the characters are brief. Maybe I have one other brief witness that I have to confirm with Mr. Terry.

THE COURT: All right. So it sounds if -- as if -- even if you call these additional witnesses, that you're going to finish say within an hour after we start again?

MS. THOMPSON: I would say -- if we called Gerald Terry, I would imagine he would be the longest of the witnesses.

THE COURT: Okay.

Attorney Bernard, Attorney Sheehan-Balchon, do you anticipate having rebuttal witnesses at this point?

MR. BERNARD: At this point, I would say that it depends on whether or not the defense calls other witnesses.

THE COURT: You have no specific intention at this point to call anyone?

MR. BERNARD: Not at this time.

THE COURT: The reason I'm asking is I'd like to get a charging conference in while the jury is away from the courthouse.

So, Attorney Thompson, you said you had certain things you'd like to do in terms of talking to certain people. If we started the charging conference at 12:30, would that give you sufficient time to do that?

MS. THOMPSON: Oh, yes, Your Honor. That should be fine.

THE COURT: Okay. Well, let's take our recess then until 12:30. Come back in and we'll do the charging conference outside the hearing of the jury. We'll try to complete that because I want to be ready to go to closing arguments if we finish with the testimony today. I don't want to delay and go

until tomorrow because we have other parts of the trial to finish also. So if we get to closing arguments today, I want to do them today.

So we can't really do that until you know what my instructions to the jury are going to be. So please be back in here at 12:30 and we'll go through -- I'm not going to try to go through the second set of instructions, and I'm not going to try to go through the second verdict form; but I do want to go through the verdict form for this portion of the case and the instructions to the jury, so if you're ready to discuss those.

As far as the others are concerned, I believe we should have time to do those tomorrow and still get everything to the jury tomorrow for the second phase.

So I'll see you back in here -- I have about 12:07. I'll see you back in here in about 20 minutes then.

(Luncheon recess taken.)

(In open court.)

THE COURT: All right, this session is without the jury. Thank you for coming in during your lunch hour. I want to keep the case moving.

I'm going to work from the rough draft of final jury instructions, phase one. And it would be one that Mr. Keys just provided to you -- I think it's dated today at 12:13 p.m.

Is that right?

MR. KEYS, LAW CLERK: Yes.

THE COURT: All right. Rather than -- I don't want to go through each one of these unless you have something you want to say about it. So let's start with 1.01 through 1.08. Are there any of those that we need to talk about?

MR. BERNARD: No, Your Honor.

MS. THOMPSON: No, Your Honor.

THE COURT: Okay. How about 2.01 through 2.12?

MR. BERNARD: No, Your Honor.

MS. THOMPSON: No, Your Honor.

THE COURT: Okay. You note the last two of those, we're not sure if we're going to need them or not. It has to do with character witnesses. It says if necessary.

3.01 through 3.07 -- by the way, these are all taken from Third Circuit standard instructions.

Go ahead, do you have anything?

MS. THOMPSON: No, Your Honor.

MR. BERNARD: No issues, Your Honor.

THE COURT: All right. 4.01 through 4.08.

MS. THOMPSON: I see no issues.

MR. BERNARD: No issues, Your Honor.

THE COURT: All right. So we're now to 5.01 and 5.02. Any issues with those?

MS. THOMPSON: No.

MR. BERNARD: No, Your Honor.

THE COURT: All right. That's good.

Now, do you have the copy of the jury verdict slip as Count 1?

MS. THOMPSON: The only thing, Your Honor, before we move on from the jury instructions -- and maybe I -- I apologize if I didn't understand. I didn't have any issues with what was printed here, but I didn't know -- like I think on the first draft 2.18 was on for impeachment of a witness, prior bad acts. And I was looking at that for Robert Dillard.

THE COURT: I think Dillard had to do with prior conviction, correct?

MS. THOMPSON: He also, yes, had prior convictions. He also was arrested or questioned about drug activity on or around July of 2018. Plus, in October 2018 -- he was talking about also a state parole violation, which is why he was imprisoned at the time that the officials came and interviewed him. And again they also interviewed him about his July 2018 criminal drug activity on that particular day.

THE COURT: Well, I do have a prior bad acts -- that has to do with Defendant. As far as Dillard, since we have in there that he has a prior conviction that calls into question the weight to be given to his testimony, I don't know. What do you think, Mr. Bernard, about the other issues?

MR. BERNARD: Your Honor, I think Mr. Dillard's pretty well covered in the instruction regarding cooperating witnesses, and I don't believe it's necessary to include

impeachment by prior bad act. I think he's well covered in Section 2.05.

THE COURT: I think so, too. I think he definitely calls into question how much weight to give to his testimony in at least two of those sections in here. I don't know that we need anything additional after that.

You could certainly argue it to the jury -- I'm sure you will -- that his testimony is not to be relied upon. And you can certainly mention those other things also. You're not precluded from mentioning the fact that he's had parole issues and that sort of thing.

MS. THOMPSON: Okay. And while we're speaking on that, what the Court already directed to 2.10, in the first paragraph of that --

THE COURT: Which one are you referring to?

MS. THOMPSON: Page 15, 2.10.

THE COURT: Just let me look there -- Page 15?

MS. THOMPSON: Yes.

THE COURT: Just one moment -- okay. Yes, 2.10; yes.

MS. THOMPSON: And can this be reworded in reference to: You heard the testimony that Defendant, Mr. Terry, possessed photographs depicting pressed cocaine -- that it was the testimony that Defendant possessed an iPhone that contained photographs --

THE COURT: Well, it's certainly -- it only says you

heard testimony about that, but you also have Mr. Terry testifying that the phone's not his, and those statements were not --

MS. THOMPSON: Right, that's why I was thinking that pulling the jury into -- that this is related to the iPhone is important, including something about the iPhone.

THE COURT: Well, we do limit it there, Counsel, in the second paragraph as to what they can use that for.

You may use this in considering whether he was the individual who possessed the Samsung and the iPhone. So it's one of the issues that it goes to.

MS. THOMPSON: Well, the second paragraph -- can we eliminate the Samsung, because I don't think that is of issue, that he possessed the Samsung, because -- I don't want them to be confused on the issues they are deciding. So we can eliminate the Samsung Galaxy and then continue with everything else.

THE COURT: Mr. Bernard?

MR. BERNARD: Judge, I agree with the way it's phrased. I think the -- I think the way the evidence has been presented, there are commonalities present between the iPhone and the Samsung. So, yes, we have Mr. Terry who admitted to possessing and using the Samsung; but if perhaps the jury discredits his testimony, then I would want to -- or hope that they would rely upon other commonality between the two devices

to attribute both of them to Mr. Terry.

And so I think evidence that is present on one phone makes more probable possession of the other phone; so, therefore, I would hope they both be included in the charge.

THE COURT: I think you can argue that. He doesn't seem to be denying the fact that he owned the Galaxy, though. So I agree to some extent we were putting this in here because we weren't certain if he would acknowledge that was his phone or not.

So we can take the Samsung Galaxy out, but you can include it in your closing.

MR. BERNARD: Okay.

THE COURT: So we'll eliminate the word "Samsung Galaxy" in Paragraph 2.

Anything else, Attorney Thompson?

MS. THOMPSON: No, Your Honor.

THE COURT: Okay. That concludes the instructions, then, anything further?

MS. THOMPSON: Yes, Your Honor.

THE COURT: I couldn't hear you.

MS. THOMPSON: Yes.

MR. BERNARD: Yes, no other objections.

THE COURT: Okay. The microphones either aren't picking you up very well or I'm just not hearing you very well. So sorry I keep saying -- asking you to repeat things. I know

I'm soft spoken, so sometimes you're not hearing me correctly either, so I -- so we'll go ahead with this draft with that one revision that we made, and this is what I will read to the jury.

And since we're here without the jury in the courtroom, Attorney Thompson, can you give me a better update on where you're going from here?

MS. THOMPSON: Yes, Your Honor. We're going to call Gerald Terry. Again, it's still my understanding that he intends to allege Fifth Amendment for the details and the contents of the iPhone.

And then we do have a character witness.

THE COURT: You have one character witness?

MS. THOMPSON: He's the only one that's currently still out there, so --

THE COURT: And Mr. Gerald Terry.

MS. THOMPSON: Yes.

MR. BERNARD: Judge, I just wanted to make a clarification. Is Mr. Gerald Terry going to be seeking -- claiming Fifth Amendment privilege as to any testimony or only with reference to questions about the content on the iPhone?

MS. THOMPSON: As I understand it, he's basically explained, from his experience in communications with other people in the federal penal system, the other drug activity that was involved in on that iPhone could lead to additional

charges. So that's what I understand as the basis for the Fifth Amendment. So as I understand it, the Fifth Amendment claim is only to the iPhone.

MR. BERNARD: So it's not for the risk of perjury?

MS. THOMPSON: That's the only one -- that's the only thing that I know of, the iPhone, and because it would lead to other charges.

THE COURT: Other drug charges that are covered.

MS. THOMPSON: Right, right.

THE COURT: Okay. Does that clarify?

MR. BERNARD: Somewhat, Your Honor.

I mean is that permissible, to piecemeal the Fifth Amendment privilege like that to afford examination into certain aspects of your testimony that the Defendant wishes the jury to believe while shielding yourself from others?

MS. THOMPSON: I think that would be the Government's argument, if they want to make that to the jury. But yes, absolutely.

So if a person is called to testify, even if they claim a Fifth Amendment privilege, if they are asked questions for which that Fifth Amendment privilege does not apply, then they are also compelled to answer those questions.

And then for the issue that the Fifth Amendment applies, then, again, whether or not they're going to be compelled is really up to the Court, obviously, on that. But

to answer can they piecemeal that Fifth Amendment, I believe, yes. It's either some that's incriminating, some is not incriminating.

MR. BERNARD: So then I presume that he would be testifying in conformity with the facts of the case already agreed to during his change of plea hearing and sentencing hearing? You will not be presenting perjured testimony?

MS. THOMPSON: I have attached as Defendant's Exhibit O and P as his change of plea and sentencing hearing. I did redact some irrelevant parts.

But, actually, counsel has the full; so as I understand it, he's not going to be contradicting any of those because he's saying at those hearings he took full responsibility for what he did.

MR. BERNARD: Which was conspiring with John?

MS. THOMPSON: No, that is not what he said.

MR. BERNARD: So he did not plead guilty to Count 1 of this superseding indictment?

MS. THOMPSON: Does it say in the -- it does not say in the transcript, "I'm guilty of conspiring with John Terry." It does not say that.

MR. BERNARD: It says to Count 1, and the Court specifically asked him, "Is Count 1 true to the best of your knowledge, information and belief?" And his answer is yes.

MS. THOMPSON: And -- it does say with other persons,

does it not?

MR. BERNARD: It says, "Is it true to your knowledge, information and belief," referring to as it is written, "is it true."

MS. THOMPSON: Well, I --

MR. BERNARD: He has an opportunity to give conditions, if he wants.

MS. THOMPSON: So, again, I'm not sure if Your Honor wants to get into this argument or not, but I think that's something as far as cross examination and what Gerald Terry's understanding of that was.

You know, I have the transcript. I can read what it actually says that he admits to. So -- we can go through what it actually says. He can be questioned as to what you told him about John Terry or somebody else. It's my understanding he is going to -- you know, he said he was in contact with Robert Dillard. So that would be the other person.

THE COURT: So if you have a transcript where he answered a question about the Count 1 --

MR. BERNARD: I do have it.

THE COURT: -- then you could use that in questioning him; and if his testimony is different than it was at the time of the plea, then that's the chance he takes.

MR. BERNARD: Well, has this witness been -- I mean has he consulted with counsel regarding his potential exposure

to perjury charges in this case?

MS. THOMPSON: So let me just be frank. So the Government is now talking about having Gerald Terry have counsel. We decided not to call Gerald Terry, and we weren't going to call Gerald Terry; and the Government said, "We're going to call Gerald Terry."

The only real reason why we would call Gerald Terry now in the defense case is because Gerald Terry is very adamant that in no way, shape or form does he want the Government calling him. So either the Government is going to raise Gerald Terry cannot testify, and then we won't call him.

THE COURT: Well, are you saying that if the Government doesn't intend to call him, then you won't call him?

MS. THOMPSON: That's correct.

THE COURT: Okay.

Your intent, sir?

MR. BERNARD: So here's the position in which the Government is placed.

The Government had the opportunity to call Mr. Terry, Gerald, and it would appear that he is poised to offer perjured testimony. That is, testimony which contradicts the facts that he agreed to at his change of plea hearing.

Mr. Terry would have the ability to invoke the Fifth Amendment privilege as to that line of questioning as well as to the line of questioning concerning the items on the iPhone.

My only concern about not calling Gerald Terry is that at the time of closing arguments the defense will say the Government could have called Gerald Terry, but they did not. So, if that means that I have to call him, advise him of his Fifth Amendment rights, advise him of the penalties of perjury, then so be it.

But I don't think it's -- I don't think it's fair for one side to utilize the Fifth Amendment privilege as sword and shield in order to permit the presentation of what's likely to be perjured testimony.

THE COURT: Well, it's all conjecture right now because neither party has called him.

MR. BERNARD: That's correct.

THE COURT: Yes. So -- if -- if the Defendant does not call him, the same thing applies for you arguing to them. So it goes both ways.

MR. BERNARD: No, I'm prohibited from making that argument, Judge. I'm prohibited from arguing that the --

THE COURT: Not if she brings it up.

MR. BERNARD: If she says that the Government didn't call him, then the Government is permitted to say, "Well, they could have called him, too"?

THE COURT: I didn't research it, but it seems likes it's reasonable.

MR. BERNARD: Okay.

THE COURT:  We can check on that --

MR. BERNARD:  I will have to.

MS. THOMPSON:  You don't happen to have a copy of Gerald Terry's --

(Off the record discussion.)

THE COURT:  I do know at the plea hearing he would have been asked if the charges are true and correct to the best of his personal knowledge, and that would include the fact that John Terry was part of the conspiracy at that.  I don't know that he can now turn around and say that I was only talking about the other people.

MS. THOMPSON:  I didn't see that that's how it was worded.  I wanted to make sure because I understand that the superseding indictment says John Terry and/or others, known to the Government.  And so --

THE COURT:  It probably does, but John Terry's name is in there.

MS. THOMPSON:  Right.

THE COURT:  And the question would have covered that.

MS. THOMPSON:  Right.  It said -- but if it says and/or others known to the Government, that "or" is what he pled to.  So that wasn't specifically, so I'd have to say --

MR. BERNARD:  I can clarify that.  It says:  The Grand Jury charges between on or about March 30th, 2018, to on or about April 4th, 2018, in the Western District of Pennsylvania

and elsewhere, the Defendants John T. Terry a/k/a Tyree Terry, and Gerald Terry and others known to the Grand Jury did knowingly, intentionally, and unlawfully conspire, confederate and agree, et cetera. It lists both of them in the conjunctive with the word "and."

So, therefore, when John Terry -- Gerald Terry says it is true, he is admitting that it is true that he conspired with his brother John.

MS. THOMPSON: So the charges are that the two did it --

MR. BERNARD: I mean that's only one point, you know. There's the factual summary that I put on at the change of plea hearing as well during which I indicated, "Cellphone data contained conversations between John and Gerald that included the coordination of the transport of the three kilos of suspected cocaine as well as photos of controlled substances and other pictures."

The Court asks the Defendant, "Mr. Terry, you were present when the Assistant United States Attorney described the evidence that he would produce if this matter would proceed to trial. Is there any respect in which you disagree with what he said?"

Mr. Terry, "No, Your Honor."

So, any claim that he did not conspire with John would be perjured testimony.

MS. THOMPSON: Well, he would plead the Fifth to that as well, I'm sure.

THE COURT: Well, as long as he's aware of his jeopardy --

MS. THOMPSON: Well, I would -- so, again, we had decided not to call Gerald, so that would be up to the Government, if they're going to call Gerald, and then he would have to plead the Fifth.

MR. BERNARD: Would you want that to be in the presence or outside the presence of the jury?

THE COURT: What?

MR. BERNARD: If Gerald were to plead the Fifth.

THE COURT: It's part of the examination; it would be in their presence, so --

MR. BERNARD: Okay.

THE COURT: I mean what he would answer would be the protected portion, not that he's taking the Fifth Amendment.

MR. BERNARD: Right. Right. But would you want the jury to see the invocation of the Fifth Amendment?

THE COURT: Again, we can check on that. But I would think that that would be something that would be part of the examination.

MR. BERNARD: Okay.

THE COURT: But we can check on that, if it's an issue.

MS. THOMPSON: So, actually, I would not have the ability to argue that the Government didn't call Gerald because he's equally available to both. So I don't believe I would have that argument if they didn't call him, in answer to the Government's question.

THE COURT: Well, does that mean you're not going to make that argument?

MS. THOMPSON: Right, of course. Yeah, I wouldn't make that argument because to me common sense says, honestly, that John Terry could call Gerald. So I think really not calling Gerald, I think, is going to leave a gaping hole for John Terry. So -- and that's a risk we wind up taking, too.

MR. BERNARD: Well, I'd like -- I mean with respect to whether or not the Government would call Gerald, I'd like to confer with co-counsel and look into that issue regarding the Fifth Amendment implication and defer that decision until the close of the defense case.

MS. THOMPSON: And, actually, since I cannot really counsel Gerald Terry and since -- maybe it's an oversight, but the new issue -- or not new, but issue of perjury, he would absolutely need independent counsel to discuss that particular issue. So if the Government does call him, then they would have to give him an opportunity to consult with counsel; and it can't be me on that, sir.

THE COURT: I think that's correct.

MR. BERNARD: I agree. We have not made that decision, though.

THE COURT: Okay. All right.

For now, your decision, though, Attorney Thompson, is not to call him at that time.

