| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal No. 3:18-cr-24 |
| JOHN T. TERRY, a/k/a "Tyree Terry" | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S AMENDED OMNIBUS POST-TRIAL MOTION FOR JUDGMENT OF ACQUITTAL/NEW TRIAL (Doc. 245)**

AND NOW comes the United States of America, by its attorneys, Troy Rivetti, Acting United States Attorney for the Western District of Pennsylvania, and Arnold P. Bernard, Jr., Assistant United States Attorney for said district, and files the following Government's Response to Defendant's Amended Omnibus, Post-Trial Motion for Judgment of Acquittal/New Trial (Doc. 245), and, in support thereof, avers as follows:

## I.      Introduction

The Defendant, John T. Terry, a/k/a "Tyree Terry," was charged in the First Superseding Indictment at Count One with Participating in a Conspiracy to Distribute 500 Grams or More of a Mixture and Substance Containing a Detectable Amount of Methamphetamine and Cocaine[1]; at Count Two with Possessing with Intent to Distribute 500 Grams or More of a Mixture and Substance Containing a Detectable Amount of Methamphetamine and Cocaine[2]; at Count Three with Possession of a Firearm by a Convicted Felon[3]; and at Count Five with Possession of a Firearm in Furtherance of a Drug Trafficking Crime[4].

The Defendant proceeded to a bifurcated jury/non-jury trial on August 22, 2022.

---

[1]      In violation of 21 U.S.C. § 846.
[2]      In violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(viii), and 841(b)(1)(B)(ii).
[3]      In violation of 18 U.S.C. § 922(g)(1).
[4]      In violation of 18 U.S.C. §§ 924(c)(1)(A) and 924(c)(1)(C)(i).

On August 25, 2022, following phase one of the bifurcated trial, the jury found Mr. Terry guilty of Counts One and Two. Doc. 217.

On August 26, 2022, the Defendant waived his right to a jury trial as to Counts Three and Five and proceeded to a non-jury trial on those counts. Following a stipulated non-jury trial, this Honorable Court found the defendant guilty of Counts Three and Five. The Court issued a written Verdict (Doc. 220), which sets forth the Court's findings of fact as to the elements of the offenses.

Following his conviction, on September 8, 2022, the Defendant filed an Omnibus Post-Trial Motion for Judgment of Acquittal and/or Motion for a New Trial. Doc. 226. In his Motion, the Defendant requested leave to amend his Motion upon receipt of the trial transcripts. Doc. 226 at p. 7.

On January 13, 2023, the Defendant filed an Amended Omnibus Post-Trial Motion for Judgment of Acquittal and/or Motion for a New Trial. Doc. 245.

This response follows.

## II. Fed. R. Crim. P. Rule 29 & Rule 33 Standards

The Defendant's Motion raises myriad allegations of error purportedly committed at trial which he alleges entitle him to a judgment of acquittal and/or a new trial pursuant to Fed. R. Crim. P. Rules 29 and/or 33. Accordingly, some background regarding Rule 29 and Rule 33 is appropriate.

### A. Fed. R. Crim P. Rule 29

Rule 29 of the Federal Rules of Criminal Procedure provides that, "a defendant may move for a judgment of acquittal…within 14 days after a guilty verdict…" and "if the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal." Fed. R. Crim. P. Rule 29(c)(1)-(2). A defendant is not required to move for a judgment of acquittal before the submits

the case to a jury as a prerequisite for making such a motion after jury discharge. Fed. R. Crim. P. Rule 29(c)(3).[5]

When determining whether to grant a defendant's Rule 29 motion, the Court must consider "whether the evidence, when viewed in a light most favorable to the government, supports the jury's verdict." United States v. Dixon, 658 F. 2d 181, 188 (3d Cir. 1987). That is, the Court "must uphold the jury's verdict unless no reasonable juror could accept the evidence as sufficient to support the defendant's guilt beyond a reasonable doubt." United States v. Fattah, 914 F.3d 112, 182-83 (3d Cir. 2019), quoting United States v. Coleman, 811 F.2d 804, 807 (3d Cir. 1987). When conducting its review, the Court "must presume that the jury has properly carried out its functions of evaluating credibility of witnesses, finding the facts, and drawing justifiable inferences." Coleman, 811 F.2d at 807 (3d Cir. 1987) (quoting United States v. Campbell, 702 F.2d 262, 264 (D.C. Cir. 1983)). If "all the pieces of evidence, taken together, make a strong enough case to let a jury find [the defendant] guilty beyond a reasonable doubt," then the Court must uphold the jury's verdict." United states v. Pavulak, 700 F.3d 651, 668 (3d Cir. 2012) (citations omitted).

### B.  Fed. R. Crim. P. Rule 33

Rule 33 of the Federal Rules of Criminal Procedure provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires. If the case was tried without a jury, the court may take additional testimony and enter a

---

5        As the Defendant filed his original Motion for Judgment of Acquittal and/or Motion for a New Trial (Doc. 226) within fourteen days of the jury discharge, the Government concedes that the Defendant's Motion is timely.

new judgment." Fed. R. Crim. P. Rule 33(a).[6] While a defendant "must show that a new trial is in the interest of justice (Fed. R. Crim P. Rule 33)…the decision whether to grant a new trial or a hearing on that motion rests in the district court's discretion. <u>McDonough Power Equip., Inc. v. Greenwood</u>, 464 U.S. 548, 556, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984)." <u>United States v. Noel</u>, 905 F.3d 258, 270 (3d Cir. 2018). "'Unlike an insufficiency of the evidence claim, when a district court evaluates a Rule 33 motion it does not view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case.' <u>United States v. Johnson</u>, 302 F.3d 139, 150 (3d Cir. 2002). However, even if a district court believes that the jury verdict is contrary to the weight of the evidence, it can order a new trial "only if it believes that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted." <u>Id.</u> (citation and quotation marks omitted). Rule 33 motions "are not favored and should be 'granted sparingly and only in exceptional cases.' <u>Gov't of Virgin Islands v. Derricks</u>, 810 F. 2d 50, 55 (3d Cir. 1987) (citations omitted)." <u>United States v. Silveus</u>, 542 F.3d 993, 1004-05 (3d Cir. 2008).

### III.    The Defendant's Claims[7]

The Defendant claims that the following trial errors occurred:

---

6    Fed. R. Crim. P. Rule 33(b)(2) provides that a defendant's motion for new trial must be filed within 14 days after the verdict. As the Defendant filed his original (Doc. 226) within fourteen days of the jury discharge, the Government concedes that the Defendant's Motion is timely.

7    The Defendant's Amended Motion contains numerous claims/sub-claims, some of which, in the Government's view, overlap. The Government has attempted to distill the Defendant's claims into the list set forth herein and attempts to address each claim through this Response. However, if the Court finds there is a particular claim to which the Government has inadvertently failed to respond, the Government requests that the Court notify undersigned Counsel of the claim and afford the Government an opportunity to provide a response, if the Court believes one would be helpful to its determination.

