IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case No. 3:18-cr-24 |
| | ) | |
| v. | ) | JUDGE KIM R. GIBSON |
| | ) | |
| JOHN T. TERRY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

### I.      Introduction

Pending before the Court are Defendant John T. Terry's ("Mr. Terry") "Omnibus Post-Trial Motion for Judgment of Acquittal and/or Motion for a New Trial" (ECF No. 226) and "Amended Omnibus Post-Trial Motion for Judgment of Acquittal, or in the Alternative, Motion for a New Trial[.]" (ECF No. 245). Mr. Terry's Motions are fully briefed (ECF Nos. 226, 245, 254, 259) and ripe for disposition. For the following reasons, the Court **DENIES** Mr. Terry's Motions at ECF Nos. 226 and 245.

### II.      Background

By way of Superseding Indictment, a Grand Jury charged Mr. Terry with four offenses. (ECF No. 62).[1] At Count One ("Count I"), the Grand Jury charged Mr. Terry with conspiring to distribute and to possess with the intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, and a detectable amount of cocaine, both Schedule II controlled substances, in violation of Title 21, United States Code,

---

[1] The Superseding Indictment contains six counts. (*See* ECF No. 62). Counts IV and VI are counts containing charges against Mr. Terry's co-defendant, Gerald Terry, alone. (*Id.* at 4, 6). The Superseding Indictment charges John T. Terry at Counts I, II, III, and V. (*Id.* at 1–5).

Sections 841(a)(1), 841(b)(1)(A)(viii), and 841(b)(1)(B)(ii), and in violation of Title 21, United States Code, Section 846. (*Id.* at 1). At Count Two ("Count II"), the Grand Jury charged Mr. Terry with possessing with the intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, and a detectable amount of cocaine, both Schedule II controlled substances, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A)(viii), and 841(b)(1)(B)(ii). (*Id.* at 2). At Count Three ("Count III"), the Grand Jury charged Mr. Terry with unlawful possession of a firearm by a convicted felon, in violation of Title 18, United States Code, Section 922(g)(1). (*Id.* at 3). Finally, at Count Five ("Count V"), the Grand Jury charged Mr. Terry with unlawful possession of a firearm in furtherance of a drug trafficking crime (the crime charged at Count II of the Superseding Indictment), in violation of Title 18, United States Code, Sections 924 (c)(1)(A) and 924(c)(1)(C)(i). (*Id.* at 5).

On November 22, 2021, Mr. Terry filed a "Motion to Sever or Bifurcate the Jury Trial[.]" (ECF No. 180). In that Motion, Mr. Terry noted that in order to prove the offense at Count III, the Government would need to show beyond a reasonable doubt that he was previously convicted of a felony. (*Id.* at 2). Therefore, he requested that the Court bifurcate "the issue of the prior conviction and [withhold] any evidence of a felony conviction … until the jury has resolved the other issues in the case." (*Id.*). Mr. Terry also noted that the fact that he had a prior felony conviction was evidence that could be used to prove the offense at Count V of the Superseding Indictment. (*Id.* at 3).

On March 14, 2022, the Court granted Mr. Terry's Motion to the extent that he sought the bifurcation of Counts I and II (the counts not implicating evidence of his prior felony conviction) from Counts III and V (the counts implicating evidence of his prior felony conviction). (ECF No.

190). Specifically, the Court ordered that the trial would "occur in two phases. During phase one, the jury [would] determine [Mr.] Terry's guilt or innocence with respect to the charges at Counts I and II of the Superseding Indictment. During that phase of the trial, the Government [would not be] permitted to introduce evidence of Terry's prior felony conviction[.]" (*Id.* at 25). Then, during phase two of the trial, the jury would "decide [Mr.] Terry's guilt or innocence with respect to the charges at Counts III and V of the Superseding Indictment. During that phase of the trial, the Government [would be permitted] to introduce the fact of [Mr.] Terry's prior felony conviction." (*Id.*).

On August 22, 2022, phase one of the trial began. (ECF No. 209). On August 25, 2022, the jury found Mr. Terry guilty of the offenses at Count I and Count II of the Superseding Indictment. (ECF No. 217).

On August 26, 2022, Mr. Terry waived his right to trial by jury with respect to the charges at Counts III and V of the Superseding Indictment and proceeded to a bench trial. (ECF Nos. 218, 219). On that same date, the Court found Mr. Terry guilty of the offenses at Counts III and V of the Superseding Indictment. (ECF No. 220).

On September 9, 2022, Mr. Terry filed his "Omnibus Post-Trial Motion for Judgment of Acquittal and/or Motion for a New Trial[.]" (ECF No. 226). In that Motion, Mr. Terry noted that he had requested a transcript of the trial in this matter, and he therefore requested an extension of time within which to amend his post-trial Motion. (*Id.* at 6). With the Court's leave, Mr. Terry filed his "Amended Omnibus Post-Trial Motion for Judgment of Acquittal, or in the Alternative, Motion for a New Trial" on January 13, 2023. (ECF No. 245). On April 14, 2023, the Government

filed its Response in Opposition to Mr. Terry's Amended Motion. (ECF No. 254). Finally, on May

5, 2023, Mr. Terry filed a Reply to the Government's Response. (ECF No. 259).

## III.     Legal Standard

### A.     Federal Rule of Criminal Procedure 29

"'[T]he Rule 29 judgment of acquittal is a substantive [judicial] determination that the

prosecution has failed to carry its burden.'" *United States v. Rodriguez-Mendez*, No. 1:17-CR-15-1,

2021 WL 6143581, at *1 (W.D. Pa. Dec. 29, 2021) (quoting *United States v. John-Baptiste*, 727 F.3d

186, 200 n.8 (3d Cir. 2014)). A "defendant 'challenging the sufficiency of the evidence' pursuant

to Rule 29 'bears a heavy burden.'" *John-Baptiste*, 747 F.3d at 201 (quoting *United States v. Casper*,

956 F.2d 416, 421 (3d Cir. 1992)).

In "deciding whether to grant a motion for acquittal, the trial court is required to view the

evidence in the light most favorable to the prosecution and to draw all reasonable inferences in

the Government's favor." *Rodriguez-Mendez*, 2021 WL 6143581, at *1 (citing *United States v.*

*Ashfield*, 735 F.2d 101, 106 (3d Cir. 1984)). The "court 'must determine whether the government

has adduced sufficient evidence respecting each element of the offense charged to permit jury

consideration.'" *Id.* (quoting *United States v. Giampa*, 758 F.2d 928, 934–35 (3d Cir. 1985)). A

"reviewing court 'must be ever vigilant … not to usurp the role of the jury by weighing credibility

and assigning weight to the evidence, or by substituting [its] judgment for that of the jury.'" *Id.*

(quoting *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 430 (3d Cir. 2013)). Courts must "review

the evidence as a whole, not in isolation, and ask whether it is strong enough for a rational trier

of fact to find guilt beyond a reasonable doubt" and must "sustain the jury's verdict if there is

substantial evidence, viewed in the light most favorable to the government, to uphold the jury's

decision." *Caraballo-Rodriguez*, 726 F.3d at 430 (internal quotation marks and citation omitted). Indeed, the "jury's verdict must be assessed from the perspective of a reasonable juror, and the verdict must be upheld as long as it does not 'fall below the threshold of bare rationality.'" *Rodriguez-Mendez*, 2021 WL 6143581, at *1 (quoting *Caraballo-Rodriguez*, 726 F.3d at 431).

Finally, the same standard that governs a Rule 29 motion in the context of a jury trial governs a Rule 29 motion in the context of a bench trial. *United States v. Robinson*, No. 2:14-CR-64, 2015 WL 3967085, at *2 (W.D. Pa. June 30, 2015); *see also United States v. Stubler*, 271 F. App'x 169, 170 (3d Cir. 2008); *Gov't of the V.I. v. Bryan*, 29 F. App'x 65, 68 (3d Cir. 2002) (stating that, when reviewing a trial court's findings in a non-jury criminal trial, the relevant question is whether the evidence "adduced at trial would permit 'reasonable mind[s]' to accept a particular conclusion.'") (quoting *United States v. Delerme*, 457 F.2d 156, 160 (3d Cir. 1972)).

## B.    Federal Rule of Criminal Procedure 33

"Federal Rule of Criminal Procedure 33(a) permits a court to 'vacate any judgment and grant a new trial if the interest of justice so requires.'" *Rodriguez-Mendez*, 2021 WL 6143581, at *3 (quoting FED. R. CRIM. P. 33(a)). If the "case was tried without a jury, the court may take additional testimony and enter a new judgment." FED. R. CRIM. P. 33(a).

The "decision to grant or deny a motion for new trial lies within the court's discretion." *Rodriguez-Mendez*, 2021 WL 6143581, at *3 (citing *United States v. Vitillo*, 490 F.3d 314, 325 (3d Cir. 2007)). In considering a motion for a new trial, district courts must "'exercise great caution in setting aside a verdict reached after fully-conducted proceedings,' and particularly so where 'the action has been tried before a jury.'" *Id.* (quoting *United States v. Kelly*, 539 F.3d 172, 182 (3d Cir. 2008)).

Even if a "trial court improperly admits evidence, this 'does not automatically mandate a new trial. There must be prejudice that affects a substantial right of the defendant.'" *Id.* (quoting *United States v. Giampa*, 904 F. Supp. 235, 302 (D.N.J. 1995)). Accordingly, a "district court may order a new trial 'only if it believes that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted.'" *Id.* (quoting *United States v. Staten*, 557 F. App'x 119, 121 (3d Cir. 2014)).

## IV.    Discussion

In his post-trial submissions, Mr. Terry generally asserts that the evidence against him was insufficient for the jury and the Court to deem him guilty of the offenses at Counts I, II, III, and V of the Superseding Indictment. (ECF No. 226 at 4). He further contends that there were several errors before, during, and after trial that should lead the Court to grant him relief. (ECF Nos. 226, 245, 259).

The Court first turns its attention to Mr. Terry's argument that the verdicts entered by the jury and the Court warrant a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. The Court then addresses Mr. Terry's additional assignments of error.

### A.    The Court Denies Mr. Terry's Motion for a Rule 29 Judgment of Acquittal

Based on the evidence presented at the jury and non-jury trials in this matter, the Court finds that reasonable minds could deem Mr. Terry guilty of the offenses at Counts I, II, III, and V of the Superseding Indictment beyond a reasonable doubt. In order to explain that finding, the Court first outlines four categories of evidence that the Government produced at trial. After doing so, the Court explains why the Government's evidence warrants the denial of Mr. Terry's Motion for Judgment of Acquittal.

1.   **Outline of the Evidence Produced at Trial**

   a.   **Evidence Obtained From the Car in Which Mr. Terry Was Riding**

At trial, Pennsylvania State Police Officer Ryan Marmol ("Trooper Marmol") testified on behalf of the Government. (ECF No. 230 at 35–36). Trooper Marmol stated that, on April 4, 2018, he stopped a red 2010 Ford Taurus. (*Id.* at 43:2–6). Upon stopping the vehicle, he obtained a driver's license from the driver, which identified that individual as Gerald Terry. (*Id.* at 47:15–18). Trooper Marmol also obtained identification from the passenger, which identified that individual as John T. Terry. (*Id.* at 48:25–49:5).

After obtaining consent to search the Ford Taurus, Trooper Marmol found "an after-market hidden compartment that was in the passenger side dash area of the vehicle." (*Id.* at 51–52). Inside that compartment, Trooper Marmol discovered "three kilogram-sized packages that were wrapped in black duct tape and clear cellophane wrapping. [He also discovered] a Smith & Wesson 40-caliber pistol that was loaded, and there was one round in the chamber and six rounds in the magazine, for a total of seven rounds." (*Id.* at 54–56; 77:18–22; 123:9–17). Trooper Marmol then conducted a field test on the unknown substance inside the black duct tape and clear cellophane wrapping, which resulted in a "positive test for suspected cocaine." (*Id.* at 57:4–13). Notably, certain of the cocaine that Trooper Marmol seized from the Ford Taurus was stamped with a backwards two. (*Id.* at 64–68; Government's Exhibit 2–2C; ECF No. 215 at 1). Finally, during his stop of the Ford Taurus, Trooper Marmol seized two electronic devices—an iPhone and a Samsung Galaxy. (ECF No. 230 at 85:3–9).

After taking Mr. Terry back to the state police barracks, Mr. Terry made a statement in the presence of Trooper Marmol that he "was responsible for the [Ford Taurus] and that he borrowed the [Ford Taurus]." (*Id.* at 92:19–93:1).

### b.   Evidence Obtained From the iPhone and the Samsung Galaxy

In this subsection, the Court outlines the following evidence: (1) the process by which the Federal Bureau of Investigation ("FBI") extracted data from the iPhone and the Samsung Galaxy and prepared to present that evidence at trial, (2) the extent to which the FBI editorialized the information that the Government presented at trial, and (3) the evidence that the Government presented at trial from the iPhone and the Samsung Galaxy tending to connect Mr. Terry to those phones.