MS. THOMPSON: With all that clarity, yes, Your Honor.

THE COURT: All right, thank you.

MS. THOMPSON: So I'm going to have an opportunity to speak to John Terry again about this whole discussion. I'm going to look out to see what character witnesses are out there, and then that's who we will be presenting.

THE COURT: I have 1:08. Let's try to bring the jury in and get started by 20 after.

MS. THOMPSON: Okay.

THE COURT: That gives you 12 minutes to do whatever you need to do in the last minutes.

Anything further, Counsel?

MS. THOMPSON: No.

MR. BERNARD: No, Your Honor.

THE COURT: Okay. Thank you.

(Brief recess taken.)

(In open court, with jury and defendant seated.)

THE COURT: Please be seated.

As I advised, we did have some administrative matters to deal with before we brought the jury in. But in the long

run, we believe that will expedite the trial and move it along a little quicker.  So we've lost a little time, but we hopefully gained some time also.  So, again, starting late, blame me.  I'm usually the one who causes the delays.

Counsel, you can call your next witness.

MS. THOMPSON:  I call Niddarah Winters.

I presume -- she may be going through security, Your Honor, if you want me to get her.

THE COURT:  No, it takes a while to get through security.  That's fine, we'll wait.

NIDDARAH WINTERS, a witness herein, having been first duly sworn, was examined and testified as follows.

DIRECT EXAMINATION

BY MS. THOMPSON:

Q   Good afternoon, Miss Winters.

A   Good afternoon.

Q   I'm Sandra Thompson, counsel for John Terry there.
Can you please state your name to the Court?

A   Niddarah Winters.

Q   And where do you live?

A   In Philadelphia.

Q   Okay.

THE COURT:  Can you spell your first name, too, please.

THE WITNESS:  It's N-I-D-D-A-R-A-H.

THE COURT:  Okay, thank you.

BY MS. THOMPSON:

Q   And how are you employed?

A   I work for the City of Philadelphia.

Q   Do you know John Terry sitting to my right, your front?

A   Yes.

Q   I'm sorry, my left, actually.

How do you know him?

A   From around the neighborhood.

Q   And you know other people who know him?

A   Yes.

Q   And from what communities of people?

A   Just religious community, the neighborhood.  The neighborhood that we live in is like -- really like a small community, so it's like everybody really knows everybody.

Q   And have you had -- well, first of all, how long have you known John Terry?

A   Like over 15 years.

Q   And do you know people who also know John Terry for 15 years?

A   Yes.

Q   And have you had conversations with people who have known John Terry for about 15 years about whether or not John Terry's a truthful and honest person?

A   Yes.  Our conversations about him is everybody says --

Q   Okay, just this --

A   Yes or no?  Yes.

Q   Okay.  And based on those conversations, were you able to determine whether or not John Terry has a good or bad reputation for being truthful and honest?

A   Yes, it's a good, truthful reputation.

Q   And for the people that you know who also know John Terry for about 15 years, have you had an opportunity to have discussions with them about John Terry on whether or not he's law-abiding?

A   Yes, he's law-abiding from the conversations.

Q   Okay.  So based on those conversations with those other people who have known John Terry for about 15 years on being law-abiding, do you know whether or not he has a good or bad reputation?

A   Yes, good.

        MS. THOMPSON:  Nothing further.

                    CROSS EXAMINATION

BY MS. SHEEHAN-BALCHON:

Q   Good afternoon, Miss Winters.

A   Hi.

Q   How are you?

A   I'm good.

Q   Good.  My name Maureen Sheehan-Balchon.  I know that's a lot, but I'm one of the prosecutors on the case.  So thank you

for appearing today.

You indicated that you're from Philadelphia. What neighborhood are you from?

A   Out where I'm from is the Logan neighborhood.

Q   Logan?

A   Uh-huh.

Q   Okay. And is that the same neighborhood that you know John Terry to be from?

A   Yes.

Q   Okay. Tell us what part of Philadelphia, north, east, south, west?

A   I guess it can be considered north --

Q   Okay.

A   Yeah.

Q   And you also know -- noted that you know him from certain religious communities.

A   Yes.

Q   What community is that?

A   So I'm Muslim, but the religious community is Muslim, Christian; it's not just one community.

Q   So would you call it a hybrid Muslim/Christian community?

A   Yeah, you could.

Q   Okay. And does John Terry partake in that community?

A   Yes.

Q   Which part of it?

A    It's one community, so it's not like it's separated.

Q    Sure.

A    So it's just the neighborhood.  Everybody is different.
They have different religions in the community.

Q    So is it fair to say that it's more neighborhood-based than
religious-based?

A    I guess you could say that.

Q    Okay.  So you have indicated you have known Mr. John Terry
for 15 years.

A    Uh-huh.

Q    How many members of his family do you know?

A    A couple, maybe like two or three.

Q    Do you know if those are siblings of his?

A    His brother -- I know one of his brothers.  I see his mom
around the community and his dad.  Yeah, probably that's it.

Q    Okay.  So you indicated to Attorney Thompson that you and
others in this community -- so let's say for argument's sake
the neighborhood community --

A    Uh-huh.

Q    -- have had conversations about John Terry's reputation for
truthfulness.

A    Uh-huh.

Q    When did those conversations occur?

A    I can't tell you exactly when.  We had many conversations
over the 15 years.

Q    When was the last one?

A    Maybe like a couple weeks ago.

Q    And who was involved in that conversation?

A    People from the neighborhood.

Q    How many?

A    It just was people standing around, so probably like three, four people.

Q    And was this an organized meeting about John Terry's truthfulness?

A    No, just a conversation.

Q    Okay.  Did Attorney Thompson ask you to hold these meetings about his truthfulness determinations?

A    No.

Q    Okay.  Now, you indicated that the last conversation happened a few weeks ago.

A    Uh-huh.

Q    Was that approximately the same time that your last discussion with these other members of the community happened about his reputation for being law-abiding; is that accurate?

A    Could you say it again?

Q    Sure.  So at the same time a few weeks ago when you had this conversation with community members about his reputation for truthfulness, is that the same time that you had the most recent conversation with them about his reputation for being law-abiding?

A    You're saying the last time or is that the only one?  The last time you're saying?

Q    Let's say the last time.

A    Okay, yeah.

Q    Okay.  You had that conversation at the same time with the same people.

A    Right -- well, not the same people every time, but those people at that time, yeah.

Q    How many times have you had this conversation with members of the neighborhood?

A    I know it's over 15 years, so we had plenty of conversations.  I had plenty of conversations with different people.  It's not just the same two or three people every time.

Q    Just for time frame sake, let's talk about from 2018 until today.  How many times have you had that conversation in the community?

A    I'm not sure.

Q    Can you estimate for us?

A    Maybe -- you said from 2018 to now?

Q    Right.

A    Maybe about four or five times.

Q    Would you agree with me that that's kind of an odd conversation to have with your neighbors?

A    No.

Q    It's not.

A    No.

Q    That you want to discuss, you know, out on the front steps whether or not members of the community think that John Terry has a reputation for truthfulness?

A    That wasn't just the conversation.  That came up in a conversation, but that just wasn't just the conversation.

Q    Okay.  And have you listened to any of the testimony in this trial?

A    No.

Q    All right.  Have you heard anything about what Mr. John Terry's charged with?

A    No.

Q    Do you understand that he has been charged in federal court with certain crimes?

A    Yeah.

Q    Okay.  If you had known about some of the circumstances of those allegations, would that change your opinion or the members of the community that you know of opinion about his reputation for being law-abiding?

A    No.

        MS. SHEEHAN-BALCHON:  Thank you, ma'am.  Have a good day.

        THE COURT:  Any redirect, counsel?

        MS. THOMPSON:  Yes, Your Honor.

                    REDIRECT EXAMINATION

BY MS. THOMPSON:

Q   So, Miss Winters, you were asked for a reason in cross about do you actually talk about law-abiding or truthful; but is that how the conversations build for reputation?

A   No.

Q   Okay.  So those were mechanical words I used to you, isn't that right?

A   Yeah.

Q   Okay.  And so how are your conversations actually going and why would they come up?

A   It's just people in the neighborhood have a conversation. We do a lot of stuff in the neighborhood, like book bag drives for the kids.  And he always been a part of stuff like that.

So if anything will come up, it will come up like that, like just when we will do a book bag drive for the kids.  And just remembering him being there and always helping, when it came to doing stuff like that; so those kind of conversations actually go.

Q   And in reference to -- and I think what I hear you say is when you're in any group, I think you said it's not always the same two or three.

A   Right.

Q   Is that what I heard you say?

That when discussion occurs about John Terry, from those discussions, you have led that this his opinion -- his

reputation is good in those areas?

A    Yes.

Q    And even though people don't come out and say he's law-abiding or using those terms, but from what you deducted from the years of discussions from others -- with others about him, that that is your conclusion of what his reputation is in the general community.

A    Yes.

MS. THOMPSON:  Nothing further.

MS. SHEEHAN-BALCHON:  No recross, Your Honor.  Thank you.

THE COURT:  All right.  Is this witness excused, Counsel?

MS. THOMPSON:  Yes, she may be, Your Honor.

THE COURT:  All right.

Miss Winters, you can step down.  You are excused.

THE WITNESS:  Thank you.

THE COURT:  Thank you.

MS. THOMPSON:  And I have to -- if I could take one moment, Your Honor.

THE COURT:  Yes, please.

(Brief pause in proceedings.)

MS. THOMPSON:  I don't see that anybody else has arrived --

THE COURT:  All right.  Do you have any additional

witnesses then at this time?

MS. THOMPSON: At this time, Your Honor, I would move for Exhibit A, A3, Lines 4 to 5, 6, Lines 24 and 25; Page 9, Lines 9 and 11 -- 9 through 11 --

THE COURT: Are these exhibit numbers or are these page numbers?

MS. THOMPSON: I'm sorry, it was Defendant's Exhibit A and Your Honor asked us to redact some, so -- and give specific lines for them.

THE COURT: Okay.

MS. THOMPSON: So I'll just put in the record what they were.

THE COURT: All right. So A3, you said, 4, 5.

MS. THOMPSON: Yes.

THE COURT: And 6, is that a page number?

MS. THOMPSON: Page 6, I'm sorry. To be absolutely clear --

THE COURT: Okay.

MS. THOMPSON: -- that's Exhibit A, Page 6 --

THE COURT: And Page 9?

MS. THOMPSON: And Page 6 was Lines 24 and 25.

THE COURT: Right.

MS. THOMPSON: And then Page 9 is Lines 9, 10 and 11. Page 11 is Lines 5 through 8. Page 17 is Lines 2 through 3.

And in Defense Exhibit D, Page 9, Lines 16 through 17.

Page 15, Line 8 and Lines 12 through 14. Page 19, Lines 7 through 25. Page 20, Lines 1 through 5 and 13 through 17.

Defense Exhibit E, Page 1. Page 3, Lines 4 through 5. Page 6, Lines 11 through 13. Page 9, Lines 20 to 25. Page 10, Line 18 and 19 and 24 to 25. Page 13, Lines 8 through 11. Page 16, Lines 2 to 5.

And so we would move for admission of those exhibits as indicated and would rest.

MR. BERNARD: Your Honor, Defendant has provided a copy of those exhibits to the Government and there is no objection.

THE COURT: Okay. Then those exhibits designated by page and line number are admitted without objection.

And Defendant, you've rested, then?

MS. THOMPSON: Yes, Your Honor.

THE COURT: Okay, thank you.

Is the United States providing any rebuttal testimony or witnesses?

MR. BERNARD: Your Honor, may we approach?

THE COURT: Yes.

(At side bar.)

MR. BERNARD: Your Honor, as the Court's aware, this is a bifurcated trial.

THE COURT: Correct.

MR. BERNARD: At this point the Government is not

inclined to call Gerald Terry. However, that is conditioned upon representation that the Defendant does not intend to call him in phase two. So if the Defendant does not propose to call him in phase two, the Government will not call him in phase one.

MS. THOMPSON: I don't see it; we're not calling him.

THE COURT: You're not the calling him for either phase?

MS. THOMPSON: Right.

MR. BERNARD: Thank you; I'll take that representation.

THE COURT: That brings us to the point where we are ready to go to closings and final instructions, then, correct?

MS. THOMPSON: If you don't mind taking a brief break? I know --

THE COURT: I can give a delay some, but what I would like to get is the closings and final instructions done today so we can let them deliberate later today and then bring them back in the morning.

MS. THOMPSON: Absolutely. I'm just saying a short break.

THE COURT: Would 20 minutes --

MS. THOMPSON: Yes.

THE COURT: All right. Twenty minutes.

MR. BERNARD: Sure, plenty.

THE COURT: We'll try to start closings then at about quarter -- quarter after --

MS. THOMPSON: Okay.

THE COURT: -- after two. That would be actually a little bit more than 15 minutes.

MS. THOMPSON: Okay, okay.

MR. BERNARD: Thank you.

THE COURT: All right. And then we'll go into recess. May as well let the jurors get up and walk around before closings. Is that right?

MR. BERNARD: Based on the representations of Attorney Thompson, can I indicate to the US Marshal that Gerald Terry can be returned?

THE COURT: Okay.

MS. THOMPSON: Yes.

THE COURT: Okay, I'll do that.

MR. BERNARD: Thank you.

(In open court.)

THE COURT: Marshall Horgus, if you'll come forward, please.

(At side bar with the Marshal only.)

(In open court.)

THE COURT: All right. Ladies and gentlemen of the jury, we've reached that point where the next phase of this trial will be closing arguments by both counsel. And I'm going

to let them have a few minutes just to make final preparations to deliver those arguments, so we're going to be in recess until 2:15. And at 2:15 we will come back into court, and we'll hear first from the prosecutor and then from the Defendant, and perhaps again from the prosecutor on closing arguments.

After that, I'll give you the final jury charge; and at that point in time you'll go back to the jury assembly room and begin your deliberations.

We're not there yet, though; so during this recess, please do not discuss the case with anyone including yourselves, other fellow jurors, or with anyone else; and the same other restrictions, admonitions, and instructions apply as during prior recesses.

So we will be in recess now until approximately 2:15 p.m.

MR. KEYS, LAW CLERK: All rise. Court is in recess.

(Jurors exit courtroom.)

THE COURT: Please be seated. The jury has left the courtroom, so these remarks are outside the hearing of the jury.

Anything further before you have your time to prepare for closings?

MR. BERNARD: No, Your Honor; thank you.

MS. THOMPSON: No, Your Honor.

THE COURT: Okay. I'll inquire to make sure you're ready at 2:15, and we will then proceed. We'll bring the jury in and we'll have the closing arguments, and then I'll have my jury charge ready to go.

And that's -- I can warn you -- at least advise you that it's going to take a while for the jury charge, probably over an hour, just because we have a lot of things to cover. So, it will be over an hour for that part of it.

It looks like we're going to get this to the jury today, at least for phase one of the trial. So we'll be in recess, thank you.

(Recess taken.)

(In open court, with Defendant and jury seated.)

THE COURT: Please be seated.

Are counsel ready to proceed?

MR. BERNARD: Yes, Your Honor.

MS. THOMPSON: Yes, Your Honor.

THE COURT: All right, the United States may give your closing statement.

MR. BERNARD: May it please Court, Counsel, Mr. Terry, members of the jury.

First of all, thank you. Thank you for your patience, listening to what has at times been a trial that has made some slow progress. But I appreciate your attentiveness, and I appreciate the consideration I know you'll give to the evidence

that you've heard in this trial.

Members of the jury, during opening statement, I told you there were two primary questions that you would have to answer during the course of this trial. The first question was: Did John Terry conspire to distribute or possess with intent to distribute cocaine and methamphetamine. And, two, did John Terry possess with intent to distribute cocaine and methamphetamine. And I would submit to you that the evidence that you've heard during this trial suggests that the answer to both of those questions is yes.

Now, proof of this case boils down to two primary things: Number one, if you believe that the iPhone and the Samsung phone found in the car belonged to John Terry, then you should find that the drugs that were found in that car were also a result of John Terry.

Alternatively, or additionally, if you believe the testimony of Robert Dillard, then you should also find that John Terry conspired to distribute 500 grams or more of cocaine and methamphetamine and that he possessed and attempted to distribute 500 grams or more of cocaine and methamphetamine.

Now, this whole case, as you're aware, started with a traffic stop, a traffic stop effected by Pennsylvania State Trooper Ryan Marmol. And Trooper Marmol testified for quite some time from that stand, went through the various details of that traffic stop. You saw portions of it in the video clips

that were played in the courtroom.  You heard questioning about what each individual who was in that vehicle told Trooper Marmol during that traffic stop.

Ultimately, that traffic stop resulted in a consent search of the vehicle that he conducted during which he found several items relevant to your determination here today.  The first, of course, is Government Exhibit 2., one of the three pressed kilograms of cocaine mixed with methamphetamine.

It's hard to see through the plastic, members of the jury, but each of these kilograms I'm about to show you bear the imprint of a backwards number 24.

The second, of course, would be Kilogram No. 3 -- or excuse me, Government's Exhibit No. 3, the second of three kilograms that were taken out of that vehicle.  On this one in particular it's much more clear to see the imprint of that backwards number four and two -- excuse me, 24.

And then, of course, Government's Exhibit 4, the third and final kilo.  It's hard to see because this one is somewhat broken apart; but if you look carefully and closely, you can see those imprints of that same backwards number 24.

The importance of that particular imprint became clear through the evidence that was presented, and I'll get to that in a minute.  The other items that were seized as a result of this traffic stop included Government's Exhibit 6, a Smith & Wesson .40 caliber handgun, which was loaded with seven rounds,

.40 caliber ammunition.

The last two primary items of import that were seized during that traffic stop, two cellphones, a Samsung Galaxy and an iPhone-8, which was the subject of much of the questioning that you heard during this trial.