1. That his Fifth Amendment right to due process was violated because the superseding indictment was based in part on perjured testimony. Doc. 245 at ¶ 5.

2. That the Government failed to present sufficient evidence that could support the Defendant's convictions:

a. Because the state police trooper who conducted the traffic stop interacted primarily with the driver of the vehicle (not the Defendant), who exercised custody and control over the vehicle (alleging that this evidence failed to demonstrate the defendant's knowledge and intent to possess the drugs and firearm found within the vehicle). Doc. 245 at ¶ 6A.

b. Similarly, because the Defendant was a passenger in the vehicle who did not admit to knowledge of the hidden compartment, firearm, or drugs. Doc. 245 at ¶ 6A.

c. Because the compartment in which the drugs and firearm were found was concealed. Doc. 245 at ¶ 6A.

d. Because, while the trooper seized two cell phones as a result of the traffic stop, the trooper was unable to state which phone belonged to whom or how he attributed possession of the phones to either of the vehicle's occupants. Doc. 245 at ¶ 6A.

e. Because, although the trooper testified that the Defendant admitted that he was "responsible" for the vehicle, the Defendant's alleged statement was not recorded or memorialized in written form by the Defendant.

3. That the Government failed to present sufficient evidence that could support the Defendant's convictions because the compartment which contained the drugs and firearm was hidden and required the activation of a layered series of triggering mechanisms to be opened. Doc. 245 at ¶ 6B.

4. That the Government failed to present sufficient evidence that could support the Defendant's convictions because, with respect to the cell phone data evidence and exhibits presented by the Government:

a. The Government failed to prove that the items and exhibits included in the cell phone extraction reports originated from cell phones themselves. Doc. 245 at 6C.

b. According to the Defendant, the Government's exhibits depicting media, messages, and other data extracted from the cell phones "were the interpretations and creations" of FBI Special Agent James Simpson. Doc. 245 at ¶ 6C.

5. That the Government failed to present sufficient evidence that could support the Defendant's convictions because the Government failed to clarify that its exhibits depicting alleged cell phone media, messages, and other data were not authenticated, verbatim items, but were the interpretations of Special Agent Simpson. Doc. 245 at ¶ 6D.

6. That the Government prejudiced the Defendant by stating in its closing argument that the jurors would be able to physically inspect the exhibits containing the complete cell phone extractions (Exhibits 22, 24, 25, and 26), when the exhibits were admitted on a limited basis. Doc. 245 at ¶ 6E.

7. That the Court admitted improper expert testimony under Fed. R. Evid. 701. Doc. 245 at ¶ 6F.

8. That the Government failed to present sufficient evidence that could support the Defendant's convictions because Forensic Scientist Morgan Wiernusz failed to testify that the margin of error in the lab testing process. Doc. 245 at ¶ 6G.

9. That the Government failed to present sufficient evidence that could support the Defendant's convictions because the testimony of alleged coconspirator Robert Dillard was not credible. Doc. 245 at ¶ 6H.

10. That the Government failed to present sufficient evidence that could support the Defendant's convictions related to possession of a firearm (Count 3 and Count 5) because the stipulated statement of alleged conspirator Robert Dillard indicated that Mr. Dillard did not know the Terrys to carry firearms. Doc. 245 at ¶ 6I.

11. That the Government failed to investigate leads which the Defendant claims could have led to the discovery of exculpatory evidence. Doc. 245 at ¶ 6J.

12. That the Government failed to present sufficient evidence that could support the Defendant's convictions because:

    a. The Defendant's character witnesses were not discredited; and

    b. The Defendant's testimony was not discredited. Doc. 247 at ¶ 6K.

13. That the Government failed to present sufficient evidence that could support the Defendant's conviction for conspiring to distribute and to possess with intent to distribute a controlled substance. Doc. 245 at ¶ 7.

14. That, during closing argument, the Government improperly bolstered the credibility of its witnesses by noting their occupations as law enforcement officers. Doc. 245 at ¶ 10.[8]

---

8 The Defendant also raised broad claims in ¶ 8 related to alleged false testimony, a lack of demonstrated communication between the Defendant and alleged coconspirator Robert Dillard, a lack of evidence that the Defendant previously acted as a drug courier, that the Government's witnesses were not credible, and that Government presented no fingerprint or DNA evidence. Doc. 245 at ¶ 8. As these claims are already included as part of the Defendant's other multitudinous claims and sub-claims, the Government has not set them forth again here. Similarly, the Defendant raises a broad sufficiency-of-the-evidence claim in ¶ 9, which is already thoroughly addressed in his other claims.

15.      That, during closing argument, the Government offered improper "prior bad acts" evidence in violation of Fed. R. Evid. 404(b).  Doc. 245 at ¶ 11.

16.      That the defendant was denied due process because juror misconduct occurred. Doc. 245 at ¶ 29.

## IV.      The Government's Responses to Defendant's Claims

### A.      The Superseding Indictment was Not Based on Perjured Testimony

The Defendant first claims that his Fifth Amendment right to due process was violated because the superseding indictment charging him with the offenses of which he was convicted was based in part on perjured testimony.

"In <u>United States v. Basurto</u>, 497 F.2d 781 (9th Cir.1974), the Ninth Circuit held that a defendant's Fifth Amendment rights are violated when he must stand trial on an indictment which (1) the Government knows is based partially on perjured testimony, (2) the perjured testimony is material, and (3) jeopardy has not attached. <u>Id</u>. at 785.  The Ninth Circuit later noted that evidence of perjured testimony must go beyond mere speculation, and suggested that the defendant must show that the Government had a reason to believe the testimony was perjured.  <u>United States v. Claiborne</u>, 765 F.2d 784, 792 (9th Cir.1985), <u>abrogation on other grounds recognized by</u> <u>United States v. Hernandez</u>, 312 Fed.Appx. 937, 938 (9th Cir.2009)."  <u>United States v. Liciardello</u>, 93 F. Supp. 3d 365, 367 (E.D. Pa. 2015).  It should be noted that the Third Circuit has not formally adopted the <u>Basurto</u> test and that the Third Circuit Court of Appeals has only once cited <u>Basruto</u> in an Opinion (a non-precedential one).  See, <u>United States v. Rodriguez</u>, 88 Fed.App'x 548, 549 (3d Cir. 2004).  However, regardless of whether <u>Basurto</u> provides the applicable test, the Defendant's claim here is without merit as the record shows that no perjured testimony was presented before the grand jury.

8

The Defendant claims that Special Agent James Simpson offered perjured testimony before the grand jury investigating the Terrys when he testified that John Terry admitted responsibility for the drugs and gun found in the vehicle in which he was a passenger. In support of this contention, in his Amended Motion, the Defendant cites to a line of inquiry posed to Special Agent Simpson during cross-examination in which Mr. Terry's counsel asked Special Agent Simpson whether John Terry specifically stated that the drugs and firearm were his and whether Special Agent Simpson testified before the grand jury that John Terry so stated. However, during this line of examination, upon which Defendant's claim rests entirely, counsel afforded Special Agent Simpson no opportunity to clarify or contextualize the basis for his grand jury testimony or to otherwise explain any semantic distinction between his grand jury testimony and the testimony of Pennsylvania State Police Trooper Ryan Marmol:

> Q: Isn't it correct that John Terry did not state the drugs and the firearm were his?
> A: So during that time when—
> Q: I'm sorry.
> A: Oh.
> Q: Can you answer my question?
> A: I'm going to answer the question. So I believed, based on the report and the information—
> Q: I'm sorry. I'm not actually asking what you believe. My question is: Isn't it correct that John Terry did not say the drugs and firearm were his?
> A: He didn't specify guns and drugs.