### i.   The Process by Which the FBI Extracted Data From the iPhone and the Samsung Galaxy and Prepared to Present That Evidence at Trial

Senior Forensic Examiner Justin Sarvey ("SFE Sarvey") of the FBI testified at trial regarding the process by which he extracted the data from the iPhone and the Samsung Galaxy that Trooper Marmol found in the Ford Taurus during the stop on April 4, 2018, and that the Government produced at trial. (ECF No. 230 at 170–77).[2] With respect to the Samsung Galaxy, SFE Sarvey extracted all of the data that he could off of the device and made it available for the

---

[2] The Court notes that Trooper Marmol testified that the iPhone that the Government produced at trial as Exhibit 7 appeared to be the same iPhone that he had recovered from the Ford Taurus during the traffic stop. (ECF No. 230 at 85:17–86:3; Government's Exhibit 7; ECF No. 215 at 1). Likewise, Trooper Marmol testified that the Samsung Galaxy that the Government produced at trial as Exhibit 8 appeared to be the same Samsung Galaxy that he had seized from the Ford Taurus during the traffic stop on April 4, 2018. (ECF No. 230 at 88:18–89:11; Government's Exhibit 8; ECF No. 215 at 1). SFE Sarvey then testified that the iPhone that was Exhibit 7 and the Samsung Galaxy that was Exhibit 8 were the phones that he had searched pursuant to the warrants signed by United States Magistrate Judge Keith A. Pesto. (ECF No. 230 at 173–77).

case agent to review. (*Id.* at 177–78; Government's Exhibit 22; ECF No. 215 at 2). In like fashion, SFE Sarvey extracted the data from the iPhone and made it available for the case agent to review. (ECF No. 230 at 184:14–185:2; Government's Exhibit 24; ECF No. 215 at 2). The case agent to whom SFE Sarvey provided the data for the iPhone and the Samsung Galaxy was Special Agent James Simpson ("Agent Simpson"). (ECF No. 230 at 186:11–14).[3]

Specifically, SFE Sarvey testified that once he extracted the data from the iPhone and Samsung Galaxy and processed it, he "put [it] up onto [the] internal review system[,]" at which point Agent Simpson would have gone "through all the data on the phone, identifie[d] [his] items of interest[,]" and then let SFE Sarvey "know that he was finished with his review and that he had tagged the items of interest." (*Id.* at 190:23–191:8). After Agent Simpson completed that process, SFE Sarvey generated a new report, which was in PDF format, of the items that Agent Simpson had tagged. (*Id.* at 191:3–10).[4] In short, SFE Sarvey testified that: (1) he extracted all of the data that he could from the iPhone and the Samsung Galaxy, (2) he posted that data to the

---

[3] On cross-examination, SFE Sarvey was asked the following regarding the data that he extracted from the phones and made available to Agent Simpson for his review: "[i]sn't it correct that even though the file's in read-only format, if it's saved into another program, then it can be edited." (ECF No. 230 at 190:12–15). In response, SFE Sarvey stated that he "guess[ed] it could be edited." (*Id.* at 190:16).

[4] During trial, SFE Sarvey was asked whether the report generated by the case agent can contain data "other than the specific items that the agent identifies, such as … text messages, contact lists, or images?" (ECF No. 230 at 185:22–24). In response, SFE Sarvey testified that the "report may also contain metadata for the files that[ are] listed in the report." (*Id.* at 185:22–186:1). SFE Sarvey explained that metadata:

> [I]s basically information about a file. So if you had a file that was a picture, the metadata would be information like the file name for that picture. It would be where that picture is stored on a device. It could contain the creation date, so the time that that photo was taken. It may also include things like the type of device or the model of device, such as like an iPhone or a Samsung device, that took that photo.

(*Id.* at 186:2–10).

FBI's internal review system, (3) Agent Simpson reviewed the data and tagged items of interest, and then (4) SFE Sarvey made a new, shorter report consisting of the items that Agent Simpson had tagged. (*Id.* at 170–91).

For his part, Agent Simpson explained that after he received the shorter report that he and SFE Sarvey had created, he prepared additional summary reports. (ECF No. 231 at 27:1–4). Specifically, Agent Simpson created an 18-page report containing data found on the iPhone that he wanted to present at trial—Government's Exhibit 31. (*Id.* at 27:10–19; Government's Exhibit 31; ECF No. 215 at 2). In like fashion, he created a 3-page report containing data found on the Samsung Galaxy that he wanted to present at trial—Government's Exhibit 33. (ECF No. 231 at 30:1–15; Government's Exhibit 33; ECF No. 215 at 3).

Finally, the Government and Mr. Terry stipulated to the following regarding the cell phones:

> The chain of custody of all seized evidence was unbroken, proper, and in accord with the procedures of the Pennsylvania State Police and [FBI]. The evidence seized was maintained in constant law enforcement custody. It was logged into and secured in evidence at all times. It has been securely transported by law enforcement members to the federal courthouse in Johnstown for trial. Proper documentation reflects any movement of the items.

(ECF No. 230 at 63:23–64:9).

### ii. The Extent to Which the FBI Editorialized the Evidence that the Government Presented at Trial

At trial, the Government presented evidence of communications extracted from the iPhone and the Samsung Galaxy, along with testimony from Agent Simpson explaining that evidence. (ECF No. 231 at 35–38, 58–65). Certain evidence from the phones was admitted by way of Government's Exhibits 32 and 34. (*Id.*).

Notably, Agent Simpson explained what information in Exhibits 32 and 34 he personally added to those Exhibits, and what information came directly from the phones. For example, he testified that the conclusion in Exhibit 32A indicating that the iPhone belonged to Mr. Terry was his conclusion—that information was not populated by the phone itself. (*Id.* at 38:16–39:5).[5] However, other information in the reports that he presented during trial was populated by the iPhone itself, such as the name of a contact in the iPhone. (*Id.* at 39:12–24, 145:13–23). Finally, with respect to "all of [the] communications" from the iPhone and the Samsung Galaxy that Agent Simpson discussed at trial, he testified that he did not change the content of those communications in any way. (*Id.* at 42:10–12). Indeed, Agent Simpson testified that he did not create the contents of the text messages or other communications coming from or going to the cell phones. (*Id.* at 143:5–14).

### iii. The Evidence That the Government Presented at Trial From the iPhone and the Samsung Galaxy Tending to Connect Mr. Terry to Those Phones

During trial, the Government offered various pieces of evidence that had the potential to show that Mr. Terry was the owner and user of the iPhone and the Samsung Galaxy that Trooper Marmol found in the Ford Taurus on April 4, 2018. (*See* ECF No. 231 at 38–65, 82–89; Government's Exhibit 32; Government's Exhibit 34; ECF No. 215 at 2–3).

---

[5] During a sidebar conference regarding Exhibit 32, the Court stated that the Government could admit the evidence in Exhibit 32 as long as the Government "made clear to the jury that this is taken from these other reports and he (Agent Simpson) has added some of his own—I guess you would call expertise or interpretation as to what these things mean. As long as that's clear, I think that's fair." (ECF No. 231 at 35–38). Based on the information that the Government adduced from Agent Simpson, such as the fact that he added to Exhibit 32A the conclusion that the iPhone belonged to Mr. Terry, the Court finds that the Government complied with the Court's admonition on this issue.

By way of example, with respect to the iPhone, two outgoing text messages from December 18, 2017, contained photographs of Mr. Terry's identification card, along with a message stating in relevant part: "I'm so embarrassed I couldn't find my f***ing [ID] … so here nothing I got a duplicate[.]" (ECF No. 231 at 38–42; Government's Exhibit 32A; Government's Exhibit 32B; Government's Exhibit 32C; ECF No. 215 at 2).

Further, on March 8, 2018, approximately one month before Trooper Marmol stopped Gerald Terry and John T. Terry in the Ford Taurus, the iPhone captured a picture of what appeared to be cocaine stamped with a backwards two. (ECF No. 231 at 72:7–73:8; Government's Exhibit 32O; ECF No. 215 at 3). Agent Simpson explained that, while he was going through the data from the iPhone, he found "this image of a backwards two which matched, you know, the kilograms that were seized out of the vehicle on April 4th, 2018." (ECF No. 231 at 72:14–16). Agent Simpson could also see that the cocaine was "on a scale being weighed. And [he] could tell from the kilograms that were seized, which were approximately 1,000 grams, that this picture was of a half kilogram, which is 500 grams of cocaine. It had the same backwards two on it." (*Id.* at 72:16–20).

Turning to the Samsung Galaxy, that phone received a message on March 29, 2018, at 6:15 P.M. that read the following: "Gerald (215) 494-8544[.]" (ECF No. 231 at 58:25–60:13; Government's Exhibit 34C; ECF No. 215 at 3). Approximately four minutes later, the Samsung Galaxy sent a text message to the phone number associated with "Gerald" stating: "Other phone died it's me big bro[.]" (ECF No. 231 at 61:4–24; Government's Exhibit 34B; ECF No. 215 at 3). Finally, approximately ten minutes later, the Samsung Galaxy received two text messages. (ECF No. 231 at 61:25–63:4; Government's Exhibit 34A; ECF No. 215 at 3). The first message read: "This

is big bro wife 1429 Grant Street Braddock PA 15104[.]" (Government's Exhibit 34A; ECF No. 215 at 3). The second message read: "Your bro other phone is down[.]" (Government's Exhibit 34A; ECF No. 215 at 3). With respect to the address on Grant Street, Agent Simpson testified that it was significant because that was "the address [law enforcement] identified where the three kilograms of cocaine were going to." (ECF No. 231 at 62:19–23).

###### c.    Robert Dillard's Testimony

At trial, Robert Dillard ("Mr. Dillard") testified on behalf of the Government. (ECF No. 215 at 4). Mr. Dillard testified that he acquired cocaine from Mr. Terry over time, and that he would typically purchase one or two kilos from him at a time. (ECF No. 231 at 193:8–11). Further, Mr. Dillard testified that: (1) the largest quantity of cocaine that he had ever ordered off of Mr. Terry was three kilograms, (2) he ordered that amount in March or April 2018, and (3) he did not actually receive the three kilograms at that time. (*Id.* at 193:23–194:5). Rather, Mr. Dillard learned that Mr. Terry and Gerald Terry had been stopped on the turnpike with the three kilograms of cocaine that were intended for him. (*Id.* at 194:6–9). Mr. Dillard also stated that in 2017 or 2018, the address that he would have provided to Mr. Terry or Gerald Terry would have been 1429 Grant Street, North Braddock. (*Id.* at 195:4–11).

Finally, Mr. Dillard testified that: (1) he had pleaded guilty to conspiracy to possess with intent to distribute 500 grams or more of cocaine and (2) the cocaine to which that guilty plea was related was the three kilograms inside the Ford Taurus when Trooper Marmol stopped Mr. Terry and Gerald Terry on April 4, 2018. (*Id.* at 196:21–197:2).

###### d.    Testimony of Morgan Wiernusz

During trial, Morgan Wiernusz ("Ms. Wiernusz") testified on behalf of the Government. (ECF No. 215 at 3). Ms. Wiernusz explained that, as of the trial in this matter, she was a forensic scientist with the Pennsylvania State Police Crime Lab. (ECF No. 231 at 159:8–10). Further, she stated that she was asked to analyze suspected narcotics relative to this case—specifically the three bricks containing compressed white powder that Trooper Marmol found in the Ford Taurus on April 4, 2018. (*Id.* at 160:13–161:3).

With respect to all three bricks, Ms. Wiernusz detected cocaine and methamphetamine, both of which are Schedule II controlled substances. (*Id.* at 165:16–167:2). Moreover, she stated that the net weight of the three bricks was 2,995 grams, plus or minus ten grams. (*Id.* at 167:3–7).

On cross examination, Ms. Wiernusz testified that she did not know the margin of error for drug detection. (*Id.* at 170:15–25).

Finally, Ms. Wiernusz testified that the work that she performs in the lab and the results of the tests that she conducts are reviewed by her supervisor before they are finalized. (*Id.* at 176:21–177:7).

### 2. The Government's Evidence Warrants the Denial of Mr. Terry's Motion for Judgment of Acquittal With Respect to Counts I, II, III, and V of the Superseding Indictment

Having outlined portions of the evidence that the Government produced at trial, the Court now turns its attention to whether the jury and the Court's conclusions that Mr. Terry is guilty of the offenses at Counts I, II, III, and V of the Superseding Indictment were rational. The Court begins by analyzing the offenses at Counts I and II.

### a. The Jury's Conclusion that Mr. Terry is Guilty of the Offenses at Counts I and II of the Superseding Indictment Was Rational

### i.   The Offenses at Count I and Count II

During phase one of the trial, the jury unanimously found Mr. Terry guilty as "to Count [I] (Conspiracy to Distribute or Possess with Intent to Distribute a Mixture and Substance Containing a Detectable Amount of Methamphetamine and Cocaine)[.]" (ECF No. 217 at 1). Further, in interrogatories relative to Count I, the jury unanimously found beyond a reasonable doubt that: (1) the mixture or substance involved in the conspiracy was methamphetamine and cocaine and (2) the weight of the mixture or substance involved in the conspiracy was 500 grams or more. (*Id.* at 2).

Further, with respect to the offense at Count II of the Superseding Indictment, the jury unanimously found Mr. Terry guilty of "Possession with Intent to Distribute a Mixture and Substance Containing a Detectable Amount of Methamphetamine and Cocaine[.]" (*Id.* at 3). In interrogatories relative to Count II, the jury unanimously found beyond a reasonable doubt that: (1) the mixture or substance that Mr. Terry possessed with the intent to distribute contained a detectable amount of methamphetamine and cocaine and (2) the weight of the mixture or substance that Mr. Terry possessed with the intent to distribute was 500 grams or more. (*Id.* at 4).

With respect to the conspiracy offense at Count I, the "essential elements of a drug distribution conspiracy under 21 U.S.C. § 846 are: '(1) a shared unity of purpose, (2) an intent to achieve a common goal, and (3) an agreement to work together toward the goal.'" *United States v. Iglesias*, 535 F.3d 150, 156 (3d Cir. 2008) (quoting *United States v. Bobb*, 471 F.3d 491, 494 (3d Cir. 2006)). Among the "factors courts have considered in determining whether a conspiracy has been shown are 'the length of affiliation between the defendant and the conspiracy; whether there is an established method of payment; the extent to which transactions are standardized; and

whether there is a demonstrated level of mutual trust.'" *Id.* (quoting *United States v. Gibbs*, 190 F.3d 188, 199 (3d Cir. 1999) (citation omitted)).

Further, the "'essential elements of the substantive offense of possession of a controlled substance with intent to distribute are that the defendant (1) knowingly possessed a controlled substance with (2) the intent to distribute it.'" *Id.* (quoting *Bobb*, 471 F.3d at 497)). A jury can convict a defendant of possession charges if it concludes that "he actually or constructively possessed" the controlled substance. *Id.* Constructive possession "requires an individual to have the power and intent to exercise both dominion and control over the object he or she is charged with possessing" and may be proved by circumstantial evidence. *Id.* (internal quotation marks and citation omitted).