Now, subsequent to that traffic stop, you heard that Trooper Marmol transported John Terry back to the Somerset barracks where, during the routine booking and processing procedure, John Terry stated that he was responsible for the vehicle. Mr. Terry disputes that. Actually, during his testimony, he claimed he never told Trooper Marmol that.

Well, the question for you to answer, members of the jury, is who do you believe? Which of these two individuals that you watched testify appeared more truthful in your evaluation of their credibility?

The judge will instruct you on the factors that you're to consider when determining a witness's credibility; but, broadly speaking, your question is: Do I believe Trooper Marmol, a nine-year member of the Pennsylvania SHIELD Unit? Or do I believe John Terry?

Now, alternatively, I'd submit that you can set the answer to that question completely aside because the cellphones, they're what tell the whole story. Let's talk about those cellphones, starting with how they were seized, how they were handled, how the data on them was extracted.

You heard testimony that these phones were seized as a result of the traffic stop on April 4th. Those phones were placed into secure storage at the Pennsylvania State Police barracks. At some point in time, when the Federal Bureau of Investigation overtook the investigation in this case, they received custody of this evidence.

You can look at it. You see clearly across the top: Evidence, Federal Bureau of Investigation. You can also see inside the bag which is Government Exhibit 8 a manila folder. You can look on that manila folder. If you look closely, you'll be able to see the property record from the Pennsylvania State Police. All of these items indicate that these two phones were placed into secure storage where they could not be tampered with.

Further, to that point, you were read a stipulation during Trooper Marmol's testimony that I'd like to remind you of now. The Defendant is not contending that the evidence in this case was not handled properly. The Defendant has stipulated to the chain of custody of all evidence, as found, was proper and in accord with the procedures of the respective law enforcement agencies that handled it. They further agreed that proper documentation reflects movement of all of those items. Therefore, I'd submit you can find there's no question as to the authenticity of these items.

So let's talk about the evidence that derived from

them. The first person who gathered evidence from these devices -- really, the only person who pulled evidence from these devices -- was Senior Forensic Examiner Justin Sarvey from the FBI.

Now, Senior Forensic Examiner Sarvey told you what experience he had in conducting imaging of devices that have been seized in investigations. What he essentially told you is that when he receives a device -- let me back up. When the FBI obtains a device, it is placed into the FBI secure evidence storage locker. When a search warrant is then obtained for that device, the FBI case agent -- in this particular case James Simpson -- notifies a forensic examiner that a search warrant has been obtained to conduct an extraction of the particular device. That search warrant is then provided to the examiner.

Pursuant to that warrant, the examiner will conduct a full extraction of the device when possible. A complete forensic image of the device is created. The data that is stored on it is copied, verbatim. That data is then processed through a program. In this case Justin Sarvey told you that the two programs that were used were Cellebrite and Gray Key, which are two common programs that the FBI forensic examiners use to conduct these types of extractions. That's what he told you.

From there, the forensic examiner takes an exact copy

of that device and puts it on a disk. That disk is then placed in secure evidence storage along with the phones from which that data was extracted. From there, the processed data is uploaded to an internal FBI server, and the examiner notifies the case agent that the information is available for him to review.

Now, the case agent who's reviewing that data does not have the ability to edit it in any way. That is the data that was taken from the phone. Forensic Examiner Sarvey indicated it was a read only file. Agent Simpson was able to tag certain things, mark what he deemed pertinent to the investigation; and that at that point Agent Simpson notified Examiner Sarvey that he was complete, and Forensic Examiner Sarvey then generated a report that was a distillation of all of the data on the phone down to just those items that were deemed pertinent to the investigation.

Agent Simpson then testified that from that report, which was generated directly from the image of the phone, that he prepared slides which you saw throughout the trial showing the text communications between individuals on those phones, showing other items that were discovered on those phones.

Now, there was a lot of questions asked of Agent Simpson about whether he, quote, created the documents, whether he edited the files, whether he copied and pasted certain information. Members of the jury, those questions are

meant to distract you from the fact of the matter that those items came directly from the device itself.

Yes, they were included in a report generated from those items, but they were not edited. There may have been comments added above the actual data, but the data itself was not changed. And you're going to have an opportunity when you go back to deliberate, if you have questions about that, to see for yourself because the Government has nothing to hide with respect to the phones.

Every phone that was seized is here for you to inspect. The original report is here. The original extraction is here. If you so choose, if you have any doubts about the authenticity of the items included in the presentation by the Government, you can compare them directly to the information from the source. So I tell you don't be distracted by these claims of manufactured evidence. You have the ability to compare and see for yourself if you so choose.

Now, now that we've established the process by which the data was extracted from the phones, let's talk about what evidence there is on those phones to attribute them each to John Terry.

Mr. Flannigan, will you please display Government Exhibit 32A.

Thank you, Mr. Flanagan.

Members of the jury, I appreciate your patience while

we got that figured out.

So what evidence do we have to prove that that device belonged to John Terry? First, we have this text conversation in Government Exhibit 32A. The text message or the user of that iPhone-8 represents to a contact in that phone known as E. Good that he could not find his ID and that he was providing a duplicate copy. Below that, we see that duplicate ID.

Mr. Flannigan, would you please show the side by side of those two images.

While he's pulling that up, members of the jury, I will note the date of that conversation was 12/18/17. That's important because what we're going to show is that there's a variety of dates where there's different indicia of ownership of that phone. But what's the importance of that? Well, that shows essentially a dataset. The more points of data there are, the more accurate the data is.

So if we have multiple indicators on the number of different dates that this phone was under the use and possession of John Terry, it makes more likely that, yes, in fact, John Terry was the possessor and user of that.

Now, looking at Government Exhibit 32B and 32C, clearly that depicts an identification card of John Terry. I believe Mr. Terry even indicated during his testimony that that card was his.

Mr. Flannigan, can you please display Government's

Exhibit 32H and 32K.

Again, members of the jury, this is another one of those data points of indicia of ownership of that iPhone-8 by John Terry. We have in Government's Exhibit 32H a photo depicting John Terry. John on the stand, he again admitted, that is in fact a photo of him; and you can use your eyes, you can see him sitting at counsel table, in that image, and you can discover for yourself that that does depict John Terry.

But what more, that particular conversation occurred on March 12th, 2018. And the text message that was sent from that iPhone regarding that image says, "That pic you sent me of us," indicating that the person using that iPhone is the person depicted in that photo, John Terry.

Mr. Flannigan, could you please display Exhibit No. 32D and 32E.

Members of the jury, 32D is the T-Mobile letter. Clearly, a letter addressed to John Terry. As another data point, you can look at the modified date that's shown in the metadata for this particular exhibit. March 16th, 2018.

Mr. Flannigan, can you please display Government's Exhibit 32W.

Members of the jury, 32W is the contact list -- excuse me, the call log, call history, call history taken from the iPhone-8 showing that that device had 33 contacts with Mr. Terry's fiancee, who in his other phone is labeled under

the contact name Wifey. Thirty-three contacts.

Take a look at some of the durations for these contacts. You have an outgoing call that lasted four minutes and 27 seconds. You have some other shorter durations. There's a variety here. Two minutes and 46 seconds at Line 17, an incoming call. Two minutes and nine seconds, an outgoing call on Line 8.

This shows continued contact. This shows use of that device by an individual who made significant phone calls or phone calls of significant duration to Mr. Terry's fiancee. Ask yourself, who would be using the phone to make that number of communications to that particular person? That, members of the jury, is a large dataset. That is a four-day dataset showing use of that phone by somebody contacting Mr. Terry's fiancee.

There's also other circumstantial evidence that suggests and proves that these phones both belong to John Terry. You have the text messages on the Samsung phone, which Mr. Terry admitted was his, that are consistent with the text message on the iPhone. Consider Exhibit 34A and 32AB. In 34A we wee the text on the Samsung phone from phone number ending in 7901, which reads, "This is big bro wife, 1429 Grant Street, Braddock, PA, 15104." The date of that text, March 29th, 2018. Government's Exhibit 32AB, a text from a contact named Geez, who we know is Gerald Terry, of the same

address.

From these commonalities, members of the jury, in addition to the other factors that showed you, I submit that you can find that John Terry is the user of both the Samsung and the iPhone. But attributing the phones to Mr. Terry is only half of it. You also have to look at the other items that are on that phone.

Mr. Flannigan, would you please display 32AA.

Members of the jury, what do you see in this conversation? Well, what you see is that the user of the iPhone, whom we've established as John Terry, indicates that he's familiar with vehicle traps, "If you take the thing off the radio," and that he has access to and ownership of a pistol, "where I put my pistol it would come on." Kind of like the pistol that was found in the hidden trap in the Ford Taurus.

Mr. Flannigan, could you please display Government's Exhibits 32AB and 34A.

Now, these items were previously displayed as indicia of ownership of the device showing the commonalities between them. But this is also substantive evidence of the conspiracy between John and Terry and his brother to deliver three kilos of methamphetamine-laced cocaine to Robert Dillard at his home in Braddock.

Mr. Flannigan, could you please display Government's

Exhibits 32N, 32P, 32R and 32T -- I can state them again if that was too fast for you.

MR. FLANIGAN: What was the second?

MR. BERNARD: N as in Nancy, P as in Paul -- 32R and 32T.

What you have displayed in these exhibits, members of the jury, are photographs of what Special Agent James Simpson, who was qualified as an expert in drug trafficking and coded language, opined was a half kilogram of cocaine. That half kilogram of cocaine bears the same backwards two stamp as the kilograms of cocaine seized from within the Ford Taurus.

That evidence, members of the jury, permits you to find the identity of the person responsible for the cocaine in the car is the same person who possessed images of identically stamped cocaine on their cellphone.

Furthermore, the metadata for these particular images all show that they were taken on the same date.

Mr. Flannigan, if you would please display the metadata for one of those pages.

Those photographs, captured on March 8th, 2018, right in the heart of those other data points that indicate the use and possession of this phone by John Terry. The metadata also shows that that phone was taken by the same camera make, an Apple phone, of the same camera model, an iPhone-8 Plus, which was seized from the Ford Taurus.

Mr. Flannigan, can you please display Government's Exhibit 37.

Members of the jury, you can see for yourself through this compilation slide the commonalities between the photo of the half kilo of cocaine on the iPhone and the kilos of cocaine that were seized from within the Ford Taurus. I would submit that that is strong evidence that the individual who possessed with intent to distribute those items that were found in the Ford Taurus.

Now, I mentioned that the evidence on the phones was one way in which you could find that the Government has met its burden of proof as to John Terry's culpability. The other way is through the testimony of Robert Dillard.

Now, the Court will advise you during his closing instructions that the testimony of cooperating witnesses is to be received with great care and caution; that you're to consider what that person says very closely, scrutinize what they told you because of the fact that they may compromised. They may have some motive to testify favorably towards one party or another.

In this particular case you heard that Robert Dillard pleaded guilty to conspiracy to possess with intent to distribute 500 grams or more of cocaine. He admitted that. He admitted that that was not his first arrest. He told you that he had been a drug trafficker essentially since the time he

turned 18, that he's been in and out of jail. He didn't attempt to hide that fact from you. I'm not sure he's proud of it, but he didn't attempt to tell you he was something that he was not.

Mr. Dillard told you that even though he had pleaded guilty, he had not yet been sentenced. And even though he had pleaded guilty, he was not yet in jail. But, more importantly, what he told you was how he had met John Terry through Gerald while he was in jail; how he would obtain kilos of cocaine from John Terry; and specifically how on April 4th, 2018, John Terry was stopped on the turnpike traveling with three kilos of cocaine that were intended for him.

I'd ask you to consider the circumstances under which Mr. Dillard first made that information known to investigators. You heard that Mr. Dillard was in SCI-Greene at the time serving a sentence for a parole violation. Investigators, he said, were there to talk about his cocaine distribution operation. They asked him: Do you have any other sources of supply beyond this guy you called Fats? And he said: John Terry from Philadelphia.

He brought that name up. He's the one who implicated John Terry. The Government didn't go to Mr. Dillard and say: Hey, do you know John Terry? Was he bringing you three kilos of cocaine? No.

And a lot of questions were asked about what

consideration Mr. Dillard received, was he allowed to stay out on bond, has he not yet been sentenced, does he expect to receive a lesser sentence. Members of the jury, the consideration that Mr. Dillard received was a guilty plea to a federal indictment. He admitted his involvement in that conspiracy to investigators. Investigators did not come to him with that information.

Through the cross examination of the Government's witnesses, I'd just like to address several defenses that the defense has tried to bring. And they've been -- there have been several, and not all in agreement one with another.

Essentially through the questioning it was attempted to prove that Trooper Marmol lied, Senior Forensic Examiner Justin Sarvey lied or somehow manipulated the cellphones, that Special Agent Simpson lied and that he created these reports out of whole cloth, he attributed these text messages to John Terry when they were not in fact on the devices where they were pulled from, that the drug lab cross-contaminated the drug samples that were provided to them.

These defenses all boil down, if you believe them, to either one of two things: Either there is some grand conspiracy to specifically charge John Terry, or John Terry is the victim of one of the most extraordinary series of unfortunate events that I've ever heard of. Those two outcomes ignore everything -- anything but the third option, which is of

course that John Terry did it.

I'd ask you to keep in mind the principle that is known as Occam's razor: Essentially, that the simplest solution is often the correct one. Ask yourself: What is the simplest solution here? Is it that every person that the Government called lied, manipulated, fabricated evidence? Or is it that John Terry did it? You be the judge.

The last piece that you're asked to consider is the intent to deliver. Special Agent Simpson testified that the drug quantity seized from the Ford Taurus were quantities consistent with an intent to deliver.

You're also asked to determine the substance for which Mr. Terry is responsible. The judge will instruct you that Mr. Terry need not know what substance is involved in the conspiracy. What you have to find is that there was a controlled substance that was involved and how much.

In this case you heard from the lab forensic scientist that these three kilos totaled 2995 grams of a mixture and substance containing a detectable amount of cocaine and methamphetamine. I'd ask that you hold Mr. Terry responsible for that.

I'd submit to you after your deliberations that you should return with a verdict of guilty as to all counts.

THE COURT: Okay.

Attorney Thompson, closing argument on behalf of the

Defendant.

MS. THOMPSON: Thank you, Your Honor.

May it please the Court, Mr. Terry, Counsel, Agent Simpson, good afternoon, ladies and gentlemen of the jury. Again, I am Sandra Thompson representing Mr. John Terry in this indictment that the Government chose to present.

Now, I have to apologize that I'm going to be a lot low tech because I don't have a Mr. Flannigan.

So, a series of unfortunate events, a curious use of words to Mr. John Terry on April 4th, 2018, based on a prior conversation with his brother, Gerald Terry, who he knew was in recovery -- or thought, at least, he was in recovery for the past seven years. So his older brother say: Hey, will you come with me, take a ride to Pittsburgh, because I'm going to speak at a narcotics convention.

Now, Gerald Terry at that time, because he was in recovery, he also spoke about an addiction. So that's what Mr. John Terry knew and knew about his brother and thought about his brother on or around from that March 29, 2018, to April 4, 2018. So Mr. John Terry, when he agreed to get in that vehicle that his brother arrived in to pick him up, didn't think anything of it, didn't think anything different than what his brother had told him it was going to be.

So, unconcerned, he's taking off his socks and shoes, relaxing and, I imagine, chatting it up with his brother for a

ride. And in that vehicle he's the passenger. He did not go in the center console. He did not go into the glove box. And I mean some things we think and we imagine, how many times have we been passengers in vehicles? How many -- how much -- how many times have we known what was in that person's center console or glove box? We're just riding. Maybe they gave us a ride or anything like that. Who knows what the situation is. Now, I guess we really need to think about Ubers nowadays, I guess.

But for Mr. John Terry, that's all he knew until Trooper Marmol stopped them and until Trooper Marmol started producing this stuff out of the vehicle.

Now, the dash cam that the Government introduced as Exhibit 1, that shows the conversation and who had conversation and what they had conversation, what they said with Trooper Marmol.

Now, the Government said by questioning several witnesses defense was putting on certain defenses. What I am going to continue to explain is how the Government failed to prove its accusation beyond a reasonable doubt.

In the beginning, even from the start, from choosing you as a juror, we said the Government has to maintain, they never get rid of the absolute burden to prove their accusation. The judge said the accusation, the indictment is not evidence. The fact somebody is charged is not evidence.

So it is -- so, yeah, holding the Government to task; absolutely. So, yes, absolutely, I'm going to question and should you question every official that comes before you and say: Did you dot your "I"s and did you cross your "T"s because you chose this man -- you chose to file these charges against this man, so can you prove it? Absolutely.

Hold the Government to task because as we also explained that, and the judge explained that, that because the indictment is not evidence against Mr. John Terry, he sits here with that cloak of innocence. And that is, again -- so if you can imagine looking through a colored glass, so you have to look through the colored glass of this Government's evidence, and that colored glass is like that cloak of innocence. So as you look through the Government's evidence, you're looking through as for Mr. John Terry having that cloak of innocence.

So, yes, we're holding them to task. Yes, we're holding them to their responsibility. Why? Because they chose to do this; and why -- I can't totally explain. Honestly, I don't really even think there's a clear explanation. There are a few things as that as I go along I'm going to point out because where the Government said: Oh, is everybody lying? Well, I'm going to point out I didn't say everybody was lying. The Government officials lied. Government officials lied to a Grand Jury, meaning that they lied under oath. So, yes, that's a problem. And it should be considered a problem.

So for the Government's Exhibit 1, the dash cam video for Trooper Marmol, that shows that the person he was speaking to was actually Gerald Terry. So it was Gerald Terry that talked about the vehicle, talked about where he got the vehicle. And, again, from what was happening from the time of the stop, Gerald Terry said: I got this vehicle from my friend's wife -- or it's my friend's wife's vehicle. It's not John Terry saying: I borrowed the car. So, yes, Trooper Marmol lied when and if he says it was John Terry.