Trial Transcript ("T.T.") Day 2 at 129-130.

Later, during redirect examination, Special Agent Simpson clarified the basis for his testimony before the grand jury:

> Q: Now, there are various questions about your prior testimony, the information that you received from Trooper Marmol about John Terry's statement about this vehicle. Do you recall those questions on cross?
> A: Yes, ma'am.
> Q: Okay. And what was your understanding of the statement that John Terry gave to Trooper Marmol?

9

A: That he was taking ownership of everything found in the vehicle, to include the cocaine and the gun.

Q: Tell us, though, what was the exact statement that you knew of from Trooper Marmol's report?

A: He advised Trooper Marmol that he would take responsibility for everything in the vehicle.

Q: The three kilograms of cocaine, the gun, the iPhone, the Samsung, were they all found within that vehicle or on one of those people?

A: Yes, ma'am.

Q: Gerald Terry or John Terry?

A: Yes, ma'am.

T.T. Day 2 at 147-148.

Proof of perjury requires (1) that the defendant was under oath (United States v. Gaudin, 515 U.S. 506 (1995)); (2) that the testimony provided was false (United States v. Reilly, 33 F.3d 1396, 1417 (3d Cir. 1994)); (3) that the witness made the false statement with knowledge of its falsity (United States v. Dunnigan, 507 U.S. 87, 94 (1993)); (4) that the witness provided the false testimony willingly; and (5) that the false statement was material to the proceeding (Kungys v. United States, 485 U.S. 759, 770 (1988). 18 U.S.C. § 1621. Here, for the sake of argument, even if the Court were to view the evidence in the *light most favorable to the Defendant*, no perjured testimony was presented to the grand jury because the testimony provided to the grand jury was not false and because, even if it were false, Special Agent Simpson did not make the statement with knowledge of its falsity. As shown through the redirect examination of Special Agent Simpson, Special Agent Simpson's testimony before the grand jury was based on his review of Trooper Ryan Marmol's report and conversations he had with Trooper Marmol. Based on his review of the report and those conversations, Special Agent Simpson construed John Terry's admission of responsibility for the vehicle to include responsibility for the vehicle and its contents—contents which included three kilograms of methamphetamine-laced cocaine and a stolen handgun, among other items. Therefore, an admission of responsibility for the vehicle could

10

reasonably be interpreted to include an admission of responsibility for drugs and a firearm found therein, even if Mr. Terry did not explicitly admit responsibility for those specific items. It would be unreasonable to expect a witness to construe a broad claim of responsibility for a vehicle to not include the vehicle's contents, without any limitations offered by the individual claiming such responsibility. While Special Agent Simpson's testimony before the grand jury could have perhaps been more precise, his testimony did not include any falsehood and Special Agent Simpson did not offer any false testimony with knowledge of its falsity. Moreover, even if Special Agent Simpson's testimony were false, it was not material. There was substantial additional evidence presented to the grand jury—including the testimony of coconspirator Robert Dillard, who directly implicated John Terry in the delivery of the three kilograms of meth-laced cocaine— from which the grand jury could find probable cause to return the Superseding Indictment.

For these reasons, the Defendant's first claim must fail.

B. <u>The Government Presented Sufficient Evidence from which the Jury Could Find the Defendant Guilty of Counts One and Two and from which the Court Could Find the Defendant Guilty of Counts Three and Five</u>

The Defendant's Amended Motion presents a series of claims at Doc. 245 at ¶¶ 6A-6D which all constitute challenges to the sufficiency of the Government's evidence.

"'The burden on a defendant who raises a challenge to the sufficiency of the evidence is extremely high.'" <u>United States v. Iglesias</u>, 535 F.3d 150, 155 (3d Cir. 2008), quoting <u>United States v. Lore</u>, 430 F.3d 190, 203–04 (3d Cir. 2005) (citation omitted). The government may defeat a sufficiency-of-the-evidence challenge on circumstantial evidence alone. <u>Iglesias</u>, 535 F.3d at 156 (3d Cir. 2008).

Here, the Defendant claims that the Government failed to present sufficient evidence from which the jury could find that he knew of the controlled substances' and firearm's presence in the

11

vehicle and intended to possess those items. In support of this claim, the Defendant points to certain testimony or evidence which does not directly connect the Defendant to the drugs and gun that was found, *i.e.*, the fact that Gerald Terry was driving the car, the fact that the contraband items were in a hidden compartment, but omits from his pleading any discussion of the wealth of circumstantial evidence the Government presented to show his knowledge of and intent to possess the contraband.

In addition to the testimony of a cooperating coconspirator who directly implicated John Terry in the offenses (discussed below), the Government focused its presentation of evidence on two cell phones seized from the vehicle, a Samsung and an iPhone. PSP Trooper Ryan Marmol testified that he seized the Samsung and iPhone during the traffic stop/arrest of John Terry. T.T. Day 2 at 85. Eventually, FBI agents applied for warrants to search the two phones. T.T. Day 2 at 173-176; Gov't Ex. 21 and 23. FBI Senior Forensic Examiner ("SFE") Justin Sarvey testified about how that search was conducted. SFE Sarvey testified that he conducted a data extraction of the devices, which involves making an exact copy of the data stored on the device and processing it into a readable format for the case agent to review. T.T. Day 2 at 172; 177-178. Using forensic software, SFE Sarvey made an exact copy of the data found on each cell phone and placed the complete copied data onto two discs (Gov't Ex. 22 and 24), which were placed into secure evidence storage. T.T. Day 2 at 178-185. SFE Sarvey next made available for the case agent's review the extracted data in a read-only format. Id. at 185. The case agent reviewed the processed data, tagged items he deemed relevant to his investigation, and then notified SFE Sarvey to generate sub-reports containing only the tagged items. Id. at 191; Gov't Ex. 31 and 33. From those reports, the Government presented evidence found on each cell phone evidencing that both cell phones were used by John Terry. Regarding ownership of the iPhone, see, *e.g.*, Gov't Ex. 32A, 32B, and