Finally, "drug identity and quantity must be treated as elements of a section 841 possession with intent to distribute offense when taking either factor into account increases the applicable statutory maximum." *United State v. Lacy*, 446 F.3d 448, 453 (3d Cir. 2006); *see also United States v. Williams*, 974 F.3d 320, 365–66 (3d Cir. 2020) (noting that the Supreme Court's decision in *Alleyne v. United States*, 570 U.S. 99 (2013), requires that the jury determine the drug quantity involved in an offense when that quantity increases the statutory mandatory minimum and holding that "[t]he jury, when determining drug quantity for purposes of the mandatory minimum, may attribute to a defendant only those quantities involved in violations of § 841(a) that were within the scope of, or in furtherance of, the conspiracy and were reasonably foreseeable to the defendant as a result of the unlawful agreement.").

### ii.  The Parties' Arguments

In relevant part, Mr. Terry advances six arguments regarding the sufficiency of the evidence that the Government produced at trial relative to the offenses at Count I and Count II. (ECF Nos. 226, 245, 259). First, as a general matter, Mr. Terry argues that the Government "failed to present sufficient evidence beyond a reasonable doubt that [he] was a participant in a conspiracy and that [he]: (1) [had] a shared unity of purpose; (2) an intent to achieve a common illegal goal; and (3) an agreement to work toward that goal." (ECF No. 245 at 12). Second, Mr. Terry contends that, for Counts I and II, the Government "failed to present sufficient evidence [that he] 'knowingly' possessed a controlled substance, was aware of the illegal object of the conspiracy, and knew of the commission of the substantive offense and acted with the intent to facilitate it." (*Id.*). Third, Mr. Terry asserts that the quantity and identity of the methamphetamine that he allegedly possessed with intent to distribute must be treated as an element of the offense at Count II in this case. (*Id.* at 14). And Mr. Terry argues that the Government failed to prove that element beyond a reasonable doubt because Ms. Wiernusz "did not testify about what was the margin of error for detection [of controlled substances] and whether the alleged methamphetamine fell within the margin of error." (*Id.* at 7). Fourth, Mr. Terry contends that the Government failed to prove that the evidence from the iPhone and the Samsung Galaxy were the work product of SFE Sarvey. (*Id.* at 4). Instead, Mr. Terry asserts that the evidence from the phones were the interpretations and creations of Agent Simpson, especially since SFE Sarvey acknowledged that the files from the phones could be altered. (*Id.* at 4–5). Fifth, Mr. Terry argues that the Government did not properly inform the jury that the evidence from the phones were Agent Simpsons' interpretations, but rather the Government "offered testimony that the reports were as if directly from the full extraction reports." (*Id.* at 5). Finally, Mr. Terry avers that Mr.

-17-

Dillard's testimony was unreliable because: (1) he was a career criminal, (2) he gave information to assist himself on a separate drug trafficking investigation, (3) and he pleaded guilty to lesser charges and a lesser controlled substance, among other factors. (*Id.* at 7–8).

In response, the Government generally argues that Mr. Terry's objections are unavailing and points to the evidence obtained from the cellphones, as well as the testimony of Mr. Dillard, in support of the jury's verdict. (*See* ECF No. 254).

### iii. Analysis

Before examining whether a reasonable juror could find that Mr. Terry was guilty of each element of the offenses at Counts I and II beyond a reasonable doubt, the Court makes three preliminary notes. First, the Court stresses the "well-established principle that witness credibility determinations must be made by the jury." *United States v. Lewis*, 284 F. App'x 940, 942 (3d Cir. 2008). Therefore, it was up to the jury to determine how much weight to assign to the testimony of Trooper Marmol, SFE Sarvey, Agent Simpson, Mr. Dillard, and Ms. Wiernusz. Evidently, the jury assigned their testimonies significant weight.

Second, based on the evidence outlined above, *see supra* Section IV.A.1, and other evidence produced by the Government at trial, a reasonable juror could find that: (1) Trooper Marmol found the iPhone and the Samsung Galaxy during the traffic stop of the Ford Taurus on April 4, 2018; (2) SFE Sarvey extracted all of the data that he could from those same phones and made the data available for Agent Simpson's review; (3) SFE Sarvey and Agent Simpson worked to condense the information on the phones in order to present that information at trial; and (4) Agent Simpson presented information from the phones at trial, without editing any of the communications sent from or to the phones. *See id.* Indeed, although SFE Sarvey testified that it

was theoretically possible for a case agent to save and then alter evidence from a cell phone, Agent Simpson testified that he did not change the contents of the messages or other communications extracted from the iPhone or the Samsung Galaxy. *See id.* Likewise, Mr. Terry points to no evidence at trial indicating that anyone changed the contents of the messages, other communications, or photographs extracted from the iPhone or the Samsung Galaxy. (ECF Nos. 226, 245, 259).

Finally, the Court finds that the Government appropriately clarified to the jury the ways in which Agent Simpson editorialized the information obtained from the phones. *See supra* Section IV.A.1. For example, the Government adduced testimony from Agent Simpson that he placed the conclusion on Exhibit 32A indicating that the iPhone belonged to Mr. Terry. *See id.*

With those initial findings in place, the Court turns to the issue of whether the Government produced sufficient evidence to permit a reasonable juror to conclude beyond a reasonable doubt that Mr. Terry participated in a conspiracy, as is necessary to prove the offense at Count I of the Superseding Indictment. Here, the evidence at trial permitted a reasonable juror to find the following: (1) the iPhone and the Samsung Galaxy belonged to Mr. Terry because he sent and received text messages from those phones indicating that he possessed and used them; (2) Mr. Terry took a picture of cocaine using the iPhone that bore a marking akin to the marking on at least certain of the cocaine that Trooper Marmol found in the hidden compartment of the Ford Taurus on April 4, 2018; (3) Mr. Terry received a text message on the Samsung Galaxy mere days before April 4, 2018, that referenced both Gerald Terry and the address 1429 Grant Street, Braddock, Pennsylvania; (4) Mr. Terry was found riding in a vehicle with Gerald Terry on April 4, 2018, and inside the vehicle there was a hidden compartment holding a mixture and substance

containing methamphetamine and cocaine that was stamped with the same (or at least a very similar) marking as the cocaine in the picture on Mr. Terry's iPhone; (5) Mr. Dillard testified that Mr. Terry was intending to bring the cocaine in the Ford Taurus to him at 1429 Grant Street, Braddock, Pennsylvania; (6) Mr. Dillard pleaded guilty to conspiring to possess with the intent to distribute that same cocaine; and (7) Mr. Dillard had purchased a standard amount of cocaine from Mr. Terry in the past. *See supra* Section IV.A.1. In light of all of that evidence, as well as the additional evidence that the Government produced at trial but which the Court has not explicitly referenced in this opinion, a reasonable juror could find, beyond a reasonable doubt, that Mr. Terry and his coconspirator(s) "shared a common goal (the distribution of a mixture and substance containing methamphetamine and cocaine), the intent to achieve that goal, and a tacit (or explicit) agreement to cooperate to achieve it[.]" *Iglesias*, 535 F.3d at 156.

The Court next turns to the issue of whether the Government sufficiently proved that Mr. Terry knowingly possessed a controlled substance with the intent to distribute it. Here, once again, based on the strong evidence demonstrating that Mr. Terry used and possessed the iPhone and the Samsung Galaxy, a reasonable juror could conclude that he was the individual who used and possessed those phones. Therefore, a reasonable juror could find that Mr. Terry took a picture of a distribution-quantity of cocaine on March 8, 2018, that bore the same (or a very similar) marking as at least some of the approximately 2,995 grams of a mixture and substance containing methamphetamine and cocaine in the Ford Taurus, a mixture and substance that Mr. Dillard testified Mr. Terry was bringing to him, and that Mr. Dillard pleaded guilty to conspiring to possess with intent to distribute. *See supra* Section IV.A.1. This evidence strongly connects Mr. Terry to the mixture and substance containing methamphetamine and cocaine in the Ford Taurus,

permitting a reasonable juror to find beyond a reasonable doubt that he knowingly possessed that mixture and substance with the intent to distribute it. Further, the Court notes that Mr. Terry took responsibility for the Ford Taurus that Trooper Marmol stopped on April 4, 2018. *See supra* Section IV.A.1. In light of all of this evidence, as well as the additional evidence set forth in the paragraphs above, and the evidence that the Government produced at trial but which the Court has not explicitly referenced in this opinion, the Court finds that a reasonable juror could conclude, beyond a reasonable doubt, that Mr. Terry knowingly possessed the mixture and substance containing methamphetamine and cocaine in the hidden compartment of the Ford Taurus with the intent to distribute that mixture and substance. *Iglesias*, 535 F.3d at 156–57.

Finally, the Court turns to the issue of whether the evidence that the Government produced at trial would permit a reasonable juror to find beyond a reasonable doubt that Mr. Terry conspired to distribute and possess with intent to distribute and possessed with the intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine and cocaine. Based on the evidence that the Government presented at trial, a reasonable juror could find the following: (1) Trooper Marmol conducted a field test on the substance that he found in the hidden compartment, and it returned a positive for suspected cocaine; (2) Ms. Wiernusz, a trained forensic scientist with the Pennsylvania State Police Crime Lab, tested the bricks that Mr. Terry conspired to distribute and possess with intent to distribute and possessed with the intent to distribute, and those bricks contained cocaine and methamphetamine and weighed a cumulative 2,995 grams, plus or minus ten grams; and (3) Ms. Wiernusz's supervisor reviewed the results of her tests before she finalized them. *See supra* Section IV.A.1. Based on this evidence, as well as all of the evidence that the Government

produced at trial, the Court finds that a reasonable juror could conclude, beyond a reasonable doubt, that Mr. Terry conspired to distribute and possess with intent to distribute and possessed with the intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine and cocaine,[6] regardless of whether Ms. Wiernusz knew the margin of error for drug detection and whether these particular drugs fell within that margin of error. *Cf. United States v. Stewart*, 179 F. App'x 814, 818 (3d Cir. 2006) ("It is well-established that lay testimony and circumstantial evidence may be sufficient, without the introduction of an expert chemical analysis, to establish the identity of the substance involved in an alleged narcotics transaction. So long as the government produces sufficient evidence, direct or circumstantial, from which the jury is able to identify the substance beyond a reasonable doubt, the lack of scientific evidence is not objectionable.") (internal quotation marks and citations omitted).[7]

Therefore, the Court holds that the jury's guilty verdict at Counts I and II did not fall below the "threshold of bare rationality" and must be upheld. Indeed, in the Court's opinion, the evidence of Mr. Terry's guilt at Counts I and II of the Superseding Indictment was very strong. Further, the Court finds that Mr. Terry's additional arguments, (ECF Nos. 226, 245, 259), which

---

[6] Indeed, the Court finds that a reasonable juror could conclude, beyond a reasonable doubt, that more than 500 grams of a mixture and substance containing a detectable amount of methamphetamine and cocaine "were within the scope of, or in furtherance of, the conspiracy and were reasonably foreseeable to [Mr. Terry] as a consequence of the unlawful agreement." *Williams*, 974 F.3d at 366.

[7] In this case, the Government did present scientific evidence (Ms. Wiernusz's testing and related testimony) that the mixture and substance that Mr. Terry conspired to distribute and possess with intent to distribute and possessed with intent to distribute was in excess of 500 grams and contained methamphetamine and cocaine. However, Ms. Wiernusz's presentation of that evidence was perhaps not perfect insofar as she did not know, at trial, the margin of error for drug detection and whether the drugs in this case fell within that margin. But if scientific evidence is not necessary to establish the identity of a substance, then completely perfect scientific evidence is not necessary either. In short, in this case, the evidence that the Court outlined above was certainly a sufficient basis upon which a reasonable juror could determine the type and quantity of drugs found in the Ford Taurus on April 4, 2018.

generally relate to issues of credibility and the weight that the jury should have assigned to certain evidence, do not alter in any way the Court's holding relative to Counts I and II. Accordingly, the Court denies Mr. Terry's Motions (ECF Nos. 226, 245) to the extent that he seeks a judgment of acquittal at Count I of the Superseding Indictment, and it likewise denies his Motions to the extent that he seeks a judgment of acquittal at Count II.

**b.     The Evidence That the Government Presented Permitted Reasonable Minds to Find Mr. Terry Guilty of the Offense at Count III**

**i.   The Offense at Count III**

With respect to the offense at Count III of the Superseding Indictment, the Court found, beyond a reasonable doubt, that Mr. Terry was guilty of the crime of being a felon in possession of a firearm. (ECF No. 220 at 1–3).

As the Court explained in its verdict, the elements of the offense at Count III of the Superseding Indictment are as follows: "(1) First, that [Mr. Terry] has been convicted of a felony, that is, a crime punishable by imprisonment for a term exceeding one year; and that on the dates set forth in the First Superseding Indictment; [Mr. Terry] knew he had been convicted of a crime punishable by imprisonment for a term exceeding one year." (*Id.* at 1). "(2) Second, that after this conviction, [Mr. Terry] knowingly possessed the firearm described in Count [III] of the First Superseding Indictment." (*Id.*). "(3) Third, that [Mr. Terry's] possession was in or affecting interstate or foreign commerce." (*Id.*) (citing *United States v. Adams*, 36 F.4th 137, 143–44 (3d Cir. 2022) (noting that, in *Rehaif v. United States*, 139 S. Ct. 2191, 2200 (2019), the Supreme Court held that a defendant must knowingly possess a firearm and also know that he "'belong[s] to the relevant category of persons barred from possessing a firearm[']"); *see also Greer v. United States*,

141 S. Ct. 2090, 2095–97 (2021) [(noting that individuals "who are convicted felons ordinarily know that they are convicted felons")]).