Now, I asked him, could you have confused the two? He said no. But there's no logical explanation of why it's very clear on the dash cam of who you're talking to, and then you flip it, and you flip it without any corroborating evidence.

If you remember his conversation, his testimony, that, yes, their interview rooms have audio or video -- or at least he believed they may have. But he didn't use the interview room with audio and video -- or he didn't produce it. He didn't produce -- he didn't say: Okay, he made this admission.

If you're so willing to make this admission, how about you write it down? You know, can you write down a statement? Even if the officer says, "well, I'll write it down; and you just sign your name to this." Nothing like that. So no video of any statement from John Terry saying that, no written statement corroborating that John Terry said that, none of that.

What do we have a visual of is this Government Exhibit 1 where it's Gerald Terry that says that. It's Gerald Terry that says: I got the car, and I got the car from Kelli Royster. And then we see in the video also and from the photos of the phone of pictures of Kelli Royster and the baby. And then in the vehicle there was like a box of baby stuff.

Now, the Government said it's all about the iPhone. And the iPhone is a clue. That's why when the Government decided to charge John Terry, that's why every time they mentioned the iPhone, they put his name attached to it.

Now, when you look at these documents, when they mention the Samsung, they don't say John Terry's Samsung -- I mean the official documents, not the document that was created by Agent Simpson. But when you -- even the search warrant request, it says John Terry's iPhone; but then a Samsung with a serial number.

Why wouldn't you -- if that was the case, if John Terry was saying, "The Samsung is mine," why wouldn't you say John Terry's Samsung and John Terry's iPhone? No, because you're trying to make something not true, true. And they want you to believe there's two people in the car, and there's two cellphones in the car, and John Terry is the only person with a cellphone. So they want you to believe that Gerald Terry went to go sell drugs with no cellphone. That's what they want you to believe. So some things belie common sense. And some

things Mr. Terry can't explain. He doesn't know why they're choosing to do this. That's why it's not his burden of proof.

How can you explain why the Government chooses to come after you? How can you explain why the Government had that the car was registered to Kelli Royster, that there was still a baby box and Kelli Royster had a kid, all of these compartments are in the car; that means that car was going back to Kelli Royster. Your baby stuff is in there. It had to be going back to him.

But, yet, the Government doesn't think that he's important to bring in, interview. And, actually, I believe it was one of -- I can't remember if it was -- I think it was Agent Simpson asked: Did Kelli Royster say that John Terry was the owner that of iPhone? He said no.

The iPhone also had a subscriber of Antwan Chambers, a real person. The Government tried to say: Well, you know, sometimes these people, they put these phones in made-up names, I guess. But I asked: Was this phone -- or could you identify this person as a real person? Yes. Did you even go interview the person and say: Okay, well if this iPhone is in your name, whose is it? Who did you give it to? Who's using it? They didn't bother to do that because if you want to present something in court to be true that may not be true, then you can't investigate further because if you investigate further, you might kill your own investigation. So they didn't bother

to ask.

Then there was an email Juice Jones, Sam Marshall as well. Did you determine if that was a real person, Samuel Marshall? Again, yes. So if -- to the iPhone, there was subscriber information or email linked to that iPhone, and you determined that was a real and natural person, then, again did you interview them, say: Hey, who's connected to this iPhone? No. Same thing. Because you're not going to even risk defeating what you want to claim because it is all about that iPhone.

So, no, it was not John Terry who took responsibility for that vehicle. It was Gerald Terry, who again is shown in the dash cam.

Now, although Trooper Marmol did attribute that statement to John Terry, he testified on April 13th, 2018, which will go back to you in a redacted form as Defendant's Exhibit D; and at that preliminary hearing, which was one of the first hearings, I guess, from April 4th -- April 13th, somewhere around nine days after the stop, he testified that the compartment was hidden, and it was depending on how you're looking at it and from where you're sitting in the front seat, front passenger seat, the compartment is hidden.

So he was questioned: You said John Terry admitted he was responsible for the vehicle, correct? And was that because borrowed the vehicle? He says: John Terry related he borrowed

the vehicle.

So is that what you meant by being responsible, saying that he borrowed the vehicle? And Trooper Marmol testified -- he indicated he was responsible for the vehicle.

And then he was further questioned: Well, being responsible at some point are you saying he borrowed; is that what you're saying? He says yes.

And he was specifically asked: He did not admit -- he being John Terry -- he did not admit to knowing the gun and drugs were in there, is that right? Trooper Marmol testified: He did not admit to knowing the drugs were there.

He did not admit to knowing or state any knowledge that the secret compartment was there, is that right? Trooper Marmol said correct.

So just like -- and then he also goes on, he said: Other than Terry admitting that he was responsible for the vehicle, he was a passenger in the vehicle and he was within reach of the compartment; but he never admitted to knowledge of the contraband.

Now, that was testimony on April 13, 2018. And you heard that -- obviously, that was a state case that started -- state charges with the state trooper; but then the state trooper turned it off over to the federal government around about October 2018.

So the state trooper turned it over to Agent Simpson;

so you have to know that Agent Simpson knew about Trooper Marmol's testimony. You have to know that Agent Simpson knew that Trooper Marmol was saying, even though he was claiming John Terry said he was, quote, unquote, responsible because he borrowed the vehicle, that he knew he didn't say, "I knew of the drugs," he didn't say, "I knew of the contraband," he didn't say, "I knew of the firearm."

And the reason why -- even though I believe that even when Trooper Marmol testified on April 13th, 2018, I still believe he testified falsely because it was Gerald Terry and not John Terry. I bring that point because then Agent Simpson goes before a Grand Jury on October 16th, 2018, which will be presented to you as Defense Exhibit A in a redacted form, and Agent Simpson goes before a Grand Jury and testifies the exact opposite of the sworn testimony of Trooper Marmol.

And specific to Page 11, he testifies after being sworn under oath and says, "Yes, Trooper Marmol interviews John Terry and asks him about what was found in the hidden compartment; and he -- the he being John Terry -- admits to those being his, the gun and the suspected cocaine."

And then he further on that day of October 16, 2018, under oath, he testifies to the Grand Jury, "John Terry accepted responsibility for the drugs and the gun."

And then Agent Simpson a second time testifies before a Grand Jury, again sworn federal officer under oath on

July 9th, 2019, testifying falsely, testifying to something he knew did not happen. The video doesn't support it happened. There's no statements that said it happened. Trooper Marmol's prior testimony shortly after the stop confirms it didn't happen.

But he testifies again for a second time, and this will be Defense Exhibit E that's going to you. So, October 2018, and now again this was July 2019, almost a year later. And it's Page 13 specifically. Agent Simpson, again, "Yes, Trooper Marmol interviews John Terry and asks him about what was found in a hidden compartment, and he admits to those being hid, the gun and the suspected cocaine."

And then Page 16, a grand juror specifically asked Agent Simpson while he's under oath, "Okay. Did he admit to it being his?" And Trooper -- Agent Simpson answers, "He admitted that the firearm and cocaine being his property."

So absolutely we are questioning this Government in this case, these particular agents.

So, you know, we understood again from when we did the voir dire, you've got family, you have friends, you have background, you were raised to respect law enforcement, you were raised to understand and believe they have a very hard job and a very dangerous job. And, honestly, I would not dispute that.

But I'm not asking you to look at the law enforcement

as a whole, as a community. I am asking you to look at Trooper Ryan Marmol in this case.

So you were asked to look at -- I believe the Government said something about he was a field agent for a number of years. We're not talking about the fact that he was a field agent for a number of years because it's not just, well, he was a police officer, so he should be believed. It's: No, what did he do in this situation? What did he do in this case? That's what matters.

And is it enough to convince you beyond a reasonable doubt that this is something that you should consider, if this was a matter that was important to a matter in your life. If this was something as you carefully consider it, and if it addressed a matter of importance, would this be the quality of something that you would give weight to, that you would expect?

So, same thing. We're not talking about the FBI in general. We're talking about Agent Simpson. And we talked about Agent Simpson in this case. I don't know what he may have done in other cases, but in this case.

So then when we do talk about that iPhone, considering that we do know that while under oath he had to be deliberate. It had to be deliberate lies. So since we know that that was begun -- and we have to consider if he was willing to do that under oath to a Grand Jury, then what else was he willing to manipulate?

So, when you talk about -- and, honestly, I think it's so convoluted. I want to get to the Government's exhibit list so I can try to speak to specifically -- I want to try to make -- make sure that something is clear.

And I don't know his exact title. I might even get it wrong. But Forensic Analyst Sarvey. To view -- please, I hope you remember that Mr. Sarvey was presented with copies of disks. That means he was -- he was shown a disk. And the disks were entered with the limitation of chain of custody.

So the Government seen to it in its closing state to you that you're going to be able to examine, to compare. I have to say that's not a true statement. You're not going to be able to look on those disks to compare the physical exhibit that was presented to you.

So the disks, as I understood -- and obviously you're recollection also governs -- so what Mr. Sarvey stated is when he got the search warrants and he -- then he started performing extractions, he put the extraction data on two disks. Those disks were marked as 22 and 24, the Government's 22 and 24. So the full extraction data was put on, and that's his initial extraction data, Government's 22 and 24.

Then he said he put it on like a general drive that Agent Simpson would have access to. And so from that Agent Simpson then marked what he thought was of interest in both the drives, so that was the Samsung and the iPhone. So

then they said that was put on -- and that's what Agent Simpson thought was of interest. That was put on disks 25 and 26. So that's what Mr. Sarvey testified to.

Now, this is where I say this: Try to be a little slight of hand. Because -- and I did go over, because they were trying to make a point of the fact that it was read only. And that's why I went over with Mr. Sarvey the fact that even though a document starts at read only, you can copy it into, say, a program like Adobe PDF, and then you can make changes in that way. Once you copy it or print it into Adobe or any other type of program, take it from the original to another, then you can make changes. So he acknowledged that.

And why is that important? Because the Government's Exhibits 31 and all their subdivisions -- I think it's 31, 32, 33 and 34 -- that is the mental impressions -- that is the mental opinion of Agent Simpson. Would you -- and that's where I said that's the slight of hand, because they want to tell you Agent Sarvey -- or Mr. Sarvey or whatever his title is -- I don't intentionally mean to get it wrong -- just took data, put it on the disk; he did nothing else. And that may be true for what's on those disks.

But what the Government did not do is they did not show Mr. Sarvey the Government's exhibit that was created by Agent Simpson and say: Are these true and accurate copies and exact copies of the same thing that you prepared on that disk?

They did not do that. And I say it to you, the same thing I said is why didn't you go interview Sam Marshall or these other people, is because they weren't going to disprove their own case.

Then -- these things are what -- and Agent Simpson did acknowledge that he basically created this by copying, pasting and adding his text. You can see certain things on there and some of his comments. So, yes, when Mr. John Terry is saying the particular, like, text messages or whatever, and he acknowledged: Well, yeah, that's me in my driver's license; just being an old friend; yes, that's my fiancee's phone number -- but this is all from the Samsung. This is not from the iPhone.

I implore you to look at these Exhibits 31 to 34 under both that colored glass of maintaining John Terry's cloak of innocence that he has unless and until you've found the Government has proved their case beyond a reasonable doubt, and I ask that you look at these exhibits, 31 through 34, and all their subdivisions, through the colored glass of Agent Simpson being willing to go under oath twice and to say something that he knew was not true.

And some may say: Well, it would take time to put this as iPhone, but not the Samsung. I mean it takes time to put all of this together. So, yes, I would believe that Agent Simpson and from October 2018 through now had time.

And again when you look at all of it, do you believe that that meant Mr. Terry had the cell -- iPhone, meant that Gerald Terry didn't have any phone. And that doesn't even make sense.

So, now, being -- you will hear the judge instruct about knowing and intentionally and mere presence doesn't mean that you're involved in a crime. You have to be conscious and you have to be aware of that. And he must be deliberate in that intent. That means he must know of the drugs exist in his presence, and he has -- he must have an intent to possess it and control it.

And Mr. Terry, John Terry, did not only not know about the presence and not only did he intend to possess and control even if he would have known about it. And he didn't know about the compartment. And he didn't know about all those triggers. And it was Ryan white who told you about the custody of the triggers, so where Trooper Marmol is saying: Well, you're a passenger, and it's in the air bag location right where you're sitting. And that's really where it started from. But, really, then after other investigation, all the triggers are on the driver's side. So it can't even be triggered by accident.

And then in reference to Morgan Wiernusz, as I said, it's my duty to hold the Government to all of its tasks. So Miss Wiernusz -- I didn't object to her being considered an expert because if you go to school or you do work in, it's not

hard to become considered an expert. But it's just like when you go to mechanics or something -- you know, the mechanic may be an expert their field, but you still go get second opinions, you still look or think about what they say and is take it with a grain of salt.

The same with a doctor. You go to the doctors and they may have say -- you know, they may have knowledge of their area, but if you look to look there, did they make a mistake, are they making a misdiagnosis? So you still weigh what they're saying.

And one of the things I did note with her is at the time that she performed this investigation, she had been on the job for about eight months. And one of the things that she said is she acknowledged that there is a margin of error for the determining the presence of drugs, but she didn't know what it was. And she didn't testify what it was, and she didn't testify that the methamphetamine was within that margin of error.

Now, you may have noticed that in my questioning of her, I stopped and I hesitated. And that's because she said she had it in case notes that wasn't provided, wasn't requested. Again, why request something that could help you to disprove your case? And I decided I'm not going to ask her if they didn't ask her. So if they didn't ask her was it within the margin of error, and they didn't ask her what was the

actual indication for the methamphetamine, why should I? So that means if they didn't ask her, it wasn't proved. I mean I don't think there's any dispute it's cocaine. But saying that there's some mixture of methamphetamine -- my mouth is dry; I talk too long, I know.

But it's their burden of proof. They should have established that. So if she did go say this -- there is -- just like there's a margin of error for the weight, and you just have to make sure that you're in the margin of error, there's a margin of error, but what exactly what was actually detected drugs? And she didn't provide that evidence. So I don't think it was proved beyond a reasonable doubt that there's even meth anyway.

Now, actually, that's really not either here nor there for Mr. John Terry because he didn't know any of it was there; but the Government is going to ask you to find him guilty of that. So that's the whole point. You're deciding who to charge and what to charge, but again you don't even present what you should be presenting.

So, Mr. Terry didn't have to come before you, but he did. And Robert Dillard -- actually before I get -- Robert Dillard. Robert Dillard was not trying to be a good citizen. Robert Dillard was trying to save his own behind. And Robert Dillard was in prison October 2018. Police came to him because his girlfriend was being investigated for a drug

activity in July 2018. So police came to interview him because of that, his and his girlfriend's involvement in drug activity around July of 2018.

So I asked him -- and if you recall the exchange, the Government was saying what time, what time, what time frame? And I said: When you were giving information to the Government about Gerald Terry, did the Government ask you about John Terry? And he said yes.

So it was actually when Robert Dillard was trying to save his own butt. It was Gerald Terry he was telling on. But, obviously, again, that's not really established in what the Government wants to prove. So, okay, we need John Terry. So Robert Dillard: Yes, John Terry, too.

No cellphone information, nowhere was it pointed out Robert Dillard's cellphone information, email information, nothing proving the connection between John Terry and Robert Dillard. Robert Dillard said he was in prison with Gerald Terry, so that was the connection with him.

So you would have to fully take the word of Robert Dillard who was trying to save his behind and offer whatever he can get and throw whoever he could, whatever they wanted, throw whoever he could under the bus. And you know he was getting consideration, you got to know that because his history is so long, and you hear he wasn't charged with having a mixture of meth, he was just charged with three kilos of

cocaine. So that was a benefit.

He with his long history wasn't sitting in prison. The Government made a big deal about who was responsible for delaying the case and whether or not the fact that he was remaining outside of prison, his thought. That wasn't even the point. The point is because this case had not yet gone to trial, he's been a free man. And how much of a benefit is that? I just give them what they want, say what they want.

So, yeah, it has been for over four years more than a series of unfortunate events for Mr. John Terry. I think Mr. Terry had testified he couldn't even remember how old his older brother was anymore. So, yeah, I think that had an impact. He didn't know why his brother put him in that position.

So I'm going to ask that you look at all these things, under that cloak of innocence and under the fact that Agent Simpson was willing to lie to a Grand Jury, the fact that Robert Dillard also had motive to lie to keep his butt out of prison. And I'm going to ask that you find that the Government has not proved their case beyond a reasonable doubt and find Mr. John Terry not guilty and finally do justice.

Thank you.

THE COURT: All right.

The Government may give its rebuttal closing argument, please.

MR. BERNARD: Members of the jury, I appreciate your patience again; this has been a long afternoon.

I'm trying to decide where to begin because we heard a lot of discussion of the evidence by defense counsel. But rather than go through and try and address every mischaracterization that was just presented, members of the jury, I trust your recollection of the testimony that you heard. The Defendant may be entitled to his own opinion, but he's not entitled to his own facts. Those are the facts that you heard from this witness. So, just briefly, I want to try and address a few of those.

The Defendant rests his position on this idea that Government officials lied throughout the course of this entire investigation. They say it begins with Trooper Marmol claiming that it was John Terry who took responsibility for the vehicle when the dash cam video actually shows that it was Gerald Terry who said that he borrowed the car from his friend's wife.

Members of the jury, you're going to have the dash cam video back there with you in the jury room. You saw it in here in court. I would submit that the interpretation of that conversation goes as follows: Trooper Marmol: Who's the vehicle registered to?

A friend's wife. My friend's wife.

Gerald Terry hands the registration. Trooper Marmol looks at it, and you hear he says: Is this a guy? Or is this

a girl?  Or --

And Gerald Terry says yes.