12

32C (Photos of John Terry's PA Identification Card found on iPhone); Gov't Ex. 32D (Photo of Email addressed to John Terry found on iPhone); Gov't Ex. 32F (text message conversation between John Terry and "Gees" (John Terry's brother, Gerald Terry) found on iPhone ("Meet me at our parents *(sic)* house")); Gov't Ex. 32K (text message conversation between John Terry and unidentified female which includes a photo of John Terry and during which the user of the iPhone remarks, "that pic you sent me of us"). Regarding ownership of the Samsung, see *e.g.*, Gov't Ex. 34A (text message conversation between John Terry and Gerald Terry ("Your bro other phone is down"); Gov't Ex. 34C (text message conversation from contact "Wifey" showing Gerald Terry's phone number). Beyond this specific information found on the phones, basic logic further suggests that the phones belonged to John Terry. Testimony and police dashcam footage presented at trial clearly demonstrated that there were two individuals found in the vehicle, John Terry and Gerald Terry, and testimony and evidence presented through the Government's exhibits showed that both phones were in contact with phone numbers used by Gerald Terry. Common sense and experience suggest that it is unlikely that someone would send text messages to/call himself. Therefore, it follows that, if John and Gerald Terry were the only two individuals in the car, and the phones seized from the car contained communications with Gerald Terry, it is likely that the phones belonged to John Terry. Once, use/possession of the phones was established, the Government presented strong circumstantial evidence found on John Terry's phones to demonstrate his knowledge and intent to possess the items found in the hidden compartment and to prove his membership in the alleged criminal conspiracy.

For example, regarding the methamphetamine-laced cocaine, the Government presented an image found on John Terry's iPhone of a half-kilogram of suspected cocaine (Gov't Ex. 32H) which bears a stamp identical to those found on the kilograms of methamphetamine-laced cocaine

13

seized from the hidden compartment (Gov't Ex. 3A, 2C, and 4B).  A comparison of the stamps imprinted on the three kilograms seized during the traffic stop to the image of the half-kilogram of cocaine found on the iPhone was presented in Gov't Ex. 37:



Gov't Ex. 37.  T.T. Day 3 at 85-86.

Regarding the firearm, the Government further presented evidence from the cell phones to show John Terry's knowledge of/familiarity with hidden compartments in vehicles and his storage of firearms in them.  T.T. Day 3 at 70-71.  Gov't Ex. 32AA ("If you take the thing off the radio where I put my pistol it would come on").

Lastly, the Government also presented evidence from the cell phones to corroborate the testimony of Mr. Terry's coconspirator, Robert Dillard[9]. Robert Dillard testified at trial that he coordinated with John Terry to purchase three kilograms of cocaine from him in March/April 2018 and that the three kilograms of methamphetamine-laced cocaine seized from the hidden compartment were intended for him. T.T. Day 3 at 193-197. The Government presented evidence to show that, days before the traffic stop, Mr. Dillard's address was found to have been shared with both John Terry's iPhone and John Terry's Samsung and was entered into a GPS mapping application on the iPhone. T.T. Day 3 at 81-82.

Therefore, the Government presented sufficient evidence[10] from which a reasonable jury could find John Terry guilty of Counts One and Two and from which the Court could find John Terry guilty of Counts Three and Five. The circumstantial evidence from the cell phones independently and in combination with the testimony of Robert Dillard provided sufficient

---

9     As a separate sub-issue, the Defendant also claims that Mr. Dillard's testimony was not credible and that without the other "errors" in this case, no rational juror would credit his testimony. Doc. 245 at ¶ 6H. The Government is addressing/will address the alleged "errors" claimed by the Defendant throughout this Response. However, with respect to this claim, the Government notes Mr. Dillard's testimony was corroborated through the cell phone evidence presented in this case and that, through testimony and cross-examination, the jury was made aware of Mr. Dillard's criminal past, his potential motives for testifying, and any benefits he received because of his cooperation. Whether to find Mr. Dillard's testimony credible considering those facts and what weight to afford it is the jury's role. This Court should not substitute its witness credibility assessment for that of the jury. See, United States v. Bevans, 728 F. Supp. 340, 343 (E.D. Pa.), aff'd, 914 F.2d 244 (3d Cir. 1990) ("When reviewing a conviction for sufficiency of the evidence, the Court may not intrude into the province of the jury and evaluate the credibility of the witnesses").

10     The Defendant also claimed that the Government failed to present sufficient evidence because it failed to investigate leads which the Defendant claims could have revealed potentially exculpatory information (Doc. 245 at ¶ 6J), and because the Defendant's character witnesses and his own testimony were not discredited (Doc. 245 at ¶ 6K). For the reasons set forth above the Government presented sufficient evidence to support the Defendant's convictions. Whether the Government discredited the Defendant's character witnesses and the Defendant's own testimony is a question of witness credibility, a determination that is solely within the province of the jury to make.

evidence to prove John Terry's knowledge of and intent to possess the three kilograms of methamphetamine-laced cocaine, his membership in a drug trafficking conspiracy, and his unlawful possession of a firearm in furtherance of his drug trafficking conduct[11].

### C. The Cell Phone Evidence was Properly Authenticated, its Chain of Custody Clearly Established, and its Accuracy Sufficiently Proven

The Defendant claims that the Government failed to properly authenticate and mischaracterized the authenticity of the evidence seized from John Terry's cell phones. This contention reflects either an ongoing misunderstanding of the testimony presented at trial or willful ignorance of it. As presented through testimony at trial, (1) the Samsung and iPhone were seized during the traffic stop/arrest of John Terry; (2) the phones were placed in secure evidence; (3) agents obtained warrants to search the devices; (4) SFE Sarvey received a copy of the warrants; (5) SFE Sarvey removed the phones from secure evidence storage and conducted a forensic extraction of their data—that is, he made an ***exact copy of the data*** that was stored on each phone, burned that data to discs, and placed the discs containing the complete extractions in secure evidence[12]—and the Government entered the complete extraction of the data into evidence at

---

11  With respect to Defendant's firearms-related convictions (Count Three and Count Five), the Defendant claims as a separate sub-issue that the Government failed to present sufficient evidence to support these convictions in light of a stipulation to the admission of a report (Defense Ex. H) in which Mr. Dillard reportedly advised agents that he did not know the Terrys to carry firearms. Doc. 245 at ¶ 6I. The Court no doubt considered this evidence when reaching its verdict as to Counts Three and Five and was unpersuaded by it. The Defendant has provided no basis to change that verdict.