With respect to the second element, proof of actual or constructive possession is sufficient. *Iglesias*, 535 F.3d at 156. "'Constructive possession requires an individual to have the power and intent to exercise both dominion and control over the object he or she is charged with possessing.'" *Id.* (quoting *United States v. Garth*, 188 F.3d 99, 112 (3d Cir. 1999)). And constructive possession "may be proved by circumstantial evidence." *Id.*

### ii. The Parties' Arguments

Generally speaking, Mr. Terry argues that the Government failed to present substantive "evidence beyond a reasonable doubt that [he] constructively possessed the firearm found in the hidden compartment, when the Government failed to provide substantive evidence that [he] acted knowingly with both the power and the intention at a given time to exercise dominion or control over the firearm[.]" (ECF No. 245 at 13). Further, Mr. Terry notes that Mr. Dillard stated that "the 'Terry[s] were not known to carry a firearm[.]'" (*Id.* at 8). Accordingly, Mr. Terry asserts that "there is no substantial evidence of proof beyond a reasonable doubt that [he] would have known a firearm was in the hidden compartment … [or] that he intended to control it[.]" (*Id.*).

In response, the Government argues that the "circumstantial evidence from the cell phones independently and in combination with the testimony of [Mr.] Dillard provided sufficient evidence to prove [Mr.] Terry's … unlawful possession of a firearm[.]" (ECF No. 254 at 15–16).

### iii. Analysis

The Court begins by noting that Mr. Terry does not contest the Court's finding that the Government proved beyond a reasonable doubt that the first and third elements of the crime of

being a felon in possession of a firearm are satisfied in this case. (ECF Nos. 226, 245, 259). Therefore, the Court adheres to its previous findings with respect to those elements, (ECF No. 220 at 1–3), again concluding that reasonable minds could deem them satisfied beyond a reasonable doubt by the Government's evidence.

Turning to the second element of the crime of being a felon in possession of a firearm— that, after Mr. Terry's prior felony conviction, he knowingly possessed the firearm described in Count III of the Superseding Indictment (a loaded Smith & Wesson, M & P Shield, .40 caliber semi-automatic pistol)—the Court finds that reasonable minds could conclude, beyond a reasonable doubt, that Mr. Terry knowingly possessed that firearm on April 4, 2018. (ECF No. 62 at 3; ECF No. 220 at 1). Indeed, as the Court explained above, *see supra* Section IV.A.2.a, there was substantial evidence at trial, and the Court itself is convinced, that Mr. Terry possessed the three bricks containing methamphetamine and cocaine that were in the hidden compartment of the Ford Taurus that Trooper Marmol stopped on April 4, 2018. Further, Trooper Marmol testified that he found a loaded Smith & Wesson, .40 caliber pistol, inside the hidden compartment of the Ford Taurus. *See supra* Section IV.A.1. Because the Court concludes that Mr. Terry possessed the mixture and substance containing methamphetamine and cocaine in the hidden compartment, the Court finds that Mr. Terry knew of and controlled the contents of that compartment, which leads the Court to conclude, beyond a reasonable doubt, that Mr. Terry knowingly possessed the firearm that was with the drugs in that hidden compartment. *United States v. Wiltshire*, 568 F. App'x 135, 137, 140 (3d Cir. 2014) (noting that: (1) use of the Third Circuit's model jury instructions is generally favored and (2) the Third Circuit's model jury instruction regarding the crime of being a felon in possession of a firearm indicates that possession "may be sole or joint.").

Before concluding, the Court briefly addresses Mr. Dillard's statement that the Terrys were not known to carry a firearm. (ECF No. 245 at 8). There are several reasons why this statement does not alter the Court's conclusion that Mr. Terry knowingly possessed the Smith & Wesson in the hidden compartment on April 4, 2018. First, Mr. Dillard did not state that the Terrys did not carry a firearm *on April 4, 2018*—he simply stated that they were not known to carry a firearm. Second, Mr. Dillard testified that the cocaine that Mr. Terry was transporting on April 4, 2018, was the most cocaine that he had ever purchased from Mr. Terry. *See supra* Section IV.A.1. It is possible that Mr. Terry acted in an unusual manner by carrying a gun on April 4, 2018, because he was transporting an unusual quantity of drugs on that date. Third, and most fundamentally, the Court believes Trooper Marmol's testimony that he found a Smith & Wesson in the hidden compartment of the Ford Taurus on April 4, 2018. Given that testimony, one of the Terrys undoubtedly possessed a firearm on that date. And given the strong evidence at trial connecting Mr. Terry to the contents of the hidden compartment, the Court concludes, beyond a reasonable doubt, that Mr. Terry knowingly possessed the Smith & Wesson firearm in that compartment on April 4, 2018.

Therefore, considering the aforementioned evidence, and the other evidence that the Government produced at trial, the Court finds that reasonable minds could conclude, beyond a reasonable doubt, that Mr. Terry is guilty of the offense at Count III of the Superseding Indictment. As with Counts I and II, in the Court's opinion, the evidence of Mr. Terry's guilt at Count III is very strong. Further, the Court finds that Mr. Terry's additional arguments regarding Count III (ECF Nos. 226, 245, 259) do not alter the Court's holding in any way. Accordingly, the

Court denies Mr. Terry's Motions (ECF Nos. 226, 245) to the extent that he seeks a judgment of

acquittal at Count III of the Superseding Indictment.

> **c.**  **The Evidence That the Government Presented Permitted Reasonable Minds to Find Mr. Terry Guilty of the Offense at Count V**

> **i.  The Offense at Count V**

With respect to Count V of the Superseding Indictment, the Court found that the

Government proved, beyond a reasonable doubt, that Mr. Terry is guilty of the offense of

possessing a firearm in furtherance of a crime of violence or a drug trafficking crime. (ECF No.

220 at 3–4).

Turning to the elements of that offense, they are as follows: "(1) First, that [Mr. Terry]

committed the crime of possession with intent to distribute 500 grams or more of a mixture and

substance containing a detectable amount of methamphetamine and cocaine, as charged in Count

[II] of the First Superseding Indictment." (*Id.* at 3). And "(2) [s]econd, that [Mr. Terry] knowingly

possessed a firearm in furtherance of this crime." (*Id.*) (citing *United States v. Sparrow*, 371 F.3d

851, 852–53 (3d Cir. 2004)). In deciding whether Mr. Terry knowingly possessed a firearm in

furtherance of the crime at Count II, the:

> [F]ollowing nonexclusive factors are relevant: the type of drug activity that is being conducted, accessibility of the firearm, the type of the weapon, whether the weapon is stolen, the status of the possession (legitimate or illegal), whether the gun is loaded, proximity to drugs or drug profits, and the time and circumstances under which the gun is found.

*Iglesias*, 535 F.3d at 157 (quoting *Bobb*, 471 F.3d at 496). To determine whether there was sufficient

evidence that Mr. Terry's possession of the Smith & Wesson was "'in furtherance of' his drug

trafficking, [the Court] scrutinize[s] the 'totality of the evidence, both direct and circumstantial,'

and make[s] 'all available inferences in favor of the government.'" *Id.* (quoting *Sparrow*, 371 F.3d at 852) (citation omitted).

### ii. The Parties' Arguments

As he does with respect to Count III, Mr. Terry generally argues that the Government failed to present substantive "evidence beyond a reasonable doubt that [he] constructively possessed the firearm found in the hidden compartment, when the Government failed to provide substantive evidence that [he] acted knowingly with both the power and the intention at a given time to exercise dominion or control over the firearm[.]" (ECF No. 245 at 13). Further, Mr. Terry asserts that the "Government failed to present substantive evidence to prove beyond a reasonable doubt that [he] possessed the firearm and that he possessed it 'in furtherance of' drug activity." (*Id.*). Indeed, Mr. Terry argues that, at best, the Government "showed that the firearm was in relation to the drugs, not in furtherance of drug activity." (*Id.*).

As the Court has previously noted, the Government contends that the "circumstantial evidence from the cell phones independently and in combination with the testimony of [Mr.] Dillard provided sufficient evidence to prove [Mr.] Terry's ... unlawful possession of a firearm in furtherance of his drug trafficking conduct." (ECF No. 254 at 15–16).

### iii. Analysis

Turning to the first element of the crime of possessing a firearm in furtherance of a drug trafficking crime, the Court concurs with the jury that Mr. Terry is guilty, beyond any reasonable doubt, of the offense at Count II of the Superseding Indictment. Therefore, the Court finds that reasonable minds could conclude, beyond a reasonable doubt, that the first element is satisfied.

Turning to the second element—whether Mr. Terry knowingly possessed the firearm *in furtherance of* the drug trafficking crime at Count II—the Court finds that reasonable minds could reach the following conclusions given the evidence that the Government presented: (1) Mr. Terry possessed with intent to distribute a significant quantity of a mixture and substance (2,995 grams, plus or minus ten grams) containing a detectable amount of methamphetamine and cocaine; (2) the firearm that he knowingly possessed was located with that significant, distribution-quantity of controlled substances in a hidden compartment in the vehicle in which he was riding; (3) the firearm that Mr. Terry possessed was loaded; (4) the firearm that Mr. Terry possessed was stolen; and (5) his knowing possession of the firearm was illegal because Mr. Terry had a prior felony conviction of which he knew and the firearm had traveled in interstate commerce. *See supra* Section IV.A.1; (ECF No. 208 at 1–3). Based on these facts, and in light of the other evidence that the Government produced in this case, the Court finds that reasonable minds could conclude that the Government proved beyond a reasonable doubt that Mr. Terry possessed the Smith & Wesson in furtherance of a drug trafficking crime and is guilty of the offense at Count V of the Superseding Indictment. *Iglesias*, 535 F.3d at 157 (finding that a rational juror could have easily concluded that the defendant possessed a firearm in furtherance of drug-trafficking activities on facts similar to those before this Court).

Indeed, just as with the previous counts, in the Court's opinion, the evidence of Mr. Terry's guilt at Count V is strong. Further, the Court finds that Mr. Terry's additional arguments regarding Count V (ECF Nos. 226, 245, 259) do not alter the Court's holding in any way. Accordingly, the Court denies Mr. Terry's Motions (ECF Nos. 226, 245) to the extent that he seeks a judgment of acquittal at Count V of the Superseding Indictment.

In sum, the Court denies Mr. Terry's Motion for Judgment of Acquittal in full. (ECF Nos. 226, 245). Having considered all of the Government's evidence and Mr. Terry's arguments, the Court concludes that rational minds could deem Mr. Terry guilty of the offenses at Counts I, II, III, and V of the Superseding Indictment beyond a reasonable doubt.

### B.    The Court Denies Mr. Terry's Motion for a New Trial Pursuant to Rule 33

The Court now turns its attention to Mr. Terry's Motion for a New Trial Pursuant to Rule 33 of the Federal Rules of Criminal Procedure. Mr. Terry raises seven assignments of error allegedly occurring before, during, and after the jury trial in this matter. The Court examines each of Mr. Terry's seven arguments in turn.[8]

#### 1.   Mr. Terry's First Argument is Unavailing

##### a.     The Parties' Arguments

In his first assignment of error, Mr. Terry argues that his Fifth Amendment Due Process Clause rights were violated when he "stood trial on an indictment which the Government knew was at least partially based on perjured material when [Agent] Simpson … knowingly testified to information that he knew was either false and/or was intentionally misleading to the Grand Jury." (ECF No. 245 at 2) (citing ECF No. 231 at 129–147). Specifically, Mr. Terry argues that Agent Simpson's testimonies before the Grand Jury indicating that Mr. Terry took responsibility for the firearm and the drugs in the hidden compartment of the Ford Taurus constituted perjury. (ECF No. 259 at 1–3). Mr. Terry further contends that without "Agent Simpson's false testimony, the

---

[8] It is not completely clear whether all of Mr. Terry's seven assignments of error relate to his Motion for a Judgment of Acquittal or his Motion for a New Trial. (ECF Nos. 226, 245). Therefore, the Court stresses that although it considers his seven assignments of error in this subsection, it has considered all of Mr. Terry's arguments in resolving each of Mr. Terry's Motions. (ECF Nos. 226, 245). Upon doing so, the Court finds that it is appropriate to deny Mr. Terry's Motions at ECF Nos. 226 and 245 in full.

[G]rand [J]ury is unlikely to have indicted" because, at each convening of the Grand Jury in this case, the Jury was concerned about whether Mr. Terry took responsibility for the firearm and the drugs in the hidden compartment. (*Id.* at 2). Therefore, pursuant to the Ninth Circuit's decision in *United States v. Basurto*, 497 F.2d 781, 786 (9th Cir. 1974), Mr. Terry argues that this Court should reverse his conviction. (*Id.* at 4–5).

In response, the Government first asserts that the Third Circuit "has not formally adopted the *Basurto* test and … the Third Circuit … has only once cited *Basurto* in an Opinion (a non-precedential one)." (ECF No. 254 at 8). Second, the Government argues that Agent Simpson's testimony before the Grand Jury did not constitute perjury because his understanding of Mr. Terry's statement to Trooper Marmol was that Mr. Terry was "'taking ownership of everything found in the vehicle, to include the cocaine and the gun.'" (*Id.* at 9–10) (quoting ECF No. 231 at 147–148). The Government therefore contends that while his testimony before the Grand Jury "could have perhaps been more precise, his testimony did not include any falsehood and … Agent Simpson did not offer any false testimony with knowledge of its falsity." (*Id.* at 11). Finally, the Government argues that even if Agent Simpson's testimony "were false, it was not material. There was substantial additional evidence presented to the [G]rand [J]ury … from which [it] could find probable cause to return the Superseding Indictment." (*Id.*).[9]

### b.    Legal Standard

In *Basurto*, the "Ninth Circuit held that a defendant's Fifth Amendment rights are violated when he must stand trial on an indictment which (1) the Government knows is based partially

---

[9] Mr. Terry also argues that Agent Marmol presented false testimony. (ECF No. 226 at 4). However, he does not refer the Court to any instance in the record where that allegedly false testimony occurred. (ECF Nos. 226, 245, 259). Therefore, the Court finds that this argument is unavailing.

on perjured testimony, (2) the perjured testimony is material, and (3) jeopardy has not attached."