There's no mention "I borrowed the vehicle from my friend's wife."  That is not the facts.  But you can review that and decide for yourself.

They claimed that Trooper Marmol lied, yet again, when he indicated that John Terry took responsibility for the vehicle and suggested that perhaps he was mistaken.  Perhaps it was Gerald who took responsibility for the vehicle.  They suggested that Trooper Marmol has access to recording devices, cameras, written statement forms that if John Terry made this statement, then he should have written it down.

Trooper Marmol can ask, but that doesn't mean that that can occur.  That doesn't always mean that the person has to follow through.

The suggestion then by defense counsel is that if a Defendant makes an incriminating statement, but it's unrecorded, that therefore you should not write that down, you should not base your case on that because that Defendant wasn't on video when they made the statement.  That's ridiculous, members of the jury.

The statement that Trooper Marmol testified to was that John Terry took responsibility for the vehicle, that words -- that series of words.  That phrase, by someone reading it, can be interpreted several ways.  Responsible for borrowing

the car, responsible for the vehicle and it contents, which I submit's the most obvious interpretation.

The defense doesn't want you to believe that because it's not helpful to their position. They want you to believe that when Agent Simpson took, "I take responsibility for the vehicle" to mean the vehicle and its contents, that he lied under oath. This is again another example of the facts being twisted to fit their narrative.

Beyond all of that, again, as I said when I addressed you during the beginning of my closing argument, you can set this whole statement aside. It doesn't matter at all because the evidence shows that the iPhone belongs to John Terry, the phone was found in the car with the three kilos of cocaine with the backwards 24, and that on the phone was photos of identical kilos of cocaine.

We went through the Government's exhibits that proved that it shows ownership of that particular device, and I'm not going to go through it again. Why? Because I submit that there is sufficient evidence for you to find that that phone belonged to John Terry.

And when the defense states that: Well, there are these, you know, loose ends that you didn't follow up on. The phone was subscribed to this other guy, there was an email address attached to the Apple ID associated with the phone that you didn't follow up on; it's the same answer because at some

point you have to draw the line. At some point you have compiled extensive evidence to show that this phone belongs to that person. It's not necessary to keep going.

When there's a photo of somebody with their ID saying, "I'm sorry, here's my ID," when there's a conversation depicting that person that includes a photo depicting the user of that phone; and the user of that phone, "You sent that picture to me of us," at that point you need to keep going? Members of the jury, use your common sense. Use your common sense and your experience to resolve the questions in this case.

Turning to the authenticity of the reports of the iPhone and the Samsung. Again, I described to you the process of the data extraction as testified to by Senior Forensic Examiner Sarvey, Special Agent Jim Simpson; I don't have to go through that again.

But, as I said before, I believe you will -- and maybe you should -- have an opportunity to compare those exhibits if you have questions about them. You can look at the file names for the files that are included in that report and compare it to the original. If you don't believe that those are on there, if you have doubts that these were something that was created out of full cloth by Agent Simpson for the specific purpose of incriminating John Terry, Agent Simpson who's been with the FBI for over ten years, that stations in Newark prior to coming to

Johnstown, if you believe that Agent Simpson would risk his entire career to copy, paste, edit PDF documents and create falsified evidence, then, by all means, compare it to the original.

Turning to the defense's arguments concerning Morgan Wiernusz. Recall that Forensic Scientist Wiernusz testified that she tested a sample from each of those three kilos. She testified that she took that sample from the middle where those kilos has been broken, an area of the kilos that had not been in contact with any surface. So even if you believe that there is some potential for cross contamination, those samples weren't taken from anywhere that would have touched that work space.

She also testified that her findings had to be reviewed by her supervisor before they could be included in the final lab report in which she opined, based on her training and experience, her undergraduate degree in chemistry, her training on the job as a forensic scientist, and previously a chemist within the Pennsylvania State Police Crime Lab, she wrote in her report, based on all of that experience, that this is a substance containing a detectable amount of cocaine and methamphetamine.

And you know what? The defense said: Well, when you're uncertain about something, you should get a second opinion? She did. She told you, her supervisor reviewed it,

agreed with the findings, and they finalized the report. I submit that there's no question about the contents of that lab report, and I'd submit that that lab report provides you sufficient basis for finding proof beyond a reasonable doubt that those three kilos contain cocaine and methamphetamine.

As for Mr. Dillard, I do want to clear up a mischaracterization of his testimony. The defense stated that the Government was talking to Robert Dillard about information that he had provided regarding Gerald Terry. Members of the jury, trust your own recollection of the facts on this.

Robert Dillard stated that he was in SCI-Greene serving a parole violation when, in fact, agents from Allegheny County District Attorney's office came to interview him regarding drug activity that occurred earlier in July of that year. During that conversation, he disclosed that his primary source of supply was an individual that he identified As fats from Philadelphia.

They asked him: Do you have any other sources where you would get cocaine? And he said: John Terry -- not Gerald Terry, not Sam Marshall, not some other person, John Terry. The first person that Robert Dillard identified as a secondary source of supply was John Terry. This idea that they're talking to him about Gerald and coerced, pressured him into mentioning John, totally false. Use your own recollection of the testimony you heard. It supports that finding.

Members of the jury, I stand by the presentation earlier regarding the contents of the iPhone. The Government has proven, proof beyond a reasonable doubt, that that iPhone belongs to John Terry. The contents of that iPhone prove beyond a reasonable doubt that Mr. John Terry conspired with his brother Gerald Terry and others, Robert Dillard, to possess with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of cocaine.

Likewise, I would submit that the evidence shows that John Terry also possessed the intent to distribute to that same amount of methamphetamine and cocaine because he knew that it was in that hidden compartment, he knew that they coordinated it with Robert Dillard, and therefore you should find him guilty of both counts.

THE COURT: All right, ladies and gentlemen of the jury. The next phase of the trial will be closing instructions, final instructions.

I can tell you that it will take quite a while to read those, so I'm going to let you get up, move around, go back to the jury assembly room. I'll give you ten minutes to use the restroom if you need to and clear your heads. Come back in here, and I'm estimating it will take me close to an hour to cover all the law in this case.

So I want you to make sure that you're alert and so -- during this recess, the same restrictions, admonitions and

instructions apply because you are not going to deliberate yet. You're still not supposed to talk to each other and are not to talk to each other about the case or to anyone else.

So we'll be back -- I have 4:06. Let's try to be back in court and ready to start at about 4:15. I'm not giving you a long recess, but long enough to use the restroom if you need to.

All right, we'll be in recess until call of court.

MR. KEYS, LAW CLERK: All rise; court is in recess.

(Jurors exit courtroom.)

THE COURT: Please be seated. The jury has left the courtroom, so these remarks are outside the hearing of the jury.

I've given the jurors a fairly limited amount of time, and I'm going to permit you the full recess if you need to use the restroom or anything like that. So we'll be in recess. Please be back in your seats, ready to start at 4:15.

MS. THOMPSON: I do have something, Your Honor.

Was it Your Honor's intent to have -- I'm not sure if I missed it, but was it Your Honor's intent to have the jury actually start deliberating today?

THE COURT: Yes.

MS. THOMPSON: Okay.

MR. BERNARD: Judge, I do ask -- I have one issue as well. At some point are we going to discuss the exhibits that

will go back with the jury?

THE COURT: Yes. After I finish my instructions, the attorneys should get together and agree on the exhibits that go back; and if you can't agree, then I'll take a role in that. Hopefully, there won't be any issues on that.

Yes, you can do take after I finish instructing them.

MR. BERNARD: All right.

THE COURT: All right, thank you.

(Brief recess taken.)

(In open court, with jurors and defendant seated.)

THE COURT: Please be seated.

We're now ready to have the final instructions. And as I told you previously, I do have to read these because they have to be totally accurate. I can't paraphrase or try to make it more interesting than it is, so please be patient, pay attention.

Members of the jury, you have seen and heard all the evidence and the arguments of the lawyers. Now I will instruct you on the law.

You have two duties as a jury. Your first duty to decide the facts from the evidence that you have heard and seen in court during the trial. That is your job and yours alone. I play no part in finding the facts. You should not take anything I may have said or done during the trial as indicating what I think of the evidence or what I think your verdict

should be.  Your second duty is to apply the law that I give to you to the facts.

My role now is to explain to you the legal principles that must guide you in your decisions.  You must apply my instructions carefully.  Each of the instructions is important, and you must apply all of them.  You must not substitute or follow your own notion or opinion about what the law is or ought to be.  You must apply the law that I give to you whether you agree with it or not.

Whatever your verdict, it will have to be unanimous.  All of you will have to agree on it, or there will be no verdict.  In the jury room, actually the jury assembly room, you will discuss the case among yourselves.  But, ultimately, each of you will have to make up his or her own mind.  This is a responsibility that each of you has and that you cannot avoid.

During deliberations, you must not communicate with or provide any information to anyone by any means about this case.  You may not use electronic devices or media such as telephone, cellphone, smartphone, iPhone, Blackberry or computer, Internet, any Internet service, any text or instant messaging service, any Internet chat room, blog, or website, such as Facebook, Myspace, LinkedIn, YouTube or Twitter to communicate to anyone any information about this case or to conduct any research about the case until I accept your verdict.

In other words, you cannot talk to anyone on the phone, correspond with anyone, or electronically communicate with anyone about this case. You can only discuss the case in the jury room with your fellow jurors during deliberations.

You may not use these electronic means to investigate or communicate about the case because it is important that you decide this case based solely on the evidence presented in this courtroom. You are only permitted to discuss the case with your fellow jurors during deliberations because they have seen and heard the same evidence you have.

In our judicial system, it is important that you are not influenced by anything or anyone outside of this courtroom. Perform these duties fairly and impartially; do not allow sympathy, prejudice, fear or public opinion to influence you. You should also not be influenced by any person's race, color, religion, national ancestry, gender, profession, occupation, economic circumstances or position in life or in the community.

You must make your decision in this case based only on the evidence that you saw and heard in this courtroom. Do not let rumors, suspicions or anything else that you may have seen or heard outside of court influence your decision in any way.

The evidence from which you are to find the facts consists of the following: The testimony of the witnesses, documents and other things received as exhibits, any fact or testimony that was stipulated -- that is, formally agreed to by

the parties.

The following are not evidence: The indictment, statements and arguments of the lawyers for the parties in this case, questions by the lawyers and questions that I might have asked, objections by lawyers including objections in which the lawyers stated facts, any testimony I struck or told you to disregard, and anything you may have seen or heard about this case outside of this courtroom.

You should use your common sense in weighing the evidence. Consider it in light of your everyday experience with people and events and give it whatever weight you believe that it deserves. If your experience and common sense tells you that certain evidence reasonably leads to a conclusion, you may reach that conclusion.

As I told you in my preliminary instructions, the Rules of Evidence control what can be received into evidence. During the trial, the lawyers objected when they thought that evidence was offered that was not permitted by the Rules of Evidence. These objections simply meant that the lawyers were asking me to decide whether the evidence should be allowed under the rules.

You should not be influenced by the fact that an objection was made. You should also not be influenced by my rulings or objections on side bar conferences you may have overheard. When I overruled an objection, the question was

answered or the exhibit was received as evidence, and you should treat that testimony or exhibit like any other.

When I allowed evidence, testimony or exhibits for a limited purpose only, I instructed you to consider that evidence only for that limited purpose, and you must do that.

When I sustained an objection, the question was not answered or the exhibit was not received as evidence. You must disregard the question or the exhibit entirely. Do not think about or guess what the witness might have said in answer to the question. Do not think about or guess what the exhibit might have shown.

Sometimes a witness may have already answered before a lawyer objected or before I ruled on the objection. If that happened, and if I sustained the objection, you must disregard the answer that was given. Also, if I ordered that some testimony or other evidence be stricken or removed from the record, you must disregard that evidence. When you are deciding this case, you must not consider or be influenced in any way by the testimony or other evidence that I told you to disregard.

Although the lawyers may have called upon your attention to certain facts or factual consequences or conclusions that they thought were important, what the lawyers said is not evidence and is not binding on you. It is your own recollection and interpretation of the evidence that controls

your decision in this case.

Finally, do not assume from anything I may have done or said during the trial that I have any opinion about any of the issues in this case or about what your verdict should be.

There are two types of evidence that may be used in this trial, direct evidence and circumstantial or indirect evidence.  You may use both types of evidence in reaching your verdict.

Direct evidence is simply evidence which, if believed, directly proves a fact.  For example, direct evidence occurs when a witness identifies -- or strike that -- when a witness testifies about something that the witness knows from his or her own senses, something the witness has seen, touched, heard or smelled.

Circumstantial evidence is evidence which, if believed, indirectly proves a fact.  It is evidence that proves one or more facts from which you could reasonably find or infer the existence of some other fact or facts.

A reasonable inference is simply a deduction or conclusion that reason, experience, and common sense lead you to make from the evidence.  A reasonable inference is not a suspicion or a guess.  It is a reasoned, logical decision to find that a disputed fact exists on the basis of another fact.

For example, if someone walked into the courtroom wearing a wet raincoat and carrying a wet umbrella, that would

be circumstantial or indirect evidence from which you could reasonably find or conclude that it was raining. You would not have to find that it was raining, but you could.

Sometimes different inferences may be drawn from the same set of facts. The Government may ask you to draw one inference, and the defense may ask you to draw another. You and you alone must decide what reasonable inferences you will draw based on all the evidence and your reasoned experience and common sense.

You should consider all the evidence that's presented in this trial, direct and circumstantial. The law makes no distinction between the weight you should give to either direct or circumstantial evidence. It is for you to decide how much weight to give any evidence.

As I stated in my preliminary instructions at the beginning of the trial, in deciding what the facts are, you must decide what testimony you believe and what testimony you do not believe. You are the sole judges of the credibility of the witnesses.

Credibility refers to whether a witness is worthy of belief. Was the witness truthful? Was the witness's testimony accurate? You may believe everything a witness says, or only part of it, or none of it.

You may decide whether to believe a witness based on his or her behavior and manner of testifying, the explanations

the witness gave, and all the other evidence in the case just as you would in any important matter where you are trying to decide if a person is truthful, straightforward and accurate in his or her recollection.

In deciding the question of credibility, remember to use your common sense, your good judgment, and your experience. In deciding what to believe, you may consider a number of factors: One, the opportunity and ability of the witness to see or hear or know the things about which the witness testified; two, the quality of the witness's knowledge, understanding and memory; three, the witness's appearance, behavior, and manner while testifying; four, whether the witness has an interest in the outcome of the case or any motive, bias or prejudice; five, any relation the witness may have had with a party in the case and any effect the verdict may have on the witness; six, whether the witness said or wrote anything before trial that was different from the witness's testimony in court; seven, how believable the witness's testimony was when considered with other evidence that you believe; and, eight, any other factors that bear on whether the witness should be believed.

Inconsistencies or discrepancies in a witness's testimony or between the testimony of different witnesses may or may not cause you to disbelieve a witness's testimony. Two or more persons witnessing an event may simply see or hear it

differently. Mistaken recollection, like failure to recall, is a common human experience. In weighing the effect of an inconsistency, you should also consider whether it was about a matter of importance or an insignificant detail.

You should also consider whether the inconsistency was innocent or intentional. You are not required to accept testimony even if the testimony was not contradicted and the witness was not impeached. You may decide that the witness is not worthy of belief because of the witness's bearing and demeanor or because of the inherent improbability of the testimony or for other reasons that are sufficient to you.

After you make your own judgment about the believability of a witness, you can then attach to that witness's testimony the importance and weight that you think it deserves.

The weight of the evidence to prove a fact does not necessarily depend on the number of witnesses who testified or the quantity of evidence that was presented. What is more important than numbers or quantity is how believable the witnesses were and how much weight you think their testimony deserves.

Although the Government is required to prove the Defendant guilty beyond a reasonable doubt, the Government is not required to present all possible evidence related to the case or to produce all possible witnesses who might have had

some knowledge about the facts of the case. In addition, as I have explained, the Defendant is not required to present any evidence or produce any witnesses.

The Defendant, John T. Terry, pleaded not guilty to the offenses charged. Mr. Terry is presumed to be innocent. He started this trial with a clean slate, with no evidence against him. The presumption of innocence stays with Mr. Terry unless and until the Government has presented evidence that overcomes that presumption by convincing you that Mr. Terry is guilty of the offenses charged beyond a reasonable doubt.

The presumption of innocence requires that you find Mr. Terry not guilty unless you are satisfied that the Government has proved guilt beyond a reasonable doubt. The presumption of innocence means that Mr. Terry has no burden or obligation to present any evidence at all or to prove that he is not guilty. The burden or obligation of proof is on the Government to prove that Mr. Terry is guilty, and this burden stays with the Government throughout the trial.

In order for you to find Mr. Terry guilty of the offenses charged, the Government must convince you that Mr. Terry is guilty beyond a reasonable doubt. That means that the Government must prove each and every element of the offenses charged beyond a reasonable doubt. A Defendant may not be convicted based on suspicion or conjecture, but only on evidence proving guilt beyond a reasonable doubt.

Proof beyond a reasonable doubt does not mean proof beyond all possible doubt or to a mathematical certainty. Possible doubts or doubts based on conjecture, speculation or hunch are not reasonable doubts.

A reasonable doubt is a fair doubt based on reason, logic, common sense or experience. It is a doubt that an ordinary reasonable person has after carefully weighing all of the evidence and is a doubt of the sort that would cause him or her to hesitate to act in matters of importance in his or her own life. It may arise from the evidence or from the lack of evidence or from the nature of the evidence.

If having now heard all the evidence you are convinced that the Government has proved each and every element of the offense charged beyond a reasonable doubt, you should return a verdict of guilty for that offense. However, if you have a reasonable doubt about one or more of the elements of the offenses charged, then you must return a verdict of not guilty for that offense.