12  In addition to testimony presented about this evidence being stored securely, the Defendant also stipulated to the chain of custody of all evidence.

trial[13]; (6) SFE Sarvey provided read-only access to a digital copy of the data to Special Agent Simpson to review; (7) Special Agent Simpson could not edit or delete the data in the read-only file, but he could apply tags to items he deemed relevant to his investigation; (8) upon completing his review, Special Agent Simpson notified SFE Sarvey and SFE Sarvey distilled a report from the complete extraction that contained only those items tagged by Special Agent Simpson[14]; (9) SFE Sarvey copied those reports to discs and stored them in secure evidence storage; (10) from those generated reports, the Government pulled the exhibits and demonstratives presented at trial. Therefore, through a side-by-side comparison of the Government's exhibits—from a trial demonstrative to the report generated from Special Agent Simpson's tags, and from the report generated from Special Agent Simpson's tags to the complete extraction of the devices—the Court

---

13 The Government originally sought to admit this evidence only to demonstrate the process by which the Special Agent created his report. Knowing that the ***complete extraction*** necessarily contained material that the Court had deemed inadmissible at trial (*i.e.,* text messages discussing uncharged drug trafficking conduct, photos of other drugs), the Government intended to admit the discs containing the complete extraction only to establish the foundation for Special Agent Simpson's later testimony about the items he found during his review of the complete extraction. The Government did not originally intend for these items to be provided to the jury for review. However, through cross-examination and argument, the Defendant suggested to the jury that the evidence the Government represented to have been extracted from the cell phones may have been altered, manipulated, or edited in some way. The Defendant claimed that the information presented by the Government in its reports and demonstratives was not actually on the phones at all, but that the Government had created this incriminating evidence out of whole cloth. This utterly baseless insinuation compelled the Government to offer into evidence each report generated during the evidence review process to prove that the evidence directly copied from the phones matched the evidence included in the Special Agent's generated report and as presented in demonstratives at trial. After raising the issue that the Government allegedly falsified forensic evidence, the Defendant sought to preclude the Government from proving the authenticity and accuracy of its information by using the Court's pretrial rulings regarding the inadmissibility of certain evidence to shield the jury from hearing this truth. The only way the Government could prove the authenticity and accuracy of the information presented through its reports and demonstratives was to permit the jurors to compare the trial materials to the original, complete extraction.

14 SFE Sarvey analogized this process to reducing "a whole library of data maybe down to one or two books." T.T. Day 2 at 189.

or a juror could confirm that a particular piece of evidence appeared consistently across each item, and was, therefore, not the "interpretations and creations[15]" of investigators, but was an authentic and accurate depiction of an artifact found on the devices.

Therefore, the Government sufficiently established the authenticity and accuracy of its evidence related to the two cell phones.

D. <u>The Government Properly Represented in its Closing Argument that the Jury Could Inspect the Government's Exhibits</u>

The Defendant claims that the Government prejudiced the jury against the Defendant during closing argument when the Government advised the jury that it could compare data across the Government's cell phone report exhibits to assure themselves of their authenticity and accuracy. Importantly, the Defendant did not object to this alleged improper statement during the trial. "Failure to object at trial, absent plain error, constitutes a waiver of the issue for post-trial purposes." <u>United States v. Tiller</u>, 302 F.3d 98, 105 (3d Cir. 2002). "To be a 'plain' error, the error must be 'clear under current law.' <u>United States v. Olano</u>, 507 U.S. 725, 734, 113 S.Ct. 1770, 1777, 123 L.Ed.2d 508 (1993). Moreover, the error must involve substantial rights and prejudice the defendant by 'affect[ing] the outcome of the district court proceedings.' <u>Id.</u>, 113 S.Ct. at 1778. A court…will decline to grant relief on a plain error basis unless the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.' <u>Id.</u> (internal quotation marks and citation omitted)." <u>United States v. Jackson</u>, 849 F.3d 540, 544–45 (3d Cir. 2017).

---

15      The Government utilized demonstratives during its presentation of evidence. However, prior to introducing any demonstratives, the Government admitted the original evidence the demonstrative represented. For example, Gov't Ex. 32AA is merely a demonstrative used to display the information set forth in Gov't Ex. 31 at page 3. Each demonstrative indicates that it was prepared by the Special Agent and cites from which exhibit the information contained in the demonstrative originated.

Here, the court did not err in allowing the Government's statement in closing, and any error was not plain. The Defendant made relevant the original extractions and original generated reports through cross-examination of the Government's witnesses on the issue of authentication, and through his own testimony suggesting that the extractions and reports were not authentic. The Defendant thereby "opened the door" to the jury's consideration of the contents of the full extractions and reports. Moreover, the full exhibits could have been made available during deliberations in a way that prevented, or at least reduced, the jury's exposure to otherwise inadmissible evidence. At the very least, any error was not plain. It was not "clear" that the defense strategy had *not* opened the door to consideration of the full exhibits, and the defense cured any potential error by contradicting the Government's statements in its own closing. For similar reasons – and because the jury did not, in fact, ask to see the full exhibits – any error did not affect substantial rights and did not seriously affect the fairness, integrity or public reputation of judicial proceedings.

As mentioned previously, originally, the Government did not intend for the complete cell phone extractions (Gov't Ex. 22 and 24) and the unredacted agent's reports (Gov't Ex. 25 and 26) to be provided to the jury as these materials contained items that the Court deemed inadmissible. Doc. 207. To that end, at the outset of trial the Government took steps to present its evidence in a manner that complied with the Court's pretrial evidentiary rulings, see, *i.e.*, T.T. Day 2 at 5 ("MR. BERNARD: I'll note that throughout Government's Exhibit 31 there are numerous redactions. Those are items that were deemed relevant to the investigation but perhaps not relevant to the trial."); Gov't Ex. 31 (which is a duplicate of Government Exhibit 25 with lengthy redactions of irrelevant material), and the Government provided copies of its proposed exhibits to the Defendant prior to trial to ensure his satisfaction with the redactions.

During trial, the Court properly admitted the original copies of the cell phones' data to prove chain of custody (Gov't Ex. 22 and 24).  T.T. Day 2 at 185.  However, during trial, the Defendant claimed that the Government fabricated or confused the evidence it presented in its redacted reports (Government Exhibit 31 and 33) and demonstratives as having originated from specific phones.  Beginning with the cross-examination of FBI Senior Forensic Examiner Sarvey, the Defendant advanced a theory that the case agent, Special Agent Simpson, could have exported the cell phone data at issue into another program to alter it.  See, T.T. Day 2 at 190.  This led the Government to admit the unredacted agent's reports (Gov't Ex. 25 and 26) during redirect examination of SFE Sarvey.  T.T. Day 2 at 192-199 (At a sidebar conference: "[MR. BERNARD]: I was not expecting to have to put this item [Exhibit 25 and 26] into evidence…If there's a question as to the veracity of the report created by Agent Simpson… the jury does need the ability to compare side by side the report he's created and the report that was generated, because if they have a question about authenticity, the accuracy, the veracity of the information on there, they should have the ability to compare those two").  The Court properly admitted Exhibit 25 and 26, subject to the caveat that the exhibits would not be provided to the jury, unless the Defendant "raises the issue that [the data] was somehow changed or manipulated."  T.T. Day 2 at 197.  As shown below, the Defendant did just that.