*United States v. Liciardello*, 93 F. Supp. 3d 365, 367 (E.D. Pa. 2015) (citing *Basurto*, 497 F.2d at 785).

The "Ninth Circuit later noted that evidence of perjured testimony must go beyond mere

speculation, and suggested that the defendant must show that the Government had a reason to

believe the testimony was perjured." *Id.* (citing *United States v. Claiborne*, 765 F.2d 784, 792 (9th

Cir. 1985), *abrogation on other grounds recognized by United States v. Hernandez*, 312 F. App'x 937,

938 (9th Cir. 2009)).

While some circuits have adopted *Basurto* in part, others have declined to decide whether

to adopt the Ninth Circuit's rule from *Basurto* because the facts would not warrant relief in any

event. *Id.* For its part, the Third Circuit has only cited *Basurto* one time—in a non-precedential

opinion. *See id.*

### c.    Relevant Testimonies

Agent Simpson testified before the Grand Jury on October 16, 2018, regarding Trooper

Marmol stopping the Ford Taurus on April 4, 2018. (*See* ECF No. 231 at 129:1–13). During that

Grand Jury testimony, Agent Simpson stated the following: "Yes, Trooper Marmol interviews

[Mr.] Terry and asks him about what was found in the hidden compartment, and he admits to

those being his, the gun and the suspected cocaine." (Defendant's Exhibit A at 11:5–8; ECF No.

215 at 3). Later, Agent Simpson told the Grand Jury that Mr. Terry "accepted responsibility for

the drugs and the gun." (Defendant's Exhibit A at 17:2–3; ECF No. 215 at 3).

Agent Simpson again testified before the Grand Jury on July 9, 2019. (ECF No. 231 at

137:16–18). During that testimony, Agent Simpson stated the following: "Yes, Trooper Marmol

interviews [Mr.] Terry and asks him about what was found in the hidden compartment, and he

admits to those being his, the gun and the suspected cocaine." (Defendant's Exhibit E at 13:8–11; ECF No. 215 at 3). Further, Agent Simpson stated that Mr. Terry "admitted that the firearm and cocaine [were] his property." (Defendant's Exhibit E at 16:2–5; ECF No. 215 at 3).

For his part, Trooper Marmol testified at trial that after he arrested Mr. Terry, Mr. Terry stated that "he was responsible for the vehicle and that he borrowed the vehicle." (ECF No. 230 at 122:5–9). However, Trooper Marmol also testified that Mr. Terry did not say that he was taking responsibility for any drugs or a firearm. (*Id.* at 122:13–18). Further, Trooper Marmol stated that he did not remember telling Agent Simpson that Mr. Terry took responsibility for the hidden compartment, firearm, and drugs. (*Id.* at 122:19–21). Indeed, Trooper Marmol testified that Mr. Terry did not specifically take responsible for the hidden compartment, firearm, and drugs. (*Id.* at 123:14–17).

When Agent Simpson was asked at trial to explain his understanding of the statement that Mr. Terry gave to Trooper Marmol after his arrest, Agent Simpson testified that he understood Mr. Terry to be "taking ownership of everything found in the vehicle, to include the cocaine and the gun." (ECF No. 231 at 147:23–148:1). Agent Simpson had this understanding because: (1) Mr. Terry "advised Trooper Marmol that he would take responsibility for everything in the vehicle" and (2) the three kilograms of cocaine and the gun were found inside the vehicle. (*Id.* at 148:2–9).

### d. Analysis

In this case, this Court does not need to decide whether to adopt *Basurto* because even if that rule applied, the Court finds that Agent Simpson did not offer perjured testimony at either convening of the Grand Jury. Indeed, having examined the relevant testimonies above, the Court

agrees with the Government that Agent Simpson's testimonies could have perhaps been more precise, (ECF No. 254 at 11), but the Court cannot find that Agent Simpson perjured himself. *United States v. Rodriguez*, 88 F. App'x 548, 548–49 (3d Cir. 2004) (affirming the District Court's denial of the motion to dismiss the indictment pursuant to *Basurto* where the District Court found that neither of the witnesses identified by the defendant perjured themselves before the Grand Jury).

With respect to Agent Simpson's testimony about the drugs and the gun in the hidden compartment, Trooper Marmol testified that Mr. Terry told him that he was responsible for the vehicle. (ECF No. 230 at 122:5–9). And Trooper Marmol testified that he found the approximately 2,995 grams of a mixture and substance containing a detectable amount of methamphetamine and cocaine and the gun *inside the same vehicle for which Mr. Terry took responsibility. See supra* Section IV.A.1. Therefore, the Court finds that Agent Simpson's Grand Jury testimonies that Mr. Terry took responsibility for the drugs and the gun constituted a reasonable deduction from the evidence that Agent Simpson had at his disposal. As a corollary, the Court finds that Agent Simpson's testimonies were not false, and they certainly were not *willfully* false. Accordingly, the Court holds that Agent Simpson did not offer perjured testimony regarding the drugs or the gun during either convening of the Grand Jury. *Cf. United States v. Jabateh*, 974 F.3d 281, 300 (3d Cir. 2020) (explaining that the elements of perjury in violation of 18 U.S.C. § 1621(1) are "1) willfully 2) ma[king] a false statement 3) under oath 4) before a tribunal or officer 5) about a material matter"); *Perjury*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("The act or an instance of a person's deliberately making material false or misleading statements while under oath …").

-34-

Further, even if Agent Simpson had willfully testified falsely before the Grand Jury, the Court seriously doubts whether Mr. Terry would be entitled to the relief he now seeks. That is because the Court would be prone to find that the events at trial negated any constitutional error that occurred during either convening of the Grand Jury.

Indeed, in *Talamante v. Romero*, 620 F.2d 784, 789–91 (10th Cir. 1980), the Tenth Circuit held that perjured testimony before a grand jury was immaterial where: (1) the perjury was recanted at trial, (2) the individual whose location was relevant to the perjured testimony was exhaustively examined at trial, and (3) the jury found the defendant guilty after a full trial. *Id.* ("We consider the perjured testimony immaterial. The perjury was recanted at trial. [The individual whose location was relevant to the perjured testimony] was exhaustively examined. The record establishes that [the defendant's] conviction was not affected by the perjured testimony. Even if the perjured testimony had been brought to the attention of the grand jury, it seems highly unlikely, in view of the petit jury's later finding of guilt after a full trial, that the grand jury would have failed to indict based on probable cause. Such negates the inference of constitutional error.") (internal citation omitted). Similarly, here: (1) Agent Simpson explained, at trial, what Trooper Marmol did and did not write in his report, the nature of his Grand Jury testimony, and the basis for that testimony, (ECF No. 231 at 129–48); (2) Trooper Marmol fully explained, at trial, exactly what Mr. Terry said to him following the traffic stop, (ECF No. 230 at 122–23); and (3) the Government presented very strong evidence at trial that led the jury and the Court to find Mr. Terry guilty of the offenses at Counts I, II, III, and V, even after hearing Agent Simpson and Trooper Marmol explain exactly what Mr. Terry said following his arrest. *See supra* Section IV.A. Therefore, even if Agent Simpson had offered perjured testimony during either convening of the

Grand Jury, the Court would be prone to find that the events that occurred at trial negated the inference of any constitutional error. *Talamante*, 620 F.2d at 790–91.

Finally, the Court notes that Mr. Terry cites to a broad portion of Agent Simpson's testimony when arguing that he perjured himself before the Grand Jury. (ECF No. 245 at 2) (citing ECF No. 231 at 129–47). The Court has examined the entirety of Agent Simpson's testimony to which Mr. Terry cites, and the Court finds that all of that testimony: (1) was not false, (2) was not willfully false, (3) was not material, or (4) some combination of the foregoing.

Accordingly, the Court holds that Mr. Terry's request for relief based on Agent Simpson's testimonies before the Grand Jury is unavailing, and the Court will deny his Motions at ECF Nos. 226 and 245 to the extent that he seeks relief based on those testimonies.

### 2. Mr. Terry's Second Argument is Unavailing

#### a.   The Parties' Arguments

In his second assignment of error, Mr. Terry argues that, in the Government's closing, it "improperly argued for the jury to consider Trooper Marmol and Agent Simpson's employment, occupation, and position in life as law enforcement officers[.]" (ECF No. 245 at 10) (citing ECF No. 232 at 118–19, 152–55). Mr. Terry contends that, as a result of these statements by the Government, the "jury's verdict of guilt in Counts [I] and [II], and the determination that [Mr. Terry] knew or was involved in a conspiracy was irrational and based on suspicion or conjecture and/or bias and/or ill will against [Mr. Terry] and a propensity to believe law enforcement[.]" (ECF No. 226 at 5).

In response, the Government cites Third Circuit precedent indicating that "'in order for vouching to be improper, the prosecutor's assurance of a witness's credibility must be based on

either the prosecutor's personal knowledge, or other information not contained within the record.'" (ECF No. 254 at 30) (quoting *United States v. Weatherly*, 525 F.3d 265, 271 (3d Cir. 2008) (citation omitted)). The Government further notes that in *Weatherly*, the Third Circuit "found that the statement of the prosecutor was proper 'because it was a reasonable response to allegations of perjury' by the Defendant's attorney.'" (*Id.*) (citing *Weatherly*, 525 F.3d at 272). Therefore, the Government asserts that it did not engage in improper vouching because its "remarks during closing argument were based on facts entered into evidence and were furthermore proper and justified because [Mr. Terry] claimed that the officers and agents involved in the case had lied." (*Id.* at 31). Finally, the Government contends that even if it did engage in improper vouching, that vouching was harmless. (*Id.*).

In Mr. Terry's Reply, he again argues that the Government "inappropriately used its office to defend the credibility of government witnesses." (ECF No. 259 at 17). Further, Mr. Terry asserts that the "Government's defense that [he] opened the door fails. The 'Invited [R]esponse' doctrine doesn't apply." (*Id.*).

### b.    Legal Standard

As the "Supreme Court explained in *United States v. Young*, 'a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial.'" *United States v. Harris*, 471 F.3d 507, 512 (3d Cir. 2006) (quoting 470 U.S. 1, 11 (1985)). With "respect to improper vouching, two criteria must be met: '(1) the prosecutor must assure the jury that the testimony of a Government witness is credible; and (2) this assurance [must be] based on either the prosecutor's personal knowledge,

or other information not contained in the record.'" *Id.* (quoting *United States v. Walker*, 155 F.3d 180, 187 (3d Cir. 1998)).

When a defendant does not object to allegedly improper vouching during trial, the Third Circuit reviews such a claim under the plain error standard. *Id.* at 512–13.[10] Under plain error review, courts may grant relief if: (1) an error was committed, (2) that error was plain, and (3) the error affected substantial rights. *Id.* at 511. An error is a "'deviation from a legal rule.'" *Id.* (quoting *United States v. Russell*, 134 F.3d 171, 180 (3d Cir. 1998)). It "is 'plain' when it is 'clear under current law.'" *Id.* (quoting *United States v. Olano*, 507 U.S. 725, 734 (1993)). And "it affects substantial rights when it is prejudicial, i.e., it affects the outcome of the district court proceedings." *Id.* (internal quotation marks and citation omitted). "Even if these requirements are satisfied, the court should only exercise discretion to grant relief in those circumstances in which a miscarriage of justice would otherwise result." *Id.* (internal quotation marks and citation omitted).

### c.   Analysis

The Court finds that Mr. Terry's argument on this issue is unavailing for two reasons.

First, the statements that Mr. Terry references from the prosecutor's closing argument were based on evidence in the record and were therefore proper. Indeed, Mr. Terry's argument on this issue centers on the following two statements made by the prosecutor during his closing argument: (1) "The judge will instruct you on the factors that you're to consider when determining a witness's credibility; but, broadly speaking, your question is: Do I believe Trooper Marmol, a nine-year member of the Pennsylvania [Safe Highway Initiative through Effective Law

---

[10] Mr. Terry does not assert that he objected to the vouching at trial, (ECF Nos. 226, 245, 259), and the Court is not aware of him having done so.

Enforcement Detection ("SHIELD")] Unit? Or do I believe [Mr.] Terry?" and (2) "[I]f you have doubts that these [exhibits] were something that was created out of full cloth by Agent Simpson for the specific purpose of incriminating [Mr.] Terry, Agent Simpson who's been with the FBI for over ten years," who had "stations in Newark prior to coming to Johnstown, if you believe that Agent Simpson would risk his entire career to copy, paste, edit PDF documents and create falsified evidence, then, by all means, compare it to the original." (ECF No. 245 at 10) (citing ECF No. 232 at 118–19, 152–55). But Trooper Marmol testified that he was a State Police Officer who had been a member of the SHIELD unit for almost six years as of the trial in this matter.[11] (ECF No. 230 at 36–37). And Agent Simpson testified that: (1) he had been a member of the FBI for approximately fourteen years as of the trial in this matter and (2) he had previously been assigned to the FBI's office in Newark. (ECF No. 231 at 6–8). Therefore, the Court finds that the prosecutor did not engage in improper vouching in this case because his comments were based on evidence in the record. *Weatherly*, 525 F.3d at 271–72 (holding that the "statements by the prosecutor in this case were proper because they were based on evidence in the record" and noting that "the average juror could easily infer that a police officer who conspired with another officer to deliberately fabricate evidence and perjured himself in open court while testifying under oath in an official capacity would risk at least *some* sort of disciplinary action.") (emphasis in original).