As you know, Defendant John T. Terry is charged in the first superseding indictment with violating federal law. Specifically at Count 1, with conspiring to distribute and to possess with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine and cocaine, both Schedule II controlled substances; and at Count 2, with possessing with intent to

distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine and cocaine, both Schedule II controlled substances.

As I explained at the beginning of the trial, an indictment is just a formal way of specifying the exact crimes the Defendant is accused of committing. An indictment is simply a description of the charges against a Defendant. It is an accusation only. An indictment is not evidence of anything, and you should not give any weight to the fact that Mr. Terry has been indicted in making your decision in this case.

You will note that the first superseding indictment charges that the offense was committed on or about a certain date. The Government does not have to prove with certainty the exact date of the alleged offense. It is sufficient if the Government proves beyond a reasonable doubt that the offense was committed on a date reasonably near the date charged.

The Government and Defendant have agreed that the following fact is true. This is a stipulation of fact. The chain of custody of all seized evidence was unbroken, proper and in accord with the procedures of the Pennsylvania State Police and the Federal Bureau of Investigation. The evidence seized was maintained in constant law enforcement custody. It was logged into and secured in evidence at all times. It has been securely transported by law enforcement members to the Federal Courthouse in Johnstown for trial. Proper

documentation reflects any movement of the items.  You should therefore treat this fact as having been proved.  You are not required to do so, however, since you are the sole judges of the facts.

The Rules of Evidence ordinarily do not permit witnesses to state their own opinions about important questions in a trial, but there are exceptions to these rules.  In this case you heard testimony from James Simpson and Morgan Wiernusz.  Because of his knowledge, skill, experience, training, or education in the field of drug trafficking and coded language of drug trafficking Agent Simpson was permitted to offer opinions in that field and the reasons for those opinions.  Further, because of her knowledge, skill, experience, training, or education in the field of drug identification, Forensic Scientist Wiernusz was permitted to offer opinions in that field and the reasons for those opinions.

The opinions of these witnesses should receive whatever weight you think appropriate, given all the other evidence in the case.  In weighing this opinion testimony, you must consider the witness's qualifications, the reasons for the witness's opinions, and the reliability of the information supporting the witness's opinions as well as the other factors discussed in these instructions for weighing the testimony of witnesses.

You may disregard the opinions entirely if you decide that Agent Simpson and Forensic Scientist Wiernusz's opinions are not based on sufficient knowledge, skill, experience, training, or education. You may also disregard their opinions if you conclude that the reasons given in support of the opinions are not sound or if you conclude that the opinions are not supported by the facts shown by the evidence or if you think the opinions are outweighed by other evidence.

During the trial, you heard testimony of witnesses and argument by counsel that the Government did not use specific investigative techniques such as fingerprinting analysis and DNA analysis. You may consider these facts in deciding whether the Government has met its burden of proof because, as I told you, you should look at all of the evidence or lack of evidence in deciding whether the Defendant is guilty.

However, there is no legal requirement that the Government use any of these specific investigative techniques or all possible techniques to prove its case. There is no requirement to attempt to take fingerprints or to offer fingerprint evidence or to gather DNA evidence or to offer DNA analysis. Your concern, as I have said, is to determine whether or not the evidence admitted in this case proves the Defendant's guilt beyond a reasonable doubt.

You have heard the testimony of law enforcement officers. The fact that a witness is employed as a law

enforcement officer does not mean that his testimony necessarily deserves any more or less consideration or greater or lesser weight than that of any other witness. You must decide after reviewing all the evidence whether you believe the testimony of the law enforcement witness and how much weight, if any, it deserves.

You have heard evidence that Robert Dillard is a cooperating witness and that he is someone who has made a plea agreement with the Government. His testimony was received in evidence and may be considered by you. The Government is permitted to present the testimony of someone who has reached a plea agreement in exchange for his testimony, but you should consider the testimony of Robert Dillard with great care and caution. In evaluating Robert Dillard's testimony, you should consider this fact along with the others that I have called to your attention.

Whether or not his testimony may have been influenced by the plea agreement is for you to determine. You may give his testimony such weight as you think it deserves. You must not consider Robert Dillard's guilty plea as any evidence of John T. Terry's guilt. His decision to plead guilty was a personal decision about his own guilt. Such evidence is offered only to allow you to assess the credibility of the witness, to eliminate any concern that the Defendant has been singled out for prosecution, and to explain how the witness

came to possess detailed first-hand knowledge of the events about which he testified.  You may consider Robert Dillard's guilty plea only for these purposes.

You have heard the testimony of certain witnesses. You have also heard that before this trial they made statements that may be different from their testimony in this trial.  It is up to you to determine whether these statements were made and whether they were different from the witness's testimony in this trial.

These earlier statements were brought to your attention only to help you decide whether to believe the witness's testimony here at trial.  You cannot use it as proof of the truth of what the witness has said in the earlier statements.  You can only use it as one way of evaluating the witness's testimony in this case.

You have heard evidence that Robert Dillard, a witness, was previously convicted of multiple crimes punishable by more than one year in jail.  You may consider this evidence along with other pertinent evidence in deciding whether or not to believe Robert Dillard and how much weight to give to Robert Dillard's testimony.

If you believe that a witness knowingly testified falsely concerning any important matter, you may distrust the witness's testimony concerning other matters.  You may reject all of the testimony or you may accept such parts of the

testimony that you believe are true and give it such weight as you believe it deserves.

In a criminal case, the Defendant has a constitutional right not to testify. However, if he chooses to testify, he is, of course, permitted to take the witness stand on his own behalf. In this case John T. Terry testified. You should examine and evaluate his testimony just as you would the testimony of any witness.

You have heard testimony that the Defendant, Mr. Terry, possessed photographs depicting pressed cocaine that was imprinted with a backwards two within one month of his arrest on April 4, 2018. You have also heard testimony that the Defendant, Mr. Terry, sent and received certain text messages during the period in time leading up to his arrest on April 4, 2018.

This evidence of other acts was admitted only for limited purposes. You may consider this evidence only for the purpose of deciding whether the Defendant, one, had knowledge to commit the crimes charged in the first superseding indictment; two, had the opportunity to commit the acts charged in the first superseding indictment; or, three, is the person who committed the crimes charged in the first superseding indictment.

Specifically, you may use this evidence in considering whether Mr. Terry was the individual who possessed the iPhone

as well as the items found in the hidden compartment of the vehicle in which Mr. Terry was riding on April 4, 2018. Do not consider this evidence for any other purpose. Of course, it is for you to determine whether you believe this evidence and, if you do believe it, whether to accept it for the purpose offered. You may give it such weight as you feel it deserves, but only for the limited purposes that I described to you.

The Defendant is not on trial for committing these other acts. You may not consider the evidence of these other acts as a substitute for proof that the Defendant committed the crimes charged. You may not consider this evidence as proof that the Defendant has a bad character or any propensity to commit crimes. Specifically, you may not use this evidence to conclude that because the Defendant may have committed the other acts, he must also have committed the acts charged in the first superseding indictment.

Remember that the Defendant is on trial here only for conspiring to distribute and to possess with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine and cocaine and possessing with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine and cocaine. Do not return a guilty verdict unless the Government proves the crimes charged in the first superseding indictment beyond a reasonable doubt.

You have heard reputation evidence about whether the Defendant has a character trait for truthfulness, honesty and law-abiding nature. You should consider this character evidence together with and in the same way as all the other evidence in deciding whether the Government has proved the charges beyond a reasonable doubt.

You heard Niddarah Winters testify about the Defendant's reputation for truthfulness, honesty, and law-abiding nature. On cross-examination of Niddarah Winters, the prosecutor asked her some questions about whether she had heard that John T. Terry has been charged with certain crimes in federal court. The prosecutor was allowed to ask these questions only to test whether Miss Winters was familiar with the reputation of the Defendant in the community. This is not evidence that the acts described in those questions actually occurred.

You may not use the information developed by the prosecutor on this subject for any other purpose. Specifically, you may not use this information to conclude that the Defendant committed the acts charged in the first superseding indictment or as proof that the Defendant has a bad character or any propensity to commit crimes.

Elements of Count 1. Count 1 of the first superseding indictment charges that on or about March 30, 2018, to on or about April 4, 2018, in the Western District of Pennsylvania

and elsewhere, the Defendant, John T. Terry, and Gerald Terry and others known to the Grand Jury did knowingly, intentionally and unlawfully conspire, confederate and agree together and with one another to distribute and to possess with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine and a detectable amount of cocaine, both Schedule II controlled substances, contrary to the provisions of Title 21 United States Code, Sections 841(a)(1), 841(b)(1)(A)(viii), and 841(b)(1)(B)(ii) in violation of Title 21 United States Code, Section 846.

It is a federal crime for two or more persons to agree or conspire to commit any offense against the United States, even if they never actually achieve their objective.  A conspiracy is a kind of criminal partnership.  In order for you to find John T. Terry guilty of conspiracy to distribute and to possess with intent to distribute a controlled substance, you must find that the Government proved beyond a reasonable doubt each of the following three elements.

First, that two or more persons agreed to distribute and to possess with the intent to distribute a controlled substance.  Second, that John T. Terry was a party to or member of that agreement.  And, third, that John T. Terry joined the agreement or conspiracy knowing of its objective to distribute and to possess with intent to distribute a controlled substance

and intending to join together with at least one other alleged conspirator to achieve that objective. That is, that John T. Terry and at least one other alleged conspirator shared a unity of purpose and the intent to achieve those objectives. I will now explain these elements in more detail.

The first element of the crime of conspiracy is the existence of an agreement. The Government must prove beyond a reasonable doubt that two or more persons knowingly and intentionally arrived at a mutual understanding or agreement, either spoken or unspoken, to work together to achieve the overall objective of the conspiracy, to distribute and to possess with the intent to distribute a controlled substance.

The Government does not have to prove the existence of a formal or written agreement or an express oral agreement spelling out the details of the understanding. The Government also does not have to prove that all members of the conspiracy met directly or discussed between themselves their unlawful objectives or agreed to all the details or agreed to what means were -- by which the objectives were to be accomplished. The Government is not even required to prove that all the people named in the first superseding indictment were, in fact, parties to the agreement or that all members of the alleged conspiracy were named, or that all members of the conspiracy are even known.

What the Government must prove beyond a reasonable

doubt is that two or more persons in some way or manner arrived at some type of agreement, mutual understanding, or meeting of the minds to try around accomplish a common and unlawful objective.

You may consider both direct evidence and circumstantial evidence in deciding whether the Government has proved beyond a reasonable doubt that an agreement or mutual understanding existed. You may find the existence of a conspiracy based on reasonable inferences drawn from the actions and statements of the alleged members of the conspiracy, from the circumstances surrounding the scheme, and from evidence of related facts and circumstances which prove that the activities of the participants in a criminal venture could not have been carried out except as the result of a preconceived agreement, scheme or understanding.

If you find that a criminal agreement or conspiracy existed, then in order to find John T. Terry guilty of conspiracy, you must also find that the Government proved beyond a reasonable doubt that John T. Terry knowingly and intentionally joined that agreement or conspiracy during its existence.

The Government must prove that John T. Terry knew the goal or objective of the agreement or conspiracy and voluntarily joined it during its existence, intending to achieve the common goal or objective and to work together with

other alleged conspirators toward those goals or objectives.

The Government need not prove that John T. Terry knew everything about the conspiracy or that he knew everyone involved in it or that he was a member from the beginning. The Government also does not have to prove that John T. Terry played a major or substantial role in the conspiracy. You may consider both direct evidence and circumstantial evidence in deciding whether John T. Terry joined the conspiracy, knew of its criminal objective, and intended to further the objective.

Evidence which shows that John T. Terry only knew about the conspiracy or only kept bad company by associating with members of the conspiracy or was the -- or was only present when it was discussed or when a crime was committed is not sufficient to prove that John T. Terry was a member of the conspiracy, even if John T. Terry approved of what was happening or did not object to it.

Likewise, evidence showing that John T. Terry may have done something that happened to help a conspiracy does not necessarily mean that he joined the conspiracy. You may, however, consider this evidence with all other evidence in deciding whether the Government proved beyond a reasonable doubt that John T. Terry joined the conspiracy.

In order to find John T. Terry guilty of conspiracy, you must find that the Government proved beyond a reasonable doubt that John T. Terry joined the conspiracy knowing of its

objective and intending to help further or achieve that objective. That is, the Government must prove that John T. Terry knew of the objective or goal of the conspiracy and that John T. Terry joined the conspiracy intending to help further achieve that goal or objective, and that at least one other alleged conspirator shared a unity of purpose toward that objective or goal.

You may consider both direct evidence and circumstantial evidence including John T. Terry's words or conduct and other facts and circumstances in deciding whether John T. Terry had the requisite knowledge and intent.

The Government is not required to prove that any of the members of the conspiracy were successful in achieving any or all of the objectives of the conspiracy. You may find John T. Terry guilty of conspiracy if you find that the Government proved beyond a reasonable doubt the elements I have explained even if you find the Government did not prove that any of the conspirators actually committed any other offense again the United States.

Conspiracy is a criminal offense separate from the offense that was the objective of the conspiracy. Conspiracy is complete without the commission of the offense.

Evidence has been admitted in this case that certain persons who are alleged to be co-conspirators of John T. Terry did or said certain things. The acts or statements of any

member of the conspiracy are treated as the acts or statements of all the members of the conspiracy if these acts or statements were performed or spoken during the existence of the conspiracy and to further the objectives of the conspiracy. Therefore, you may consider as evidence against John T. Terry any acts done or statements made by any members of the conspiracy during the existence of and to further the objectives of the conspiracy.

You may consider these acts and statements even if they were done and made in John T. Terry's absence and without his knowledge. As with all the evidence presented in the case, it is for you to decide whether you believe this evidence and how much weight to give it.

If you find John T. Terry guilty of the offense charged in Count 1, you must answer some questions called jury interrogatories to decide whether the offense involved certain types of controlled substances and certain weights or quantities of controlled substances. Do not answer these jury interrogatories until you have reached your verdict -- until after you have reached your verdict.

If you find that the Government has not proved John T. Terry guilty of the offense charged in Count 1, then you do not need to answer the interrogatories. If you find John T. Terry guilty, then in answering these interrogatories, as in deciding your verdict, you must be unanimous.

And in order to find that the offense involved a particular type of controlled substance or controlled substances, and a weight or quantity of controlled substances or controlled substance, you must all be satisfied that the Government proved the type of controlled substance or substances and weight or quantity beyond a reasonable doubt. "Weight or quantity" means the total weight of any mixture or substance which contains a detectable amount of the controlled substances charged.

The first Jury Interrogatory No. 1 relates to Count 1 and first asks whether you unanimously find beyond a reasonable doubt that the mixture and substance which was involved in the conspiracy was methamphetamine and cocaine or cocaine. You are instructed to select only one answer. In making this decision, you should consider all controlled substances that the members of the conspiracy actually possessed with intent to distribute.

Once you answer the first jury interrogatory regarding Count No. 1, you must then answer the second jury interrogatory regarding Count No. 1, whether you unanimously find beyond a reasonable doubt that the weight or quantity of the mixture or substance contained in the conspiracy or involved in the conspiracy was 500 hundred grams or more, or at least 50 grams but less than 500 grams, or less than 50 grams. You are instructed to select only one answer.

That completes the two jury interrogatories regarding

Count No. 1.

Count 2. Count 2 of the first superseding indictment charges that on or about April 4, 2018, in the Western District of Pennsylvania, John T. Terry did knowingly, intentionally, and unlawfully possess with the intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine and a detectable amount of cocaine, both Schedule II controlled substances, in violation of Title 21 United States Code, Sections 841(a)(1), 841(b)(1)(A)(viii), and 841(b)(1)(B)(ii).

In order to find John T. Terry guilty of this offense, you must find that the Government proved each of the following four elements beyond a reasonable doubt. First, that John T. Terry possessed a mixture or substance containing a controlled substance. Second, that John T. Terry possessed the controlled substance knowingly or intentionally. Third, that John T. Terry intended to distribute the controlled substance. And, fourth, that the controlled substance was methamphetamine and cocaine or cocaine.

To possess a controlled substance means to have it within a person's control. The Government does not have to prove that John T. Terry physically held the substance, the controlled substance, that is had actual possession of it. As long as the controlled substance was within John T. Terry's control, he possessed it.

If you find that John T. Terry either had actual possession of the controlled substance or had the power and intention to exercise control over it, even if it was not in John T. Terry's physical possession, that is, that John T. Terry had the ability to take actual possession of the substance when John T. Terry wanted to do so, you may find that the Government had proved possession. Possession may be momentary or fleeting. Proof of ownership of the controlled substance is not required.

The law also recognizes that possession may be sole or joint. If one person alone possesses a controlled substance, that is sole possession. However, more than one person may have the power and intention to exercise control over the controlled substance. This is called joint possession. If you find that John T. Terry had such power and intention, then he possessed the controlled substance even if he possessed it jointly with another.

Mere proximity to the controlled substance or mere presence on the location property where it is located, or mere association with the person who does control the controlled substance or property is not enough to support a finding of possession.

To "distribute" as used in the offenses charged means to deliver or transfer possession or control of a controlled substance from one person to another. To "distribute" includes

the sale of a controlled substance by one person to another, but does not require a sale. "Distribute" also includes a transfer without any financial compensation such as a gift or trade.

You are instructed that as a matter of law cocaine and methamphetamine are controlled substances. That is, they are prohibited drugs under federal drug abuse laws. It is solely for you, however, to decide whether the Government has proved beyond a reasonable doubt that John T. Terry possessed with the intent to distribute a mixture or substance containing methamphetamine and/or cocaine.