As trial progressed, the Defendant continued to challenge the authenticity/accuracy of the cell phone data.  He did so through cross-examination of the Government's witnesses, specifically he tried to convince the jury that the redacted agent's report and demonstrative exhibits were "creations" of the special agent, rather than accurate replicas of the original data.  See, *e.g.*, T.T. Day 3 at 93-95.  The Defendant, himself, also took the stand and flatly denied that certain conversations which the Government presented as having occurred on the iPhone actually occurred

on the iPhone, and suggested that the Government also juxtaposed some of the cell phone data between the Samsung and the iPhone. T.T. Day 4 at 61 (Court acknowledging that Defendant "testified that this [(the messages/photos the Government alleged were on the phones)] wasn't on there"); T.T. Day 4 at 63 ("MR. BERNARD: Okay. You would agree that there was testimony that a substantial amount of information related to you was found on [the iPhone]; is that fair to say? [MR. TERRY]: No"); T.T. Day 4 at 65 ("MR. BERNARD: So your testimony is that this conversation was not you? [MR. TERRY]: I'm saying that that conversation, if it was me, was not on an iPhone because I don't have an iPhone. I'm saying it was on the Samsung"); T.T. Day 4 at 68-69 (Defendant alleges that photo depicting him was not on the iPhone, but was on the Samsung); T.T. Day 4 at 70 (Defendant testifies that the 33 instances of phone contact between he and his fiancée occurred over the Samsung, not the iPhone); T.T. Day 4 at 72 ("MR. BERNARD: Do you believe that the items that were produced during this trial as having come from the Samsung did, in fact, come from the Samsung? [MR. TERRY]: I believe that some of the items came from there, and there was a lot of things mixed up").

Therefore, based on the cross-examination by defense counsel and the Defendant's own testimony, the Defendant injected into trial the issue of whether the case agent's report and demonstratives derived therefrom (Gov't Exhibits 31-34C) actually originated from the phones and forensic images the Government claimed them to, and whether the case agent fabricated the evidence allegedly extracted from the cell phones. During closing argument, because the Defendant had raised the issue that the cell phone evidence had been manipulated or juxtaposed, the Government suggested that the jury could review the information across the Government's exhibits to confirm that it was consistent. T.T. Day 4 at 121-122.

The Defendant did not object to this remark. Instead, defense counsel argued during closing argument that the jury would not be able to compare the cell phone data across the admitted exhibits. T.T. Day 4 at 143. During closing argument, defense counsel further advanced the Defendant's contentions regarding the Government's alleged intentional or accidental misrepresentation of the evidence:

MS. THOMPSON: Now, this is where I say this: Try to be a little slight (*sic*) of hand. Because…they were trying to make a point of the fact that it was read only. And that's why I went over with Mr. Sarvey the fact that even though a document starts at read only, you can copy it into, say, a program like Adobe PDF, and then you can make changes in that way. Once you copy it or print it into Adobe or any other type of program, take it from the original to another, then you can make changes…But what the Government did not do is they did not show Mr. Sarvey the Government's exhibit that was created by Agent Simpson and say: Are these true and accurate copies and exact copies of the same thing that you prepared on that disk?...I implore you to look at these Exhibits 31 to 34 under both that colored glass of maintaining John Terry's cloak of innocence that he has unless and until you've found the Government has proved their case beyond a reasonable doubt, and I ask that you look at these exhibits, 31 through 34, and all their subdivisions, through the colored glass of Agent Simpson being willing to go under oath twice and to say something that he knew was not true.

And some may say: Well, it would take time to put this as iPhone, but not the Samsung. I mean it takes time to put all of this together. So, yes, I would believe that Agent Simpson and from October 2018 through now had time.

T.T. Day 4 at 144-145.

During rebuttal argument, the Government again stated that the jury could compare the cell phone data across its admitted exhibits to verify its consistency. T.T. Day 4 at 155. Again, the Defendant neither objected to this remark nor requested a curative instruction.

22

Following closing arguments, the Court entered a brief recess and then reconvened for the final jury charge. Following the Court's reading of final instructions to the jury, Counsel for the Defendant and Counsel for the Government engaged in the following discussion with the Court at a sidebar conference:

MS. THOMPSON: And to that point, while I was talking at, I think on the CD that's relevant to that would be the Government's Exhibit 1, 1/9. The Government exhibits – I believe it was 22, 24, 25, and 26 -- many were only admitted for the limited purpose of chain of custody, so that shouldn't be available for viewing to the jury.

MR. BERNARD: Judge, at the time they were offered, they were admitted for that limited purpose because the Defendant had not yet raised his defense, at least through presentation of witnesses, closing argument. Following the defense presentation, the defense has raised the issue that the generated reports by Agent Simpson are somehow manipulated, fabricated, edited, and that they are not accurate as to the content of the cellphones that were extracted. In light of that, I would submit that the Government should be able to admit those items for the jury to consider. And I recognize that those items contain evidence that is not admissible, but the way that they would be able to work around that would be if they wanted to view a particular item conveyed on the report, on the original extraction, they can indicate which item it is, we can put the original report in, pull up that original item, and display only that.

T.T. Day 4 at 200-201 (emphasis added). As argued at the sidebar conference, the Government believed that the defense expanded the basis for admitting the complete reports—the complete, original extractions and unredacted case agent's reports became necessary to rebut the Defendant's allegations that the cell phone data was falsified or juxtaposed between the two phones. The Government advised the Court of its position and offered a solution by which the complete extractions and unredacted reports could be admitted and presented to the jury without presenting inadmissible material. Specifically, the Government offered that, in the event the jury wished to compare evidence across the original extraction, unredacted case agent's report, and the

redacted report/demonstratives presented at trial, the jury could advise which particular piece of information they wished to review and the Government could open the relevant disc, locate the requested information, and present it to the jury in such a way that other, inadmissible evidence would not be visible. At no point during this sidebar conference or during trial did the Government advocate that the Court should provide the jury unfettered access to the original, unredacted reports to view inadmissible evidence. Ultimately, the Court deferred ruling to what extent, if at all, the jury would be permitted to review the original extractions/unredacted reports unless and until the jury requested to see them. T.T. Day 4 at 201 ("THE COURT: …We're not going to send them out; but if they ask to see them, then we can get into these circumstances…").

Therefore, through cross-examination of the Government's witnesses and through his own testimony, the Defendant injected into trial the issue of alleged manipulation or confusion of the cell phone evidence. The injection of this issue before the jury made relevant the admission of the original extraction reports and generated reports (Government Exhibits 22, 24, 24, and 26) for a broader purpose than chain of custody. Following the defense's cross-examination of the Government's witnesses and the Defendant's own testimony, admission of the original extractions and generated reports "had a tendency to make a fact more…probable than it would be without the evidence"—that is, use/possession of the cell phones by John Terry—and that "fact [was] of consequence in determining the action" because the cell phone data contained strong circumstantial evidence that the user of the cell phones conspired to distribute and to possess with intent to distribute a controlled substance[16]. Fed. R. Evid. Rule 401. Based on the apparent

---

16      In its Memorandum Order regarding the Defendant's Motion in Limine and the Government's Notice of Intent to Present 404(b) Evidence, the Court noted the strength of evidence on the cell phones. See, Doc. 207 at p. 15-17 (calling the evidence "highly relevant" and "highly probative."

relevance of these exhibits, and because they could be displayed to the jury in such a way as to prevent the presentation of inadmissible evidence, the court did not err – let alone err plainly – in not *sua sponte* striking the Government's comment in closing that the jury could review the full exhibits.

Additionally, the Defendant was not prejudiced by any of these remarks during closing because the jury never requested to review the referenced materials and because there existed overwhelming evidence of the Defendant's guilt as discussed above.