Second, even if the prosecutor had engaged in improper vouching, the Court would still find that that vouching did not lead to a "miscarriage of justice" requiring reversal because of: (1) this Court's jury instructions, (2) the strength of the Government's evidence, and (3) the particular

---

[11] The Court finds that the prosecutor's mistaken comment that Trooper Marmol was a member of the SHIELD unit for nine years rather than six years is immaterial.

nature of the prosecutor's comments. *Harris*, 471 F.3d at 512–13. Indeed, in this case, the Court "gave clear instructions to the jury regarding the evidentiary value of statements by lawyers, the jury's exclusive role in making determinations of credibility, and the weight of [law enforcement] testimony relative to that of other evidence." *Id.* at 513; (ECF No. 232 at 163–64, 165, 172–73). Further, as the Court noted above, *see supra* Section IV.A, the Government's evidence in this case was very strong. Finally, the prosecutor's comments regarding Trooper Marmol and Agent Simpson's positions and experience were isolated and "made in response to [Mr. Terry's] allegations that" certain of their assertions were not true. *Harris*, 471 F.3d at 512–13; (ECF No. 232 at 75–76). Therefore, even if the prosecutor had engaged in improper vouching, the Court would find that his comments did not constitute "the kind of miscarriage of justice that would require reversal." *Harris*, 471 F.3d at 513 (internal quotation marks and citation omitted).

Accordingly, the Court holds that Mr. Terry's second assignment of error is unavailing and denies his Motions at ECF Nos. 226 and 245 to the extent that he seeks relief based on that alleged error.

### 3. Mr. Terry's Third Argument is Unavailing

#### a.     The Parties' Arguments

Mr. Terry's third argument is that his rights to due process and a fair trial were violated when the prosecutor stated, in his closing, that the "jury could view and inspect the Government's [E]xhibits 22 [and] 24–26[,] that were discs entered into evidence over [Mr. Terry's] objections limited to chain of custody purposes." (ECF No. 226 at 5). Indeed, Mr. Terry contends that the Court precluded the jury from viewing these discs, and he was prejudiced by the prosecutor stating that the jury could view them. (ECF No. 245 at 5–6).

In response, the Government asserts that Mr. Terry did not object to these statements during trial, meaning that this issue is analyzed under plain error review. (ECF No. 254 at 18). The Government argues that the Court "did not err in allowing the [prosecutor's] statement in closing" because Mr. Terry "'opened the door' to the jury's consideration of the contents of the full extractions and reports." (*Id.* at 19). Further, the Government contends that even if the Court did err in allowing those statements, that error was not plain. (*Id.*).

In his Reply, Mr. Terry asserts that the Government's error "negatively affected the outcome of the trial, as it bolstered the authenticity and credibility by asserting verification could be conducted knowing it could not have been. Prejudice resulted even if the jury did not request to see the exhibits when the power of the government told them they could." (ECF No. 259 at 10). Further, Mr. Terry argues that prosecutorial misconduct, "including improper statements made during a closing argument, merits reversal under the plain error standard when the record reveals 'egregious error or a manifest miscarriage of justice.'" (*Id.* at 11) (quoting *United States v. Brennan*, 326 F.3d 176, 182 (3d Cir. 2003)). And Mr. Terry argues that there was an "egregious error or a manifest miscarriage of justice" in this case. (*Id.*).

b.      **Legal Standard**

The Fifth Amendment's "Due Process Clause secures a defendant's right to a fair trial." *Gov't of the V.I. v. Mills*, 821 F.3d 448, 456 (3d Cir. 2016). When "confronted with a claim that a prosecutor's remarks violated this right, [courts] first determine whether those remarks constituted misconduct." *Id.* Courts then determine "whether that misconduct so infected the trial with unfairness as to make the resulting conviction a denial of due process, taking into account the entire proceeding." *Id.* (internal quotation marks and citation omitted). In conducting this

inquiry, courts consider "'the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant.'" *United States v. Welshans*, 892 F.3d 566, 574 (3d Cir. 2018) (quoting *Moore v. Morton*, 255 F.3d 95, 107 (3d Cir. 2001)). "Mere misconduct is not grounds for a reversal." *United States v. Mack*, 629 F. App'x 443, 445–46 (3d Cir. 2015) (finding that, even if the Government had committed misconduct, that misconduct did not unfairly prejudice the Defendant where the District Court instructed the jury that statements of attorneys are not evidence and the weight of the evidence against the Defendant was overwhelming).

Further, where, as in this case,[12] a defendant "did not object to prosecutorial misconduct at trial, [courts] review for plain error." *Mills*, 821 F.3d at 456. As the Court noted above, under this standard of review, "'before [a] court can correct an error not raised at trial, there must be (1) error (2) that is plain and (3) that affects substantial rights.'" *Id.* (quoting *Johnson v. United States*, 520 U.S. 461, 466–67 (1997)). "In the ordinary case, an error affects substantial rights when it affected the outcome of the [district] court proceedings." *Id.* at 456–57 (internal quotation marks and citation omitted). If these "conditions are met, [courts] may exercise … discretion to remedy the error, but only if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 457 (internal quotation marks and citation omitted).

c.     **Relevant Statements by the Court and the Prosecutor**

---

[12] Mr. Terry offers no argument that he objected to the Government's statement(s) regarding Exhibits 22 and 24–26 at trial, (ECF Nos. 226, 245, 259), and the Court is unaware of him having lodged such an objection at trial. Further, Mr. Terry argues that the Government's statement(s) during closing argument constituted plain error, (ECF No. 259 at 11), indicating his implicit agreement that this issue is governed by the plain error standard at this juncture. Therefore, the Court finds that plain error review applies to this assignment of error.

As the Court noted earlier, Mr. Terry's argument on this issue centers around the Government's Exhibits 22 and 24–26. (ECF No. 226 at 5; ECF No. 245 at 5–6).

With respect to the Government's Exhibits 22 and 24–26, the Court stated that it would admit those Exhibits for the purpose of showing chain of custody, and the Court further stated that they would not be displayed to the jury, at least as of the time that it made its ruling on their admissibility. (ECF No. 230 at 178–83, 193–97). Indeed, in response to the Government's argument that Mr. Terry was asserting that the Government had tampered with evidence in Exhibits 22 and 24–26, the Court stated the following:

> At this time we would not permit [the Exhibits] to go out to the jury, and at this time we would not permit it to be published to the jury, subject to later developments which are perhaps fair or raise issues that should be in some form published to the jury; but that's—at this point in time we don't need to do that.

(*Id.* at 196–97).

In his closing argument, and apparently with reference to the Government's Exhibits 22 and 24–26 (and potentially additional exhibits), the prosecutor stated that:

> If you so choose, if you have any doubts about the authenticity of the items included in the presentation by the Government, you can compare them directly to the information from the source. So I tell you don't be distracted by these claims of manufactured evidence. You have the ability to compare and see for yourself if you so choose.

(ECF No. 232 at 121–22).

Finally, the prosecutor stated that he believed the jury would, and maybe they should "have an opportunity to compare those [E]xhibits if you have questions about them." (*Id.* at 154:12–19).

### d.    Analysis

Here, the Court finds that the prosecutor's statements regarding the jury viewing Government's Exhibits 22 and 24–26 likely constituted minor misconduct. Although the Government argues that Mr. Terry raised the issue of tampering, meaning that the prosecutor's statements were simply responses to Mr. Terry's assertions, the Government does not point to a ruling by the Court that the jury could in fact view Government's Exhibits 22 and 24–26 (or portions thereof). (ECF No. 254). In the absence of such a ruling, the prosecutor committed a misstep by stating that the jury could view those Exhibits. *Cf. Kinard v. Palakovich*, No. 05-CV-2804, 2006 WL 3366168, at *18 (E.D. Pa. Nov. 16, 2018) (calling a prosecutor's comment inviting the jury to draw an inference that exceeded the evidence in the record "inartful[,]" but also finding that that comment did not violate due process).

However, the Court finds that this misconduct did not render Mr. Terry's convictions a denial of due process. Indeed, the prosecutor's conduct in this case was not at all severe because: (1) it consisted of two quite brief statements, *see supra* Section IV.B.3.c; (2) the Court did indicate a willingness to reconsider the issue of letting the jury view portions of Exhibits 22 and 24–26 in the event that Mr. Terry continued to question whether they were altered, *see id.*; and (3) Mr. Terry did challenge the truthfulness of the law enforcement officer(s) working with Exhibits 22 and 24–26. (*See* ECF No. 232 at 75–76). Further, the Court instructed the jury that the statements of lawyers are not evidence. (*Id.* at 163:21–164:1); *Welshans*, 892 F.3d at 577 (noting that juries are presumed to follow their instructions). And the evidence against Mr. Terry was very strong. *See supra* Section IV.A. Finally, the jury did not request to see Government's Exhibit 22, 24, 25, or 26. (ECF No. 232 at 198–213). Therefore, the Court finds that the potentially minor prosecutorial misconduct in this case does not warrant a new trial—the prosecutor's statements did not unfairly

prejudice Mr. Terry, and they likewise did not make his convictions a denial of due process. *Mack*, 629 F. App'x at 446. As a corollary, the Court finds that the prosecutor's minor misstep did not affect Mr. Terry's substantial rights. *See Mills*, 821 F.3d 460–65.

Accordingly, the Court holds that Mr. Terry's third assignment of error is unavailing and denies his Motions at ECF Nos. 226 and 245 insofar as he seeks relief based on that assignment of error.

### 4.   Mr. Terry's Fourth Assignment of Error is Unavailing

#### a.        The Parties' Arguments

In his fourth assignment of error, Mr. Terry argues that:

> [H]e was denied due process and a fair trial, because there was juror bias, misconduct and/or collusion that contributed to his guilty verdict, in that on August 26, 2022, hours after the jurors were dismissed, [his] family observed three jurors approaching the courthouse with flowers, but upon seeing the family, the jurors continued to walk past the courthouse.

(ECF No. 226 at 7).

In response, the Government asserts that the "legal standard for obtaining a hearing on a claim of juror misconduct is a high one: 'while the evidence of juror misconduct need not be literally incontrovertible to warrant a hearing, it still must constitute clear, strong, and substantial evidence of a specific, nonspeculative impropriety.'" (ECF No. 254 at 33) (quoting *United States v. Noel*, 905 F.3d 258, 274 (3d Cir. 2018)). The Government contends that that standard is not met in this case. (*Id.*).

In his Reply, Mr. Terry argues that it is:

> [C]lear, strong and substantive evidence when hours after the jurors were dismissed, while [Mr. Terry] awaited the bench trial verdict, three different jurors with no identified connection walked together with flowers toward the

courthouse, as though they are going to reward someone associated with the court. Yet, when they observe [Mr. Terry's] family outside of the court building, they continue together past the court building.

(ECF No. 259 at 18). Mr. Terry asserts that this evidence requires a hearing. (*Id.*) (citing *Waldorf v. Shuta*, 3 F.3d 705, 710–13 (3d Cir. 1993)).

b.    **Analysis**

To obtain a hearing relative to a claim of juror misconduct, a movant must offer allegations that "rise to the level of clear, strong, substantial and incontrovertible evidence that a specific, nonspeculative impropriety has occurred." *United States v. Nucera*, 67 F.4th 146, 162–63 (3d Cir. 2023) (internal quotation marks and citation omitted); *see also United States v. Gilsenan*, 949 F.2d 90, 97 (3d Cir. 1991) ("We are always reluctant to haul jurors in after they have reached a verdict in order to probe for potential instances of bias, misconduct or extraneous influences. As we have said before, post-verdict inquiries may lead to evil consequences: subjecting juries to harassment, inhibiting jury room deliberation, burdening courts with meritless applications, increasing temptation for jury tampering and creating uncertainty in jury verdicts.") (quoting *United States v. Ianniello*, 866 F.2d 540, 543 (2d Cir. 1989) (internal quotation marks and citation omitted)).

The Court finds that Mr. Terry's allegations do not warrant a hearing in this case. Indeed, Mr. Terry's assertions on this issue constitute no more than threadbare speculation that there was juror bias. *United States v. Claxton*, 766 F.3d 280, 300–01 (3d Cir. 2014) (concluding that the district court did not abuse its discretion in denying the defendant's motion for a new trial and declining to hold an evidentiary hearing where the defendant offered "speculation" that juror misconduct occurred). Mr. Terry's assertion that the jurors were bringing flowers to someone at the courthouse is wholly unsubstantiated. (ECF Nos. 226, 245, 259). The jurors could have just as

-46-

easily been walking past the courthouse with the flowers as walking to the courthouse with the flowers.

Further, as a general matter, the Court conducted an extensive voir dire of all of the prospective jurors in this case, and the Court watched the jurors carefully during trial. Having witnessed the jury's conduct in this matter, the Court has every confidence that the jurors who returned the guilty verdict on Counts I and II were attentive, appropriately applied the law, and acted without bias.

Therefore, given the highly speculative nature of Mr. Terry's assertions of juror misconduct, the Court denies his request for a hearing, as well as his Motions at ECF Nos. 226 and 245 to the extent that he seeks relief on the basis of that alleged juror misconduct.

### 5. Mr. Terry's Fifth Assignment of Error is Unavailing

#### a. The Parties' Arguments

In his fifth assignment of error, Mr. Terry contends that while Agent Simpson was admitted as an expert in drug trafficking and coded language, he was "permitted to render opinions outside of the scope of his expertise and within the province of the factfinder, including but not limited to:" (1) the identity of cellphone users and subscribers, (2) the identity of a person sending a text, (3) that the photographs containing cocaine were taken with an iPhone, (4) an opinion that Mr. Terry used the iPhone, and (5) an opinion on the metadata on the Government's exhibits. (ECF No. 245 at 6) (citing ECF No. 230 at 6–7, 15; ECF No. 231 at 19, 32–33, 45–46, 49–50, 73, 75–76, 78, 150). Indeed, Mr. Terry argues that Agent Simpson rendered impermissible expert testimony because he entered the province of the trier of fact. (*Id.* at 14). Specifically, he asserts that an "expert may not render an opinion about either intent or mental state or on the conclusion

of an element charged or a defense." (*Id.*) (citing *United States v. Dunn*, 846 F.2d 761, 762 (D.C. Cir. 1988)).