To "act knowingly" as used in the offenses charged means that John T. Terry was conscious and aware that he engaged in the acts charged and knew of the surrounding facts and circumstances that make out the offenses. "Knowingly" does not require that John T. Terry knew that the acts charged and the surrounding facts amounted to a crime.

To "act intentionally" as used in the offenses charged means to act deliberately and not by accident. "Intentionally" does not require that John T. Terry intended to violate the law.

The phrase "knowingly or intentionally" as used in the offenses charged requires the Government to prove beyond a reasonable doubt either that John T. Terry knew that what he possessed with intent to distribute was a controlled substance

under federal drug abuse laws, even if he did not know what the substance was, or John T. Terry knew that the controlled substance was, in fact, a mixture or substance containing a detectable amount of methamphetamine and cocaine or cocaine.

In addition, the Government must prove beyond a reasonable doubt that the controlled substance was, in fact, methamphetamine and cocaine or cocaine.

In deciding whether John T. Terry acted knowingly or intentionally, you may consider evidence about what John T. Terry said, what John T. Terry did and failed to do, and how John T. Terry acted, and all other facts and circumstances shown by the evidence that may prove what was in John T. Terry's mind at that time.

In order to find John T. Terry guilty of possession of a controlled substance with intent to distribute, as charged in Count 2 of the first superseding indictment, you must find that the Government proved beyond a reasonable doubt that John T. Terry intended to distribute a mixture or substance containing a controlled substance.

To find that John T. Terry had the intent to distribute, you must find that John T. Terry had in mind or planned in some way to deliver or transfer possession or control over the controlled substance to someone else. In determining whether John T. Terry had the intent to distribute, you may consider all the facts and circumstances shown by the

evidence presented including John T. Terry's words and actions.

In determining John T. Terry's intent to distribute controlled substances, you may also consider, among other things, the quantity and purity of the controlled substance, the manner in which the controlled substance was packaged, and the presence or absence of weapons, large amounts of cash, or equipment used in the processing or sale of controlled substances.

Count 2 of the first superseding indictment charges that on or about April 4, 2018, in the Western District of Pennsylvania, John T. Terry did knowingly, intentionally, and unlawfully possess with the intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine and detectable amount of cocaine, both Schedule II controlled substances.

The Government may prove John T. Terry guilty of this offense by proving that John T. Terry personally committed it. The Government may also prove John T. Terry guilty of this offense based on the legal rule that each member of a conspiracy is responsible for crimes and other acts committed by other members as long as those crimes and acts were committed to help further or achieve the objective of the conspiracy and were reasonably foreseeable to John T. Terry as a necessary or natural consequence of the agreement.

In other words, under certain circumstances, the act

of one conspirator may be treated as the act of all.  This means that all the conspirators may be convicted of a crime committed by any one or more of them, even though they did not all personally participate in that crime themselves.

In order to find John T. Terry guilty of possess with intent to distribute a controlled substance charged in Count 2 based on this legal rule, you must find that the Government proved beyond a reasonable doubt each of the following four requirements.

First, that John T. Terry was a member of the conspiracy charged in the first superseding indictment. Second, that while John T. Terry was still a member of that conspiracy, one or more other members of the conspiracy committed the offense charged at Count 2 by committing each of the elements of that offense as I explained those elements to you in these instructions.  However, the other members of the conspiracy need not have been proved -- found guilty or even charged with the offenses as long as you find that the Government proved beyond a reasonable doubt that the other members committed the offenses.

Third, that the other members of the conspiracy committed this offense within the scope of the unlawful agreement and to help further or achieve the objective of the conspiracy.  And, fourth, that this offense was reasonably foreseeable to or reasonably anticipated by John T. Terry as a

necessary or natural consequence of the unlawful agreement.

The Government does not have to prove that John T. Terry specifically agreed or knew that this offense would be committed. However, the Government must prove that the offense was reasonably foreseeable to John T. Terry as a member of the conspiracy and within the scope of the agreement as John T. Terry understood it.

If you find John T. Terry guilty of the offense charged in Count 2, you must answer some questions called jury interrogatories to decide whether the offense involved specific types of controlled substances and certain weights or quantities of controlled substances. Do not answer these jury interrogatories until after you have reached your verdict.

If you find that the Government has not proved John T. Terry guilty of the offense charged in Count 2, then you do not need to answer the interrogatories.

If you find John T. Terry guilty, then in answering these interrogatories, as in deciding your verdict, you must be unanimous. And in order to find that the offense involved a particular type of controlled substance or controlled substances and a weight or quantity of controlled substances or a controlled substance, you must all be satisfied that the Government proved the type of controlled substances or controlled substance and the weight or quantity beyond a reasonable doubt.

"Weight or quantity" means the total weight of any mixture or substance which contains a detectable amount of the controlled substances charged.

The first jury interrogatory regarding Count 2 relates to Count 2 and asks whether you unanimously find beyond a reasonable doubt that the mixture or substance the Defendant possessed with intent to distribute contained a detectable amount of methamphetamine and cocaine or cocaine. You are instructed to select only one answer.

Once you answer the first jury interrogatory regarding Count No. 2, you must then answer the second jury interrogatory regarding Count No. 2, whether you unanimously find beyond a reasonable doubt that the weight of the mixture or substance the Defendant possessed with the intent to distribute is 500 grams or more, or at least 50 grams but less than 500 grams, or less than 50 grams. You are instructed to select only one answer.

That completes the two jury interrogatories regarding Count No. 2.

At this time -- in a few moments -- the regular jurors in Seats 1 through 12 will begin their deliberations in the case. Nevertheless, the alternate jurors in Seats 13 and 14 are not excused. While the jury conducts its deliberations, the alternate jurors shall remain in the jury deliberation room. Mr. Feldman and Mr. Keys will escort you to that room.

During this time -- I'm addressing this to the alternate jurors now -- you must continue to observe all the restrictions I have instructed you on throughout the trial. That is, the alternate jurors must not discuss this case with anyone. Do not speak at all with any of the regular jurors, the parties, the witnesses or the attorneys. Do not permit anyone to discuss the case with you. Do not even remain in the presence of anyone discussing the case. If anyone approaches you as an alternate juror and tries to talk to you about the case, please report that to me through my court staff immediately.

As news coverage of this case may be continuing, do not watch or listen to any news reports concerning this trial on television or radio. Do not read any news accounts of this trial in a newspaper or the Internet. Do not use the Internet to search for information about the parties, witnesses, lawyers or anything else associated with the trial. Do not visit the scene of any alleged offense or conduct, do any kind of investigation of your own.

Should you be asked to participate in reaching a verdict in this case, the only information you will be allowed to consider in deciding the case is what you learned in this courtroom during the trial.

That concludes my instructions on the law regarding testimony and other evidence and the offenses charged. Now let

me explain some things about your deliberations in the jury assembly room and your possible verdicts.

The first thing you should do in the jury assembly room is to choose someone to be your foreperson. This person will speak for the jury here in court. He or she will also preside over your discussions. However, the views and vote of the foreperson are entitled to no greater weight than those of any other juror.

Second, I want to remind you that your verdict, whether it is guilty or not guilty, must be unanimous. To find John T. Terry guilty of an offense, every one of you must agree that the Government has overcome the presumption of innocence with evidence that proves each element of the offense beyond a reasonable doubt. To find Mr. Terry not guilty, every one of you must agree that the Government has failed to convince you beyond a reasonable doubt.

Third, if you decide that the Government has proved Mr. Terry guilty, then it will be my responsibility to decide what the appropriate punishment should be. You should never consider the possible punishment in reaching your verdict.

Fourth, as I have said before, your verdict must be based only on the evidence received in this case and the law as I have given it to you. You should not take anything I may have said or done during the trial as indicating what I think of the evidence or what I think your verdict should be. What

the verdict should be is the exclusive responsibility of the jury.

Fifth, now that all the evidence is in and the arguments are completed, and once I have finished these instructions, you are free to talk about the case in the jury assembly room. In fact, it is your duty to talk with each other about the evidence and to make every reasonable effort you can to reach unanimous agreement.

Talk with each other, listen carefully and respectfully to each other's views, and keep an open mind as you listen to what your fellow jurors have to say. Do not hesitate to change your mind if you are convinced that the other jurors are right and that your original position was wrong. But do not ever change your mind just because other jurors see things differently or just to get the case over with. In the end, your vote must be exactly that, your own vote. It is important for you to reach unanimous agreement, but only if you can do so honestly and in good conscience.

Listen carefully to what the other jurors have to say and then decide for yourself if the Government has proved the Defendant guilty beyond a reasonable doubt.

No one will be allowed to hear your discussions in the jury deliberations room, and no record will be made of what you say. You should all feel free to speak your minds.

Remember, if you elected to take notes during the

trial, your notes should be used only as memory aids. You should not give your notes greater weight than your independent recollection of the evidence. You should rely upon your own independent recollection of the evidence or lack of evidence, and you should not be unduly influenced by the notes of other jurors. Notes are not entitled to any more weight than the memory or impression of each juror.

Sixth, once you start deliberating, do not talk, communicate with, or provide any information about this case by any means to the court officials, or to me, or to anyone else except each other.

During your deliberations, you may not use any electronic device or media such as telephone, cellphone, smartphone, iPhone, Blackberry or computer, the Internet, Internet service, or any text or messaging service, or any Internet chat room, blog, or website such as Facebook, Myspace, LinkedIn, YouTube or Twitter to communicate to anyone any information about this case or to conduct any research about this case.

Seventh, if you have any questions or messages, your foreperson should write them down on a piece of paper, sign the paper, and then give it to the court official who will give it to me. I will first talk to the lawyers about what you have asked, and I will respond as soon as I can. In the meantime, if possible, continue with your deliberations on some other

subject.

If you want to see any of the exhibits that were admitted into evidence, you may send me a message; and if I can legally do so, I will have those exhibits pried to you.  There will be exhibits sent out with you to the jury assembly room.

One more thing about messages.  Do not ever write down or tell anyone how you or anyone else voted.  That should stay secret until you have finished your deliberations.  If you have occasion to communicate with the Court while you are deliberating, do not disclose the number of jurors who have voted to convict or acquit on any offense.

A verdict form has been prepared, and you should use it to record your verdict.  The verdict form is here, and there is an envelope attached to put it into when you bring it back into court.

Take this form with you to the jury room.  When you have reached your unanimous verdicts, the foreperson should write the verdicts on the form, date it, and sign it, and then all of you sign it and return it to the courtroom and give the form to my courtroom deputy to give to me.

If you decide that the Government has proved John T. Terry guilty of any or all of the offenses charged beyond a reasonable doubt, say so by having your foreperson mark the appropriate place on the form.  If you decide that the Government has not proved Mr. Terry guilty of some or all of

the offenses charged beyond a reasonable doubt, say so by having your foreperson mark the appropriate place on the form.

Further, I want to remind you that nothing about my instructions and nothing about the form of verdict is intended to suggest or convey in any way or manner what I think your verdict should be. It is your sole and exclusive duty and responsibility to determine the verdict.

Very shortly the Court will excuse you to commence your deliberations. The Court thanks you for your earnest and diligent service to this point.

And one last important point. Please be aware that after you complete your deliberations, there may be some additional evidence presented and an additional matter about which you will have to deliberate. I will discuss that later if necessary.

Would counsel approach, please.

(At side bar.)

THE COURT: Any objection to the instructions as read?

MR. BERNARD: No, Your Honor.

MS. THOMPSON: I think I missed it. I think I missed looking at the very last two sentences telling them that there's going to be additional evidence to present. I think that's going to be --

THE COURT: That is phase two.

MS. THOMPSON: I know, but I mean telling them there

is a phase two --

THE COURT: That's part of the Circuit's suggested instructions, and that's why I read it.

MS. THOMPSON: Okay.

THE COURT: It wasn't my own; I didn't make that up.

MS. THOMPSON: I guess wouldn't they leave -- wouldn't that they leave a question in the jury's mind: Well, maybe they don't have evidence now, but maybe they will have enough evidence?

THE COURT: I don't really know how to respond to that other than saying that's the Third Circuit suggested instruction. This is a bifurcated proceedings, and I read it. I think they understand what they have to do, what they're supposed to use to decide the first two counts.

MR. BERNARD: Those last lines indicate that it may be a decision of another matter, so I think that indicates that the evidence that may be presented --

THE COURT: It's sort of specific and not specific, but that's the language that was provided.

MR. BERNARD: Yeah, I have no objection.

THE COURT: I understand what you're saying.

MS. THOMPSON: Okay.

THE COURT: The exhibits, you are to agree as to what goes out and what doesn't go out. I will tell you I don't believe there's any equipment in there to play any CDs or

anything; so if they want to look at something again that's on the CD or something like that, they're going to have to come back here and look at it because we don't have that capability in the jury room.

MS. THOMPSON: And to that point, while I was talking at, I think on the CD that's relevant to that would be the Government's Exhibit 1, 1/9. The Government exhibits -- I believe it was 22, 24, 25, and 26 -- many were only admitted for the limited purpose of chain of custody, so that shouldn't be available for viewing to the jury.

MR. BERNARD: Judge, at the time they were offered, they were admitted for that limited purpose because the Defendant had not yet raised his defense, at least through presentation of witnesses, closing argument.

Following the defense presentation, the defense has raised the issue that the generated reports by Agent Simpson are somehow manipulated, fabricated, edited, and that they are not accurate as to the content of the cellphones that were extracted. In light of that, I would submit that the Government should be able to admit those items for the jury to consider.

And I recognize that those items contain evidence that is not admissible, but the way that they would be able to work around that would be if they wanted to view a particular item conveyed on the report, on the original extraction, they can

indicate which item it is, we can put the original report in, pull up that original item, and display only that.

THE COURT: I think they should be kept here, and they can ask for them if they want to see them, and then we can sort out whether or not they should see them or no see them.

MS. THOMPSON: Well, in response to that, the Government did not -- the Government had an opportunity to present that evidence in rebuttal. They never did that. So there was no such matching of Agent Simpson's Exhibits 31 and 34 during the trial with those CDs, 22, 24, 25 and 26. So the Government shouldn't be allowed to let the jury now conduct an investigation.

THE COURT: We will keep them here for now. You may be anticipating something they don't even ask for. We're not going to send them out; but if they ask to see them, then we can get into these circumstances. I'm not sure that they will.

MR. BERNARD: Okay.

THE COURT: And the CD No. 1, we will have to play that for them in here if they want to see it again.

MS. THOMPSON: That also includes the whole stop, so they would have to let us know which one way to view. They can ask for the VC, the traveling stop, and that would be one; correct?

MR. BERNARD: Right. But, you know, we had presented clips that were edited because they -- the full stop contains

inadmissible material.

THE COURT: Right.

MR. BERNARD: But we can perceive specification, if it comes up.

THE COURT: I think we might be addressing something that's not even going to be requested at this point.

MR. BERNARD: Okay.

THE COURT: Okay. Well, make sure you get the exhibits that should go out, and Mr. Keys gets them to take to the jury room. I'm going to send a copy of my charge out also, the same that you have, exactly the same.

MR. BERNARD: Okay.

THE COURT: That's a lot to digest --

MR. BERNARD: Yes.

THE COURT: -- in one sitting, so I'll send the envelope, the verdict form, and a copy of the charge.

MS. THOMPSON: Okay.

THE COURT: And I want to express the appreciation of the Court on your conduct in this trial. I think you both did an excellent job.

MR. BERNARD: Thank you.

MS. THOMPSON: I would say the same thing, Your Honor, as well.

(In open court.)

THE COURT: All right. Ladies and gentlemen, at this

time I'm going to have Mr. Keys escort you to the jury assembly room.

The attorneys will put the exhibits together and then he'll bring them in very shortly. But this is your verdict form with the envelope. This is a copy of what I just read to you in case you want to go back and check certain things. It's a lot to digest in one sitting without having it in front you, so this is a copy of the complete charge that I just read. I'll give that to Mr. Keys.

And if you would, during this recess -- I'll declare a recess. Please escort the 12 jurors to the jury assembly room and the two alternates to the deliberations room, and I'll just say we're keeping the alternates here because at some point, depending on if we lose a juror to illness or something like that, you may be called upon to deliberate, so that's why we're not excusing you.

Okay. Thank you.

MR. KEYS, LAW CLERK: All rise. Court is in recess.

(Alternate jurors and jury exit the courtroom.)

THE COURT: Please be seated. The jury has left the courtroom and to go to the jury assembly room where they'll deliberate; and the two alternate jurors will be taken to the old deliberations room separate from the other twelve jurors.

And if we have your cellphone number that we can contact you -- please stay within a distance where you can be

back in the courtroom within 15 minutes.

I can tell you if you go up to the hotel/motel on Market Street, that's walkable within 15 minutes. If you're staying somewhere else, I'm not certain. But please be available to be back in here within 15 minutes. If I contact you, it may not be for a verdict, it may just be for a question.

All right, anything further from either party or counsel?

MR. BERNARD: No, Your Honor.

MS. THOMPSON: No, Your Honor.

THE COURT: All right. Thank you.

(Jury deliberations begun.)

(Open court, with Defendant seated; without jury.)

THE COURT: Please be seated.

We have a question -- more of a request than a question. It reads as follows: Can we please have the CD with the dash cam video for review, signed by the -- evidently the foreperson.

I don't believe we have anything in the jury assembly room that can play the video that was played here, so what we could do is bring the jury in here and just play it for them without any speaking by us in terms of narrating or anything, just let them watch it.

MS. THOMPSON: Your Honor, I would also suggest, since

we don't really know, there's four clips that the Government has on there, plus the long video which is over an hour in length. So I presume that they're speaking of one of the four clips, but we don't know which one. So would we just play all four clips?

THE COURT: Well, I can ask them which one they want to see. They could probably be more specific, if they -- I'm just guessing it was maybe the traffic stop, the first one that you've played. It's one they've already seen, so I can ask them to be more specific.