For these reasons, any error was not "plain," did not affect the Defendant's substantial rights, and did not seriously affect the fairness, integrity or public reputation of judicial proceedings. Therefore, a new trial would not be in the interest of justice and the Defendant's claim must fail.

E. The Court Did Not Admit Improper Expert Testimony

The Defendant next claims that Special Agent Simpson, who was admitted and recognized as an expert in drug trafficking and coded language, testified to opinions outside the scope of his expertise. The Defendant claims that Special Agent Simpson's testimony exceeded the scope of his field of expertise and therefore constituted improper lay witness testimony when he discussed the identity of cell phone users and subscribers; discussed the identity of a person sending a text message; testified that photos found on an iPhone, and whose metadata indicate that the photos were taken by an iPhone, were taken by an iPhone; and that the Defendant was the user of the iPhone.

Regarding alleged evidentiary errors, "'A new trial should be ordered only when substantial prejudice has occurred,' United States v. Armocida, 515 F.2d 29, 49 (3d Cir. 1975), and 'if the interest of justice so requires.' Fed.R.Crim.P. 33. To grant a new trial, a court must

determine that 'the allegedly improper statements or conduct make it "reasonably probable" that the verdict was influenced by the resulting prejudice.' <u>Forrest v. Beloit Corp</u>., 424 F.3d 344, 351 (3d Cir. 2005) (quoting <u>Greenleaf v. Garlock, Inc</u>., 174 F.3d 352, 363–64 (3d Cir. 1999))." <u>United States v. Georgiou</u>, 777 F.3d 125, 143 (3d Cir. 2015).

F.R.E. 701 provides that, "if a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."

In this case, without objection, Special Agent Simpson was recognized as an expert in "drug trafficking and coded language." T.T. Day 3 at 19. In laying the foundation for the admission of Special Agent Simpson as an expert in that field, Special Agent Simpson testified about his training and experience. He specifically indicated that he had experience in reviewing the contents of cell phones pursuant to search warrants. <u>Id</u>. at 17. Thus, based on Special Agent Simpson's experience and his expertise in drug trafficking and coded language, any opinion as to the users/subscribers of cell phones involved in a drug trafficking investigation were reasonably within his area of expertise. Similarly, his familiarity with basic metadata associated with cell phone data that he regularly reviews is not outside of his area of expertise.

In any event, even assuming *arguendo* that some portion of Special Agent Simpson's testimony was improper lay witness opinion testimony, it was not "reasonably probable" that the verdict was influenced by the resulting prejudice.' <u>Forrest v. Beloit Corp</u>., 424 F.3d 344, 351 (3d Cir. 2005) (quoting <u>Greenleaf v. Garlock, Inc</u>., 174 F.3d 352, 363–64 (3d Cir. 1999))." <u>United States v. Georgiou</u>, 777 F.3d 125, 143 (3d Cir. 2015). The Government presented strong evidence of the Defendant's guilt, discussed above, including the testimony of a cooperating witness, which

was corroborated by cell phone evidence. Any alleged improper testimony would have been harmless in light of the other evidence presented.

For these reasons, this claim must fail.

F. <u>The Government Presented Sufficient Evidence Related to the Identity and Quantity of the Controlled Substances</u>

The Defendant claims that the Government failed to present sufficient evidence to support the Defendant's conviction because the Forensic Scientist failed to testify about the margin of error in the lab testing process.

To prove the offenses at Count One and Two, the Government was required to prove that the Defendant conspired to distribute/possess with intent to distribute and possessed with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine and cocaine. To prove this element, the Government had to prove the presence of a detectable amount of the alleged controlled substances within a mixture that meets or exceeds the quantity alleged. The Third Circuit has held that even "trace amounts" too small to even determine a mixture's purity constitutes a "detectable amount" of a controlled substance. <u>United States v. Berroa-Medrano</u>, 303 F.3d 277, 285 (3d Cir. 2002). "Webster's Dictionary defines detectable as 'capable of being detected' and defines 'detect' as 'to discover or determine the existence, presence or fact of.' Webster's Third New International Dictionary 616 (1993)." <u>Id</u>. at 285.

Here, to prove the type and quantity of the controlled substances involved in this case, the Government called Morgan Wiernusz, a forensic scientist with the Pennsylvania State Police Crime Lab. The Defendant stipulated to the admission of Ms. Wiernusz's curriculum vitae and to her qualification as an expert in drug identification. T.T. Day 3 at 158. After directing Ms. Wiernusz to identify the drug evidence she tested, the Government moved her expert report into

evidence. T.T. Day 3 at 158; Gov't Ex. 11. The defense cross-examined Ms. Wiernusz regarding her testing process. Ms. Wiernusz explained that she utilized a gas chromatograph mass spectrometer ("GCMS") for confirmatory testing. T.T. Day 3 at 174. She stated that the GCMS produces a printout or reading identifying the substance. Id. The defense questioned Ms. Wiernusz about the margin of error for drug identification and Ms. Wiernusz answered that she did not know what that specific margin of error was. T.T. Day 3 at 170. However, Ms. Wiernusz explained that, prior to submitting her final report (Gov't Ex. 11), the report is reviewed by a supervisor within the lab. T.T. Day 3 at 176-177.

Based on Ms. Wiernusz's testimony, there was sufficient evidence from which a rational juror could find that the substances involved contained a detectable amount of methamphetamine and cocaine and that the weight of the mixture and substance containing the methamphetamine and cocaine was 500 grams or more. Ms. Wiernusz's testimony made clear that GCMS testing "determined the existence, presence or fact of" of methamphetamine and cocaine within the drug evidence she was provided and that the weight of the entire mixture and substance was 2,995 grams. Whether or not Ms. Wiernusz could testify as to what the margin of error for each specific type of lab testing is does not diminish the fact that through the lab testing she unequivocally "detected" the presence of methamphetamine and cocaine. Furthermore, prior to the final submission of her lab report, a supervisor within the lab reviewed and concurred with her conclusions. Based on those facts, the Government presented sufficient evidence to the jury to prove to the type and quantity of the controlled substances.

For these reasons, this claim must fail.

G. The Government Did Not Improperly Bolster the Credibility of Witnesses and Did Not Argue that the Defendant had a Propensity to Commit Bad Acts in Violation of F.R.E. 404(b)

The Defendant claims that two errors occurred during the Government's closing argument. First, he claims that the Government improperly vouched for the credibility of witnesses by pointing out in its closing argument their occupations as law enforcement officers. Doc. 245 at ¶ 10. Second, he claims that the Government improperly argued that the Defendant had a propensity to commit bad acts, in violation of F.R.E. 404(b). Doc. 245 at ¶ 11.

The Defendant did not object to any alleged vouching during trial. Thus, the Court should review the record for plain error. "In order to be plain error, an error must not only be 'obvious,' it must also 'have affected the outcome of the District Court proceeding." United States v. Walker, 155 F.3d 180, 188 (3d Cir. 1998) (internal quotations and citations omitted). The Court should vacate the Defendant's convictions "only if [it finds] error in the prosecutor's comments so serious as to undermine the fundamental fairness of the trial and contribute to a miscarriage of justice." Id. at 188.