In response, the Government contends that Agent Simpson's testimony at trial fell within his areas of expertise in "'drug trafficking and coded language.'" (ECF No. 254 at 26) (quoting ECF No. 231 at 19). Further, the Government argues that even if some portion of Agent Simpson's testimony was improper lay witness opinion testimony, the Court's error in permitting that testimony was harmless in light of the other evidence presented at trial. (*Id.* at 26–27).

In his Reply, Mr. Terry asserts that he "contemporaneously objected to Agent Simpson's testimony" and that there is a "reasonable probability that the verdicts rendered in this case were influenced by Agent Simpson's improper testimony resulting in a prejudicial conviction." (ECF No. 259 at 12). Further, Mr. Terry contends that Agent Simpson's testimony that Mr. Terry used the iPhone was improper lay opinion testimony because it merely told the jury what result to reach. (*Id.* at 13–14).

b.    **Legal Standard**

It is well-established that "a district judge has a 'general gatekeeping obligation' with respect to all testimony based on specialized knowledge of some form." *United States v. Williams*, 974 F.3d 320, 358 (3d Cir. 2020) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999)). Under Federal Rule of Evidence 702, a district judge must ensure that "such testimony is both reliable and relevant, including under the standard laid down in Rule 403." *Id.* (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 594–95 (1993)). Further, under Federal Rule of Evidence 704(a), an opinion by an individual offering expert testimony "is not objectionable just because it embraces an ultimate issue." FED. R. EVID. 704(a). However, in a criminal case, a district judge

"must … ensure that 'an expert witness [does] not state an opinion about whether [a] defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense.'" *Williams*, 974 F.3d at 358 (quoting FED. R. EVID. 704(b)). Finally, the "permissible scope of expert testimony is quite broad, and District Courts are vested with broad discretion in making admissibility determinations." *Hill v. Reederei F. Laeisz G.M.B.H., Rostock*, 435 F.3d 404, 423 (3d Cir. 2006).

The standard of review for objected-to evidentiary rulings is abuse of discretion. *United States v. Wheeler*, No. 16-3780, 2021 WL 4129731, at *5 (3d Cir. Sept. 10, 2021).[13] An "abuse of discretion occurs only where the district court's decision is arbitrary, fanciful, or clearly unreasonable—in short, where no reasonable person would adopt the district court's view." *United States v. Green*, 617 F.3d 233, 239 (3d Cir. 2010) (internal quotation marks and citation omitted). However, "even erroneous rulings only require a new trial if the ruling affects a 'substantial right of the party[.]'" *United States v. Friedman*, 658 F.3d 342, 352 (3d Cir. 2011) (quoting FED. R. EVID. 103(a)). An "error in an evidentiary ruling is harmless error when it is highly probable that the error did not affect the result." *Id.* (internal quotation marks and citation omitted). Indeed, errors are harmless when a reviewing court can "have a sure conviction that the error did not prejudice the defendant," and the Third Circuit will not reverse an evidentiary ruling under harmless error review "when the other evidence in the record of the defendant's guilt is overwhelming." *United States v. Evdokimow*, 726 F. App'x 889, 896 (3d Cir. 2018) (internal quotation marks and citations omitted). Finally, when a witness offers improper testimony

---

[13] The Court notes that Mr. Terry did object to Agent Simpson's testimony on at least certain of the occasions that are relevant to this assignment of error. By way of example, he objected to "Agent Simpson interpreting the metadata" from the iPhone. (ECF No. 231 at 75:20–23).

regarding evidence in the record, but when the jury can review that evidence and would all but certainly reach the same conclusion as the witness, the witness's improper testimony constitutes harmless error. *Wheeler*, 2021 WL 4129731, at *7; *cf. United States v. Fattah*, 914 F.3d 112, 177 (3d Cir. 2019) (holding that it was harmless error for the district court to allow the prosecutor to make a certain inquiry when there was other evidence in the record that made it "highly probable" that the jury would have reached the same result even without the improper inquiry).

      c.      **Analysis**

In this case, the Court permitted Agent Simpson to give opinion testimony with regard to the field of drug trafficking and drug trafficking coded language. (ECF No. 231 at 19:12–19). Mr. Terry did not object to Agent Simpson offering such testimony. (*Id.* at 19:5–11). Further, as the Government laid the foundation for Agent Simpson to give expert testimony in the field of drug trafficking and drug trafficking coded language, the prosecutor asked Agent Simpson about his experience in "cases involving the analysis of communications of drug traffickers that are later found on [a] cellular phone[.]" (*Id.* at 17:5–9). In response, Agent Simpson testified to the following:

> [S]o the buildup for a lot of these wiretap investigations requires a lot of historical background. So a lot of times we'll end up arresting lower level distributors underneath, you know, the main targets that we're looking to investigate.
>
> And then we'll seize their phones, we'll get search warrants for their phones, and then we'll go through their phones to understand, you know, who they're talking to, we'll start learning their language, how they're texting their street level distributors or users, so we'll learn how they, you know, communicate the narcotic, how they communicate the amounts. We'll also see some text communications with their, you know, suppliers or higher level distributors.

In addition, we'll look for images on those phones and videos to try and—you know, sometimes they'll post pictures of the actual drugs that they are, you know, distributing.

(*Id.* at 17:10–25).[14]

Although the Court does not presently enumerate each line of testimony by Agent Simpson to which Mr. Terry objects, the Court has reviewed every such portion of Agent Simpson's testimony, and the Court finds that the entirety of that testimony fell squarely within the permissible scope of Agent Simpson's expert testimony in the fields of drug trafficking and drug trafficking coded language. (ECF No. 230 at 6–7, 15; ECF No. 231 at 19, 32–33, 45–46, 49–50, 73, 75–76, 78, 150); *Hill*, 435 F.3d at 423 ("[The] permissible scope of expert testimony is quite broad, and District Courts are vested with broad discretion in making admissibility determinations."). Further, the Court finds that none of Agent Simpson's testimony violated Rule 704(b) because Agent Simpson did not offer an opinion regarding "whether [Mr. Terry] did or did not have a mental state or condition that constitutes an element of the crime[s] charged or of a defense." (ECF No. 230 at 6–7, 15; ECF No. 231 at 19, 32–33, 45–46, 49–50, 73, 75–76, 78, 150); FED. R. EVID. 704(b). In short, the Court found Agent Simpson's testimony at trial to fall squarely within the scope of the testimony that he was qualified to offer under the Federal Rules of Evidence, and the Court adheres to that finding at this time.

---

[14] Agent Simpson also testified at trial that he had become familiar "with looking at cellphone extraction and just gleaning basic information, meaning did this communication come to the cellphone or did it come from the cellphone, basic information like that[.]" (ECF No. 231 at 46:4–13). Further, the Court overruled an objection by Mr. Terry regarding Agent Simpson testifying about certain metadata from cellphones. (*Id.* at 46:18–47:1) ("I'll permit the question based on the fact that it's not expert testimony regarding metadata, but just basically being able to glean whether something is sent or received[.]").

Further, even if the Court had erred in admitting certain portions of Agent Simpson's testimony, the Court would decline to grant Mr. Terry's request for a new trial because the Court finds it all but certain that the jury would reach the same conclusions that Agent Simpson reached upon reviewing the evidence that he referenced. *Wheeler*, 2021 WL 4129731, at *7. Indeed, by way of example, the jury could review the photograph of Mr. Terry's identification card, which was sent from the iPhone, as well as the other evidence that the Government offered tending to show Mr. Terry's ownership, possession, and use of that phone. *See supra* Section IV.A.1. Upon doing so, the Court finds it highly probable that the jury would conclude that Mr. Terry used and possessed the iPhone. The Court finds it highly probable that the jury would then take that evidence, couple it with the photograph of the cocaine on the iPhone and the testimony of Mr. Dillard, as well as the rest of the Government's evidence, and find Mr. Terry guilty of the offenses at Counts I and II beyond a reasonable doubt, all without the aid of Agent Simpson's testimony on these issues.[15] Likewise, even in the absence of this testimony by Agent Simpson, the Court would deem Mr. Terry guilty of the offenses at Counts III and V beyond a reasonable doubt. Therefore, the Court finds that it is highly probable that any error that it made in permitting any portion(s) of Agent Simpson's testimony did not affect the result of the trial in this matter.

Accordingly, the Court finds Mr. Terry's fifth assignment of error unavailing, and the Court denies his Motions at ECF Nos. 226 and 245 to the extent that he seeks relief based on that assignment of error.

### 6.  Mr. Terry's Sixth Argument is Unavailing

---

[15] The Court also notes that Mr. Terry admitted that the Samsung Galaxy found in the Ford Taurus on April 4, 2018, was his. (ECF No. 232 at 15:14–18, 21:6–9).

a.        **The Parties' Arguments**

In his sixth assignment of error, Mr. Terry contends that the Government violated Federal Rule of Evidence 404(b) because it improperly argued propensity when it referenced a "hidden compartment in another vehicle that was not of the same triggers, location, or complexity" as the hidden compartment in the Ford Taurus. (ECF No. 245 at 9) (citing ECF No. 232 at 9–46, 48–49, 63–82, 101–09). Relatedly, Mr. Terry asserts that in its closing, the Government violated Rule 404(b) when it "improperly argued the jury should consider [Mr. Terry's] propensity for committing the offenses based on Government Exhibits 31 through 34." (*Id.* at 10–11) (citing ECF No. 230 at 161–62; ECF No. 231 at 70–71; ECF No. 232 at 126–27).

In response, the Government notes that Mr. Terry's contention on this ground is based on "three portions of the [trial] transcript related to a text message conversation found on the iPhone wherein the user of the iPhone, whom the Government argued is [Mr.] Terry, indicated his knowledge of the storage of a firearm in a hidden compartment in a vehicle." (ECF No. 254 at 32). The Government asserts that it presented this information "through testimony and referenced it in its closing argument for a permissible purpose—to prove Mr. Terry's knowledge of vehicle traps, and the identity of the owner of the firearm found in the vehicle trap in this case (and thus, the possessor of the drugs found there, as well)." (*Id.*). Finally, the Government argues that the jury in this case was not made aware of the fact that Mr. Terry has a prior felony conviction, meaning that his possession of the firearm was not itself a "bad act." (*Id.* at 32 n.17).

In his Reply, Mr. Terry again contends that the Government improperly argued Rule 404(b) "evidence of [his] character and propensity to carry a firearm, sell drugs, and to use vehicles with a trap." (ECF No. 259 at 17).

### b.      Legal Standard

Federal Rule of Evidence 404(b) provides that "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." FED. R. EVID. 404(b)(1). However, evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." FED. R. EVID. 404(b)(2). "'Rule 404(b) is a rule of general exclusion … That is, Rule 404(b) directs that evidence of prior bad acts be excluded—*unless* the proponent can demonstrate that the evidence is admissible for a non-propensity purpose.'" *United States v. Wright*, 534 F. Supp. 3d 384, 399 (M.D. Pa. 2021) (quoting *United States v. Repak*, 852 F.3d 230, 240 (3d Cir. 2017) (emphasis in original)). The threshold inquiry "'a court must make before admitting similar acts evidence under Rule 404(b) is whether that evidence is probative of a material issue other than character.'" *Id.* at 400 (quoting *Huddleston v. United States*, 485 U.S. 681, 686 (1988)).

Rule 404(b) "carries 'no presumption of admissibility.'" *Id.* (quoting *United States v. Caldwell*, 760 F.3d 267, 276 (3d Cir. 2014)). Admissibility of other-acts evidence under Rule 404(b) therefore requires the proponent to show that the evidence is: "(1) offered for a proper purpose under Rule 404(b)(2); (2) relevant to that purpose; (3) sufficiently probative under the Rule 403 balancing requirement; and (4) accompanied by a limiting instruction, if requested." *United States v. Davis*, 726 F.3d 434, 441 (3d Cir. 2013). All "this really means is that such evidence must have a nonpropensity purpose and satisfy the same relevancy requirements as any other evidence." *Id.*

A "district court should apply 'care and precision … in ruling on the admission of prior act evidence for a non-propensity purpose' and, if admitting the evidence, must 'articulate

reasons why the evidence also goes to show something other than character … The reasoning should be detailed and on the record[.]'" *Wright*, 534 F. Supp. 3d at 400 (quoting *Caldwell*, 760 F.3d at 277)).

With respect to the first step in the inquiry (i.e., whether the evidence is offered for a proper purpose under Rule 404(b)(2)), the Court must determine "'whether the evidence is probative of a material issue other than character.'" *United States v. Davis*, No. 2:14-CR-271, 2016 WL 3406056, at *3 (W.D. Pa. June 21, 2016) (quoting *United States v. Boone*, 279 F.3d 163, 187 (3d Cir. 2002)). To determine "whether an 'identified purpose is at issue, courts should consider the material facts the government must prove to obtain a conviction.'" *Id.* (quoting *Caldwell*, 760 F.3d at 276). Indeed, the "specific purpose must be 'of consequence in determining the action.'" *Id.* (quoting *Campbell*, 760 F.3d at 276).

At the second step of the analysis, "the government must 'explain how the evidence is relevant' to, or how it tends to establish, the identified non-propensity purpose.'" *Id.* (quoting *Caldwell*, 760 F.3d at 276). To "be relevant, proffered evidence must fit into a 'chain of inferences— a chain that connects the evidence to a proper purpose, no link of which is a forbidden propensity inference.'" *Repak*, 852 F.3d at 243 (quoting *Davis*, 726 F.3d at 442). "'[T]his chain [must] be articulated with careful precision because, even when a non-propensity purpose is at issue in a case, the evidence offered may be completely irrelevant to that purpose, or relevant only in an impermissible way.'" *Id.* (quoting *Caldwell*, 760 F.3d at 281).