MS. THOMPSON: I mean I would say either ask -- I don't think the four clips would take more than five, ten minutes if we just played all four clips, either way. But --

MR. BERNARD: There are five clips. I think the longest one is about four minutes. So I think a total we're looking at maybe 15 minutes or so at one time.

But if the Court wants to inquire if there's a specific portion they want --

THE COURT: I can ask them once they come in here if they have some specific portion that they want to see. If they want to see all of them, that's fine.

I'm going to have the jury come back in and they can be seated, and I'll make on offer that we can play all of them or just one.

Go ahead, bring the jury back in.

Depending on what they want are you prepared to play it then?

MR. BERNARD: Yes, Your Honor.

THE COURT: Is there some better way to identify it, by number or -- is this all No. 1?

MR. BERNARD: The clips as they were presented at trial, Exhibit 1 and Clip A, B, C, D and E. But they are not identified in the exhibit book that they have. There's no exhibit list or any breakdown of what each sub-exhibit to that was. So their explanation of what they want to say will just be based on, I guess, their description of the content of the part that they want to see, if they want to see just one.

THE COURT: Did you say there were five separate clips?

MR. BERNARD: Yes, Your Honor.

THE COURT: And they were all played during the trial?

MR. BERNARD: Yes, Your Honor.

THE COURT: I can't identify it by that.

MR. BERNARD: No, Your Honor.

THE COURT: Okay.

(Jury seated.)

MR. KEYS, LAW CLERK: Court is in session.

THE COURT: Please be seated. The jury has entered the courtroom.

Ladies and gentlemen of the jury, I have read to the

counsel and the parties your request, and we wanted to try to be certain what exactly you wanted to view.

We don't have -- as far as I know, we have no way of having you play that in the jury assembly room. We can play it for you here and just have you watch it again. But I believe there were five separate clips.

Without getting into great detail, can you describe which one you want to see again?

JUROR NO. 5: We want to see it from the beginning of the stop to the point that Gerald was asked whether the car could be inspected or -- inspected.

THE COURT: All right. Would that be 1A?

MR. BERNARD: I believe that would be 1A and 1B.

THE COURT: All right. Will you do that, sir.

If we inadvertently don't play what you want to watch, we will play something else for you, but we'll try to make sure we get 1A and 1B. We're not going to have any narration or discussion or anything, you can just watch it. If you want to go back and have something played another time, just please raise your hand and let us know that you want to see it again.

Okay. Any objection to that, counsel?

MS. THOMPSON: No, Your Honor.

MR. BERNARD: No, Your Honor.

THE COURT: Okay. All right.

(1A played for the jury in open court, with audio, but no

narration.)

MR. FLANNIGAN, IT:  I had to restart the computer, so it might be a moment.

(1-A resumed and played with audio, but no narration.)

MR. FLANNIGAN, IT:  That's the end of the first clip.

THE COURT:  Okay, play the next one.

(1B played for the jury in open court, with audio, but no narration.)

JUROR NO. 5:  That's it, thank you.

THE COURT:  Is that all you need?

JUROR NO. 5:  Yes, Your Honor.

THE COURT:  Thank you.

And you can take them back to the jury assembly room, please.

MR. KEYS, LAW CLERK:  All rise; court is in recess.

(Jurors exit courtroom.)

THE COURT:  All right, please be seated.  The jury has left the courtroom, and they are going back to the jury assembly room.

Anything further?

MR. BERNARD:  No, Your Honor.

MS. THOMPSON:  No, Your Honor.

I was just wondering how long would the Court keep the jury through the night or tonight?

THE COURT:  Good question.

(Laughter.)

THE COURT: I was thinking maybe 8:00, 8:30 I'd send them home.

MS. THOMPSON: I was also wondering if you were going to give them dinner.

THE COURT: They had it; they were fed.

MS. THOMPSON: Okay.

THE COURT: They had dinner waiting for them when they got to the jury deliberations room. I would usually keep them later and just until we reached a verdict; but since they're coming back tomorrow anyway, I thought 8:00 or 8:30.

Anyone have a suggestion?

MR. BERNARD: No, Your Honor, that seems reasonable.

THE COURT: Does that sound reasonable?

MR. BERNARD: Yes.

MS. THOMPSON: Yes, yes.

THE COURT: Okay. 8:30 would be about another hour. We'll do that. And if it goes to 8:30 and we haven't heard anything yet, we'll have them come back in here and we'll send them home and bring them back in the morning.

MS. THOMPSON: So as long as they don't have a question, we're back here at 8:30.

THE COURT: Yes. Yes. I won't send them home without you being here.

MS. THOMPSON: Oh, okay.

THE COURT: We'll call you back for my sending them back home.

MS. THOMPSON: If we don't get a call by 8:30, I'm free to do --

THE COURT: If you haven't gotten a call from us by then, please be back at 8:30 and we'll call the jury in and send them home.

MS. THOMPSON: Oh, okay. All right.

THE COURT: Okay?

(Jury deliberations resume.)

(In open court, with Defendant seated, but not the jury.)

THE COURT: Please be seated.

All right, court is in session. I'm going to continue to wait -- you can be seated. I'm going do continue to wait for the family to get here. I just want to tell you we do have a verdict, and Mr. Keys is going to get the jury. So, in the interim, hopefully we'll have everybody here.

MS. THOMPSON: Your Honor, also, after you take the verdict, I'm going -- I would like to approach before -- there may be other discussions with the jury about phase two.

THE COURT: Okay, we can do that, sure.

(Jury seated.)

MR. KEYS, LAW CLERK: Court is in session.

THE COURT: Please be seated.

The foreperson of the jury, has the jury unanimously

agreed on its verdict?

JUROR NO. 5:  We have, Your Honor.

THE COURT:  Hand it to Mr. Keys, please.

(Envelope given to the bailiff, who gives it to the judge, who reads it silently.

THE COURT:  I am now going to publish the verdict, which is a fancy way of saying read it.

Count 1.  We, the jury, unanimously find the Defendant as to Count 1, conspiracy to distribute or possess with intent to distribute a mixture and substance containing a detectable amount of methamphetamine and cocaine, guilty.

Jury Interrogatory No. 1, relative to Count 1:  We, the jury, unanimously find that the Government has proved beyond a reasonable doubt that the mixture or substance involved in the conspiracy was methamphetamine and cocaine.

Interrogatory 2:  We, the jury, unanimously find that the Government proved beyond a reasonable doubt that the weight of the mixture or substance involved in the conspiracy was 500 grams or more.

Count 2:  We, the jury, unanimously find the Defendant as to Count 2, possession with intent to distribute a mixture and substance containing a detectable amount of methamphetamine and cocaine, guilty.

Jury Interrogatory 1 with regard to Count 2:  We, the jury, unanimously find that the Government proved beyond a

reasonable doubt that the mixture or substance the Defendant possessed with intent to distribute contained a detectable amount of methamphetamine and cocaine.

Two: We, the jury, unanimously find that the Government proved beyond a reasonable doubt that the weight of the mixture or substance the Defendant possessed or intended to distribute was 500 grams or more.

And the last page is signed by all 12 jurors and dated this date.

Counsel approach, please.

(At side bar.)

THE COURT: Attorney Thompson, you asked for a bench conference?

MS. THOMPSON: Yes. I would ask for judgment of acquittal on the other two that are remaining, so -- but we didn't get there. That's the reason, just in case, I wanted to ask after the verdict.

THE COURT: I usually ask whether you wish to poll the jury; but since the jury is going to be deciding the next portion of the trial, if either of you wish to poll the jury, I would poll them on my own so that neither of you is responsible for the polling.

Do you wish to poll the jury, either one of you?

MS. THOMPSON: I mean I would waive in polling them, but I did explain that sometimes that it doesn't go up too well

with the jury and they still have to decide on the fate, so I didn't recommend it.

THE COURT: All right.

MR. BERNARD: No request to poll them.

THE COURT: Okay. I'm going to wait and -- to set a sentencing date or time until we get the results on the phase two, so I'm not going to do that at this time. And rather than excuse the jury, I'm going to tell them that they need to be back here tomorrow at normal time.

MR. BERNARD: I'm sure they will be thrilled.

THE COURT: Yes, I'm going to try to explain it to them the best I can. And I'm sure they won't be happy about it, but it will just be for one day.

MR. BERNARD: Yes.

MS. THOMPSON: Uh-huh, okay.

THE COURT: Thank you.

MR. BERNARD: Thank you.

(In open court.)

THE COURT: Ladies and gentlemen of the jury, thank you for your service to this point.

If you recall, at the time I read to you the instructions, at the end of the trial I did tell you the following. Now I'm going to explain what I meant by it.

At the end of the instructions remember I said please be aware that after you complete your deliberations, there may

be some additional evidence presented and an additional matter about which you will have to deliberate. I'm going to explain this as best I can.

This is -- was taken into account when I gave the estimate for the trial. When I said Friday, I included this in that estimate. I'll read the following to you.

Remember that at the beginning of the case I told you that the trial was expected to end on Friday, August 26th, 2022, which is tomorrow. That has not changed. You have completed that part of the trial dealing with Counts 1 and 2. However, Counts 3 and 5 will be addressed tomorrow.

The evidence and instructions which you heard during the first four days is still applicable and will be used for the remainder of the trial, for phase two. Additional evidence will be offered tomorrow pertaining to Counts 3 and 5.

Now, you're probably curious as to why we're doing this in two phases, and I will admit to you that I have not done this before, had a two-phased trial. But in this particular case we did have a good reason. We're not doing it just to extend your time as jurors.

The reason we have two phases of this trial rather than one is that evidence of a prior conviction of Defendant of a crime is permitted to be used in phase two of the trial, but is not permitted to be used for phase one of the trial. So we could not have that admitted and have you decide these two

counts, if that makes sense, hopefully. It would be prejudicial to the Defendant to bring in the prior convictions. However, Counts 3 and 5 require that that be done in order to complete the evidence.

So, the evidence that you already heard will continue to be in the case. The instructions that I have given you will continue to be in the case. And you will hear some additional evidence tomorrow. I am going to try to keep the instructions to the minimum that I can and cover everything. And I feel -- I anticipate that phase two will be concluded tomorrow, so we still should finish in the time that I estimated, which was five days.

And I can't -- I was unable to tell you about this specifically as to what we were doing because it would have been prejudicial to this portion of the case. I hope you understand that.

So what I'm going to ask you to do, rather than dismiss you and thank you for your service and tell you that you're done, I'm going to ask you to report tomorrow at the normal time. We will get right into phase two. As I said, I do believe we probably will finish that tomorrow. And so my estimate that I gave you on day one of finishing on Friday should be able to be adhered to. Hope you understand in the interests of justice that's the way we have to do it. Okay?

I do appreciate your patience and diligence to this

point and I -- in addition to watching the witnesses, I also watch the jury, and I know how you've paid attention in the case and take your duties seriously. So, please, one more day. I don't believe it will go more than one day, and we will have phase two of the trial tomorrow.

And I don't know if it's still light out or if it's dark out or what, but if any of the jurors feels that they need an escort to their vehicles or something, I'll be glad to check with the security people and see if we can get them to do that.

Alternate jurors, you also may be needed tomorrow because even though you did not participate in the deliberations today, if we lose a juror -- and we need to have twelve to deliberate -- you will need to take the place of that juror. So please report in the morning just as you have been, and your services are also very much appreciated and -- appreciated, and I'm sure that the parties and I know the court system appreciates your service.

All right, Counsel, anything that I need to cover that I have not covered at this point?

MR. BERNARD: No, Your Honor.

MS. THOMPSON: No, Your Honor.

THE COURT: Okay. I do want to just say this at this time. I believe both counsel and -- all three counsel in this case have really done a very fine, professional job; and I wanted to point that out to the jurors, that I notice those

things because I see some that aren't as top notch, and these three have really been good. I thank you for that.

All right, we're going to -- I'm going to direct that the clerk docket the jury verdict slip, and that will happen in the morning, and we will see everyone here same time tomorrow and proceed with phase two.

Okay. Thank you very much. Have a safe trip back to your homes and offices or wherever you're headed and I'll see you tomorrow.

MR. KEYS, LAW CLERK: All rise. Court is in recess.

(Jurors exit courtroom.)

THE COURT: Please be seated. The jury and the alternate jurors have left the courtroom, so these remarks are in the absence of all 14 jurors and alternate jurors.

Anything for the Court at this time before we recess for the day?

MR. BERNARD: No, Your Honor.

MS. THOMPSON: Yes. Your Honor, we are waiting, as far as phase two -- and maybe I'll need to also speak to the Government. I think the key issues was that possession and whether or not he conspired and possessed whatever was in that compartment. Unfortunately, as I've stated, I hoped that it would be not guilty and I would have asked for judgment of acquittal on the last two charges.

With it being guilty, it seems that they may follow

that along with the last two charges.  So as far as doing a stipulated trial on that to the bench, so -- versus going back through openings and closings and all of that to the same jury, who obviously didn't take our position in the first place.

THE COURT:  Understood.  If you're going to do that and then place that on the record, we should probably try to get the jurors before they come back tomorrow.

Do you want to go down and see if they're still there, sir?

I don't want to bring that up with the jurors until we know that's what you're actually going to do.

MS. THOMPSON:  Right.

THE COURT:  Is that okay with the government, go forward with a bench trial?

MR. BERNARD:  Yes, Your Honor; we would consent to a bench trial on that issue.

MS. THOMPSON:  So I want to make sure that Mr. Terry fully understands, so -- I don't know if that means having the jury wait a while now or bring them back in the morning, so I have an opportunity to talk with him in more length -- at more length about --

THE COURT:  Well, I would like to avoid them coming in here tomorrow if they're actually not going to hear the case, but I certainly can have them come in and then tell them in the morning.  I mean I'm willing to do that.  Is that what you'd

prefer.

MS. THOMPSON: That would give me more time with Mr. Terry.

THE COURT: Okay. That's fine. I'm going to need to countermand my countermanded order and tell them to come in in the morning, so -- we'll be in recess at this point in time and we'll see if we catch the jurors.

We're not going to have a court reporter now.

(Off the record discussion.)

THE COURT: Okay, we have the court reporter back now; so, Counsel, would you put on the record what you were telling me while the court reporter was out and we'll get a record of that.

MS. THOMPSON: I'm sorry, I forget you did that.

THE COURT: That's fine, that's okay.

MS. THOMPSON: One moment, Your Honor.

(Off the record discussion.)

MS. THOMPSON: All right.

So, Your Honor, as I stated, that Mr. Terry has decided to waive his right to a jury trial for the second phase in light of their judgment, in light of basically they did not accept his arguments, and they're basically the same arguments for the second phase as well; so to preserve his appellate rights of any pretrial motions and as well as any trial errors that may be of existence, we would ask the Court to do a bench

trial.

THE COURT: It's understood. I understand why you want to do it that way.

Apparently most of the jurors have already left, so -- they may be back in the morning, but we can take care of that issue in the morning. But I'll certainly agree to have this done as a bench trial, and I would encourage counsel to the extent they can, just put a stipulation together that I can use as a basis upon which to come to a conclusion.

MR. BERNARD: I'm sorry, I missed the last part.

THE COURT: Just that you put together as much stipulated testimony and agreement as you can since I'm going to be doing it as a bench trial, and I'll hear anything that's not been stipulated to.

Is that clear?

MR. BERNARD: I think -- so I'll figure it out.

THE COURT: Okay.

MR. BERNARD: This is my first bench trial, Your Honor, so --

THE COURT: Okay.

MR. BERNARD: Uncharted waters, but I'll contact others who have had them and figure it out.

THE COURT: I think it should be easier than a jury trial.

All right, we can work that all out in the morning

with the counsel that are in the case. I have no doubt that we can work this out and make it as painless and expeditious as possible.

And I understand why you're doing it in this way, Attorney Thompson, because you do want to preserve your appellate rights for the motions that have been decided and that sort of thing, yes.

Okay. Any questions from the Government?

MR. BERNARD: Will we just convene and commence the bench trial tomorrow as we were scheduled for jury trial essentially?

THE COURT: We'll start at 9:00, and we'll probably have jurors show up, but I will bring them in before we start and tell them that we appreciate their services and they're not going to be needed tomorrow, and explain -- I'll take the blame for it as usual.

So it's -- I'll tell them that I should have told them that earlier, so -- but I do want to thank them anyway for their services and that sort of thing.

Yeah, you and Attorney Sheehan-Balchon and Attorney Thompson, if you can work out what all you can before we get in here in the morning, that would be good.

And anything further?

MS. THOMPSON: No, Your Honor.

MR. BERNARD: No, Your Honor.

THE COURT: Okay. Well, thank you very much. Everyone have a safe trip back to their respective homes or wherever they're heading, and I will see you in the morning. Thank you.

We'll be in recess.

(Court recessed at 8:35 p.m.)

C E R T I F I C A T E

I, Shirley Ann Hall, certify that the foregoing is a correct transcript for the record of proceedings in the above-titled matter.


s/Shirley Ann Hall
Shirley Ann Hall, RDR, CRR
Official Court Reporter

I N D E X

Government Closes......................................115

Defense Closes........................................132

Government Rebuts.....................................151

Charge to the Jury...................................159

Jury Question........................................204

Jury Verdict.........................................210

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| John Terry | 7 | 51 | 77 | 78 |
| | | | 80 | |
| Niddarah Winters | 100 | 102 | 108 | -- |

E X H I B I T S

| NUMBER | IDENTIFIED | ADMITTED |
|---|---|---|
| Deft. Ex. D | 111 | 111 |
|    Page 9, Lines 16-17 | | |
|    Page 15, Lines 8 and 12-14 | | |
|    Page 19, Lines 7-25 | | |
|    Page 20, Lines 1-5 and 13-17 | | |
| Deft. Ex. E | 111 | 111 |
|    Page 1 | | |
|    Page 3, Lines 4-5 | | |