The Defendant alleges that the improper vouching occurred twice during the Government's closing argument, first when Counsel stated, "The judge will instruct you on the factors that you're to consider when determining a witness's credibility; but, broadly speaking, your question is: Do I believe Trooper Marmol, a nine-year member of the Pennsylvania SHIELD Unit? Or do I believe John Terry?" (T.T. Day 4 at 118), and second, when Counsel stated, "You can look at the file names for the files that are included in that report and compare it to the original. If you don't believe that those are on there, if you have doubts that these were something that was created out of full cloth by Agent Simpson for the specific purpose of incriminating John Terry, Agent Simpson who's been with the FBI or over ten years, that stations in Newark prior to coming to Johnstown, if you believe that Agent Simpson would risk his entire career to copy, paste, edit PDF

documents and create falsified evidence, then, by all means, compare it to the original." T.T. Day 4 at 154-155.

As mentioned previously in this Response, the Defendant injected into this trial the issue of alleged perjured testimony and falsification of evidence by law enforcement officers. The Third Circuit addressed claims of improper vouching by the Government under similar circumstances in United States v. Weatherly, 525 F.3d 265 (3d Cir. 2008). In Weatherly, the Court held that, "in order for vouching to be improper, the prosecutor's assurance of a witness's credibility must be based on either the prosecutor's personal knowledge, or other information not contained within the record. Id. at 271 (citation omitted). The alleged improper vouching at issue in Weatherly involving the following statement made by the prosecutor during closing argument, "Why would Officer Ryel and Detective Medina risk their 32-34 years of experience on the police force over this case?" Id. While the Court acknowledged that, in some cases, statements that an officer would be risking his career to lie under oath would be improper vouching, it held that the statement was not improper for two reasons. First, the Court found that the statement was based on facts in the record such as the officers' length of tenure and because "the average juror could easily infer that a police officer who conspired with another officer to deliberately fabricate evidence and perjured himself in open court while testifying under oath in an official capacity would risk at least *some* sort of disciplinary action." Id. (emphasis in original). Therefore, the Court reasoned, "the prosecutor's rhetorical question about why the police officers would risk their careers to testify falsely against this single defendant was proper because it called for an inference directly based upon evidence in the record." Id. at 272.

Second, it found that the statement of the prosecutor was proper "because it was a reasonable response to allegations of perjury" by the Defendant's attorney. Id. "'When

determining whether a prosecutor's statements improperly vouched for a witness's credibility, the statements must be considered in context.'" Id., quoting United States v. Brennan, 326 F.3d 176, 186 (3d Cir. 2003).

In this case, the Government's remarks during closing argument were based on facts entered into evidence and were furthermore proper and justified because the Defendant claimed that the officers and agents involved in the case had lied. See, T.T. Day 4 at 75-76 (Defendant testifies that Government witnesses were lying).

Even if this Court were to find that improper vouching occurred on these two occasions, such errors were harmless. The Court reviews improper vouching for witness credibility under the harmless error standard. Weatherly, 525 F.3d at 273 (3d Cir. 2008), citing United States v. Zehrbach, 47 F.3d 1252, 1264 (3d Cir. 1995). Error is harmless when it is highly probable that the error did not contribute to the judgment. To determine if the defendant was prejudiced, the Court must consider the scope of the comments and their relationship to the proceeding, the extent of any curative instructions, and the strength of the evidence against defendants. Weatherly, 525 at 273 (3d Cir. 2008).

Here, the Defendant was not prejudiced because, the two remarks at issue were narrow in scope. The comments were brief, comprising six lines of an argument and rebuttal that spanned over 20 pages of the trial transcript.

Second, the Court instructed the jury regarding the testimony of law enforcement witnesses as follows:

> You have heard the testimony of law enforcement officers. The fact that a witness is employed as a law enforcement officer does not mean that his testimony necessarily deserves any more or less consideration or greater or lesser weight than that of any other witness. You must decide after reviewing all the evidence whether you believe the testimony of the law enforcement witness and how much weight if any, it deserves.

T.T. Day 4 at 173. This instruction, though a standard instruction, rather than a curative instruction, further minimized any impact of any allegedly improper vouching.

Finally, as set forth above, the evidence of the Defendant's guilt in this case was strong.

For these reasons, the Defendant's claim that the improper vouching occurred must fail.

The Defendant also claimed that during closing argument the Government violated Rule 404(b) of the Federal Rules of Criminal Procedure by arguing that the Defendant had a propensity for committing bad acts. In support of this contention the Defendant refers to three portions of the transcript related to a text message conversation found on the iPhone wherein the user of the iPhone, whom the Government argued is John Terry, indicated his knowledge of the storage of a firearm in a hidden compartment in a vehicle. The Government presented this information through testimony and referenced it in its closing argument for a permissible purpose—to prove Mr. Terry's knowledge of vehicle traps, and the identity of the owner of the firearm found in the vehicle trap in this case (and thus, the possessor of the drugs found there, as well).[17]

For these reasons, the Defendant's claims related to errors committed during the Government's closing argument must fail.

H. The Defendant's Claim of Juror Misconduct

Lastly, the Defendant claims that a new trial must be ordered because juror misconduct occurred. Doc. 245 at ¶ 29. In support of this contention, the Defendant notes only that, "on August 26, 2022, hours after the jurors were dismissed, Defendant's family observed three jurors

---

[17] It should also be noted that the this was a bifurcated trial and the jury was not made aware of the fact that Mr. Terry is a felon. Possession of a firearm by an ordinary, non-felon citizen is not itself a "bad act." Similarly, storing a firearm behind the radio in a vehicle, while unconventional, is not in and of itself, a bad act. Thus, this testimony and argument does not even fall within Rule 404(b).

approaching the courthouse with flowers, but upon seeing the family, the jurors continued to walk past the courthouse." Id.

The legal standard for obtaining a hearing on a claim of juror misconduct is a high one: "while the evidence of juror misconduct need not be literally incontrovertible to warrant a hearing, it still must constitute clear, strong, and substantial evidence of a specific, nonspeculative impropriety." United States v. Noel, 905 F.3d 258, 274 (3d Cir. 2018).

Here, the Defendant provides only limited information related to a generalized suspicion that juror misconduct occurred. The Defendant claims that juror misconduct occurred based on his family's alleged observation of jurors the day after the jury had already returned a verdict in this case.

Because the Defendant has failed to demonstrate "clear, strong, and substantial evidence of a specific, nonspeculative impropriety" the Defendant's claim of juror misconduct must fail.

### V.      Conclusion

WHEREFORE, for the reasons set forth herein, it is respectfully submitted that the Defendant's Amended Motion for Judgment of Acquittal/New Trial (Doc. 245) should be DENIED.

> Respectfully submitted,
>
> TROY RIVETTI
> Acting United States Attorney
>
> s/*Arnold P. Bernard, Jr.*
> ARNOLD P. BERNARD, JR.
> Assistant United States Attorney
> PA ID No. 313734