Finally, as the Court has previously noted, "as with other non-constitutional trial errors, the improper admission of evidence does not require reversing a conviction it if is 'highly probable that the error did not contribute to the judgment.'" *United States v. Cross*, 308 F.3d 308,

326 (3d Cir. 2002) (quoting *United States v. Tyler*, 281 F.3d 84, 101 n. 26 (3d Cir. 2002)). Under the

"highly probable" standard, there is no "need to disprove every reasonable possibility of

prejudice." *Id.* at 326–27 (internal quotation marks and citation omitted) (finding harmless error

where the cumulative, inadmissible evidence may have prejudiced the defendants, but where the

Third Circuit could "confidently say that it [was] 'highly probable' that the superfluous evidence

made no difference in the ultimate verdict of the jury" given the overwhelming evidence in the

case, among other factors).

      c.    **Analysis**

      Mr. Terry's argument on this issue centers on two categories of evidence that the

Government offered during trial. (ECF No. 245 at 9–11).[16] The first category of evidence is

comprised of four photographs that were captured by the iPhone and that were addressed in this

Court's August 19, 2022, Memorandum Order. (ECF No. 205 at 5–8; ECF No. 207 at 13–17; ECF

No. 232 at 126–27; ECF No. 245 at 10–11). In that Memorandum Order, the Court denied Mr.

Terry's Motion to exclude these four photographs, finding that they were admissible at trial under

Federal Rule of Evidence 404(b). (ECF No. 207 at 13–17). Mr. Terry has provided the Court with

no reason to depart from its prior finding of admissibility, (ECF Nos. 226, 245, 259), and the Court

is not aware of such a reason. Further, having examined the Government's discussion of those

four photographs in the portion of the trial transcript to which Mr. Terry cites, (ECF No. 232 at

126–27), the Court finds that the Government's argument at trial regarding the four photographs

---

[16] The Court has examined each portion of the transcript that Mr. Terry cites relative to his sixth assignment of error, (ECF Nos. 245, 259), and the Court finds that the only two potentially relevant categories of prior act evidence contained within those portions of the transcript are the two categories that the Court outlines in the text above. Therefore, the Court confines its analysis on this issue to those two categories of evidence.

was appropriate. Therefore, with respect to this first category of evidence, the Court finds Mr. Terry's sixth assignment of error unavailing.

The second category of evidence that Mr. Terry references is the Government's Exhibit 32AA. (Government's Exhibit 32AA; ECF No. 215 at 3; ECF No. 245 at 10–11). That Exhibit shows a text message sent from the iPhone on March 2, 2018, reading: "If you take the thing off the radio where I put my pistol it would come on[.]". (Government's Exhibit 32AA). During trial, Agent Simpson noted that Trooper Marmol found a firearm in the Ford Taurus on April 4, 2018, and he further noted that, from his own law enforcement experience, "you can remove [radios] and store things behind those radios. They can be set up as traps." (ECF No. 231 at 71:1–7). The prosecutor also referenced this text message during his cross examination of Mr. Terry. (ECF No. 232 at 72:24–73:2). Finally, the prosecutor referenced this text message during his closing argument:

> Members of the jury, what do you see in this conversation? Well, what you see is that the user of the iPhone, whom we've established as [Mr.] Terry, indicates that he's familiar with vehicle traps, "If you take the thing off the radio," and that he has access to and ownership of a pistol, "where I put my pistol it would come on." Kind of like the pistol that was found in the hidden trap in the Ford Taurus.

(*Id.* at 126:8–16).

With respect to this second category of evidence, Mr. Terry orally moved for its exclusion during trial. (ECF No. 224 at 1). For the reasons set forth in the Court's August 30, 2022, Memorandum Order, the Court denied Mr. Terry's request and deemed this evidence admissible under Rule 404(b). (*Id.* at 3–5). Mr. Terry offers no reason why the Court should depart from its prior holding on this issue, (ECF Nos. 226, 245, 259), and the Court is not aware of such a reason.[17]

---

[17] Indeed, the Court briefly outlines why this evidence is admissible to show: (1) Mr. Terry's knowledge of vehicle traps, (2) the identity of the owner of the firearm found in the hidden compartment in the Ford Taurus, and (3) the fact that Mr. Terry had the opportunity to be the individual who possessed that firearm.

At the outset, the Court notes that the issue of who possessed the items in the hidden compartment in the Ford Taurus was the central issue in this case, and resolution of that issue directly informs whether Mr. Terry was guilty of the offenses with which he was charged because his knowing possession of the item(s) in the hidden compartment is a recurring element of those offenses.

With that reality in view, the Court first reaffirms its earlier finding that Mr. Terry's prior text message does indicate his knowledge of vehicle traps generally, which is a permissible purpose for prior act evidence under Rule 404(b), and his knowledge of vehicle traps generally is relevant to the highly material issue of whether he knowingly possessed and controlled the items in the hidden compartment in the Ford Taurus. FED. R. EVID. 404(b)(2). Second, Mr. Terry's general knowledge of vehicle traps does make it more likely that Mr. Terry knew of and used the hidden compartment in the Ford Taurus, which, in turn, makes it more likely that Mr. Terry used and possessed the drugs and the gun therein. Indeed, the Court has no indication that most members of the general public know much about vehicle traps. Mr. Terry's knowledge on this score therefore puts him in a limited category of people who could be aware of and use such traps, making it more likely that he used the one in the Ford Taurus, regardless of whether the vehicle trap Mr. Terry referenced in his text message was completely identical to the one in the Ford Taurus. *Davis*, 726 F.3d at 443 (noting that evidence of past drug distribution is relevant to prove knowledge of a different drug in a later possession trial). Third, this evidence has fairly high probative value insofar as it makes it more likely that Mr. Terry knowingly possessed the items in the hidden compartment in the Ford Taurus, which goes directly to whether he committed all (or some) of the offenses at Counts I, II, III, and V. Further, while this evidence does indicate that Mr. Terry engaged in an unorthodox activity and is therefore potentially unfairly prejudicial, that risk of unfair prejudice does not substantially outweigh the fairly high probative value of this evidence. Accordingly, this evidence was admissible under Rule 403, especially because the Court gave a jury instruction regarding the proper use of this evidence at trial. (ECF No. 232 at 175–76).

Turning to Mr. Terry's identity as the individual possessing the items in the hidden compartment of the Ford Taurus, the Court reaffirms its earlier finding that the fact that Mr. Terry possessed a gun in a hidden compartment in a vehicle one month before the traffic stop is relevant to showing the identity of the individual who possessed the gun and the drugs in the hidden compartment in the Ford Taurus, which is a permissible use for this evidence under Rule 404(b) and relates directly to the central issue in this case. FED. R. EVID. 404(b)(2). Second, the fact that Mr. Terry knowingly possessed a gun in a hidden compartment in a vehicle approximately one month before the traffic stop is relevant because it makes it more likely that he knew of the gun in the hidden compartment in the Ford Taurus and that *he* was the individual who possessed that gun. Third, the probative value of this evidence is somewhat high because it has a tendency to make it more likely that Mr. Terry was responsible for the items in the hidden compartment of the Ford Taurus. And the risk of unfair prejudice was mitigated in this case because the jury did not know of Mr. Terry's prior felony conviction when it heard this evidence. Accordingly, the Court finds that the risk of unfair prejudice from this evidence does not substantially outweigh its probative value, meaning that this evidence was admissible under Rule 403.

Finally, the Court turns its attention to whether the text message demonstrates that Mr. Terry had the opportunity to possess the firearm in the hidden compartment in the Ford Taurus. First, the Court finds that Mr. Terry's possession of a firearm approximately one month before the traffic stop does relate to whether Mr. Terry had the opportunity to possess the firearm in the hidden compartment of the Ford Taurus one month later, which is a permissible purpose under Rule 404(b) and is relevant to the highly material issue of whether he did in fact possess the firearm in the hidden compartment. FED. R. EVID. 404(b)(2). Second, the fact that Mr. Terry had access to and possession of a firearm in March 2018 makes it

Therefore, the Court reaffirms its holding that the evidence in the Government's Exhibit 32AA was admissible at trial.[18]

Further, the Court finds that even if it erred in admitting this second category of evidence, thereby leading to a degree of prejudice against Mr. Terry, that error was harmless in light of the overwhelming evidence at trial. *Cross*, 308 F.3d at 326–27. Indeed, setting aside the Government's Exhibit 32AA and the related testimony and argument, there was very strong evidence, such as the other text messages and pictures on the phones and the testimony of Mr. Dillard, upon which the jury and the Court could find Mr. Terry guilty of the offenses at Counts I, II, III, and V beyond

---

more likely that he had the opportunity to possess a firearm approximately one month later. Third, this evidence has fairly high probative value insofar as it makes it more likely that Mr. Terry possessed the firearm in the hidden compartment of the Ford Taurus. On the other hand, because the jury did not know of Mr. Terry's prior felony conviction when it heard evidence of the text message in the Government's Exhibit 32AA, the risk of unfair prejudice to Mr. Terry from this evidence was fairly low. Therefore, the Court finds that the risk of unfair prejudice from this evidence does not substantially outweigh its probative value, and it was admissible under Rule 403.

Finally, the Court reiterates that it gave a jury instruction regarding the proper use of this Rule 404(b) evidence at trial. (ECF No. 232 at 175–76).

[18] The Court makes one brief clarifying point relative to its August 30, 2022, Memorandum Order. In that Order, the Court wrote that the "jury ha[d] no basis for drawing the forbidden inference of propensity from the messages because the Court ha[d] not allowed it to learn of [Mr.] Terry's felony conviction. Insofar as the gun is evidence of a prior bad act, the jury would have no way of recognizing it as such. The risk of the jury inferring propensity here is negligible." (ECF No. 224 at 4). By way of clarification, the Court notes that it is not only prior *bad* act evidence that falls within the ambit of Rule 404(b). *Ansell v. Green Acres Contracting Co., Inc.*, 347 F.3d 515, 520 (3d Cir. 2003) ("The evidence admitted in this case differs from garden variety Rule 404(b) matter because it is evidence, not of a prior bad act in a criminal case, but of a subsequent good act in a civil case. Nonetheless, this evidence is encompassed by the plain text of Rule 404(b) which addresses 'other … act[s,]' not just prior bad acts.") (quoting FED. R. EVID. 404(b)). Indeed, the Court now notes that its prior point that the jury could not necessarily infer a prior *bad* act from Mr. Terry's possession of the firearm was true. However, the fact that his possession of the firearm was not a prior bad act did not take that evidence out of the operation of Rule 404(b). Even so, the Court adheres to its previous ruling that the evidence in Exhibit 32AA and the related testimony and argument were admissible under Rule 404(b).

a reasonable doubt.[19] Therefore, the Court finds that it is highly probable that any error by the Court in admitting this second category of evidence did not contribute to the judgment—any error by the Court was harmless beyond a reasonable doubt.

Accordingly, for all of the foregoing reasons, the Court finds Mr. Terry's sixth assignment of error unavailing and denies his Motions at ECF Nos. 226 and 245 insofar as he seeks relief on that basis.

### 7.   Mr. Terry's Seventh Assignment of Error is Unavailing

In Mr. Terry's seventh assignment of error, he asserts that in the prosecutor's closing argument, he "improperly argued the metadata was sufficient evidence when there was no qualified testimony to authenticate the metadata of the evidence." (ECF No. 245 at 11) (quoting ECF No. 231 at 45–47, 75–76, 78; ECF No. 232 at 127).

The Court finds this objection unavailing. With respect to authenticating the metadata, SFE Sarvey testified regarding the process by which he extracted the data from the Samsung Galaxy and the iPhone, including the metadata, (ECF No. 230 at 177–86), and the Court has previously explained how a reasonable jury could find that the data that the Government presented at trial was the data extracted directly from those phones. *See supra* Section IV.A.2.a.iii. Further, the Court has examined the portion of the prosecutor's closing argument to which Mr. Terry refers, (ECF No. 232 at 127), and the prosecutor did not assert that the metadata alone is a

---

[19] The Court stresses that it has not considered the evidence in the Government's Exhibit 32AA and the related testimony and argument while weighing the sufficiency of the Government's evidence in this case. Throughout this Memorandum Opinion and Order, when the Court has referenced "the other evidence that the Government produced at trial" or the like, the Court has excluded from its consideration the evidence in the Government's Exhibit 32AA and the related testimony and argument.

sufficient basis upon which to convict Mr. Terry. Therefore, the Court denies Mr. Terry's Motions at ECF Nos. 226 and 245 to the extent that he seeks relief based on this assignment of error.

Before concluding, the Court notes that Mr. Terry argues that the cumulative effect of the alleged errors before, during, and after trial should lead this Court to grant him relief. (ECF No. 245 at 11; ECF No. 259 at 18–19). However, because the Court has found that there was only one error at trial (the prosecutor's minor misstep relative to the Government's Exhibits 22 and 24–26), and because that error alone does not warrant granting Mr. Terry's request for relief, the Court finds that Mr. Terry's argument regarding cumulative errors likewise does not warrant granting his request for relief.

## V.    Conclusion

Therefore, for the reasons set forth above, the Court denies Mr. Terry's Motions at ECF Nos. 226 and 245.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case No. 3:18-cr-24 |
| | ) | |
| v. | ) | JUDGE KIM R. GIBSON |
| | ) | |
| JOHN T. TERRY, | ) | |
| | ) | |
| Defendant. | ) | |

<u>ORDER</u>

**AND NOW**, this \_\_11th\_\_ day of July, 2023, upon consideration of Defendant John T. Terry's "Omnibus Post-Trial Motion for Judgment of Acquittal and/or Motion for a New Trial" (ECF No. 226) and "Amended Omnibus Post-Trial Motion for Judgment of Acquittal, or in the Alternative, Motion for a New Trial[,]" (ECF No. 245), and for the reasons set forth in the accompanying Memorandum Opinion, **IT IS HEREBY ORDERED** that the Motions at ECF Nos. 226 and 245 are **DENIED.**

BY THE COURT

_____
KIM R. GIBSON
UNITED STATES DISTRICT JUDGE